# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                                  :
STUDENT FINANCE CORPORATION,                            :
                    Debtor.         :
                              :
_____ :
CHARLES A. STANZIALE, JR.,                              :
CHAPTER 7 TRUSTEE OF STUDENT                            :   Civil Action No. 04-1551 (JJF)
FINANCE CORPORATION,                                    :
                    Plaintiff,      :
       v.                                            :
                              :
PEPPER HAMILTON LLP, et al.                             :
               Defendants.      :

**SUR-REPLY MEMORANDUM OF LAW OF CHARLES A. STANZIALE, JR.,
CHAPTER 7 TRUSTEE OF STUDENT FINANCE CORPORATION, IN RESPONSE TO
REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS OF PEPPER
HAMILTON LLP AND ITS PARTNER W. RODERICK GAGNÉ**

Dawn Zubrick (4327)
DILWORTH PAXSON LLP
First Federal Plaza
Suite 500
Wilmington, DE 19801
(302) 571-9800

James J. Rodgers
Derrick A. Dyer
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103

*Special Litigation Counsel for Plaintiff, Charles A.
Stanziale, Jr., Chapter 7 Trustee of Student
Finance Corporation*

Of Counsel:
SCHWARTZ, TOBIA, STANZIALE,
BECKER, ROSENSWEIG & SEDITA, P.A.
22 Cresmont Road
Montclair, NJ 07042

00594922_1

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | The Trustee Has Standing To Assert General Claims Of Creditors | 1 |
| III. | The Trustee Has Standing To Assert Aiding And Abetting Claims | 4 |
| IV. | Additional Discovery Is Necessary To Determine If The Sole Actor Exception Is Applicable | 5 |
| V. | Conclusion | 7 |

## TABLE OF AUTHORITIES

### CASES

*Caplin v. Marine Midland Grace Trust Co.*,
  406 U.S. 416 (1972)                                                                    1, 2

Cedarbrook Plaza, Inc. v. Gottfried,
  1997 U.S.Dist.Lexis 8026 (E.D. Pa. 1997)                                              2

*Dana Molded Prods. Inc. v. Brodner*,
  58 B.R. 576 (N.D.Ill. 1986)                                                            5

*Delgado Oil Co., Iinc. v. Torres*,
  785 F.2d 857 (10th Cir. 1986)                                                          4

*In re Bridge*,
  18 F.3d 195 (3d Cir. 1994)                                                             4

*In re Ozark Restaurant Equip. Co.*,
  816 F.2d 1222 (8th Cir. 1987), cert. den'd 484 U.S. 848                               1, 2, 3

*In re Stein*
  314 B.R. 306 (D.N.J. 2004)                                                             4

*Koch Refining v. Farmers Union Central Exchange, Inc.*
  831 F,2d 1339 (7th Cir. 1987)                                                          2, 3, 4

*Lowell Staats Min. Co., Inc. v. Philadelphia Elec. Co.*,
  878 F.2d 1271 (10th Cir. 1989)                                                         5

*PHP Liquidating, LLC v. Robbins*,
  291 B.R. 603 (D.Del. 2003)                                                             3, 5

*St. Paul Fire and Marine Insurance Co. v. Pepsico, Inc.*,
  884 F.2d 688 (2d Cir. 1989)                                                            3

*Wooten v. Loshbough*,
  951 F.2d 768 (7th Cir. 1991)                                                           4

### STATUTES

11 U.S.C. § 544                                                                          1, 2, 3, 4

11 U.S.C. §544(b)                                                                        3

## Introduction

On February 25, 2005, the Pepper Defendants filed their Reply Brief in Support of Motion to Dismiss. In that Reply Brief, the Pepper Defendants misconstrue the law as it relates both to a trustee's ability to assert general causes of action and the to application of the sole actor exception to the in pari delicto doctrine. Since the legal arguments were not raised until the Pepper Defendants Reply Brief, the following memorandum therefore seeks to correct several instances of the Pepper Defendants' misapplication of law.

### The Trustee Has Standing To Assert General Claims of Creditors.

The Pepper Defendants wrongly claim that the Trustee has no standing to assert even general claims of creditors under §544 of the Bankruptcy Code. They rely on a string of cases in which trustees sought to assert specific claims of creditors, or claims in which the estate has suffered no harm, none of which are applicable here. Absent support in relevant case law, the Pepper Defendants purport to invoke the legislative history of §544 to support their position, a position that is contrary to the law of this district and the plain, unambiguous language of §544.

In support of their position, the Pepper Defendants rely on *In re Ozark Restaurant Equip. Co.*, 816 F. 2d 1222 (8th Cir. 1987), *cert. den'd*, 484 U.S. 848, 108 S.Ct. 147 (1987). Ozark espouses a minority position that is not controlling in this Circuit and, as such, does not control here. In *Ozark*, the Eighth Circuit relied heavily on *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972). *Caplin*, unlike the present matter, involved a trustee in a reorganization attempting to pursue the individual claims of certain specific creditors. The Supreme Court determined that the claims were specific and personal to those creditors and therefore the trustee did not have standing to pursue those claims.[1] The *Ozark* court expanded the holding of *Caplin*

---

[1] The amount of the claims to which the trustee sought recovery was $4.3 million when the debtor's total liabilities were $60 million. In contrast, in the present matter, the Trustee seeks recovery for all claimants.

in determining that a trustee cannot assert even general claims applicable to all creditors of the estate. In expanding *Caplin*, the Eighth Circuit reasoned that Congress had the opportunity to overrule *Caplin* when enacting the current version of the Bankruptcy Code, but did not do so. Further, while the House version of §544 did include a provision that would allow a trustee to pursue causes of action on behalf of creditors, the final version of §544 did not. The Eighth Circuit reasoned in *Ozark* that since Congress did not adopt this provision, by negative implication Congress intended to expand *Caplin's* limited prohibition against a trustee bringing creditor-specific actions to a broad prohibition against a trustee asserting general causes of action on behalf of all creditors.

