# EXHIBIT B

LEXSEE

**In re: VERESTAR, INC., et. al., Debtors. OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF VERESTAR, INC., VERESTAR NETWORKS, INC. and VERSTAR INTERNATIONAL, INC. for and on behalf of itself and VERESTAR, INC., VERESTAR NETWORKS, INC. and VERESTAR INTERNATIONAL, INC., Plaintiffs–against– AMERICAN TOWER CORPORATION, BEAR, STEARNS & CO., INC., JUSTIN BENINCASA, NORMAN A. BIKALES, ALAN BOX, ARNOLD CHAVKIN, STEVEN B. DODGE, DAVID W. GARRISON, WILLIAM H. HESS, DAVID KAGAN, MARC LAYNE, JACK R. McDONNELL, MICHAEL MILSOM, SCOTT MOSKOWITZ, STEVEN J. MOSKOWITZ, RAYMOND O'BRIEN, MATTHEW PETZOLD, DAVID J. PORTE, BRADLEY E. SINGER, JAMES TAICLET and JOSEPH L. WYNN, Defendants.**

**Chapter 11, Case No. 03–18077 (ALG), Jointly Administered, Adv. Nos.: 05–03635, 05–02259**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 Bankr. LEXIS 1022*

**June 9, 2006, Decided**

**PRIOR HISTORY:** *Verestar Networks, Inc. v. Am. Tower Corp. (In re Official Comm. of Unsecured Creditors of Verestar, Inc.), 2006 U.S. Dist. LEXIS 12820 (S.D.N.Y., Mar. 23, 2006)*

**COUNSEL:** [*1] Counsel for the Official Committee of Unsecured Creditors: David S. Rosner, Esq., Cindy C. Kelly, Esq., Michael J. Bowe, Esq., Brian Condon, Esq., Erin Zavalkoff, Esq., KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, New York, New York.

Counsel for American Tower Corporation and the Individual Defendants: Barry N. Seidel, Esq., Scott E. Eckas, Esq., KING & SPALDING LLP, New York, New York.

For KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP, Counsel for the Bear Stearns Defendants: Barry H. Berke, Esq., Stephen M. Sinaiko, Esq., New York, New York.

For Official Committee of Unsecured, Creditors of Verestar, Inc., Verestar Networks, Inc. and Verestar International, Inc., for and on behalf of itself, Verestar Inc., Verestar Networks, Inc., Tax id: 95-4542908, Verestar International, Inc., Tax id: 01-0711857, Plaintiffs: Cindy Caranella Kelly, David S Rosner, Erin Zavalkoff, Michael J. Bowe, Kasowitz, Benson, Torres & Friedman, L.L., New York, NY.

For American Tower Corporation, Justin Benincasa, Steven J. Moskowitz, Raymond O'Brien, Matthew Petzold, David J. Porte, Bradley E. Singer, James Taiclet, Joseph L. Winn, Defendants: Barry N. Seidel, Scott E. Eckas, King & Spalding LLP, New [*2] York, NY.

For Bear Stearns & Co. Inc., Norman A. Bikales, Alan Box, Arnold Chavkin, Steven B. Dodge, David W. Garrison, William H. Hess, David Kagan, Mare Layne, Jack R. McDonnell, Michael Milsom, Scott Moskowitz, Defendants: Barry H. Berke, Savvas Socrates Diacosavvas, Stephen M. Sinaiko, Kramer, Levin, Naftalis & Frankel, L.L.P, New York, NY.

For Official Committee Of Unsecured Creditors, Plaintiff: David S Rosner, David Sol Rosner, Kasowitz, Benson, Torres & Friedman LLP, New York, NY.

For Kasowitz, Benson, Torres & Friedman LLP, Creditor Committee: David Sol Rosner, Kasowitz, Benson, Torres & Friedman LLP, New York, NY.

**JUDGES:** ALLAN L. GROPPER, UNITED STATES BANKRUPTCY JUDGE.

**OPINIONBY:** ALLAN L. GROPPER

**OPINION:**

**MEMORANDUM OF OPINION**

## ALLAN L. GROPPER

**UNITED STATES BANKRUPTCY JUDGE**These are motions to dismiss filed by the defendants in two separate lawsuits brought by the Official Committee of Unsecured Creditors (the "Committee") of Verestar, Inc. and affiliates ("Verestar") in connection with the above-captioned Chapter 11 cases. The Committee has sued the following defendants: American Tower Corporation ("ATC"), Verestar's parent corporation; [*3] Bear Stearns & Co., Inc. ("Bear Stearns"), financial advisor to ATC and Verestar; two Bear Stearns' officers, Marc Layne and Scott Moskowitz (together with Bear Stearns, the "Bear Stearns Defendants"); and individuals Justin Benincasa, Norman A. Bikales, Alan Box, Arnold Chavkin, Steven B. Dodge, David W. Garrison, William H. Hess, David Kagan, Michael Milsom, Steven Moskowitz, Raymond O'Brien, Matthew Petzold, David Porte, Bradley E. Singer, James Taiclet and Joseph L. Wynn (the "Individual Defendants"). n1 Both complaints were filed on July 8, 2005 by the Committee on behalf of Verestar and its co-debtor subsidiaries (together with Verestar, the "Debtors"). One was commenced as an adversary proceeding in this Court by a complaint filed against ATC only (the "Bankruptcy Court Complaint"). n2 The other was commenced as a plenary action in the United States District Court for the Southern District of New York by a complaint filed against all the Defendants (the "District Court Complaint" and together with the Bankruptcy Court Complaint, the "Complaints"). The District Court Complaint was referred to this Court by Judge Patterson in strongly-worded opinions concluding that the Committee [*4] had no reasonable basis for having filed initially in the District Court rather than in this Court. *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp., 2005 U.S. Dist. LEXIS 33340 (S.D.N.Y. Dec. 15, 2005), 2006 U.S. Dist. LEXIS 12820 (S.D.N.Y. Mar. 23, 2006).*

n1 Norman A. Bikales, Alan Box, David W. Garrison, Jack R. McDonnell, Steven Moskowitz, Scott Moskowitz, Joseph L. Wynn, David J. Porte, Steven B. Dodge, William H. Hess, Raymond O'Brien, and Bradley E. Singer are former directors of Verestar. Justin Benincasa, David Kagan, Michael Milsom and Matthew Petzold are former non-director officers of Verestar. Arnold Chavkin (a former director of ATC) and James Taiclet (ATC's president and CEO) never served as officers or directors of Verestar.

n2 The Complaint was endorsed, "Jury Trial Demand."

The factual allegations set forth in the Complaints are virtually identical and serve as the basis for a total of twenty-one claims for relief. ATC has moved to dismiss [*5] the following claims raised in the Bankruptcy Complaint: (i) equitable subordination (B. Ct. Count III) and (ii) substantive consolidation (B. Ct. Count IV). n3 The Defendants have moved to dismiss variously the following claims raised in the District Court Complaint: (i) alter ego (D. Ct. Count I), (ii) breach of fiduciary duty (D. Ct. Count II), (iii) conversion (D. Ct. Count III), (iv) aiding and abetting breach of fiduciary duty and conversion (D. Ct. Count IV), (v) conspiracy (D. Ct. Count V), (vi) tortious interference with prospective or existing business relations (D. Ct. Count VII), (vii) deepening insolvency (D. Ct. Count VIII), (viii) breach of contract (D. Ct. Count IX), (ix) state law fraudulent transfer (D. Ct. Counts X and XI), (x) Bankruptcy Code fraudulent transfer (in part) (D. Ct. Counts XII and XIII), (xi) recovery of avoidable transfers (in part) (D. Ct. Count XV), (xii) turnover (in part) (D. Ct. Count XVI), and (xiii) accounting pursuant to *Bankruptcy Code § 542(e)* (D. Ct. Count XVII). n4

n3 The following claims raised in the Bankruptcy Court Complaint are not subject to the motions to dismiss: (i) objection to ATC claims (B. Ct. Count I) and (ii) recharacterization of debt allegedly owed by Verestar to ATC as equity (B. Ct. Count II).

[*6]

n4 The following claims raised in the District Court Complaint are not subject to the motions to dismiss: (i) Bankruptcy Code fraudulent transfer (in part) (D. Ct. Counts XII and XIII), (ii) avoidance of preferential transfers (D. Ct. Count XIV), (iii) recovery of avoidable transfers (in part) (D. Ct. Count XV), and (iv) turnover (in part) (D. Ct. Count XVI).

The motions are disposed of as follows.**Background**

**The Facts as Alleged in the Complaints**The following factual allegations in the Complaints are assumed to be true for purposes of these motions to dismiss. Verestar was founded in 1999 as a wholly owned subsidiary of ATC, a telecommunications company, for the purpose of owning and operating ATC's teleport business. ATC initially capitalized Verestar with $1,000, an amount that the Committee asserts was inadequate given the size and nature of the teleport business. Verestar allegedly remained undercapitalized and dependent on ATC for financing throughout its existence. The Committee asserts that at all relevant times ATC treated Verestar as a mere division and used [*7] Verestar to reap financial rewards from the teleport business while attempting to shield itself from

any associated liability or risk. (D. Ct. Compl. PP 33–34.) ATC was Verestar's 100% shareholder, and according to the Complaint, there was an almost complete overlap of its officers and directors with those of Verestar, allowing ATC to dominate and control Verestar's Board and all material business decisions, including its teleport acquisitions and other transactions. (D. Ct. Compl. PP 35, 37.) As evidence of control, the Committee asserts that (i) the majority of Verestar's Board meetings were held on the same day as ATC's board meetings at ATC's regional offices or headquarters in Massachusetts, and not at Verestar's headquarters in Virginia (D. Ct. Compl. P 35); (ii) ATC's officers and directors attended and directed Verestar Board meetings and engaged in transactions on Verestar's behalf, even though they did not hold positions at Verestar (D. Ct. Compl. P 36); and (iii) by the end of 2001, Verestar did not have a properly constituted board, due to the resignation of several board members and the failure to fill vacancies as required by Verestar's by-laws. (D. Ct. Compl. P 52.) [*8] ATC and its directors and officers also allegedly held out to creditors and the public in general that Verestar was part of a single operation with ATC, describing Verestar as a division of ATC. (D. Ct. Compl. P 37.) As further evidence of ATC's dominion over Verestar, the Committee asserts that ATC maintained Verestar's records and controlled all of its core corporate functions. ATC provided Verestar's corporate support services, including human resources, accounts payable, accounts receivable, tax, internet and information technology functions. Verestar employees were paid by ATC with checks drawn on ATC accounts, and ATC provided employee benefits and all forms of business insurance. (D. Ct. Compl. P 39.) With respect to financing, the Committee alleges that Verestar's main bank account was in the name of ATC, and ATC officers were authorized signatories on all other ancillary Verestar accounts. ATC used its control over Verestar to sweep funds from Verestar's accounts on a daily basis and then commingled these funds with those from its own operations without returning adequate consideration to Verestar. (D. Ct. Compl. P 40.) According to the Complaint, ATC also caused Verestar [*9] to engage in an extremely aggressive acquisition strategy, secure in the belief that in the event the teleport business failed, it could extract the value of the business at the expense of Verestar's other creditors. (D. Ct. Compl. PP 37, 43.) Between 1997 (before Verestar's separate incorporation) and 2003, ATC allegedly pursued over thirteen acquisitions and other transactions on Verestar's behalf without regard to Verestar's purported separate legal existence and with the result that its business was grossly over-expanded. (D. Ct. Compl. P 44.) These transactions included, *inter alia*, (i) the acquisition of InterPacket Networks, Inc. ("IPN") in December 2000, which was not approved by the Verestar Board and

was consummated despite ATC's knowledge that the acquisition would generate substantial losses for Verestar (D. Ct. Compl. PP 45–46); (ii) the purchase of additional satellite capacity from PanAmSat International Systems, Inc. ("PanAmSat") in March 2001, despite the knowledge of ATC, the Bear Stearns Defendants and certain of the Individual Defendants that Verestar would continue to incur losses and not be able to meet its financial commitments (D. Ct. Compl. PP 47–48); and [*10] (iii) the acquisition of Integrated Systems Design, Inc. ("ISD") in October 2001, which allegedly was neither considered nor approved by the Verestar Board (D. Ct. Compl. PP 51.) Each of these transactions contributed to Verestar's increased operating costs and major revenue and EBITDA losses (D. Ct. Compl. PP 47, 49–50.) The Committee alleges that in the spring of 2002, when it was clear that Verestar would ultimately have to be liquidated, ATC's and Verestar's officers and directors (mostly the same individuals) and Bear Stearns agreed on a scheme entitled "Project Harvest," a program to transfer as many of Verestar's assets and as much of its value as possible to ATC before Verestar's inevitable collapse. Bear Stearns, which was retained by Verestar as the financial advisor for Project Harvest at the same time it was serving as financial advisor to ATC, allegedly played a leading role in the scheme through its managing director, Scott Moskowitz, and one of its vice presidents, Marc Layne. (D. Ct. Compl. PP 55–56.) Under Project Harvest, ATC allegedly cut off new funding to Verestar and began to siphon off its value. ATC also allegedly caused Verestar to sell certain assets to ATC [*11] for little or no consideration and to convey other assets to third parties and divert the proceeds to ATC. (D. Ct. Compl. PP 57–58, 60.) The District Court Complaint identifies the following transactions as steps taken to carry out Project Harvest: Transfer of Tower Assets: In 2002 and 2003, ATC, Dodge, Singer, Porte and Hess caused Verestar to transfer its communication tower assets and surrounding land (the "Tower Assets") to ATC. The Committee specifically alleges that ATC, Dodge, Singer and Porte caused Verestar to transfer the Tower Assets in San Bruno to ATC without appraisal and for substantially less than fair market value. The Committee also alleges that Dodge instructed Bear Stearns through Layne, as well as Steven Moskowitz, Taiclet, Singer, Hess and Milsom, to review Verestar's Tower Assets and determine how to transfer them to ATC. (D. Ct. Compl. P 59.) Sale of MTN: ATC allegedly looted Verestar's subsidiary, Micronet, Inc. ("MTN"), the only profitable operating asset in Verestar's portfolio. First, ATC helped its lenders perfect their security interests in MTN so that the value of the asset would be transferred to the lenders in the event it was not sold before [*12] Verestar's bankruptcy filing. This would prefer ATC because it was also liable on the debt. Second, ATC caused Verestar to engage

