**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : |
| STUDENT FINANCE CORPORATION, | : |
| Debtor, | : |
| | : |
| ———————————————— | : |
| | : |
| CHARLES A. STANZIALE, JR., | : |
| CHAPTER 7 TRUSTEE OF STUDENT | : |
| FINANCE CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | :    Civil Action No. 04-1551(JJF) |
| v. | : |
| | : |
| PEPPER HAMILTON LLP, et al., | : |
| | : |
| Defendants. | : |
| ———————————————— | : |

**APPENDIX OF EXHIBITS TO**
**BRIEF IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF**
**COMMUNICATIONS BETWEEN THE TRUSTEE AND ROYAL AND**
**DOCUMENTS RELATING TO COMPENSATION RECEIVED BY THE TRUSTEE**

William H. Sudell, Jr., Esq. (No. 0463)
Donna L. Culver, Esq. (No. 2983)
Daniel B. Butz (No. 4227)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
(302) 658-3989 (facsimile)

Elizabeth K. Ainslie, Esq.
Nicholas J. LePore, III, Esq.
Bruce P. Merenstein, Esq.
Stephen J. Shapiro, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000
(215) 751-2205 (facsimile)

*Counsel for defendants Pepper Hamilton LLP and W. Roderick Gagné*

TABLE OF CONTENTS

PAGE #

Trustee's Motion to Approve Settlement with Royal Indemnity Company ................................ A-1

Trustee's Amended Complaint in *Stanziale v. Royal Indemnity Company* ............................... A-15

Trustee's Objections and Responses to Pepper's First Set of Requests
　　　　for the Production of Documents .......................................................................... A-71

Letter Dated June 6, 2006 ................................................................................................ A-82

Letter Dated June 20, 2006 .............................................................................................. A-83

Letter Dated July 5, 2006 ................................................................................................ A-85

Letter Dated August 1, 2006 ............................................................................................ A-87

Trustee's Responses to Pepper's Second Set of Requests
　　　　for the Production of Documents .......................................................................... A-89

Trustee's Second Set of Requests for the Production of Documents ........................................ A-94

Letter Dated August 17, 2006 ........................................................................................... A-105

Internal Royal E-mail Dated September 28, 1999 ................................................................. A-107

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| STUDENT FINANCE CORPORATION, | : | Case No. 02-11620-JBR |
| | : | |
| Debtor. | : | Objection Date: October 25, 2004 at 4:00 p.m. |
| | : | Hearing Date: October 27, 2004 at 4:00 p.m. |
| | : | |

**TRUSTEE'S MOTION TO APPROVE
SETTLEMENT WITH ROYAL INDEMNITY COMPANY**

Charles A. Stanziale, Jr., as Chapter 7 Trustee ("Trustee") for Student Finance Corporation ("SFC" or "Debtor"), hereby moves pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for the approval of the settlement ("Settlement") between the Trustee and Royal Indemnity Company ("Royal") attached as Exhibit "A" to this Motion. In support of this Motion, the Trustee respectfully represents as follows:

**JURISDICTION AND VENUE**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     The statutory predicates for the relief sought herein are Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

**PROCEDURAL BACKGROUND**

5.     On or about June 5, 2002 ("Filing Date"), certain creditors of SFC filed an involuntary petition against the Debtor.  Prior to the Filing Date, SFC was in the business of

559780v1
559139_1

9922779

**A - 001**

originating and acquiring non-guaranteed student loans and tuition installment agreements ("Student Loans") primarily from truck driving schools. The petitioning creditors asserted, in part, that SFC failed to purchase Student Loans as agreed and that SFC was insolvent.

6.     On or about November 4, 2002, with the consent of SFC, the Court entered an Order for Relief under Chapter 11 of the Bankruptcy Code.

7.     On or about September 29, 2003, the Court appointed Mr. Stanziale as Chapter 11 Trustee for the Debtor.

8.     On or about November 14, 2003 ("Conversion Date"), upon the expedited motion of Mr. Stanziale, this Court converted this matter to Chapter 7. On or about November 20, 2003, Mr. Stanziale was appointed as the Chapter 7 Trustee of SFC.

9.     On or about April 15, 2004, the Trustee filed an action in the United States Bankruptcy Court for the District of Delaware, Adv. Proc. No. 04-53306, seeking, inter alia, to avoid certain payments made for the benefit of Royal as fraudulent (the "Avoidance Action"). A copy of the Avoidance Action is attached hereto as Exhibit "B".

10.     On November 20, 2002, prior to the appointment of the Trustee, the Debtor filed a Complaint against Royal alleging various claims based on Royal's decision not to continue to extend credit risk insurance for the Debtor's benefit prior to the filing of this case. Royal moved to dismiss this action, and on March 23, 2004 the District Court ordered that SFC amend the Complaint. On or about April 15, 2004, the Trustee filed an Amended Complaint. A copy of the Amended Complaint is attached hereto as Exhibit "C".

## FACTUAL BACKGROUND

11.    SFC was in the business of originating and acquiring Student Loans, primarily from truck driving schools.

12.    At the outset of its operations, SFC limited its activities to traditional lending arrangements, whereby it purchased bundles of pre-arranged Student Loans at a discount using funds borrowed from either commercial banks or private investors.

13.    As SFC expanded, its method of financing relied upon the use of securitization transactions.

14.    To complete the securitization transactions SFC sold the pooled Student Loans to an affiliated entity, which transferred the Student Loans to a trust that it created. To fund the purchase of the Student Loans from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors.

15.    Both the Certificates and Notes were backed by the principal and interest received from the Student Loans and represented an undivided interest in the Student Loans transferred to the Trusts. The Certificates and Notes were sold to investors in private placement transactions for which private placement memoranda (the "PPM's") were issued.

16.    In order to provide additional security for the purchasers of the Notes and Certificates, the income streams created from the Student Loans were backed by credit risk insurance issued by Royal (the "Royal Policies"). In accordance with the terms of the Royal Policies, Royal insured against defaults by the student borrowers on their student loan accounts.

17.    For the first six of the eight securitizations, the special purpose entities owned and created by SFC for that transaction maintained an account ("Experience Account") equal to 18% of the initial principal balances in each pool. The Experience Account served the function of a

deductible. As a claim would be made against Royal, Royal would pay the claim and then seek reimbursement from the Experience Account. The special purpose entity, by agreement, would advance funds to Royal to pay the initial claims against Royal.

18.     The Student Loans defaulted at a staggering rate; more than 80% of those loans are now in default. As the default rates began to rise, to avoid classifying Student Loans as in default, SFC began making payments on behalf of the borrowers on the Student Loans (the "Forbearance Payments"). By making these Forbearance Payments, a great number of Student Loans that otherwise would have, did not go into default and claims were not made on the Royal Policies with respect to those Loans.

19.     Through employment of Forbearance Payments, default rates on the Student Loans appeared to be very low, but, in fact, were very high. SFC did not disclose in any of the PPM's issued in connection with the eight securitizations or in the monthly operating reports detailing the payments received that SFC was making the Forbearance Payments to conceal that the borrowers had defaulted on their Student Loans.

20.     The Forbearance Payments therefore masked the actual default rates of the Student Loans.

### THE ROYAL PROOF OF CLAIM

21.     On or about May 11, 2004, Royal filed an amended proof of claim (the "Proof of Claim") in this case. The Proof of Claim alleges that Royal holds claims against the Debtor in the aggregate amount of at least $562,047,003.00, of which Royal alleges that $45,418,321.00 is secured by property of the Debtor. These claims arise from Royal's provision of credit risk insurance to certain of the Debtors' affiliates through the Royal Policies. Royal alleges that SFC, along with its affiliates, *inter alia,* fraudulently induced Royal into providing this credit risk insurance by, among other things, concealing from Royal the true default rates of the student loans

originated and/or purchased by the Debtor and its affiliates. As a result of SFC's actions, Royal asserts that it has been harmed in amounts equal to at least its losses under the Royal Policies. As of September 30, 2004, Royal asserts that its losses under the Royal Policies are at least $562,047,003.00.

**THE AVOIDANCE ACTION**

22.     The Avoidance Action seeks to avoid $46,903,500.00 in Forbearance Payments, pursuant to 11 U.S.C. §548(a)(1)(A). Through the Avoidance Action, the Trustee also seeks to recover that amount from Royal, as the party which the Trustee alleges was the beneficiary of the Forbearance Payments under 11 U.S.C. §550(a)(1)(A). The Trustee alleges that (i) the making of the Forbearance Payments was part of a fraudulent scheme orchestrated by SFC and (ii) the Forbearance Payments ultimately benefited Royal by reducing Royal's liability under the credit enhancement. Royal disputes that the Trustee can assert such a claim against Royal since Royal asserts that it was the victim of SFC's fraudulent scheme and did not receive the Forbearance Payments, disputes that it benefited in any material way from the Forbearance Payments, and has asserted various other defenses.

23.     The Adversary Proceeding also seeks, pursuant to 11 U.S.C. §548(a)(1)(B), to recover from Royal $20,760,800.00 in payments made by SFC under the experience account during a period in which the Trustee alleges that SFC was insolvent, and in return for which the Trustee alleges that SFC did not receive reasonably equivalent value. The Trustee alleges that SFC had no legal obligation to make those payments. Royal contends that SFC was required to make such payments under the terms of the Royal Policies, and has asserted various other defenses to the Adversary Proceeding.

559780v1

5

A - 005

## THE AMENDED COMPLAINT

24.    The Amended Complaint alleges that Royal aided and abetted SFC's breach of fiduciary duties, contributed to SFC's deepening insolvency and seeks to have Royal's claims against the estate subordinated to those of other creditors as a result. Specifically, the Amended Complaint alleges that, at a time when Royal was aware that SFC was making Forbearance Payments, that Royal loaned $12 million to SFC, the proceeds of which were used to fund further Forbearance Payments. Consequently, the Trustee alleges, Royal made this loan for its own benefit and, because SFC continued to operate when there was no hope of any economic recovery, its creditors were harmed.

25.    Royal denies all allegations of wrongdoing asserted against it in the Amended Complaint, and has vigorously defended against it.

## THE PROPOSED SETTLEMENT

26.    Royal has asserted various defenses to both the Avoidance Action and the Amended Complaint and the parties now desire to resolve this litigation (and all other remaining disputes between themselves) amicably, by means of settlement. In addition to resolving those two pending matters, Royal and the Trustee also wish to provide a mechanism to fund the estate's pursuit of valuable claims against a number of third parties. As a result, a crucial component of the Settlement is the creation of a substantial pool of funds that will permit the Trustee to pursue these estate claims against the various responsible parties for the benefit of all creditors of the estate. Pursuant to the Settlement, the Trustee and Royal have agreed to settle any and all claims that exist between the Trustee, SFC and Royal in return for a cash payment of $4,900,000.00 by Royal to the estate. The Settlement provides that Royal will have an allowed administrative claim in the Chapter 7 case for $1,900,000.00 of that total settlement amount, pursuant to §§364(b) and 364(c)(1) of the Bankruptcy Code, subordinate only to the Trustee's commissions

559780v1                                6

and unpaid, allowed fees of the Trustee's professionals. Further, the Settlement provides for the allowance against the estate, on a final basis, of Royal's $516,628,682.00 general unsecured claim as well as Royal's $45,418,321.00 secured claim. Considering all of the factors and all of the facts known to the Trustee, the Trustee believes that the settlement as a whole is the most reasonable and prudent course of action for the estate.

