# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : |
| STUDENT FINANCE | : |
| CORPORATION, | : |
| | : |
| Debtor. | : |
| | : |
| | : |
| CHARLES A. STANZIALE, JR., | : |
| CHAPTER 7 TRUSTEE OF STUDENT | : |
| FINANCE CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : Civil Action No.: 04-1551 (JJF) |
| v. | : |
| | : |
| PEPPER HAMILTON LLP, et al., | : |
| | : |
| Defendants. | : **REDACTED VERSION** |

---

## APPENDIX OF EXHIBITS TO BRIEF IN OPPOSITION TO PEPPER HAMILTON'S MOTION TO COMPEL AND IN SUPPORT OF TRUSTEE'S MOTION FOR PROTECTIVE ORDER AND TO COMPEL DISCOVERY

---

THE BAYARD FIRM
Daniel K. Astin (No. 4068)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000 (telephone)

MCELROY, DEUTSCH,
MULVANEY & CARPENTER, LLP
Michael S. Waters, Esquire
Lois H. Goodman, Esquire
Candice E. Chesson, Esquire
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079
(973) 622-7711 (telephone)

Original Filing Date: October 30, 2006

Redacted Filing Date: October 31, 2006

TABLE OF CONTENTS

Transcript of October 27, 2004 Hearing to Approve Settlement between the Trustee and Royal Indemnity Company ...................................................................................................B-1

Settlement Term Sheet between the Trustee and Royal Indemnity Company ........................B-180

Order Approving Settlement between the Trustee and Royal Indemnity Company ...............B-183

Pepper Hamilton LLP's Responses and Objections to the Trustee's Second Request for Production of Documents ........................................................................................................B-186

Joint Litigation Agreement (filed under seal)........................................................................B-199

Trustee's Responses to Pepper Hamilton LLP's Second Set of Interrogatories.....................B-207

Letter from Pepper Hamilton, LLP dated September 1, 2005 .................................................B-210

Privilege Log of Pepper Hamilton LLP .................................................................................B-214

Redacted Memorandum Provided to Trustee, Dated August 6, 2002 .....................................B-230

Redacted Electronic Mail from Duncan Grant, Dated April 30, 2002 ...................................B-232

Unredacted Electronic Mail from Duncan Grant, Dated April 30, 2002................................B-233

Attestation by Konrad Smith ................................................................................................B-234

Pepper Hamilton LLP's Bills for Service for January 2002 ...................................................B-235

Redacted Electronic Mail from Andrew Yao, Dated November 29, 2000 .............................B-245

Redacted Electronic Mail from Roderick Gagne, Dated November 29, 2000 ........................B-246

Letter and Related Documents Regarding Pledge Agreement .................................................B-247

Relevant Portions of Transcript Dated December 28, 2005 ...................................................B-305

Letter from Michael Waters, Dated August 31, 2006..............................................................B-320

Letter from Stephen Shapiro, Dated September 18, 2006 .......................................................B-322

Memorandum to Robert Bast, Dated September 30, 1999 ......................................................B-324

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                    ) Chapter 7
                          )
STUDENT FINANCE           ) Case No. 02-11620(JBR)
CORPORATION,              )
                          )
        Debtor.           )

                    Wednesday, October 27, 2004
                    4:10 p.m.
                    Courtroom 2A

                    844 King Street
                    Wilmington, Delaware

BEFORE:  THE HONORABLE JOEL B. ROSENTHAL
         United States Bankruptcy Court Judge

APPEARANCES:

        THE BAYARD FIRM
        BY:  DANIEL ASTIN, ESQ.

            -and-

        DILWORTH PAXSON, LLP
        BY:  LAWRENCE G. McMICHAEL, ESQ.
        BY:  SHERYL AUERBACH, ESQ.
        BY:  DERRICK DYER, ESQ.

            -and-

        SCHWARTZ, TOBIA, STANZIALE
        SEDITA & CAMPISANO
        BY:  CHARLES A. STANZIALE, JR., ESQ.
        BY:  JEFFREY TESTA, ESQ.

            Counsel for the Trustee

2

```
 1   APPEARANCES CONTINUED:

 2

 3                    ASHBY & GEDDES
                      BY:  WILLIAM BOWDEN, ESQ.
 4
                          -and-
 5
                      SONNENSCHEIN, NATH & ROSENTHAL
 6                    BY:  PETER WOLFSON, ESQ.
                      BY:  ALAN GILBERT, ESQ.
 7                    BY:  JOHN BICKS, ESQ.

 8
                              Counsel for Royal
 9                            Indemnity Company

10
                      YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
11                    BY:  JOEL WAITE, ESQ.

12                        and

13                    PROSKAUER ROSE, LLP
                      BY:  MICHAEL FOREMAN, ESQ.
14

15                            Counsel for Wells Fargo/MBIA

16
                      DEPARTMENT OF JUSTICE
17                    BY:  DAVID L. BUCHBINDER, ESQ.

18                            Counsel for the U.S. Trustee

19
                      KLEHR, HARRISON, HARVEY
20                    BRANZBURG & ELLERS, LLP
                      BY:  STEVEN K. KORTANEK, ESQ.
21

22                            Counsel for Commercial
                              Drivers, et al
23

24
```

3

1   APPEARANCES CONTINUED:

2

3

4       DUANE MORRIS, LLP
        BY:  CHRISTOPHER WINTER, ESQ.

5            -and-

6       THELEN REID & PRIEST, LLP
        BY:  VERONICA E. RENDON, ESQ.
7

8                Counsel for RSM McGladrey,
                 Inc., et al
9

10      WOLF, BLOCK, SCHORR & SOLIS-COHEN, LLP
        BY:  BARRY M. KLAYMAN, ESQ.
11       BY:  DAVID E. STERN, ESQ.

12               Counsel for Transport
                 Training, Inc., et al
13

14

15

16

17

18

19

20

21

22

23

24

4

1          THE CLERK:  All rise.

2          THE COURT:  You can be seated,

3  please.

4          THE CLERK:  This is the case of

5  Student Finance Corporation.  Case Number

6  02-11620.

7          MR. ASTIN:  Good afternoon, Your

8  Honor.  Daniel Astin of the Bayard Firm on behalf

9  of Charles Stanziale, the Chapter 7 Trustee in

10  the case.

11          Your Honor, what we would like to

12  do, and first, we thank you for allowing us to

13  take some extra time.

14          THE COURT:  If you could settle the

15  rest of them, I'll give you more time.

16          MR. ASTIN:  Well, we haven't been

17  that lucky.  But we think we have it narrowed

18  down, and it shouldn't be too much of a problem.

19          THE COURT:  I have nothing to do

20  until 8:19 tonight.

21          MR. ASTIN:  Glad to hear that.  What

22  we would like to do, Your Honor, is take one

23  matter out of turn.

24          We took to heart, all of us, all the

5

1  professionals in the case, your admonishment at

2  the last several hearings that we should get in a

3  room, and reach a settlement that makes sense for

4  the case, and is designed to maximize the

5  recovery of creditors.

6          We think we've done that. We'd like

7  to start off with the motion to approve the

8  settlement with Royal. If Your Honor would

9  proceed in that way, I'd turn the podium to Larry

10  McMichael, who's special litigation counsel from

11  the Dilworth firm to present on the motion on

12  behalf of the Trustee.

13          THE COURT: That's fine. Take

14  Number 5 on the agenda first.

15          MR. ASTIN: Thank you, Judge.

16          THE COURT: Mr. McMichael, go ahead.

17          MR. McMICHAEL: Yes. Good

18  afternoon, Your Honor.

19          Lawrence McMichael from Dilworth

20  Paxson, LLP in Philadelphia. We are special

21  litigation counsel to Mr. Stanziale, the Trustee

22  in this case.

23          As Mr. Astin pointed out, we think

24  this is a very important settlement and an

6

1    important benchmark for this case to move it

2    forward in an orderly manner and an efficient

3    manner.  We have a brief presentation on the

4    merits of the settlement, which in accordance

5    with local practice, if it's acceptable to the

6    Court, I would present by proffer and then

7    present Mr. Stanziale for any cross-examination

8    or any questions that the Court may have.

9              THE COURT:  That's fine.  Go ahead.

10             MR. McMICHAEL:  Mr. Stanziale, if

11   testifying in support of the settlement, would

12   first describe his background.

13             He's been practicing law for 38

14   years.  He has been a practitioner in the

15   bankruptcy insolvency area for the same 38 years.

16   And he is a panel Trustee in this district, as

17   well as in the District of New Jersey.

18             He has presided as a Trustee in over

19   50 cases that are asset cases, not counting no

20   asset cases where they're routine appointments.

21   Among those 50 cases were several cases of

22   comparable size and magnitude to this case.

23             And if asked for some examples, he

24   would point to the Tower Air case where he served

7

1    as a Trustee for an operating airline that

2    ultimately liquidated, had international

3    operations, had debt of 350 million or so.

4        He also served as the Chapter 7

5    Trustee for a case, actually a case in which I

6    met him, a case called MUMA Services. M-U-M-A,

7    it's an acronym.

8        It's a case involving the businesses

9    of a gentleman named Thomas Holt, Sr., who

10   operated a steam ship line. The business is --

11   operated a steam ship line providing cargo

12   services, and some significant marine terminal

13   operations. Total debt in their case was, I

14   think, over 500 million.

15       25 Debtors. Very complicated

16   situation.

17       And he feels very comfortable in

18   cases of this size and capable of analyzing the

19   complex issues that are presented to the Trustee.

20       He would also testify that he's had

21   a wide range of experience in bankruptcy cases

22   and other capacities serving as debtor's counsel,

23   Creditors Committee counsel, and counsel for

24   individual creditors.

B-7

8

1         He also represents trustees on

2    occasion.  The settlement in this case starts

3    with the litigation.

4         There are two pieces of litigation

5    that the Trustee commenced against Royal.  One

6    piece of litigation is here in the Bankruptcy

7    Court, and that case seeks to recover fraudulent

8    transfers on the basis -- the basic theory of

9    that case is that Royal received transfers that

10   were transfers by the Debtor, that actually

11   intended to mask the activity that the Debtor was

12   engaged in.

13        And it's a fairly straight forward

14   548 claim.  The second claim is a separate

15   lawsuit commenced prior to Mr. Stanziale's

16   involvement as Trustee in the United States

17   District Court for the District of Delaware.

18        And this case is somewhat more

19   complex.  It involves claims for aiding and

20   abetting, for deepening a solvency and related

21   actions.

22        In addition to those two cases, the

23   third sort of piece of the puzzle when looking at

24   the overall relationship between the estate and

9

1    Royal, is Royal's claim.  Royal has filed a proof

2    of claim, later amended to assert claims against

3    SFC, the Debtor, well in excess of $500 million.

4            The process that Mr. Stanziale

5    employed in analyzing whether a settlement was

6    prudent was to start with the claim of Royal.

