1    which my counsel indicated was collateralized,

2    but was not a security interest.

3              And interest has been running for a

4    year on that -- on those judgments entered by the

5    United States District Court.  So my assumption

6    that the total amount is in excess of $550

7    million, in my view, is fairly accurate.

8        Q.  But the settlement does not allow any --

9    doesn't allow the Trustee to contest the amount

10   of that allowed unsecured claim down the road,

11   other than money that may come back in as a

12   result of this litigation being overturned;

13   correct?

14       A.  Well --

15              THE COURT:  It's an agreement.  It's

16   a settlement.

17              They're fixing their claim.  I think

18   that you're forgetting that this is all on the

19   record as a proffer.

20              And it's -- the hour is growing

21   late.  And to go over ground that already is in

22   the proffer, I don't see as terribly productive.

23              Mr. McMichael put the proffer in.

24   Let's move on.

92

1    BY MR. STERN:

2        Q.  Do any of the unsecured creditors have the

3    right to contest the proof of claim filed by

4    Royal under your settlement agreement?

5        A.  There's no mention of the rights of

6    anyone.  Is that a legal question or a factual --

7        Q.  No.  As the Trustee, would you object if

8    another creditor of the estate objected to the

9    proof of claim asserted by Royal?

10       A.  Oh, Royal would object.

11       Q.  I'm asking whether the Trustee would

12   object.

13       A.  I've stood by the claims submitted here.

14   I don't know if it's my responsibility to object.

15           I don't --

16       Q.  Would it --

17       A.  Why would I?  I mean, I'm sorry.

18           You're asking the questions.

19       Q.  No.  I want you to finish.

20           I apologize.

21           Well, I think we can all agree that

22   part of the settlement that is the allowance of

23   a -- of the claimant management, it would bar the

24   unsecured creditors.

1              THE COURT:  Are you asking me or the

2    witness?

3              THE WITNESS:  Isn't that what

4    allowance means?

5              MR. STERN:  That's correct.

6              THE COURT:  Okay.

7              THE WITNESS:  If the Court -- if

8    the -- if the claim was allowed and the Court

9    approves it, an objection would be -- would be --

10   I suspect it would be overruled and not

11   sustainable.

12   BY MR. STERN:

13       Q.  So the bottom line is that at the end of

14   the day, there will be, under your analysis, very

15   little available for the unsecured claims which

16   amount to about $60 million?

17       A.  That's -- you're here.  If you object, so

18   state it.

19              But the answer to your question is,

20   at the end of this hearing, it's my assumption,

21   if the Court approves it, the Court may not

22   approve it, but if the Court approves it, then

23   anyone seeking to object will be summarily

24   dismissed.

94

1     Q.  How would it be a detriment to the estate

2     to allow the claims, subject to the rights of

3     other creditors, to come in and object?

4                MR. WOLFSON:  Objection, Your Honor.

5     It's way beyond the scope.

6                This is -- it has nothing to do with

7     the reasonableness of this settlement asking the

8     witness' opinion of some other hypothetical

9     situation.

10                THE COURT:  Well, I assume what he's

11     asking is why did you negotiate that?  And I

12     think the answer is pretty obvious that that

13     wasn't the deal.

14                MR. WOLFSON:  That's not the deal we

15     assume we're going to.

16                THE COURT:  If you want to examine

17     him on what other settlements he might have

18     entered into, that Royal would not have agreed

19     to, I guess you can ask that question.

20                MR. STERN:  No.  That would be

21     argument.

22                THE COURT:  It seems to me the

23     answer is pretty obvious.

24                MR. STERN:  It would be argument.

1    And I don't need to ask him that.

2                    I don't have any further questions.

3                    THE COURT:  Thank you.

4                    Anyone else want to examine this

5    witness?

6                    Redirect?

7                    MR. McMICHAEL:  Brief redirect.

8    BY MR. McMICHAEL:

9        Q.  Mr. Stanziale, you have the settlement

10   term sheet in front of you?

11       A.  Yes, I do.

12       Q.  Could you look at the paragraph that deals

13   with Paragraph 6?  I just want to deal with these

14   off-the-record so-called side agreements.

15       A.  I see it.

16       Q.  Do you see Paragraph 6?  Could you explain

17   to the Court why it is that the settlement

18   threshold described in Paragraph 6 is not put in

19   the record?

20                    THE COURT:  Mr. McMichael, this is

21   the Pepper Hamilton one?

22                    MR. McMICHAEL:  I'm sorry?

23                    THE COURT:  Is this the Pepper

24   Hamilton one, so-called side agreement?

96

)

1          MR. McMICHAEL:  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Well --

4    BY MR. McMICHAEL:

5      Q.  Do you just want to put that in the

6    record?

7      A.  First of all -- first of all, Royal has a

8    cause of action of its own, if it wishes to

9    proceed against Pepper Hamilton.  And Pepper

10   Hamilton, if Pepper Hamilton sought to negotiate

11   a settlement with the estate, with the Trustee,

12   it's our view that they wouldn't proffer money to

13   the Trustee, and then leave themselves open to a

14   lawsuit, another lawsuit, possibly under the same

15   set of facts, absent collateral estoppel, et

16   cetera.

17          So any settlement that we would

18   enter into with -- if we were fortunate to do so

19   with Pepper, would necessarily require a sign off

20   from Royal.

21          Now, why do we not set forth that

22   amount in here?  What this agreement says is that

23   there's a minimum amount that Pepper would agree

24   to without any further opportunity to object.

)

1    And so we came to a conclusion as to
2    what that amount would be.  If the amount that we
3    would settle for is under this amount that Royal
4    feels is justifiable, Royal can either say, Yeah,
5    I'll go along with it, or say, No, I'm not going
6    to go along with that.
7    But any amount that we settle for
8    over this particular amount, Royal will have no
9    say in whether the estate accepts that settlement
10    or not.
11    Q.  Would it be a bargaining disadvantage for
12    the Trustee in trying to settle a claim against
13    Pepper Hamilton for Pepper to know that amount?
14    A.  Of course, it would.
15    Q.  Okay.  And isn't that why you didn't put
16    it in the agreement?
17    A.  Yes, it is.
18    Q.  Okay.  And is it true that we have a side
19    letter with Royal that documents that amount?
20    A.  Yes, we do.
21    Q.  Okay.  And have you authorized us to file
22    that under seal?
23    A.  Yes, I have.
24    Q.  Okay.  So you're not attempting to hide it

98

1    from the Court?

2        A.  No, I'm not.

3        Q.  You just don't want Pepper to find out

4    about it, because of the obvious implications; is

5    that correct?

6        A.  Yes.

7        Q.  Is the same thing essentially true with

8    respect to the threshold amount for the

9    settlement of Chapter 11 administrative claims

10   that appears in Paragraph 8, same basic theory?

11       A.  Yes.

12       Q.  Okay.  We have a side letter?

13       A.  Yes.

14       Q.  And you've authorized us to file that

15   under seal with the Court --

16       A.  Yes.

17       Q.  -- if the Court wants to inspect it?

18       A.  Yes.

19       Q.  But, obviously, it would be an advantage

20   to those admin creditors from the Chapter 11 if

21   they knew what that number was; right?

22       A.  Yes.

23       Q.  All right.  Now, let's just talk about

24   admin claims for one more second, and then I'll

99

1     sit down.

2                You were asked a lot of questions

3     about administrative claims.  So let me just go

4     over it with you again, so we are clear what

5     we're talking about.

6                You said there was $4 million of

7     administrative claims.  Isn't it true that about

8     two million of it was from the chapter?

9        A.  Yes.

10       Q.  About half of it?

11       A.  Yes.

12       Q.  And isn't it true that under Paragraph 8,

13    as long as we meet our target, Paragraph 8 of the

14    term sheet, Royal will withdraw its $7 million

15    claim?

16       A.  Yes.

17       Q.  So that comes out.

18                And do you have objections?  If you

19    can't resolve the Chapter 11 admin claims, do you

20    have objections to those claims?

21       A.  Yes.

22       Q.  And last, but not least, the 1.9 million

23    dollar admin claim that Royal gets under this

24    agreement, they can't take that out of your $3

100

1    million settlement; right?

2        A.   No.

3        Q.   All right.   One more question.

4             Is there money in the estate --

5        A.   Yes.

6        Q.   -- today?

7        A.   Yes.

8        Q.   Without the settlement, there is cash in

9    the estate?

10       A.   Yes.

11            MR. McMICHAEL:   That's all I have,

12   Your Honor.   I'll have some argument if the Court

13   wants to hear it later.

14            THE COURT:   Any recross?

15            MR. KORTANEK:   No, Your Honor.

16            MR. STERN:   No, Your Honor.

17            THE COURT:   Thank you,

18   Mr. Stanziale, you may step down.   Any other

19   evidence from the moving party?

20            MR. McMICHAEL:   No, sir.   The

21   Trustee rests.

22            THE COURT:   All right.   Any

23   witnesses from the other side?

