# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

ORIGINAL

In re:                        ) Chapter 7
                              )
STUDENT FINANCE               ) Case No. 02-11620(JBR)
CORPORATION,                  )
                              )
          Debtor.             )


                    Wednesday, October 27, 2004
                    4:10 p.m.
                    Courtroom 2A


                    844 King Street
                    Wilmington, Delaware



BEFORE:   THE HONORABLE JOEL B. ROSENTHAL
          United States Bankruptcy Court Judge



APPEARANCES:

              THE BAYARD FIRM
              BY:  DANIEL ASTIN, ESQ.

                 -and-

              DILWORTH PAXSON, LLP
              BY:  LAWRENCE G. McMICHAEL, ESQ.
              BY:  SHERYL AUERBACH, ESQ.
              BY:  DERRICK DYER, ESQ.

                 -and-

              SCHWARTZ, TOBIA, STANZIALE
              SEDITA & CAMPISANO
              BY:  CHARLES A. STANZIALE, JR., ESQ.
              BY:  JEFFREY TESTA, ESQ.

                 Counsel for the Trustee

```
 1    APPEARANCES CONTINUED:

 2

 3              ASHBY & GEDDES
              BY:  WILLIAM BOWDEN, ESQ.
 4
                   -and-
 5
              SONNENSCHEIN, NATH & ROSENTHAL
 6            BY:  PETER WOLFSON, ESQ.
              BY:  ALAN GILBERT, ESQ.
 7            BY:  JOHN BICKS, ESQ.

 8
                        Counsel for Royal
 9                      Indemnity Company

10
              YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
11            BY:  JOEL WAITE, ESQ.

12                 and

13            PROSKAUER ROSE, LLP
              BY:  MICHAEL FOREMAN, ESQ.
14
15                      Counsel for Wells Fargo/MBIA

16
              DEPARTMENT OF JUSTICE
17            BY:  DAVID L. BUCHBINDER, ESQ.

18                      Counsel for the U.S. Trustee

19
              KLEHR, HARRISON, HARVEY
20            BRANZBURG & ELLERS, LLP
              BY:  STEVEN K. KORTANEK, ESQ.
21
22                      Counsel for Commercial
                        Drivers, et al
23

24
```

```
 1    APPEARANCES CONTINUED:

 2

 3

 4           DUANE MORRIS, LLP
             BY:  CHRISTOPHER WINTER, ESQ.

 5                 -and-

 6           THELEN REID & PRIEST, LLP
             BY:  VERONICA E. RENDON, ESQ.
 7
                     Counsel for RSM McGladrey,
 8                   Inc., et al

 9

10           WOLF, BLOCK, SCHORR & SOLIS-COHEN, LLP
             BY:  BARRY M. KLAYMAN, ESQ.
11           BY:  DAVID E. STERN, ESQ.

12                   Counsel for Transport
                     Training, Inc., et al
13

14

15

16

17

18

19

20

21

22

23

24
```

1          THE CLERK:  All rise.

2          THE COURT:  You can be seated,

3    please.

4          THE CLERK:  This is the case of

5    Student Finance Corporation.  Case Number

6    02-11620.

7          MR. ASTIN:  Good afternoon, Your

8    Honor.  Daniel Astin of the Bayard Firm on behalf

9    of Charles Stanziale, the Chapter 7 Trustee in

10    the case.

11          Your Honor, what we would like to

12    do, and first, we thank you for allowing us to

13    take some extra time.

14          THE COURT:  If you could settle the

15    rest of them, I'll give you more time.

16          MR. ASTIN:  Well, we haven't been

17    that lucky.  But we think we have it narrowed

18    down, and it shouldn't be too much of a problem.

19          THE COURT:  I have nothing to do

20    until 8:19 tonight.

21          MR. ASTIN:  Glad to hear that.  What

22    we would like to do, Your Honor, is take one

23    matter out of turn.

24          We took to heart, all of us, all the

1    professionals in the case, your admonishment at

2    the last several hearings that we should get in a

3    room, and reach a settlement that makes sense for

4    the case, and is designed to maximize the

5    recovery of creditors.

6              We think we've done that.  We'd like

7    to start off with the motion to approve the

8    settlement with Royal.  If Your Honor would

9    proceed in that way, I'd turn the podium to Larry

10   McMichael, who's special litigation counsel from

11   the Dilworth firm to present on the motion on

12   behalf of the Trustee.

13             THE COURT:  That's fine.  Take

14   Number 5 on the agenda first.

15             MR. ASTIN:  Thank you, Judge.

16             THE COURT:  Mr. McMichael, go ahead.

17             MR. McMICHAEL:  Yes.  Good

18   afternoon, Your Honor.

19             Lawrence McMichael from Dilworth

20   Paxson, LLP in Philadelphia.  We are special

21   litigation counsel to Mr. Stanziale, the Trustee

22   in this case.

23             As Mr. Astin pointed out, we think

24   this is a very important settlement and an

1  important benchmark for this case to move it

2  forward in an orderly manner and an efficient

3  manner.  We have a brief presentation on the

4  merits of the settlement, which in accordance

5  with local practice, if it's acceptable to the

6  Court, I would present by proffer and then

7  present Mr. Stanziale for any cross-examination

8  or any questions that the Court may have.

9         THE COURT:  That's fine.  Go ahead.

10        MR. McMICHAEL:  Mr. Stanziale, if

11  testifying in support of the settlement, would

12  first describe his background.

13        He's been practicing law for 38

14  years.  He has been a practitioner in the

15  bankruptcy insolvency area for the same 38 years.

16  And he is a panel Trustee in this district, as

17  well as in the District of New Jersey.

18        He has presided as a Trustee in over

19  50 cases that are asset cases, not counting no

20  asset cases where they're routine appointments.

21  Among those 50 cases were several cases of

22  comparable size and magnitude to this case.

23        And if asked for some examples, he

24  would point to the Tower Air case where he served

7

1  as a Trustee for an operating airline that

2  ultimately liquidated, had international

3  operations, had debt of 350 million or so.

4          He also served as the Chapter 7

5  Trustee for a case, actually a case in which I

6  met him, a case called MUMA Services.  M-U-M-A,

7  it's an acronym.

8          It's a case involving the businesses

9  of a gentleman named Thomas Holt, Sr., who

10 operated a steam ship line.  The business is --

11 operated a steam ship line providing cargo

12 services, and some significant marine terminal

13 operations.  Total debt in their case was, I

14 think, over 500 million.

15          25 Debtors.  Very complicated

16 situation.

17          And he feels very comfortable in

18 cases of this size and capable of analyzing the

19 complex issues that are presented to the Trustee.

20          He would also testify that he's had

21 a wide range of experience in bankruptcy cases

22 and other capacities serving as debtor's counsel,

23 Creditors Committee counsel, and counsel for

24 individual creditors.

8

1              He also represents trustees on

2      occasion.  The settlement in this case starts

3      with the litigation.