 *Ozark*'s broad reading of *Caplin* is not supported by the language of *Caplin* and, as other courts have noted, *Ozark's* reasoning regarding the legislative history of §544 is flawed. The holding of *Caplin* is limited: a trustee cannot maintain an action owned by and specific to a creditor or sub-set of creditors. *Koch Refining v Farmers Union Central Exchange, Inc.*, 831 F. 2d 1339, 1348 n.11 (7th Cir. 1987). Because of its overbroad reading of *Caplin, Ozark* remains the minority view and its reasoning has been rejected by the Fourth, Fifth, Seventh, and Tenth Circuits. *See Cedarbrook Plaza, Inc. v. Gottfried*, 1997 U.S. Dist. Lexis 8026 (E.D. Pa. 1997) (collecting cases), attached hereto as Exhibit A. The Seventh Circuit expressly distinguished *Ozark* and rejected *Ozark's* flawed analysis of §544 legislative history in determining that a trustee *does* have the ability to assert general claims on behalf of creditors: "The omission [from the Code] does not affect a trustee's right to bring a general action on behalf of all creditors rather than a personal one on behalf of only some." *Koch*, 831 F. 2d at 1348 n.11. The Seventh

Circuit in *Koch*, as with the majority of circuits presented with the issue, also found *Caplin* limited to attempts to assert specific causes of action.[2]

More importantly, *Ozark* is not controlling in the District of Delaware. The Pepper Defendants ignore this Court's holding in *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603 (D.Del. 2003). In *PHP*, this Court followed both *Koch* and *St. Paul Fire and Marine Insurance Co. v. Pepsico, Inc.*, 884 F.2d 688 (2d Cir. 1989) in determining that a trustee *__does__* have standing to assert general claims creditors *__under §544__*. In *PHP*, a liquidating administrator, created pursuant to a confirmed chapter 11 plan, commenced an action to recover the proceeds of an allegedly illegal stock redemption transaction, based on Section 160 of the Delaware General Corporation Law, purportedly as assignee from certain creditors. Judge Joseph Farnan granted a motion to dismiss, holding that the liquidating administrator did not acquire standing to assert the claims as an assignee, but rather that the claim for recovery of the proceeds of the improper stock redemption were general claims that may be asserted only by the trustee or debtor-in-possession, citing § 544(b) of the Bankruptcy Code. 291 B.R. at 609.

Recognizing the substantial case law holding that a trustee may assert general claims of creditors, the Pepper Defendants attempt to restrict a trustee's ability to assert general claims to claims that are alter ego in nature. In *St. Paul*, the court rejected the Pepper Defendants' argument. "[C]ongress intended to protect all creditors by making the trustee the proper person to assert claims against the debtor. This reasoning extends to common claims against . . . others who have misused the debtor's property." 884 F.2d at 701. Thus, as *PHP* and *St. Paul* make

---

[2] Royal Indemnity Co., the largest single creditor of the estate, has recently filed a motion for leave to file an amended counterclaim/third-party complaint, including the addition of the Pepper Defendants, in the pending case of *MBIA Insurance Corp., et al v. Royal Indemnity Co.*, C.A. No. 02-1294-JJF (D. Del.), thus asserting those specific claims which Royal contends it has against the Pepper Defendants.

clear, and contrary to the Pepper Defendants' assertions, a trustee is not limited under §544 to asserting alter ego claims.

While it is clear in this jurisdiction that a "[t]rustee is the only party who can sue to represent the interests of the creditors as a class," *In re Stein*, 314 B.R. 306, 311 (D.N.J. 2004), the Pepper Defendants cite *In re Bridge*, 18 F.3d 195, 198 (3d Cir. 1994) for the proposition that §544 does no more than define the trustee's position over rival creditors, in an attempt to salvage their argument. *Bridge*, however, is inapposite. *Bridge* did not involve a trustee asserting authority to sue under §544. Rather, *Bridge* involved the battle of priority between a trustee and a creditor. There is no discussion in *Bridge* as to the trustee's authority to assert an action under §544.

### The Trustee Has Standing To Assert Aiding And Abetting Claims

The cases cited by the Trustee illustrate that, notwithstanding the position of the Pepper Defendants, where creditors of the estate would not have a cause of action but for their status as creditors, the trustee is empowered as the sole authority to assert the action. *See Wooten v. Loshbough*, 951 F.2d 768, 770 (7th Cir. 1991) (Trustee had exclusive standing to assert judgment creditor's RICO claim against corporation looted by officers and third-party accounting firm for personal gain); *Koch,* 831 F.2d at 1351-52 (7th Cir. 1987) (Creditors of bankrupt corporation did not have standing to assert alter ego action against corporate fiduciaries because claim was derivative of corporation); *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857, 861 (10th Cir. 1986).

The Pepper Defendants attempt to misconstrue the Trustee's allegations as limited to a claim of aiding and abetting the insolvent SFC's breach of duty to its creditors.[3]    In fact, the Trustee also alleges that the Pepper Defendants aided and abetted officers and directors of SFC

---

[3]  The Pepper Defendants contend that it is the Trustee's allegation that SFC that actually breached its fiduciary duty to creditors.

in breaching their fiduciary duties *to SFC* itself (*e.g.,* Complaint ¶¶249, 255), a claim for which the Trustee clearly has standing. Even if the Trustee's claim were limited to aiding the breach of duty to creditors generally, he has standing to bring such a claim.

A corporation acts through its officers, directors, and agents. *Lowell Staats Min. Co., Inc. v. Philadelphia Elec. Co.*, 878 F.2d 1271 (10th Cir. 1989). The Trustee contends that certain directors of SFC breached their fiduciary duties to creditors, which arose upon the insolvency of SFC. The Trustee has alleged that the Pepper Defendants aided that breach of fiduciary duty. The harm which the Trustee seeks to remedy arose only because all creditors of SFC have been harmed. *See Dana Molded Prods. Inc. v. Brodner*, 58 B.R. 576, 579 (N.D. Ill. 1986) (trustee had exclusive standing to bring RICO claim against fiduciary of corporation for fraudulent transfers of creditors' money because creditors' injury is derivative of harm to corporation). The Trustee's claim for aiding and abetting breach of fiduciary duty is a general claim, derivative of the estate, and therefore the Trustee is the sole party that may assert the claim. *PHP Liquidating*, 291 B.R. at 610.