2006 Bankr. LEXIS 1022, *12

Bear Stearns to achieve a disposition of MTN beneficial to ATC. To facilitate this process, Dodge, Singer, Porte and Hess falsely represented to Verestar personnel that Verestar would receive consideration from any sale of MTN. Falconhead Capital, a private equity firm, offered to purchase MTN for $30 million in 2002, at which time Kagan was serving as Falconhead Capital's president and CEO. ATC, through Dodge, Singer, Bikales, Hess and Milsom, directed Bear Stearns to accept the offer, negotiated and approved the final sale, and kept all the proceeds. Dodge, Singer, Hess and O'Brien approved the transfer on behalf of Verestar despite having knowledge that Verestar would receive nothing in return. (D. Ct. Compl. PP 61-64.)Sale of GenTel: Bear Stearns was also instructed to sell another valuable Verestar subsidiary and teleport asset, the General Telecom ("GenTel") voice port business. ATC, Bear Stearns, Layne, Dodge, Singer, Hess, O'Brien and Petzold allegedly selected an offer that was less valuable to Verestar and better suited to ATC's desire to [*13] maximize value transferred to ATC prior to a Verestar bankruptcy. Again, ATC received all of the sale proceeds, and Dodge, Singer, Hess and O'Brien, in violation of their duties, approved the transaction on behalf of Verestar after the fact. (D. Ct. Compl. P 65.)The Credit Facility *Seventh Amendment*: In October 2002, with Verestar's consent, ATC executed an amendment (the "*Seventh Amendment*") to its credit facility that (i) removed Verestar as a borrower, kept Verestar as a guarantor and left its assets pledged to ATC's lenders; (ii) terminated Verestar's rights to a portion of proceeds of the sale of any Verestar asset pledged as collateral; (iii) capped additional ATC funding for Verestar at $25 million; and (iv) eliminated certain defenses Verestar and its creditors could assert against claims by ATC's lenders in bankruptcy. The alleged dual purpose of the amendment was to avoid the trigger of a default when Verestar filed for bankruptcy and to siphon off the value of Verestar's teleport assets that could not be transferred to ATC in kind. By unanimous consent, the Verestar Board authorized Petzold to execute the *Seventh Amendment* on behalf of Verestar (D. Ct. Compl. PP 66-70.)  [*14] Vendor Payments: ATC allegedly caused Verestar to withhold substantial payments to vendors in order to increase immediate cash available for "harvesting" to ATC. ATC also allegedly caused Verestar to make misrepresentations to these vendors concerning Verestar's financial situation in order to obtain further concessions that would benefit ATC. Dodge, Milsom, Singer, Hess, O'Brien, Petzold and Bear Stearns were allegedly involved in the preparation and communication of these misrepresentations. (D. Ct. Compl. P 71.)The $250 Million Note: The District Court Complaint alleges that ATC officers and directors knew that ATC would be unable to recover the funds that it had previously invested in Verestar's teleport business by way of equity or undocumented inter-company ad-

vances. Therefore, in 2002, these parties created a $250 million promissory note payable by Verestar to ATC that was back-dated to January 1, 2000 (the "Note"), plus Verestar Board resolutions purporting to consent to the debt and acknowledging loans in an almost equal amount. Specifically, Hess prepared draft resolutions and Dodge, Singer and Porte executed written consents to the resolutions. The District [*15] Court Complaint asserts that prior to the back-dated Note, there was no debt as such, Verestar and ATC did not record any of its advances to Verestar as loans, Verestar never paid interest to ATC on any purported loans, and ATC never imposed on Verestar any repayment terms, fixed any maturity dates, or required any collateral from Verestar. Further, the Committee alleges that (i) ATC had the Note fraudulently executed by Kagan, who was an officer and director of MTN, a subsidiary of Verestar that was later sold, (ii) Verestar Board approval of the Note was not valid, and (iii) the debt was incurred without consideration. (D. Ct. Compl. PP 72-75.)

**The Bankruptcy**On December 22, 2003, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Committee was appointed on January 2, 2004. On July 12, 2004, this Court approved a stipulation, as amended on November 7, 2005, granting the Committee standing to pursue claims on behalf of the Debtors against the Defendants. The Debtors sold all of their remaining assets in the Chapter 11 cases. n5

> n5 It is uncertain, as of the date of this opinion, whether the proceeds of the sales will be sufficient to cover even the Debtors' administrative expenses.

[*16] ATC has filed proofs of claim in the cases that, in total amount, dwarf all other claims, but it has (not surprisingly) been unwilling to agree to a plan of reorganization that is premised on lawsuits that would disallow its claims and render it liable to pay all other debt. The Chapter 11 cases have, accordingly, stalled, and the resolution of these adversary proceedings remains the most significant open item in the cases.As noted above, on July 8, 2005, the Committee filed the Bankruptcy Court Complaint against ATC and the District Court Complaint against all the Defendants. On September 12, 2005, ATC moved to dismiss certain claims for relief set forth in the Bankruptcy Court Complaint. On September 10, 2005 and October 28, 2005, respectively, the Bear Stearns Defendants and ATC together with the Individual Defendants moved to dismiss most of the claims for relief in the District Court Complaint. After referral of the District Court Complaint to this Court, the motions came on for argument on February 10, 2006.The claims subject to the motions to

dismiss can be most easily grouped as (i) claims brought against ATC only; (ii) claims brought against Verestar's officers and directors; [*17] (iii) claims brought against the Bear Stearns Defendants; and (iv) claims brought against all Defendants. **Discussion**

**I. General Standards** A complaint may not be dismissed under *Federal Rule of Civil Procedure 12(b)(6)*, incorporated herein by Bankruptcy *Rule 7012(b)(6)*, unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45–46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Upon consideration of the allegations contained in the complaint, including any exhibits attached thereto, the Court is obligated to accept all of the allegations in the complaint as true and to draw all reasonable inferences in favor of the plaintiff. *Stuto v. Fleischman, 164 F.3d 820, 824 (2d Cir. 1999)*. The scope of the court's review is limited, as the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).* [*18] In order to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).Rule 8(a)* the Federal Rules of Civil Procedure, incorporated herein by Bankruptcy *Rule 7008*, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2). Rule 9(b)*, incorporated herein by Bankruptcy *Rule 7009*, providing that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," *Fed. R. Civ. P. 9(b)*, applies only to Plaintiff's claims against ATC for actual fraudulent conveyance. A claim for actual fraudulent transfer pursuant to *§ 548(a)(1)(A)* or applicable State law must satisfy the requirements of *Rule 9(b) of the Federal Rules of Civil Procedure. See Picard v. Taylor (In re Park South Securities, LLC), 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005); Sharp Int'lCorp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 281 B.R. 506, 524 (Bankr. E.D.N.Y. 2002),* [*19] *aff'd on other grounds, 302 B.R. 760 (E.D.N.Y 2003), aff'd on other grounds, 403 F.3d 43 (2d Cir. 2005)*. These pleading requirements, however, do not apply to claims of constructive fraudulent conveyance under *§ 548(a)(1)(B)* and applicable State law, because they are based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee, not on fraud. See *In re White Metal Rolling and Stamping Corp., 222 B.R. 417, 428–29 (Bankr. S.D.N.Y. 1998); see also Secs. Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 319 (Bankr. S.D.N.Y. 1998).*The Defendants as-sert that the heightened pleading requirements of *Rule 9(b)* should apply to all claims raised in the District Court Complaint on the basis that the Complaint "sounds in fraud." (Mem. in Supp. of Mot. to Dismiss of ATC and Individual Defendants at 15.) However, as the Committee argues, fraud is not the basis of any of the Committee's claims other than its claims for actual fraudulent transfer and its claims relating to the execution and back–dating of the Note. (Mem. in Opp. to Mot. to Dismiss of ATC and Individual [*20] Defendants at 10.) The Court has no warrant to expand the requirements of *Rule 9(b)* beyond its purview. See *National Union Fire Ins. Co. v. Stroh Cos., 1999 U.S. Dist. LEXIS 12580, at *11 (S.D.N.Y. Aug. 12, 1999)*.Notwithstanding the foregoing, substantive law imposes a heightened pleading standard on certain of the Committee's claims. For example, conclusory allegations of control are not sufficient to state a claim for alter ego liability or piercing the corporate veil. See *Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002)*. Similarly, in order to overcome the business judgment rule and state a claim against corporate directors, the complaint must set forth specific, well-pleaded facts and cannot rest on generalities. See *Stanziale v. Nachtomi, 2004 U.S. Dist. LEXIS 15664, 2004 WL 1812705, at *1 (D. Del. Aug. 6, 2004)*, citing *In re Gen. Motors Class E Sec. Litig., 694 F. Supp. 1119, 1132 (D. Del. 1988)*. These requirements will be discussed further below.

**II. Claims Against ATC Only** **A. Equitable Subordination** ATC has filed claims in the Debtors' bankruptcy cases for over $536 [*21] million, based in part on the Note. The Bankruptcy Court Complaint charges that ATC's claims should be equitably subordinated to the claims of the Debtors' general unsecured creditors. The power of a bankruptcy court to subordinate allowed claims is codified in *§ 510(c) of the Bankruptcy Code*, which provides, in relevant part:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may — (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

In determining whether a claim should be equitably subordinated, many courts have applied the three–part test set forth in *In re Mobile Steel Co.*: (i) the subordinated creditor must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the

creditor to be subordinated; and (iii) equitable subordination of the claim must not be inconsistent with the other provisions of the bankruptcy [*22] laws. *Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 700 (5th Cir. 1988)*, cited with approval in *United States v. Noland, 517 U.S. 535, 538, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996)*; see also *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986–87 (3d Cir. 1998)*; *New Jersey Steel Corp. v. Bank of New York, 1997 U.S. Dist. LEXIS 18137, 1997 WL 716911, at *4 (S.D.N.Y. Nov. 17, 1997)*; *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.), 264 B.R. 69, 132–33 (Bankr. S.D.N.Y. 2001)*; *In re Sunbeam Corp., 284 B.R. at 363*. The third prong of the *Mobile Steel* test (requiring that equitable subordination be consistent with the provisions of bankruptcy law) is of little significance today. *Mobile Steel* was decided under the former Bankruptcy Act, which did not specifically provide for equitable subordination. The Bankruptcy Code does. As one Court has noted, "[S]ince the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994)* [*23] (citation omitted).Turning to the first factor, inequitable conduct encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience. It includes a secret or open fraud, lack of good faith by a fiduciary, unjust enrichment, or enrichment brought about by unconscionable, unjust or unfair conduct or double–dealing. *In re Lois/USA, 264 B.R. at 134*; *In re Adler, Coleman Clearing Corp., 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002)*. Other courts have described the type of misconduct that warrants equitable subordination as including: (i) fraud, illegality or breach of fiduciary duty; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a vehicle to benefit another. *In re Granite Partners, L.P., 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997)*; *In re 80 Nassau Assocs., 169 B.R. at 838 (Bankr. S.D.N.Y. 1994)*.Taking the allegations of the Bankruptcy Court Complaint as true for purposes of the motions to dismiss, the Committee has pleaded facts setting forth a textbook case that ATC engaged in inequitable conduct and that such conduct (i) damaged other creditors and (ii) conferred on ATC an [*24] unfair advantage, the second requirement for a finding of equitable subordination. The Bankruptcy Court Complaint contains multiple allegations that would justify equitable subordination, including (i) what can only be termed as the "looting" of Verestar during the period of its financial decline; (ii) the creation of false documentation for the purpose of improving the parent's position; and (iii) unjust double–dealing. The Complaint easily satisfies the

*Mobile Steel* standard that the subordinated creditor engaged in (i) some type of impermissible conduct that (ii) resulted in injury to other creditors and an unfair advantage to itself.ATC argues that the Committee's demand for equitable subordination is dependent on its claim of alter ego liability and must be dismissed on the ground that an alter ego claim has not been adequately pleaded. Contrary to ATC's assertions, the Committee need not prove all elements of its claim that Verestar is the alter ego of ATC to make out a claim of equitable subordination. See *WHBA Real Estate Ltd. Partnership. v. Lafayette Hotel Partnership (In re Lafayette Hotel Partnership), 227 B.R. 445, 454 (S.D.N.Y. 1998)*; *Granite Partners, 210 B.R. at 514–15.* [*25] n6 The Court also need not determine at this stage the extent of damages and/or the appropriate remedy in the event the Committee can sustain its allegations. In any event, even if only some of the allegations of the Bankruptcy Court Complaint are proven, equitable subordination of some or all of ATC's claim would appear to be appropriate. ATC's motion to dismiss the Committee's claim for equitable subordination is denied.

n6    ATC argues that the Bankruptcy Court Complaint is structured in a way that precludes the Committee from basing its equitable subordination claim on any grounds other than alter ego, such as inequitable conduct and breaches of fiduciary duty. However, at the hearing on these motions, ATC conceded that striking or moving one paragraph in the Bankruptcy Court Complaint would rectify this structural problem. ATC even went so far as to state that it would not have sought to dismiss the Committee's equitable subordination claim had the Bankruptcy Court Complaint been pleaded in this manner. To cure this problem, the Complaint will be deemed amended and P 77 deleted as surplusage.