## RELIEF REQUESTED

27.    In order to raise the necessary funding to allow the estate to appropriately pursue the substantial and valuable claims against third parties, and to settle the pending disputes between Royal, the Trustee and the Debtor, the Trustee seeks the entry of an Order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a): (i) approving the proposed Settlement; (ii) compromising and settling the Avoidance Action and the Amended Complaint; (iii) granting the Trustee the authority to execute all documents and take all actions necessary to effectuate the terms of the Settlement; and (iv) allowing, on a final basis, Royal's general unsecured claim against the Debtor in the total amount of $516,628,682.00 as well as Royal's secured claim against the Debtor in the amount of $45,418,321.00.

28.    The Trustee is contemporaneously filing a complementary motion seeking approval of a settlement with the other two defendants in the Avoidance Action.

## BASIS FOR RELIEF

29.    Bankruptcy Rule 9019(a) provides, in pertinent part, as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement . . . .

Fed. R. Bankr. P. 9019(a). Section 105(a) of the Bankruptcy Court further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua

559780v1                                    7

sponte, taking any action or making any determination necessary
or appropriate to enforce or implement court orders or rules, or to
prevent an abuse of process. 11 U.S.C. § 105(a).

30.      The standards by which courts evaluate a proposed compromise and settlement

are well established.  In essence, the settlement standards balance the probable success and

potential costs of pursuing a claim or defense against the benefits and costs of the proposed

settlement. However, courts need not conduct an independent investigation in formulating an

opinion as to the reasonableness of a settlement.  Rather, the court is permitted to defer to the

judgment of the trustee, and the court's responsibility to canvass the issues to see whether the

proposed settlement "falls below the lowest point in the range of reasonableness." In re

Pennsylvania Truck Lines, Inc., 150 B.R. 595, 601 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir.

1993); In re Grant Broadcasting of Phila., Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

Accordingly, courts will approve a compromise and settlement if it is fair and equitable and in

the best interests of the estate and the debtor's creditors. See Kranzdorf v. Green, 76 B.R. 974,

979 (E.D. Pa. 1987); In re Culmtech, Ltd., 118 B.R. 237, 240 (Bankr. M.D. Pa. 1990).

31.      In reviewing settlements, courts apply the following factors, in addition to

reviewing the terms and conditions of the settlement itself:

        a.     The probability of success in the litigation;

        b.     The difficulty in collecting any judgment which may be obtained;

        c.     The complexity of the litigation involved and expense, inconvenience and
             delay necessarily attendant to it; and

        d.     The interest of creditors and stockholders with a proper deference to their
             reasonable views of the settlement.

See, e.g., Protective Comm. for Independent Stockholders for TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968); In re Paolino, 87 B.R. 8, 10 (E.D. Pa.. 1988); In re

Columbia Gas System, Inc., Case No. 91-803, 1995 Bankr. LEXIS 936, at *1-2 (Bankr. D. Del. June 16, 1995); In re Culmtech, Ltd., 118 B.R. at 238; In re Grant Broadcasting, 71 B.R. at 395.

32.    In addition to these criteria, courts have considered additional factors.  These additional factors include: (a) the competency and experience of counsel who support the settlement; (b) the relative benefits to be received by individuals or groups within the class; (c) the nature and breadth of releases to be obtained by the parties to the settlement; and (d) the extent to which the settlement is the product of arm's length bargaining.  In re 47-49 Charles Street, Inc., 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Spielfogel, 211 B.R. 133, 144 (Bankr. S.D.N.Y. 1997); In re Dow Corning Corp., 198 B.R. 214, 223 (Bankr. E.D. Mich. 1996).

33.    When applying the above criteria to the facts of a particular case, a bankruptcy court does not have to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement.  Cajun Electric Power Cooperative, Inc., 119 F.3d at 356.  Nor is a bankruptcy court required to conduct an evidentiary hearing as a prerequisite to approving a settlement.  In re Depositer, 36 F.3d 582, 586 (7th Cir. 1994).  The bankruptcy court must, however, gather all of the relevant facts and law so that it can make an informed, intelligent, and objective decision with respect to approving the settlement.  Depositer, 36 F.3d at 586.  See also Cajun Electric Power Cooperative, 119 F.3d at 356.

34.    The above factors strongly support the Court's approval of the Settlement.

Probability of Success

35.    The Trustee believes that he could likely satisfy his burden under section 548 of the Bankruptcy Code as well as section 550 of the Bankruptcy Code and thus ultimately prevail against Royal through the Avoidance Action to recover the Forbearance Payments for the benefit of the estate. However, Royal has raised a number of defenses to the Avoidance Action, and has indicated

559780v1                    9

that it intends to defend itself vigorously against that action and that it believes that the Trustee will not ultimately prevail. Consequently, it is unclear whether the Avoidance Action would ultimately be successful.

36.    The Trustee may also have difficulty in establishing Royal's liability to the estate under the Amended Complaint. Royal has alleged that, once it discovered the Debtor's true financial situation, it advanced the $12 million to the Debtor only to maintain the status quo until it could complete an investigation of the Debtor's finances. Moreover, Royal has contended that the Trustee does not have standing to assert this claim, and that recovery is barred by the doctrine of in pari delicto.

37.    Moreover, Royal submits that it is by far the largest creditor of the estate. Judgment has already been entered against Royal by the District Court requiring Royal to pay more than $550 million; and, accepting Royal's position, the vast bulk of any recovery on either the Avoidance Action or the Amended Complaint will ultimately be distributed to Royal in any event as a creditor of the estate. Thus, any recovery from Royal on the Amended Complaint and/or the Avoidance Action is essentially circular, and confers little benefit on any creditor of the estate other than Royal.

38.    Such an analysis is obviously dependent on Royal's Proof of Claim being substantially allowed. Based upon the facts currently known to the Trustee, the Trustee believes that Royal could introduce substantial evidence to support its claim in the amounts set forth in the Proof of Claim. Royal asserts that it had a contractual relationship with SFC and that SFC breached certain of those contractual obligations. Further, Royal asserts various fraud claims against SFC, and, while not binding, this Court has commented in another context that the evidence garnered by Royal supports such fraud claims. Also, Royal has claimed that SFC and

559780v1                                          10

its affiliated entities operated as one entity and that the corporate distinctions between the entities should be disregarded. Finally, the Trustee recognizes that it is likely that SFC did, as Royal alleges, misrepresent important information concerning the Student Loans, particularly their default rates. Accordingly, it may be difficult to disallow Royal's Proof of Claim.

39.    Moreover, Royal's claim against the estate is driven principally by the amounts that it is ultimately obligated to pay under the Royal Policies, and summary judgment has already been entered in district court litigation against Royal by the named insureds under those policies requiring Royal to pay more than $550 million under the Royal Policies. Royal is appealing that judgment.

40.    If, as a practical matter, recovery on the estate's various claims against Royal merely results in returning the majority of the recovered funds back to Royal, settlement would appear warranted. This is especially so where the Court has recognized the benefits of having Royal and the Trustee work together to maximize recoveries for all creditors of the estate.

<u>Difficulty In Collecting Judgment</u>.

41.    While Royal has posted security for the judgments entered against it to appeal those judgments, the Trustee cannot be certain that funds will be available after $550 million has been paid.

<u>Complexity and Expense of Litigation</u>

42.    The issues raised in the Avoidance Action and the Amended Complaint are extremely complex, both factually and legally, and would require a considerable amount of discovery. That discovery would require the review and analysis of more than one hundred thousand pages of documents and data as well as dozens of depositions related to the transactions between and among the Debtor, its affiliates, the various trucking schools, Royal and others. It

would also involve locating and interviewing witnesses to the transactions and responding to what would likely be voluminous discovery requests from Royal. Likewise, litigating the merits of the Proof of Claim would require considerable time and expense to be borne by the estate.

43.    The Trustee believes that the estate possesses many valuable claims against third parties, such as the trucking schools who originated and sold the underperforming loans to the Debtor in the first place and certain professionals that were working for the Debtor during that period of time. If the Settlement is not approved, the estate will not have the resources necessary to actively and appropriately pursue these valuable claims for the benefit of all stakeholders of the estate. The Settlement provides the estate with significant resources to investigate, pursue, litigate and/or settle these substantial claims of the estate against the various responsible parties. The pursuit of such claims would therefore command a tremendous amount of the estate's resources -- resources that the estate does not presently possess.

<u>Interests of the Creditors</u>

44.    The Settlement represents a fair and reasonable compromise of the claims between Royal and the Debtor, and is in the best interests of the creditors of SFC's estate. Under the Settlement, the estate will immediately receive $4,900,000 in cash, which it can use to pursue and collect on its valuable claims against third parties, for the benefits of all creditors of the estate. Absent the funds from the Settlement, the estate would not have adequate funds to properly pursue those claims. At the same time, the Settlement will save the estate the enormous ongoing expenses that it would incur by continuing its litigation against Royal through the Avoidance Action and the Amended Complaint. Finally, as set forth above, ultimate recovery for the estate on either of those actions is uncertain, and if Royal's analysis were accepted, the

majority of any such recovery would end up being returned to Royal as the estate's largest creditor.

<u>Relative Benefits</u>

45.     The estate possesses various litigation claims against third parties that the Trustee believes are worth millions of dollars.  However, the estate presently lacks the funds to pursue those claims.  The proposed settlement will allow the estate to properly pursue those claims.  At the same time, the Trustee believes that the payment proposed to be made by Royal under the Settlement represents a fair and appropriate settlement of the estate's claims against Royal.

## **NOTICE**

46.     Notice of this Motion has been given to: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for Royal and (iii) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the relief requested herein, the Trustee respectfully submits that no further notice of the Motion is required.

WHEREFORE, the Chapter 7 Trustee respectfully requests that this Court enter an Order: (i) granting the Motion in its entirety; (ii) authorizing the Chapter 7 Trustee to enter into the Settlement on behalf of the Debtor's bankruptcy estate; (iii) authorizing the Chapter 7 Trustee to execute any other documents and take such actions reasonably necessary to effectuate the Settlement; (iv) allowing Royal's unsecured claim against the estate in the amount of $516,628,682.00 and Royal's secured claim against the estate in the amount of $45,418,321.00 and (v) granting such other relief as the Court deems just and appropriate under the circumstances.