7    That has two parts really when you're analyzing

8    the claim, two things that you look at, and two

9    things that Mr. Stanziale will say stand, that he

10   examined with quite a degree of care were the

11   basis on which Royal has a claim against the

12   estate.

13           Putting aside the amount of the

14   claim, what was the basis for there to be a claim

15   against this particular entity, SFC?  And what

16   Mr. Stanziale reviewed in that was a series of

17   things.

18           First, written contracts.  There are

19   three written contracts called insurance

20   agreements where these are direct written

21   contracts between Royal and Student Finance

22   Corporation signed by a Mr. Gary Hawthorne, an

23   officer of Student Finance Corporation.

24           These contracts contain various

10

1    terms and provisions, including representations

2    and warranties of Student Finance's financial

3    condition that were relied upon by Royal to issue

4    insurance policies.

5            And these direct contracts account

6    for over $300 million.  Actually under these, I

7    believe, slightly under $300 million in direct

8    contract claims by Royal against Student Finance

9    Corporation.

10            299 million and change, I think, is

11   the exact number.  But the written contract

12   analysis doesn't stop with the insurance

13   agreements.

14            In addition to that, Royal issued a

15   large number of insurance policies.  These

16   policies, Mr. Stanziale would say, and these were

17   his words, not mine, these policies were the

18   engine that propelled a vehicle called Student

19   Finance Corporation.

20            It enabled -- they enabled -- the

21   insurance policies enabled Student Finance

22   Corporation to engage in the business activities

23   that it engaged in, and to generate the losses

24   that they ultimately generated.

1              Each and every one of these

2    insurance policies contains a fairly standard

3    subrogation provision.  The subrogation provision

4    allows Royal, as the insurer, to assert rights

5    that could have been asserted by any party whose

6    claim Royal pays, including claims of parties

7    like MBIA, and Wells Fargo, who have filed claims

8    in this case; PNC Bank, who has filed a claim in

9    this case.

10              THE COURT:  Let me stop you there.

11    Has Royal -- actually something in my memory

12    tells me that Royal hadn't made claims yet.  Now,

13    maybe that's changed since I last heard the --

14              MR. McMICHAEL:  No, that's an

15    excellent question.  I'll be happy to address it.

16              It was on my list, and here's where

17    we are on that.  The District Court for the

18    District of Delaware has entered summary judgment

19    against Royal.

20              It has actually entered three

21    summary judgments against Royal, unless the

22    Trustee actually reviewed these.  So they're

23    worth mentioning specifically.

24              The first was the MBIA judgment, and

12

1    the amount of that judgment -- I'm going to use

2    approximate numbers for all of these -- the

3    amount of that judgment was about $380 million.

4         A second judgment was entered

5    against Royal in favor of PNC Bank in the amount

6    of $110 million.

7         And a third judgment has been

8    entered against Royal on behalf of Wilmington

9    Trust Company in the amount of $12 million.

10         Those total 502 million.  And what

11    has happened is that upon the entry of those

12    judgments, Royal did two things.

13         One, it took an appeal, which the

14    appeal is pending in the Third Circuit.  But,

15    two, and this directly addresses the question

16    that Your Honor just asked, Royal had bonds in

17    those amounts in order to obtain a stay of

18    execution.

19         Otherwise, the judgment creditor

20    could proceed to seize Royal's assets.  And that

21    money has been posted.

22         My understanding is there are cash

23    bonds posted by Royal securing 120 percent of the

24    amount of judgment.

13

```
 1              THE COURT:  All right.  But let me
 2    ask you if Royal succeeds on the appeal --
 3              MR. McMICHAEL:  Yes, sir.
 4              THE COURT:  -- and ultimately
 5    prevails in its attempt to defend on these
 6    contracts, what happens to Royal's claim that you
 7    want to allow some 500 some odd thousand -- $550
 8    million in this case?
 9              MR. McMICHAEL:  Two things will
10    happen, Your Honor.  One is -- one is that Royal
11    will be very happy.
12              THE COURT:  Well --
13              MR. McMICHAEL:  And the second
14    thing --
15              THE COURT:  If they're happy, we're
16    all happy.  But what happens to the claim?
17              MR. McMICHAEL:  And the second thing
18    is that the claim would disappear.
19              Now, what -- this settlement
20    specifically contemplates that eventuality, and
21    there is a provision in Paragraph 5 of the
22    settlement.  And it's at the end of Paragraph 5.
23              THE COURT:  Which exhibit is that?
24              MR. McMICHAEL:  This is Exhibit A to
```

14

```
 1    the settlement agreement.  I'm sorry, the

 2    settlement motion.

 3              THE COURT:  Well, Item 7, term

 4    sheet.  What is it?

 5              MR. McMICHAEL:  Second page of the

 6    term sheet, Paragraph 5.  And the last sentence

 7    of Paragraph 5 says -- of course, the Court -- I

 8    don't want to -- -

 9              THE COURT:  I have it.  Fine.  Okay.

10              MR. McMICHAEL:  Okay.  So now, as a

11    practical matter, the settlement makes sense

12    either way, because if Royal's claim disappears

13    by a reason of it prevailing on its appeal in the

14    Third Circuit, what will happen to this estate is

15    that MBIA, PNC, Wells Fargo, Wilmington Trust

16    Company will weigh in with their claims.

17              They have already filed back-up

18    claims, because they are going to stand back and

19    wait --

20              THE COURT:  I want to make sure we

21    didn't have a double.

22              MR. McMICHAEL:  No.  We contemplated

23    that it was discussed and it's provided for.

24              And I don't think we have any
```

15

1    problem along those lines.

2              But in any event, to get back to

3    Mr. Stanziale's evaluation of the settlement and

4    why he is here recommending it that it be

5    approved, he looked at the written contracts,

6    both the insurance agreements, and reviewed the

7    insurance policies, and concluded that it was far

8    more likely than not that based on the current

9    state of affairs, Royal would have a contract

10   claim in the full amount that it's claiming

11   against the estate.  But his analysis did not

12   stop there.

13             As the Court knows, this case is

14   surrounded by allegations of fraud.  And there

15   has been, on other occasions, some evidence

16   previewed to the Court as to the alleged

17   fraudulent activities of the Debtor before it was

18   in bankruptcy.

19             Mr. Stanziale looked at information

20   about those claims, and looked at the corporate

21   structure of SFC and its affiliates, who is

22   involved, and how the transactions worked.  And

23   they're quite complex.

24             And concluded that consistent, I

16

1    think with an observation from the Court, based

2    on just a preview that there was a significant

3    claim.

4          Now, in endorsing a settlement,

5    neither the Trustee nor the Court is required to

6    adjudicate the underlying merits.  So

7    Mr. Stanziale did not say, yes, Royal's going to

8    win on this fraud claim.

9          What Mr. Stanziale realized in

10   looking at the volume of this evidence was that

11   Royal had a pretty good case.  Might it be

12   defended?  Sure.

13         But they had a pretty good case.

14   And that even if -- even if for some reason a

15   direct contract claim didn't work, and we can't

16   see how it wouldn't, they would have the same

17   claims based on the fraud theories.

18         And when I say fraud, I mean to

19   incorporate alter ego, piercing of the corporate

20   veil, all of the related tort notions that come

21   into play in dealing with that sort of claim.

22         So the first conclusion reached by

23   Mr. Stanziale was that Royal had a claim against

24   this estate, and it was not a prudent expenditure

1    of estate resources to engage in warfare over

2    that claim.

3            The next question is how much?

4    We've addressed that, because Your Honor asked me

5    about that.

6            And we have built in a provision in

7    the settlement to deal with reductions in the

8    claim in the event that reductions are in order.

9            So where we are now is with the

10   starting point of why it makes sense for SFC to

11   settle with Royal.  The starting point is that

12   Royal is our biggest creditor, and likely to be

13   our biggest creditor in the amount of well over

14   $500 million.

15           So now Mr. Stanziale goes back to

16   his clients, and he would tell you if he were on

17   the witness stand right now that he has total

18   confidence in his claims, particularly his 548

19   claim, but that he also recognizes that Royal has

20   defenses, and they have made defenses.

21           He has seen and expects to continue

22   to see from Royal vigorous spirited defense,

23   which will result in laborious and expensive

24   litigation from the standpoint of the estate.

18

1    And when looking at that, which is, by the way,

2    what lawyers and clients always look at when

3    settling case.

4              But when looking at that,

5    Mr. Stanziale reached a very important

6    conclusion. And that was that while academically

7    it might make sense to do that, in the real

8    world, with a 500-plus million dollar claim, the

9    vast bulk of any recovery going into the estate

10   is going to go back out of the estate to Royal.

11             That results in what we now refer to

12   as the recycling effect of that litigation.

13   Because of the recycling effect, where most of

14   what we would get from Royal, we would ultimately

15   have to pay back to Royal.

16             What are we doing it for other than

17   to, you know, enrich our firm as litigation

18   counsel.

19             THE COURT:  Well, some might say

20   that's a great idea.

21             MR. McMICHAEL:  My partners thought

22   that was a great idea, but Mr. Stanziale

23   concluded otherwise, as is appropriate.

24             The other thing that he considered

1    in looking at whether to settle his claims

2    against Royal was not just that there was this

3    recycling effect and it was going to be a long

4    and expensive litigation, but that this was a

5    real settlement.  We're here today looking for a

6    $4.9 million check from Royal, which they

7    actually won't write tomorrow, because we'll have

8    to let the appeal period run.

9              But they will write soon after this

10   settlement, if it's proved by the Court, $4.9

11   million, a very major contribution to this

12   estate.  It makes a big difference to the ability

13   of the Trustee to pursue other claims that need

14   to be pursued.

15             Now, the settlement agreement

16   provides -- I want to highlight this, because

17   parties who are in court may have questions about

18   it.  The settlement agreement provides that

19   there's the payments of $4.9 million.  It also

20   provides in Paragraph 2 that one of the things

21   that Royal gets is an administrative claim for

22   $1.9 million.

23             Let me pause for a moment and talk

24   about the rationale for that.  All settlements,

20

1    as I know this Court is keenly aware of, all

2    settlements ultimately involve negotiated

3    numbers.  There is no absolute right number and

4    no absolute right number.

5            I mean, could 4.9 million have been

6    4.8 million, or 5.1 million?  Sure.  But what we

7    did in the negotiating process, what

8    Mr. Stanziale did was he was looking at the

9    underlying merits of his claim.

10           He was looking at the interest of

11   other creditors in this estate.  And there are

12   quite a few other creditors.  Royal is big, but

13   they're not alone.

14           The other creditors amount to,

15   including Mr. Yao's claim, which we intend to

16   object to, amount to over 12 million.