24            MR. KORTANEK:   No, Your Honor.

1              MR. STERN:  No, Your Honor.

2              THE COURT:  Very well.  I'll hear

3    argument.

4              MR. KORTANEK:  Your Honor, the CDI

5    schools have objections that are on three

6    principal grounds.

7              One is the delegation concept.

8              Two is process.

9              And three is what I'll call merits

10   of the settlement.

11             On the point of delegation, Your

12   Honor, I think that Cybergenics is an important

13   milestone, but it is only a starting point.

14             First, I think that Mr. Wolfson

15   turns Cybergenics on its head a little bit.  It

16   is, indeed, a case where the Third Circuit, and

17   then the On Bonk Third Circuit was only deciding

18   whether a committee should be delegated estate

19   causes of action.  But it is definitely a fair

20   characterization that it wrestled with that

21   concept mightily.

22             THE COURT:  But let me understand

23   them.  These -- delegation is only in causes of

24   action that the Trustee independently uses his

102

1    judgment that he's not going to bring --

2            MR. KORTANEK:  That's correct.

3            THE COURT:  So does that hurt the

4    creditors?  And you're here as a creditor, not as

5    a defendant.

6            MR. KORTANEK:  Right.

7            THE COURT:  Why does that hurt the

8    creditors if the Trustee says, I'm not going to

9    do it.  Is it worth it, or I don't think it's

10   worth it, or I don't want to spend my time on it,

11   or I don't think it's a good enough cause of

12   action to pursue to have somebody else who's

13   interested in collecting money say, okay, I'll do

14   it.

15           MR. KORTANEK:  Whether --

16           THE COURT:  Isn't that what we have

17   here?

18           MR. KORTANEK:  Well, no.  Your

19   Honor, the question is not whether it hurts

20   creditors.

21           I was going to take Your Honor back

22   to the STN case, which is out of the Second

23   Circuit.

24           THE COURT:  Which case?

1          MR. KORTANEK:  STN.

2          THE COURT:  Yeah.

3          MR. KORTANEK:  It's a Second Circuit

4    case, and it's a very important case.  It's a

5    1995 case.

6          The cite is 779 F. 2d 901.  And STN

7    and lot of cases that follow it articulated a

8    standard for when a party seeks to obtain

9    delegation of an estate cause of action.

10         First of all, when you think of the

11   whole Bankruptcy Codes and what a Trustee or

12   Debtor-in-possession has under 544, they have

13   things that are given to the Trustee.

14   Hypothetical creditor standing, without the

15   baggage, let's say that comes with being an

16   actual true creditor who would have to bring a

17   fraudulent transfer claim.

18         I thought it was very interesting to

19   hear questions and answers about potential cross

20   claims or counterclaims.  Because it will be

21   especially awkward for someone like Royal to be

22   standing in the shoes of a supposed fiduciary for

23   the estate, which I think one has to accept

24   someone bringing an estate cause of action, if

104

1    it's being delegated, not sold.

2              If it's being delegated, what comes

3    with that is the fiduciary duties that an estate

4    fiduciary would have, which I think they've

5    acknowledged begrudgingly that they would have to

6    file fee applications.

7              We appreciate that they have moved

8    our direction, but also they have to be free of

9    conflicts.

10             Take a look at 327(e), for example,

11   Your Honor.  That really -- you talk about the

12   lowest point of a professional's lack of conflict

13   as an example when an estate cause of action is

14   going to be pursued, you can bring in a special

15   litigation counsel.

16             But the most important thing

17   articulated in 327(e) is that they cannot hold an

18   interest or represent an interest.

19             THE COURT:  So why isn't that an

20   issue to be -- you heard that, in fact, if this,

21   in fact, happens, stop me if I'm misstating it --

22   you are -- they're going to come in with a motion

23   for permission to do that.

24             MR. WOLFSON:  Your Honor, that would

1    only happen in connection with the Paragraph 2

2    claims if the Trustee's counsel, all of them,

3    attempt to bail out of the case, and there's

4    nobody else left representing the Trustee.

5              THE COURT:  So --

6              MR. WOLFSON:  As to right now, as

7    the testimony indicated, it is the anticipation

8    of the parties that the Trustee is going to bring

9    all of the litigation.  What, as Your Honor

10   properly noted, Paragraph 7 is designed solely to

11   say that, in the event the Trustee chooses not to

12   bring a particular cause of action that Royal

13   believes ought to be pursued, then, at our own

14   cost and expense on behalf of the estate, we can

15   do it.

16              The one exception that we know about

17   today, and as far as we know the Trustee is going

18   to be bringing all of the other actions, but the

19   one exception we know about today at the request

20   of the Trustee is the CDI, DDI litigation.

21              And --

22              THE COURT:  All right.

23              MR. WOLFSON:  That's the only one.

24              THE COURT:  I don't want to waste

106                    )

1    your time with something I've already decided.

2    I'm going to overrule your objection on

3    delegation.

4            Move on to the other points.

5            MR. KORTANEK:  Thank you, Your

6    Honor.

7            Your Honor, we'll be moving for a

8    stay pending appeal, because I think it's clearly

9    something that the Third Circuit or the District

10   Court will find important, and we shouldn't have

11   our rights prejudiced.

12           Your Honor, --

13           THE COURT:  What right is being                    )

14   prejudiced by the right not to be sued by Royal?

15           MR. KORTANEK:  Not at all, Your

16   Honor.  But the right that's being prejudiced is

17   when an estate fiduciary who's -- the exercise of

18   his fiduciary duty to decide to settle the CDI's

19   claim has not been challenged as an appropriate

20   exercise of that duty.

21           Today, the Trustee, again, he

22   iterated he thought that was a good business

23   judgment as a Trustee and as a fiduciary.  That

24   right would now be given against a very -- the

1   very party that, by Royal's own choosing it, it

2   sued us on the same claims in Tennessee.

3              We have counterclaimed in a five or

4   seven-count complaint seeking from Royal all the

5   damages that our clients have suffered, seeking

6   doubling of those damages.  You have the Trustee

7   acknowledging that he has valid -- he believes he

8   has valid claims against Royal.

9              So what you have is an inherent and

10  irreconcilable conflict of interest that I've

11  never seen in all the STN or Cybergenic-type

12  cases.

13             So Your Honor, I want to be clear

14  that the conflict issue is the remaining point

15  for us and for the estate, and we think it's

16  irreconcilable as far as Royal's interests are

17  concerned.

18             Think about how the litigation will

19  be prosecuted.  There are hundreds --

20             THE COURT:  I've given you my

21  ruling.

22             MR. KORTANEK:  Thank you, Your

23  Honor.

24             Your Honor, I guess what I'm getting

108

1    into, we'll submit papers for motion for stay,

2    and we'll do that in writing.

3              Your Honor, as to the --

4              THE COURT:  Did you argue the 327(e)

5    issue --

6              MR. KORTANEK:  We did raise that

7    section, Your Honor.

8              THE COURT:  -- in your objection?

9              MR. KORTANEK:  Yes.  I raised it as

10   a benchmark because, to me, it was important to

11   think about how the Bankruptcy Code was written,

12   that even where there's --

13             THE COURT:  Counsel, you know your

14   virtue of protecting the system is very

15   impressive, but raising these things out of the

16   dozens, perhaps hundreds of creditors, your

17   virtue is -- I'm not going to question your

18   virtue, but your motives are suspect.

19             MR. KORTANEK:  That's fine, Your

20   Honor.  And in fairness, the same can be said for

21   Royal and seeking the delegation only against us.

22             THE COURT:  But Royal's putting up

23   the bucks, too.  And, you know, if you want to

24   stall and do that, fine.

1          The worse that happens is that

2    somebody else will sue you.  I mean, you know...

3          MR. KORTANEK:  Well, that's fine,

4    Your Honor.

5          THE COURT:  You're being sued.

6    You're a defendant.

7          Defend the case.  Don't waste a lot

8    of time, effort, and money on side issues.

9          Let's move onto your other

10   arguments.

11         MR. KORTANEK:  Your Honor, the

12   second point is a process.  You have an agreement

13   in front of you that it's interesting that they

14   have decided, evidently in response to the

15   objections, that they will now file these

16   material side agreements under seal.  But they

17   haven't been filed yet.

18         It's admitted that they are

19   material, and they haven't been disclosed to Your

20   Honor.  I think that alone is cause --

21         THE COURT:  I'm not going to approve

22   the agreement until I get them.

23         MR. KORTANEK:  I appreciate that,

24   Your Honor.  That's certainly an important

110

1    point --

2              THE COURT:  You do understand that

3    by -- if they filed them in open Court, at least

4    their uncontroverted testimony is there being

5    competitive disadvantage to which you -- or you

6    have a claim in this case.

7              MR. KORTANEK:  I understand.

8              THE COURT:  I really don't want to

9    do that.  Do you?