4              There are two pieces of litigation

5      that the Trustee commenced against Royal.  One

6      piece of litigation is here in the Bankruptcy

7      Court, and that case seeks to recover fraudulent

8      transfers on the basis -- the basic theory of

9      that case is that Royal received transfers that

10     were transfers by the Debtor, that actually

11     intended to mask the activity that the Debtor was

12     engaged in.

13             And it's a fairly straight forward

14     548 claim.  The second claim is a separate

15     lawsuit commenced prior to Mr. Stanziale's

16     involvement as Trustee in the United States

17     District Court for the District of Delaware.

18             And this case is somewhat more

19     complex.  It involves claims for aiding and

20     abetting, for deepening a solvency and related

21     actions.

22             In addition to those two cases, the

23     third sort of piece of the puzzle when looking at

24     the overall relationship between the estate and

1    Royal, is Royal's claim.  Royal has filed a proof

2    of claim, later amended to assert claims against

3    SFC, the Debtor, well in excess of $500 million.

4              The process that Mr. Stanziale

5    employed in analyzing whether a settlement was

6    prudent was to start with the claim of Royal.

7    That has two parts really when you're analyzing

8    the claim, two things that you look at, and two

9    things that Mr. Stanziale will say stand, that he

10   examined with quite a degree of care were the

11   basis on which Royal has a claim against the

12   estate.

13             Putting aside the amount of the

14   claim, what was the basis for there to be a claim

15   against this particular entity, SFC?  And what

16   Mr. Stanziale reviewed in that was a series of

17   things.

18             First, written contracts.  There are

19   three written contracts called insurance

20   agreements where these are direct written

21   contracts between Royal and Student Finance

22   Corporation signed by a Mr. Gary Hawthorne, an

23   officer of Student Finance Corporation.

24             These contracts contain various

1    terms and provisions, including representations

2    and warranties of Student Finance's financial

3    condition that were relied upon by Royal to issue

4    insurance policies.

5              And these direct contracts account

6    for over $300 million.  Actually under these, I

7    believe, slightly under $300 million in direct

8    contract claims by Royal against Student Finance

9    Corporation.

10             299 million and change, I think, is

11   the exact number.  But the written contract

12   analysis doesn't stop with the insurance

13   agreements.

14             In addition to that, Royal issued a

15   large number of insurance policies.  These

16   policies, Mr. Stanziale would say, and these were

17   his words, not mine, these policies were the

18   engine that propelled a vehicle called Student

19   Finance Corporation.

20             It enabled -- they enabled -- the

21   insurance policies enabled Student Finance

22   Corporation to engage in the business activities

23   that it engaged in, and to generate the losses

24   that they ultimately generated.

11

1           Each and every one of these

2      insurance policies contains a fairly standard

3      subrogation provision.  The subrogation provision

4      allows Royal, as the insurer, to assert rights

5      that could have been asserted by any party whose

6      claim Royal pays, including claims of parties

7      like MBIA, and Wells Fargo, who have filed claims

8      in this case; PNC Bank, who has filed a claim in

9      this case.

10           THE COURT:  Let me stop you there.

11      Has Royal -- actually something in my memory

12      tells me that Royal hadn't made claims yet.  Now,

13      maybe that's changed since I last heard the --

14           MR. McMICHAEL:  No, that's an

15      excellent question.  I'll be happy to address it.

16           It was on my list, and here's where

17      we are on that.  The District Court for the

18      District of Delaware has entered summary judgment

19      against Royal.

20           It has actually entered three

21      summary judgments against Royal, unless the

22      Trustee actually reviewed these.  So they're

23      worth mentioning specifically.

24           The first was the MBIA judgment, and

1    the amount of that judgment -- I'm going to use

2    approximate numbers for all of these -- the

3    amount of that judgment was about $380 million.

4                A second judgment was entered

5    against Royal in favor of PNC Bank in the amount

6    of $110 million.

7                And a third judgment has been

8    entered against Royal on behalf of Wilmington

9    Trust Company in the amount of $12 million.

10               Those total 502 million.  And what

11   has happened is that upon the entry of those

12   judgments, Royal did two things.

13               One, it took an appeal, which the

14   appeal is pending in the Third Circuit.  But,

15   two, and this directly addresses the question

16   that Your Honor just asked, Royal had bonds in

17   those amounts in order to obtain a stay of

18   execution.

19               Otherwise, the judgment creditor

20   could proceed to seize Royal's assets.  And that

21   money has been posted.

22               My understanding is there are cash

23   bonds posted by Royal securing 120 percent of the

24   amount of judgment.

```
 1                    THE COURT:  All right.  But let me
 2      ask you if Royal succeeds on the appeal --
 3                    MR. McMICHAEL:  Yes, sir.
 4                    THE COURT:  -- and ultimately
 5      prevails in its attempt to defend on these
 6      contracts, what happens to Royal's claim that you
 7      want to allow some 500 some odd thousand -- $550
 8      million in this case?
 9                    MR. McMICHAEL:  Two things will
10      happen, Your Honor.  One is -- one is that Royal
11      will be very happy.
12                    THE COURT:  Well --
13                    MR. McMICHAEL:  And the second
14      thing --
15                    THE COURT:  If they're happy, we're
16      all happy.  But what happens to the claim?
17                    MR. McMICHAEL:  And the second thing
18      is that the claim would disappear.
19                    Now, what -- this settlement
20      specifically contemplates that eventuality, and
21      there is a provision in Paragraph 5 of the
22      settlement.  And it's at the end of Paragraph 5.
23                    THE COURT:  Which exhibit is that?
24                    MR. McMICHAEL:  This is Exhibit A to
```

14

1   the settlement agreement.  I'm sorry, the

2   settlement motion.

3            THE COURT:  Well, Item 7, term

4   sheet.  What is it?

5            MR. McMICHAEL:  Second page of the

6   term sheet, Paragraph 5.  And the last sentence

7   of Paragraph 5 says -- of course, the Court -- I

8   don't want to -- -

9            THE COURT:  I have it.  Fine.  Okay.

10            MR. McMICHAEL:  Okay.  So now, as a

11   practical matter, the settlement makes sense

12   either way, because if Royal's claim disappears

13   by a reason of it prevailing on its appeal in the

14   Third Circuit, what will happen to this estate is

15   that MBIA, PNC, Wells Fargo, Wilmington Trust

16   Company will weigh in with their claims.

17            They have already filed back-up

18   claims, because they are going to stand back and

19   wait --

20            THE COURT:  I want to make sure we

21   didn't have a double.

22            MR. McMICHAEL:  No.  We contemplated

23   that it was discussed and it's provided for.

24            And I don't think we have any

1    problem along those lines.

2              But in any event, to get back to

3    Mr. Stanziale's evaluation of the settlement and

4    why he is here recommending it that it be

5    approved, he looked at the written contracts,

6    both the insurance agreements, and reviewed the

7    insurance policies, and concluded that it was far

8    more likely than not that based on the current

9    state of affairs, Royal would have a contract

10    claim in the full amount that it's claiming

11    against the estate.  But his analysis did not

12    stop there.

13              As the Court knows, this case is

14    surrounded by allegations of fraud.  And there

15    has been, on other occasions, some evidence

16    previewed to the Court as to the alleged

17    fraudulent activities of the Debtor before it was

18    in bankruptcy.