### Additional Discovery Is Necessary To Determine If The Sole Actor Exception Is Applicable.

The Trustee has alleged that the "adverse interest" exception to the in pari delicto defense is applicable. The Pepper Defendants contend that the sole actor exception to the adverse interest rule is applicable. That the sole actor exception is applicable, they contend, is "belied by the Trustee's own allegations." Pepper Reply Brief, at 17. Specifically, the Pepper Defendants point to paragraph 23 of the Complaint, which provides that "Yao was SFC's sole shareholder, and its Chief Executive Officer and treasurer," but omit the temporal predicate to that statement: "Immediately prior to the Filing Date...."

The Trustee's allegations regarding the Pepper Defendants are not limited to the period immediately prior to the filing date. Yao was not the sole shareholder at all times. Indeed, as alleged in paragraph 77, members of Pepper partner Gagne's family also owned stock in SFC at pertinent times. Moreover, while Yao may have been SFC's sole shareholder, Chief Executive Officer and treasurer as of the filing date, he may not have been the sole decision maker of the corporation. Rather, as the Trustee has alleged, there were other persons that may have affected the decisions of SFC. At minimum, the Trustee's allegations, which must be accepted as true for purposes of the Pepper Defendants' motions, require discovery regarding the roles of these parties to determine the applicability of the sole actor exception.

## Conclusion

For the foregoing reasons, as well as the reasons described in the Response of Charles A. Stanziale, Jr., Chapter 7 Trustee of Student Finance Corporation, In Opposition to the Motion to Dismiss of Pepper Hamilton LLP, the Trustee requests that this Court deny the Pepper Defendants' Motion to Dismiss.

Dated: March 16, 2005

Dawn Zubrick (No. 4627)
DILWORTH PAXSON LLP
First Federal Plaza, Suite 500
Wilmington, DE 19801
(302) 571-9800

James J. Rodgers
Derrick A. Dyer
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, Pennsylvania 19103
(215) 575-7000

Special Counsel to Charles A. Stanziale, Jr.,
Chapter 7 Trustee of Student Finance Corporation

Of Counsel:
SCHWARTZ, TOBIA, STANZIALE, BECKER, ROSENSWEIG & SEDITA, P.A.
22 Cresmont Road
Montclair, NJ 07042

# EXHIBIT A

LEXSEE

## CEDARBROOK PLAZA, INC. v. JEFFREY GOTTFRIED

### CIVIL ACTION NO. 97-1560

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1997 U.S. Dist. LEXIS 8026; Bankr. L. Rep. (CCH) P77,404*

**June 4, 1997, Decided**

**June 6, 1997, FILED, ENTERED**

**DISPOSITION:** [*1] Defendant's Motion to Dismiss the Complaint (Doc. No. 2) and Plaintiff's Memorandum in Opposition thereto (Doc. No. 3), IT IS HEREBY ORDERED THAT: 1. Defendant's Motion is GRANTED IN PART AND DENIED IN PART. 2. Defendant's Motion is DENIED with respect to Count I. 3. Defendant's Motion is GRANTED with respect to Count II. 4. Defendant's Motion is GRANTED with respect to Cedarbrook's attempt to assert a claim for alter ego liability against Gottfried. 5. Count II of the Complaint is DISMISSED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CEDARBROOK PLAZA, INC., PLAINTIFF: DAVID SMITH, JEANNETTE M. BRIAN, SCHNADER, HARRISON, SEGAL & LEWIS, PHILA, PA USA.

For JEFFREY GOTTFRIED, DEFENDANT: DANIEL S. BERNHEIM, 3RD, SILVERMAN, COOPERSMITH, HILLMAN AND FRIMMER, PHILA, PA USA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION:**

### MEMORANDUM

**Padova, J.**

June 4, 1997

Plaintiff, Cedarbrook Plaza, Inc. ("Cedarbrook") brings this action against Defendant Jeffrey Gottfried, alleging breach of contract, violations of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. Ann. § § 5101-5110 (West Supp. 1997), and fraudulent transfer under common law. Gottfried submits, for the Court's consideration, [*2] a motion to dismiss Cedarbrook's Complaint for failure to state a claim upon which relief can be granted, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the following reasons, Gottfried's Motion will be granted in part and denied in part.

#### I. Factual Allegations

##### A. The Lease and Guaranty

The Complaint alleges the following facts, which the Court must consider true for purpose of adjudicating Gottfried's Motion. Gottfried is the sole shareholder and CEO of National Furniture Warehouse, Inc., t/a "Furniture to Go" ("National"). On June 27, 1995, National entered into a Lease and Security Agreement ("Lease") with Cedarbrook to lease 24,000 square feet of retail space at the Cedarbrook Plaza shopping center in Wyncote, Pennsylvania.

Section 11.01 of the Lease lists the "Events of Default," which include, inter alia, the following:

> (a) If Tenant defaults in the payment of any rent, including but not limited to Fixed Minimum Rent and additional rent, or any other charges due hereunder for five (5) days after the same is due. Notwithstanding anything to the contrary,

Case 1:04-cv-01551-JJF   Document 44-2   Filed 09/16/2005   Page 13 of 21

Page 2

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

on no more than two (2) occasions in any twelve (12) month period, Tenant shall be provided [*3] with five (5) days notice of default and opportunity to cure the default before Landlord shall exercise its remedies hereunder, unless to do so would seriously jeopardize the health, safety or welfare of the Shopping Center of any Tenant herein.

(Compl. Ex. A at 21). Section 11.04 allows acceleration upon default:

Upon occurrence of any Event of Default, all Fixed Minimum Rent and additional rent and other charges that would otherwise have been due periodically throughout the Term (or extended term) of the Lease had there been no Event of Default, shall be automatically accelerated and all such rent, charges and amounts shall be immediately due and payable by Tenant to Landlord, and, to the extent not paid on demand, shall bear daily interest thereon at the higher of (a) the rate of sixteen percent (16%) per annum or (b) highest rate of interest allowable by law (hereinafter referred to as "Default Interest").