[*26] **B. Substantive Consolidation and Alter Ego**The Bankruptcy Court Complaint has a count asserting that the assets of the Debtors should be substantively consolidated with the assets of ATC, and the District Court Complaint has a similar, but not identical, count alleging that the corporate veil between the Debtors and ATC should be pierced, that the Debtors should be treated as ATC's alter ego, and that ATC should be liable for all of their debts. ATC has moved to dismiss both claims for relief.*(i) Substantive Consolidation*The Committee's claim for substantive consolidation seeks to combine the assets and liabilities of the Debtors with those of ATC so that the Debtors' creditors can look to ATC for recovery on their bankruptcy claims. "Substantive consolidation usually results in, *inter alia*, pooling the assets

of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans." *In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988)*. It is a remedy that is used "sparingly" and with [*27] caution. *Id.*; see also *In re Owens Corning, 419 F.3d 195, 208–09 (3d Cir. 2005); In re Fas Mart Convenient Stores, Inc., 320 B.R. 587, 594 (Bankr. E.D. Va. 2004)*.Bankruptcy courts in this Circuit have examined the following factors in determining whether to substantively consolidate: (i) whether the entities kept consolidated business and financial records; (ii) whether there was complete unity of interest and ownership between or among the entities; (iii) the existence of intercompany loans and guarantees; and (iv) the degree of difficulty associated with identifying and/or segregating the assets and liabilities of the two entities. See, e.g., *Soviero v. Franklin Nat'l Bank, 328 F.2d 446, 447–48 (2d Cir. 1964)* (Bankruptcy Act case); *In re Food Fair, Inc., 10 B.R. 123, 126 (Bankr. S.D.N.Y. 1981)* (Bankruptcy Act case); *In re Richton Int'l Corp., 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981); In re Donut Queen, Ltd., 41 B.R. 706, 709 (Bankr. E.D.N.Y. 1984)*. In *Augie/Restivo*, the Second Circuit reformulated the factors as two, stating that a plaintiff must demonstrate one of the [*28] factors following in order to succeed on a claim of substantive consolidation: (i) the operational and financial affairs of the entities to be consolidated are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved, or (ii) creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit. See *Augie/Restivo, 860 F.2d at 518*; see also *In re 599 Consumer Electronics, Inc., 195 B.R. 244, 248 (S.D.N.Y. 1996); In re Drexel Burnham Lambert Group, 138 B.R. 732, 763 (Bankr. S.D.N.Y. 1992)*. The Second Circuit set forth these tests in the disjunctive and the presence of either may justify an order of substantive consolidation. See also *FDIC v. Colonial Realty Co., 966 F.2d 57, 61 (2d Cir. 1992); Reider v. Federal Deposit Ins. Co. (In re Reider), 31 F.3d 1102, 1108 (11th Cir. 1994)* (adopting test for Eleventh Circuit and stating it in the disjunctive); *Alexander v. Compton (In re Bonham), 229 F.3d 750, 766 (9th Cir. 2000)* (same for Ninth Circuit). There are cases, including some of the [*29] earliest ones, that have substantively consolidated debtors with non-debtor affiliates. See *Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S. Ct. 904, 85 L. Ed. 1293 (1941); Soviero v. Franklin Nat'l Bank, 328 F.2d at 448*. Although there is some authority to the contrary, it is assumed that in an appropriate case, it would be possible for the bankruptcy court to substantively consolidate debtor and non-debtor entities. *Bracaglia v. Manzo (In re United Stairs Corp.), 176 B.R. 359, 368 (Bankr. D.N.J. 1995); In*

*re Alico Mining, Inc., 278 B.R. 586, 588 (Bankr. M.D. Fla. 2002)*.In this case, the Bankruptcy Court Complaint does not contain adequate allegations that the operational and financial affairs of Verestar and ATC were so entangled that the two entities should be substantively consolidated. The Complaint, fairly read, alleges just the opposite — that ATC misused its position of control and engaged in a program of raiding its subsidiary whereby Verestar assets were converted and Verestar liabilities manufactured. For example, the Committee claims that ATC used its control over Verestar's finances to sweep Verestar's cash into [*30] a common account and return nothing to Verestar. (Bankr. Ct. Comp. P 21). Such a course of conduct may give rise to liability, but there is no allegation that it is impossible to sort out the intercompany transfers or that the companies' respective rights to the cash cannot be traced.The alternate ground for substantive consolidation is that creditors dealt with the two entities as one and did not rely on their separateness in extending credit. Although the Complaint has conclusory allegations that ATC and its officers and directors held themselves out to creditors and others "generally as indistinguishable from Verestar" (Bankr. Ct. Comp. P 18), there is no specific allegation of creditor confusion or that Verestar's creditors extended credit on the basis of ATC's financials or credit reports or even on the basis of consolidated financial statements. The Complaint does state that Verestar's business was apparently started as a division of ATC, but it was separately incorporated in 1999, years before the bankruptcy filing. Under the circumstances of this case, a bald allegation that "creditors" of Verestar relied on ATC's assets and liabilities in extending credit to Verestar is [*31] simply inadequate to state a claim for substantive consolidation of the separate corporations. This is especially true in that substantive consolidation is a two-way street, at least in theory, and there is no basis for a finding that the creditors of ATC should as a result of substantive consolidation suddenly find themselves creditors of Verestar.*(ii) Alter Ego and Piercing the Corporate Veil*The Committee's alter ego claim is far more clearly set out in the District Court Complaint. It is based on allegations that ATC exercised complete control over Verestar, causing Verestar to become a mere instrumentality of ATC, and that ATC used this control to engage in wrongful conduct resulting in such harm to Verestar that ATC should be held liable for Verestar's debts. Although piercing the corporate veil is frequently compared with substantive consolidation, as the Second Circuit has held, "the comparison of the two doctrines is not entirely apt. . . . The focus of piercing the corporate veil is the limited liability afforded to a corporation, and 'liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads [*32] to a wrong against third parties.' Substantive consolidation, on the

other hand, has a narrower focus: 'the equitable treatment of all creditors.'" *Colonial Realty Co., 966 F.2d at 60–61* (citations omitted).Under Delaware law, n7 a plaintiff must satisfy a two-part test to succeed on a claim for alter ego liability: "(1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness . . . [is] present." *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)* (internal citations omitted). Factors establishing that the entities acted as a single economic unit include:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988),* [*33] *aff'd, 879 F.2d 857 (3d Cir. 1989); see also Fletcher, 68 F.3d at 1458; In re Sunbeam Corp., 284 B.R. at 365.* No single factor justifies a decision to disregard the corporate form. Rather, some combination of factors is required, and an overall element of injustice or unfairness must always be present. See *Acciai Speciali Terni USA, Inc. v. Momene, 202 F. Supp. 2d 203, 207 (S.D.N.Y. 2002).* Claims of alter ego liability must be pleaded with some particularity, and "it is not sufficient, at the pleading stage, to make conclusory allegations of control." *In re Sunbeam Corp., 284 B.R. at 366.* n8

> n7 Delaware law applies in that Verestar, whose corporate veil would be pierced, is a Delaware corporation. *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995).*
>
> n8 On the other hand, contrary to ATC's assertions, fraud is not a necessary element of a claim for alter ego liability. *Id.*

ATC makes a strong [*34] case that there is much in the Complaint inconsistent with a viable alter ego claim. For example, as ATC argues, (i) Verestar was a separate business with separate headquarters in Virginia, whereas ATC was headquartered in Massachusetts; (ii) Verestar had its own employees and subsidiaries; (iii) Verestar was easily able to identify its assets in the sales to third parties approved in these Chapter 11 cases; and (iv) the Complaint itself implies that ATC's lenders took action that recognized ATC's and Verestar's separate liabilities.

ATC also argues that the following allegations by the Committee are merely indicative of many unremarkable parent-subsidiary relationships: (i) ATC provided managerial services to Verestar, including human resources and benefits, insurance, accounting services, tax services, and internet services; (ii) ATC and Verestar shared a common cash management system; (iii) ATC financed Verestar's activities and acquisitions; (iv) ATC handled Verestar's payroll; and (v) ATC and Verestar had overlapping officers and directors. Finally, ATC claims that the Committee's allegation that Verestar was undercapitalized is insufficient to support an alter ego claim because [*35] it ignores the reality of start-up companies and is contradicted by the Committee's assertion that the Note itself represented $250 million that ATC had previously invested in Verestar as equity.The Committee responds that ATC's arguments ignore the allegations that ATC operated Verestar as a mere facade, manipulated Verestar's Board, stripped Verestar of assets and manufactured the Note. The Committee asserts that ATC and Verestar did not have a typical parent-subsidiary relationship in that (i) ATC controlled all aspects of Verestar's core corporate functions and business, attempting to shield itself from Verestar's liabilities but raiding the assets at will; (ii) ATC controlled Verestar's cash, with Verestar's main bank account in the name of ATC and ATC an authorized signatory on all other ancillary Verestar accounts; and (iii) Verestar failed to maintain its own employee records. With regard to capitalization, the Committee claims that Verestar was undercapitalized and financially dependent upon ATC at all times and that Verestar's need for an equity floor of $250 million evidences undercapitalization rather than adequate capitalization.The key to a finding of alter ego [*36] liability is that the controlling owners operated the subsidiary as an "incorporated pocketbook," *United States v. Golden Acres, Inc., 702 F. Supp. at 1105–07.* As the Court said in *Brown v. GE Capital Corp. (In re Foxmeyer Corp.), 290 B.R. 229, 236 (Bankr. D. Del. 2003),* "the fraud or similar injustice that must be demonstrated in order to pierce a corporate veil under Delaware law must, in particular, be found in the defendants' use of the corporate form." (internal quotations omitted). Based on applicable Delaware authority, the Court concludes that the Complaint states a claim with respect to alter ego liability. Factual determinations cannot be made in connection with a motion to dismiss, and the Committee has pleaded allegations of misuse of the corporate form with sufficient specificity to pursue its alter ego claim.**C. Conversion**The District Court Complaint contains a claim against ATC for conversion of Verestar's property. The only property specifically identified is (i) cash that was allegedly swept from Verestar's bank accounts on a daily basis, (ii) the proceeds from the sale of MTN and GenTel, and (iii) the specific Tower Assets