Charlene D. Davis (No. 2336)
Daniel K. Astin (No. 4068)
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

and

Lawrence G. McMichael
Sheryl L. Auerbach
Dilworth Paxson LLP
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000

Special Counsel to Charles A.
Stanziale Jr. Chapter 7 Trustee
Student Finance Corporation

Dated: October 14, 2004

559780v1

14

ORIGINAL

| 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| IN RE: | : Chapter 7 |
| STUDENT FINANCE CORPORATION, | : Case No. 02-11620-JBR |
| DEBTOR. | : |
| | : Civil Action No. 03-507-JJF |
| CHARLES A. STANZIALE, JR., CHAPTER 7 TRUSTEE OF STUDENT FINANCE CORPORATION, | : Adversary Proceeding No. 02-6803 |
| PLAINTIFF, | : |
| v. | : |
| ROYAL INDEMNITY COMPANY, | : |
| DEFENDANT. | : |

## AMENDED COMPLAINT

Charles A. Stanziale, Jr., Esquire, Chapter 7 Trustee ("Trustee") of Student Finance Corporation ("SFC" or "Debtor"), by and through his undersigned counsel, pursuant to the Court's Order dated March 23, 2004, and consistent with Federal Rules of Civil Procedure 15 and 41 and Federal Rules of Bankruptcy Procedure 7015 and 7041, hereby amends the pending Complaint, withdraws without prejudice Counts I through VI thereof and represents in support of this Amended Complaint as follows:

### Introduction

1.     This action arises from efforts by the Royal Indemnity Company ("Royal") to limit its exposure to potentially hundreds of millions of dollars in claims under insurance policies issued by Royal to SFC or SFC affiliated entities. In so doing, Royal has harmed creditors of SFC.

535609_1

A - 015

2.     Immediately prior to its involuntary bankruptcy filing, SFC's business consisted of the acquisition and sale of accounts receivable comprised of student loan agreements. To complete its transactions, SFC utilized a credit risk enhancement provided from Royal to SFC's affiliated entities. The credit risk enhancement insured the income streams produced by the accounts receivable. In addition, on or about May 3, 2001, Royal Insurance Company of America, upon information and belief, an affiliate of Royal, issued a Directors' and Officers' Insurance Policy ("D&O Policy") to SFC and covered individuals.

3.     Through making so called "forbearance" payments (payments using SFC's own funds) on student loan accounts that would otherwise go into default, SFC protected Royal's interest by preventing claims from being made against Royal. Few parties, other than Royal and professionals and employees working for SFC, could have been aware that SFC was making payments on behalf of obligors. The result of these payments was that the actual default rates on the receivables were obscured. While the default rates on the receivables appeared to be very low, in fact, the default rates were very high.

4.     With mounting increases in the default rates on the accounts receivable, SFC's fortunes began to decline. No later than September 2001, SFC was unable to fund its obligations as they came due without resorting to additional financing. At that time, in order to sustain itself financially, SFC was required to use assets acquired in new financings to cure past due debts. SFC was caught in a cycle where, in order to survive, it was required to expand, but to expand, it was required to purchase and sell noncreditworthy accounts.

5.     SFC's downward financial spiral continued through February 2002, when Royal announced that it would no longer provide credit risk insurance. SFC, however, could not complete an additional securitization without a policy from Royal. If SFC could no longer

2

acquire additional assets, it could no longer make payments on student loans to prevent their default.

6.    SFC's financial tailspin was especially evident in or about March 2002, when Andrew Yao, former chief executive officer of SFC, advised William Hibberd, Account Manager of Royal's Financial & Risk Insurance Management Department, Tony McKenzie, and David Schneider of Royal that SFC could no longer operate without Royal's provision of an additional credit risk insurance policy. With SFC no longer in a position to make payments on behalf of obligors, Royal faced immediate claims on its credit risk insurance policies in excess of $100 million. SFC's precarious financial position also meant that it was more likely that third parties would seek redress from the D&O Policy for numerous breaches of fiduciary duty.

7.    To protect itself by preventing claims from being made against credit enhancement policies and preventing claims covered by the D&O Policy, Royal, although not a lender, lent $12,302,150.88 to SFC. The purpose for lending these funds was to allow SFC to continue to make payments to prevent the student loans from going into default. Royal extended this credit, after it had the opportunity to examine SFC's records and could determine that SFC was not a financially viable operation.

8.    Royal's credit extension allowed SFC representatives to continue in their breach of fiduciary duties. It allowed SFC to increase its debt level at a time when it was certain that SFC could not continue operating. It allowed SFC to delay a bankruptcy filing. With a bankruptcy filing, creditors would have been made aware of SFC's activities sooner and could have sought redress from the D&O Policy.

**Jurisdiction and Venue**

9.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1331, and 1334.

10.    This is an adversary proceeding brought pursuant to sections 541(a) and 544(a) of title 11 of the United States Code (the "Bankruptcy Code"), Federal Rule of Bankruptcy Procedure 7001 and other applicable state and local laws.

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    This is a core proceeding within the meaning of 28 U.S.C. § 157.

**The Parties**

13.    Plaintiff, Charles A. Stanziale, Jr., is the duly-appointed Chapter 7 Trustee of SFC, a Pennsylvania corporation with its principal place of business located at 170 Lukens Drive, New Castle, Delaware 19720.

14.    Defendant Royal, a subsidiary of Royal & Sun Alliance Insurance Group, plc., is a Delaware capital stock insurance company with its principal place of business located at 9300 Arrowpoint Boulevard, Charlotte, North Carolina 28723.

**Procedural Background**

15.    On June 5, 2002 ("Filing Date") an involuntary bankruptcy petition was filed against the Debtor. With the consent of SFC, on November 4, 2002, the Bankruptcy Court entered an order for relief under chapter 11 of the Bankruptcy Code.

16.    On September 29, 2003, the Bankruptcy Court appointed Mr. Stanziale as Chapter 11 Trustee for the Debtor.

17.    On November 14, 2003 ("Conversion Date"), upon the expedited motion of Mr. Stanziale, the Bankruptcy Court converted the matter to chapter 7. On November 20, 2003, Mr. Stanziale was appointed as the Chapter 7 Trustee of SFC.

18.    On or about November 20, 2002, SFC, as debtor-in-possession, filed the Complaint in the instant proceeding in the United States Bankruptcy Court, seeking damages from Royal. On May 23, 2003, the Complaint was removed from the Bankruptcy Court to the District Court. On March 23, 2004, this Court entered an Order ruling on Royal's Motion to Dismiss, dismissing two counts of the Complaint for lack of specificity and one for failure to state a claim and providing that an amended complaint be filed.

19.    Contemporaneous with the filing of the Amended Complaint, the Trustee is filing a Complaint to Avoid and Recover Fraudulent Transfers against Royal and other defendants in the Bankruptcy Court.

<u>Factual Background</u>

A. SFC and Its Business

20.    SFC was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements ("Student Loan Accounts"), primarily from truck driving schools.

21.    At the outset of its operations, SFC limited its activities to traditional lending arrangements, whereby it purchased bundles of pre-arranged Student Loan Accounts at a discount using funds borrowed from either commercial banks or private investors.

22.    As SFC expanded, its method of financing changed. With expansion, SFC financed its operation through securitization. Securitization allowed SFC to clear its credit lines, and thereby allowed the acquisition of additional Student Loan Accounts.

23.     The securitization process began with SFC's acquisition of Student Loan Accounts at a discount, using funds from a warehouse line of credit provided to certain of SFC's affiliates.  SFC, through an affiliated entity, would pool the Student Loan Accounts.  The warehouse lender would obtain a security interest in the acquired Student Loan Accounts.

24.     To complete the securitization transaction, SFC would sell the pooled Student Loan Accounts to an affiliated bankruptcy remote entity.  The bankruptcy remote entity would transfer the Student Loan Accounts to a trust created by the bankruptcy remote entity.  To fund the bankruptcy remote entity's purchase of the Student Loan Accounts from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors.

25.     Both the Certificates and Notes were backed by the principal and interest received from the Student Loan Accounts and represented an undivided interest in the Student Loan Accounts transferred to the Trusts.  The Certificates and Notes were sold to investors in private placement transactions for which private placement memoranda were issued.  The private placement memoranda included such information as the default rates on the Student Loan Accounts.

26.     A different trust was created for each securitization.  Thus, SFC Grantor Trust, Series 2000-1, SFC Grantor Trust, Series 2000-2, SFC Grantor Trust, Series 2000-3, SFC Grantor Trust, Series 2000-4, SFC Grantor Trust, Series 2001-1, SFC Grantor Trust, Series 2001-2, SFC Grantor Trust, Series 2001-3, and SFC Owner Trust 2001A-I (the "Trusts") were created to complete securitization transactions.

27.    Because the Student Loan Accounts had been sold to the bankruptcy remote entities and subsequently transferred to the Trusts, payments by the borrowers underlying the Student Loan Accounts (the income stream) were remitted to the Trusts.

28.    Using the proceeds of the securitizations, the Debtor would pay the outstanding amounts owed to the warehouse lenders for SFC's acquisition of the Student Loan Accounts. Thus, through securitization, SFC replenished its warehouse line of credit.

### B.    Credit Risk Enhancement

29.    In order to provide additional security for the purchasers of the Notes and Certificates, the income streams created from the Student Loan Accounts were backed by credit risk insurance issued by Royal (the "Royal Policies"). Through the Royal Policies, Royal agreed to insure and otherwise guarantee payments due to the Trusts on account of the Student Loan Accounts. With each of the eight securitizations, Royal would issue an additional insurance policy.

30.    The Royal Policies insured the payment of principal and ninety days interest in the event of default. As defined by the Royal Policies, default, and hence Royal's obligation to pay, did not occur unless a Student Loan Account was more than ninety days delinquent.

31.    SFC was not named as the insured on the Royal Policies. Rather, the insured was the bankruptcy remote entity created by SFC to complete the transaction. The bankruptcy remote entity was a limited liability company managed by an entity other than SFC.

32.    Prior to Royal's issuance of the Royal Policies, Royal was afforded the opportunity to perform, and in fact did conduct, substantial due diligence. Through due diligence, SFC sought information concerning the expected default rates concerning the Student

Loan Accounts as well as information related to a previous securitization in which a different insurer provided a credit risk enhancement.

### C. Protection to Royal

33.    Royal requested information on how its interest was to be protected and from what sources the SFC affiliates would obtain funds to protect Royal's interest.

34.    Upon satisfaction that its interests would be protected and after substantial negotiation with SFC, Royal issued a policy to SFC's affiliated entity.

35.    In exchange for its issuance of the Royal Policies, Royal received tens of millions of dollars in premiums as well as additional payments to protect its interest.