17           THE COURT:  If you take Yao out?

18           MR. McMICHAEL:  If you take Yao out,

19   you're down to about four million.  But that's

20   not all.

21           Four million, and that is in

22   non-trucking school claims.  We then have the

23   trucking school claims, and they are in the

24   neighborhood of 60 million.

21

1          We have, and we'll have substantial
2   disputes with a lot of the trucking schools.  And
3   we don't know what the ultimate allowed amount of
4   those claims will be.
5          But there will be claims there.
6   There will be claims.
7          You know, I think that in this case,
8   you are going to have 10, 15, maybe $20 million
9   worth of claims in addition to the claims of
10  Royal.  So in looking at the settlement amount,
11  what Mr. Stanziale really said was Royal is doing
12  two things for us.
13         One, they're settling claims, saving
14  us the expense, and putting money into the
15  estate.
16         But two, they're providing sort of
17  seed capital for the Trustee to be able to
18  litigate a lot of other lawsuits that need to be
19  litigated, Chapter 5 avoidance action, and a
20  variety of other claims.
21         And if the estate is successful in
22  generating recoveries for the benefit of all
23  creditors from those claims, it's only fair that
24  Royal get some amount back on a priority basis.

22

1    And that's how the $1.9 million administrative

2    claim was negotiated.

3            So that brings us to the fundamental

4    conclusion, unfortunately not quite the end of

5    the presentation, but the fundamental conclusion

6    that when weighing all of the factors that

7    trustees and Courts look in determining the

8    merits of a settlement, Mr. Stanziale reached the

9    very firm conclusion that this settlement was in

10   the interest of the estate.

11           And he has asked us to come and

12   vigorously ask the Court to approve it.  He's

13   done a little bit more than that, though.

14           And I'm going to address an issue

15   that has been raised in the objection that was

16   filed.  Part of the settlement involves what we

17   call the cooperation clause.

18           The cooperation clause, if Your

19   Honor wants to take a quick look at it, it is

20   Paragraph 7.  It's a long paragraph, but it's

21   Paragraph 7 of the term sheet.

22           The cooperation clause is there for

23   a number of important reasons.  It recognizes

24   that Royal, who has been involved in matters

23

1    related to Student Finance far longer than the
2    Trustee has, with its resources accumulated a
3    massive amount of information.  It has done a lot
4    of analysis.
5            And it is generally in possession of
6    information that is very useful for the Trustee
7    and will save us a lot of work if we have access
8    to it.  And what we said to Royal, and what Royal
9    has said to us is if we settle, we both have a
10   mutual interest in pursuing the other claims that
11   need to be pursued.  And there's some examples of
12   those claims given in Paragraph 7.
13           Therefore, we want to agree with
14   each other and make part of the settlement that
15   we're going to cooperate, and we're going to
16   participate with each other.  That will save the
17   expense, save the estate money by way of legal
18   fees and expenses.  And it will allow the estate
19   to make use of the enormous resources and
20   information developed by Royal in their
21   investigation and in their prosecution of claims.
22           We have been criticized by saying
23   that we're making Royal into the Trustee in this
24   case.  And Mr. Stanziale, if he were on the

24

1    witness stand, and he will be in a minute, would

2    tell this Court that nothing could be further

3    from the truth.

4            He is the Trustee.  He's been the

5    Trustee in a lot of cases and a lot of big cases.

6            He understands what his role is.  He

7    understands that he's still the Trustee.

8    Agreeing to cooperate with a litigant that has

9    mutual interest is not ceasing your power as a

10   Trustee.  It's simply a common sense

11   business-like way of dealing with a complex

12   litigation environment, much that will whittle

13   down to everybody's benefit.

14           Mr. Stanziale retains 100 percent of

15   his powers, his duties, and his fiduciary

16   obligations as the Trustee.

17           You now --

18           THE COURT:  Well, let me ask you

19   because --

20           MR. McMICHAEL:  Yes, sir.

21           THE COURT:  You suggest in one of

22   the objections that if the Trustee elects not to

23   sue a party that Royal determines to sue, then

24   Royal can bring an action on behalf of the estate

25

1    against that defendant.

2            MR. McMICHAEL:  Yes, sir.

3            THE COURT:  Now, how do you deal

4    with the issue of if Royal already has a claim, a

5    separate claim against that potential defendant

6    or the cause of action against the estate, in

7    that situation, what happens?

8            MR. McMICHAEL:  The estate's claim

9    goes first.  We had a specific discussion about

10   that, and the estate's -- the estate gets the

11   first bite of the apple, whether it's my law

12   firm, or Mr. Stanziale's law firm or --

13           THE COURT:  I'm not worried about

14   which law firm handles it, as much as I am

15   worried about the priority of those claims that

16   are being prosecuted by potentially Royal by two

17   different capacities, if you will.

18           MR. McMICHAEL:  Yes.

19           THE COURT:  One on their own behalf,

20   and one as a -- as state representative of some

21   sort.

22           MR. McMICHAEL:  Yes, sir.  I

23   understand the question.

24           That is actually addressed, if I

26

1    could find the language quickly.  It is in the

2    bottom of the last sentence of Paragraph 7.

3              This is the important point.  If

4    Royal takes over a claim because the Trustee

5    determines not to pursue it, and we've allowed

6    for this as Your Honor has pointed out, the claim

7    is prosecuted by Royal in the name of the estate.

8              It's still the estate's claim.  We

9    have not sold the claim or assigned the claim.

10             THE COURT:  But they're prosecuting

11   it at their empowered level?  They have their own

12   as well.

13             MR. McMICHAEL:  They may have their

14   own as well, but Royal has said, and it is our

15   understanding, and as part of this deal that the

16   estate claim will go first.  The estate claim

17   will be litigated.

18             THE COURT:  Does that say that?

19             MR. McMICHAEL:  I don't know that it

20   is that clear.  And if it's not, we can certainly

21   make that part of any order approving the

22   settlement.

23             THE COURT:  Okay.  Go ahead.

24             MR. McMICHAEL:  But that is the

1    understanding that we have with Royal, if that --

2    if that occurs. And by the way, it will occur in

3    at least one case.

4         THE COURT: I understand. That's

5    why I'm asking the question.

6         MR. McMICHAEL: Yes, the CTI case.

7         THE COURT: Which case may be -- in

8    my mind, may be different, but that's not

9    important.

10        MR. McMICHAEL: But the right point

11   is that Royal will be acting for the estate,

12   standing estate and prosecuting the claim.

13        The money will come in through the

14   estate, and pass through the estate, and take

15   priority over Royal, separate and independent

16   claims against the same defendant, if it has one.

17        MR. WOLFSON: Your Honor, may I just

18   address that point or --

19        MR. McMICHAEL: This is Mr. Wolfson.

20   Mr. Wolfson is my friend from New York who

21   represents Royal, and I want to note.that --

22        THE COURT: We've met. Yeah.

23        Let's try to get this point. Why

24   don't you come up and let's deal with this point.

28

1           MR. WOLFSON:  This issue may be

2    ameliorated somewhere at the request of the U.S.

3    Trustee.  I think we have agreed that if we were

4    to pursue any claim under Paragraph 7, it would

5    be with prior Court approval.  So that, A, if the

6    Trustee determines not to pursue it, and we're

7    going to pursue it, we would have prior Court

8    approval.

9           And in any event, Your Honor, the

10   issue really, from our standpoint, I'm not sure I

11   would necessarily agree, because I don't know all

12   of the other litigation that's out there that we

13   can just pursue one litigation before the other.

14           But our understanding, and the

15   premise of this settlement is that we are

16   possibly 90-percent plus of the estate.  And,

17   therefore, one of the things that we were very

18   sensitive to is we didn't want to just buy claims

19   outright, because we didn't think that was fair

20   to the other, you know, legitimate creditors that

21   are out there.

22           We're prepared to prosecute these

23   actions, either to fund the estate prosecuting

24   it, or to fund it ourselves if we prosecute it,

29

1    and share any and all proceeds with everyone in

2    the estate.

3            Whether we recover money at the

4    90-percent mark from some of these claimants, if

5    we have a similar lawsuit -- classic example

6    would be there is a pending lawsuit with CDI, DDI

7    I think that's pending in Tennessee.

8            Whether we recover money from them

9    individually in their capacity there, or whether

10   we recover it here, we get a hundred percent of

11   one pot, 90 percent of the other.  We certainly

12   would come to the Court before we --

13           THE COURT:  I just wanted to make

14   sure you focus on it.

15           MR. WOLFSON:  We intend to do this

16   fairly.

17           THE COURT:  If there's going to be a

18   motion for each case, if you do -- each type of

19   case that you pursue, then we can make sure that

20   that's in the orders.  There I was concerned

21   because you imagine they have, I guess, somewhat

22   different causes of action against some of these

23   people, because of the -- their relationship is

24   different with the Debtor.

30

1          MR. WOLFSON:  Indeed, they're

2     entirely different.  The only actions that we

3     would be pursuing if the Trustee decides not to

4     pursue it would be an action of the estate.

5          That is, there may be similar fact

6     patterns, but it's a totally different recovery,

7     totally different.  Right.

8          The only real issue would be not

9     whether we pursue and get a judgment in our

10    individual capacity.  First, the issue is whether

11    we seek to enforce it enforcing our own

12    individual rights.

13         Would we therefore -- would we

14    thereby be depriving the estate of its ability to

15    recover when it gets a judgment on it?  And what

16    we would suggest to resolve that issue is that we

17    certainly would agree that with respect to the

18    recovery of anything, we're not going to have a

19    race to the courthouse to see that we can beat

20    the Trustee on individuals.

21         And, in fact, we have agreed as part

22    of this settlement agreement to keep the Trustee

23    fully informed of what's going on in those other

24    lawsuits.  So I don't want to agree and modify

1    this term sheet to say how we're going to proceed

2    in individual actions.

3              But we do have -- we will represent

4    to the Court that we will not seek to use a

5    judgment that we obtained or in order to deprive

6    the estate of the ability to recover on any

7    judgment that it would obtain.

8              THE COURT:  All right.  Thank you.

9              All right.  Mr. McMichael, let's

10   keep going.

11             MR. KORTANEK:  Your Honor, Steve

12   Kortanek with Klehr Harrison.  We represent the

13   CDI schools.

14             And I just -- I was listening, but I

15   didn't hear counsel assure us that they will file

16   a separate motion as to any lawsuit, including

17   the actions against the CDI schools, because

18   that's -- that's what's set forth in the papers

19   as they stand now.

20             THE COURT:  We'll get to deal with

21   CDI when we get to CDI.  Let's keep going with

22   the settlement.

23             MR. KORTANEK:  Thank you.

24             MR. McMICHAEL:  In our effort to try

32

1    to clean up as many stray issues as we have,

2    I've -- by the way, I have concluded the basic

3    rationale for the Trustee's recommendation to

4    this Court for --

5                THE COURT:  Let me ask you, because

6    you skipped over one of the lawsuits.  You

7    didn't, and I don't -- it's one that I don't know

8    much about.