10             MR. KORTANEK:  I don't disagree with

11   that, Your Honor.  Again, it's a process.  I

12   think it's important.

13             THE COURT:  All right.

14             MR. KORTANEK:  Now, on the merits,

15   Your Honor, I thought it was -- the one thing

16   that really sticks out to me when you look at a

17   half a billion dollar claim, that will be

18   irrevocably allowed today if Your Honor were to

19   grant the motion, the case is essentially over,

20   and -- as to all other creditors are concerned.

21             Did you read -- rhetorical question.

22   Did you really hear enough today to "end the case

23   for other creditors"?  Specifically the Trustee

24   told Your Honor that -- what I think is the

111

1    biggest potential neutron bomb as to the claim,

2    the contract-based claim back against the estate.

3            To me a 510(c) claim is a very, very

4    important issue.  And it has not been explored as

5    to any potential 510(c) predicated on the aiding

6    and abetting claim that was only refiled a few

7    months ago by the Trustee.

8            So it looks to us, and I think the

9    record shows that since that complaint was filed

10   in April, very little has actually been done.  We

11   don't -- I didn't hear any clear evidence that

12   there were actual depositions or examinations

13   taken in that litigation.

14           I thought the cross by the other

15   objecting counsel was also important, that there

16   was no expert retained at any time to look at the

17   aiding and abetting claims, and other claims that

18   could be leverage -- leverage under a 510(c).

19           Maybe not a meritorious one, but

20   certainly having a lot of value to other

21   creditors of the estate.

22           Because if you subordinate just a

23   part of this claim, given what's been represented

24   about non-Royal creditors, that's of enormous

112

```
 1   impact to other creditors.  Your Honor, our

 2   litigation in Tennessee will, in fact, be

 3   pursuing claims against Royal on many of those

 4   theories.

 5           And it will be interesting, Your

 6   Honor, if the Tennessee District Court will be

 7   hearing those things.  It's going to go to trial

 8   at some point, perhaps a year from now.

 9           And only time will tell whether, you

10   know, who proves right in terms of what Your

11   Honor is being asked to do today.

12           But those issues are engaged, and I

13   think it's a fair statement, just as Your Honor

14   was convinced that the Trustee should not have

15   approved the settlement with our client, based on

16   all the evidence that Royal brought up from the

17   Tennessee litigation without our participation.

18           Well, Your Honor, the same can be

19   said going the other direction.  So we didn't

20   bring that show to Your Honor, because quite

21   frankly, they didn't -- we didn't have the six or

22   seven weeks that Royal had when the Trustee filed

23   the motion as to our settlement.

24           So you really have a remarkable
```

113

1    mirror image as to what Royal knew, what it

2    didn't know.  And is there any basis for a

3    510(c)?

4            That ought to, with all respect,

5    have some seed of doubt that I think doesn't meet

6    the lowest range.

7            THE COURT:  Well, seed of doubt, I

8    mean, you know, yeah, I've got seeds of doubt all

9    over the place.  But he doesn't have to make a --

10   very much of a showing.  That's my point.

11           I mean, is the burden -- does he

12   have to get rid of all my seeds of doubt?

13           MR. KORTANEK:  Your Honor, that's a

14   poorly chosen phrase.

15           THE COURT:  But I mean --

16           MR. KORTANEK:  Your Honor --

17           THE COURT:  It's not my judgment,

18   would I do this?  It's his judgment measured by

19   the lowest end of the spectrum of reasonableness,

20   isn't it?

21           MR. KORTANEK:  Well, that's what

22   we've always thought, Your Honor.  And in fact,

23   you know, what Your Honor saw on the settlement

24   for our claim, although I was excluded from the

114

1    courtroom, was an awful lot of evidence with no

2    testimony from Royal.  Documents that were taken

3    out of context.

4              Where you are today is at least

5    we've had live testimony.  And through that

6    testimony, I think the most important tool in

7    dealing with the Royal claim has been that that

8    stone has been left completely unturned.

9              That's more than a seed of doubt.  I

10   don't think that passes muster as even satisfying

11   the lowest range of reasonableness under the

12   standard that Your Honor is supposed to apply.

13             Because even a partial

14   subordination -- if we're only talking about 10

15   million, or 20, or 30 in other claims, a partial

16   subordination of a half a billion dollar claim of

17   a few million -- few million dollars would mean

18   that those dollars go to other creditors first,

19   and then the rest can go to Royal.

20             As I understand the economics of

21   this deal, even leaving the three million on the

22   table, Royal's taking back 90 percent of it.  I

23   may be missing something, but that's how I see

24   it.

115

1          THE COURT:  Well, if there's -- I

2    don't see that at all.  I think it's 90 percent

3    of what's left as long as it's not -- and it's

4    only up to a million nine, and then they get --

5          MR. KORTANEK:  I can be corrected on

6    that.  I know they have the million nine

7    superpriority, but the three million typical bank

8    deal.

9          THE COURT:  Let me ask you, counsel:

10   You seem to think that -- you were very concerned

11   in your objection about the timing of this thing,

12   yet, you haven't honored that today.  And at

13   least two creditors, maybe more if they file

14   their statements, as they should have already

15   done are objecting.

16          Why do you think that is?

17          MR. KORTANEK:  Well, I asked the

18   witness, Your Honor, candidly.  I asked the

19   witness how much of a factor the time was to the

20   Trustee.

21          And I was going to get to that.

22   It's a tertiary argument.

23          I think it's clear from the motion,

24   Your Honor, that a very significant reason for

116

```
 1    filing it when they're filing it is they need a

 2    war chest.

 3              THE COURT:  You already heard, but

 4    he also said he just filed -- he's already filed

 5    more than 60 lawsuits.

 6              MR. KORTANEK:  That is right, Your

 7    Honor.

 8              THE COURT:  And that there's money

 9    in the estate.

10              MR. KORTANEK:  That's right.  I'm

11    not making that my first argument.

12              I still think the timing is suspect.

13    I don't think it's an issue.

14              THE COURT:  But I'm not suspect of

15    the timing.  I understand -- I get the sense that

16    you felt that things would be different and more

17    people would object if there was more time.

18              And I mean, I haven't seen any

19    creditor file a motion asking for more time.

20    I've only seen two out of the hundreds of

21    creditors even taking the interest to show up.

22              Now, is there something misleading

23    about the notice?

24              MR. KORTANEK:  For -- Your Honor,
```

117

1    for a settlement that's been negotiated for six

2    months, for a settlement that the story of the

3    case will tell, it has virtually changed the case

4    in a remote fashion.

5              THE COURT:  My view is somewhat

6    different than yours.  I see the Trustee spending

7    a very significant amount of time and energy

8    duking it out, very preliminary grounds with

9    Royal with no focus on other things.

10             And you may not have seen it all,

11   but it's -- I mean, it's been a war of attrition

12   on both sides.

13             And I understand why the Trustee

14   would like to get on with other things,

15   particularly, and I have no reason to disbelieve

16   them.  If their evaluation of the litigation was

17   what he said it was, I don't know why I should

18   disbelieve that.

19             MR. KORTANEK:  Well --

20             THE COURT:  I mean, I'm concerned,

21   510(c), that maybe he could have squeezed a

22   little more out of Royal.  You know, that's his

23   judgment, not yours.

24             MR. KORTANEK:  Well, that's right,

118

1   Your Honor.  Although, respectfully, I don't

2   think he exercised any -- I think that's what the

3   evidence shows on that point, because he

4   didn't -- he did not analyze if he were -- had

5   any chance of success on the aiding and abetting

6   claims as he said, whether that would dovetail

7   into any 510(c).  So I don't think that's there.

8              And Your Honor, that's essentially

9   our argument, and we'll sit down.

10             Thank you.

11             THE COURT:  Thank you.

12             MR. STERN:  Your Honor, he

13  articulated the objections.  I won't repeat them.

14             I think what really -- what really

15  stood out in the testimony of the Trustee and

16  what bothered me most about the settlement is the

17  fact that it was clear that it wasn't -- was a

18  war of attrition.

19             That's something that motivated the

20  trust at the -- to do the settlement.  We all

21  understand that.

22             THE COURT:  It's part of litigation.

23  It's part of litigation.

24             MR. STERN: I question why the trust

119

1    didn't seek out other alternatives.  If the

2    Trustee thought it was too costly, too expensive

3    to handle it, didn't have the manpower or

4    whatever, I would say that prudence dictates the

5    minimum level that you see, if there's any other

6    alternatives.

7            The Trustee clearly testified that

8    he didn't consider offering this case to another

9    counsel who might be competent, who might be able

10   to handle it, who might have the capacity and the

11   resources to duke it out and benefit the estate.

12           What we've done here is it's a

13   capitulation to the 800-pound gorilla, with all

14   due respect, because they had the resources to

15   beat the Trustee based on their ability to fund

16   it.  And it was clear through the Trustee's own

17   testimony that, you know, he's called it a day.