19              Mr. Stanziale looked at information

20    about those claims, and looked at the corporate

21    structure of SFC and its affiliates, who is

22    involved, and how the transactions worked.  And

23    they're quite complex.

24              And concluded that consistent, I

1    think with an observation from the Court, based

2    on just a preview that there was a significant

3    claim.

4           Now, in endorsing a settlement,

5    neither the Trustee nor the Court is required to

6    adjudicate the underlying merits.  So

7    Mr. Stanziale did not say, yes, Royal's going to

8    win on this fraud claim.

9           What Mr. Stanziale realized in

10   looking at the volume of this evidence was that

11   Royal had a pretty good case.  Might it be

12   defended?  Sure.

13          But they had a pretty good case.

14   And that even if -- even if for some reason a

15   direct contract claim didn't work, and we can't

16   see how it wouldn't, they would have the same

17   claims based on the fraud theories.

18          And when I say fraud, I mean to

19   incorporate alter ego, piercing of the corporate

20   veil, all of the related tort notions that come

21   into play in dealing with that sort of claim.

22          So the first conclusion reached by

23   Mr. Stanziale was that Royal had a claim against

24   this estate, and it was not a prudent expenditure

1    of estate resources to engage in warfare over

2    that claim.

3                    The next question is how much?

4    We've addressed that, because Your Honor asked me

5    about that.

6                    And we have built in a provision in

7    the settlement to deal with reductions in the

8    claim in the event that reductions are in order.

9                    So where we are now is with the

10   starting point of why it makes sense for SFC to

11   settle with Royal.  The starting point is that

12   Royal is our biggest creditor, and likely to be

13   our biggest creditor in the amount of well over

14   $500 million.

15                   So now Mr. Stanziale goes back to

16   his clients, and he would tell you if he were on

17   the witness stand right now that he has total

18   confidence in his claims, particularly his 548

19   claim, but that he also recognizes that Royal has

20   defenses, and they have made defenses.

21                   He has seen and expects to continue

22   to see from Royal vigorous spirited defense,

23   which will result in laborious and expensive

24   litigation from the standpoint of the estate.

18

1    And when looking at that, which is, by the way,

2    what lawyers and clients always look at when

3    settling case.

4              But when looking at that,

5    Mr. Stanziale reached a very important

6    conclusion.  And that was that while academically

7    it might make sense to do that, in the real

8    world, with a 500-plus million dollar claim, the

9    vast bulk of any recovery going into the estate

10   is going to go back out of the estate to Royal.

11             That results in what we now refer to

12   as the recycling effect of that litigation.

13   Because of the recycling effect, where most of

14   what we would get from Royal, we would ultimately

15   have to pay back to Royal.

16             What are we doing it for other than

17   to, you know, enrich our firm as litigation

18   counsel.

19             THE COURT:  Well, some might say

20   that's a great idea.

21             MR. McMICHAEL:  My partners thought

22   that was a great idea, but Mr. Stanziale

23   concluded otherwise, as is appropriate.

24             The other thing that he considered

1   in looking at whether to settle his claims

2   against Royal was not just that there was this

3   recycling effect and it was going to be a long

4   and expensive litigation, but that this was a

5   real settlement.  We're here today looking for a

6   $4.9 million check from Royal, which they

7   actually won't write tomorrow, because we'll have

8   to let the appeal period run.

9               But they will write soon after this

10  settlement, if it's proved by the Court, $4.9

11  million, a very major contribution to this

12  estate.  It makes a big difference to the ability

13  of the Trustee to pursue other claims that need

14  to be pursued.

15              Now, the settlement agreement

16  provides -- I want to highlight this, because

17  parties who are in court may have questions about

18  it.  The settlement agreement provides that

19  there's the payments of $4.9 million.  It also

20  provides in Paragraph 2 that one of the things

21  that Royal gets is an administrative claim for

22  $1.9 million.

23              Let me pause for a moment and talk

24  about the rationale for that.  All settlements,

1    as I know this Court is keenly aware of, all

2    settlements ultimately involve negotiated

3    numbers.  There is no absolute right number and

4    no absolute right number.

5                I mean, could 4.9 million have been

6    4.8 million, or 5.1 million?  Sure.  But what we

7    did in the negotiating process, what

8    Mr. Stanziale did was he was looking at the

9    underlying merits of his claim.

10                He was looking at the interest of

11    other creditors in this estate.  And there are

12    quite a few other creditors.  Royal is big, but

13    they're not alone.

14                The other creditors amount to,

15    including Mr. Yao's claim, which we intend to

16    object to, amount to over 12 million.

17                THE COURT:  If you take Yao out?

18                MR. McMICHAEL:  If you take Yao out,

19    you're down to about four million.  But that's

20    not all.

21                Four million, and that is in

22    non-trucking school claims.  We then have the

23    trucking school claims, and they are in the

24    neighborhood of 60 million.

21

1    We have, and we'll have substantial

2    disputes with a lot of the trucking schools.  And

3    we don't know what the ultimate allowed amount of

4    those claims will be.

5    But there will be claims there.

6    There will be claims.

7    You know, I think that in this case,

8    you are going to have 10, 15, maybe $20 million

9    worth of claims in addition to the claims of

10    Royal.  So in looking at the settlement amount,

11    what Mr. Stanziale really said was Royal is doing

12    two things for us.

13    One, they're settling claims, saving

14    us the expense, and putting money into the

15    estate.

16    But two, they're providing sort of

17    seed capital for the Trustee to be able to

18    litigate a lot of other lawsuits that need to be

19    litigated, Chapter 5 avoidance action, and a

20    variety of other claims.

21    And if the estate is successful in

22    generating recoveries for the benefit of all

23    creditors from those claims, it's only fair that

24    Royal get some amount back on a priority basis.

1    And that's how the $1.9 million administrative

2    claim was negotiated.

3              So that brings us to the fundamental

4    conclusion, unfortunately not quite the end of

5    the presentation, but the fundamental conclusion

6    that when weighing all of the factors that

7    trustees and Courts look in determining the

8    merits of a settlement, Mr. Stanziale reached the

9    very firm conclusion that this settlement was in

10   the interest of the estate.

11             And he has asked us to come and

12   vigorously ask the Court to approve it.  He's

13   done a little bit more than that, though.

14             And I'm going to address an issue

15   that has been raised in the objection that was

16   filed.  Part of the settlement involves what we

17   call the cooperation clause.

18             The cooperation clause, if Your

19   Honor wants to take a quick look at it, it is

20   Paragraph 7.  It's a long paragraph, but it's

21   Paragraph 7 of the term sheet.

22             The cooperation clause is there for

23   a number of important reasons.  It recognizes

24   that Royal, who has been involved in matters

1     related to Student Finance far longer than the

2     Trustee has, with its resources accumulated a

3     massive amount of information.  It has done a lot

4     of analysis.

5                    And it is generally in possession of

6     information that is very useful for the Trustee

7     and will save us a lot of work if we have access

8     to it.  And what we said to Royal, and what Royal

9     has said to us is if we settle, we both have a

10    mutual interest in pursuing the other claims that

11    need to be pursued.  And there's some examples of

12    those claims given in Paragraph 7.