(Compl. Ex. A at 23). Section 11.05(e) contains a warrant of attorney provision empowering any attorney to confess judgment against National for sums due under the Lease, including "accelerated rent." (See Compl. P 8; Ex. A at 24-25). Finally, the Lease [*4] imposes the following obligation on Gottfried, as sole shareholder of National:

Guarantor, Jeffrey Gottfried ("Guarantor") hereby unconditionally and irrevocably guarantees and shall be a surety for the monetary obligations of the Tenant hereunder, as and only as follows:

* * *

(ii) Guarantor also irrevocably guarantees and serves as surety with respect to the obligation of the Tenant to keep the Leased Premises stocked with a full inventory of new merchandise, owned outright by Tenant and unencumbered with any lien or encumbrance superior to that of the Landlord, which full inventory must have a wholesale fair market value of at least $ 300,000.00. Upon monetary

default and following all applicable cure periods, and in the event that such inventory is not in the Leased Premises, Guarantor shall be obligated to and shall promptly pay to Landlord on demand the difference between $ 300,000.00 and the amount of inventory actually in the Leased Premises. In the event that any of said inventory is encumbered with a lien superior to that of Landlord, then Guarantor shall be obligated to and shall promptly pay Landlord on demand the amount so encumbered by the superior lien.

[*5]

(Compl. Ex. A at 36) ("Guaranty").

### B. Cedarbrook's Initial Lawsuit Against National

The lease commenced November 1, 1995, and Cedarbrook extended rent abatements and cash incentives to National through September, 1996. Despite these abatements, National defaulted on its rent obligations in April, 1996, and, to date, has failed to pay its rent. As required by § 11.01(a) of the Lease, Cedarbrook notified National of its default on two separate occasions, June 10, 1996 and September 30, 1996, demanding National to cure. (See Compl. PP 9-11; Ex. B; Ex. C).

Acting within its rights as articulated in the warrant of attorney provision, § 11.05(e), Cedarbrook filed a complaint against National in confession of judgment in this Court for sums owed by National in the amount of $ 4,296,382.88 ("Initial Lawsuit"). On October 10, 1996, the Court entered judgment by confession against National in the Initial Lawsuit. See Cedarbrook Plaza, Inc. v. National Warehouse, Inc. t/a "Furniture to Go", No. 96-6891 (E.D. Pa. Oct. 9, 1996) (order entering judgment by confession) (Doc. No. 2).

On November 12, 1996, Cedarbrook (1) filed a Praecipe for Writ of Execution Upon a Confessed [*6] Judgment directing the United States Marshall for the Eastern District of Pennsylvania ("Marshall") to levy upon "all goods, merchandise and inventory of [National]" and (2) obtained a Writ of Execution. (Compl. Ex. E). On December 18, 1996, the Marshall served National with the Writ and levied upon National's property at the Cedarbrook Plaza store. (Compl. P 15). On January 28, 1997, National filed a motion to strike or open the judgment, and Cedarbrook filed an answer in opposition. That Motion is still pending, and the Initial Lawsuit has been placed in civil suspense. (Compl. P 16; Pl.'s Mem. Opp. at 2). n1

Page 3

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

n1 On February 24, 1997, National filed bankruptcy in the United States Bankruptcy Court for the Southern District of Florida. A stay has been entered pursuant to *11 U.S.C.A. § 362* (West 1993 & Supp. 1997) which halts "litigation, lien enforcement, and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims." 3 Collier on Bankruptcy P 362.01 (1996).

## C. Cedarbrook's    [*7]    Lawsuit Against Gottfried

On March 3, 1997, Cedarbrook initiated the instant lawsuit against Gottfried after Gottfried informed Cedarbrook that he "caused National to become judgment-proof by closing all seven of the other stores that had been owned and operated by [National] and by opening other stores under the corporate umbrella of another entity whose assets, according to Gottfried, cannot be reached by Cedarbrook to satisfy its judgment." (Compl. P 18). Gottfried also told Cedarbrook that the only assets available are the inventory items at the Cedarbrook Plaza store, the liquidation of which would result in $ 50,000. "Gottfried removed from [National] assets and opportunities of [National], including the assets of the [National] store he closed, without adequate consideration therefor, leaving [National] unable to meet its normal operating expenses, including payment of sums owed Cedarbrook." (Compl. PP 18-19).

## II. Specific Counts in the Instant Complaint

The Complaint presents two counts against Gottfried. Count I calls for Gottfried to make payment on the Guaranty in an amount equal to $ 300,000, less the wholesale market value of the inventory at [*8] National's Cedarbrook Plaza store. (See Compl. P 22). Count II alleges both (1) a violation the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. Ann. § § 5101-5110 (West Supp. 1997), and (2) fraudulent transfer under common law. Specifically:

> On information and belief, the actions of [National] and Gottfried in removing assets and opportunities from [National], including closing the seven other stores that had been owned and operated by [National], removing the assets of those stores from [National] and the creation of new Furniture to Go stores under a different corporate umbrella, were done with the actual intent to hinder, delay, or defraud Cedarbrook in the collection of [National's] obligations under the lease

and judgment obtained by Cedarbrook and were also done without a reasonably equivalent value in exchange.

After [National] closed the other [National] stores and opened its new stores under a different corporate umbrella, the only assets of [National] still available to satisfy Cedarbrook's judgment were the contents of [National's] sole remaining store at Cedarbrook Plaza. The value of the contents of [National's] [*9]    Cedarbrook Plaza store were unreasonably small in relation to [National's] lease obligations to Cedarbrook.

[National] and Jeffrey Gottfried were fully aware that their actions in closing the seven other [National] stores, removing the assets of those stores from [National] and opening stores under a separate corporate entity would leave [National] unable to pay its obligation to Cedarbrook.

* * *

All transfers of assets and opportunities out of [National] resulting from the closing of other [National] stores and the opening of new stores under a different corporate umbrella should be avoided and those assets and opportunities should be returned to [National] to satisfy the judgment against [National].

By this conduct, Gottfried has made himself responsible for [National's] obligations to Cedarbrook.