[*37] that were transferred to ATC. ATC claims that the Committee's conversion claims are invalid because they involve (i) commingled and unidentified sums of money allegedly taken from Verestar's bank accounts, (ii) unidentifiable sale proceeds from the sale of MTN and GenTel, and (iii) real property. The first question raised by the ATC motion to dismiss is the law that governs the conversion claim. ATC's motion cites Delaware and New York cases. The Committee relies on New York law but then adds that the laws are similar in Massachusetts (ATC's headquarters), Virginia (Verestar's headquarters), California (where some assets were located) and Florida (also a location of assets). Suffice it to say for purposes of this motion that there is no contention that there would be a material difference depending on the controlling law relating to the tort of conversion, and there is no need to engage in a lengthy choice of law analysis at this point. See *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.), 340 B.R. 510, 528 (Bankr. D. Del. 2006).* For purposes of the instant motion, conversion may be defined as "any unauthorized exercise of [*38] dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Meese v. Miller, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 500 (N.Y. App. Div. 1981)* (citations omitted); see also *LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 274 B.R. 600, 629 (Bankr. S.D.N.Y. 2002).* To sustain a conversion claim, acts must be alleged that are unlawful or wrongful and not merely a violation of contractual rights. *Fraser v. Doubleday & Co., Inc., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984).* As noted above, the Committee asserts conversion claims with respect to (i) cash, (ii) proceeds from the sale of MTN and GenTel, and (iii) certain sales of towers. *(i) Cash* With regard to cash transferred from Verestar's accounts, ATC correctly asserts that money is properly the subject of a conversion action only "if it is specifically identifiable and there is an obligation to return it or treat it in a particular manner." *Hoffman v. Unterberg, 9 A.D.3d 386, 780 N.Y.S.2d 617, 619 (N.Y. App. Div. 2004);* [*39] see also *Carlton Invs. ex rel. TLC Beatrice Int'l Holdings v. TLC Beatrice Int'l Holdings, 1995 Del. Ch. LEXIS 140, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995); High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998); Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1203 (Del. Ch. 1998).* The Committee contends that specifically identifiable funds can be the subject of a conversion action even if they are not segregated and held in a separate account, citing *LoPresti v. Terwilliger, 126 F.3d 34, 42 (2d Cir. 1997)* (union dues withheld by company); *Moses v. Martin, 360 F. Supp. 2d 533, 541–42 (S.D.N.Y. 2004)* (percentage of sales to be remitted by vendor). The Committee uses this proposition as a basis for extending the tort of conversion to cover an affiliate's operation of a common cash management system. The allegations of the Complaint charge ATC with misappropriation of cash that was the subject of a cash management system, in which affiliates commingle cash from their operations and finance their cash needs from a common fund. Here, as in many situations, the cash was subject to a security interest held by lenders and was paid down [*40] and re-loaned based on formulas set forth in financing documents. Notwithstanding its contentions, the Committee has not cited any authority that has applied the tort of conversion to a dispute over an affiliate's operation of a common cash management system, and there is no cause in this case to do so. For certain purposes relating to cash management accounts, the courts have focused on the issue of control, finding that the cash is property of the entity that has control, and the "unfettered discretion to pay creditors of its own choosing," even where the account contains commingled funds. *In re Southmark Corp., 49 F.3d 1111, 1116 (5th Cir. 1995)* (avoidance action); *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 377 (Bankr. S.D.N.Y. 1998)* (same). The thrust of the Committee's Complaint is that ATC had complete control over Verestar's cash and used that control for improper purposes. The question whether ATC incurred any liability in connection with its management of the system is reserved, but ATC's admitted control over Verestar's cash is inconsistent with the proposition that it converted funds. Moreover, as noted above, a conversion claim [*41] for money must seek the return of "specifically identifiable" sums of money. Even now, the Committee has no way to identify the money that ATC allegedly converted except to state that it has failed to treat Verestar's cash administered in the cash management program in an appropriate manner or in accordance with the agreement of the parties. If ATC has failed to account for any funds that were Verestar's, it can be held liable for breach of contract. If ATC used its control over Verestar's cash for improper purposes, or to maintain control to the detriment of other creditors, ATC's claims can be subordinated or ATC can possibly be held liable on alter ego or other principles. The Committee has not, however, stated a claim for the conversion of cash from the operation of the companies' common system. *(ii) Proceeds of MTN and GenTel* ATC asserts that the Committee cannot sustain a claim for conversion of the proceeds ATC allegedly received from the sale of MTN and GenTel. ATC does not dispute that a tort of conversion may properly apply to proceeds derived from the sale of a subsidiary, but rather argues that the Committee's conversion claim fails in this instance because the District [*42] Court Complaint does not adequately identify the sale proceeds at issue. However, the Complaint sets forth in sufficient detail the timing of and

circumstances surrounding these transactions, and it cannot be seriously argued that the Complaint fails to give ATC sufficient notice under *Rule 8(a)* of a claim for conversion of sale proceeds received directly by ATC from third party purchasers. It may be that ATC had a claim of right with respect to the application of these proceeds, but that cannot be determined on these motions. The motion to dismiss is denied as to these proceeds.*(iii) Tower Assets*The Defendants next argue that the Committee's claim for conversion of Tower Assets must be dismissed because (i) it seeks the return of real property while only tangible personal property may be the subject of a conversion action, and (ii) it does not identify any specific transaction except the transfer of Verestar's San Bruno towers in August 2002. The Defendants are correct that the Complaint only identifies the San Bruno incident, and that the other properties are only generally referenced. Defendants are also correct that real property may not properly be the subject of a conversion [*43] action. See *Geler v. Nat'l Westminster Bank, 770 F. Supp. 210, 214 (S.D.N.Y. 1991); E. River Sav. Bank v. Secretary of Hous. & Urban Devel., 702 F. Supp. 448, 455 (S.D.N.Y. 1988)*. However, the cash proceeds of the sale of real property can be converted. *Asdourian v. Konstantin, 93 F. Supp. 2d 296, 299 (E.D.N.Y. 2000)*. n9 The Committee has adequately pleaded a claim for conversion as to proceeds from the sale of the Tower Assets transferred to ATC.

n9 It is also not clear at this point whether the sale of the towers encompassed chattels or trade fixtures, which are personal property and may be the proper subject of a conversion action. See *Orange County — Poughkeepsie MSA Ltd Partnership v. Bonte, 301 A.D.2d 583, 754 N.Y.S.2d 312 (2d Dep't 2003); J.K.S.P. Restaurant, Inc. v. County of Nassau, 127 A.D.2d 121, 134, 513 N.Y.S.2d 716, 725 (2d Dep't 1987)*. Whether an object is a trade fixture or an ordinary fixture is generally a mixed question of law and fact which the Court cannot decide at this stage in the proceedings, especially as the State's law that will apply to the Committee's claim for conversion is not established. See *In re Dormitory Authority of State, 172 A.D.2d 401, 586 N.Y.S.2d 782, 783 (N.Y. App. Div. 1991)*.

[*44] **D. Fraudulent transfer**The Committee has asserted claims against ATC for actual and constructive fraudulent transfer under §§ 544(b) and 548(a)(1) of the Bankruptcy Code, seeking in the District Court Complaint to avoid the following specific pre-petition transfers by Verestar: (i) a transfer of $7,600,421 to ATC; (ii) the *Seventh Amendment* to the Credit Agreement; (iii) the transfer of the Tower Assets to ATC; and (iv) Verestar's

execution of the Note. n10 *Section 548(a)(1)*, as applicable to this case, permits a trustee to avoid any actual or constructive fraudulent transfer made by the debtor within one year before the filing of the petition. *Section 544(b)* grants a trustee the right to avoid any actual or constructive fraudulent transfer that is voidable by an existing unsecured creditor under "applicable" State law.

n10 The District Court Complaint includes additional allegedly fraudulent transfers that are not the subject of these motions to dismiss, including $640,000 paid to Bear Stearns for "financial services rendered" and daily cash sweeps. (D. Ct. Comp. P 130.)

[*45] *(i) § 548 of the Bankruptcy Code*With regard to the Committee's claims under *§ 548(a)(1)*, the Defendants argue that these claims should be dismissed because the Committee has failed to meet the applicable pleading requirements.To establish a claim for actual fraudulent transfer under *§ 548(a)(1)(A)*, a plaintiff must plead facts showing that the transfer was made by the defendant with the intent to hinder, delay or defraud present or future creditors of the transferor. As discussed above, a claim for actual fraudulent transfer must be pleaded with particularity in accordance with *Rule 9(b)*. In contrast to a claim for actual fraud, a claim for constructive fraud pursuant to *§ 548(a)(1)(B)* need only comply with the liberal pleading standards of *Rule 8(a)*. To establish a claim for constructive fraudulent transfer under *§ 548(a)(1)(B)*, a plaintiff must allege facts showing that (i) the debtor had an interest in the property; (ii) a transfer of that interest occurred within the prescribed time period; (iii) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (iv) the debtor received less than reasonably equivalent [*46] value in exchange for such transfer. *BFP v. Resolution Trust Corp., 511 U.S. 531, 535, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994)*.With regard to the first three transfers at issue — the transfer to ATC of $7,600,421, the *Seventh Amendment*, and the transfer of the Tower Assets — the Committee has sufficiently alleged a claim for constructive fraudulent conveyance under *§ 548(a)(1)(B)* but has failed to make out a claim for actual fraudulent conveyance under *§ 548(a)(1)(A)*. The Committee has pleaded that each of the challenged transfers was made for less than reasonably equivalent value within one year of the Petition Date and that the Debtors were insolvent at the times these transactions were made. These allegations easily meet the pleading requirements of *Rule 8(a)*. However, the Committee incorrectly asserts that these allegations, combined with its alter ego allegations described above and an alleged overall "pattern of inappropriate trans-

2006 Bankr. LEXIS 1022, *46

fers" and "general chronology of events," are sufficient for pleading a claim of actual fraudulent transfer. *Rule 9(b)* requires that claims be spelled out with particularity, and conclusory allegations that do not evidence fraudulent intent with respect to the [*47] specific transfers challenged do not suffice. With regard to the first transfer at issue, the Committee alleges simply that Verestar made a fraudulent transfer to ATC of $7,600,421, as reflected in the Debtors' Amended Statement of Financial Affairs. (D. Ct. Complaint P 130). The Committee provides no additional allegations of fraudulent intent necessary to support its claim for actual fraudulent transfer. The Committee also fails to allege facts sufficient to support its claim for actual fraudulent transfer with respect to the *Seventh Amendment* to the Credit Agreement. The Complaint explains the reasons why the *Seventh Amendment* may have been adverse to the interests of Verestar and its creditors, by severely limiting Verestar's ability to borrow additional sums, by leaving Verestar's assets pledged to the lenders (but eliminating its right to retain a portion of the proceeds of any sales) and by limiting Verestar's defenses against a suit by the lenders. But the Complaint does not adequately tie the Amendment to one of the badges of fraud that are characteristic of intentionally fraudulent transfers or allege facts from which one could find fraudulent intent. n11 The parties maintained [*48] a cash management program and the Complaint, on its face, demonstrates that ATC had a contractual interest in the funds.

> n11 The Second Circuit has recognized the following "badges of fraud" as circumstantial evidence of actual intent under *§ 548(a)(1)(A)*: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *In re Kaiser, 722 F.2d 1574, 1582–83 (2d Cir. 1983).*

The result is different with respect to at least some of the remaining transfers alleged to have [*49] been made with the intent to harm Verestar's creditors. The Complaint details a scheme by ATC to seize the value of the San Bruno tower in August 2002 for less than fair consideration. n12 With respect to the Note, the Complaint sets out in detail allegations regarding ATC's back–dating of a bogus

instrument to document as debt advances that had actually been made as equity. As noted above, this is one of the very few claims that the Committee has purported to ground in fraud. The Committee's allegations regarding the back–dating of the Note and other circumstances surrounding the Note's execution and approval are pleaded with particularity.

> n12 The only transaction set forth with adequate specificity relates to San Bruno. The remaining assertions ("Ultimately, ATC acquired most if not all of the Verestar's tower assets, for little or no consideration," D. Ct. Complaint P 60) are not adequate to state a claim under *§ 548(a)(1)(A)*, as opposed to *§ 548(a)(1)(B)*.

The Defendants argue that execution of the [*50] Note did not constitute a transfer of an interest in property within the meaning of *§ 548*, that the Note was merely evidence of an obligation, and that, in any event, there was no damage to Verestar because the District Court Complaint does not allege that any payments were made on the Note. In *Weaver v. Kellogg, 216 B.R. 563, 573–74 (S.D. Tex. 1997)*, the Court held that a debtor's execution of promissory notes constituted a transfer for purposes of *§ 548*, even though the notes were not paid down, because the notes altered the debtor's rights by documenting changes in interest rates and payment deadlines. Quoting *In re Besing, 981 F.2d 1488, 1492 (5th Cir. 1993), cert. denied, 510 U.S. 821, 114 S. Ct. 79, 126 L. Ed. 2d 47 (1993)*, the *Weaver* Court noted that the term "transfer" in *§ 548* had been broadly construed to encompass "'every mode . . . of . . . parting with . . . an interest in property.'" *216 B.R. at 573.* Here, the Committee has adequately alleged that the Note conveyed property to ATC, in that it purported to recognize equity advances as debt and to put into place repayment terms, maturity dates and other terms that did not previously [*51] exist. It gave ATC the ability to compete with other creditors as the holder of a debt obligation. Execution of the Note constituted a transfer subject to avoidance as a fraudulent transfer under the Bankruptcy Code, and the District Court Complaint has more than enough specific allegations of intent to hinder, delay or defraud creditors. n13

> n13 It should be noted that the Committee is also seeking to recharacterize the Note and ATC's other claims as equity, a cause of action that is not subject to the motions to dismiss.