36.    For the first six of the eight securitizations, the Royal Policies required that the bankruptcy remote entity create an unfunded account ("Experience Account") equal to 18% of the initial principal balances in each pool.  The Experience Account served the function of a deductible.  As a claim would be made against Royal, Royal would pay the claim and then seek reimbursement from the Experience Account.  The bankruptcy remote entity, by agreement, would advance funds to Royal to pay the initial claims against Royal.

37.    Each of the eight securitizations included an Excess Spread Reserve.  Through the Excess Spread Reserve, a percentage of the income stream generated by the Student Loan Accounts would be placed into this reserve account.  Thus, as payments were made, the Excess Spread Reserve would increase.  At the same time, because payments were being made on the particular Student Loan Accounts, the outstanding balances, and Royal's exposure would decrease.

38.    Royal could seek redress from the Excess Spread Reserve in the event of non-payment.

39.     Since the Excess Spread Reserve was created from payments arising from the Student Loan Accounts, if payments were not received on account of the Student Loan Accounts, the Excess Spread Reserve could not build.

40.     The Excess Spread Reserve did not build as anticipated by Royal and, as a result, SFC provided additional security to Royal to further protect Royal against potential claims.

41.     At the same time Royal noted that the Excess Spread Reserve was not building as contemplated, the payments which Royal received under the Experience Account were also increasing.

42.     With the increase in payments from the Experience Account as well as the failure of the Excess Spread Reserve to build as contemplated, it should have been evident to Royal that borrowers were not making the payments due on the Student Loan Accounts.

### D. The "Forbearance" Payments

43.     In addition to the payments received from the Experience Account and the Excess Spread Reserve, SFC segregated a portion of the agreed purchase price of the Student Loan Accounts into a separate account. From this account, the vocational schools allowed SFC to pay Student Loan Accounts that would otherwise be in default.

44.     Through its due diligence, before Royal issued its first policy, Hibberd was aware that SFC maintained accounts that SFC could use to pay claims that otherwise could be made against the Royal Policies.

45.     However, as indicated by Hibberd, Royal did not concern itself with this account because Royal did not consider this to be part of the Royal transaction. Rather, Royal considered this account to be another potential source of funds that could be used to protect Royal against claims.

46.    SFC's use of "forbearance" payments to make payments for obligors was referenced in footnotes in SFC's audited financial statement for the year 2000. This financial statement was furnished by SFC to Royal.

47.    The forbearance payments prevented numerous Student Loan Accounts from going into default, and claims that otherwise would be made against Royal were not made.

48.    The fact that SFC utilized such forbearance payments was not disclosed to all creditors or parties in interest.

49.    SFC did not disclose in the private placement memoranda issued in connection with the eight securitizations or in other reports detailing the payments received from the borrowers, that SFC was making the forbearance payments and thereby preventing certain Student Loan Accounts from going into default.

50.    Over time, the number of students failing to make timely payments on the Student Loan Accounts began to rise. With the rise in default rates, the rate and amount of forbearance payments increased, and SFC utilized its own funds to make forbearance payments.

51.    As a result of the forbearance payments, SFC was rendered insolvent. Proceeds from new loans and securitizations were being used to make forbearance payments rather than to fund SFC's obligations to creditors.

52.    In May 2001, using a balance sheet test, with the exceptions of October and November 2001, SFC had a negative equity. See Summary of Unaudited Balance Sheets attached hereto as Exhibit "A" and incorporated by reference.

53.    SFC was unable to pay its obligations as they came due. In September 2001, SFC was unable to fund its payments for student loan agreements from trucking schools. The monies that would be used to fund this purchase had been allocated to making forbearance payments.

Not until SFC was able to securitize newer loans was SFC able to fund its past purchase of Student Loan Accounts.

54.    Despite its inability to fund Student Loan Accounts, SFC sought to continue its practice of making forbearance payments.

55.    In February 2002, the Debtor was again unable to fund additional purchases of new Student Loan Accounts. Notwithstanding its agreements to purchase additional Student Loan Accounts and take possession of the Student Loan Accounts, SFC could not fund its approximately $27 million purchase of Student Loan Accounts. See List of Unfunded Schools (the "Schools List"), attached hereto as Exhibit "B" and incorporated by reference.

56.    On or about March 5, 2002, SFC borrowed an additional $3.3 million from a private investor group having other relations to SFC, for the purpose of funding the forbearance payments arising from defaults on Student Loan Accounts in the month of February 2002.

57.    Upon information and belief, notwithstanding the increase in forbearance payments and their drain on SFC's assets, SFC did not create a mechanism to control or otherwise limit the forbearance payments. This failure to do so, in addition to making and failing to disclose the forbearance payments, was a breach of the fiduciary duties owed by the officers of SFC to SFC and SFC's creditors.

### E. The Royal Credit Extensions

58.    As default rates continued to rise, it became evident that SFC would no longer be in a position to fund additional forbearance payments.

59.    On or about March 28, 2002, with knowledge that SFC had been making the forbearance payments, Royal loaned $6,145,187.66 to SFC, with the understanding that the proceeds of that loan would be used directly for payment of additional forbearance payments.

The loan was evidenced by the promissory note ("Promissory Note") attached hereto as Exhibit "C" and incorporated by reference.

60.     Prior to the execution of the Promissory Note, Tony McKenzie and Robert Van Epps, analysts employed by Royal, conducted due diligence, in March 2002, specifically focusing on the forbearance payments made by SFC.

61.     Upon information and belief, based upon the investigation by McKenzie and Van Epps, Royal believed that the potential claims against Royal policies if the forbearance payments stopped would be approximately $150 million in March and $180 million in April.

62.     From April 2002 through May 2002, the accounting firm of Grant Thornton LLP ("Grant"), acting on behalf of Royal, performed a forensic investigation related to the Student Loan Accounts and the financial activities of SFC.

63.     In the process of its investigation, Grant's representative, Steven Haenchen, on behalf of Royal, had access to SFC's computer systems and spent several days copying computer files maintained by SFC to Grant's own system.   In addition to electronic information, Grant obtained numerous paper documents to complete its investigation.

64.     On or about April 29, 2002, Royal and SFC amended the Promissory Note to advance a total of $12,302,150.88 to SFC.  A copy of the amended Promissory Note is attached hereto as Exhibit "D" and is incorporated by reference.  As with the March loan, SFC directed that the proceeds be applied directly to either the Trusts or to a particular lender.

65.     Although Royal was not a lending institution, it provided funds to SFC to allow the continued operation of SFC, an operation that was insolvent using either a balance sheet or cash flow test.

66.    As a result of Royal's loan, SFC's creditors, with limited exceptions, were not allowed to discover SFC's true financial circumstances.

67.    Royal's credit extension provided no substantial value to SFC. It did, however, cause direct or proximate harm to SFC's creditors: Royal's credit extension plunged the Debtor into an additional $12,302,150.88 of debt.

### F.  The Royal D&O Policy

68.    To protect its directors and officers from potential claims, SFC purchased the D&O Policy from Royal. Royal agreed to insure SFC's directors and officers through May 3, 2002, for claims made against the directors and officers for, inter alia, breaches of fiduciary duty.

69.    During the policy period, the corporate officers of SFC breached their fiduciary duty to SFC and SFC's creditors by inter alia:

    (a)    concealing that SFC was making the forbearance payments to purchasers of the Notes and Certificates, and its creditors;

    (b)    making misleading representations as to the default rates to purchasers of the Notes and Certificates;

    (c)    failing to create mechanisms to prevent fraud by the vocational schools;

    (d)    continuing to solicit business from vocational schools with high default rates;

    (e)    causing SFC to continue to purchase Student Loan Accounts from vocational schools which allegedly defrauded SFC;

    (f)    allowing employees to approve excessive compensation to Yao; and

    (g)    failing to timely file a bankruptcy petition.

70.    The D&O Policy covered these breaches of fiduciary duty.

71.     The D&O Policy expired shortly after Royal's second extension of credit.

72.     The D&O Policy expired prior to the Filing Date, without the ability of creditors of SFC to seek redress from the D&O Policy.

## COUNT I
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

73.     The Trustee incorporates paragraphs 1-72 as though fully set forth herein.

74.     The Trustee stands in the shoes of a hypothetical creditor under section 544(a)(1) of the Bankruptcy Code.

75.     The Trustee also has authority to assert this Count I pursuant to section 541(a) of the Bankruptcy Code.

76.     The Debtor was insolvent in May 2001.

77.     As more fully set forth above, corporate officers and directors of SFC breached their fiduciary duties to SFC and SFC's creditors.

78.     Royal provided substantial direct assistance to SFC officers and directors in furtherance of their breaches of fiduciary duties by providing funding for the express purpose of making forbearance payments for Royal's own benefit.

79.     Royal's credit extensions encouraged and proximately caused SFC's officers and directors not to seek bankruptcy protection and SFC to instead incur additional debt.

80.     Royal provided this substantial assistance with actual or constructive knowledge that the effect thereof would be to cause the officers and directors to breach their fiduciary duties owed to SFC and SFC's creditors.

81.     Creditors were harmed as a result of Royal's actions.

535609_1                        14

A - 028

82.    Through the conduct set forth in this Amended Complaint, Royal aided and abetted SFC's officers' and directors' breach of fiduciary duties to the Debtor and the Debtor's unsecured creditors and is therefore liable for damages in an amount to be determined at trial.

## COUNT II
## EQUITABLE SUBORDINATION

83.    The Trustee incorporates paragraphs 1-82 as though fully set forth herein.

84.    On or about May 14, 2003, Royal filed a proof of claim in the amount of $12,302,150.88 against SFC.

85.    Pursuant to Section 510(c) of the Bankruptcy Code, a Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

86.    Through engaging in the inequitable conduct described in this Amended Complaint, Royal has injured creditors and/or given an unfair advantage to Royal.

87.    At the time of Royal's inequitable conduct, the Debtor was insolvent and owed fiduciary duties to its creditors.

88.    Royal knew or should have known that as a result of its advancement of the $12,302,150.88 loan, that the breaches of fiduciary duties would not be discovered by creditors until after the D&O policy had expired.

89.    In taking the actions described in this Amended Complaint, Royal had:

    (a)    access to the computer database, books and records of the Debtor;

    (b)    opportunity to determine the then existing financial condition of the Debtor;

(c)     opportunity to assess, with all relevant information, what the financial condition of Debtor would be after each decision (i) to provide funding to the Debtor and (ii) to cause the Debtor to not timely file bankruptcy; and

(d)     opportunity to determine what the Debtor's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

90.     In contrast, creditors of the Debtor (other than professionals and insiders) did not participate in the within described transactions and did not have:

(a)     access to the financial information concerning the Debtor that was available to Royal;

(b)     the same opportunity as Royal to assess what the financial condition of the Debtor would be after each of the aforementioned transactions or actions;

(c)     the same opportunity as Royal to assess the Debtor's ability to pay its respective obligations in the ordinary course of its business after each transaction and action; or

(d)     input into whether the transactions should be consummated or an opportunity to comment upon or object to the transactions or actions.