9                You talked about the analysis of the

10   proof of claim.  You talked about the 548 action.

11               There apparently is another lawsuit

12   that you suggested was brought against Royal.

13   Again, I'm not sure quite by whom, the aiding and

14   abetting.

15               MR. McMICHAEL:  Yes, sir.  I don't

16   know who the plaintiff is in that one.

17               I didn't mean to skip that.  The

18   plaintiff is the Estate of Student Finance

19   Corporation.  That case was commenced by the

20   Chapter 11 Debtor and his counsel.

21               It was dismissed with leave.  It was

22   amended prior to the appointment of Mr. Stanziale

23   as initially Chapter 11 Trustee, later Chapter 7

24   Trustee.

33

1          The -- one of the first things the
2     Trustee did was to review that case, look at it,
3     and file an amended pleading, which has been
4     done.  And that is the -- what I'm calling the
5     aiding and abetting claim.
6          That claim is more complex and more
7     factually intensive than the 548 claim.  And
8     accordingly, more difficult to prosecute.
9          It is equally vigorously defended.
10    It seeks essentially parallel relief, although
11    arguably under the aiding and abetting theory,
12    the amount of damages could be larger.  We're
13    still focusing on Royal's role in the underlying
14    transactions.
15         And it doesn't provide really a
16    separate basis for us to say that, you know, gee,
17    we'd rather sue them on that theory.  I mean, if
18    we're litigating them, against them, we'll be
19    litigating on each of these.  And if we're
20    settling, we're settling all claims.
21         The fact is that you have the same
22    exact recycling effect of any recovery.  That's
23    the ultimate problem.
24         It's a problem.

34

1           THE COURT:  That doesn't affect if

2   other people have direct claims against Royal.

3           MR. McMICHAEL:  This has no affect

4   on that, on the fraud theory, or the -- I don't

5   know if they exist.

6           Those are undisturbed.

7           I don't -- I'm not aware of such

8   claims.  If they existed, they would not be

9   affected by this settlement.

10          This is a settlement with the

11  Trustee, not with anybody else.

12          THE COURT:  Okay.

13          MR. McMICHAEL:  Okay.  So, as I was

14  saying, that the totality of circumstances and

15  factors that were reviewed and analyzed by the

16  Trustee lead him to the conclusion that this is a

17  very good and favorable settlement for the

18  estate.

19          It positioned the estate to pay a

20  dividend to the creditors to pursue claims that

21  need to be pursued, and to do so quickly,

22  efficiently and much less expensively than if we

23  were on the other side of the table from Royal.

24          We have made a few adjustments to

35

1    this deal since it was filed.  All of them are, I

2    would describe, as technical.

3              But let me describe what each one of

4    them is.  And we had prepared an amended order to

5    reflect some of them, although some of the

6    adjustments were made three minutes before Your

7    Honor came on the bench.

8              We don't quite have an amended order

9    that contemplates --

10             THE COURT:  That is fine.  Why don't

11   you outline on the record --

12             MR. McMICHAEL:  I will tell you

13   exactly what they are.

14             The first is in Paragraph 5.  In the

15   term sheet, there is a reference to a secured

16   claim by Royal.

17             We have provided in the order, first

18   of all, the concept.  The concept is that the

19   amount of the secured claim identifies the

20   amount, the dollar amount of a claim that Royal

21   has against the estate as to which there is

22   collateral or security.  It is not an ultimate

23   determination of secured status, because we have

24   not valued the collateral.

36                                )

1           So the first object is to -- just to

2    identify what the starting number is.  And that

3    number has changed, and that's what I wanted to

4    point out to the Court.

5           The number that appears in Paragraph

6    5 is $45,418 and change.  In the order approving

7    the settlement, we have changed that number to

8    just under $16 million.

9           And the reason for that adjustment

10   was that when we went back with Royal and

11   reviewed the exact basis of the claims, both we

12   and Royal concluded that there was an overlap

13   between the 45 and the 516.  And we have pushed                    )

14   that overlap into the unsecured portion of the

15   claim.

16          The order approving the settlement

17   will provide, however, that the ultimately

18   allowed secured claim will, of course, be limited

19   to the value of the collateral when that's

20   determined.

21          And that won't be now.  That will be

22   determined whenever the collateral is ultimately

23   sold.

24          The second adjustment that we have

37

1   made is to address a concern raised this

2   afternoon by the U.S. Trustee's office.  And that

3   is a concern that involves the last sentence,

4   actually I guess the last two sentences of

5   Paragraph 2 of the term sheet.

6           First, let me state the general

7   proposition that in agreeing to the term sheet,

8   neither Royal nor the Trustee intended to change

9   any otherwise applicable principles that would,

10  for instance, require Court approval before

11  counsel could withdraw from a case, or that would

12  require a filing of fee applications for

13  professionals seeking to be paid for the estate.

14          Those are all routine bankruptcy

15  overlays that we assume continue to exist.  The

16  Trustee, the U.S. Trustee's office believed that

17  the specific language used at the bottom of

18  Paragraph 2 may collide in some respect with

19  those principles, and that was certainly not an

20  intended effect.

21          So what we have done to resolve the

22  claim raised by the U.S. Trustee is to delete at

23  the very, very end of Paragraph 2 the last words

24  which read, or undertake other matters on behalf

38

1    of the estate.  That will come out.

2            And we have further inserted in the

3    sentence that the exercise of the rights that are

4    described here are subject to prior approval of

5    the Court, which will be sought when, and if,

6    these things come into play.

7            In short, we're not seeking to short

8    circuit any processes here.  We're just creating

9    the framework of our deal with Royal.

10            The final point, and this is the

11   last thing I will say before asking if anyone has

12   questions for Mr. Stanziale, the final point is

13   that any party, whether it's professionals

14   retained by the Trustee, or whether it's Royal,

15   any party seeking compensation from the estate

16   will, of course, file fee apps and be subject to

17   that process.  And that was intended.

18            There's nothing in here that we

19   think is inconsistent with that.  But to the

20   extent that any party, particularly the U.S.

21   Trustee's office has a concern about it, I want

22   to make it clear on the record that that is our

23   intention and understanding of this settlement.

24            Unless Your Honor has further

39

1   questions, which I'd be happy to answer if you

2   do.

3           THE COURT:  Well, do you want to

4   address the few things that were in the objection

5   while you're up?

6           MR. McMICHAEL:  Sure.  I can do

7   that.

8           I've addressed one of them, which is

9   are we exceeding our power as Trustee to Royal.

10  The answer is we're not.

11          This does not have that effect.  It

12  does not have that intent.

13          THE COURT:  Let's take the CDI one.

14  What's the rush?

15          You don't even have a fully flushed

16  out settlement agreement deal.

17          MR. McMICHAEL:  That was okay.  That

18  objection, I understand exactly the objection.

19  The objection is we don't intend to have a fully

20  flushed out settlement agreement.

21          THE COURT:  So the term sheet is the

22  agreement.

23          MR. McMICHAEL:  The term sheet is

24  the agreement.  Mr. Wolfson and I have dealt with

40                )

 1    each other in the past.  We've known each other

 2    for 18 or 19 years.

 3               THE COURT:  Has this case been going

 4    on that long?

 5               MR. McMICHAEL:  No, it hasn't.

 6    There was one even worse than that out in the

 7    West Coast that we were involved in for 10 years.

 8               And I think that we are both

 9    believers in economy of words.  Could we spend

10    more money of the estate and take this document

11    and create a 50-page document agreement with a

12    lot of reps and warranties?

13               THE COURT:  You answered my                )

14    question.

15               MR. McMICHAEL:  We could do that.

16    We don't think it's necessary.

17               In fact, the settlement agreement

18    says that.  By the way, in the very last

19    paragraph, Paragraph 14 of the term sheet

20    expressly says, This is the settlement.  And we

21    don't want to create any further documents and

22    make it more complicated than it needs to be.

23               The major legal objection, as I read

24    CDI papers, relies on the well-known Cybergenics

1    case in the Third Circuit.  And I don't know if

2    Your Honor has had an opportunity to visit

3    Cybergenics' issue in the First Circuit.

4         But the short story of that case is

5    that a Debtor, Trustee for a Debtor, I think,

6    decided not to -- actually it was just a Debtor,

7    decided not to pursue certain Chapter 5 avoidance

8    claims.

9         The Creditors Committee was upset

10   with that decision and asked the Court to empower

11   it to pursue the claim.  The Court said, Yes, go

12   ahead and pursue the claims.  There was an

13   appeal.

14        The District Court said, You can't

15   do that based on the Harford Underwriters

16   decision from the United States Supreme Court.

17   It says in the statute, The Trustee may, that

18   cannot be read to mean the Trustee and the

19   Creditors Committee may.

20        The District Court, the District

21   Court reversed the Bankruptcy Court, said, You

22   can't do that.  They went to the Third Circuit.

23        A panel of the Third Circuit agreed

24   with the District Court.  The case was taken on

42

1    Bonk, because it generally created a lot of fuss.

2              A lot of people -- you know a lot of

3    crying, gnashing of teeth, all those things out

4    there in the bankruptcy world.  So the Third

5    Circuit convened on Bonk, considered it, and

6    reversed -- the panel reversed the District

7    Court, and agreed that it could be done.

8              THE COURT:  Now, does -- what does

9    that have to do with this case?

10             MR. McMICHAEL:  We would submit very

11   little.  This is not a case where the Trustee or

12   a Debtor in dereliction of its duties is not

13   pursuing claims.

14             This is not a case where somebody

15   else is coming into court saying let us sue.

16   This is a case where parties, the Trustee and

17   Royal, with the exact same litigation interest

18   and objectives to maximize the recovery in this

19   estate, have agreed that under certain

20   circumstances it may make more sense, and it may

21   be economically more efficient for Royal to

22   actively litigate the claim as opposed to the

23   Trustee.

24             And as we discussed in response to

43

1    an earlier question of the Court, if that

2    happens, the claim will be prosecuted in the name

3    of the estate.  The recovery will go into the

4    estate.

5           This is a situation unlike

6    Cybergenics where someone is asking to be

7    invested with authority that belongs to the

8    Trustee.  This is a situation where the Trustee

9    is agreeing by contract to allow certain other

10   parties, certain other parties under certain

11   circumstances to pursue a claim.

12          Even if the Court were to say, Nice

13   distinction, Mr. McMichael, but I don't buy it,

14   and I think Cybergenics has to be really studied,

15   if the Court were to say that, the short answer

16   to the objection is that Cybergenics was decided

17   our way.

18          At the end of the day, the United

19   States Supreme Court was deprived of its

20   opportunity to decide whether the Third Circuit

21   on Bonk was correct or not.  Because after

22   granting seriatum, the parties to Cybergenics

23   decided -- chose to settle.