18           Now, that may have been prudent for,

19   on his standpoint, to say, hey, you know, I

20   really have had enough of this litigation, but

21   from the standpoint, the bigger picture, and I

22   believe, and Your Honor, I represent many of the

23   schools here on 93 that I filed, and I will file

24   the statement, there is no litigation pending.

120

1          We are -- we represent the unsecured

2     creditors.  We have several million dollars in

3     claims.

4          I've been following the bankruptcy

5     since the Chapter 11 was filed.  I have not taken

6     a proactive stance, because there's nothing that

7     had to be done.

8          But, ultimately, we are, at the end

9     of the day with this big claim against Royal, and

10    there's really no benefit to the estate.  And

11    then Royal now calls the shots.

12         I think it is -- and I know Your

13    Honor had ruled.  I'll just add one more point.

14         If there was some oversight to the

15    delegation aspect that I feel more comfortable,

16    but what we have, in effect, is Royal's ability

17    now to sue whoever they want, when they want, and

18    to use the Bankruptcy Court as a forum for that.

19         Now, because they're 90 percent of

20    the unsecured claims, they have the most benefit

21    available.  I think the Court should have some

22    oversight over that.

23         I think that it should be noticed to

24    all the unsecured creditors that the Trustee has

121

1    been presented a claim to pursue, and the Trustee

2    has decided to delegate that.  And we should

3    know, as unsecured creditors, what the terms and

4    conditions of the agreement are.

5           You know, it could be that Royal

6    spends millions of dollars in that claim

7    defending, and we have another administrative

8    claim that we have to deal with.  There are no

9    checks and balances.

10          There is a complete delegation

11   responsibility.  I believe that Royal's counsel

12   said that, to the extent that there's any

13   obligation to seek Court approval, it only

14   applies to Paragraph 2.

15          I would ask Your Honor to consider

16   applying those same provisions to Paragraphs 7

17   and 11, which would then give the creditors a

18   fighting chance of at least knowing what's going

19   on.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22   Mr. McMichael.

23          MR. McMICHAEL:  Your Honor, as a

24   matter of basic litigation strategy, I think it's

122                                          )

1    obvious why we cannot put on the open -- in the

2    open record the amount that we have agreed to

3    with Royal, by which we can give up Royal's

4    claim, knowing that would be a significant

5    litigation disadvantage.

6              And we have those agreement letters

7    here, and I have prepared an envelope to file

8    them under seal, and would request that the Court

9    permit me to file them under seal for the Court's

10   inspection.

11             THE COURT:  I will take them, but I

12   don't recall off hand whether there's a

13   requirement that you file a motion under the                    )

14   local rules.

15             THE CLERK:  Yes.

16             THE COURT:  Give them to me.  File

17   your motion tomorrow.

18             MR. McMICHAEL:  Yes, sir.  These

19   letters would be addenda to Exhibit A to our

20   settlement agreement, and are part of it.

21             And they relate to Paragraph 6 and

22   to Paragraph 8.  Let me just point out the effect

23   of them, though.  It's less than meets the eye.

24             In Paragraph 6, if we reach a

123

1   certain threshold of either recovery of

2   settlement of the claims against Pepper, we, the

3   Trustee, can bind Royal to it, so that Royal's

4   claims are settled at the same time.  If we

5   don't, it doesn't mean we can't litigate with

6   Pepper, and achieve whatever recovery we can

7   achieve.

8         It doesn't mean we can't settle.  We

9   can still settle.

10       We just couldn't settle by giving up

11   Royal's claim.  That's all that really amounts

12   to.

13       Paragraph 8, same thing.  We can

14   object to admin claims in the Chapter 11, and

15   have those allowed or disallowed as the Court

16   sees fit, or we can settle them.

17       And what Paragraph 8 says simply is

18   if we settle them for a certain amount or less,

19   Royal will give up its claim.  If Royal doesn't

20   give up its claim, we have the right to object to

21   the claim as well as any other claim.  Nothing is

22   given up there.

23       So I would submit that these are --

24   it is important for these things to not be on the

124

1    record at the same time.  They're not as

2    important as our adversaries would make them out

3    to be.

4              By the way, Your Honor, I am -- and

5    we're happy to file a motion tomorrow morning.

6    I'm advised by my local counsel that under Rule

7    9013, we can move orally in Court for permission

8    to file a document under seal.

9              THE COURT:  You may be able to, but

10   I don't --

11             MR. McMICHAEL:  That's fine.

12             THE COURT:  Oral motions are very

13   hard for people to read on the record.

14             So file a motion, and I will deal

15   with the motion.

16             But I -- you know, it's one thing to

17   have a signed agreement with good litigation

18   strategy protection, but I don't think that the

19   same applies to the Court entering orders.

20             MR. McMICHAEL:  Very well.

21             THE COURT:  Let me ask you a

22   question, counsel.

23             MR. McMICHAEL:  Yes, sir.

24             THE COURT:  The basis for your

125

1    expedited motion was that this was the last

2    omnibus hearing before the expiration of the

3    two-year statute of limitations. But as I sit

4    here and listen to what I've been told, so what?

5         I mean, I didn't hear that there

6    were cases that couldn't be filed because the

7    two-year statute of limitations was about to

8    expire, nor have I heard anything today that

9    tells me that.

10        MR. McMICHAEL: Your Honor, the

11    Trustee wasn't really asked that question. And I

12    didn't address it in my proffer, not thinking it

13    was an issue.

14        But the answer is this: The Trustee

15    has a broad range of claims that it believes

16    should be brought against many people. It has --

17    the Trustee has some money in the estate, but not

18    nearly enough to litigate those claims.

19        THE COURT: But not enough to

20    litigate them, but certainly to bring them?

21        MR. McMICHAEL: Yes.

22        THE COURT: I mean, the concern that

23    I have, I'm going to be very frank with you, is I

24    ruled on the delegation issue. I'm feeling a

126

1    little uncomfortable about it, I must tell you.

2              And I'm not sure that -- you know,

3    sometimes you've got to be careful what you wish

4    for.

5              MR. McMICHAEL:  Mm-hmm.

6              THE COURT:  If I'm wrong, and if

7    you're wrong, you're going to spend the next year

8    fighting the delegation battle, rather than

9    dealing with the rest of the case.

10             MR. McMICHAEL:  Right.  We can --

11             THE COURT:  I am --

12             MR. McMICHAEL:  I'm sorry.

13             THE COURT:  I'm wondering if you

14   guys want to think about whether you want to talk

15   amongst yourselves.  I understand everybody's all

16   excited behind you, but --

17             MR. McMICHAEL:  That happens.

18             THE COURT:  I understand.  But think

19   about whether maybe you want to try to, and maybe

20   Royal ought to, too, because they don't want to

21   fight this battle and find out a year from now

22   that I was wrong, and you were wrong to ask me,

23   to give me the opportunity to be wrong.

24             Because that's just another waste of

127

1    everybody's time and effort.  And maybe you ought

2    to think about that, because I have no reason to

3    disbelieve that they're going to ask for a stay.

4           They're probably not going to get it

5    from me, but they may well get it from someone

6    else in this building.  And whether you want to

7    fight that battle, and whether you want to just

8    try to accommodate what their concerns are.

9           And I'm particularly concerned about

10   the potential types of disinterested issues that

11   you end up with, and the analogy of the 327(e).

12          And the disinterested standard is

13   one.  I mean, I'm going to review this any way.

14          I'm not going to decide this today.

15   But whether you really want to just put this on

16   for perhaps the next time I'm here, and consider

17   whether you want to try to craft some, perhaps

18   insignificant in the real world, modifications in

19   the agreement, but ones that might accommodate

20   and deal with those particular issues.

21          MR. MCMICHAEL:  I'll do it.

22          MR. ASTIN:  Your Honor, before you

23   rule --

24          THE COURT:  I'm not going to rule.

128

```
 1              MR. ASTIN:  Just a moment with
 2    Mr. McMichael?
 3              MR. McMICHAEL:  He wants to make
 4    sure I don't say anything really stupid.
 5              THE COURT:  He wants to tell you
 6    what they've been negotiating while you've been
 7    talking.
 8              (Following a discussion held off the
 9    record:)
10              MR. McMICHAEL:  No.  Your Honor's,
11    suggestion that we think about this is exactly
12    the right suggestion.
13              The good news is we already did
14    that, and we did it while other things were
15    happening in the courtroom.  And we can solve the
16    problem right here.
17              The only case as to which there is a
18    current issue concerning delegating to Royal the
19    ability to bring on behalf of the estate is CDI,
20    DDI, Mr. Kortanek's client.  The Trustee will
21    simply bring that case.
22              It won't be an issue.  The reason
23    that we were doing it this way was because we
24    felt since we had tried to settle the case, and
```

129

```
1    the Court has overruled us on that, and we accept

2    the Court's ruling.  And that's the basis for

3    which we now go forward.

4              That is our foundation.  We thought

5    that under those circumstances, it might be less

6    awkward for Royal to do it, but it's not really a

7    significant matter.  And we're happy to do it.

8              So there will be no other

9    delegation, unless the Trustee decides not to

10   bring a claim, or Royal wants to bring it.  And

11   the Court can take that up when, and if, it

12   happens.

13             THE COURT:  But that's what I

14   thought it was, but it's not.  Apparently,

15   Paragraph 2 is different than Paragraph 7.

16             MR. McMICHAEL:  Well, Paragraph 2

17   isn't going to happen unless the Court agrees to

18   it.

19             THE COURT:  But what I'm

20   suggesting -- it's late.  We are all tired.

21             What I'm suggesting is take a look

22   and see whether you can make everybody happy and

23   accomplish what you want.  And take a few days,

24   if necessary, talk to the other side, look at
```

130

1   this whole new world.