13                   Therefore, we want to agree with

14    each other and make part of the settlement that

15    we're going to cooperate, and we're going to

16    participate with each other.  That will save the

17    expense, save the estate money by way of legal

18    fees and expenses.  And it will allow the estate

19    to make use of the enormous resources and

20    information developed by Royal in their

21    investigation and in their prosecution of claims.

22                   We have been criticized by saying

23    that we're making Royal into the Trustee in this

24    case.  And Mr. Stanziale, if he were on the

1    witness stand, and he will be in a minute, would

2    tell this Court that nothing could be further

3    from the truth.

4              He is the Trustee.  He's been the

5    Trustee in a lot of cases and a lot of big cases.

6              He understands what his role is.  He

7    understands that he's still the Trustee.

8    Agreeing to cooperate with a litigant that has

9    mutual interest is not ceasing your power as a

10   Trustee.  It's simply a common sense

11   business-like way of dealing with a complex

12   litigation environment, much that will whittle

13   down to everybody's benefit.

14             Mr. Stanziale retains 100 percent of

15   his powers, his duties, and his fiduciary

16   obligations as the Trustee.

17             You now --

18             THE COURT:  Well, let me ask you

19   because --

20             MR. McMICHAEL:  Yes, sir.

21             THE COURT:  You suggest in one of

22   the objections that if the Trustee elects not to

23   sue a party that Royal determines to sue, then

24   Royal can bring an action on behalf of the estate

```
 1    against that defendant.

 2              MR. McMICHAEL:  Yes, sir.

 3              THE COURT:  Now, how do you deal

 4    with the issue of if Royal already has a claim, a

 5    separate claim against that potential defendant

 6    or the cause of action against the estate, in

 7    that situation, what happens?

 8              MR. McMICHAEL:  The estate's claim

 9    goes first.  We had a specific discussion about

10    that, and the estate's -- the estate gets the

11    first bite of the apple, whether it's my law

12    firm, or Mr. Stanziale's law firm or --

13              THE COURT:  I'm not worried about

14    which law firm handles it, as much as I am

15    worried about the priority of those claims that

16    are being prosecuted by potentially Royal by two

17    different capacities, if you will.

18              MR. McMICHAEL:  Yes.

19              THE COURT:  One on their own behalf,

20    and one as a -- as state representative of some

21    sort.

22              MR. McMICHAEL:  Yes, sir.  I

23    understand the question.

24              That is actually addressed, if I
```

1      could find the language quickly.  It is in the

2      bottom of the last sentence of Paragraph 7.

3                    This is the important point.  If

4      Royal takes over a claim because the Trustee

5      determines not to pursue it, and we've allowed

6      for this as Your Honor has pointed out, the claim

7      is prosecuted by Royal in the name of the estate.

8                    It's still the estate's claim.  We

9      have not sold the claim or assigned the claim.

10                   THE COURT:  But they're prosecuting

11     it at their empowered level?  They have their own

12     as well.

13                   MR. McMICHAEL:  They may have their

14     own as well, but Royal has said, and it is our

15     understanding, and as part of this deal that the

16     estate claim will go first.  The estate claim

17     will be litigated.

18                   THE COURT:  Does that say that?

19                   MR. McMICHAEL:  I don't know that it

20     is that clear.  And if it's not, we can certainly

21     make that part of any order approving the

22     settlement.

23                   THE COURT:  Okay.  Go ahead.

24                   MR. McMICHAEL:  But that is the

1    understanding that we have with Royal, if that --

2    if that occurs. And by the way, it will occur in

3    at least one case.

4            THE COURT: I understand. That's

5    why I'm asking the question.

6            MR. McMICHAEL: Yes, the CTI case.

7            THE COURT: Which case may be -- in

8    my mind, may be different, but that's not

9    important.

10            MR. McMICHAEL: But the right point

11    is that Royal will be acting for the estate,

12    standing estate and prosecuting the claim.

13            The money will come in through the

14    estate, and pass through the estate, and take

15    priority over Royal, separate and independent

16    claims against the same defendant, if it has one.

17            MR. WOLFSON: Your Honor, may I just

18    address that point or --

19            MR. McMICHAEL: This is Mr. Wolfson.

20    Mr. Wolfson is my friend from New York who

21    represents Royal, and I want to note that --

22            THE COURT: We've met. Yeah.

23            Let's try to get this point. Why

24    don't you come up and let's deal with this point.

28

1              MR. WOLFSON:  This issue may be

2    ameliorated somewhere at the request of the U.S.

3    Trustee.  I think we have agreed that if we were

4    to pursue any claim under Paragraph 7, it would

5    be with prior Court approval.  So that, A, if the

6    Trustee determines not to pursue it, and we're

7    going to pursue it, we would have prior Court

8    approval.

9              And in any event, Your Honor, the

10   issue really, from our standpoint, I'm not sure I

11   would necessarily agree, because I don't know all

12   of the other litigation that's out there that we

13   can just pursue one litigation before the other.

14             But our understanding, and the

15   premise of this settlement is that we are

16   possibly 90-percent plus of the estate.  And,

17   therefore, one of the things that we were very

18   sensitive to is we didn't want to just buy claims

19   outright, because we didn't think that was fair

20   to the other, you know, legitimate creditors that

21   are out there.

22             We're prepared to prosecute these

23   actions, either to fund the estate prosecuting

24   it, or to fund it ourselves if we prosecute it,

29

1    and share any and all proceeds with everyone in

2    the estate.

3                    Whether we recover money at the

4    90-percent mark from some of these claimants, if

5    we have a similar lawsuit -- classic example

6    would be there is a pending lawsuit with CDI, DDI

7    I think that's pending in Tennessee.

8                    Whether we recover money from them

9    individually in their capacity there, or whether

10   we recover it here, we get a hundred percent of

11   one pot, 90 percent of the other.  We certainly

12   would come to the Court before we --

13                   THE COURT:  I just wanted to make

14   sure you focus on it.

15                   MR. WOLFSON:  We intend to do this

16   fairly.