WHEREFORE, plaintiff Cedarbrook Plaza, Inc. demands judgment against defendant Jeffrey Gottfried in excess of $ 75,000, plus interest and costs, including attorneys' fees, as well as any other relief the circumstances may require.

(Compl. PP 24-30).

## III. Standard of Review

A claim may be dismissed under Fed. [*10] R. Civ. P. 12(b)(6) only if plaintiff can prove no set of facts in support of the claim that would entitle plaintiff to relief. *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)*. The reviewing court must consider only those facts alleged in the complaint and accept all of the

Case 1:04-cv-01551-JJF     Document 44-2     Filed 09/16/2005     Page 15 of 21

Page 4

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

allegations as true. Id.. See also *Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)* (holding that when deciding a motion to dismiss for failure to state a claim, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party").

## IV. Discussion

### A. The Guaranty

Gottfried moves to dismiss Count I of the Complaint (demanding payment under the Guaranty), arguing that Cedarbrook has failed to allege the specific elements of an actionable breach of contract claim. Gottfried cites *Kerrigan v. Villei, 1996 U.S. Dist. LEXIS 2195, No. 95-4334, 1996 WL 84271 (E.D. Pa. Feb. 28, 1996)* (requiring allegations of "the existence of a contract, which created the duties of the defendant, the failure of the defendant to comply with his duties, the damages suffered by plaintiff as a result [*11] of the breach, and the full satisfaction by plaintiff of his own obligations under the contract") (citing *Public Serv. Entertainment Group v. Philadelphia Elec. Co., 722 F. Supp. 184, 219 (D.N.J. 1989)).* According to Gottfried, Cedarbrook must allege that: (1) the wholesale market value of the inventory at National's Cedarbrook Plaza location was less than $ 300,000 -- as opposed to the liquidation value; (2) that Cedarbrook obtained an appraisal of the inventory; and that (3) subsequent to this appraisal, Cedarbrook issued a legitimate demand to Gottfried to pay the difference between the value of the inventory and $ 300,000. In the absence of these assertions, argues Gottfried, Cedarbrook ultimately fails to allege (1) Gottfried's failure to comply with his contractual duties, (2) the extent of Cedarbrook's damages, and (3) Cedarbrook's full satisfaction of its contractual obligations. Gottfried asserts that without these conditions precedent, Cedarbrook's breach of contract claim on the Guaranty is not ripe for adjudication.

Cedarbrook protests that the Complaint establishes a breach of contract action by alleging that Gottfried promptly agreed to pay Cedarbrook upon [*12] National's default, that all applicable cure periods have expired, and that Gottfried owes the difference between $ 300,000 and the fair market value of the actual inventory. More specifically, Cedarbrook maintains that filing and serving the present Complaint -- which calls for payment under the Guaranty -constitutes a "demand," and the Lease is silent in prescribing the manner in which "demand" shall occur. Neither the Guaranty nor the Lease, argues Cedarbrook, require an appraisal prior to payment, and a condition precedent requiring as much must be explicitly stated in the Guaranty.

The Court finds that the Complaint adequately states a cause of action for breach of contract. Cedarbrook's general theory is that Gottfried agreed, through the Guaranty, to provide Cedarbrook with the difference between $ 300,000 and the value of the inventory at National's Cedarbrook Plaza store in the event of National's default. National has defaulted; Cedarbrook wants to collect; and Gottfried is not paying. Cedarbrook thus successfully alleges (1) the existence of a contract which created Gottfried's duties under the Guaranty (Compl. PP 5-6); (2) Gottfried's failure to comply with these duties [*13]   (Compl. P 22); (3) Cedarbrook's damages as a result of Gottfried's breach (Compl. P 22); and (4) Cedarbrook's full satisfaction of its obligations under the contract, i.e., waiting for the expiration of the cure periods. (Compl. PP 9-10, 11).

Concededly, the lease requires Cedarbrook to "demand" payment. Neither the Lease nor the specific Guaranty provisions, however, describe exactly how a demand is to be made. In the absence of such an explanation, the Court considers the filing of the Complaint a demand for Guaranty payments. See e.g., *In re Fulghum Constr. Corp., 78 Bankr. 146, 153 (M.D. Tenn. 1987)* (noting, in an action brought by a bankruptcy trustee against the debtor's sole shareholder to recover preferential transfers, that "generally interest should be paid from the time a demand was made for a return of property, or, in the case where no demand was made, from the date the complaint was filed to the entry of the judgment" and concluding that "the filing of the complaint in this action constituted a demand"), rev'd on other grounds, *872 F.2d 739 (6th Cir. 1989); In re Foreman Indus., Inc., 59 Bankr. 145, 155 (S.D. Ohio 1986)* (finding that "where no demand for [*14] payment had been made prior to the commencement of this case, the filing of the complaint constitutes such a demand").

Similarly, the Lease does not impose any specific obligation on Cedarbrook to appraise the value of the inventory before demanding payment. The Lease would have to specifically articulate a condition precedent requiring this. See *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1007, 1016 (3d Cir. 1980)* (noting "the rule in Pennsylvania is that a condition precedent to an obligation must be expressed by clear language or it will be construed as a promise or covenant. Language not clearly written as a condition precedent is presumed not to be, unless the contrary appears to be the intention of the parties"); *Acme Markets, Inc. v. Federal Armored Express, Inc., 437 Pa. Super. 41, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994)* (noting "while the parties to a contract need not utilize any particular words to create a condition precedent, an act or event designated in a contract will not be

Case 1:04-cv-01551-JJF    Document 44-2    Filed 09/16/2005    Page 16 of 21

Page 5

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

construed as constituting one unless that clearly appears to have been the parties' intention").

The Court finds unpersuasive Gottfried's argument that the Complaint does not allege [*15] the inventory's wholesale value. Whether the purported $ 50,000 value of the inventory is its wholesale or liquidation value presents a factual question. It is possible that both the liquidation and the wholesale values are $ 50,000. At this stage, the Court assumes that $ 50,000 is the wholesale value of the inventory.

Cedarbrook need only furnish "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990) (stating "Rule 8 indicates that a complaint need only set out a generalized statement of facts from which defendant will be able to frame a responsive pleading. Few complaints fail to meet this liberal standard"). Having accomplished this, the Court shall deny Gottfried's Motion to Dismiss the Guaranty Count.