*(ii) § 544(b) of the Bankruptcy Code* The Committee also purports to state fraudulent transfer claims under *§ 544(b) of the Bankruptcy Code*, which permits a trustee (or debtor

in possession with the power of a trustee) to make use of the avoidance powers of an unsecured creditor under "applicable law." As a practical matter, these rights generally permit the plaintiff to extend the § 548 look–back period (one year in this case) by using [*52] longer State statutes of limitation. The Defendants assert that any claims under § 544(b) must be dismissed because the Committee has not specified under which "applicable law" — meaning which State fraudulent transfer law — the claims are being pleaded. There is conflicting authority on this issue. The Defendants rely on *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003)*, in which a creditors committee alleged actual and constructive fraudulent transfer claims under § 544(b) without specifying which State law applied. The Bankruptcy Court dismissed the claims summarily and without much analysis but granted the committee leave to amend the complaint to rectify the deficiency. *Id. at 749*. The Committee responds that it should not be required to plead law in its Complaint and cites *Argus Mgmt. Group v. Rider (In re CVEO Corp.), 2004 Bankr. LEXIS 1343, at *8 (Bankr. D. Del. Sept. 13, 2004)*, for the proposition that it is not necessary to provide statutory citations in a complaint. This case, as well as the more recent case of *In re Oakwood Homes Corp., 340 B.R. at 526*, [*53] so held, and relied on the general principle that a plaintiff ordinarily does not have to plead law in the complaint under the general standards of *Rule 8*. See *Ghebreselassie v. Coleman Sec. Service, 829 F.2d 892, 895 (9th Cir. 1987)*; *Watson v. Pennsylvania, 251 F.3d 420, 429 (3d Cir. 2001)*; see also *Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir. 1997)*, quoting *Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988)*: "Under the liberal pleading principles established by *Rule 8 of the Federal Rules of Civil Procedure*, in ruling on a 12(b)(6) motion 'the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.'" With respect to the allegations charging ATC with receipt of constructive fraudulent conveyances under applicable State law, the Committee's Complaint is sufficient under the general standards discussed above. On the other hand, although a complaint ordinarily does not have to specify the statute relied on, the requirement that claims subject to the standards [*54] of *Rule 9(b)* be pleaded with particularity has been construed to require particularity in pleading the statutory basis for a claim. See, e.g., *Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1270 (S.D.N.Y. 1991)*; *Kunzweiler v. Zero.net, Inc., 2002 U.S. Dist. LEXIS 12080, at *49 n.18 (N.D. Tex. July 3, 2002)*. Therefore, the allegations that ATC acted with fraudulent intent under some unspecified State statute do not meet the standards of *Rule 9(b)* and must be dismissed. **E. Accounting** The Committee has in-

voked *§ 542(e) of the Bankruptcy Code* in an effort to require ATC to produce a full written accounting of certain transfers and assets identified in the District Court Complaint. *Section 542(e)* provides: "Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." The statute by its terms does not require ATC to provide an accounting [*55] under the circumstances set forth in the Complaint. ATC is not an "other person that holds" recorded information relating to Verestar. As the legislative history confirms, *§ 542(e)* was intended by Congress to apply to professionals holding certain documentation relating to a debtor's property or financial affairs. See S. Rep. No. 95–989, at 84 (1978); H. R. Rep. No. 95–595, at 369–70 (1977). *Section 542(e)* does not reach parties such as ATC, and the Committee's accounting claim is dismissed.

## III. Claims Against Verestar Officers and Directors A. Breach of Fiduciary Duty

We finally reach the core of the District Court Complaint, a claim for breach of fiduciary duty against former directors and officers of Verestar. According to the Committee, the directors and officers abdicated their fiduciary responsibilities by engaging in an asset-stripping scheme and managing Verestar exclusively for the benefit of ATC and to the detriment of Verestar and its creditors. As described above, the Complaint sets forth in detail a deliberate scheme to divest Verestar of assets and rights, to transfer value to ATC and to improve ATC's position in the event of Verestar's inevitable [*56] collapse and bankruptcy. The scheme allegedly included the aptly–named "Project Harvest," a plan to harvest the value of Verestar for the benefit of the parent and to the detriment of all other creditors. ATC and the Individual Defendants do not dispute that under Delaware law the directors owed fiduciary duties to the corporation that encompassed duties to its creditors once Verestar was operating "in the vicinity of insolvency." See *Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 787–88 (Del. Ch. 1992)*; *Production Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 793 (Del. Ch. 2004)*; *In re Buckhead America Corp., 178 B.R. 956, 968 (D. Del. 1994)* (Delaware law). n14 As stated in the Delaware Chancellor's well-known footnote in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communs. Corp., 1991 Del. Ch. LEXIS 215, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991)*, when a corporation is "in the vicinity of insolvency," the directors owe fiduciary duties to the entire "community of interests" of those involved with the corporation, including creditors. Subsequent decisions have emphasized that when managing a corpo-

2006 Bankr. LEXIS 1022, *56

ration [*57] "in the vicinity of insolvency," directors must consider the best interests of the corporation, and not just the interests of either creditors or shareholders alone. "[W]hile this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity." *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.), 274 B.R. 71, 89 (D. Del. 2002).* Other Delaware cases emphasize that the rationale behind the "insolvency exception" is that fiduciary duties ordinarily owed exclusively to shareholders shift to benefit creditors who "now occupy the position of residual owners."

> n14 There is no dispute that Delaware law is applicable to the breach of duty claims against the directors and officers of a Delaware corporation.

*Steinberg v. Kendig (In re Ben Franklin Retail Stores), 225 B.R. 646, 653 (Bankr. N.D. Ill. 1988),* quoting [*58] Frost, *The Theory, Reality and Pragmatism of Corporate Governance in Bankruptcy Reorganizations, 72 Am. Bankr. L.J., 103, 108 (1998);* see also *Geyer v. Ingersoll Publ'ns Co., 621 A.2d at 787.* The fiduciary duties of directors ordinarily include the duty of care and the duty of loyalty. *Norlin Corp. v. Rooney, Pace, Inc., 744 F.2d 255, 264 (2d Cir. 1984).* The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his or her tasks, the care that a reasonably prudent person would use under similar circumstances. The duty of loyalty derives from the prohibition against self-dealing that inheres in the fiduciary relationship. *Id.,* citing *Pepper v. Litton, 308 U.S. 295, 306–07, 60 S. Ct. 238, 84 L. Ed. 281 (1939).* To establish a breach of fiduciary duty by a corporate director, a plaintiff must take into account the business judgment rule, which provides that in making business decisions, there is a presumption that the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984);* [*59] *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999); Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985).* ATC and the Individual Defendants do not contend that the allegations in the District Court Complaint fail to charge the directors with breach of duty with sufficient particularity. n15 Defendants' first attack on the fiduciary duty allegations in the Complaint is that the directors are shielded by an exculpatory clause in Verestar's certificate of incorporation. Article 8 of Verestar's certificate of incorporation provides in pertinent part: "No director shall be personally liable to the Corporation or any stockholder for breach of fiduciary duty as a director, except

[to] the extent that exculpation from liability is not permitted under the General Corporation Law of the State of Delaware in effect when such breach occurred." The relevant Delaware statute is *§ 102(b)(7)* of the Delaware Corporate Law, which provides that an exculpatory clause in a corporation's charter cannot "eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; [*60] (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; . . . or (iv) for any transaction from which the director derived an improper personal benefit." *8 Del. C. § 102(b)(7).* ATC argues that this statute and the charter provision eliminate all of the fiduciary claims in the Complaint against the directors.

> n15 All of the Defendants except those connected to Bear Stearns have the same counsel and filed the same papers in support of their motion to dismiss.

The Delaware Chancery Court and the Second Circuit have both held that exculpatory clauses of this type are enforceable against a bankruptcy estate representative asserting a debtor's claims on behalf of creditors. See *Production Resources, 863 A.2d at 792–95; Pereira v. Farace, 413 F.3d 330, 341–42 (2d Cir. 2005)* (Delaware law). Nevertheless, as both Courts pointed out, the effect of such a provision is only to eliminate claims based [*61] on the duty of care. In the words of the *Pereira* court, the exculpatory clause "precluded creditor claims predicated on mismanagement — i.e., duty of care violations — but did not preclude claims based on deliberate wrongdoing — i.e., duty of loyalty violations." *Pereira v. Farace, 413 F.3d at 342,* citing *Production Resources, 863 A.2d at 793–95.* Based on the foregoing authority and the Verestar charter provision, the allegations of the Complaint that charge the directors with breach of the duty of care must be dismissed. These include charges that ATC caused Verestar to engage in an overly aggressive acquisition strategy, that it made acquisitions despite knowledge that substantial losses would be generated and that these transactions contributed to creditors' losses. These allegations are not saved by a conclusory assertion that the directors' acts and omissions were not taken in good faith or involved intentional misconduct or a knowing violation of the law, even though such conduct cannot be exculpated under the Delaware statute. As discussed above, the business judgment rule protecting directors from having their decisions second-guessed [*62] cannot be overcome by conclusory allegations of bad faith. See *Stanziale v. Nachtomi, 330 B.R. 56, 63 (D. Del. 2004); McMillan v. Intercargo Corp., 768 A.2d 492, 507 (Del. Ch. 2000).* For the same reasons, Delaware's decision to permit exculpatory provi-

2006 Bankr. LEXIS 1022, *62

sions relating to the duty of care cannot be overcome by conclusory allegations of bad faith. Notwithstanding the dismissal of the duty of care claims in the Complaint, the vast bulk of the claims allege that the directors breached their duty of loyalty. To successfully plead a claim for breach of loyalty, a plaintiff must allege facts showing that "the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." *Orman v. Cullman, 794 A.2d 5, 24 (Del. Ch. 2002)* (internal quotation omitted). The Committee asserts that Verestar's directors lacked independence because most or all also served as officers and/or directors of ATC and were beholden to ATC when making their decisions on behalf of Verestar. These "beholden" directors then allegedly deferred to ATC's power and failed to exercise business judgment with regard to (i) the [*63] management of Verestar, engaged in a scheme to prefer the parent over all other creditors and assisted ATC in siphoning off Verestar's assets for the benefit of the parent. The Complaint alleges in great detail acts of Verestar's officers and directors to advance ATC's interests and damage the interests of Verestar and all of its other creditors, including allegations relating to (i) Project Harvest, (ii) manufacturing, executing and approving the Note, (iii) transferring the Tower Assets as well as the proceeds of MTN and GenTel, (iv) approving the *Seventh Amendment*, and (v) withholding payments from vendors in order to improve ATC's position as a creditor. Any situation where a wholly-owned and controlled subsidiary enters the zone of insolvency obviously requires all responsible parties to act with the utmost care and responsibility. It is possible that ATC took every appropriate step to deal with the situation, and it is not appropriate on these motions to dismiss to discuss those measures that would obviously protect directors against future liability, such as the delegation of responsibility to independent directors and the retention of independent advisors with a duty only [*64] to the subsidiary. For purposes of these motions to dismiss, it suffices to state that the allegations of the Complaint, which the Court must accept as true, are that the Verestar directors did almost everything wrong. n16

n16 In *Steinberg v. Kendig (In re Ben Franklin Retail Stores), 225 B.R. 646, 655, aff'd in part, 1999 U.S. Dist. LEXIS 16645 (N.D. Ill. 1999), rev'd in part on other grounds, 2000 U.S. Dist. LEXIS 276 (N.D. Ill. 2000)*, the Court observed, "All of the decisions in which the courts have allowed creditors to recover for breach of fiduciary duty have involved directors of an insolvent corporation diverting corporate assets for the benefit of insiders or preferred creditors." Quoting Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of*

*Directors' Duty of Creditors, 46 Vand. L. Rev. 1485, 1512 (1993)*. That is precisely what the District Court Complaint alleges.