91.     As a result of Royal's inequitable conduct, SFC's creditors have been deprived of valuable assets.

92.     By reason of the foregoing, SFC's unsecured creditors were harmed.

93.     Allowing Royal to receive payments on its claim prior to payment of the general unsecured creditors would be unfair and inequitable.

94.     Equitable subordination of Royal's claim is consistent with the Bankruptcy Code.

95.    Because of the transactions and actions described herein, without prejudice to and expressly reserving the Trustee's rights to object to Royal's Proof of Claim, Royal's claims against the Debtor should be equitably subordinated to the claims of general unsecured creditors pursuant to section 510 of the Bankruptcy Code.

## COUNT III
## DEEPENING INSOLVENCY

96.    The Trustee incorporates paragraphs 1-95 as though fully set forth herein.

97.    The Trustee stands in the shoes of a hypothetical creditor under section 544(a)(1) of the Bankruptcy Code.

98.    The Trustee also has authority to assert this allegation pursuant to section 541(a) of the Bankruptcy Code.

99.    Royal loaned $12,302,150.88 to the Debtor for the purpose of allowing the Debtor to continue to mask defaults through forbearance payments.

100.    As a direct result of these advances, the Debtor was allowed to continue to operate and the Debtor's officers and directors continued to breach their fiduciary duties.

101.    As a result of the forbearance payments including financial contribution thereto, the filing of a bankruptcy petition was further delayed.  Unsecured creditors were deprived of an earlier opportunity to examine the Debtor's financial information.

102.    The Debtor's officers' and directors' breaches of their fiduciary duties would have entitled creditors to recover Royal against the D&O policy.

103.    By advancing the $12,302,150.88 to SFC, Royal knew, or should have known, that it was delaying SFC's bankruptcy filing and potential claims against the D&O policy.

104.    Unsecured creditors were deprived of sources of repayment and their claims were impaired as a result of the delay.

105.    The delay in seeking bankruptcy protection caused SFC to increase the total amount of its debt. The amount available to distribute to creditors was diminished.

106.    Accordingly, because Royal caused the Debtor to delay its eventual bankruptcy filing while the Debtor was insolvent, Royal caused additional harm to creditors of SFC and is liable for damages in an amount to be determined at trial.

WHEREFORE, the Trustee requests that the Court grant the following relief:

1.    On Count I, grant judgment against Royal for damages sustained in an amount to be determined at trial, plus prejudgment interest;

2.    On Count II, equitably subordinate Royal's claims to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code;

3.    On Count III, grant judgment against Royal for damages sustained in an amount to be determined at trial, plus prejudgment interest;

4.    Award prejudgment interest;

5.    Award reasonable costs and attorneys' fees; and

6.    Award such other and further relief as the Court may deem just and proper.

Dated: April 15, 2004

THE BAYARD FIRM

Charlene D. Davis (No. 2336)
Daniel K. Astin (No. 4068)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

Co-Counsel for Charles A. Stanziale,
Jr., Chapter 7 Trustee of Student
Finance Corporation

and

Sheryl L. Auerbach
Derrick A. Dyer
Dilworth Paxson LLP
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000

Special Counsel for Charles A.
Stanziale Jr., Chapter 7 Trustee of
Student Finance Corporation

# EXHIBIT A

**Student Finance Corporation**
**Balance Sheet Summary**
**May 2001 through June 2002**

| | | 5/31/01 | 6/30/01 | 7/31/01 | 8/31/01 | 9/30/01 | 10/31/01 |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Total Cash | | $4,266,127 | $5,178,638 | $1,497,207 | $3,289,350 | $4,592,572 | $2,633,175 |
| Loans Receivable | | $13,663,714 | $11,347,144 | $20,195,173 | $27,876,361 | $48,200,374 | $19,909,377 |
| Total Deferred Revenue | | ($21,434,526) | ($27,395,961) | ($34,085,102) | ($32,121,122) | ($539,089,901) | ($528,450,494) |
| Deferred Commitment Fees | | ($4,211,556) | ($5,119,662) | ($6,122,683) | ($7,491,717) | ($8,503,897) | ($9,742,656) |
| Other Current Assets | | $97,403,037 | $91,095,587 | $91,558,382 | $94,920,284 | $93,927,480 | $114,590,423 |
| Fixed Assets | | $2,793,689 | $2,934,526 | $3,095,895 | $3,111,025 | $3,251,498 | $3,496,066 |
| Other Assets | | $222,115 | $203,115 | $184,114 | $216,813 | $211,557 | $190,179 |
| Total Assets | | $82,692,599 | $78,244,387 | $76,332,985 | $89,800,994 | $102,589,683 | $102,626,079 |
| | | | | | | | |
| **Liabilities & Equity** | | | | | | | |
| Accounts Payable | | $1,091,850 | $824,344 | $603,191 | $495,954 | $510,082 | $631,673 |
| School Reserve | | $19,054,366 | $20,093,707 | $23,412,584 | $31,713,188 | $41,223,483 | $28,546,519 |
| Other Current Liabilities | | $65,779,080 | $62,873,689 | $59,710,423 | $57,391,501 | $63,127,639 | $55,888,964 |
| Long Term Liabilities | | $0 | $0 | $0 | $0 | $0 | $0 |
| Equity | | ($3,232,697) | ($5,553,353) | ($7,393,213) | $200,420 | ($2,271,502) | $17,558,923 |
| Total Liabilities & Equity | | $82,692,599 | $78,244,387 | $76,332,985 | $89,800,964 | $102,589,683 | $102,626,079 |
| | | | | | | | |
| Additional Loss Reserve | 35% | $4,782,300 | $3,971,500 | $7,088,311 | $9,756,726 | $16,870,131 | $6,968,282 |
| | | | | | | | |
| Adjusted Equity | | ($8,014,997) | ($9,524,853) | ($14,461,524) | ($9,556,306) | ($19,141,633) | $10,590,641 |

May 01 to Jun 02 BS detail summary 2004 03 291.xls printed on 4/14/04

1 of 3

A - 035

2 of 3

Student Finance Corporation
Balance Sheet Summary
May 2001 through June 2002

| | | 11/30/01 | 12/31/01 | 1/31/02 | 2/28/02 | 3/31/02 | 4/30/02 |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Total Cash | | $2,623,450 | $2,755,060 | $3,171,223 | $903,514 | $3,130,960 | $1,585,518 |
| Loans Receivable | | $17,721,239 | $7,701,172 | $11,417,403 | $28,097,076 | $30,697,434 | $25,510,021 |
| Total Deferred Revenue | | ($9,853,373) | ($17,451,517) | ($25,126,723) | ($31,845,581) | ($32,630,014) | ($31,684,970) |
| Deferred Commitment Fees | | ($10,790,009) | $0 | ($1,167,400) | ($2,125,454) | ($2,370,118) | ($2,098,714) |
| Other Current Assets | | $114,994,601 | $14,772,747 | $17,220,421 | $17,746,999 | $14,286,606 | $13,471,417 |
| Fixed Assets | | $3,598,171 | $2,878,414 | $2,948,094 | $2,969,809 | $2,974,340 | $3,026,998 |
| Other Assets | | $171,958 | $155,878 | $177,226 | $158,573 | $139,921 | $190,701 |
| **Total Assets** | | $108,466,038 | $10,811,754 | $8,640,243 | $15,904,938 | $16,199,130 | $10,000,971 |
| | | | | | | | |
| **Liabilities & Equity** | | | | | | | |
| Accounts Payable | | $666,562 | $1,343,452 | $1,194,360 | $1,426,735 | $1,464,727 | $1,682,400 |
| School Reserve | | $29,130,134 | $31,772,824 | $37,267,421 | $51,206,062 | $55,615,688 | $51,899,116 |
| Other Current Liabilities | | $44,334,883 | $17,042,658 | $12,438,548 | $8,562,276 | $44,772 | ($8,190,210) |
| Long Term Liabilities | | $0 | $0 | $0 | $0 | $6,145,188 | $12,302,151 |
| Equity | | $34,344,456 | ($39,347,178) | ($42,260,086) | ($45,280,125) | ($47,071,224) | ($47,892,487) |
| **Total Liabilities & Equity** | | $108,466,038 | $10,811,754 | $8,640,243 | $15,904,938 | $16,199,130 | $10,000,971 |
| | | | | | | | |
| Additional Loss Reserve | 35% | $6,202,434 | $2,895,410 | $3,996,091 | $9,833,976 | $10,733,602 | $9,928,507 |
| | | | | | | | |
| Adjusted Equity | | ($28,142,024) | ($42,242,599) | ($46,256,177) | ($55,114,102) | ($57,804,826) | ($56,620,994) |

May 01 to Jun 02 BS detail  summery 2004 03 291.xls printed on 4/14/04

A - 036

**Student Finance Corporation**
**Balance Sheet Summary**
**May 2001 through June 2002**

| | | 5/31/02 | 6/30/02 |
|---|---|---|---|
| **Assets** | | | |
| Total Cash | | $580,721 | $517,638 |
| Loans Receivable | | $22,846,601 | $22,637,504 |
| Total Deferred Revenue | | ($30,959,606) | ($30,944,197) |
| Deferred Commitment Fees | | ($2,079,994) | ($2,077,142) |
| Other Current Assets | | $17,165,483 | $16,706,719 |
| Fixed Assets | | $3,026,998 | $3,024,814 |
| Other Assets | | $166,263 | $141,824 |
| Total Assets | | $10,746,465 | $10,007,161 |
| | | | |
| **Liabilities & Equity** | | | |
| Accounts Payable | | $1,564,743 | $1,698,469 |
| School Reserve | | $48,333,108 | $48,303,074 |
| Other Current Liabilities | | ($8,855,993) | ($9,289,128) |
| Long Term Liabilities | | $12,302,151 | $12,302,151 |
| Equity | | ($42,618,543) | ($43,007,406) |
| Total Liabilities & Equity | | $10,745,465 | $10,007,161 |
| | | | |
| Additional Loss Reserve | 35% | $7,995,960 | $7,923,126 |
| | | | |
| Adjusted Equity | | ($50,614,503) | ($50,930,532) |