24          So what we have is a Third Circuit

44

1    on Bonk decision under -- reviewed by the United

2    States Supreme Court, which holds that other

3    parties can, under certain circumstances, assert

4    rights that are given to the Trustee.

5            And that is all we're doing.

6    Actually less than that here, as I've said

7    earlier.

8            I think without trying to preempt

9    Mr. Kortanek, I think that is what we read to be

10   the heart of the objections that they filed.

11           THE COURT:  We'll give you an

12   opportunity after he's had a chance to speak.

13           Anyone else want to be heard in

14   favor of the motion before I -- well, first, go

15   ahead.

16           I'll hear you, and then I'll deal

17   with the evidentiary issue.  Go ahead.

18           MR. WOLFSON:  Your Honor, if I may

19   just from here.

20           THE COURT:  Can you hear him from

21   there?

22           THE REPORTER:  If he speaks up.

23           MR. WOLFSON:  Well, I'll move up.

24           I'll be very brief, Your Honor.  I

1    don't want to duplicate that which Mr. McMichael

2    indicated.

3            THE COURT:  Good.

4            MR. WOLFSON:  One comment that I

5    would have with respect to the Cybergenics case,

6    and to the quick response to the objections, you

7    know, the notion that we did not sign the term

8    sheet, this is the agreement we're prepared to go

9    forward with subject to Court approval.

10            That the term sheet hasn't been

11    signed, we don't think is a valid objection.

12    Cybergenics is the case used by CDI to object to

13    the so-called delegation of responsibilities.

14            And as I understood the argument,

15    maybe a little bit differently than Mr.

16    McMichael, was -- the argument was that

17    Cybergenics says the Creditor Committee could do

18    it.  It didn't say that, and individual creditors

19    could it.

20            What Cybergenics made very clear

21    throughout itself is that, in fact, Cybergenics

22    cited the cases time and time again indicating

23    that individual creditors can, with Court

24    approval, pursue actions that belong to the

46

1    estate.

2         It went on about that.  And what

3    Cybergenics was struggling with was finding the

4    authority that the Code gave to individual

5    creditors under 503(b) to bring actions with the

6    approval of the Court to find some authority to

7    give it to a Creditors Committee.

8         And, ultimately, concluded that when

9    you took a look at Section 503(b), which gave the

10   right to an individual creditor to pursue an

11   action on the estate, with Court approval, either

12   where the Trustee refuses to bring that action,

13   or where the Trustee consents to allow someone

14   else to do it, the Court struggled with it and

15   concluded ultimately three uses, various

16   provisions under Section 1109 and elsewhere in

17   1103 that, in fact, the Creditors Committee would

18   be vested with the same authority to bring a

19   derivative-type action on behalf of the estate,

20   that the code clearly gave to individual

21   creditors.

22         So we don't think that there's

23   really any real dispute that Cybergenics does, in

24   fact, support and cite cases, indeed, that

47

1    support this sort of a resolution.

2            The analog also that we keep coming

3    back to, which I think the Cybergenics Court

4    recognized is that the Trustee can sell

5    preference claims, formulation transfers, and

6    other claims of the estate, and somebody could

7    pursue it.  We had the option and could have

8    negotiated a deal where, rather than bring an

9    action on behalf of the estate and share all the

10   proceeds with everybody, we could have just

11   bought it for the same price, candidly, and just

12   kept all the assets for ourselves.

13            But we thought it was appropriate,

14   given our size, to share the recoveries on a pro

15   rata basis with all of the other creditors.

16            This was -- well, I'm sure

17   Mr. Stanziale would also indicate in his

18   testimony, that this was a very vigorously

19   pursued negotiation.  It is an arm's length

20   resolution that took many weeks, if not longer,

21   to negotiate and finalize.

22            THE COURT:  Thank you.

23            I will accept your proffer of

24   Mr. Stanziale.  But is there anybody who wants

48

1    the opportunity to cross-examine Mr. Stanziale?

2              MR. KORTANEK:  Yes, Your Honor.

3    Steve Kortanek on behalf of CDI schools.

4              We would like to cross cross-examine

5    Mr. Stanziale.

6              THE COURT:  Are there others that

7    want to examine Mr. Stanziale as well?

8              All right.  I'll get to you.

9              I just wanted to make sure that's

10   why you were moving around.

11             MR. KORTANEK:  Your Honor, while

12   Mr. Stanziale is taking the stand, I would ask

13   that Your Honor exclude counsel to Royal or any

14   business representatives of Royal essentially for

15   the same reason that Your Honor excluded our

16   clients at the last hearing.

17             Because when the Trustee is

18   testifying, necessarily about benefits of his

19   claims and weaknesses of his claims, I think for

20   the benefit of the estate and for creditors, that

21   the target of that litigation shouldn't be in the

22   courtroom.

23             I understand the same motion was

24   made last month, and we did not oppose that

49

```
 1    request.  So I think the same thing ought to
 2    apply.
 3              THE COURT:  I don't recall that
 4    motion.
 5              MS. AUERBACH:  Your Honor, we had
 6    filed normal written motion to file the response
 7    of the Trustee, support the DDI CDI settlement
 8    under seal, and that was consented to by CDI,
 9    DDI.
10              And then in accordance with that,
11    the courtroom was sealed.
12              THE COURT:  All right.  I just
13    didn't remember.
14              MS. AUERBACH:  But that was
15    something that was requested by the Trustee and
16    agreed to by CDI, DDI.  And that is not the same
17    as this situation today.
18              The Trustee is not requesting that
19    this be filed under seal.  And Royal has not
20    agreed to it.
21              MR. KORTANEK:  Your Honor, the one
22    difference --
23              THE COURT:  Go ahead, counsel.
24              MR. KORTANEK:  The difference is we
```

50

1    didn't oppose putting that response under seal

2    when the Trustee asked us that.  But we were not

3    asked in advance of the hearing whether we

4    consented to having the courtroom sealed.

5            I appeared in court just as the

6    hearing began, and I was asked for counsel by the

7    Trustee to leave under the understanding that

8    Your Honor had sealed the courtroom.

9            So we simply think that that's fair

10   in this situation.  It doesn't prejudice Royal.

11           THE COURT:  Well, let me just --

12   first, let's make sure we all understand the

13   standard in which I have to measure this.  This

14   is not a very high standard.

15           The Trustee has to -- you can sit

16   down, sir.  This is not a very high standard, as

17   I understand it.

18           Do you disagree?

19           MR. KORTANEK:  It's the lowest range

20   of reasonableness, Your Honor.  I do not

21   disagree.

22           THE COURT:  Okay.  Does Royal

23   object?

24           MR. WOLFSON:  We do object to being

51

1    excluded, Your Honor.

2              THE COURT:  And the basis of your

3    objection is, other than you don't want to miss

4    anything?

5              What --

6              MR. WOLFSON:  Well, there's no

7    basis.  As indicated, this is a settlement that

8    the Trustee is proposing, that we're supporting.

9    The Trustee did not ask to submit anything that

10   it has to say under seal.

11             It has disclosed to the Court the

12   strengths and weaknesses of its position.

13             THE COURT:  I agree.  All right.

14             Your request is denied.

15             MR. KORTANEK:  Thank you, Your

16   Honor.

17             THE COURT:  Let's swear the witness.

18             THE CLERK:  Raise your right hand

19   and state your full name for the record.

20             THE WITNESS:  Charles Stanziale, Jr.

21                CHARLES STANZIALE, JR., ESQ.,

22        the deponent herein, having first

23        been duly sworn on oath, was

24        examined and testified as follows:

52    )

```
 1   BY MR. KORTANEK:

 2       Q.  Mr. Stanziale, did the -- did the U.S.

 3   Trustee evaluate any grounds to subordinate

 4   Royal's claims against the case?

 5               THE COURT:  You just said the U.S.

 6   Trustee.

 7               MR. KORTANEK:  To you as Trustee.

 8   Excuse me.

 9               THE WITNESS:  I took that into

10   consideration in my own -- in my own right.  I

11   had some discussions with counsel.

12               I didn't believe that there was any

13   basis to subordinate the claims of Royal to any

14   other -- any of the other creditors.

15               The answer to your question is

16   clearly, yes, I did consider it.  And I

17   concluded -- it was not -- it was not something

18   that I would pursue in a settlement.

19   BY MR. KORTANEK:

20       Q.  Is that a complete description of your due

21   diligence in that respect?  In other words, did

22   you review any documents in that connection?

23       A.  Well, all of the documents that I

24   reviewed, as a result of reviewing those
```

53

1    documents, I concluded that they had a legitimate

2    claim, a valid claim in this case.

3              I saw no reason to seek their

4    subordination.  I made no judgment as to their

5    defalcation or anything that they had done wrong

6    in this particular situation.

7              And further, I think it's the

8    Court's -- the Court would make that

9    determination as to whether they had done

10   anything improper that would justify

11   subordination of their claim.

12       Q.  Now, when you say you didn't believe they

13   had done anything improper, you did, sir,

14   authorize the filing of the aiding and abetting

15   complaint just enabled this year?

16       A.  That's correct.

17       Q.  And that complaint alleged, did it not,

18   that Royal aided and abetted a breach of

19   fiduciary duty?

20       A.  That's an allegation, sir.

21       Q.  Okay.  But the complaint was filed under

22   your auspices and with a good faith belief that

23   that claim had merit?

24       A.  Yes.

54

1    Q.  Okay.  Sir, did you evaluate with counsel

2    whether if that claim were successful, if that

3    would constitute or give rise to even a potential

4    claim for equitable subordination of Royal's

5    claim?

6    A.  If that -- if that claim were pursued, no

7    settlement had been entered into, and we were --

8    and I, as Trustee, were successful in pursuit of

9    that litigation, certainly, I would have sought

10   collection of the -- of the funds.

11             I'm not sure whether I would -- at

12   what point I would look to equitable

13   subordination.  The matter of that claim hadn't

14   been determined at that time.

15   Q.  So is it fair to say, then, that there

16   really was no evaluation specifically as to

17   whether equitable subordination could occur if

18   you won that lawsuit?

19   A.  No, I don't -- I think that's correct.  I

20   did not give that specific thought.

21   Q.  Did you or your counsel interview any

22   potential witnesses as to the Royal -- the claims

23   against Royal starting there?

24   A.  At the benefit of -- I had the benefit of

55

1   voluminous discovery that had taken place, both

2   prior to and subsequent to my appointment.  I had

3   had among those persons, and I'm not saying that

4   that was the basis of the conclusion to start a

5   lawsuit, but I certainly interviewed Mr. Yao who

6   was -- who is a principal in this case.

7           I discussed the matter with

8   Mr. Yao's counsel.  I certainly discussed it with

9   my own counsel.