2            You guys are sitting on the same

3   side of the table.  Maybe you can sit on the same

4   side of the table with them.

5            I will rule if I have to.  What I'd

6   like you to do is submit to me a black lined with

7   whatever you decide you want to do that modifies

8   the term sheet that's there.  I think in spite of

9   the fact that I think everybody's acting in good

10  faith, your agreement says the term sheet's got

11  to be signed.  I think it should be signed.

12            MR. McMICHAEL:  The agreement?

13            THE COURT:  The modifications don't

14  have to be in writing.  I'd feel better if I'm

15  approving something that at least both sides have

16  signed off on.

17            Take a few days.  I'm going to take

18  this under advisement.  I'm going to await a

19  black lined from you with whatever amendments you

20  want, and then I will rule if it's necessary.

21            If you resolve the issues, or if you

22  think you've accommodated things, just black line

23  it.  I'll look at them, and I'll give you my

24  ruling.

1          I will tell you that I'm not

2     troubled by the 510(c) issue.  I think that I'm

3     satisfied with the economics of the transaction.

4          I'm prepared to approve it on the

5     basis that it does not, or it reaches at least

6     the lowest -- what's the exact words?  I forget.

7          I don't want to misstate this.  The

8     lowest end of the spectrum of reasonableness, I

9     think you've satisfied me on that.  It's these

10    other issues that are raised, and that raise real

11    issues.

12          Now, I think I'm right on the

13    delegation issue, but you know, I've been

14    reversed before.  I know that may be shocking to

15    you.

16          But I don't want to put you through

17    another year, a year and a half of unnecessary

18    litigation if a couple of corrective points

19    that -- and I'm not trying to interject myself

20    into the Royal litigation.  I mean, if you can't

21    resolve it, if there's no change to the

22    agreement, just submit a signed agreement, and I

23    will rule.

24          Okay.

132                    )

1              MR. McMICHAEL:  Your Honor, that's

2    fine.  And we will be guided by what the Court

3    wants, and we'll do that.

4              I have two observations, though,

5    that -- just so I am accurately communicating

6    with the Court on these subjects.

7              The first is the statute of

8    limitations is not an unimportant date for us,

9    because it effects Mr. Stanziale's judgment as

10   to --

11             THE COURT:  So when is it?  What day

12   is it?

13             MR. McMICHAEL:  It's November 3rd.          )

14             THE COURT:  Oh, that's light years

15   away.

16             MR. McMICHAEL:  It's next week.

17             THE COURT:  Well, is that before or

18   after the parade in Boston?

19             MR. McMICHAEL:  It will be after the

20   parade in Boston.

21             THE COURT:  You can skip the game

22   and do it tonight.  I don't really care.

23             Get me something.

24             MR. McMICHAEL:  We will.  We will.

133

1          THE COURT:  You will have a ruling.

2    You get me materials, you'll have a ruling.

3          What's the 3rd?

4          MR. McMICHAEL:  The 3rd is next

5    Wednesday.

6          THE COURT:  Okay.

7          MR. McMICHAEL:  Okay.  We will.

8          THE COURT:  I'm here all day

9    tomorrow if you want to submit something

10   tomorrow.

11         MR. McMICHAEL:  We will.

12         THE COURT:  Fine.

13         MR. McMICHAEL:  We will.

14         My second question is -- I think

15   Your Honor has answered it -- we don't need to

16   have another hearing.  We need to submit --

17         THE COURT:  Not unless you think,

18   after due consideration, that you need another

19   hearing.

20         MR. McMICHAEL:  Okay.

21         THE COURT:  You know, the

22   probability of you getting another hearing

23   between now and the 3rd is low.  If you think

24   there's a need for another hearing, then you will

134

1    tell me.

2              MR. McMICHAEL:  We don't think

3    there's need for another hearing.  In fact, we

4    prefer there not to be one for wanting to get

5    this resolved before the 3rd for obvious reasons.

6              So we know we have this deal that

7    will -- in place before we dive head first into a

8    large pool of litigation.

9              THE COURT:  Fine.

10             MR. McMICHAEL:  That is all right.

11   I think that's all we have today on this issue.

12             THE COURT:  That takes care of the

13   matter.  We took -- the small matter, we took out

14   of order.

15             You gentlemen are excused if you

16   want to.  We have several other matters.  Don't

17   run away.

18             MR. STANZIALE:  May I make it clear

19   to the Court that, as Trustee, I am going to

20   pursue the action against CDI, DDI.  I'm not

21   going to delegate that right to Royal.

22             Royal understands that, and Royal

23   agrees with that.

24             THE COURT:  Well, put it in the

135

1    agreement.

2            MR. STANZIALE:  Okay.  I just wanted

3    the Court to understand.

4            THE COURT:  Fine.  I appreciate

5    that, and I understand that.

6            All right.  I'm going to exercise my

7    extensive powers and defer -- there are no

8    objections, is that true, to the fees anymore?

9    Although there was a continuance to give Royal an

10   opportunity to get further information.

11           MR. ASTIN:  That's correct, Your

12   Honor.  Three --

13           THE COURT:  Do you have orders for

14   me?

15           MR. ASTIN:  I have orders.

16           THE COURT:  Does anybody want to be

17   heard on those fee applications in opposition to

18   them?  Fine.

19           Give me your orders.

20           MR. WOLFSON:  Your Honor, we

21   resolved the fee application and have agreed just

22   to a 20-percent hold back.  And on that basis --

23           MR. ASTIN:  Your Honor, I have 10

24   seconds on what we've agreed to.

136

```
 1              THE COURT:  Go ahead.
 2              MR. ASTIN:  We have all made
 3    reductions by agreement with the U.S. Trustee or
 4    otherwise.  These orders will all reflect that.
 5              We've agreed that we go with a
 6    20-percent hold back on this application.
 7              THE COURT:  Is that in the order,
 8    too?
 9              MR. ASTIN:  That's in the order.
10    Then we're going to file at a hundred percent
11    several months.
12              THE COURT:  All right.
13              MR. ASTIN:  We're going to also put
14    another motion on, so that going forward
15    beginning about November, we'll start going with
16    an 80-20 hold back, if Your Honor signed that
17    order.
18              That's all I have.
19              THE COURT:  Very well.  Okay.
20              So five is under advisement.
21              Just put them over there with the
22    fees.  We'll deal with them tomorrow.
23              The motion to prove the settlement,
24    MBIA and Wells Fargo.
```

137

```
 1              MR. ASTIN:  There are no objections,
 2    Your Honor.
 3              MS. AUERBACH:  We have a slightly
 4    revised order.
 5              THE COURT:  Give me the order.  I'll
 6    take care of it tomorrow.
 7              What's that?
 8              MR. ASTIN:  Your Honor, we have the
 9    motion to quash, which Ms. Auerbach is handling,
10    which is not resolved.
11              THE COURT:  Okay.  Let me just put
12    these things aside.
13              MR. WINTER:  Your Honor, good
14    evening.  Chris Winter with Duane Morris.
15              Your Honor, I'm here for McGladrey &
16    Pullen and RSM McGladrey, Inc., and I'd like to
17    introduce the Court to Veronica Rendon of Thelen,
18    Reid & Priest.
19              We have filed papers for her
20    admission pro hac vice.  I'd like to supplement
21    that now with an oral motion.
22              THE COURT:  Go ahead.  Welcome,
23    Ms. Rendon.
24              MS. RENDON:  Thank you, Your Honor.
```

138

1   And I'll try to go as quickly as I can in light

2   of the hour that we're at.

3           THE COURT:  We've got an hour and 18

4   minutes.

5           MS. RENDON:  Okay.

6           THE COURT:  An hour and 38 minutes.

7   Security people might not think so, though.

8           MS. RENDON:  That's fine.

9           MR. WOLFSON:  Do you have tickets to

10  game five or not?

11          THE COURT:  Actually, I have tickets

12  to game six, and I'm prepared to -- they're

13  available for a small premium now.