17                   THE COURT:  If there's going to be a

18   motion for each case, if you do -- each type of

19   case that you pursue, then we can make sure that

20   that's in the orders.  There I was concerned

21   because you imagine they have, I guess, somewhat

22   different causes of action against some of these

23   people, because of the -- their relationship is

24   different with the Debtor.

```
1                    MR. WOLFSON:   Indeed, they're
2     entirely different.  The only actions that we
3     would be pursuing if the Trustee decides not to
4     pursue it would be an action of the estate.
5                    That is, there may be similar fact
6     patterns, but it's a totally different recovery,
7     totally different.  Right.
8                    The only real issue would be not
9     whether we pursue and get a judgment in our
10    individual capacity.  First, the issue is whether
11    we seek to enforce it enforcing our own
12    individual rights.
13                   Would we therefore -- would we
14    thereby be depriving the estate of its ability to
15    recover when it gets a judgment on it?  And what
16    we would suggest to resolve that issue is that we
17    certainly would agree that with respect to the
18    recovery of anything, we're not going to have a
19    race to the courthouse to see that we can beat
20    the Trustee on individuals.
21                   And, in fact, we have agreed as part
22    of this settlement agreement to keep the Trustee
23    fully informed of what's going on in those other
24    lawsuits.  So I don't want to agree and modify
```

31

```
 1   this term sheet to say how we're going to proceed
 2   in individual actions.
 3                But we do have -- we will represent
 4   to the Court that we will not seek to use a
 5   judgment that we obtained or in order to deprive
 6   the estate of the ability to recover on any
 7   judgment that it would obtain.
 8                THE COURT:  All right.  Thank you.
 9                All right.  Mr. McMichael, let's
10   keep going.
11                MR. KORTANEK:  Your Honor, Steve
12   Kortanek with Klehr Harrison.  We represent the
13   CDI schools.
14                And I just -- I was listening, but I
15   didn't hear counsel assure us that they will file
16   a separate motion as to any lawsuit, including
17   the actions against the CDI schools, because
18   that's -- that's what's set forth in the papers
19   as they stand now.
20                THE COURT:  We'll get to deal with
21   CDI when we get to CDI.  Let's keep going with
22   the settlement.
23                MR. KORTANEK:  Thank you.
24                MR. McMICHAEL:  In our effort to try
```

1　　to clean up as many stray issues as we have,

2　　I've -- by the way, I have concluded the basic

3　　rationale for the Trustee's recommendation to

4　　this Court for --

5　　　　　　　　THE COURT:  Let me ask you, because

6　　you skipped over one of the lawsuits.  You

7　　didn't, and I don't -- it's one that I don't know

8　　much about.

9　　　　　　　　You talked about the analysis of the

10　　proof of claim.  You talked about the 548 action.

11　　　　　　　　There apparently is another lawsuit

12　　that you suggested was brought against Royal.

13　　Again, I'm not sure quite by whom, the aiding and

14　　abetting.

15　　　　　　　　MR. McMICHAEL:  Yes, sir.  I don't

16　　know who the plaintiff is in that one.

17　　　　　　　　I didn't mean to skip that.  The

18　　plaintiff is the Estate of Student Finance

19　　Corporation.  That case was commenced by the

20　　Chapter 11 Debtor and his counsel.

21　　　　　　　　It was dismissed with leave.  It was

22　　amended prior to the appointment of Mr. Stanziale

23　　as initially Chapter 11 Trustee, later Chapter 7

24　　Trustee.

1          The -- one of the first things the

2    Trustee did was to review that case, look at it,

3    and file an amended pleading, which has been

4    done.  And that is the -- what I'm calling the

5    aiding and abetting claim.

6          That claim is more complex and more

7    factually intensive than the 548 claim.  And

8    accordingly, more difficult to prosecute.

9          It is equally vigorously defended.

10   It seeks essentially parallel relief, although

11   arguably under the aiding and abetting theory,

12   the amount of damages could be larger.  We're

13   still focusing on Royal's role in the underlying

14   transactions.

15         And it doesn't provide really a

16   separate basis for us to say that, you know, gee,

17   we'd rather sue them on that theory.  I mean, if

18   we're litigating them, against them, we'll be

19   litigating on each of these.  And if we're

20   settling, we're settling all claims.

21         The fact is that you have the same

22   exact recycling effect of any recovery.  That's

23   the ultimate problem.

24         It's a problem.

34

1           THE COURT:  That doesn't affect if

2   other people have direct claims against Royal.

3           MR. McMICHAEL:  This has no affect

4   on that, on the fraud theory, or the -- I don't

5   know if they exist.

6           Those are undisturbed.

7           I don't -- I'm not aware of such

8   claims.  If they existed, they would not be

9   affected by this settlement.

10          This is a settlement with the

11  Trustee, not with anybody else.

12          THE COURT:  Okay.

13          MR. McMICHAEL:  Okay.  So, as I was

14  saying, that the totality of circumstances and

15  factors that were reviewed and analyzed by the

16  Trustee lead him to the conclusion that this is a

17  very good and favorable settlement for the

18  estate.

19          It positioned the estate to pay a

20  dividend to the creditors to pursue claims that

21  need to be pursued, and to do so quickly,

22  efficiently and much less expensively than if we

23  were on the other side of the table from Royal.

24          We have made a few adjustments to

1   this deal since it was filed.  All of them are, I

2   would describe, as technical.

3            But let me describe what each one of

4   them is.  And we had prepared an amended order to

5   reflect some of them, although some of the

6   adjustments were made three minutes before Your

7   Honor came on the bench.

8            We don't quite have an amended order

9   that contemplates --

10            THE COURT:  That is fine.  Why don't

11   you outline on the record --

12            MR. McMICHAEL:  I will tell you

13   exactly what they are.

14            The first is in Paragraph 5.  In the

15   term sheet, there is a reference to a secured

16   claim by Royal.

17            We have provided in the order, first

18   of all, the concept.  The concept is that the

19   amount of the secured claim identifies the

20   amount, the dollar amount of a claim that Royal

21   has against the estate as to which there is

22   collateral or security.  It is not an ultimate

23   determination of secured status, because we have

24   not valued the collateral.

1              So the first object is to -- just to

2    identify what the starting number is.  And that

3    number has changed, and that's what I wanted to

4    point out to the Court.

5              The number that appears in Paragraph

6    5 is $45,418 and change.  In the order approving

7    the settlement, we have changed that number to

8    just under $16 million.

9              And the reason for that adjustment

10   was that when we went back with Royal and

11   reviewed the exact basis of the claims, both we

12   and Royal concluded that there was an overlap

13   between the 45 and the 516.  And we have pushed

14   that overlap into the unsecured portion of the

15   claim.

16             The order approving the settlement

17   will provide, however, that the ultimately

18   allowed secured claim will, of course, be limited

19   to the value of the collateral when that's

20   determined.

21             And that won't be now.  That will be

22   determined whenever the collateral is ultimately

23   sold.

24             The second adjustment that we have

37

1   made is to address a concern raised this

2   afternoon by the U.S. Trustee's office.  And that

3   is a concern that involves the last sentence,

4   actually I guess the last two sentences of

5   Paragraph 2 of the term sheet.

6           First, let me state the general

7   proposition that in agreeing to the term sheet,

8   neither Royal nor the Trustee intended to change

9   any otherwise applicable principles that would,

10  for instance, require Court approval before

11  counsel could withdraw from a case, or that would

12  require a filing of fee applications for

13  professionals seeking to be paid for the estate.

14          Those are all routine bankruptcy

15  overlays that we assume continue to exist.  The

16  Trustee, the U.S. Trustee's office believed that

17  the specific language used at the bottom of

18  Paragraph 2 may collide in some respect with

19  those principles, and that was certainly not an

20  intended effect.

21          So what we have done to resolve the

22  claim raised by the U.S. Trustee is to delete at

23  the very, very end of Paragraph 2 the last words

24  which read, or undertake other matters on behalf

1    of the estate.  That will come out.