### B. Fraudulent Transfer

Gottfried protests that Cedarbrook lacks standing to assert fraudulent transfer claims. Attempting to assert these causes of action, argues Gottfried, violates the automatic stay. Cedarbrook maintains that its fraudulent transfer claims are not subject to the automatic stay because [*16] this lawsuit is being brought against Gottfried and not National.

The Bankruptcy Code's "automatic stay" precludes:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

> * * *

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

*11 U.S.C.A. § 362*(a) (West 1993 & Supp. 1997). The purpose of the automatic stay is to give "the debtor a 'breathing spell' by halting the collection process. It enables the debtor to attempt a repayment or reorganization plan with an aim toward satisfying existing debt." *In re Siliciano, 13 F.3d 748, 750 (3d Cir. 1994)* (citation omitted).

This provision results in a "broad stay of litigation, lien enforcement, and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims . . . . and stays [*17] a wide range of actions that would affect or interfere with property of the estate, property of the debtor, or property in the custody of the estate." 3 Collier on Bankruptcy P 362.01 (1996). More specifically, § 362 aims:

> to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another. The automatic stay prevents creditors from reaching assets of the debtor's estate piece-meal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.

*In re Colonial Realty Co., 980 F.2d 125, 133 (2d Cir. 1992)* (citations omitted).

Section 362 "applies to almost any type of formal or informal action taken against the debtor or the property of the estate." 3 Collier on Bankruptcy P 362.03 (1996). In fact, Courts have extended the automatic stay to prohibit creditors from initiating proceedings [*18] alleging fraudulent transfer of the debtor's assets.

> A substantial body of case law stands for the proposition that commencement of bankruptcy stays any state court fraudulent conveyance actions involving a debtor or his transferees. The case law reaches this conclusion by two different paths. One line of cases holds that fraudulently transferred property constitutes property of the debtor's estate, pursuant to § 541(a)(1), because the debtor retains an equitable interest in such property. Consequently, those cases state that *§ 362(a)(3) of the Bankruptcy Code* stays an act by a creditor to 'obtain possession of the property of the estate.' Thus, pursuing a debtor's spouse to

Case 1:04-cv-01551-JJF    Document 44-2    Filed 09/16/2005    Page 17 of 21

Page 6

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

recover property fraudulently transferred violates the automatic stay.

A second line of cases holds that any property that the trustee recovers, pursuant to *§ 550 of the Bankruptcy Code*, becomes property of a debtor's estate under § 541(a)(3); until the trustee recovers the property, however, it does not constitute property of the debtor's estate. Nonetheless, these courts hold that any state court lawsuit to recover a fraudulent conveyance violates the automatic stay under § 362(a)(1), an action [*19] 'to recover a claim against the debtor.'

*In re Fletcher, 176 Bankr. 445, 452 (Bankr. W.D. Mich. 1995).*

The progenitor of the first approach is *Mortgageamerica Corp. v. The American Nat'l Bank of Austin (In re Mortgageamerica, Corp.), 714 F.2d 1266 (5th Cir. 1983)*, where the American National Bank of Austin ("American") obtained a judgment against the Mortgageamerica Corporation. American then filed a separate lawsuit against Joe R. Long, who controlled Mortgageamerica, claiming Long deliberately stripped Mortgageamerica of its assets and defrauded its creditors. Specifically, American brought claims against Long based upon the "corporate trust fund" doctrine, the "denuding the corporation" theory, and the Texas Fraudulent Transfers Act, *Tex. Bus. & Com. Code Ann. § § 24.02-.03 (Vernon 1968)*. One month after American brought its suit against Long, Mortgageamerica was forced into involuntary bankruptcy. The United States Court of Appeals for the Fifth Circuit found that the automatic stay prohibited American from pursuing the separate lawsuit against Long:

> An action under the Fraudulent Transfers Act is essentially one for property that properly belongs to the debtor [*20] and to which the debtor has fraudulently transferred in an effort to put it out of reach of the creditors . . . . The automatic stay under section 362(a) thus applies and prevents a creditor from continuing to pursue a cause of action under the Texas Fraudulent Transfers Act after a petition for bankruptcy has been filed . . . . Actions for the recovery of the debtor's property by individual creditors under state fraudulent conveyance laws would interfere with this estate and with the equitable distribution scheme dependent upon it, and are therefore

appropriately stayed under § 323(a)(3). Any other result would produce near anarchy where the only discernable organizing principle would be first-come-first-served. Even without the Bankruptcy Code and the policies that support it, we would be reluctant to elevate such a principle to a rule of law.

*Id. at 1275-76* (citations omitted).

The second approach has its origins in Colonial, where involuntary bankruptcy proceedings were initiated against a partnership and its two general partners. Subsequent to the bankruptcy proceeding, the Federal Deposit Insurance Corporation ("FDIC"), acting as receiver for failed creditors [*21] of the partnership, instituted a separate lawsuit against transferees of the general partners to recover transferred funds, alleging that the general partners conveyed such funds in an effort to hinder, delay, and defraud the FDIC. Like Mortgageamerica, the United States Court of Appeals for the Second Circuit found, albeit employing different reasoning, that the automatic stay precluded the FDIC from bringing the separate lawsuit. Colonial, however, did not accept Mortgageamerica's view that the separate lawsuit against the transferees threatened "property of the estate."

> If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions. Further, the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered.