The Defendants next argue that Verestar's [*65] non-director officers (Benincasa, Kagan, Milsom and Petzold) cannot be held liable for breach of fiduciary duty. Their principal contention is that these officers did not breach their fiduciary duties because they did not have responsibility over the various types of misconduct alleged in the District Court Complaint. Although corporate officers may not owe fiduciary duties to a corporation regarding aspects of the management of the corporation that are not within their responsibility or are within the exclusive province of the board, non-director officers may be held liable for breach of fiduciary duty "to the extent that they have discretionary authority over, and the power to prevent, the complained of transactions," in which case they will be held to the same standards as a director. *Pereira v. Cogan, 294 B.R. 449, 520 (S.D.N.Y. 2003), vacated on other grounds, Pereira v. Farace, 413 F.3d 330 (2d Cir. 2005)*; see also *In re Walt Disney Co. Derivative Litig., 2004 Del. Ch. LEXIS 132, *13 (Del. Ch. Sept. 10, 2004)*, citing David A. Drexler, *et al., Delaware Corporation Law and Practice § 14.02* (Rel. [*66] No. 16, 2003); *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.), 333 B.R. 506, 526 (Bankr. D. D.C. 2005)* (Delaware law). The District Court Complaint sets forth specific allegations against the nondirector officers of Verestar concerning improper actions and omissions taken in their capacity as officers. According to the Committee, these officers had direct discretionary authority over certain aspects of Verestar's business and participated in the scheme to transfer to ATC assets that were within their area of responsibility. Specifically, the Committee asserts that Kagan, who was the president and CEO of Verestar and the signatory for Verestar on the Note, was also the president and CEO of Falconhead Capital, the purchaser of MTN. Kagan allegedly executed the Note in the hope that ATC would accept Falconhead's offer to buy certain other teleport assets. The Committee also alleges that Milsom, who was vice president, controller and assistant treasurer of Verestar, participated in the transfer of Tower Assets to ATC, the sale of MTN, the threats to vendors, and the misconduct surrounding the manufacture and execution of the Note. Lastly, Petzold, who was [*67] Verestar's vice president, CFO and treasurer, allegedly participated in the sale of GenTel and executed the *Seventh Amendment* to the Credit Agreement on behalf of Verestar. These allegations are sufficient to establish "discretionary authority" as a matter of Delaware law, and the Committee has sufficiently pleaded allegations supporting its claim for breach of the duty of loyalty, which also falls outside the

exculpatory clause in Verestar's charter. See *In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 290 (Del. Ch. 2003)*.As for the officers' breach of the duty of care, the exculpatory clause in the Verestar certificate of incorporation protects only directors, not officers. However, the decisions that impose a fiduciary duty on officers of a Delaware corporation hold them to the same standards as a director. See *Cogan, 294 B.R. at 463, 522*. No reason has been suggested why an officer should be held to a higher standard. Accordingly, only claims sounding in breach of the duty of loyalty are sustained as against the officers.**B. Deepening Insolvency**The Committee appends to its count alleging breach of fiduciary duty a count alleging [*68] the wrong of deepening insolvency, which refers to "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 347–48 (3d Cir. 2001)*. Claims of deepening insolvency usually involve misconduct that causes a financially troubled company to suffer losses by incurring additional debt with little or no hope of recovery, damaging creditors in the process. Courts are in disagreement over whether deepening insolvency is a separate tort or a theory of damages, and the parties likewise dispute whether this Court should recognize deepening insolvency as an independent claim in this case.Citing *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003)*, the Committee asserts that its claim for deepening insolvency is a valid cause of action under Delaware law. The Defendants counter that no Delaware State court has ruled that deepening insolvency is a separate cognizable tort and that the Bankruptcy Court's decision in *Exide* was based on its prediction that the Delaware Supreme Court "would recognize [*69] a claim for deepening insolvency when there has been damage to corporate property." *299 B.R. at 752*. They cite a plethora of Federal cases construing various State laws that have concluded that the claim of "deepening insolvency" adds nothing of substance to claims of breach of the duty of loyalty and other established torts. For example, in *In re Parmalat Sec. Litig., 383 F. Supp. 2d 587, 601–602 (S.D.N.Y. 2005)* (North Carolina law), the District Court dismissed the debtor's claim for deepening insolvency as duplicative of its other claims for breach of fiduciary duty or aiding and abetting a breach of fiduciary duty and said: "If officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable (a point on which courts are split, but that need not be resolved at this stage), that injury is compensable on a claim for breach of fiduciary duty." Similarly, in *In re Kittay v. Atlantic Bank (In re Global Serv. Group LLC), 316 B.R. 451, 458 (Bankr. S.D.N.Y.*

*2004)* (New York law), the Court concluded that "one seeking to recover for 'deepening [*70] insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt." See also *In re Greater Southeast Cmty. Hosp. Corp., 333 B.R. at 517; Official Comm. of Unsecured Creditors of VarTec Telecom, Inc. v. Rural Tel. Fin. Coop. (In re VarTec Telecom, Inc.), 335 B.R. 631, 644 (Bankr. N.D. Tex. 2005)* (Texas law); *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.), 2005 Bankr. LEXIS 1740, 2005 WL 2205703, at \*9 (Bankr. C.D. Ill. Aug. 26, 2005)* (Delaware law); Willett, *The Shallows of Deepening Insolvency, 60 Bus. Law 549 (2005)*; Heaton, *Deepening Insolvency, 30 Iowa J. Corp. Law 465 (2005)*. In addition to those courts that have accepted and those that have rejected the theory are some that are waiting for a definition of just what the theory entails. See, e.g., *Smith v. Arthur Andersen LLP, 421 F.3d 989, 1003–04 (9th Cir. 2005)*, where the Ninth Circuit, reviewing a proposed settlement, found that the debtor was harmed by dissipation of assets (and suffered additional costs) by a prolongation of its [*71] existence, and stated, "We need not make any general pronouncements on the deepening insolvency theory, not least because it is difficult to grasp exactly what the theory entails." (citation omitted).In *In re Oakwood Homes Corp., 340 B.R. at 530–31*, the Delaware Bankruptcy Court recently considered a claim of "deepening insolvency" governed by Delaware law, reviewed the increasing number of cases that have variously accepted and rejected the doctrine as a separate tort and predicted that the Delaware courts would recognize it. However, an important factor in the Court's conclusion was the Third Circuit's decision in *Lafferty, 267 F.3d at 351*, which recognized the doctrine, albeit in the context of construing Pennsylvania, not Delaware, law. And even more recently the Third Circuit took note of *In re Oakwood Homes Corp.* and went out of its way to observe, "nothing we said in *Lafferty* compels any extension of the doctrine beyond Pennsylvania." *Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.), 2006 U.S. App. LEXIS 13141, at \*19 n.11 (3d Cir. May 26, 2006)*. In that case, the Third Circuit held that any separate [*72] claim of "deepening insolvency" could only be predicated on a showing of fraud, noting that *Lafferty* itself "holds only that fraudulent conduct will suffice to support a deepening–insolvency claim under Pennsylvania law. . . . To that end, we hold that a claim of negligence cannot sustain a deepening insolvency cause of action." *Id. at \*20–21* (footnote omitted).In this case the Court must do its best to predict the ultimate decision of the Delaware courts as to whether a director can breach an independent duty by prolonging the life of a financially troubled or insolvent corporation, without violating any other duty (such as the

2006 Bankr. LEXIS 1022, *72

duty of loyalty or the duty of care), in the face of a charter provision that expressly exculpates directors from liability for breach of duty to the extent permitted by Delaware law. As discussed above, this provision insulates the director Defendants from claims that they breached the duty of care but not from the allegations in the Complaint of breach of the duty of loyalty or of intentional or fraudulent misconduct.As the Complaint in this case makes clear, to the extent a plaintiff asserts that a director harmed creditors solely by permitting [*73] the corporation to remain in business and incur "unnecessary" debt, and alleges no more, the charge must relate to a breach of the duty of care. Unlike some foreign jurisdictions, where the law imposes liability on directors who continue to trade after the corporation becomes insolvent, under American law there is no duty to liquidate, untempered by the business judgment rule, upon insolvency. *In re Global Serv. Group, LLC, 316 B.R. at 460–61; RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.), 2003 Bankr. LEXIS 1635, 2003 WL 22989669, at \*8 (Bankr. S.D.N.Y. Dec. 11, 2003).* The Committee has cited no principle that the directors of an insolvent company or one in financial difficulty cannot, on pain of liability for "deepening insolvency," conserve cash and increase the total debt level. Such a rule would preclude the directors of a possibly insolvent enterprise from trying to "work out" a problem.In any event, the Verestar exculpatory charter provision relieves the director Defendants of all liability except for breach of the duty of loyalty and knowing, willful violations of law or fraud, and there is no basis, without more [*74] being alleged, to equate a charge of "deepening insolvency" with a knowing and willful violation of law or breach of the duty of loyalty. This conclusion is compelled by the holding of *Production Resources Group*, where the Delaware Court of Chancery enforced a charter provision exculpating directors from liability where the corporation was allegedly insolvent and creditors allegedly harmed. The Court explained why the Delaware statute permits the adoption of an exculpatory clause, stating:

> One of the primary purposes of *§ 102(b)(7)* is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith. To expose directors to liability for breach of the duty of care for derivative claims of mismanagement asserted by creditors guts this purpose by denying directors the protection of *§ 102(b)(7)* when they arguably need it most.

*863 A.2d at 777.* The Court also cited *Asmussen v. Quaker City Corp., 18 Del. Ch. 28, 156 A. 180 (Del. Ch. 1931),* for the proposition that "the mere fact that directors of an

insolvent firm favor certain creditors over others of similar priority does not constitute [*75] a breach of fiduciary duty, absent self-dealing." *863 A.2d at 791–92* (footnote omitted). The law of other jurisdictions is the same. See the Second Circuit's decision in *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43 (2d Cir. 2005),* which held that under New York law a debtor may pay certain creditors, excluding insiders, and leave others unpaid. n17

> n17 Rejecting a related fraudulent conveyance claim, the Court stated that "the decisive principle in this case is that a mere preference between creditors does not constitute bad faith." *403 F.3d at 54.*

The Committee's own description of its Complaint is that the only claim of fraud (other than intentional fraudulent conveyance) relates to the back-dated Note. To the extent the Individual Defendants fraudulently back-dated the Note and thereby purported to increase the debt level and/or improve ATC's position vis-a-vis other creditors, they can be held liable in fraud or breach [*76] of the duty of loyalty. To the extent the Individual Defendants looted Verestar during the period of "deepening insolvency," they can be held liable for breach of the duty of loyalty. But Count VIII of the District Court Complaint is stated without any such limitations and $150 million in undifferentiated damages is sought. As broadly pleaded by the Committee, Count VIII must be dismissed as precluded by the exculpatory provision in Verestar's charter relating to the duty of care or as duplicative of other claims already stated in the Complaint. See *Ferran v. Town of Nassau, 11 F.3d 21, 23 (2d Cir. 1992)* (dismissing duplicative claims); *In re Buckhead America Corp., 178 B.R. at 968; Parmalat, 383 F. Supp. 2d at 601–02.* n18

> n18 The Committee's deepening insolvency claim is also asserted against ATC. Just as the claim adds nothing to the Committee's breach of fiduciary duty claim against the Individual Defendants, the deepening insolvency claim adds nothing to the Committee's claim against ATC for aiding and abetting breach of fiduciary duty as well as its cause of action to recharacterize the ATC claims as equity. (See the discussion below in Section V., *infra*, with respect to aiding and abetting breach of fiduciary duty.) Thus the Committee's claim for deepening insolvency should also be dismissed as to ATC. See *Parmalat, 383 F. Supp. 2d at 602* (a claim for aiding and abetting breach of fiduciary duty reaches any potential harm suffered by the corporation from

deepened insolvency wrought by the officers' and directors' breach of fiduciary duty with the assistance of a third party).

[*77]

**IV. Claims Against the Bear Stearns Defendants** The Committee has brought a claim for breach of contract against Bear Stearns and claims for conspiracy and aiding and abetting against all Bear Stearns Defendants. According to the District Court Complaint, (i) Bear Stearns, (ii) Scott Moskowitz, who was a managing director at Bear Stearns (as well as a Verestar director from March 2000 through June 2002), and (iii) Marc Layne, who was an associate of Scott Moskowitz and a vice president of Bear Stearns, purported to act as Verestar's exclusive financial advisors but in fact were beholden to ATC, helping ATC loot its subsidiary and siphon off Verestar's assets and value to the detriment of Verestar and its creditors. Specifically, the Committee alleges that the Bear Stearns Defendants materially participated in (i) Project Harvest, (ii) the diversion of sale proceeds from Verestar to ATC upon the sale of MTN and GenTel, (iii) the transfer of the Tower Assets to ATC for little or no consideration and (iv) the coercion of Verestar's vendors. This purported wrongdoing allegedly breached the express terms of Bear Stearns' letter agreement with Verestar and the implied covenant [*78] of good faith and fair dealing that was an integral part of the contract. It also allegedly amounted to aiding and abetting a breach of fiduciary duty by Verestar's directors and officers, aiding and abetting conversion by ATC, and conspiracy with the other Bear Stearns Defendants to commit these torts. The Bear Stearns Defendants have moved to dismiss the claims brought against the firm and Moskowitz and Layne as its representatives in reliance on the common law defense of *in pari delicto*, which prohibits a party from recovering damages arising from misconduct for which the party bears responsibility. See *Pinter v. Dahl, 486 U.S. 622, 632, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988); Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310, 105 S. Ct. 2622, 86 L. Ed. 2d 215 (1985).* These Defendants also rely on the "*Wagoner* rule," an affirmative defense similar to the *in pari delicto* doctrine, derived from a Second Circuit case, *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991). In Wagoner,* the Second Circuit held that a bankruptcy trustee had no standing to bring a claim against a brokerage firm for aiding and abetting fraudulent activity by the debtor's president and sole [*79] shareholder because such a claim "accrues to creditors, not to the guilty corporation." *Id. at 120.* Thus, a plaintiff acting on behalf of a debtor cannot sue an outside professional or other third party for damages for which the corporation itself can be held responsible. The Bear