May 01 to Jun 02 BS detail summary 2004 03 291.xls printed on 4/14/04

3 of 3

# EXHIBIT B

Disbursement Remaining & Collateral Analysis by Corporation

| CorpName | Settlement Status | Original Loan Amount Total | Original Loan Amount Unassigned | DisbAmt | Process Fees | WthdrwnFundsDuSFG | NetDisbRem |
|---|---|---|---|---|---|---|---|
| ACTION | Agreed/Pending | | | | | | |
| ALABAMA | Agreed/Pending | | | | | | |
| AMER AIR FORCE | Agreed/Pending | | | | | | |
| A103 | Agreed/Pending | | | | | | |
| CAREER DEV | Agreed/Pending | | | | | | |
| CAREER VISION | Agreed/Pending | | | | | | |
| CAREERS WW | Agreed/Pending | | | | | | |
| CCS | Agreed/Pending | | | | | | |
| CDL | Agreed/Pending | | | | | | |
| CDL TRAINING | Agreed/Pending | | | | | | |
| CDS | Agreed/Pending | | | | | | |
| CHARI TDTS | Agreed/Pending | | | | | | |
| COMMER TRAIN | Agreed/Pending | | | | | | |
| CONTINENTAL | Agreed/Pending | | | | | | |
| ELITE—EL CAJON | Agreed/Pending | | | | | | |
| FIRST CLASS | Agreed/Pending | | | | | | |
| HAMRICK | Agreed/Pending | | | | | | |
| HD3 | Agreed/Pending | | | | | | |
| HEALTH CARE | Agreed/Pending | | | | | | |
| HICKORY | Agreed/Pending | | | | | | |
| K3 | Agreed/Pending | | | | | | |
| KNIGHTS | Agreed/Pending | | | | | | |
| LUWORL | Agreed/Pending | | | | | | |
| MARCO | Agreed/Pending | | | | | | |
| MAPPER | Agreed/Pending | | | | | | |
| NAT DR ACAD | Agreed/Pending | | | | | | |
| NETITS | Agreed/Pending | | | | | | |
| PC PRO J-WWB | Agreed/Pending | | | | | | |
| PRO—BA | Agreed/Pending | | | | | | |
| QUALITY | Agreed/Pending | | | | | | |
| SHORE | Agreed/Pending | | | | | | |
| SW FL CAREER | Agreed/Pending | | | | | | |
| TRANS TECH | Agreed/Pending | | | | | | |
| TRI-AREA | Agreed/Pending | | | | | | |
| UNITED | Agreed/Pending | | | | | | |
| UNLIMITED | Agreed/Pending | | | | | | |
| US TRUCK—DETROIT | Agreed/Pending | | | | | | |
| USTUS | Pending | | | | | | |
| FRANKLIN | Open | | | | | | |
| ALLIANCE | Open | | | | | | |
| AMER INST | Open | | | | | | |
| AUGUSTA MASSAGE | Open | | | | | | |
| BEARCAT | Open | | | | | | |
| BUSTERS | Open | | | | | | |
| C.V.A.T. | Open | | | | | | |
| C3 | Open | | | | | | |
| CENTN | Open | | | | | | |
| CDL —ACADEMY | Open | | | | | | |
| COASTAL | Open | | | | | | |
| COMMONWEALTH | Open | | | | | | |
| DELTA | Open | | | | | | |
| DDG TRAINING | Open | | | | | | |
| ELITE—LDX | Open | | | | | | |
| HOOKUP | Open | | | | | | |
| INTERNATIONAL | Open | | | | | | |
| KATLAW | Open | | | | | | |
| KEY POWER | Open | | | | | | |
| MCDG | Open | | | | | | |
| MTA | Open | | | | | | |
| NAT DDS INST FL | Open | | | | | | |
| NTT | Open | | | | | | |
| PAZZ3O | Open | | | | | | |
| PHOENIX TDA | Open | | | | | | |
| PRO P4 | Open | | | | | | |
| ROADMASTER | Open | | | | | | |
| THOROUGHBRED | Open | | | | | | |
| TRANS TRAIN | Open | | | | | | |
| TRI-STATE | Open | | | | | | |
| TRUCKING STREET | Open | | | | | | |
| TTC—LEBANON | Open | | | | | | |
| WESTERN NE | Open | | | | | | |
| ACROSS | Settled | | | | | | |
| AMER EAGLE | Settled | | | | | | |
| AMER TRAIN | Settled | | | | | | |
| CAREER LDG | Settled | | | | | | |
| CD USA | Settled | | | | | | |
| COBA | Settled | | | | | | |
| COM COML | Settled | | | | | | |
| CROSSCOUNTRY | Settled | | | | | | |
| DAL | Settled | | | | | | |
| DALYS | Settled | | | | | | |
| INTERSTATE | Settled | | | | | | |
| KCC | Settled | | | | | | |
| M ALABAMA | Settled | | | | | | |
| OMEGA | Settled | | | | | | |
| PRO—TWIN FALLS | Settled | | | | | | |
| SHIPPERS | Settled | | | | | | |
| SUPERIOR | Settled | | | | | | |
| THWG—MARLETON | Settled | | | | | | |
| TRUCK MASTER | Settled | | | | | | |
| TTI | Settled | | | | | | |
| Grand Total | | | | | | | |

| Count | Settlement Status | Orig Debt Due Total | Orig Debt Due Unassigned | DisbAmt | Process Fees | WthdrwnFundsDuSFG | NetDisbRem |
|---|---|---|---|---|---|---|---|
| 39 | Agreed/Pending | | | | | | |
| 34 | Open | | | | | | |
| 22 | Settled | | | | | | |
| 1 | Franklin | | | | | | |
| | Franklin Unassigned | | | | | | |

Process Fees and Withdrawn Funds Due SFG
are incorporated in Net Disbursement Due for Non Settled Schools
Claims have been filtered out of Unassigned Collateral

FundingSummary041703.xls                4/14/04

# EXHIBIT C

## SECURED PROMISSORY NOTE

$6,145,187.66

Wilmington, DE
March 28, 2002

FOR VALUE RECEIVED, Student Finance Corporation, a Pennsylvania corporation (the "Obligor"), with offices at 170 Lukens Drive, New Castle, Delaware, 19720, hereby promises to pay on demand to the order of Royal Indemnity Company, a Delaware insurance company ("Holder"), at its address at 11111 Carmel Commons Blvd., Charlotte, NC 28226 or at such other place as Holder may designate from time to time in writing, the principal amount of SIX MILLION ONE HUNDRED FORTY FIVE THOUSAND ONE HUNDRED EIGHTY SEVEN DOLLARS AND SIXTY SIX CENTS (US$6,145,187.66) (the "Principal Amount") in lawful money of the United States of America, together with interest thereon, payable in accordance with the terms hereof, as hereinafter provided.

1.    Loan; Payments.

(a)    Loan.  The proceeds of the loan (the "Loan") evidenced by this Secured Promissory Note (the "Note") shall be used by the Obligor to fund transfers in such amounts and to such accounts as described on Schedule A attached hereto. Upon the execution and delivery of this Note, the Obligor irrevocably authorizes and instructs Holder to disburse on behalf of the Obligor all of the proceeds of the Loan in the amounts and to the accounts set forth in Schedule A attached hereto.

(b)    Payments.  The Principal Amount, together with any and all costs, fees, expenses and accrued interest then outstanding, shall be due and payable in full on the earliest to occur of:  (i) Holder's demand for payment hereunder, (ii) March 28, 2007, or (iii) such date that the indebtedness owing hereunder becomes due and payable pursuant to Section 8 hereof  (such earliest date, the "Maturity Date").  Obligor may prepay all of any portion of this Note at any time and from time to time.  All such prepayments shall be applied first, to accrued and unpaid costs, fees, expenses and interest, and the balance to principal.

2.    Interest.  All amounts outstanding from time to time hereunder shall bear interest until such amounts are paid at a rate equal to ten percent (10%) per annum.  The interest owing hereunder shall be calculated for the actual days elapsed on the basis of a 360-day year. In the absence of a demand for payment hereunder, interest shall be payable monthly on the first Business Day of each month, commencing on the first Business Day following the date of this Note.  Upon the occurrence and during the continuation of an Event of Default hereunder (as defined in Section 7 below), all amounts outstanding shall thereafter bear interest at an interest rate equal to eighteen percent (18%) per annum (the "Default Interest Rate").  The Default Interest Rate shall also apply after maturity and judgment.  As used herein, the term "Business Day" shall mean any day not a Saturday, Sunday or public holiday under the laws of the State of Delaware or the laws of the United States of America.

PHLEGAL: #1237540 v2 (Q5XE022I.DOC)

3.   Security.

    (a)   Grant of Security Interest.   Obligor shall amend the SFC Grantor Trust Interest-Only Certificates Pledge and Security Agreement, dated as of June 19, 2001, between Obligor, as Pledgor, in favor of Wells Fargo Bank Minnesota, National Association, as Collateral Agent for Holder (the "Collateral Agent (the "Pledge"), such that the Pledged Collateral (as such term is defined in each Pledge), in addition to the indebtedness currently secured thereby,  shall also secure all of Obligor's obligations and liabilities to Holder owing under or with respect to the Loan (all of such indebtedness and liabilities owing to Holder under or with respect to the Loan, being herein called the "Liabilities").

    (b)   The liens and security interests of the Collateral Agent in the Pledged Collateral shall be first priority perfected liens and security interests, subject to no liens, encumbrances or security interests of any kind except in favor of  the Collateral Agent as security for the Liabilities, and may be retained by the Collateral Agent for the benefit of Holder until all of the Liabilities have been indefeasibly paid and satisfied in full.

4.   Representations and Warranties.   Obligor represents and warrants that:

    (a)   Organization; Authority.   Obligor is a corporation duly organized, validly existing and in good standing under the laws of Pennsylvania, is qualified to conduct business in all applicable jurisdictions, and Obligor knows of no facts which would prevent it from being in good standing in those jurisdictions.  Obligor has the necessary power and authority to enter into and perform its obligations under this Note and the other Loan Documents (as defined in Section 6 below) and all other documents required by Holder in connection with the Loan. The execution and performance of the Loan Documents have been duly authorized by all necessary proceedings on the part of Obligor, and, upon their execution and delivery, they will be valid, binding, and enforceable in accordance with their terms.

    (b)   No Violation.   Obligor's execution and performance of this Note and the other Loan Documents do not and will not violate any orders, laws or regulations applicable to Obligor, any organizational documents of Obligor, or any instruments, indentures or agreements (including any provisions pertaining to assignment of contracts or subordinated debt) to which Obligor is a party or by which Obligor, or Obligor's properties, are bound; and all consents and approvals, if any, required in connection with this Note and the other Loan Documents have been obtained and are in full force and effect.

    (c)   Use of Proceeds.   All of the proceeds of the Loan shall solely be used to fund transfers in such amounts and to such accounts as described on Schedule A attached hereto.

    (d)   Suits.   There are no actions, suits, proceedings, or claims pending or threatened against Obligor or any of its property which, if adversely determined, is likely to have a material adverse effect on Obligor or its operations or financial condition; and Obligor's business is in compliance with all applicable orders, laws and regulations.

PHLEGAL:#1237580 v2 (QEX8022.DOC)

(e)  **Defaults**. Neither Obligor's execution of nor performance under this Note or the other Loan Documents will create a default or any lien or encumbrance under any agreement, indenture or instrument to which Obligor is a party or by which Obligor or any of its properties is bound other than a lien or encumbrance in favor of Holder.