10          I read the depositions and the

11  testimony taken under 2004, specifically as to

12  any other individuals that I had spoken to with

13  regard to bringing the lawsuits in light of the

14  United States District Court or the Bankruptcy

15  Court.

16          I think I made that determination

17  primarily based upon the information that I read

18  and recalled from previous testimony.

19      Q.  When did the settlement discussions that

20  resulted in this settlement begin in earnest?

21      A.  The settlement discussions began when we

22  went to -- I have to estimate.  I can't give you

23  specific dates.

24          I would say these discussions have

56

1    been carried on for the past two months.

2         Q.  It's a correct characterization, is it

3    not, that in your view, a significant benefit of

4    this settlement at this particular time is

5    providing funding to commence actions within the

6    next few weeks?

7         A.  It is a benefit.  I won't characterize the

8    quality of that.

9         Q.  What can you tell the Court about the bid

10   and, if you will, as to the settlement

11   discussions, bidding as who started the

12   negotiations and who made the first offer of a

13   number, which got us to the 4.9 that we have

14   today?

15             MR. McMICHAEL:  Objection.

16             THE COURT:  Basis?

17             MR. McMICHAEL:  I think it's

18   privileged settlement discussions.  I don't think

19   it's something that is -- just because we are

20   seeking approval, we don't waive the normal rule

21   408 privilege that covers settlement objection,

22   settlement discussions, unless it's some -- you

23   know, unless it's tied to something.

24             Even if it were, I don't think he

57

1    could get into it.

2              MR. KORTANEK:  Your Honor, I

3    understand Rule 408.  I think this is different,

4    because they're asking Your Honor to review the

5    settlement and render a decision as to whether

6    it's a good faith product of arm's length

7    negotiations.

8              THE COURT:  That's fine.  But we

9    know the number they ended up at.

10             I think we can presume, without

11   knowing the numbers, that one started higher, one

12   started lower.  They ended up somewhere in

13   between based on their evaluation of it.

14             But I don't know why the numbers are

15   even relevant.

16             MR. KORTANEK:  We could get to it a

17   different way.

18             THE COURT:  Well, get to it if you

19   think so -- if you think it's relevant.  But

20   right now, it's a standing objection.

21             MR. KORTANEK:  All right.

22   BY MR. KORTANEK:

23     Q.  How would you characterize how many back

24   and forth numerical offers were made, if you can

58

1    testify to that?

2        A.  I would estimate that there were four or

3    five, maybe more, maybe ten.

4        Q.  Now, your counsel characterized your

5    testimony and the agreement that, as far as the

6    delegation of causes of action, I think he

7    characterized it as a cooperation clause.

8            But in your understanding, what the

9    agreement will do is, in fact, delegate complete

10   authority as to certain causes of action so that

11   Royal can pursue them on behalf of the estate?

12       A.  That is not my understanding.

13       Q.  Then explain to me what your understanding

14   is.

15       A.  My understanding is not only as the intent

16   of the agreement, but my definition of

17   cooperation suggests that Royal can provide

18   assistance to the estate or to me, as the estate,

19   in pursuing certain important litigation that

20   will benefit all the creditors of this estate.

21           In cooperation, in my mind, means

22   that I will have access to information that

23   they've determined relevant -- excuse me.  They

24   will have access to information that my counsel

59

1   and I have subsequently determined to be valid

2   and important information.

3          And that we -- I shall pursue

4   certain litigation as Trustee of the estate of

5   Student Finance Corporation.

6          And to the extent of strategy, to

7   the extent of justification for, or possibly

8   settlement, et cetera, the agreement is to confer

9   with Royal with my having the ultimate say as to

10  whether that is a justifiable settlement or not.

11  That's my definition of cooperation.

12      Q.  Sir, can you point to where it says in the

13  agreement, or just from your recollection whether

14  the agreement expressly gives you the final say

15  over how Royal prosecutes estate litigation?

16      A.  There -- there is a clause, and I can't

17  remember the paragraph.  But I remember that

18  there is a clause that sets forth that the

19  responsibility of litigation is my responsibility

20  and at such time --

21          MR. KORTANEK:  May I approach, Your

22  Honor?

23          THE WITNESS:  May I finish my answer?

24          THE COURT:  Keep going.  No.

60

1          Go back.

2          MR. KORTANEK:  All right.

3          THE COURT:  He's in the middle of an

4     answer.

5          Go ahead, Mr. Stanziale.

6          THE WITNESS:  And at such time that

7     I feel that, we do -- the matter should be

8     handled in a particular manner, I will pursue it

9     in that regard.

10         And to the extent that Royal

11    disagrees that Royal will have to guarantee, in

12    the case of a settlement, no less than an amount

13    that I've negotiated.

14         At the time, I wouldn't be in a

15    position to know under the circumstances.

16         THE COURT:  Don't talk him out of

17    it, Mr. Stanziale. Next question.

18    BY MR. KORTANEK:

19    Q.  Mr. Stanziale, you still believed, in your

20    judgment, when you entered into the settlement

21    agreement with Commercial Driver Institute and

22    its affiliates about two months ago; correct?

23    A.  Yes.  Repeat that question, sir.

24         THE COURT:  You want the question

1   read back?

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:   Read the question back,

4   please.

5            (The record was read back as

6   requested.)

7            THE WITNESS:  Yes, I think that is

8   true.

9   BY MR. KORTANEK:

10      Q.  Now, Mr. Stanziale, there are, are there

11  not, several side agreements referenced in the

12  term sheet?  For example, one dealing with a

13  dispute against Pepper Hamilton?

14      A.  Referring to separate documentation?

15      Q.  Yes.

16      A.  That's correct.

17      Q.  Do you recall that?

18          And those terms aren't disclosed

19  anywhere in this term sheet or in your motion?

20      A.  No, they are not.

21      Q.  And there's also reference in the term

22  sheet to another side deal involving cooperation

23  or information sharing.

24          Those terms aren't disclosed or set

62

```
 1    forth anywhere, are they?

 2              MR. WOLFSON:  Objection, Your Honor.

 3    That's not an accurate representation.

 4              THE WITNESS:  I don't recall.  I

 5    don't recall the second, as you characterize it,

 6    side deal.

 7              MR. KORTANEK:  May I approach, Your

 8    Honor?

 9              THE COURT:  Yes.

10              THE WITNESS:  I don't recall the

11    content of it, the terms.

12              This is the term sheet.

13    BY MR. KORTANEK:

14       Q.  Correct.

15       A.  Okay.

16       Q.  If you could turn to Paragraph 7, and

17    there's a sentence that is about seven lines up

18    from the bottom.  It begins at the right-hand

19    column.

20              It says the Trustee and Royal will

21    enter into an agreement in connection with

22    litigation on behalf of the estate acknowledging

23    their joint interest, and allowing each other

24    access to privileged information, and continuing
```

63

1    on.

2        A.  Yes.  I read it.

3        Q.  Does that agreement exist today?

4        A.  I believe it does.

5        Q.  But it hadn't been disclosed?

6        A.  No.  It hadn't been executed.

7        Q.  Okay.  But it also hasn't been disclosed

8    to us, or to the Court, or anybody?

9        A.  Not to my knowledge.

10       Q.  Okay.  And would you agree with me, sir,

11   that the Pepper Hamilton provision and this

12   information sharing provision, those agreements

13   are material to the overall settlement?

14       A.  Yes.

15       Q.  Now, if you turn to Paragraph 8 or Section

16   8, the very last two words on that page say, a

17   separate letter.  And that talks about -- it

18   speaks for itself, but it says Royal agrees to

19   withdraw its administrative claim and so on.

20           And the last line says are reduced

21   by amount satisfactory to Royal as indicated to

22   the Trustee in a separate letter.  Is that yet a

23   third undisclosed set of agreements that are part

24   of this settlement?

64

1      A.  Yes.

2      Q.  Is it fair to characterize the provisions

3   in that term as material to your settlement of as

4   the Trustee with Royal?

5      A.  Yes.

6      Q.  With Royal, do you have a clear

7   understanding, sitting here today, exactly how

8   Royal will prosecute the proposed claims against

9   the CDI schools that you seek to delegate to

10  Royal with respect to the pending litigation

11  against the CDI schools in Tennessee?

12     A.  I have not read their complaint.

13     Q.  You've never read Royal's complaint

14  against our clients?

15     A.  I've never -- I have not read Royal's

16  complaint against your client.

17     Q.  Are you aware there's a counterclaim that

18  has been filed in that action?

19     A.  No.  I haven't read the answer, either.

20          MR. KORTANEK:  No further questions.

21          THE COURT:  All right.  There was

22  someone else who wanted to examine Mr. Stanziale.

23          MR. KLAYMAN:  Good afternoon, Your

24  Honor.  My name is Barry Klayman, K-L-A-Y-M-A-N,

65

1     of the law firm of Wolf, Block, Schorr &

2     Solis-Cohen.  I'd like to introduce my partner,

3     David Stern from our Philadelphia office.

4               We moved his admission pro hac vice

5     yesterday.  It's yet to be acted on by the Court.

6               We represent Transport Training,

7     Inc., and various other creditors in this case.

8               THE COURT:  Welcome, Mr. Stern.

9     Good afternoon.

10               MR. STERN:  Good afternoon, Your

11     Honor.  Thank you for allowing me to appear.

12               THE COURT:  Is there a reason why

13     you're up, sir?

14               MR. WOLFSON:  Their objection was

15     filed late.  And there's -- and there's no 2019

16     statement filed.

17               They're appointed to represent

18     multiple claims.  We would object to their

19     appearing.

20               THE COURT:  Well, when you say their

21     objection was filed late?

22               MR. STERN:  We filed it at five

23     o'clock or 5:15.

24               THE COURT:  When was it due?

66                )

```
 1              MR. STERN:  Four o'clock, Your
 2   Honor.
 3              THE COURT:  Well, I'm going to allow
 4   that.  Have you filed a statement indicating the
 5   various people you represent?
 6              MR. STERN:  Your Honor, in the
 7   Chapter 11 we had filed proofs of claims on
 8   behalf of 17 of the schools that we represent.
 9   There was no other filing, Your Honor.
10              And to the extent that there was no
11   other filing, we'll supplement the filing
12   immediately.
13              Thank you.
14              THE COURT:  Go ahead.  Objection
15   overruled.
16   BY MR. STERN:
17      Q.  Mr. Stanziale, you want to file a me too
18   objection; correct?
19      A.  That is correct.  We believe it was very
20   well articulated by the other objectors.
21              THE COURT:  You're not satisfied
22   with Mr. Kortanek's cross-examination?
23              MR. STERN:  No.
24              THE COURT:  You do believe -- agree
```

67

1    with me how low the standard is?

2              MR. STERN:  We do, Your Honor.

3              THE COURT:  Not that I'm suggesting

4    that it doesn't -- once I get there, I don't have

5    to listen anymore, I guess is what I'm saying.