14          MS. RENDON:  I'm guessing this is

15  not the right time to say I'm from New York, and

16  I'm a Yankees' fan.  So I won't.

17          THE COURT:  We all have our crosses.

18  I've been carrying one around for 60 years.

19          MS. RENDON:  Good luck.  Actually

20  I'm rooting for the Sox.

21          I'm here on behalf of McGladrey &

22  Pullen and RSM McGladrey's motion, emergency

23  motion to quash a subpoena that was served by

24  Royal on the bankruptcy Trustee, in which Royal

139

1    is seeking documents.

2              I'm just going to call them

3    McGladrey, and have that term cover both

4    McGladrey & Pullen, and RSM McGladrey, Inc. just

5    for the Court's convenience.

6              But we're here to quash the subpoena

7    that Royal served on the Bankruptcy Trustee in

8    which Royal is seeking the documents that

9    McGladrey made available to its Trustee earlier

10   this year.

11             And the basis for our objection

12   is -- there are a number of bases for our

13   objection.  The first is that the subpoena was

14   issued in a procedurally improper manner.

15             It was issued with too short notice.

16   There was less than 48 hours' notice given for

17   the subpoena.

18             THE COURT:  All right.  So let's --

19   if I was prepared to deny it on that, they'd

20   issue a new one.  Let's not spend a lot of time.

21             MS. RENDON:  It was not done on

22   notice.  But most importantly, Royal does not

23   have standing to have issued the subpoenas.

24             The basis for the issuance,

140    )

1    according to Royal's paper and the Trustee's

2    submission, is the settlement that the Court is

3    considering today.  Obviously, that settlement

4    was not in place when the subpoena was issued,

5    and it's still not in place.

6        So to the extent that the mechanism

7    from which Royal is standing to have issued the

8    subpoena, Royal doesn't have standing to have

9    issued that subpoena.

10        Secondly, the subpoena violates a

11    confidentiality agreement that McGladrey entered

12    into with the Trustee.  And I'll give you some

13    additional factual background on that.    )

14        But let me just outline quickly

15    that -- all the three bases for our objection.

16    And then our most substantive objection, going

17    past procedural issues, I think dovetails very

18    much with the Court's express concerns or some

19    concerns that the Court has about delegation to

20    Royal.

21        I think it's clear, and again, I'll

22    give you some factual background to support the

23    assertion I'm about to make, that the subpoena

24    issued by Royal is really an attempt to obtain

141

1    improper pre-claim discovery against McGladrey,

2    relating much more to a civil lawsuit that Royal

3    is contemplating against McGladrey, having

4    nothing to do with any type of action that the

5    estate would like to bring against McGladrey.

6              And let me explain that a little bit

7    further by giving you a factual background here

8    about the circumstances surrounding the issuance

9    of the subpoena.

10             Back in January of 2004, the Trustee

11   approached McGladrey asking for our documents.

12   McGladrey had acted as one of the accountants and

13   auditors for Student Finance Corporation for a

14   number of years.

15             Given the Trustee's broad 2004

16   powers --

17             THE COURT:  I'm sorry.  I was trying

18   to ask parties over there to quiet down, so that

19   I could hear you better.

20             MS. RENDON:  I have enough children,

21   I'm able to tune that out.

22             But thank you.

23             THE COURT:  But my children are

24   grown up.  I'm not as used to it as you, perhaps.

142

1           MS. RENDON:  Okay.  Given the

2     Trustee's broad 2004 powers and understanding

3     legitimacy of the Trustee's request to see our

4     documents, we were agreeable back in January 2004

5     to providing our documents to the Trustee.  We

6     only placed one condition upon providing our

7     documents to the Trustee, and that was that we

8     wanted to protect against third parties being

9     able to go directly to the Trustee to seek our

10    documents, instead of those same third parties

11    coming to McGladrey & Pullen to seek those

12    documents.

13           The reason why we had that type of

14    concern back in January of 2004 is we were aware

15    at the time of the number of civil litigations

16    that were pending that involved Student Finance

17    Corp., including the Royal and MBIA litigation

18    that was pending in which Your Honor well knows

19    at this point involves big numbers, over $500

20    million.

21           And because we were concerned that

22    Royal or MBIA might try to circumvent coming to

23    McGladrey to seek our documents and may go right

24    to the Trustee.  We asked the Trustee to enter

143

1  into a confidentiality agreement with McGladrey,

2  in which we would protect against and ensure that

3  the Trustee would provide McGladrey with notice,

4  and an opportunity to intervene and object if a

5  third party were, in fact, to come to the Trustee

6  and seek our documents from the Trustee as

7  compared to coming to McGladrey directly.

8          We explained our concerns to the

9  Trustee, and back in February, on February 6th,

10  2004, the Trustee entered into a confidentiality

11  agreement with McGladrey to protect against

12  third-party access to our documents without us

13  having notice and an opportunity to intervene.

14          And Your Honor has a copy of that

15  confidentiality agreement.  It was attached as

16  Exhibit 2 to the affidavit of Richard Swanson,

17  which was submitted in support of our motion to

18  quash.

19          The clear purpose of the agreement

20  was to provide McGladrey with notice and an

21  opportunity to respond to any third-party request

22  for our documents.  And what Your Honor will see,

23  if you review that agreement, is that if, in

24  fact, a third party made a formal request for our

144

1   documents through notice motion or a subpoena to

2   the Trustee, the Trustee agreed to provide

3   McGladrey with notice of that subpoena and an

4   opportunity to object, to intervene and object.

5           THE COURT:  Which is why you're here

6   today.

7           MS. RENDON:  That's right.

8           If, on the other hand, a third party

9   came to the Trustee on an informal a verbal

10  basis, and requested our documents, the Trustee

11  agreed to provide McGladrey with notice of that

12  informal request, and agree that if McGladrey

13  requested that the Trustee go back to a third

14  party and ask that that request for documents be

15  made formal and be put in a formal written

16  notice, so that, again, McGladrey would have the

17  opportunity to intervene and object.

18          In entering into the confidentiality

19  agreement, the Trustee argued at this time that

20  there were too many limits being placed on

21  counsel's ability to utilize the McGladrey

22  documents, either in deposition or in Court

23  submissions.

24          So we added a paragraph into the

1   agreement confirming the Trustee counsel's right

2   to use our documents for those types of purposes.

3   And it's that paragraph that you'll see cited in

4   Royal's and the Trustee's opposition to our

5   motion to quash.

6           However, the manner in which they're

7   citing that paragraph is completely out of

8   context.  And tellingly, the way that they're

9   citing that paragraph, it leaves out the last

10  sentence of that paragraph, which again --

11          THE COURT:  Which paragraph is it?

12          MS. RENDON:  It is the second, Your

13  Honor.  It's the last large paragraph on the

14  second page.

15          It should be -- it's the second --

16  excuse me, the second substantive paragraph on

17  the second page of the letter agreement starting,

18  It should be noted.

19          THE COURT:  It should be noted.

20          MS. RENDON:  There it says that it

21  should be noted that in making this proposal, we

22  understand that the Trustee wishes to use the RSM

23  documents for the benefit of the estate without

24  limitation, and advanced notice is not requested.

146

```
 1              By that I read for such use, thus,
 2     we do not propose limiting the Trustee's right by
 3     using the RSM documents as documents -- as
 4     attachments to Court submissions or for
 5     disclosure to the estate.  Retained professionals
 6     agree to be bound by this letter or any other
 7     purpose that the Trustee determines would benefit
 8     the interest to the estate.
 9              And counsel for the Trustee and
10     Royal highlights that last clause of the
11     sentence.
12              However, in citing this paragraph to
13     Your Honor, they leave out the last sentence,
14     which really articulates the purpose that we
15     entered into the confidentiality agreement.  And
16     that sentence says, All we are seeking is
17     protection against disclosure to third parties in
18     the circumstances outlined in the third and
19     fourth paragraph above without our awareness and
20     our opportunity to respond.
21              Clearly, the intent of the agreement
22     was to provide McGladrey with a notice and an
23     opportunity to object and respond to any
24     third-party request for our documents that are in
```

147

1    the Trustee's possession.

2           Believing that we would have that

3    opportunity, on February 10th, 2004, McGladrey

4    made the documents available to the Trustee.  And

5    we did so, again, a second time on October 1st of

6    2004, after the Trustee agreed to be bound again

7    by our confidentiality agreement when they --

8    when they wished to review McGladrey's documents

9    for a second time.

10          On September -- on September 15th,

11   2004, the Trustee notified us that Royal had

12   verbally requested access to our documents that

13   were in the Trustee's possession.  Knowing that

14   Royal had just had a motion for summary judgment

15   or motions for summary judgment granted against

16   it in the MBIA civil litigation, and knowing that

17   that may well result in an excess of a $500

18   million civil liability for Royal, and not

19   understanding any legitimate purpose for Royal to

20   be seeking our documents, we told the Trustee

21   that we objected to Royal's request.

22          And pursuant to our agreement with

23   the Trustee, we asked the Trustee to go back to

24   Royal and have Royal make a formal written

148

1   request for our documents.  The express purpose

2   being so that we could intervene and object.