2              And we have further inserted in the

3    sentence that the exercise of the rights that are

4    described here are subject to prior approval of

5    the Court, which will be sought when, and if,

6    these things come into play.

7              In short, we're not seeking to short

8    circuit any processes here.  We're just creating

9    the framework of our deal with Royal.

10              The final point, and this is the

11    last thing I will say before asking if anyone has

12    questions for Mr. Stanziale, the final point is

13    that any party, whether it's professionals

14    retained by the Trustee, or whether it's Royal,

15    any party seeking compensation from the estate

16    will, of course, file fee apps and be subject to

17    that process.  And that was intended.

18              There's nothing in here that we

19    think is inconsistent with that.  But to the

20    extent that any party, particularly the U.S.

21    Trustee's office has a concern about it, I want

22    to make it clear on the record that that is our

23    intention and understanding of this settlement.

24              Unless Your Honor has further

1    questions, which I'd be happy to answer if you

2    do.

3                THE COURT:  Well, do you want to

4    address the few things that were in the objection

5    while you're up?

6                MR. McMICHAEL:  Sure.  I can do

7    that.

8                I've addressed one of them, which is

9    are we exceeding our power as Trustee to Royal.

10   The answer is we're not.

11               This does not have that effect.  It

12   does not have that intent.

13               THE COURT:  Let's take the CDI one.

14   What's the rush?

15               You don't even have a fully flushed

16   out settlement agreement deal.

17               MR. McMICHAEL:  That was okay.  That

18   objection, I understand exactly the objection.

19   The objection is we don't intend to have a fully

20   flushed out settlement agreement.

21               THE COURT:  So the term sheet is the

22   agreement.

23               MR. McMICHAEL:  The term sheet is

24   the agreement.  Mr. Wolfson and I have dealt with

1    each other in the past.  We've known each other

2    for 18 or 19 years.

3                    THE COURT:  Has this case been going

4    on that long?

5                    MR. McMICHAEL:  No, it hasn't.

6    There was one even worse than that out in the

7    West Coast that we were involved in for 10 years.

8                    And I think that we are both

9    believers in economy of words.  Could we spend

10   more money of the estate and take this document

11   and create a 50-page document agreement with a

12   lot of reps and warranties?

13                    THE COURT:  You answered my

14   question.

15                    MR. McMICHAEL:  We could do that.

16   We don't think it's necessary.

17                    In fact, the settlement agreement

18   says that.  By the way, in the very last

19   paragraph, Paragraph 14 of the term sheet

20   expressly says, This is the settlement.  And we

21   don't want to create any further documents and

22   make it more complicated than it needs to be.

23                    The major legal objection, as I read

24   CDI papers, relies on the well-known Cybergenics

41

1    case in the Third Circuit.  And I don't know if

2    Your Honor has had an opportunity to visit

3    Cybergenics' issue in the First Circuit.

4              But the short story of that case is

5    that a Debtor, Trustee for a Debtor, I think,

6    decided not to -- actually it was just a Debtor,

7    decided not to pursue certain Chapter 5 avoidance

8    claims.

9              The Creditors Committee was upset

10   with that decision and asked the Court to empower

11   it to pursue the claim.  The Court said, Yes, go

12   ahead and pursue the claims.  There was an

13   appeal.

14             The District Court said, You can't

15   do that based on the Harford Underwriters

16   decision from the United States Supreme Court.

17   It says in the statute, The Trustee may, that

18   cannot be read to mean the Trustee and the

19   Creditors Committee may.

20             The District Court, the District

21   Court reversed the Bankruptcy Court, said, You

22   can't do that.  They went to the Third Circuit.

23             A panel of the Third Circuit agreed

24   with the District Court.  The case was taken on

1      Bonk, because it generally created a lot of fuss.

2                  A lot of people -- you know a lot of

3      crying, gnashing of teeth, all those things out

4      there in the bankruptcy world.  So the Third

5      Circuit convened on Bonk, considered it, and

6      reversed -- the panel reversed the District

7      Court, and agreed that it could be done.

8                  THE COURT:  Now, does -- what does

9      that have to do with this case?

10                 MR. McMICHAEL:  We would submit very

11     little.  This is not a case where the Trustee or

12     a Debtor in dereliction of its duties is not

13     pursuing claims.

14                 This is not a case where somebody

15     else is coming into court saying let us sue.

16     This is a case where parties, the Trustee and

17     Royal, with the exact same litigation interest

18     and objectives to maximize the recovery in this

19     estate, have agreed that under certain

20     circumstances it may make more sense, and it may

21     be economically more efficient for Royal to

22     actively litigate the claim as opposed to the

23     Trustee.

24                 And as we discussed in response to

1     an earlier question of the Court, if that

2     happens, the claim will be prosecuted in the name

3     of the estate.  The recovery will go into the

4     estate.

5              This is a situation unlike

6     Cybergenics where someone is asking to be

7     invested with authority that belongs to the

8     Trustee.  This is a situation where the Trustee

9     is agreeing by contract to allow certain other

10    parties, certain other parties under certain

11    circumstances to pursue a claim.

12             Even if the Court were to say, Nice

13    distinction, Mr. McMichael, but I don't buy it,

14    and I think Cybergenics has to be really studied,

15    if the Court were to say that, the short answer

16    to the objection is that Cybergenics was decided

17    our way.

18             At the end of the day, the United

19    States Supreme Court was deprived of its

20    opportunity to decide whether the Third Circuit

21    on Bonk was correct or not.  Because after

22    granting seriatum, the parties to Cybergenics

23    decided -- chose to settle.

24             So what we have is a Third Circuit

44

```
 1    on Bonk decision under -- reviewed by the United

 2    States Supreme Court, which holds that other

 3    parties can, under certain circumstances, assert

 4    rights that are given to the Trustee.

 5                  And that is all we're doing.

 6    Actually less than that here, as I've said

 7    earlier.

 8                  I think without trying to preempt

 9    Mr. Kortanek, I think that is what we read to be

10    the heart of the objections that they filed.

11                  THE COURT:  We'll give you an

12    opportunity after he's had a chance to speak.

13                  Anyone else want to be heard in

14    favor of the motion before I -- well, first, go

15    ahead.

16                  I'll hear you, and then I'll deal

17    with the evidentiary issue.  Go ahead.

18                  MR. WOLFSON:  Your Honor, if I may

19    just from here.

20                  THE COURT:  Can you hear him from

21    there?

22                  THE REPORTER:  If he speaks up.

23                  MR. WOLFSON:  Well, I'll move up.

24                  I'll be very brief, Your Honor.  I
```

1    don't want to duplicate that which Mr. McMichael

2    indicated.

3              THE COURT:  Good.

4              MR. WOLFSON:  One comment that I

5    would have with respect to the Cybergenics case,

6    and to the quick response to the objections, you

7    know, the notion that we did not sign the term

8    sheet, this is the agreement we're prepared to go

9    forward with subject to Court approval.

10             That the term sheet hasn't been

11   signed, we don't think is a valid objection.

12   Cybergenics is the case used by CDI to object to

13   the so-called delegation of responsibilities.