*980 F.2d at 131* (citations omitted). Colonial still found the automatic stay applicable, [*22] however, because "upon analysis, a third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)." See *Colonial, 980 F.2d at 131-32.*

Other courts, while acknowledging the divergent approaches employed in these cases, still consider them a source of instruction when deciding whether to prevent creditors from initiating a separate lawsuit to recover fraudulently transferred property. Recently, the United States Bankruptcy Court for the Southern District of Ohio followed Mortgageamerica notwithstanding

Case 1:04-cv-01551-JJF    Document 44-2    Filed 09/16/2005    Page 18 of 21

Page 7

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

Colonial because "despite Colonial Realty, the Fifth Circuit continues to adhere to Mortgageamerica . . . . . [Colonial] questioned only the rationale upon which Mortgageamerica was based; it agreed with the outcome in that case and reached the same outcome." *In re Swallen's, Inc., 205 Bankr. 879, 882 n.2 (Bankr. S.D. Ohio 1997)* (citations omitted). See also *Fletcher, 176 Bankr. at 452* (concluding "regardless of the difference in rationale for their conclusions, the courts agree that commencing a bankruptcy case stays [*23] any state court fraudulent conveyance actions by a creditor"). Indeed, Mortgageamerica still presents a viable approach. n2

> n2 See e.g., *In re Criswell, 102 F.3d 1411, 1417 n.27 (5th Cir. 1997)* (stating "even though a Second Circuit decision [Colonial] has criticized part of our reasoning, the Mortgageamerica decision remains binding precedent in this circuit"); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142, 1150 n.9 (5th Cir. 1987)* (stating "our decision and analysis in [Mortgageamerica] has been cited with approval by several courts and represents the accepted interpretation of the scope of section 362(a)(3) stays") (citing *Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1042 (2d Cir.)*, cert. denied, *479 U.S. 950, 107 S. Ct. 436, 93 L. Ed. 2d 385 (1986); Delgado Oil Co., Inc. v. Torres, 785 F.2d 857, 861 (10th Cir. 1986);* and *In re Central Heating & Air Conditioning, Inc., 64 Bankr. 733, 735-37 (N.D. Ohio 1986)); In re Ciccone, 171 Bankr. 4, 5 n.2 (Bankr. D.R.I. 1994)* (noting "we agree with the holding of Colonial on this issue, but do not follow that case in its abandonment of Mortgageamerica as to the estate property issue. We find no acceptable reason for departing from the Mortgageamerica holding") (citation omitted).

[*24]

In the case sub judice, Cedarbrook alleges that both National and Gottfried are stripping National of its assets in an effort to hinder, delay, and defraud creditors. (See Compl. PP 19, 24-30). The automatic stay prohibits Cedarbrook from initiating, after the filing of a bankruptcy petition, a third-party action against Gottfried to recover fraudulently transferred property. Such an action is both one "to recover a claim against the debtor" and "to obtain possession of property of the estate" as contemplated by §§ 362(a)(1) and (a)(3). Accordingly, the Court will grant Gottfried's Motion to Dismiss Cedarbrook's fraudulent transfer claim and its claim under the Uniform Fraudulent Transfer Act. n3

> n3 Gottfried also attacks the particularity with which Cedarbrook has pled its fraudulent transfer claims. The Court need not assess the particularity of Cedarbrook's allegations of fraud, however, in light its decision with respect to the scope of the automatic stay.
>
> The particularity issue is, nonetheless, capable of repetition. Specifically, the Court notes that had Cedarbrook alleged common law fraud, as opposed to fraudulent transfer, against Gottfried -- with the appropriate particularity as required by *Fed. R. Civ. P. 9(b)* -- the automatic stay might not apply. See *In re Phar-Mor, Inc. Sec. Litig., 164 Bankr. 903, 905 (W.D. Pa. 1994)* ((1) finding automatic stay was not violated by a separate lawsuit claiming violations of state securities laws, fraud, and negligent misrepresentation because those claims were distinct and personal to the plaintiffs and (2) relying on authority that (a) "property of the debtor cannot be extended to include the separate obligations of the non-bankrupt third party;" and (b) "[an] action for negligence against accounting firm alleging that creditors relied on false financial statements [is] personal to [the] creditors and cannot be asserted by [the] trustee of debtor") (citations omitted).

[*25]

Cedarbrook contends, in the alternative, that even if the automatic stay prohibits the fraudulent transfer claim, the Court should sever the fraudulent transfer claim and place it in civil suspense. The Court declines to exercise this option. The statutory bar imposing a broad stay of litigation in § 362 precludes Cedarbrook from stating a viable cause of action against Gottfried for fraudulent transfer. In the absence of relief authorized by the Bankruptcy Court, the Court must do more than just sever the unsustainable claim. It must dismiss it.

### C. Alter Ego Theory

Cedarbrook argues that the Complaint clearly states a cause of action for alter ego liability by alleging that National's principal and sole shareholder, Gottfried, transferred corporate assets to a newly created corporate entity. According to Cedarbrook, this new entity amounts to nothing more than a continuation of the debtor [National], formed solely to act as a repository for National's assets and thereby to hinder, delay, and defraud National's creditors. Gottfried protests that the

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

automatic stay prohibits Cedarbrook's alter ego claim. The Court agrees.

The Court finds ample authority to support the proposition [*26] that the automatic stay precludes Cedarbrook from bringing a claim against Gottfried based on an alter ego theory of liability. *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688 (2d Cir. 1989)* provides instruction. St. Paul reviewed cases from other United States Circuit Courts of Appeals that have decided the issue. See *id. at 696-99* (examining specifically *Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132 (4th Cir. 1988); Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339 (7th Cir. 1987)*, cert. denied, *485 U.S. 906, 108 S. Ct. 1077, 99 L. Ed. 2d 237 (1988); Mixon v. Anderson (In re Ozark Restaurant Equip. Co.), 816 F.2d 1222 (8th Cir.)*, cert. denied, *484 U.S. 848, 108 S. Ct. 147, 98 L. Ed. 2d 102 (1987)*; S.I. Acquisition [5th Cir.]; and Delgado [10th Cir.]). A review of these decisions led St. Paul to the following conclusion:

> We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside the bankruptcy proceedings depends on an analysis of state law. Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, inter alia, on the [*27] rights of the debtor and on certain rights of the debtor's creditors. Whether the rights belong to the debtor or the individual creditors is a question of state law.

\* \* \*

> If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action . . . . The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors. It therefore would be illogical to distinguish between this type of claim against a third party and a claim against the debtor.

\* \* \*

> Therefore, because an alter ego claim is the property of the estate, and because the injury in this case is a generalized one,

which is already being litigated by the bankruptcy trustee and by the unsecured creditors' committee, [Plaintiff] does not have standing to assert its alter ego claim outside of the bankruptcy proceeding.