Stearns Defendants argue that courts in this Circuit routinely apply the *Wagoner* rule to bar the bankruptcy estate from asserting a claim against outside professionals for participation in an alleged scheme to strip the debtor's assets. For example, in *In re The Mediators, Inc., 105 F.3d 822 (2d Cir. 1997),* a creditors committee sued a law firm and an accounting firm on behalf of the estate for assisting the debtor's principal and sole shareholder in selling certain assets pre-petition at a discounted price and to the detriment of creditors. The committee asserted that the professionals had aided and abetted in the principal's breach of fiduciary duty by recommending and facilitating the fraudulent transfers. The District Court dismissed the claims against the professionals and the Circuit Court affirmed on the basis that the committee lacked standing to sue the professionals [*80] because the debtor participated in the underlying misconduct. *105 F.3d at 826.* The principle has been applied in major corporate fraud cases. See, e.g., *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.), 336 F.3d 94, 100 (2d Cir. 2004); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085 (2d Cir. 1995); Lippe v. Bairnco Corp., 218 B.R. 294 (S.D.N.Y. 1998).* The Committee responds that in *Wagoner,* the Second Circuit applied New York law and that the law of some other jurisdiction might apply under the circumstances of this case — the jurisdiction not to be specified until after discovery. The short answer is that all of the jurisdictions that the Committee has cited as possibly relevant have endorsed either the *Wagoner* rule or the common law principle *of in pari delicto:* Delaware (the state of incorporation of *Verestar and ATC), Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A., 80 F. Supp. 2d 129, 135– 37 (S.D.N.Y. 1999)* (applying Delaware law); Virginia (where Verestar was located), *Zysk v. Zysk, 239 Va. 32, 404 S.E.2d 721, 722 (Va. 1990)* [*81] *(in pari delicto* principle applies "to all civil actions, whether in tort or in contract"); Massachusetts (where ATC is located), *Baena v. KPMG LLP, 389 F. Supp. 2d 112, 118–20 (D. Mass. 2005);* California (where some property was located), *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, 133 Cal. App. 4th 658, 35 Cal. Rptr. 3d 31, 35 Cal Reptr. 3d 31, 47–48 (1st Dist. 2005);* and Florida (where other property was located), *Securities Investor Protection Corp. v. Capital City Bank (In re Meridian Asset Mgmt., Inc.), 296 B.R. 243, 257–58 (Bankr. N.D. Fla. 2003).* The Committee also contends that the malfeasance attributed to Verestar's officers and directors should not be imputed to Verestar and therefore that the Bear Stearns Defendants should not be able to raise the *in pari delicto* defense. Misconduct by a corporation's fiduciaries will not be imputed to the corporation, and the doctrine *of in pari delicto* will not apply, where the fiduciaries were acting outside the scope of their employment or engaged

in self–dealing and accordingly had an interest "adverse to the corporation." See *Allied Ir. Banks, P.L.C. v. Bank of Am., N.A., 2006 U.S. Dist. LEXIS 4270,* [*82] *at *29 (S.D.N.Y. January 31, 2006),* citing *Wight v. BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000).* On the other hand, as the Bear Stearns Defendants respond, this so-called "adverse interest" exception does not apply where all of the directors were subject to the control of a "sole actor," namely the debtor's "sole shareholder and decision maker." See, e.g., *In re The Mediators, Inc., 105 F.3d at 826;* Breeden *v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.), 336 F. 3d at 100;* Hirsch *v. Arthur Andersen, 72 F.3d at 1094.* The Committee's assertion that "questions of fact" exist as to whether ATC was Verestar's "sole actor" and "sole shareholder and decision maker" flies in the face of the allegations of its Complaint. The gist of the Committee's claim is that ATC, the sole shareholder, totally controlled and subverted the Verestar Board. The very same wrongdoing alleged against the Bear Stearns Defendants — including participation in Project Harvest, the fraudulent transfer of Tower Assets, and the diversion of sale proceeds — is also alleged against ATC and all of Verestar's directors. This alleged misconduct must be imputed from ATC, as [*83] Verestar's "sole actor" and alleged alter ego, to Verestar. This imputation of wrongdoing clearly establishes fault on the part of Verestar and "substantial responsibility" for purposes of the *in pari delicto* defense. Since the District Court Complaint itself alleges the facts that give rise to an *in pari delicto* defense, *Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001)* (a claim is subject to dismissal when an affirmative defense appears on the face of the complaint), the Committee's aiding and abetting and conspiracy claims against the Bear Stearns Defendants must be dismissed under the *Wagoner* doctrine and *in pari delicto.* The contract claims, which seek to impose $150 million in damages on Bear Stearns for violating its engagement letter, are also dismissed, as the *in pari delicto* doctrine has been applied to bar relief in contract as well as tort. See *Burns v. Ferro, 1991 Del. Super. LEXIS 99, C.A. No. 88C–SE–178, 1991 WL 53834, at *2 (Del. Super. Mar. 28, 1991);* Jeremias *v. Shearson Hayden Stone, Inc., 72 A.D.2d 506, 420 N.Y.S. 2d 881, 882–83 (1st Dept. 1999).* n19

n19 It should be noted that *in pari delicto* is not a defense to a fraudulent conveyance suit. *In re The Mediators, 105 F.3d at 825.* Bear Stearns has not moved to dismiss the claims against it seeking return of the contractual fees paid as an alleged constructive fraudulent coveyance.

[*84] The claims against Scott Moskowitz stand in a different position. As a representative of Bear Stearns, he is entitled to dismissal of all of the claims brought against him in that capacity. As noted above, however, he was also a director of Verestar from March 8, 2000 to June 30, 2002. He has also moved to dismiss the claims brought against him alleging breach of the duty of loyalty on the ground that the Committee has failed to adequately specify the wrongful conduct in which he engaged. Moskowitz aims most of his attack on the Complaint on the allegations involving the complained of business transactions that took place during his tenure as director, such as the IPN, PanAmSat and ISD transactions. He argues, for example, that each of these transactions reflected rational business judgment and is protected by the business judgment rule. Whether or not the Committee may have adequately pleaded a breach of the duty of care, any such claim against Moskowitz as a director is precluded by the exculpatory provision of the Verestar charter, and Moskowitz is entitled to dismissal of all such claims. He is not, however, entitled to an order dismissing the claims that, fairly read, accuse [*85] him (as well as the other directors) of a breach of the duty of loyalty during the period he was a director. Contrary to Moskowitz's contentions, the Complaint adequately alleges that "Project Harvest" was launched during the period he was still a director and that he participated in its creation. It is clear that much of the wrongdoing attributed to the directors' breach of the duty of loyalty took place after Moskowitz left the Board. It may be that he got off the Board just in time. Further factual development may demonstrate that he did not breach the duty of loyalty to Verestar. Or factual development may demonstrate that he resigned from the Board because he saw what was coming — complete disregard for Verestar's interests and looting for the benefit of the parent corporation. For purposes of the instant motion to dismiss, the District Court Complaint contains sufficient allegations of lack of independence and breach of a duty of loyalty during his period of Board service. See *Heineman v. Datapoint Corp., 611 A.2d 950, 955 (Del. 1992);* Krasner *v. Moffett, 826 A.2d 277, 283 (Del. 2003).* n20

n20 Moskowitz cites *In re CompuCom Sys. Stockholders Litig, 2005 Del. Ch. LEXIS 145, No. Civ. A. 499–N, 2005 WL 2481325, at *8 (Del. Ch. Sept. 29, 2005),* and *Kohls v. Duthie, 765 A.2d 1274, 1284–85 (Del. Ch. 2000),* for the proposition that the District Court Complaint does not adequately charge him with breach of the duty of loyalty. In *In re CompuCom,* the question was whether the plaintiffs adequately pleaded that a corporation dominated and controlled directors who were purportedly independent. In *Kohls v. Duthie,* the Chancery

Court denied a motion for a preliminary injunction to prevent a buy–out to take a company private, finding that the company's investment of $5 million in a fund in which a company director was CEO and CFO did not make the director interested. As in *CompuCom*, the plaintiffs in *Kohls* failed to demonstrate how the director's outside relationships evidenced lack of independence. In this case, the Committee adequately alleges that the relationship between ATC and Bear Stearns impaired the independence of Bear Stearns and its personnel.

[*86]

**V. Claims Against All Defendants**The remaining claims against ATC and the Individual Defendants include aiding and abetting breach of fiduciary duty, aiding and abetting conversion, conspiracy to commit these torts, and tortious interference with existing or prospective business relations. These claims have been dismissed as to the Bear Stearns Defendants as set forth above in Section III, *supra*, with the exception of the claim for tortious interference, which will be addressed below.As an initial matter, the claims alleged against Individual Defendants Arnold Chavkin and James Taiclet must be dismissed for failure to state a claim on which relief can be granted. According to the District Court Complaint, Chavkin was a director of ATC, Taiclet was ATC's president and CEO, and neither was an officer or director of Verestar at any time. The Committee alleges that Chavkin consulted with Dodge, who preceded Taiclet as ATC's president and CEO and who also held similar positions at Verestar, on the majority of the decisions Dodge made as CEO of ATC. Chavkin also allegedly advised Garrison, a Verestar director, and attended Verestar Board meetings on occasion. With regard [*87] to Taiclet, the Committee alleges that Taiclet was instructed to review the status of certain towers and determine how to effectuate their transfer to ATC.The Committee correctly notes that a complaint may group individual defendants to a certain degree for the purpose of stating a claim for relief when each defendant is explicitly connected to the underlying allegations supporting that claim. See *Wynder v. McMahon, 360 F.3d 73, 77, 80 (2d Cir. 2004)*. However, neither Chavkin nor Taiclet was a director or officer of Verestar, and neither can have breached any duty owed to Verestar in such capacity. The allegations described above, relating to Chavkin's unspecified advice and meeting attendance and Taiclet's receipt of instructions, are insufficient to link them to the breach of any duty they owed to Verestar. The Committee's claims for aiding and abetting, conspiracy and tortious interference are dismissed with respect to Chavkin and Taiclet for failure to state a claim.The claims against the remaining Defendants are dealt with as follows.**A. Aiding and**

**Abetting Breach of Fiduciary Duty**The Committee alleges claims against ATC and the Individual Defendants [*88] for aiding and abetting breach of fiduciary duty by Verestar's officers and directors. Under Delaware law, to pursue a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must properly allege (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) a knowing participation in that breach by a defendant who is not a fiduciary, and (iv) damages proximately caused by the concerted action of the fiduciary and non-fiduciary. See *In re GM (Hughes) S'holder Litig., 2005 Del. Ch. LEXIS 65, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005); In re Santa Fe Pacific Corp. S'holder Litig., 669 A.2d 59, 72 (Del. 1995)*. n21 Because a claim for aiding and abetting breach of fiduciary duty can only be sustained against a non–fiduciary, the Committee's claim for aiding and abetting breach of fiduciary duty is dismissed as to Verestar's directors and officers. *Gen. Motors, 2005 Del. Ch. LEXIS 65, 2005 WL 1089021, at *23*.

> n21 In contrast to Delaware law, to state a claim for aiding and abetting breach of fiduciary duty under New York law, a claimant must plead that that the defendant knowingly induced or substantially assisted in the breach. *S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847–48 (2d Cir. 1987)*.