(f)  **Tax Returns and Taxes**. Obligor has filed all federal, state and local tax returns required to be filed and has paid all taxes, assessments and governmental charges and levies thereon, including interest and penalties, except where the same are being contested in good faith by appropriate proceedings and for which adequate reserves have been set aside in accordance with generally accepted accounting principles in effect in the United States from time to time ("GAAP"), and no liens for taxes have been filed and no claims have been assessed by a governmental authority with respect to any taxes. The charges, accruals and reserves on the books of Obligor with respect to taxes or other governmental charges are adequate.

(g)  **Compliance with Laws**. Obligor has complied in all material respects with all requirements of foreign, federal, state and local law in connection with the acquisition, ownership and operation of Obligor's business and property, including, without limitation, any and all applicable requirements of environmental protection laws other than those the failure to comply with which is not likely to have a material adverse effect on Obligor or its properties or on Obligor's operations or financial condition.

(h)  **Place of Business, Chief Executive Office; Locations of Pledged Collateral; Jurisdiction of Organization**. The principal place of business or chief executive office of Obligor is located at the address set forth at the beginning of this Note or at the location(s) hereafter disclosed to Holder pursuant to Section 5(b) hereof. The jurisdiction of organization of Obligor is the jurisdiction set forth at the beginning of this Note or the jurisdiction(s) hereafter disclosed to Holder pursuant to Section 5(b) hereof.

(i)  **Location of Books and Records**. Obligor maintains its books and records at its address set forth at the beginning of this Note or at the location(s) hereafter disclosed to Holder pursuant to Section 5(b) hereof.

(j)  **Obligor is Sole Owner of Pledged Collateral**. Obligor is the sole owner of the Pledged Collateral, holding good and marketable title thereto, free from any lien, security interest, encumbrance, or claim (including without limitation, claims by or against any previous owner or holder of any right, title or interest in the Pledged Collateral or any portion thereof) or contractual or other right other than the liens and encumbrances of the Collateral Agent for the benefit of Holder and has the right to grant the security interests created by the Pledge and this Note.

(k)  **Materially Misleading Statements**. No representation, warranty, or statement made herein or any of the other Loan Documents, on any Schedule hereto or thereto or in any certificate or document furnished or to be furnished pursuant hereto or any of the other Loan Documents contains or will contain any untrue statement of a material fact or omits or will omit any material fact necessary to make it not misleading.

-3-

PHLEGAL: #1237580 v2 (QDXBG01LDOC)

5.     Covenants. Obligor hereby covenants and agrees that for as long as any Liabilities are outstanding:

(a)     Defense of Pledged Collateral. Obligor shall defend the Pledged Collateral against all claims and demands of all persons or entities at any time claiming any interest therein other than the Collateral Agent for the benefit of Holder.

(b)     Notice of Changes in Location of Chief Executive Offices, Jurisdiction of Organization, Books and Records, Pledged Collateral. Obligor shall provide Holder with prompt written notice of any intended change in its chief executive office, its jurisdiction of organization, and/or the office where it maintains its books and records at least, in the case of any intended change in its chief executive office and/or the office where it maintains its books and records, five (5) days prior to the effective date of any such change, and, in the case of its jurisdiction of organization, at least thirty (30) days prior to the effective date of any such change, and, within such period, Obligor shall execute and deliver such documents as Holder or the Collateral Agent shall reasonably request to continue the first priority perfected lien and security interest in the Pledged Collateral that secures the Liabilities.

(c)     Prompt Payment of Taxes; Delivery to Holder of Proof of Payment. Obligor shall promptly pay any and all taxes, assessments, and/or governmental charges upon the Pledged Collateral on the dates such taxes, assessments, and/or governmental charges are due and payable, except to the extent that such taxes, assessments, and/or charges are contested in good faith by Obligor by appropriate proceedings and for which such Obligor is maintaining adequate reserves in accordance with GAAP. Upon request of Holder, Obligor shall deliver to Holder such receipts and other proofs of payment as Holder may request.

(d)     Notice of Adverse Changes, Events of Default, Seizures and Institution of Litigation. Obligor shall immediately notify Holder of: (i) any material changes in its business, property, or financial condition, (ii) the occurrence of an Event of Default; (iii) any claims or alleged claims of third parties to the Pledged Collateral; and (iv) the institution of any litigation, arbitration, governmental investigation or administrative proceedings against or affecting Obligor or any of the Pledged Collateral.

(e)     Compliance with Laws. Obligor shall continue to be in compliance with all applicable laws, statutes, rules, and regulations.

(f)     Maintenance, Inspection of Books and Records. Obligor shall maintain complete and accurate books and records in accordance with GAAP. Obligor shall keep Holder fully informed as to the location of all such books and records and shall permit Holder and its authorized agents to have full, complete and unrestricted access thereto at all reasonable times to inspect, audit and make copies of any and all such books and records. Upon submission to Obligor of an invoice therefor, Obligor will reimburse Holder for any and all fees and costs related to any inspection and/or audit by Holder and its authorized agents of Obligor's books and records. Holder's rights hereunder shall be enforceable at law or in equity, and Obligor consents to the entry of judicial orders or injunctions enforcing specific performance of all of Obligor's obligations hereunder and under the other Loan Documents.

-4-

PHLEGAL: #1237580 v2 (QEXB02L.DOC)

(g)    <u>Continuation of Perfected Status of Pledged Collateral</u>. Obligor agrees to cooperate and join, at its expense, with the Collateral Agent and Holder in taking such steps as are necessary, in the Collateral Agent's or Holder's judgment, to perfect or continue the perfected status of the security interests granted in the Pledged Collateral, including, without limitation, the execution and delivery of any Uniform Commercial Code financing statements, amendments thereto and continuation statements.

(h)    <u>Restrictions on other Debt or Financing</u>. Until such time as the Liabilities have been indefeasibly paid and satisfied in full, Obligor shall not incur any other debt or equity nor shall Obligor either guarantee or provide security for any debt or other financing without the prior written consent of Holder unless the proceeds of any such new indebtedness or equity are used to repay this Note.

6.    <u>Conditions to Funding Loan</u>. The obligation of Holder to fund the Loan shall be subject to Holder's receipt of the following documents (this Note, the Pledge and all of the following documents, the "Loan Documents") and other conditions, each in form and substance satisfactory to Holder:

(a)    <u>Note</u>. This Note, duly executed by Obligor.

(b)    <u>Pledge Amendment</u>. The amendment of the Pledge required pursuant to Section 3(a) hereof, duly executed and delivered by the parties thereto.

(c)    <u>Financing Statements</u>. Holder shall have received satisfactory evidence of the filing and proper indexing of Uniform Commercial Code financing statements, in form satisfactory to Holder, evidencing the security interest in the Pledged Collateral in such jurisdictions as Holder shall determine are necessary to perfect its (or the Collateral Agent's) first priority perfected security interest therein as security for the Liabilities.

(d)    <u>Authorization Documents</u>. A certified copy of the articles of incorporation, the bylaws and the resolutions of the Board of Directors of Obligor authorizing Obligor's execution and full performance of this Note, the other Loan Documents and all other documents and actions required hereunder, and an incumbency certificate setting forth the officers of Obligor and those persons authorized to execute this Note and related documents, together with a certificate of good standing from Obligor's jurisdiction of organization.

(e)    <u>Officer's Certificate</u>. An officer's certificate executed by an officer of Obligor certifying as to the accuracy of the warranties and representations of Obligor set forth herein and certain other factual matters required by Holder.

(f)    <u>Opinion of Counsel</u>. An executed opinion letter from counsel to Obligor, in form and substance satisfactory to Holder and its counsel.

(g)    <u>Fees and Expenses</u>. All fees and legal expenses due from Obligor to Holder or its counsel shall be payable at or before the funding of the Loan. Obligor shall pay all out of pocket expenses incurred by Holder in connection with the preparation, execution and delivery of this Note and all other Loan Documents, search and filing fees and expenses, including, but not limited to, reasonable legal fees and all other reasonable related costs.

-5-

PHXROAL: #1237150 V2 (QEX6021.DOC)

(h)    Other Documents and Conditions.  Such additional documents and conditions as Holder reasonably may request.

7.    Events of Default.  The occurrence, after the date hereof, of one or more of the following events shall constitute an event of default (an "Event of Default") hereunder:

(a)    Obligor shall fail to make any payment due to Holder under this Note or the other Loan Documents as and when due, whether at maturity, as a result of the occurrence of an Event of Default, or otherwise.

(b)    Obligor shall fail to observe or perform any other covenant or agreement required to be observed or performed by Obligor under this Note or under any other Loan Document, and such failure shall continue after the expiration of five (5) days following notice from Holder to Obligor of such failure.

(c)    Any representation or warranty of Obligor under this Note, under any other Loan Document, or under any document, instrument or agreement executed and delivered in connection with this Note or the transactions contemplated hereby (collectively, the "Related Documents"), shall be false or misleading in any material respect.

(d)    Obligor shall default in the payment of any obligation for borrowed money, which default is not cured within any grace or cure period applicable thereto.

(e)    Any event of default shall occur under the terms of any of the Loan Documents.

(f)    If custody or control of any substantial part of the property of Obligor shall be assumed by any governmental agency or any court of competent jurisdiction at the instance of any governmental agency; if any material license or franchise shall be suspended, revoked or otherwise terminated; or if any governmental regulatory authority or judicial body shall make any other final non-appealable determination the effect of which would be to affect materially and adversely the operations of Obligor as now conducted.

(g)    If Obligor shall create, permit or suffer the creation of any liens, security interests, or any other encumbrances on any of its property, real or personal, except (A) those in favor of the Collateral Agent for the benefit of Holder as security for the Liabilities and (B) other valid and perfected security interests in property of Obligor other than the Pledged Collateral existing as of the date hereof; provided that Obligor shall have five (5) days from the date on which Obligor becomes aware or should have become aware of the existence thereof to remove, or purge or satisfy any such lien, security interest or encumbrance that is both non-consensual and not in favor of any government entity.

(h)    If Obligor shall sell, lease, transfer or otherwise dispose of all or any portion of its assets, real or personal, other than such transactions in the normal and ordinary course of business for value received; or discontinue, liquidate, or change in any material respect any substantial part of its operations or business.

PHLEGAL:#1237580 v2 (QEX01!.DOC)

-6-

(i)    If Obligor is or becomes bankrupt or insolvent (including without limitation generally failing to pay its debts as such debts become due); is adjudicated insolvent or bankrupt; or shall suffer a custodian, receiver or trustee for it or substantially all of its property to be appointed and if appointed without its consent, not be discharged within sixty (60) days; makes an assignment for the benefit of creditors; or suffers proceedings under any law related to bankruptcy, insolvency, liquidation or the reorganization, readjustment or the release of debtors to be instituted against it and if contested by it not dismissed or stayed within thirty (30) days; if proceedings under any law related to bankruptcy, insolvency, liquidation, or the reorganization, readjustment or the release of debtors is instituted or commenced by Obligor; if any order for relief is entered relating to any of the foregoing proceedings; or if Obligor shall by any act or failure to act indicate its consent to, approval of or acquiescence in any of the foregoing.