6              It can be a very -- he may be

7    meeting a very high standard.  I'm not debasing

8    what he said.  I just wanted to make sure you do

9    understand that he doesn't have to prove a whole

10   lot.

11             MR. STERN:  We understand that, Your

12   Honor.

13   BY MR. STERN:

14       Q.  Mr. Stanziale, the notice that went out to

15   creditors is -- refers to the settlement term

16   sheet, which is the document that you have been

17   referring to; correct?

18       A.  Yes.

19       Q.  And that's the only documents that's gone

20   out to creditors; correct?

21       A.  In reference to?

22       Q.  In terms of the settlement.

23       A.  As far as I know.

24       Q.  And counsel has already indicated that

68

1    there are maybe other documents that are

2    associated with the term sheets; correct?

3        A.  That's correct.

4        Q.  And it's anticipated that those documents

5    were incorporated as part of that term sheet?

6        A.  It will be incorporated if the Court so

7    approves.

8        Q.  How would the creditors, the unsecured

9    creditors know what the terms of the settlement

10   are if the term sheet does not include all of the

11   documents?  Are they supposed to guess?

12       A.  They would object.  They would come to

13   Court.

14            They would place their objection on

15   the record.

16       Q.  Okay.

17       A.  Let the Court decide what it wanted to do.

18       Q.  Okay.  Now, it's anticipated that this

19   document will be amended; correct, the term

20   sheet, to reflect those items that were referred

21   to here today?

22            As I remember, there were three

23   items that the order would reflect as changes to

24   the agreement.  And those three things would be

69

1  the amount of the secured claim, the deletion of

2  undertaking other matters in the fee application,

3  and professionals that anticipate that the term

4  sheet will be changed; correct?

5      A.  That's correct.

6      Q.  Okay.  Now, under Paragraph 14 of the term

7  sheet, doesn't it also say that this term sheet

8  can only be modified by a writing signed by both

9  parties?

10      A.  I believe it does.

11      Q.  Do you have a writing signed by both

12  parties incorporating those terms?

13      A.  We are in Court at this time.

14      Q.  That's not my question.

15      A.  Well, I'm going to answer your question.

16  If the Court approves this document, an order

17  will be submitted to the Court with those

18  changes.

19      Q.  Is that fundamentally fair to the

20  creditors to, after the fact, meaning you've

21  noticed all the creditors out there that this is

22  what you've agreed to, and now you've changed it

23  at the Court hearing, but you haven't given the

24  creditors notice?  And the only notice they'll

70

)

```
 1   get is an order which was in effect never -- the

 2   changes were never in the notification.

 3              THE COURT:  Is that a question or

 4   are you arguing to me?

 5              MR. STERN:  No, I am asking him, as

 6   the Trustee, whether that's fair notice to the

 7   creditors.

 8              MR. McMICHAEL:  I object to the

 9   question.  It's argumentative.

10              THE COURT:  Excuse me?

11              MR. McMICHAEL:  It's argumentative.

12              THE COURT:  At least.  I'll allow

13   the question.                                        )

14              THE WITNESS:  Answer the question?

15   I'm sorry, Your Honor.

16              I think the question will have to be

17   read.

18              THE COURT:  He's asking you whether

19   you think it's fair to have terms that the --

20   amending the agreement in Court and the creditors

21   never knew about the amendments.

22              Is that the substance?

23              MR. STERN:  That's it, Your Honor.

24              THE COURT:  Without the bluster
```

1    added to it.  Okay.

2              THE WITNESS:  It certainly wouldn't

3    be fair if -- it would not be fair if the

4    creditors didn't know about it.  But, in fact, we

5    are in public session and the creditors do know

6    about it.

7    BY MR. STERN:

8      Q.  How would someone who -- strike that, Your

9    Honor.

10             Have you --

11             THE COURT:  Are you suggesting --

12   counsel, let me just understand the thrust of

13   that question.

14             Are you suggesting that the changes

15   that -- the adjustments to the deal, which were

16   put on the record by counsel, are so material

17   that they would require renoticing.

18             Because I'll tell you:  If it was

19   part of a confirmation hearing, I would be

20   finding that they were all beneficial to the --

21   to the creditors and finding them non-material.

22             Are you suggesting because this --

23   that regardless of how miniscule and how

24   material, that it's a 7 and not an 11, that all

72

1    these changes have to be renoticed?

2              MR. STERN:  Your Honor, I don't know

3    what the changes will say.  This is what has been

4    negotiated at the hearing.

5              THE COURT:  Well, one of them, you

6    were just told it brings down the amount of the

7    alleged secured claim from 45 to under $16

8    million.  That's one.

9              Now, you can't -- the unsecured

10   creditors are going to argue, no, it should be

11   higher.

12             MR. STERN:  I'm relating to -- the

13   issues are pertaining to the side letters and

14   side agreements.

15             THE COURT:  Oh, all right.  Then you

16   didn't make that clear.

17             MR. STERN:  Well...

18             THE COURT:  I've got you.  All

19   right.

20             MR. STERN:  I don't know whether

21   they are -- whether they're material or not,

22   because I've never seen them.

23             THE COURT:  I understand.  I thought

24   you were referring to the adjustments that were

73

1    put on the record by Mr. McMichael.

2           MR. STERN:  I never got to the rest

3    of them, Your Honor, but they're included.  Also,

4    I think it's abundantly clear, the term sheet, by

5    its own term, says it only can be modified in

6    writing by -- signed by the parties.

7           So we're not at that point yet,

8    because the Trustee has already indicated that

9    there's going to be some modification.  But more

10   fundamental to the issue to the fairness of this

11   settlement is the fact that we don't know what

12   those side agreements are.

13          And they may be material.  They may

14   not.  We may agree that there's no objection to

15   it.

16   BY MR. STERN:

17      Q.  Getting back to the analysis or due

18   diligence that the Trustee performed really

19   active to approving the settlement, did you

20   retain any other expert to evaluate the claims

21   that were asserted against Royal?

22      A.  No.  Well --

23      Q.  Anyone other than yourself or counsel?

24      A.  No.

74

1    Q.  Why?

2    A.  I didn't think it was necessary.

3    Q.  Isn't it true, though, that the two

4  complaints, as I read it, assert over $70 million

5  worth of claims which you admit you felt, in good

6  faith, were sustainable in terms of the Trustee's

7  ability to pursue those claims; correct?

8    A.  Yes.

9    Q.  So you took a $70 million case and, based

10  on your experience and expertise, which I assume

11  is substantial, and your counsel's expertise, you

12  decided that the settlement that was reached as

13  memorialized by this term sheet is fair and

14  reasonable?

15    A.  In the context of the entire matter, the

16  answer to the question is yes.

17    Q.  Okay.  So I go back to my question:  Why

18  did you not feel it necessary to seek the advice

19  of any other third party expert as to the

20  reasonableness of this settlement?

21    A.  As I looked at the -- I looked at the --

22  at this case in its entirety.  I looked at the

23  allegations that were about not only in

24  complaints and answers, and in discovery, but as

1    a result of conversations with other persons

2    involved in this case.

3              And I concluded that while

4    they're -- while there were -- there was a basis

5    to pursue claims with regard to Royal, that there

6    were other claims that were very substantial in

7    this case that required pursuit by the estate.

8              And I looked at the entire case, and

9    in the context of the entire case.  And what I

10   sought to -- as a result in this case, i.e. to

11   bring a substantial amount of dividend to the

12   estate.

13             In looking at that, I decided

14   that -- I came to the conclusion, subject to the

15   Court's approval, of course, I came to the

16   conclusion that this settlement in its entirety

17   was a valid settlement.

18        Q.  Now, when you talk about benefit to the

19   estate, Mr. Stanziale, the 4.9 million takes into

20   consideration a 1.9 million administrative claim

21   that would go back to Royal; correct?

22        A.  Go back to Royal only upon -- only upon

23   success of litigation in excess of that amount.

24        Q.  What are the amount of the administrative

76

1    claims that have been filed to date?

2        A.  Administrative claims are in the --

3    approximately, under four million.

4        Q.  So in the context of this settlement --

5        A.  Excuse me, sir.

6        Q.  I'm sorry.

7        A.  That includes, of course, professional

8    fees, et cetera.

9        Q.  Well, that's -- does that include the

10   Royal claim or not?

11       A.  Yes, it would include the Royal claim.

12       Q.  So there's four million in administrative

13   claims.  You're collecting 4.9 from Royal.

14          Isn't it true that the benefit

15   conferred to the estate, to the extent that the

16   professionals seek compensation, would be very

17   little.  900,000 would be left to fund all these

18   settlements, all these other pieces of

19   litigation?

20       A.  I don't believe you understand -- pardon

21   me.  I don't believe you and I agree with the

22   terms of this agreement.

23         As I understand the terms of this

24   agreement, if after litigation is commenced and

1   there is a -- there is a result that benefits the

2   estate in a certain -- in a -- recognized in a

3   dollar amount, which I can't -- I can't determine

4   at this point, but to the extent that there is a

5   result, a financial result, the $1.9 million or

6   anything over it -- let me restate that.

7           If, for example, we brought

8   litigation and that litigation was funded by the

9   sum of money set forth in this agreement, and as

10  a result of that we either settled or got a

11  judgment of $10 million, then the agreement

12  states that Royal will receive, subject to Court

13  approval, the funds that it advanced.

14          So that I could benefit the estate

15  by, roughly, $8 million.

16      Q.  But that arrangement only applies to

17  Royal, it doesn't apply to the other

18  professionals who have administrative claims who

19  can now seek compensation from the Court from the

20  funds that you've created?

21      A.  The other professionals that would seek --

22  would seek payment would seek payment as a result

23  from the funds set forth in the estate.  That's

24  correct.

78

1    Q.  So that would diminish the amount of the

2    settlement available to use the funds to this

3    litigation that you feel is so important for the

4    benefit of the creditors; correct?

5    A.  Yes.

6    Q.  Have you done an analysis as to the

7    ultimate benefit to the estate after payment of

8    the administrative claims?

9    A.  Any analysis that I would do would be

10   based in real time.  And the administrative

11   claims at this particular point exceed the amount

12   of funds that I have on hand.

13           If that's the answer to the

14   question.

15   Q.  Okay.  So how would you ever fund the

16   settlement if, in fact, the funds that you're now

17   deriving will be used to pay administrative

18   claims?

19           MR. WOLFSON:  Objection.  I don't

20   understand the question.

21           THE COURT:  Well, I sure don't.

22           Restate the question.  Break it down

23   into understandable components.

24           MR. STERN:  Very good, Your Honor.

79

BY MR. STERN:

1

2      Q.    To the extent that the administrative

3   claims exceed five million, and you're collecting

4   five million in settlement, isn't it possible and

5   probable that that five million will be

6   diminished by the administrative claims very

7   quickly?