3            On September 22nd, pursuant to our

4   request, Ms. Auerbach, counsel for the Trustee

5   wrote to Royal, and made that request, that Royal

6   put its request for our documents into -- make

7   it -- put it into a formal written request.

8            At that time, Ms. Auerbach clearly

9   understood that McGladrey planned on objecting to

10  Royal's request for our documents.  We did not

11  hear anything further after September 22nd until

12  October 13th.

13           On that day at 6:40 p.m. in the

14  evening, we received a subpoena from Royal.  I

15  should say it's the Royal subpoena that was

16  addressed to the Trustee, and the Trustee

17  provided it to us at 6:40 p.m. on the night of

18  October 13th.

19           It requested production of

20  McGladrey' documents in the Trustee's possession.

21  It requested that the production of those

22  documents occur at 10 o'clock a.m. that -- the

23  following Friday, October 15th, less than 48

24  hours later.

149

1           Clearly, the manner in which the

2    subpoena was issued was designed to craft

3    McGladrey's ability to intervene and object to

4    the subpoena, notwithstanding the existing

5    confidentiality agreement, and notwithstanding

6    the fact that they were well aware of the

7    existence of the confidentiality agreement.

8           It was explained to us much earlier

9    that Ms. Auerbach -- Royal had been provided with

10   our confidentiality agreement and that they

11   understood the terms.

12          Still being at my desk at 6:40 at

13   night, because that's just life in New York, I

14   responded to Ms. Auerbach's Email, and the

15   subpoena from Royal.  And I notified Ms. Auerbach

16   by Email that we plan on objecting to the Royal

17   subpoena, because it was procedurally improper,

18   because Royal lacks standing to issue the

19   subpoena, and because we believed it was an

20   improper attempt to obtain pre-claimed discovery

21   for a civil litigation that Royal may wish to

22   pursue against McGladrey some day.

23          THE COURT:  Is there -- there is no

24   litigation pending between the estate and

150                                   )

1    McGladrey, is there?

2                MS. RENDON:  No.  In fact, I'll get

3    to that.

4                It's our understanding that the

5    estate, at least the estate represented by

6    Ms. Auerbach's firm, has no, absolutely no

7    intention of bringing a lawsuit against

8    McGladrey.  And I think I understand if the

9    estate were to attempt to do that, they would

10   face insuperable in pari delicto questions in

11   trying to make that type of claim.

12               But let me get to that in just a

13   moment.  If that's in pari delicto, when I wrote                 )

14   back to Ms. Auerbach, the note of October 19th, I

15   asked her in my Email to please confirm

16   consistent with the confidentiality agreement

17   that the Trustee would not produce our documents

18   to Royal until we had an opportunity to intervene

19   and object to Royal's request for our documents.

20               The next morning, October 14th, less

21   than one day after, with less than one day to go

22   before production was supposed to occur,

23   Ms. Auerbach Emailed me back to say they planned

24   on complying with the subpoena.

1          I called Ms. Auerbach later in the

2    day to inquire why it was that she was planning

3    on complying when I believed that was a clear

4    breach of the confidentiality agreement that had

5    been entered into between McGladrey and the

6    Trustee.  And I also -- and Ms. Auerbach's answer

7    was because she believed it would be a benefit

8    of -- a benefit to the estate to produce the

9    documents to Royal.

10          I asked Ms. Auerbach to explain how

11    the would be of benefit to the estate, and she

12    said that she couldn't say anything further

13    except that it would be consistent with the

14    Trustee's settlement with Royal.

15          When I told her I was not aware of

16    any kind of settlement with Royal, could she

17    explain that to me, and explain the terms of the

18    settlement to me, she said -- she said that she

19    couldn't tell me anything further, that it was --

20    it should be on the public docket, and that she

21    had probably already told me too much.

22          We believe Royal's subpoena is

23    simply an attempt to obtain improper pre-claim

24    discovery for a civil lawsuit that has absolutely

152

)

1    no bearing on the interest of the estate.

2            Let me tell you initially why we

3    think that's clear.  On October 14th, having

4    received the Royal subpoena, my partner Richard

5    Swanson contacted Mr. Gilbert and counsel for

6    Royal to talk about Royal's request for our

7    documents.

8            Mr. Swanson, in the course of that

9    conversation, asked Mr. Gilbert what he believed

10   the benefit to the estate would be for Royal to

11   obtain our documents.

12           Mr. Gilbert refused to respond to

13   that inquiry.  My partner, Mr. Swanson, also

14   asked Mr. Gilbert whether Mr. Gilbert would agree

15   to accept McGladrey's documents pursuant to a

16   protective order, pursuant to which an ethical

17   wall would be erected between people at Royal who

18   are interested in pursuing estate claims, and

19   people at Royal who would be interested in

20   pursuing civil litigation claims against

21   McGladrey.

22           Tellingly, Mr. Gilbert refused that

23   request, as reasonable as it was.  It's clear to

24   us, based upon our conversations with

153

1    Ms. Auerbach and Mr. Gilbert, that Royal is

2    trying to use the settlement or the proposed

3    settlement with the Trustee to obtain our

4    documents.

5            But even were a settlement to be in

6    place, there's no legitimate reason for Royal to

7    be obtaining our documents.  In its opposition

8    papers to our motion to quash, Royal allowed the

9    necessity of exploring claims against McGladrey.

10   Yet, the Trustee has had our documents for over

11   eight months for exactly that purpose.

12           And the Trustee has clearly

13   indicated to us that, and said that it has

14   absolutely no intention of seeking any claims

15   against McGladrey.  Those statements were made by

16   Mr. Derrick Dyer in a letter to me in connection

17   with our second production of documents to the

18   Trustee.

19           And in that letter, Mr. Dyer

20   clarified that the reason why the Trustee wanted

21   to review our documents was not to investigate

22   claims against McGladrey, but rather to

23   investigate claims that the Trustee was likely

24   going to make against Pepper Hamilton.

154

1          Following that, Ms. Auerbach wrote

2     back and softened Mr. Dyer's letter.  But in a

3     conversation that I had with Ms. Auerbach, she

4     clearly stated to me that there was no current

5     intention of bringing a claim against McGladrey,

6     and likely never would be.  She simply could not

7     make that official, because it would be

8     inappropriate, given the procedural stance of the

9     case.

10          The terms of the settlement and

11     everything we heard today indicates that

12     McGladrey is not being considered for a lawsuit,

13     and with good reason.  The estate would clearly

14     face insuperable in pari delicto -- in pari

15     delicto problems if it were to attempt to claim

16     against McGladrey.

17          As Mr. Stanziale testified today,

18     their allegations are fraud all over the place,

19     and it's a fraud that was committed by

20     Mr. Yao.

21          And if that's the case, the estate

22     cannot sue McGladrey for not having caught that

23     fraud without facing an insuperable in pari

24     delicto case.

155

```
 1              THE COURT:  I don't have to decide
 2    that today, do I?
 3              MS. RENDON:  I think you're right.
 4              THE COURT:  I mean, the estate's got
 5    the documents.  You have no problem -- I gather
 6    you knew that there was a possibility that they
 7    might sue you and use those documents.
 8              MS. RENDON:  That's correct, Your
 9    Honor.
10              THE COURT:  I mean, you took that
11    risk.
12              MS. RENDON:  Yes.
13              THE COURT:  Which what you are
14    saying is you didn't take the risk that Royal,
15    acting on their own behalf, would have access to
16    those documents?
17              MS. RENDON:  I think --
18              THE COURT:  By way of the Trustee or
19    anybody else that might choose to sue you?
20              MS. RENDON:  That's exactly right,
21    Your Honor.  In fact, when we entered into the
22    confidentiality agreement, we were specifically
23    trying to guard against exactly that risk by --
24    and that is why we entered into the
```

156

1    confidentiality agreement, because we were not

2    willing to sign on for that risk.

3            We were certainly willing to

4    cooperate with counsel for the Trustee, though,

5    and Your Honor, it just appears so clear to us,

6    given Mr. Gilbert's unwillingness to enter into

7    the protective order, and given a complete

8    failure even as of right now to articulate a real

9    need for Royal to have our documents when the

10   Trustee has had them for eight months, and had

11   the ability to analyze them for our documents to

12   be made available to Royal.

13           And it's clear that Royal's 2004, as

14   broad as it is, cannot -- does have its limits.

15   It cannot be used to circumvent the requirements

16   of Federal Rules of Civil Procedure.

17           Rule 9016 of the Bankruptcy

18   Procedure Rules incorporates Rule 45, which in

19   turn is governed by rule, Federal Rules of Civil

20   Procedure Rule 26.

21           And under those rules, you cannot

22   take pre-claim discovery until after a claim is

23   filed.  Those types of concerns were raised in

24   the In Re:  Continental Forge case, in the In Re:

157

1    Enron case, in the In Re:  Nyder versus Society

2    Bank case.

3              And in all of these cases, Royal's

4    2004 requests for documents were turned down

5    because the belief was that they were really

6    trying to obtain information for interests

7    unrelated to the estate, but interests to further

8    a private litigation.  And that is clearly an

9    improper purpose of Rule 2004.