14             And as I understood the argument,

15   maybe a little bit differently than Mr.

16   McMichael, was -- the argument was that

17   Cybergenics says the Creditor Committee could do

18   it.  It didn't say that, and individual creditors

19   could it.

20             What Cybergenics made very clear

21   throughout itself is that, in fact, Cybergenics

22   cited the cases time and time again indicating

23   that individual creditors can, with Court

24   approval, pursue actions that belong to the

estate.

It went on about that.  And what Cybergenics was struggling with was finding the authority that the Code gave to individual creditors under 503(b) to bring actions with the approval of the Court to find some authority to give it to a Creditors Committee.

And, ultimately, concluded that when you took a look at Section 503(b), which gave the right to an individual creditor to pursue an action on the estate, with Court approval, either where the Trustee refuses to bring that action, or where the Trustee consents to allow someone else to do it, the Court struggled with it and concluded ultimately three uses, various provisions under Section 1109 and elsewhere in 1103 that, in fact, the Creditors Committee would be vested with the same authority to bring a derivative-type action on behalf of the estate, that the code clearly gave to individual creditors.

So we don't think that there's really any real dispute that Cybergenics does, in fact, support and cite cases, indeed, that

1    support this sort of a resolution.

2            The analog also that we keep coming

3    back to, which I think the Cybergenics Court

4    recognized is that the Trustee can sell

5    preference claims, formulation transfers, and

6    other claims of the estate, and somebody could

7    pursue it.  We had the option and could have

8    negotiated a deal where, rather than bring an

9    action on behalf of the estate and share all the

10   proceeds with everybody, we could have just

11   bought it for the same price, candidly, and just

12   kept all the assets for ourselves.

13           But we thought it was appropriate,

14   given our size, to share the recoveries on a pro

15   rata basis with all of the other creditors.

16           This was -- well, I'm sure

17   Mr. Stanziale would also indicate in his

18   testimony, that this was a very vigorously

19   pursued negotiation.  It is an arm's length

20   resolution that took many weeks, if not longer,

21   to negotiate and finalize.

22           THE COURT:  Thank you.

23           I will accept your proffer of

24   Mr. Stanziale.  But is there anybody who wants

1   the opportunity to cross-examine Mr. Stanziale?

2              MR. KORTANEK:  Yes, Your Honor.

3   Steve Kortanek on behalf of CDI schools.

4              We would like to cross cross-examine

5   Mr. Stanziale.

6              THE COURT:  Are there others that

7   want to examine Mr. Stanziale as well?

8              All right.  I'll get to you.

9              I just wanted to make sure that's

10  why you were moving around.

11             MR. KORTANEK:  Your Honor, while

12  Mr. Stanziale is taking the stand, I would ask

13  that Your Honor exclude counsel to Royal or any

14  business representatives of Royal essentially for

15  the same reason that Your Honor excluded our

16  clients at the last hearing.

17             Because when the Trustee is

18  testifying, necessarily about benefits of his

19  claims and weaknesses of his claims, I think for

20  the benefit of the estate and for creditors, that

21  the target of that litigation shouldn't be in the

22  courtroom.

23             I understand the same motion was

24  made last month, and we did not oppose that

```
 1    request.  So I think the same thing ought to

 2    apply.

 3              THE COURT:  I don't recall that

 4    motion.

 5              MS. AUERBACH:  Your Honor, we had

 6    filed normal written motion to file the response

 7    of the Trustee, support the DDI CDI settlement

 8    under seal, and that was consented to by CDI,

 9    DDI.

10              And then in accordance with that,

11    the courtroom was sealed.

12              THE COURT:  All right.  I just

13    didn't remember.

14              MS. AUERBACH:  But that was

15    something that was requested by the Trustee and

16    agreed to by CDI, DDI.  And that is not the same

17    as this situation today.

18              The Trustee is not requesting that

19    this be filed under seal.  And Royal has not

20    agreed to it.

21              MR. KORTANEK:  Your Honor, the one

22    difference --

23              THE COURT:  Go ahead, counsel.

24              MR. KORTANEK:  The difference is we
```

1    didn't oppose putting that response under seal

2    when the Trustee asked us that.  But we were not

3    asked in advance of the hearing whether we

4    consented to having the courtroom sealed.

5              I appeared in court just as the

6    hearing began, and I was asked for counsel by the

7    Trustee to leave under the understanding that

8    Your Honor had sealed the courtroom.

9              So we simply think that that's fair

10   in this situation.  It doesn't prejudice Royal.

11             THE COURT:  Well, let me just --

12   first, let's make sure we all understand the

13   standard in which I have to measure this.  This

14   is not a very high standard.

15             The Trustee has to -- you can sit

16   down, sir.  This is not a very high standard, as

17   I understand it.

18             Do you disagree?

19             MR. KORTANEK:  It's the lowest range

20   of reasonableness, Your Honor.  I do not

21   disagree.

22             THE COURT:  Okay.  Does Royal

23   object?

24             MR. WOLFSON:  We do object to being

51

```
 1    excluded, Your Honor.
 2              THE COURT:  And the basis of your
 3    objection is, other than you don't want to miss
 4    anything?
 5              What --
 6              MR. WOLFSON:  Well, there's no
 7    basis.  As indicated, this is a settlement that
 8    the Trustee is proposing, that we're supporting.
 9    The Trustee did not ask to submit anything that
10    it has to say under seal.
11              It has disclosed to the Court the
12    strengths and weaknesses of its position.
13              THE COURT:  I agree.  All right.
14              Your request is denied.
15              MR. KORTANEK:  Thank you, Your
16    Honor.
17              THE COURT:  Let's swear the witness.
18              THE CLERK:  Raise your right hand
19    and state your full name for the record.
20              THE WITNESS:  Charles Stanziale, Jr.
21                   CHARLES STANZIALE, JR., ESQ.,
22              the deponent herein, having first
23              been duly sworn on oath, was
24              examined and testified as follows:
```

52

BY MR. KORTANEK:

Q.  Mr. Stanziale, did the -- did the U.S.
Trustee evaluate any grounds to subordinate
Royal's claims against the case?

THE COURT:  You just said the U.S.
Trustee.

MR. KORTANEK:  To you as Trustee.
Excuse me.

THE WITNESS:  I took that into
consideration in my own -- in my own right.  I
had some discussions with counsel.

I didn't believe that there was any
basis to subordinate the claims of Royal to any
other -- any of the other creditors.

The answer to your question is
clearly, yes, I did consider it.  And I
concluded -- it was not -- it was not something
that I would pursue in a settlement.

BY MR. KORTANEK:

Q.  Is that a complete description of your due
diligence in that respect?  In other words, did
you review any documents in that connection?