*884 F.2d at 700-05* (citations omitted). St. Paul's conclusion comported with those reached by the United States [*28] Courts of Appeals for the Fourth, Fifth, Seventh, and Tenth Circuits.

Only Ozark, a decision from the United States Court of Appeals for the Eighth Circuit, reached a different result. Ozark acknowledged that "causes of action belonging to the debtor at the commencement of the case are included within the definition of property of the estate," and "whenever a cause of action 'belongs' to the debtor corporation, the trustee has the authority to pursue it in bankruptcy proceedings." Ozark ultimately found, however, that where:

> the applicable state law makes such obligations or liabilities run to the corporate creditors personally, rather than to the corporation, such rights of action are not assets of the estate under Section 541(a) that are enforceable by the trustee under Section 704(1). In this respect, we recognize that generally the corporate veil is never pierced for the benefit of the corporation or its stockholders. This general statement of the law is followed in Arkansas, where the courts have held that a corporate entity is to be disregarded only if the corporate structure is illegally or fraudulently abused to the detriment of a third person [*29]    . Thus, the obligations and liabilities of an action to pierce the corporate veil in Arkansas do not run to the corporation, but to third parties, e.g., creditors of the corporation.

\* \* \*

> Because the corporate entity will be disregarded under Arkansas law only if it has been abused to the detriment of a third person, and because the nature of the alter ego theory of piercing the corporate veil makes it one personal to the corporate creditors rather than the corporation itself, it is axiomatic that the claim does not become property of the estate under Section 541(a)(1), nor is it enforceable by the trustee under Section 704(1).

*Ozark, 816 F.2d at 1224-25* (citations omitted). n4

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

n4 The United States Court of Appeals for the Third Circuit has not spoken to the issue. A few lower courts have noticed the divergence in approaches but have refrained from reaching a decision. See *Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc., 133 Bankr. 176, 179-80 (W.D. Pa. 1991)* (noting that "the Court of Appeals for the Third Circuit has not yet spoken on the issues addressed in Matter of S.I. Acquisition"); *Begier v. Price Waterhouse, 81 Bankr. 303, 305 (E.D. Pa. 1987)* (refraining from deciding which approach is more appropriate). Phar-Mor neither invoked nor rejected the approach taken in S.I. Acquisition, noting "S.I. Acquisition has no bearing on the instant action because the Debtor and Coopers are separate, unaffiliated entities, and while the Debtor may be entitled to an award of damages from property of Coopers, a judgment in favor of the Debtor would not transform the entire assets of Coopers into property of the Debtor." *Phar-Mor, 164 B.R. at 906.*

[*30]

The Court finds that Cedarbrook presents a claim for "generalized" harm. The injury alleged "is primarily to the corporation, and is injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt[. Thus,] the suit is for a tort suffered by the corporation, and properly brought by the trustee." *Begier, 81 Bankr. at 305.* The claim is not personal to Cedarbrook. See id. (noting "if there is a special damage to the creditor suing, not common to other creditors, then it is a personal creditor action which the trustee may not pursue").

Cedarbrook's alter ego claim rests on allegations that the new corporation is the alter ego of Gottfried, a fiduciary, who is fraudulently transferring assets. Cedarbrook avers "general" injury that is not specific to any particular creditor because the purported conduct alleges the dissipation of assets belonging to National's estate. Thus, other creditors, besides Cedarbrook, stand to suffer injury. Allowing the claim to proceed would, in effect, elevate Cedarbrook to the status of a preferred creditor with rights superior to those of National's other creditors. [*31] See *St. Paul, 884 F.2d at 704* (noting "PepsiCo's harm is precisely that suffered by all other creditors of CL and Lee Way: because CL and Lee Way were used by Banner to preferentially pay off debts owed to Banner, all other creditors of CL and Lee Way fell into disfavored positions" and describing the "proper remedy" in alter ego action as "bringing an action alleging preferential or fraudulent transfer of assets");

*Begier, 81 Bankr. at 306* (listing, as examples of general claims brought on behalf of all creditors, a "claim to recover fraudulently transferred property of the debtor under a theory of corporate trust fund or state fraudulent transfer action . . . [or an] alter ego action to recover preferential transfers and to hold the alter ego liable for the obligations of the debtor") (citations omitted).

Notwithstanding Ozark, which constitutes a minority view and rests specifically on Arkansas law, the Court finds persuasive the logic employed in St. Paul. Cedarbrook fails to supply the Court with any Pennsylvania case suggesting that Pennsylvania law mirrors Arkansas law on this issue. Cedarbrook also fails to demonstrate how the harm it alleges represents particularized [*32] injury. On the contrary, the harm alleged is general as it merely involves the dissipation of assets belonging to National's estate. It therefore affects all of National's creditors. Accordingly, Cedarbrook's alter ego claim fails. n5

n5 By letter dated May 30, 1997, Cedarbrook informed the Court that National filed, in the United States Bankruptcy Court for the Southern District of Florida, a "Motion to Dismiss [Its] Chapter 11 Case." The Court notes, however, that dismissal of National's Chapter 11 case subsequent to Cedarbrook's filing the instant lawsuit against Gottfried does not alter the fact that the Bankruptcy Code barred both the fraudulent transfer and alter ego claims in the instant action at the time Cedarbrook filed it.

An appropriate Order follows.

ORDER

AND NOW, this 4th day of June, 1997, upon consideration of Defendant's Motion to Dismiss the Complaint (Doc. No. 2) and Plaintiff's Memorandum in Opposition thereto (Doc. No. 3), **IT IS HEREBY ORDERED THAT:**

1.   [*33]   Defendant's Motion is **GRANTED IN PART AND DENIED IN PART**.

2. Defendant's Motion is **DENIED** with respect to Count I.

3. Defendant's Motion is **GRANTED** with respect to Count II.

4. Defendant's Motion is **GRANTED** with respect to Cedarbrook's attempt to

1997 U.S. Dist. LEXIS 8026, *; Bankr. L. Rep. (CCH) P77,404

assert a claim for alter ego liability against
Gottfried.

BY THE COURT

John R. Padova, J.

5. Count II of the Complaint is **DISMISSED**.