[*89] With respect to ATC, the Committee has adequately stated a claim for aiding and abetting breach of fiduciary duty, including allegations of fact from which this Court can infer knowing participation as required under Delaware law. See *Nebenzahl v. Miller, 1996 Del. Ch. LEXIS 113, 1996 WL 494913, at *7 (Del. Ch. Aug. 29, 1996); Santa Fe Pacific Corp., 669 A.2d at 72*. The majority of allegations underlying the Committee's claim for breach of fiduciary duty involve conduct in which both Verestar fiduciaries and ATC allegedly engaged to the damage of Verestar and its creditors and to the benefit of ATC. ATC's knowing participation is alleged in a manner sufficient to state a claim for aiding and abetting breach of fiduciary duty. See *In re eBay, Inc., S'Holders Litig., 2004 Del. Ch. LEXIS 4, at *17 (Del. Ch. Jan. 23, 2004)*.**B. Aiding and Abetting Conversion**The Committee has also alleged a claim against ATC and the Individual Defendants for aiding and abetting ATC's conversion of Verestar's assets. Under Delaware law, in the face of a motion to dismiss a claim for aiding and abetting common law conversion, a plaintiff must properly allege (i) the existence [*90] of a primary violation, (ii) knowledge of the violation on the part of the aider and abettor, and (iii) substantial assistance by the aider and abettor in achievement of the violation. *Anderson v. Airco, Inc., 2004 Del. Super. LEXIS 210, 2004 WL 2827887, at *4 (Del. Super.*

*Nov. 30, 2004).* n22

n22 Although the parties disagree as to whether the Court should apply the law of Delaware or New York to the Committee's claim for aiding and abetting conversion, there is no contention that their respective laws are different or that there is a conflict for purposes of the motions to dismiss. See *Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003).*

The Committee's claim for aiding and abetting conversion is dismissed as to ATC, since ATC, as the alleged tortfeasor of the underlying claim of conversion, cannot be liable for aiding and abetting in the commission of its own tort. As for the remaining Defendants, the Court has sustained the Committee's conversion claims only with respect to the following [*91] acts: Verestar's transfer of the Tower Assets to ATC and the sale of MTN and GenTel. The Committee has sufficiently alleged that the following Verestar directors and officers knowingly and substantially assisted ATC in its conversion of Verestar assets: Bikales, Porte, Dodge, Hess, O'Brien, Singer, Kagan, Milsom and Petzold. As stated above, the allegations underlying the Committee's breach of fiduciary duty claim involve actions taken by Verestar's officers and directors in connection with the transfer of assets, including the Tower Assets, and the sale of Verestar subsidiaries to or for the benefit of ATC. These allegations demonstrate knowledge and substantial assistance sufficient to state a claim for aiding and abetting conversion.**C. Conspiracy**The District Court Complaint alleges that the ATC and the Individual Defendants conspired among themselves to breach fiduciary duties owed to Verestar and its stakeholders and to convert Verestar's assets. Under Delaware law, the elements of a claim for civil conspiracy include: (i) an agreement, confederation or combination of two or more persons, (ii) an unlawful act in furtherance of the conspiracy, and (iii) actual damage to [*92] the plaintiff. *Everett v. Hosp. Billing & Collection Serv., Ltd., 2005 U.S. Dist. LEXIS 5249, 2005 WL 751940, at *3 (D. Del. Mar. 31, 2005).* In order to satisfy the first element, a plaintiff must prove knowing participation by the defendant in the conspiracy that was not "accidental, inadvertent, or negligent." *Anderson v. Airco, 2004 Del. Super. LEXIS 210, 2004 WL 2827887, at *4; Nicolet, Inc. v. Nutt, 525 A.2d 146, 148 (Del. 1987).*The Defendants argue that the Committee's conspiracy claims must be dismissed because the Committee has failed to successfully allege a viable confederation in light of the doctrine of intra-corporate conspiracy. This doctrine provides that (i) a corporation cannot conspire with its own directors, officers or agents; (ii) officers, directors and agents of

a corporation cannot conspire among themselves; and (iii) a parent corporation cannot conspire with its subsidiary or agents of its subsidiary. *Amaysing Techs. Corp. v. CyberAir Communs., 2005 Del. Ch. LEXIS 35, 2005 WL 578972, at *6–8 (Del. Ch. Mar. 3, 2005);* see also *Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1316–17 (8th Cir. 1986); Mehl v. Navistar Int'l Corp., 670 F. Supp. 239, 241 (N.D. Ill. 1987);* [*93] *Harp v. King, 266 Conn. 747, 835 A.2d 953, 974 (Conn. 2003).*The Committee responds that it has alleged a proper confederation, and that the doctrine of intra-corporate conspiracy does not apply, because the claimed conspiracy included "third parties" who were not directors, officers or agents of ATC — namely, the Bear Stearns Defendants, Kagan, O'Brien and Petzold. This argument is not sound. The Bear Stearns Defendants are considered agents of ATC for the purposes of these motions because the Committee claims that Bear Stearns was acting as a financial advisor to ATC when engaging in the alleged misconduct. (District Court Compl. PP 56–57). See *Harp v. King, 835 A.2d at 974* (a corporation cannot conspire with its employee or agent regarding acts taken within the scope of employment). n23 With regard to the remaining "third parties," Kagan, O'Brien and Petzold were all officers or directors of Verestar and could not be co-conspirators with ATC since a parent corporation cannot conspire with its subsidiary or its subsidiary's agent. See *Amaysing Techs. Corp., 2005 Del. Ch. LEXIS 35, 2005 WL 578972, at *7.*

n23 The Committee notes that the engagement letter between Bear Stearns and Verestar describes Bear Stearns as an "independent contractor." While this description may affect whether Bear Stearns was an agent of Verestar, it does not impact Bear Stearns' alleged status as a financial advisor and agent of ATC for purposes of conspiracy doctrine.

[*94] The Committee's conspiracy claims are dismissed with respect to all Defendants.**D. Tortious Interference with Existing or Prospective Business Relations**The Committee alleges that the Defendants tortiously interfered with Verestar's existing and prospective business relations with certain of its vendors and customers by causing Verestar to withhold payments from commercial vendors and by misrepresenting Verestar's financial condition in order obtain concessions from its vendors. These actions in turn allegedly injured Verestar by harming its vendor and customer relationships as well as the possibility of selling all or a part of its business.Under Delaware law, which Defendants cite, a plaintiff must allege the following elements to state a claim for tortious interference with prospective business relationships: (i) the existence of a valid business relationship or expectancy,

(ii) knowledge of the relationship or expectancy on the part of the defendant, (iii) intentional interference that induces or causes a breach or termination of the relationship or expectancy, (iv) intentional or wrongful conduct, and (v) resulting damages to the party whose relationship or expectancy [*95] has been disrupted. *Marino v. Cross Country Bank*, 2003 WL 503275, at *4 (D. Del. Feb. 14, 2003); *Commerce Nat'l Ins. Servs., Inc. v. Buchler, 120 Fed App'x 414, 418 (3d Cir. 2004)*. A claim for tortious interference with business relations requires the same allegations under Virginia law, which the Committee asserts is likely to govern these claims, and New York law, which the Committee claims the Court should apply for purposes of the motions to dismiss. See *Warner v. Buck Creek Nursery, Inc., 149 F. Supp. 2d 246, 265 (W.D. Va. 2001); Bass v. World Wrestling Fed'n Entmt's, Inc., 129 F. Supp. 2d 491, 503–04 (E.D.N.Y. 2001)*. With respect to the Individual Defendants, the Committee has failed to adequately plead a claim for relief. As the Defendants argue, employees or directors of a corporation cannot be held personally liable for tortious interference with a contractual or business relationship of their own company unless such interference is caused by actions taken outside the scope of their employment. *International Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42 v. Absolute Environmental Services, Inc., 814 F. Supp. 392, 400 (D. Del. 1993); Goldman v. Pogo.com, 2002 Del. Ch. LEXIS 71, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002)* [*96] ; *Wallace v. Wood, 752 A.2d 1175, 1182 (Del. Ch. 1999)*. The Committee does not allege that the Individual Defendants acted outside the scope of their employment with respect to the interference claims, and the Committee's claim for tortious interference is dismissed as to the Individual Defendants. The Committee has also failed to state a claim for tortious interference with respect to the Bear Stearns Defendants. The District Court Complaint does not contain sufficient allegations to draw a connection between the Bear Stearns Defendants and Verestar's alleged coercion of its vendors. The Committee makes one allegation that Bear Stearns had some level of involvement in the preparation and communication of demands to vendors. (District Court Complaint, P 71). This single, conclusory allegation is not sufficient to support the Committee's broader claim that the Bear Stearns Defendants interfered with Verestar's business relationships with its vendors, customers and creditors. The Committee's tortious interference claim as against the Bear Stearns Defendants is dismissed. n24

n24 Although the Bear Stearns Defendants do not raise either doctrine as a defense to the Committee's claim for tortious interference, this claim may also be subject to dismissal as against the Bear Stearns

Defendants under the *Wagoner* rule or the principle of *in pari delicto*. See *Brandaid Marketing Corp. v. Biss, 418 F. Supp. 2d 329 (S.D.N.Y. 2005)* (barring a claim for tortious interference based on *in pari delicto* grounds).

[*97] With regard to the Committee's tortious interference claim as against ATC, the Defendants assert that the claim should be dismissed for failure to adequately plead facts identifying Verestar's existing and prospective business relations that are the subject of the claim and failure to allege any injury suffered from tortious interference. However, this argument assumes application of the specificity requirements of *Rule 9*, and the Committee need only meet the pleading requirements of *Rule 8(a)* with respect to this claim. Although the Committee has not identified all relevant business relations by name, it has alleged facts demonstrating interference with Verestar's relations with its vendors and customers. These allegations fairly place ATC on notice, and there can be further identification of the specific contracts and relationships at issue during the course of discovery. See *Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205 (2d Cir. 1998)*; see also *SLM, Inc. v. Shelbud Prods. Corp., 1993 U.S. Dist. LEXIS 5171, *12–14 (S.D.N.Y. Apr. 19, 1993); Shred–It USA, Inc. v. Mobile Data Shred, Inc., 202 F. Supp. 2d 228, 237 (S.D.N.Y. 2002)*. The [*98] Committee has also adequately alleged that ATC's interference had a material adverse impact on Verestar's relationships with vendors and customers, causing them to use other providers, and adversely affected the sale of Verestar's business and assets. See *Hannex Corp. v. GMI, Inc., 140 F.3d at 206; Don Buchwald & Assocs. V. Marber–Rich, 11 A.D.3d 277, 279, 782 N.Y.S.2d 725 (1st Dep't 2004)*. **Conclusion** The motions are disposed of as follows: 1. Equitable subordination (B. Ct. Count III): the motion to dismiss is denied. 2. Substantive consolidation (B. Ct. Count IV): the motion to dismiss is granted. 3. Alter ego (D. Ct. Count I): the motion to dismiss is denied. 4. Breach of fiduciary duty (D. Ct. Count II): the motion to dismiss is denied. 5. Conversion (D. Ct. Count III): the motion to dismiss is denied. 6. Aiding and abetting (D. Ct. Count IV): the motion to dismiss the claim for aiding and abetting breach of fiduciary duty is granted as to the Bear Stearns Defendants and the Individual Defendants. The motion to dismiss the claim for aiding and abetting breach of fiduciary duty is denied as to ATC. The motion [*99] to dismiss the claim for aiding and abetting conversion is granted as to ATC, Bear Stearns, Marc Layne, Scott Moskowitz, Alan Box, David W. Garrison, Jack R. McDonnell, Steven Moskowitz, Joseph L. Wynn, Justin Benincasa, Arnold Chavkin and James Taiclet. The motion to dismiss the claim for aiding and abetting conversion is denied as to Norman A. Bikales, David J. Porte, Steven B. Dodge,

William H. Hess, Raymond O'Brien, Bradley E. Singer, David Kagan, Michael Milsom and Matthew Petzold.7. Conspiracy (D. Ct. Count V): the motion to dismiss is granted.8. Tortious interference with prospective or existing business relations (D. Ct. Count VII): the motion to dismiss is granted as to the Individual Defendants and the Bear Stearns Defendants. As to ATC, the motion to dismiss is granted.9. Deepening insolvency (D. Ct. Count VIII): the motion to dismiss is granted.10. Breach of contract by Bear Stearns (D. Ct. Count IX): the motion to dismiss is granted.11. State law actual fraudulent transfer (D. Ct. Count X): the motion to dismiss is granted.12. State law constructive fraudulent transfer (D. Ct. Count XI): the motion to dismiss is denied.13. Bankruptcy [*100] Code actual fraudulent transfer (in part) (D. Ct. Count XII): the motion to dismiss is granted except with respect to execution of the Note.14. Bankruptcy Code constructive fraudulent transfer (in part) (D. Ct. XIII): the motion to dismiss is denied.15. Recovery of avoidable transfers and turnover (in part) (D. Ct. Counts XV and XVI): the motion to dismiss is granted and denied to the same extent that the motion relating to D. Ct. Counts X–XIII is granted and denied.16. Accounting (D. Ct. Count XVII): the motion to dismiss is granted. The Committee shall settle an appropriate order on ten days' notice and may, if so advised, provide for appropriate leave to amend. All interested parties are also requested to meet and confer and to submit to the Court, within twenty days, an agreed or (absent agreement) separate memoranda setting forth their positions as to the future management of this litigation as well as the Verestar Chapter 11 cases as a whole. As noted above, Verestar has sold virtually all of its assets, but its efforts to confirm a Chapter 11 plan have been delayed by the fact that *ATC's prima facie* claim is far larger than the claims of all other creditors [*101] combined, and ATC has been unwilling to consent to a plan whose main distributable asset is a litigation claim against itself. There has previously been consideration of an early trial of the Bankruptcy Court Complaint, leaving the District Court Complaint to await the later jury trial the Committee has demanded. Now that the motions to dismiss have been decided, it is necessary to develop a plan to administer the cases as fairly and expeditiously as possible. After the above–described memoranda are filed, a conference will be scheduled promptly.

Dated: New York, New YorkJune 9, 2006/s/ Allan L. GropperUNITED STATES BANKRUPTCY JUDGE