8.    Remedies.

(a)    General Rights of Holder.  Upon Holder's demand, or, without in any manner restricting or limiting the right of Holder to demand payment of the entire indebtedness owing hereunder at any time and for any reason or for no reason, upon the occurrence of an Event of Default, the entire unpaid principal sum owing hereunder, together with any and all interest accrued thereon plus all other sums due and payable to Holder hereunder and the other Loan Documents, shall, at the option of Holder, become due and payable immediately without presentment, demand, notice of nonpayment, protest, notice of protest, or other notice of dishonor, all of which are hereby expressly waived by Obligor.

(b)    Additional Rights and Remedies.  In addition to the rights and remedies available to Holder as set forth above, upon the occurrence of an Event of Default, or at any time thereafter, Holder may at its option, immediately and without notice, do any or all of the following, which rights and remedies are cumulative, may be exercised from time to time, and are in addition to any rights and remedies available to Holder or the Collateral Agent for the benefit of Holder or under any other agreement or instrument by and between Obligor and Holder:

(i)    Exercise or cause the Collateral Agent to exercise any and all of the rights and remedies of a secured party under the Uniform Commercial Code or other applicable law relating to the liens on or security interests in the Pledged Collateral, including, without limitation, the right to require Obligor to assemble the Pledged Collateral and make it available to the Collateral Agent or Holder;

(ii)    Demand, sue for, collect, or retrieve any money or property at any time payable, receivable on account of, or in exchange for, or make any compromise, or settlement deemed desirable with respect to any of the Pledged Collateral;

(iii)    Notify the post office authorities to change the address for delivery of Obligor's mail to an address designated by Holder and to receive, open, and distribute all mail addressed to Obligor, retaining all mail relating to the Pledged Collateral and forwarding all other mail to Obligor;

-7-

PHLEGAL: #1237380 v2 (QJXX601.DOC)

       (iv)     Charge interest on the Loan at the Default Interest Rate;

and/or

       (v)     Upon five (5) calendar days' prior written notice to Obligor (or one (1) day notice by telephone with respect to Pledged Collateral that is perishable or threatens to decline rapidly in value), which Obligor hereby acknowledges to be sufficient, commercially reasonable and proper, Holder may sell, lease or otherwise dispose of any or all of the Pledged Collateral or cause the Collateral Agent to sell, lease or otherwise dispose of any or all of the Pledged Collateral, at any time and from time to time at public or private sale, with or without advertisement thereof, and apply the proceeds of any such sale first to the Collateral Agent's and Holder's expenses in preparing the Pledged Collateral for sale (including reasonable attorneys' fees) and second to the complete satisfaction of the Liabilities in any order deemed appropriate by Holder in its sole discretion. Obligor waives the benefit of any marshaling doctrine with respect to the Collateral Agent's and Holder's exercise of its rights hereunder and under the other Loan Documents. Obligor grants a royalty-free license to the Collateral Agent and Holder for all patents, service marks, trademarks, tradenames, copyrights, computer programs and other intellectual property and proprietary rights sufficient to permit Holder to exercise all rights granted to the Collateral Agent and to Holder under this Note and the other Loan Documents. Holder or anyone else may be the purchaser of any or all of the Pledged Collateral so sold and thereafter hold such Pledged Collateral absolutely, free from any claim or right of whatsoever kind, including any equity of redemption of Obligor or any other obligor, any such notice, right and/or equity of redemption being hereby expressly waived and released.

       (c)     <u>Grant of Power of Attorney</u>.

       (i)     <u>Attorney-in-Fact</u>. Obligor hereby irrevocably appoints the Collateral Agent and Holder (and any of its respective attorneys, officers, employees, or agents) as its true and lawful attorney-in-fact, said appointment being coupled with an interest, with full power of substitution, in the name of Obligor, Collateral Agent, Holder, or otherwise, for the sole use and benefit of Holder in its sole discretion, but at Obligor's expense, to exercise, to the extent permitted by law, in its name or in the name of Obligor or otherwise, the powers set forth herein, following the occurrence of an Event of Default, such powers, including, but not limited to, the power at any time: (i) to endorse the name of Obligor upon any instruments of payment, invoice, freight, express bill, bill of lading, storage, or warehouse receipt relating to the Pledged Collateral; (ii) to demand, collect, receive payment of, settle, compromise, or adjust all or any of the Pledged Collateral; (iii) to correspond and negotiate directly with obligors of the Pledged Collateral; and (iv) to execute any notice, statement, instrument, agreement, or other paper that the Collateral Agent or Holder may require to create, preserve, perfect, or validate any security interest in the Pledged Collateral or to enable the Collateral Agent or Holder to exercise or enforce its respective rights under this Note or the other Loan Documents or with respect thereto.

       (ii)     <u>Liability of Holder as Attorney-in-Fact</u>. Neither the Collateral Agent nor Holder nor any of its respective attorneys, officers, employees, or agents shall be liable for acts, omissions, any error in judgment, or mistake in fact in its/their capacity as attorney-in-fact. Obligor hereby ratifies all lawful acts of the Collateral Agent and Holder as its attorney-in-fact. This power, being coupled with an interest is irrevocable until the Liabilities have been indefeasibly paid and satisfied in full. Neither the Collateral Agent nor Holder shall

PHLEGAL: #1237550 v2 (QJXX03!L.DOC)

be required to take any steps necessary to preserve any rights against prior parties with respect to any of the Pledged Collateral.

9.    Remedies Cumulative, etc.

(a)    No right or remedy conferred upon or reserved to the Collateral Agent or Holder under this Note or any of the other Loan Documents or now or hereafter existing at law or in equity is intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of Holder, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefor shall occur.

(b)    Obligor hereby waives presentment, demand, notice of nonpayment, protest, notice of protest, notice of dishonor and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, all of the Liabilities. To the extent permitted by law, Obligor waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect.

10.    Waiver of Jury Trial. OBLIGOR HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF OBLIGOR, COLLATERAL AGENT OR HOLDER. OBLIGOR HEREBY ACKNOWLEDGES THAT IT WAS REPRESENTED BY COUNSEL IN ITS ENTERING INTO THIS NOTE AND THE OTHER LOAN DOCUMENTS AND IT WAS EXPLAINED THE MEANING OF THIS SECTION 9(d) RELATING TO THE WAIVER OF JURY TRIAL.

11.    Costs and Expenses. Following the occurrence of any Event of Default, Obligor shall pay upon demand all costs and expenses (including all attorneys' fees and expenses) incurred by the Collateral Agent for the benefit of Holder or by Holder in the exercise of any of its rights, remedies or powers under this Note or any of the other Loan Documents, and any amount thereof not paid shall be added to the principal sum hereunder from the date paid by the Collateral Agent or by Holder and shall thereafter bear interest at the Default Interest Rate until paid in full.

12.    Notices. All notices required to be given to any of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when presented personally to such party or sent by United States mail, postage prepaid or sent by overnight courier, or by facsimile, with written confirmation of successful transmission received by the sender, to such party at its address set forth below:

-9-

PHLEGAL2: #1237580 v2 (QSX80YI.DOC)

Obligor:

    Student Finance Corporation
    170 Lukens Drive
    New Castle, DE 19720
    Attention: Gary J. Hawthorne
    Telephone: (302) 467-4000
    Facsimile: (302) 467-4040

with a copy to:

    Pepper Hamilton LLP
    3000 Two Logan Square
    Eighteenth and Arch Streets
    Philadelphia, PA 19103-2799
    Facsimile: (215) 981-4750
    Attention: W. Roderick Gagné

Holder:

    Royal Indemnity Company
    11111 Carmel Commons Boulevard
    Charlotte, NC 28226
    Attention: Tony McKenzie
    Telephone: (704) 543-3411
    Facsimile: (704) 543-3466

with a copy to Holder's counsel at:

    Royal Indemnity Company
    9300 Arrowpoint Blvd.
    Post Office Box 1000
    Charlotte, NC 28201-1000
    Attention: Theodore J. Chandler, Esq.
    Telephone: (704) 522-3364
    Facsimile: (704) 522-2688

Such notice shall be deemed to be given when received if delivered personally, one Business Day after the date sent by overnight courier or by facsimile, or three days after the date mailed by certified or registered mail. Any notice of any change in such address shall also be given in the manner set forth above. Whenever the giving of notice is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

    13.    Severability. In the event that any provision of this Note is held to be invalid, illegal or unenforceable in any respect or to any extent, such provision shall nevertheless remain valid, legal and enforceable in all such other respects and to such extent as may be permissible. Any such invalidity, illegality or unenforceability shall not affect any other

-10-

PHLEGAL: #1237560 v2 (Q5X402L.DOC)

provisions of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.    <u>Amendments and Waivers</u>. No modification or amendment hereof, or waiver or consent hereunder, shall be effective unless made in a writing signed by appropriate officers of Holder and Obligor.

15.    <u>Successors and Assigns</u>. This Note inures to the benefit of Holder and binds the Obligor, and their respective successors and assigns, and the words "Holder" and "Obligor" whenever occurring herein shall be deemed and construed to include such respective successors and assigns.

16.    <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the State of Delaware.

17.    <u>Consent to Jurisdiction and Service of Process</u>. Obligor irrevocably appoints each and every owner, partner and/or officer of Obligor as its attorneys upon whom may be served, by regular or certified mail at the address set forth in this Note, any notice, process or pleading in any action or proceeding against it arising out of or in connection with this Note or any of the other Loan Documents. Obligor hereby consents that any action or proceeding against it may at Holder's option be commenced and maintained in any court within New Castle County in the State of Delaware or in the United States District Court for the District of Delaware by service of process on any such owner, partner and/or officer. Obligor further agrees that such courts of New Castle County in the State of Delaware and the United States District Court for the District of Delaware shall have jurisdiction with respect to the subject matter hereof and the person of Obligor and all Pledged Collateral for the Liabilities.

[Remainder of page intentionally left blank]

PHLEGAL: #1237580 v2 (Q 5XX01LDOC)

-11-

IN WITNESS WHEREOF, Obligor has duly executed this Note on the day and year first above written.

ATTEST:                                STUDENT FINANCE CORPORATION

By: _____         By: _____
Name: Perry A. Turnbull                   Name:   Gary J. Hawthorne
Title: Vice Chairman                      Title:   President

-12-

Acknowledged and accepted this 28 day of March, 2002:

ROYAL INDEMNITY COMPANY

By: _William J. Hibberd_
   Name:  William J. Hibberd
   Title:   Authorized Representative

-13-

MAR-28-2002 THU 12:14 PM 704 543 3586

P. 02