8      A.    Yes.

9      Q.    So what is going to be used to fund these

10   lawsuits that you claim are the basis for this

11   settlement?

12      A.    Administrative claims -- administrative

13   claims are the -- obviously, the Chapter 11

14   administrative claims, and there are Chapter 7

15   administrative claims.

16      Q.    I understand that.

17      A.    And I know you understand that the Chapter

18   7 claims are paid first, and the remainder would

19   be any balance on hand after those claims are

20   paid would be paid to the administrative claims.

21           If you're saying that if I take this

22   $5 million and I pursue the litigation, and I'm

23   unsuccessful in this litigation, will I have

24   depleted the $5 million and have nothing left for

80

1     either, you know, the balance of Chapter 7 claims

2     or the Chapter 11 administrative claims; that is

3     correct.

4          Q.   Well --

5          A.   I hope that's what your question is.

6          Q.   Actually it's backwards.  The question is

7     if right now fee applications are filed and

8     orders are entered allowing payment of

9     administrative claims, there won't be any money

10    left to fund litigation against third parties;

11    correct?

12         A.   I don't agree with that.  I would say the

13    answer is not correct.

14         Q.   Why?

15         A.   Because the first claims to be paid are

16    claims in the Chapter 7 administrative claims.

17    Chapter 7 administrative claims come nowhere near

18    $5 million.

19         Q.   How much are they?

20         A.   If allowed by the Court, they would be,

21    approximately, a million.

22         Q.   Okay.  And those claims would be the

23    claims of the Trustee, and the Trustee's counsel,

24    and special counsel such --

81

```
 1      A.  Correct.

 2      Q.  Mm-hmm.

 3              Now, did you -- do you have any

 4  expertise in litigating securitized loan claims?

 5              Strike that.

 6              Do you have any expertise in

 7  litigating cases involving securitized loans?

 8      A.  I -- over the course of my career, I may

 9  have.  I may have been involved in litigating

10  those claims.

11              But I can't specifically recall a

12  litigation of a securitized claim.  I have

13  litigated literally thousands of claims.

14      Q.  Now, you felt comfortable at the time you

15  filed the complaint that this was protected and

16  complex litigation; correct?

17      A.  Yes, indeed.

18      Q.  What has changed today, other than the

19  fact that the Trustee can fund the litigation

20  against Royal, that has now caused you to agree

21  to the settlement?

22      A.  I think the basis of the settlement is

23  that pursuing the claim against Royal, both

24  claims against Royal make it no less complex.
```

82

1    And with any litigation, there is always the

2    possibility that I will be unsuccessful.

3            Royal has filed an answer. My

4    experience with Royal thus far has been that they

5    will take this case as far as they can go, and

6    they will appeal to every Court they can get to.

7            They will take extensive discovery.

8    And they believe that they have a valid defense.

9            Now, the fact that I don't believe

10   the defense is valid is not what a Court, or a

11   jury, or a judge may believe is valid or not

12   valid.

13           So because of the complexity of

14   litigation, because of the complexity of the

15   case, because of the defense that was filed, and

16   because of the extraneous matters that come in,

17   because of the allegations of fraud that abound

18   in this case, there is a possibility that they

19   may succeed.

20           And they're willing to put $5

21   million up close to the -- on the table. Three

22   million, they can never -- 1.9 million that they

23   might have an opportunity to get back presumably

24   if we're successful in subsequent litigation, and

1  three million that they'd never get back.

2      Q.  Well, let's talk about that.  Why are they

3  entitled to the 1.9 million?

4      A.  Well, I believe they'd be entitled to the

5  1.9 million if they're -- if I'm going to use

6  that 1.9 million to bring in substantial assets

7  to the estate, they should be -- have a right to

8  be reimbursed for having expended that money,

9  because I don't have that money.

10           That's money that I, as a Trustee on

11  behalf of the creditors, don't have to expend.

12           But, conversely, if I'm not

13  successful, they don't get it back.

14      Q.  Mr. Stanziale, the issue, as I see it, and

15  by your testimony, if you had the funds available

16  today to fund the litigation against Royal,

17  meaning that the estate had sufficient assets to

18  adequately fund the litigation, would you still

19  have entered into that settlement?

20      A.  I don't think -- I don't think the issues

21  change whether I had the money or didn't have the

22  money.  I think the fact is that there's always a

23  possibility that they could be successful.

24           And --

84

1     Q.  But you --

2     A.  -- I would have --

3                THE COURT:  Let him finish.

4                MR. STERN:  Sorry, Your Honor.

5                THE WITNESS:  There's always the

6     possibility that they would be successful, and I

7     would lose out on the opportunity to get not less

8     than $3 million.

9     BY MR. STERN:

10     Q.  Have you consulted with any other counsel

11     to see whether they'd be interested in taking on

12     the case against Royal on a contingency fee

13     basis?

14     A.  No.

15     Q.  Why not?

16     A.  Well, first of all, I think that besides

17     believing that the counsel Debtor involved, that

18     are involved with me in this case, which are my

19     own firm, are capable and experienced in this

20     litigation, Number 1.

21                Number two, there is an extensive

22     learning curve that would have to be undertaken

23     by any other firm that took this on.

24                And so if the firm said, Oh, I'll

1    take this on on a contingency basis, I'm not sure

2    the representation would be as adequate as the

3    representation that I have.

4        Q.  But your answer is that you have not

5    endeavored to determine whether any --

6             THE COURT:  He answered the

7    question.  Move on.

8             I mean, if this is -- you know, war

9    of attrition, I understand.

10            Let's move along.  I mean, you

11   understand the standard he's got to meet.

12            Ask your questions.  Don't argue

13   with the witness.

14            MR. STERN:  Thank you, Your Honor.

15   BY MR. STERN:

16       Q.  In reviewing the term sheet, it indicates

17   that the Trustee is to get due deference to the

18   position of Royal.  Does the Trustee have veto

19   power over Royal's decision to proceed with

20   litigation that the Trustee decides not to

21   pursue?

22       A.  The -- if I decide not to pursue this

23   litigation, Royal has the option to pursue it.

24   The answer to your question is, no, I don't have

86

1    a veto power over their right to pursue a piece

2    of litigation.

3        Q.  Are you giving up your delegated authority

4    and responsibility under the Bankruptcy Code by

5    allowing Royal to sue whoever they want?

6        A.  No.

7        Q.  Why is that?

8        A.  First of all, Royal is a creditor.  And as

9    a creditor, they have a cause of action.

10            They have a right to bring an action

11    against any party that I bring an action to, by

12    and large.  And that's -- that's the answer to

13    number one.

14            Answer number two, I have a

15    responsibility, fiduciary responsibility as a

16    Trustee, and under the code.  And I don't believe

17    providing a creditor who has a right to bring an

18    action, not to mention a $550 million creditor to

19    bring an action, I don't believe that giving him

20    an opportunity to pursue cause of action is

21    waiving, delegating, or in any other way avoiding

22    my responsibility as a fiduciary.

23        Q.  What happens if a counterclaim is asserted

24    in the cause of action asserted by Royal, what

87

1   would be the Trustee's position?

2       A.  I don't understand your question.

3       Q.  What if in the event that the Trustee

4   decides not to initiate legal action, and Royal

5   in the name of the trustees on behalf of the

6   estate brings legal action, a counterclaim is

7   asserted against the estate management, against

8   the estate?

9       A.  Then that would be -- then that will be

10  defended by -- under the auspice -- they're

11  bringing -- they're bringing a cause of action

12  under the auspices of the estate.  Then they will

13  defend that counterclaim on behalf of the estate.

14      Q.  And what happens if the counterclaim is

15  sustained and there's a substantial award entered

16  against the estate, who's going to pay for that?

17      A.  I think -- I don't know if I can answer

18  that question.  It's highly speculative.

19          MR. WOLFSON:  These are misleading

20  the whole basis of this case and the state of

21  law.  There's been a bar date set in this case.

22          If there was any claim asserted by

23  way of a counterclaim that was not already

24  asserted by way of a claim, they could only be

88

1   used to offset the amount of any judgment.  It

2   could not give rise to a new claim that doesn't

3   already exist against the estate.

4            THE COURT:  Is what you're

5   suggesting that the bar date has already passed?

6            MR. WOLFSON:  Correct.

7            THE COURT:  You may answer the

8   question.

9            THE WITNESS:  I don't know the

10   answer, but I'm going to -- I can't -- I'm not

11   going to take a position for Royal.  If a

12   counterclaim were sustained against the estate,

13   it was costly to the estate, I think that I would

14   look to Royal.

15            But it would be -- in any event, it

16   would be if it were payable and didn't become an

17   administrative insolvent estate, it would attach

18   to the claim of Royal.  So you know, if I might

19   just take a little bit of leave here, you know,

20   as Trustee, we have effective -- by Friday -- we

21   will, effective Friday, have filed 60 lawsuits in

22   this case.

23            We have a lawsuit by the Trustee.

24   The Trustee has filed a lawsuit against Mr. and

1    Mrs. Yao.  The Trustee is about to file a lawsuit

2    against a professional firm involved in this case

3    and others.

4              So there is an inordinate -- when I

5    say inordinate, there is a great deal of

6    litigation that the Trustee and this estate is

7    pursuing without -- without the aid, assistance,

8    or otherwise of Royal.

9              So this is -- this has been a very

10   active case in the sense of litigation.  As I

11   said, 60 -- 60 cases will be filed soon.

12   Possibly more.

13             And again, I might add, I believe

14   they're trucking schools that they're being filed

15   against, for the most part.

16             They're also being filed against

17   others besides the trucking schools, insiders.

18   The case of one, a Playboy bunny who received a

19   million and a half dollars.  An escort service.

20   And certain casinos in Las Vegas, and other

21   insiders.

22             So we are actively pursuing the

23   litigation we need to pursue in this case.  And

24   Royal's litigation is only part of the -- part of

90

1    the litigation program the estate has undertaken

2    here.

3        Q.  Isn't it -- I believe you had already

4    testified that the amount allowed as the

5    unsecured prepetition claim of around 516 million

6    was never calculated with certainty by the

7    Trustee, it was a number that you assumed was

8    correct.

9            Or how did you derive or how did you

10   conclude that number was accurate?

11       A.  Well, the -- there is a judgment entered

12   into the -- in the United States District Court

13   which my counsel, Mr. McMichael, alluded to

14   against Royal in the approximate amount of 380

15   million.

16           There is a judgment entered into the

17   United States District Court with the District of

18   Delaware against PNC Bank for 110 million.

19           There is a judgment entered against

20   Wilmington Trust in the same Court for,

21   approximately, 12 million.  I'm not sure exactly

22   what that adds up to.

23           But there are -- there is the

24   additional advance that Royal made in the case,