10             Each one of those cases I just cited

11   to Your Honor express the concern that Rule 2004

12   discovery cannot be used to circumvent the

13   safeguards of the Federal Laws of Civil

14   Procedure, and that is exactly what Royal is

15   attempting to do for all these reasons, because

16   Royal does not have standing to have issued the

17   subpoena, because it was improperly noticed,

18   because it wasn't done on a notice motion.

19             And most importantly, because the

20   subpoena is trying to be used to circumvent the

21   requirements of the Federal Rules of Civil

22   Procedure.  We respectfully request that the

23   subpoena be quashed.

24             Thank you, Your Honor.

158

)

1        THE COURT:  Thank you.

2        Royal.

3        MR. BICKS:  Good evening, Your

4    Honor.  John Bicks of Sonnenschein, Nath &

5    Rosenthal for Royal Indemnity.

6        Your Honor, obviously to hear the

7    presentation from McGladrey, you might lose sight

8    of a couple of the basic touchstones of the issue

9    that's really before you.

10        We are talking about documents that

11   are indisputably not privileged documents that

12   have already been produced to the Trustee.

13        THE COURT:  What right do you have                    )

14   to them?

15        MR. BICKS:  Your Honor, you heard a

16   lot of testimony today from Mr. Stanziale, a lot

17   of argument about Royal's willingness to step up,

18   put the money where its mouths is, and put almost

19   $5 million of seed capital into this estate.

20        And the principal purpose of that

21   settlement from the estate's perspective is it

22   gives the estate the ability to investigate

23   claimants, and it certainly is clear why

24   McGladrey ought to be concerned that the estate

159

1    might very well want to assert not only claims --

2         THE COURT:  But if this is an estate

3    claim, why does Royal have a right to these

4    documents?

5         MR. BICKS:  I think, were we not

6    before you, Your Honor, this afternoon also on

7    the motion to approve the settlement, whereby

8    Royal was going to act in partnership with the

9    Trustee, to help the Trustee.

10         THE COURT:  But even if that's the

11    case, this would be a Paragraph 7 action, if, in

12    fact, the Trustee determined not to bring the

13    action.

14         MR. BICKS:  It could qualify if the

15    Trustee chose not to bring the action.  That's

16    absolutely true.

17         THE COURT:  So you haven't any right

18    at the moment to bring an action on behalf of the

19    Trustee, do you?

20         MR. BICKS:  We don't have an

21    approved settlement.  Your Honor has taken it

22    under advisement.

23         THE COURT:  Even if I did, does the

24    approved settlement give you automatic right to

160

1    bring action?

2              MR. BICKS:  Only after the Trustee

3    takes a pass.

4              THE COURT:  And the Trustee hasn't

5    taken a pass.

6              MR. BICKS:  That is correct.  I

7    think it's also important that the record be

8    accurate, what the Trustee has done, and what the

9    Trustee has said and not said about what its

10   willingness is to --

11             THE COURT:  Well, I would assume --

12   I mean, whether the Trustee told them they didn't

13   think it was going to sue them at all, I don't

14   really care what at this point.

15             If you had a settlement and if the

16   provisions were triggered that you could bring

17   the action, maybe you might have the right to the

18   documents from the Trustee.  But we're not there

19   now, are we?

20             MR. BICKS:  We are not there in the

21   sense that two things have not happened, Your

22   Honor.

23             One, Your Honor has not approved the

24   settlement.

161

```
 1              And, two, the Trustee has not
 2    reviewed and taken a pass.
 3              The other issue that you have to
 4    look at, this whole issue, I think in fairness
 5    under the real life time line that we're
 6    currently presented with, and that is that next
 7    week certain statutes of limitation will arise
 8    and will bar or may bar.
 9              THE COURT:  Hey, I didn't create
10    that problem, gentlemen and ladies.  That date
11    was set two years ago, and you just got around to
12    settling your case.
13              You may have to bring your own
14    lawsuits.
15              MR. BICKS:  Understood.  I
16    understand Your Honor.
17              That may very well happen.
18              THE COURT:  That may be.  But what
19    you're telling me is that part of what you bought
20    is the right to get information from the Trustee
21    even before the settlement came before me.
22              MR. WOLFSON:  Your Honor --
23              THE COURT:  That I find a little
24    offensive, frankly.
```

162

1           MR. WOLFSON:  First -- first couple

2    of points.

3           Under 2004, I think that we, as a

4    creditor of the estate, have the absolute right

5    to try to review any and all documents that

6    impact the action, conduct, property of this

7    estate.  To the extent these documents impact the

8    act, conduct and property of the estate, I don't

9    understand counsel's point of view that we

10   have -- just because we might have some other

11   potential claims which we have not brought

12   against them, the fact that I might have another

13   potential individual claim doesn't mean that we

14   can't exercise our rights under 2004, and look at

15   the act, conduct, property of this estate.

16          That's point number one.

17          Point number two is we are trying to

18   cooperate with the Trustee.  We are trying to

19   work with the Trustee and understand where the

20   Trustee is coming out.

21          On the McGladrey issue, they have

22   not definitively said to us that they are or are

23   not going to bring the action, although clearly

24   they're leaning on not bringing it.  A good

1  portion of why they're leaning that way is

2  because of what we perceived may be a

3  misunderstanding of the in pari delicto defense

4  where, while it may be applicable under a 541

5  action, it is not applicable under a Section 544

6  action.

7          And we are working diligently with

8  the estate in order to enable the Trustee to

9  better understand our perspective.  This may be

10 an important asset of the estate for an estate

11 claim, not an individual creditor claim.

12         And to the extent it's an estate

13 claim, we just want to be able to have the

14 information.

15         THE COURT:  When does the statute of

16 limitations run?

17         MR. WOLFSON:  You have two -- my

18 understanding is you have two years to bring the

19 action from the commencement of the case.

20         THE COURT:  So it ends --

21         MR. WOLFSON:  November 3rd, it ends.

22 It ends next week.

23         So we have a couple of days.

24         THE COURT:  So that's why you felt

164

1    you could issue a subpoena on 36 hours' notice?

2              MR. WOLFSON:  We told them -- first,

3    we believe that this subpoena was issued.

4              THE COURT:  Why wasn't the subpoena

5    issued on them?

6              MR. WOLFSON:  Well, because --

7              THE COURT:  Why do you need the

8    Trustee if you truly are doing a 2004?

9              MR. WOLFSON:  Right.

10             THE COURT:  And you want somebody's

11   documents.

12             MR. WOLFSON:  Well, I can take a

13   2004 of a Trustee.

14             THE COURT:  Yeah, I know you can.

15             MR. WOLFSON:  That is what we're

16   trying to do.

17             THE COURT:  Yeah, but the Trustee --

18   you're putting the Trustee in the position of the

19   soft confidentiality agreement being entered and

20   now you're basically prostituting him by making

21   him give up those documents because of the

22   settlement.  The settlement isn't approved.

23             MR. WOLFSON:  I understand.

24             THE COURT:  And if you want me to

165

1   deny the settlement because you're doing an end

2   run around instead of going directly to the

3   source, you're very close to it.

4          MR. WOLFSON:  No, we don't.  We're

5   not basing our right to the documents on the

6   settlement.  Either they're approved or not

7   approved.

8          What we understood from the Trustee

9   who has said to us -- we have been collaborating

10  and working with the Trustee to try and get into

11  a better -- a better arrangement, so that we're

12  working cooperatively instead of at odds.  And we

13  have been sharing information.

14         We have been trying to share our

15  point of view.  They've been sharing their point

16  of view.

17         Of all the lawsuits out there, this

18  is one -- this is one potential lawsuit that

19  we've been exploring with them.  And what we

20  wanted to do is see what documents they're

21  looking at.

22         Now, yes, we understand there's a

23  confidentiality agreement.  We read the

24  confidentiality agreement, and candidly, we

166

1    thought that that confidentiality agreement

2    absolutely permits the Trustee in the context of

3    this sort of a collaboration, with or without a

4    settlement agreement, given it has the right to

5    share this sort of a document with another

6    creditor of the estate in order to help the

7    Trustee determine what to do on that action.

8            We asked for it.  And I believe my

9    understanding is that counsel for the Trustee

10    believes that that's the appropriate analysis of

11    that agreement, also.

12            But counsel for McGladrey objected,

13    and out of an abundance of caution, counsel for

14    the Trustee said, Look, we read this agreement.

15    We think we can give it to you.

16            We think McGladrey is making a big

17    fuss about it.  We don't want to get sued by

18    McGladrey, because we're giving you documents

19    that we thought we could.

20            So would you give us a subpoena?

21    That's how that came about.

22            And, yes, we are faced with a time

23    line by which the Trustee needs to decide whether

24    to bring a lawsuit, and with or without this