A.  Well, all of the documents that I
reviewed, as a result of reviewing those

53

```
 1   documents, I concluded that they had a legitimate
 2   claim, a valid claim in this case.
 3            I saw no reason to seek their
 4   subordination.  I made no judgment as to their
 5   defalcation or anything that they had done wrong
 6   in this particular situation.
 7            And further, I think it's the
 8   Court's -- the Court would make that
 9   determination as to whether they had done
10   anything improper that would justify
11   subordination of their claim.
12        Q.   Now, when you say you didn't believe they
13   had done anything improper, you did, sir,
14   authorize the filing of the aiding and abetting
15   complaint just enabled this year?
16        A.   That's correct.
17        Q.   And that complaint alleged, did it not,
18   that Royal aided and abetted a breach of
19   fiduciary duty?
20        A.   That's an allegation, sir.
21        Q.   Okay.  But the complaint was filed under
22   your auspices and with a good faith belief that
23   that claim had merit?
24        A.   Yes.
```

54

1    Q.   Okay.  Sir, did you evaluate with counsel

2    whether if that claim were successful, if that

3    would constitute or give rise to even a potential

4    claim for equitable subordination of Royal's

5    claim?

6    A.   If that -- if that claim were pursued, no

7    settlement had been entered into, and we were --

8    and I, as Trustee, were successful in pursuit of

9    that litigation, certainly, I would have sought

10   collection of the -- of the funds.

11            I'm not sure whether I would -- at

12   what point I would look to equitable

13   subordination.  The matter of that claim hadn't

14   been determined at that time.

15   Q.   So is it fair to say, then, that there

16   really was no evaluation specifically as to

17   whether equitable subordination could occur if

18   you won that lawsuit?

19   A.   No, I don't -- I think that's correct.  I

20   did not give that specific thought.

21   Q.   Did you or your counsel interview any

22   potential witnesses as to the Royal -- the claims

23   against Royal starting there?

24   A.   At the benefit of -- I had the benefit of

1    voluminous discovery that had taken place, both

2    prior to and subsequent to my appointment.  I had

3    had among those persons, and I'm not saying that

4    that was the basis of the conclusion to start a

5    lawsuit, but I certainly interviewed Mr. Yao who

6    was -- who is a principal in this case.

7                    I discussed the matter with

8    Mr. Yao's counsel.  I certainly discussed it with

9    my own counsel.

10                    I read the depositions and the

11   testimony taken under 2004, specifically as to

12   any other individuals that I had spoken to with

13   regard to bringing the lawsuits in light of the

14   United States District Court or the Bankruptcy

15   Court.

16                    I think I made that determination

17   primarily based upon the information that I read

18   and recalled from previous testimony.

19   Q.   When did the settlement discussions that

20   resulted in this settlement begin in earnest?

21   A.   The settlement discussions began when we

22   went to -- I have to estimate.  I can't give you

23   specific dates.

24                    I would say these discussions have

1    been carried on for the past two months.

2        Q.  It's a correct characterization, is it

3    not, that in your view, a significant benefit of

4    this settlement at this particular time is

5    providing funding to commence actions within the

6    next few weeks?

7        A.  It is a benefit.  I won't characterize the

8    quality of that.

9        Q.  What can you tell the Court about the bid

10   and, if you will, as to the settlement

11   discussions, bidding as who started the

12   negotiations and who made the first offer of a

13   number, which got us to the 4.9 that we have

14   today?

15              MR. McMICHAEL:  Objection.

16              THE COURT:  Basis?

17              MR. McMICHAEL:  I think it's

18   privileged settlement discussions.  I don't think

19   it's something that is -- just because we are

20   seeking approval, we don't waive the normal rule

21   408 privilege that covers settlement objection,

22   settlement discussions, unless it's some -- you

23   know, unless it's tied to something.

24              Even if it were, I don't think he

57

1    could get into it.

2              MR. KORTANEK:  Your Honor, I

3    understand Rule 408.  I think this is different,

4    because they're asking Your Honor to review the

5    settlement and render a decision as to whether

6    it's a good faith product of arm's length

7    negotiations.

8              THE COURT:  That's fine.  But we

9    know the number they ended up at.

10             I think we can presume, without

11   knowing the numbers, that one started higher, one

12   started lower.  They ended up somewhere in

13   between based on their evaluation of it.

14             But I don't know why the numbers are

15   even relevant.

16             MR. KORTANEK:  We could get to it a

17   different way.

18             THE COURT:  Well, get to it if you

19   think so -- if you think it's relevant.  But

20   right now, it's a standing objection.

21             MR. KORTANEK:  All right.

22   BY MR. KORTANEK:

23      Q.  How would you characterize how many back

24   and forth numerical offers were made, if you can

1    testify to that?

2        A.   I would estimate that there were four or

3    five, maybe more, maybe ten.

4        Q.   Now, your counsel characterized your

5    testimony and the agreement that, as far as the

6    delegation of causes of action, I think he

7    characterized it as a cooperation clause.

8            But in your understanding, what the

9    agreement will do is, in fact, delegate complete

10   authority as to certain causes of action so that

11   Royal can pursue them on behalf of the estate?

12       A.   That is not my understanding.

13       Q.   Then explain to me what your understanding

14   is.

15       A.   My understanding is not only as the intent

16   of the agreement, but my definition of

17   cooperation suggests that Royal can provide

18   assistance to the estate or to me, as the estate,

19   in pursuing certain important litigation that

20   will benefit all the creditors of this estate.

21           In cooperation, in my mind, means

22   that I will have access to information that

23   they've determined relevant -- excuse me.  They

24   will have access to information that my counsel

1    and I have subsequently determined to be valid

2    and important information.

3              And that we -- I shall pursue

4    certain litigation as Trustee of the estate of

5    Student Finance Corporation.

6              And to the extent of strategy, to

7    the extent of justification for, or possibly

8    settlement, et cetera, the agreement is to confer

9    with Royal with my having the ultimate say as to

10   whether that is a justifiable settlement or not.

11   That's my definition of cooperation.

12   Q.   Sir, can you point to where it says in the

13   agreement, or just from your recollection whether

14   the agreement expressly gives you the final say

15   over how Royal prosecutes estate litigation?

16   A.   There -- there is a clause, and I can't

17   remember the paragraph.  But I remember that

18   there is a clause that sets forth that the

19   responsibility of litigation is my responsibility

20   and at such time --

21             MR. KORTANEK:  May I approach, Your

22   Honor?

23             THE WITNESS:  May I finish my answer?

24             THE COURT:  Keep going.  No.

```
 1                    Go back.

 2            MR. KORTANEK:  All right.

 3            THE COURT:  He's in the middle of an

 4   answer.

 5            Go ahead, Mr. Stanziale.

 6            THE WITNESS:  And at such time that

 7   I feel that, we do -- the matter should be

 8   handled in a particular manner, I will pursue it

 9   in that regard.

10            And to the extent that Royal

11   disagrees that Royal will have to guarantee, in

12   the case of a settlement, no less than an amount

13   that I've negotiated.

14            At the time, I wouldn't be in a

15   position to know under the circumstances.

16            THE COURT:  Don't talk him out of

17   it, Mr. Stanziale. Next question.

18   BY MR. KORTANEK:

19       Q.   Mr. Stanziale, you still believed, in your

20   judgment, when you entered into the settlement

21   agreement with Commercial Driver Institute and

22   its affiliates about two months ago; correct?

23       A.   Yes.  Repeat that question, sir.

24            THE COURT:  You want the question
```