1    read back?

2                    THE WITNESS:  Yes, Your Honor.

3                    THE COURT:  Read the question back,

4    please.

5                    (The record was read back as

6    requested.)

7                    THE WITNESS:  Yes, I think that is

8    true.

9    BY MR. KORTANEK:

10       Q.  Now, Mr. Stanziale, there are, are there

11   not, several side agreements referenced in the

12   term sheet?  For example, one dealing with a

13   dispute against Pepper Hamilton?

14       A.  Referring to separate documentation?

15       Q.  Yes.

16       A.  That's correct.

17       Q.  Do you recall that?

18                   And those terms aren't disclosed

19   anywhere in this term sheet or in your motion?

20       A.  No, they are not.

21       Q.  And there's also reference in the term

22   sheet to another side deal involving cooperation

23   or information sharing.

24                   Those terms aren't disclosed or set

1   forth anywhere, are they?

2              MR. WOLFSON:  Objection, Your Honor.

3   That's not an accurate representation.

4              THE WITNESS:  I don't recall.  I

5   don't recall the second, as you characterize it,

6   side deal.

7              MR. KORTANEK:  May I approach, Your

8   Honor?

9              THE COURT:  Yes.

10              THE WITNESS:  I don't recall the

11   content of it, the terms.

12              This is the term sheet.

13   BY MR. KORTANEK:

14        Q.   Correct.

15        A.   Okay.

16        Q.   If you could turn to Paragraph 7, and

17   there's a sentence that is about seven lines up

18   from the bottom.  It begins at the right-hand

19   column.

20              It says the Trustee and Royal will

21   enter into an agreement in connection with

22   litigation on behalf of the estate acknowledging

23   their joint interest, and allowing each other

24   access to privileged information, and continuing

1    on.

2         A.   Yes.   I read it.

3         Q.   Does that agreement exist today?

4         A.   I believe it does.

5         Q.   But it hadn't been disclosed?

6         A.   No.   It hadn't been executed.

7         Q.   Okay.   But it also hasn't been disclosed

8    to us, or to the Court, or anybody?

9         A.   Not to my knowledge.

10        Q.   Okay.   And would you agree with me, sir,

11   that the Pepper Hamilton provision and this

12   information sharing provision, those agreements

13   are material to the overall settlement?

14        A.   Yes.

15        Q.   Now, if you turn to Paragraph 8 or Section

16   8, the very last two words on that page say, a

17   separate letter.   And that talks about -- it

18   speaks for itself, but it says Royal agrees to

19   withdraw its administrative claim and so on.

20             And the last line says are reduced

21   by amount satisfactory to Royal as indicated to

22   the Trustee in a separate letter.   Is that yet a

23   third undisclosed set of agreements that are part

24   of this settlement?

1    A.   Yes.

2    Q.   Is it fair to characterize the provisions

3    in that term as material to your settlement of as

4    the Trustee with Royal?

5    A.   Yes.

6    Q.   With Royal, do you have a clear

7    understanding, sitting here today, exactly how

8    Royal will prosecute the proposed claims against

9    the CDI schools that you seek to delegate to

10    Royal with respect to the pending litigation

11    against the CDI schools in Tennessee?

12    A.   I have not read their complaint.

13    Q.   You've never read Royal's complaint

14    against our clients?

15    A.   I've never -- I have not read Royal's

16    complaint against your client.

17    Q.   Are you aware there's a counterclaim that

18    has been filed in that action?

19    A.   No.   I haven't read the answer, either.

20        MR. KORTANEK:   No further questions.

21        THE COURT:   All right.   There was

22    someone else who wanted to examine Mr. Stanziale.

23        MR. KLAYMAN:   Good afternoon, Your

24    Honor.   My name is Barry Klayman, K-L-A-Y-M-A-N,

65

```
 1    of the law firm of Wolf, Block, Schorr &

 2    Solis-Cohen.  I'd like to introduce my partner,

 3    David Stern from our Philadelphia office.

 4                We moved his admission pro hac vice

 5    yesterday.  It's yet to be acted on by the Court.

 6                We represent Transport Training,

 7    Inc., and various other creditors in this case.

 8                THE COURT:  Welcome, Mr. Stern.

 9    Good afternoon.

10                MR. STERN:  Good afternoon, Your

11    Honor.  Thank you for allowing me to appear.

12                THE COURT:  Is there a reason why

13    you're up, sir?

14                MR. WOLFSON:  Their objection was

15    filed late.  And there's -- and there's no 2019

16    statement filed.

17                They're appointed to represent

18    multiple claims.  We would object to their

19    appearing.

20                THE COURT:  Well, when you say their

21    objection was filed late?

22                MR. STERN:  We filed it at five

23    o'clock or 5:15.

24                THE COURT:  When was it due?
```

1          MR. STERN:  Four o'clock, Your

2     Honor.

3          THE COURT:  Well, I'm going to allow

4     that.  Have you filed a statement indicating the

5     various people you represent?

6          MR. STERN:  Your Honor, in the

7     Chapter 11 we had filed proofs of claims on

8     behalf of 17 of the schools that we represent.

9     There was no other filing, Your Honor.

10         And to the extent that there was no

11    other filing, we'll supplement the filing

12    immediately.

13         Thank you.

14         THE COURT:  Go ahead.  Objection

15    overruled.

16    BY MR. STERN:

17     Q.  Mr. Stanziale, you want to file a me too

18    objection; correct?

19     A.  That is correct.  We believe it was very

20    well articulated by the other objectors.

21         THE COURT:  You're not satisfied

22    with Mr. Kortanek's cross-examination?

23         MR. STERN:  No.

24         THE COURT:  You do believe -- agree

1    with me how low the standard is?

2            MR. STERN:  We do, Your Honor.

3            THE COURT:  Not that I'm suggesting

4    that it doesn't -- once I get there, I don't have

5    to listen anymore, I guess is what I'm saying.

6            It can be a very -- he may be

7    meeting a very high standard.  I'm not debasing

8    what he said.  I just wanted to make sure you do

9    understand that he doesn't have to prove a whole

10   lot.

11           MR. STERN:  We understand that, Your

12   Honor.

13   BY MR. STERN:

14      Q.   Mr. Stanziale, the notice that went out to

15   creditors is -- refers to the settlement term

16   sheet, which is the document that you have been

17   referring to; correct?

18      A.   Yes.

19      Q.   And that's the only documents that's gone

20   out to creditors; correct?

21      A.   In reference to?

22      Q.   In terms of the settlement.

23      A.   As far as I know.

24      Q.   And counsel has already indicated that

1    there are maybe other documents that are

2    associated with the term sheets; correct?

3        A.   That's correct.

4        Q.   And it's anticipated that those documents

5    were incorporated as part of that term sheet?

6        A.   It will be incorporated if the Court so

7    approves.

8        Q.   How would the creditors, the unsecured

9    creditors know what the terms of the settlement

10   are if the term sheet does not include all of the

11   documents?  Are they supposed to guess?

12       A.   They would object.  They would come to

13   Court.

14            They would place their objection on

15   the record.

16       Q.   Okay.

17       A.   Let the Court decide what it wanted to do.

18       Q.   Okay.  Now, it's anticipated that this

19   document will be amended; correct, the term

20   sheet, to reflect those items that were referred

21   to here today?

22            As I remember, there were three

23   items that the order would reflect as changes to

24   the agreement.  And those three things would be

1    the amount of the secured claim, the deletion of

2    undertaking other matters in the fee application,

3    and professionals that anticipate that the term

4    sheet will be changed; correct?

5         A.    That's correct.

6         Q.    Okay.  Now, under Paragraph 14 of the term

7    sheet, doesn't it also say that this term sheet

8    can only be modified by a writing signed by both

9    parties?

10        A.    I believe it does.

11        Q.    Do you have a writing signed by both

12   parties incorporating those terms?

13        A.    We are in Court at this time.

14        Q.    That's not my question.

15        A.    Well, I'm going to answer your question.

16   If the Court approves this document, an order

17   will be submitted to the Court with those

18   changes.

19        Q.    Is that fundamentally fair to the

20   creditors to, after the fact, meaning you've

21   noticed all the creditors out there that this is

22   what you've agreed to, and now you've changed it

23   at the Court hearing, but you haven't given the

24   creditors notice?  And the only notice they'll

```
 1    get is an order which was in effect never -- the
 2    changes were never in the notification.
 3                    THE COURT:  Is that a question or
 4    are you arguing to me?
 5                    MR. STERN:  No, I am asking him, as
 6    the Trustee, whether that's fair notice to the
 7    creditors.
 8                    MR. McMICHAEL:  I object to the
 9    question.  It's argumentative.
10                    THE COURT:  Excuse me?
11                    MR. McMICHAEL:  It's argumentative.
12                    THE COURT:  At least.  I'll allow
13    the question.
14                    THE WITNESS:  Answer the question?
15    I'm sorry, Your Honor.
16                    I think the question will have to be
17    read.
18                    THE COURT:  He's asking you whether
19    you think it's fair to have terms that the --
20    amending the agreement in Court and the creditors
21    never knew about the amendments.
22                    Is that the substance?
23                    MR. STERN:  That's it, Your Honor.
24                    THE COURT:  Without the bluster
```

```
 1    added to it.  Okay.
 2              THE WITNESS:  It certainly wouldn't
 3    be fair if -- it would not be fair if the
 4    creditors didn't know about it.  But, in fact, we
 5    are in public session and the creditors do know
 6    about it.
 7    BY MR. STERN:
 8        Q.  How would someone who -- strike that, Your
 9    Honor.
10              Have you --
11              THE COURT:  Are you suggesting --
12    counsel, let me just understand the thrust of
13    that question.
14              Are you suggesting that the changes
15    that -- the adjustments to the deal, which were
16    put on the record by counsel, are so material
17    that they would require renoticing.
18              Because I'll tell you:  If it was
19    part of a confirmation hearing, I would be
20    finding that they were all beneficial to the --
21    to the creditors and finding them non-material.
22              Are you suggesting because this --
23    that regardless of how miniscule and how
24    material, that it's a 7 and not an 11, that all
```

72

1    these changes have to be renoticed?

2              MR. STERN:  Your Honor, I don't know

3    what the changes will say.  This is what has been

4    negotiated at the hearing.

5              THE COURT:  Well, one of them, you

6    were just told it brings down the amount of the

7    alleged secured claim from 45 to under $16

8    million.  That's one.

9              Now, you can't -- the unsecured

10   creditors are going to argue, no, it should be

11   higher.

12             MR. STERN:  I'm relating to -- the

13   issues are pertaining to the side letters and

14   side agreements.

15             THE COURT:  Oh, all right.  Then you

16   didn't make that clear.

17             MR. STERN:  Well...

18             THE COURT:  I've got you.  All

19   right.

20             MR. STERN:  I don't know whether

21   they are -- whether they're material or not,

22   because I've never seen them.

23             THE COURT:  I understand.  I thought

24   you were referring to the adjustments that were

1    put on the record by Mr. McMichael.

2            MR. STERN:  I never got to the rest

3    of them, Your Honor, but they're included.  Also,

4    I think it's abundantly clear, the term sheet, by

5    its own term, says it only can be modified in

6    writing by -- signed by the parties.

7            So we're not at that point yet,

8    because the Trustee has already indicated that

9    there's going to be some modification.  But more

10   fundamental to the issue to the fairness of this

11   settlement is the fact that we don't know what

12   those side agreements are.

13           And they may be material.  They may

14   not.  We may agree that there's no objection to

15   it.

16   BY MR. STERN:

17      Q.  Getting back to the analysis or due

18   diligence that the Trustee performed really

19   active to approving the settlement, did you

20   retain any other expert to evaluate the claims

21   that were asserted against Royal?

22      A.  No.  Well --

23      Q.  Anyone other than yourself or counsel?

24      A.  No.

1      Q.   Why?

2      A.   I didn't think it was necessary.

3      Q.   Isn't it true, though, that the two

4   complaints, as I read it, assert over $70 million

5   worth of claims which you admit you felt, in good

6   faith, were sustainable in terms of the Trustee's

7   ability to pursue those claims; correct?

8      A.   Yes.

9      Q.   So you took a $70 million case and, based

10   on your experience and expertise, which I assume

11   is substantial, and your counsel's expertise, you

12   decided that the settlement that was reached as

13   memorialized by this term sheet is fair and

14   reasonable?

15      A.   In the context of the entire matter, the

16   answer to the question is yes.

17      Q.   Okay.  So I go back to my question:  Why

18   did you not feel it necessary to seek the advice

19   of any other third party expert as to the

20   reasonableness of this settlement?

21      A.   As I looked at the -- I looked at the --

22   at this case in its entirety.  I looked at the

23   allegations that were about not only in

24   complaints and answers, and in discovery, but as

75

```
 1    a result of conversations with other persons

 2    involved in this case.

 3                  And I concluded that while

 4    they're -- while there were -- there was a basis

 5    to pursue claims with regard to Royal, that there

 6    were other claims that were very substantial in

 7    this case that required pursuit by the estate.

 8                  And I looked at the entire case, and

 9    in the context of the entire case.  And what I

10    sought to -- as a result in this case, i.e. to

11    bring a substantial amount of dividend to the

12    estate.

13                  In looking at that, I decided

14    that -- I came to the conclusion, subject to the

15    Court's approval, of course, I came to the

16    conclusion that this settlement in its entirety

17    was a valid settlement.

18        Q.   Now, when you talk about benefit to the

19    estate, Mr. Stanziale, the 4.9 million takes into

20    consideration a 1.9 million administrative claim

21    that would go back to Royal; correct?

22        A.   Go back to Royal only upon -- only upon

23    success of litigation in excess of that amount.

24        Q.   What are the amount of the administrative
```

1    claims that have been filed to date?

2        A.   Administrative claims are in the --

3    approximately, under four million.

4        Q.   So in the context of this settlement --

5        A.   Excuse me, sir.

6        Q.   I'm sorry.

7        A.   That includes, of course, professional

8    fees, et cetera.

9        Q.   Well, that's -- does that include the

10   Royal claim or not?

11       A.   Yes, it would include the Royal claim.

12       Q.   So there's four million in administrative

13   claims.  You're collecting 4.9 from Royal.

14              Isn't it true that the benefit

15   conferred to the estate, to the extent that the

16   professionals seek compensation, would be very

17   little.  900,000 would be left to fund all these

18   settlements, all these other pieces of

19   litigation?

20       A.   I don't believe you understand -- pardon

21   me.  I don't believe you and I agree with the

22   terms of this agreement.

23              As I understand the terms of this

24   agreement, if after litigation is commenced and

1    there is a -- there is a result that benefits the

2    estate in a certain -- in a -- recognized in a

3    dollar amount, which I can't -- I can't determine

4    at this point, but to the extent that there is a

5    result, a financial result, the $1.9 million or

6    anything over it -- let me restate that.

7            If, for example, we brought

8    litigation and that litigation was funded by the

9    sum of money set forth in this agreement, and as

10   a result of that we either settled or got a

11   judgment of $10 million, then the agreement

12   states that Royal will receive, subject to Court

13   approval, the funds that it advanced.

14           So that I could benefit the estate

15   by, roughly, $8 million.

16   Q.   But that arrangement only applies to

17   Royal, it doesn't apply to the other

18   professionals who have administrative claims who

19   can now seek compensation from the Court from the

20   funds that you've created?

21   A.   The other professionals that would seek --

22   would seek payment would seek payment as a result

23   from the funds set forth in the estate.  That's

24   correct.

```
 1        Q.   So that would diminish the amount of the

 2   settlement available to use the funds to this

 3   litigation that you feel is so important for the

 4   benefit of the creditors; correct?

 5        A.   Yes.

 6        Q.   Have you done an analysis as to the

 7   ultimate benefit to the estate after payment of

 8   the administrative claims?

 9        A.   Any analysis that I would do would be

10   based in real time.  And the administrative

11   claims at this particular point exceed the amount

12   of funds that I have on hand.

13              If that's the answer to the

14   question.

15        Q.   Okay.  So how would you ever fund the

16   settlement if, in fact, the funds that you're now

17   deriving will be used to pay administrative

18   claims?

19              MR. WOLFSON:  Objection.  I don't

20   understand the question.

21              THE COURT:  Well, I sure don't.

22              Restate the question.  Break it down

23   into understandable components.

24              MR. STERN:  Very good, Your Honor.
```

1    BY MR. STERN:

2        Q.    To the extent that the administrative

3    claims exceed five million, and you're collecting

4    five million in settlement, isn't it possible and

5    probable that that five million will be

6    diminished by the administrative claims very

7    quickly?

8        A.    Yes.

9        Q.    So what is going to be used to fund these

10   lawsuits that you claim are the basis for this

11   settlement?

12       A.    Administrative claims -- administrative

13   claims are the -- obviously, the Chapter 11

14   administrative claims, and there are Chapter 7

15   administrative claims.

16       Q.    I understand that.

17       A.    And I know you understand that the Chapter

18   7 claims are paid first, and the remainder would

19   be any balance on hand after those claims are

20   paid would be paid to the administrative claims.

21                If you're saying that if I take this

22   $5 million and I pursue the litigation, and I'm

23   unsuccessful in this litigation, will I have

24   depleted the $5 million and have nothing left for

80

```
 1    either, you know, the balance of Chapter 7 claims
 2    or the Chapter 11 administrative claims; that is
 3    correct.
 4        Q.   Well --
 5        A.   I hope that's what your question is.
 6        Q.   Actually it's backwards.  The question is
 7    if right now fee applications are filed and
 8    orders are entered allowing payment of
 9    administrative claims, there won't be any money
10    left to fund litigation against third parties;
11    correct?
12        A.   I don't agree with that.  I would say the
13    answer is not correct.
14        Q.   Why?
15        A.   Because the first claims to be paid are
16    claims in the Chapter 7 administrative claims.
17    Chapter 7 administrative claims come nowhere near
18    $5 million.
19        Q.   How much are they?
20        A.   If allowed by the Court, they would be,
21    approximately, a million.
22        Q.   Okay.  And those claims would be the
23    claims of the Trustee, and the Trustee's counsel,
24    and special counsel such --
```

81

```
 1        A.   Correct.

 2        Q.   Mm-hmm.

 3             Now, did you -- do you have any

 4   expertise in litigating securitized loan claims?

 5             Strike that.

 6             Do you have any expertise in

 7   litigating cases involving securitized loans?

 8        A.   I -- over the course of my career, I may

 9   have.  I may have been involved in litigating

10   those claims.

11             But I can't specifically recall a

12   litigation of a securitized claim.  I have

13   litigated literally thousands of claims.

14        Q.   Now, you felt comfortable at the time you

15   filed the complaint that this was protected and

16   complex litigation; correct?

17        A.   Yes, indeed.

18        Q.   What has changed today, other than the

19   fact that the Trustee can fund the litigation

20   against Royal, that has now caused you to agree

21   to the settlement?

22        A.   I think the basis of the settlement is

23   that pursuing the claim against Royal, both

24   claims against Royal make it no less complex.
```

1    And with any litigation, there is always the

2    possibility that I will be unsuccessful.

3              Royal has filed an answer.  My

4    experience with Royal thus far has been that they

5    will take this case as far as they can go, and

6    they will appeal to every Court they can get to.

7              They will take extensive discovery.

8    And they believe that they have a valid defense.

9              Now, the fact that I don't believe

10   the defense is valid is not what a Court, or a

11   jury, or a judge may believe is valid or not

12   valid.

13             So because of the complexity of

14   litigation, because of the complexity of the

15   case, because of the defense that was filed, and

16   because of the extraneous matters that come in,

17   because of the allegations of fraud that abound

18   in this case, there is a possibility that they

19   may succeed.

20             And they're willing to put $5

21   million up close to the -- on the table.  Three

22   million, they can never -- 1.9 million that they

23   might have an opportunity to get back presumably

24   if we're successful in subsequent litigation, and

1    three million that they'd never get back.

2       Q.   Well, let's talk about that.   Why are they

3    entitled to the 1.9 million?

4       A.   Well, I believe they'd be entitled to the

5    1.9 million if they're -- if I'm going to use

6    that 1.9 million to bring in substantial assets

7    to the estate, they should be -- have a right to

8    be reimbursed for having expended that money,

9    because I don't have that money.

10              That's money that I, as a Trustee on

11   behalf of the creditors, don't have to expend.

12              But, conversely, if I'm not

13   successful, they don't get it back.

14      Q.   Mr. Stanziale, the issue, as I see it, and

15   by your testimony, if you had the funds available

16   today to fund the litigation against Royal,

17   meaning that the estate had sufficient assets to

18   adequately fund the litigation, would you still

19   have entered into that settlement?

20      A.   I don't think -- I don't think the issues

21   change whether I had the money or didn't have the

22   money.   I think the fact is that there's always a

23   possibility that they could be successful.

24              And --

```
 1          Q.   But you --

 2          A.   -- I would have --

 3                    THE COURT:   Let him finish.

 4                    MR. STERN:   Sorry, Your Honor.

 5                    THE WITNESS:   There's always the

 6    possibility that they would be successful, and I

 7    would lose out on the opportunity to get not less

 8    than $3 million.

 9    BY MR. STERN:

10          Q.   Have you consulted with any other counsel

11    to see whether they'd be interested in taking on

12    the case against Royal on a contingency fee

13    basis?

14          A.   No.

15          Q.   Why not?

16          A.   Well, first of all, I think that besides

17    believing that the counsel Debtor involved, that

18    are involved with me in this case, which are my

19    own firm, are capable and experienced in this

20    litigation, Number 1.

21                    Number two, there is an extensive

22    learning curve that would have to be undertaken

23    by any other firm that took this on.

24                    And so if the firm said, Oh, I'll
```

85

1    take this on on a contingency basis, I'm not sure

2    the representation would be as adequate as the

3    representation that I have.

4        Q.  But your answer is that you have not

5    endeavored to determine whether any --

6                    THE COURT:  He answered the

7    question.  Move on.

8                    I mean, if this is -- you know, war

9    of attrition, I understand.

10                    Let's move along.  I mean, you

11    understand the standard he's got to meet.

12                    Ask your questions.  Don't argue

13    with the witness.

14                    MR. STERN:  Thank you, Your Honor.

15    BY MR. STERN:

16        Q.  In reviewing the term sheet, it indicates

17    that the Trustee is to get due deference to the

18    position of Royal.  Does the Trustee have veto

19    power over Royal's decision to proceed with

20    litigation that the Trustee decides not to

21    pursue?

22        A.  The -- if I decide not to pursue this

23    litigation, Royal has the option to pursue it.

24    The answer to your question is, no, I don't have

86

```
 1   a veto power over their right to pursue a piece

 2   of litigation.

 3       Q.  Are you giving up your delegated authority

 4   and responsibility under the Bankruptcy Code by

 5   allowing Royal to sue whoever they want?

 6       A.  No.

 7       Q.  Why is that?

 8       A.  First of all, Royal is a creditor.  And as

 9   a creditor, they have a cause of action.

10              They have a right to bring an action

11   against any party that I bring an action to, by

12   and large.  And that's -- that's the answer to

13   number one.

14              Answer number two, I have a

15   responsibility, fiduciary responsibility as a

16   Trustee, and under the code.  And I don't believe

17   providing a creditor who has a right to bring an

18   action, not to mention a $550 million creditor to

19   bring an action, I don't believe that giving him

20   an opportunity to pursue cause of action is

21   waiving, delegating, or in any other way avoiding

22   my responsibility as a fiduciary.

23       Q.  What happens if a counterclaim is asserted

24   in the cause of action asserted by Royal, what
```

1    would be the Trustee's position?

2         A.   I don't understand your question.

3         Q.   What if in the event that the Trustee

4    decides not to initiate legal action, and Royal

5    in the name of the trustees on behalf of the

6    estate brings legal action, a counterclaim is

7    asserted against the estate management, against

8    the estate?

9         A.   Then that would be -- then that will be

10   defended by -- under the auspice -- they're

11   bringing -- they're bringing a cause of action

12   under the auspices of the estate.   Then they will

13   defend that counterclaim on behalf of the estate.

14        Q.   And what happens if the counterclaim is

15   sustained and there's a substantial award entered

16   against the estate, who's going to pay for that?

17        A.   I think -- I don't know if I can answer

18   that question.   It's highly speculative.

19              MR. WOLFSON:   These are misleading

20   the whole basis of this case and the state of

21   law.   There's been a bar date set in this case.

22              If there was any claim asserted by

23   way of a counterclaim that was not already

24   asserted by way of a claim, they could only be

1   used to offset the amount of any judgment.  It

2   could not give rise to a new claim that doesn't

3   already exist against the estate.

4              THE COURT:  Is what you're

5   suggesting that the bar date has already passed?

6              MR. WOLFSON:  Correct.

7              THE COURT:  You may answer the

8   question.

9              THE WITNESS:  I don't know the

10  answer, but I'm going to -- I can't -- I'm not

11  going to take a position for Royal.  If a

12  counterclaim were sustained against the estate,

13  it was costly to the estate, I think that I would

14  look to Royal.

15             But it would be -- in any event, it

16  would be if it were payable and didn't become an

17  administrative insolvent estate, it would attach

18  to the claim of Royal.  So you know, if I might

19  just take a little bit of leave here, you know,

20  as Trustee, we have effective -- by Friday -- we

21  will, effective Friday, have filed 60 lawsuits in

22  this case.

23             We have a lawsuit by the Trustee.

24  The Trustee has filed a lawsuit against Mr. and

89

1    Mrs. Yao.  The Trustee is about to file a lawsuit

2    against a professional firm involved in this case

3    and others.

4              So there is an inordinate -- when I

5    say inordinate, there is a great deal of

6    litigation that the Trustee and this estate is

7    pursuing without -- without the aid, assistance,

8    or otherwise of Royal.

9              So this is -- this has been a very

10   active case in the sense of litigation.  As I

11   said, 60 -- 60 cases will be filed soon.

12   Possibly more.

13             And again, I might add, I believe

14   they're trucking schools that they're being filed

15   against, for the most part.

16             They're also being filed against

17   others besides the trucking schools, insiders.

18   The case of one, a Playboy bunny who received a

19   million and a half dollars.  An escort service.

20   And certain casinos in Las Vegas, and other

21   insiders.

22             So we are actively pursuing the

23   litigation we need to pursue in this case.  And

24   Royal's litigation is only part of the -- part of

1    the litigation program the estate has undertaken

2    here.

3        Q.   Isn't it -- I believe you had already

4    testified that the amount allowed as the

5    unsecured prepetition claim of around 516 million

6    was never calculated with certainty by the

7    Trustee, it was a number that you assumed was

8    correct.

9             Or how did you derive or how did you

10   conclude that number was accurate?

11       A.   Well, the -- there is a judgment entered

12   into the -- in the United States District Court

13   which my counsel, Mr. McMichael, alluded to

14   against Royal in the approximate amount of 380

15   million.

16            There is a judgment entered into the

17   United States District Court with the District of

18   Delaware against PNC Bank for 110 million.

19            There is a judgment entered against

20   Wilmington Trust in the same Court for,

21   approximately, 12 million.  I'm not sure exactly

22   what that adds up to.

23            But there are -- there is the

24   additional advance that Royal made in the case,

1    which my counsel indicated was collateralized,

2    but was not a security interest.

3              And interest has been running for a

4    year on that -- on those judgments entered by the

5    United States District Court.  So my assumption

6    that the total amount is in excess of $550

7    million, in my view, is fairly accurate.

8        Q.  But the settlement does not allow any --

9    doesn't allow the Trustee to contest the amount

10   of that allowed unsecured claim down the road,

11   other than money that may come back in as a

12   result of this litigation being overturned;

13   correct?

14       A.  Well --

15              THE COURT:  It's an agreement.  It's

16   a settlement.

17              They're fixing their claim.  I think

18   that you're forgetting that this is all on the

19   record as a proffer.

20              And it's -- the hour is growing

21   late.  And to go over ground that already is in

22   the proffer, I don't see as terribly productive.

23              Mr. McMichael put the proffer in.

24   Let's move on.

1    BY MR. STERN:

2        Q.   Do any of the unsecured creditors have the

3    right to contest the proof of claim filed by

4    Royal under your settlement agreement?

5        A.   There's no mention of the rights of

6    anyone.  Is that a legal question or a factual --

7        Q.   No.  As the Trustee, would you object if

8    another creditor of the estate objected to the

9    proof of claim asserted by Royal?

10       A.   Oh, Royal would object.

11       Q.   I'm asking whether the Trustee would

12   object.

13       A.   I've stood by the claims submitted here.

14   I don't know if it's my responsibility to object.

15               I don't --

16       Q.   Would it --

17       A.   Why would I?  I mean, I'm sorry.

18               You're asking the questions.

19       Q.   No.  I want you to finish.

20               I apologize.

21               Well, I think we can all agree that

22   part of the settlement that is the allowance of

23   a -- of the claimant management, it would bar the

24   unsecured creditors.

93

```
 1              THE COURT:  Are you asking me or the

 2    witness?

 3              THE WITNESS:  Isn't that what

 4    allowance means?

 5              MR. STERN:  That's correct.

 6              THE COURT:  Okay.

 7              THE WITNESS:  If the Court -- if

 8    the -- if the claim was allowed and the Court

 9    approves it, an objection would be -- would be --

10    I suspect it would be overruled and not

11    sustainable.

12    BY MR. STERN:

13        Q.  So the bottom line is that at the end of

14    the day, there will be, under your analysis, very

15    little available for the unsecured claims which

16    amount to about $60 million?

17        A.  That's -- you're here.  If you object, so

18    state it.

19              But the answer to your question is,

20    at the end of this hearing, it's my assumption,

21    if the Court approves it, the Court may not

22    approve it, but if the Court approves it, then

23    anyone seeking to object will be summarily

24    dismissed.
```

1          Q.   How would it be a detriment to the estate

2      to allow the claims, subject to the rights of

3      other creditors, to come in and object?

4                    MR. WOLFSON:   Objection, Your Honor.

5      It's way beyond the scope.

6          '          This is -- it has nothing to do with

7      the reasonableness of this settlement asking the

8      witness' opinion of some other hypothetical

9      situation.

10                   THE COURT:   Well, I assume what he's

11     asking is why did you negotiate that?   And I

12     think the answer is pretty obvious that that

13     wasn't the deal.

14                   MR. WOLFSON:   That's not the deal we

15     assume we're going to.

16                   THE COURT:   If you want to examine

17     him on what other settlements he might have

18     entered into, that Royal would not have agreed

19     to, I guess you can ask that question.

20                   MR. STERN:   No.   That would be

21     argument.

22                   THE COURT:   It seems to me the

23     answer is pretty obvious.

24                   MR. STERN:   It would be argument.

1    And I don't need to ask him that.

2                I don't have any further questions.

3                THE COURT:  Thank you.

4                Anyone else want to examine this

5    witness?

6                Redirect?

7                MR. McMICHAEL:  Brief redirect.

8    BY MR. McMICHAEL:

9        Q.  Mr. Stanziale, you have the settlement

10   term sheet in front of you?

11       A.  Yes, I do.

12       Q.  Could you look at the paragraph that deals

13   with Paragraph 6?  I just want to deal with these

14   off-the-record so-called side agreements.

15       A.  I see it.

16       Q.  Do you see Paragraph 6?  Could you explain

17   to the Court why it is that the settlement

18   threshold described in Paragraph 6 is not put in

19   the record?

20               THE COURT:  Mr. McMichael, this is

21   the Pepper Hamilton one?

22               MR. McMICHAEL:  I'm sorry?

23               THE COURT:  Is this the Pepper

24   Hamilton one, so-called side agreement?

1          MR. McMICHAEL:  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Well --

4     BY MR. McMICHAEL:

5          Q.  Do you just want to put that in the

6     record?

7          A.  First of all -- first of all, Royal has a

8     cause of action of its own, if it wishes to

9     proceed against Pepper Hamilton.  And Pepper

10    Hamilton, if Pepper Hamilton sought to negotiate

11    a settlement with the estate, with the Trustee,

12    it's our view that they wouldn't proffer money to

13    the Trustee, and then leave themselves open to a

14    lawsuit, another lawsuit, possibly under the same

15    set of facts, absent collateral estoppel, et

16    cetera.

17              So any settlement that we would

18    enter into with -- if we were fortunate to do so

19    with Pepper, would necessarily require a sign off

20    from Royal.

21              Now, why do we not set forth that

22    amount in here?  What this agreement says is that

23    there's a minimum amount that Pepper would agree

24    to without any further opportunity to object.

1           And so we came to a conclusion as to

2   what that amount would be.  If the amount that we

3   would settle for is under this amount that Royal

4   feels is justifiable, Royal can either say, Yeah,

5   I'll go along with it, or say, No, I'm not going

6   to go along with that.

7           But any amount that we settle for

8   over this particular amount, Royal will have no

9   say in whether the estate accepts that settlement

10  or not.

11      Q.   Would it be a bargaining disadvantage for

12  the Trustee in trying to settle a claim against

13  Pepper Hamilton for Pepper to know that amount?

14      A.   Of course, it would.

15      Q.   Okay.  And isn't that why you didn't put

16  it in the agreement?

17      A.   Yes, it is.

18      Q.   Okay.  And is it true that we have a side

19  letter with Royal that documents that amount?

20      A.   Yes, we do.

21      Q.   Okay.  And have you authorized us to file

22  that under seal?

23      A.   Yes, I have.

24      Q.   Okay.  So you're not attempting to hide it

1    from the Court?

2         A.   No, I'm not.

3         Q.   You just don't want Pepper to find out

4    about it, because of the obvious implications; is

5    that correct?

6         A.   Yes.

7         Q.   Is the same thing essentially true with

8    respect to the threshold amount for the

9    settlement of Chapter 11 administrative claims

10   that appears in Paragraph 8, same basic theory?

11        A.   Yes.

12        Q.   Okay.  We have a side letter?

13        A.   Yes.

14        Q.   And you've authorized us to file that

15   under seal with the Court --

16        A.   Yes.

17        Q.   -- if the Court wants to inspect it?

18        A.   Yes.

19        Q.   But, obviously, it would be an advantage

20   to those admin creditors from the Chapter 11 if

21   they knew what that number was; right?

22        A.   Yes.

23        Q.   All right.  Now, let's just talk about

24   admin claims for one more second, and then I'll

```
1     sit down.

2                 You were asked a lot of questions

3     about administrative claims.  So let me just go

4     over it with you again, so we are clear what

5     we're talking about.

6                 You said there was $4 million of

7     administrative claims.  Isn't it true that about

8     two million of it was from the chapter?

9          A.   Yes.

10         Q.   About half of it?

11         A.   Yes.

12         Q.   And isn't it true that under Paragraph 8,

13    as long as we meet our target, Paragraph 8 of the

14    term sheet, Royal will withdraw its $7 million

15    claim?

16         A.   Yes.

17         Q.   So that comes out.

18                 And do you have objections?  If you

19    can't resolve the Chapter 11 admin claims, do you

20    have objections to those claims?

21         A.   Yes.

22         Q.   And last, but not least, the 1.9 million

23    dollar admin claim that Royal gets under this

24    agreement, they can't take that out of your $3
```

1    million settlement; right?

2        A.   No.

3        Q.   All right.  One more question.

4             Is there money in the estate --

5        A.   Yes.

6        Q.   -- today?

7        A.   Yes.

8        Q.   Without the settlement, there is cash in

9    the estate?

10       A.   Yes.

11            MR. McMICHAEL:   That's all I have,

12   Your Honor.  I'll have some argument if the Court

13   wants to hear it later.

14            THE COURT:   Any recross?

15            MR. KORTANEK:   No, Your Honor.

16            MR. STERN:   No, Your Honor.

17            THE COURT:   Thank you,

18   Mr. Stanziale, you may step down.  Any other

19   evidence from the moving party?

20            MR. McMICHAEL:   No, sir.  The

21   Trustee rests.

22            THE COURT:   All right.  Any

23   witnesses from the other side?

24            MR. KORTANEK:   No, Your Honor.

101

1          MR. STERN:  No, Your Honor.

2          THE COURT:  Very well.  I'll hear

3     argument.

4          MR. KORTANEK:  Your Honor, the CDI

5     schools have objections that are on three

6     principal grounds.

7               One is the delegation concept.

8               Two is process.

9               And three is what I'll call merits

10    of the settlement.

11              On the point of delegation, Your

12    Honor, I think that Cybergenics is an important

13    milestone, but it is only a starting point.

14              First, I think that Mr. Wolfson

15    turns Cybergenics on its head a little bit.  It

16    is, indeed, a case where the Third Circuit, and

17    then the On Bonk Third Circuit was only deciding

18    whether a committee should be delegated estate

19    causes of action.  But it is definitely a fair

20    characterization that it wrestled with that

21    concept mightily.

22              THE COURT:  But let me understand

23    them.  These -- delegation is only in causes of

24    action that the Trustee independently uses his

1    judgment that he's not going to bring --

2              MR. KORTANEK:  That's correct.

3              THE COURT:  So does that hurt the

4    creditors?  And you're here as a creditor, not as

5    a defendant.

6              MR. KORTANEK:  Right.

7              THE COURT:  Why does that hurt the

8    creditors if the Trustee says, I'm not going to

9    do it.  Is it worth it, or I don't think it's

10   worth it, or I don't want to spend my time on it,

11   or I don't think it's a good enough cause of

12   action to pursue to have somebody else who's

13   interested in collecting money say, okay, I'll do

14   it.

15             MR. KORTANEK:  Whether --

16             THE COURT:  Isn't that what we have

17   here?

18             MR. KORTANEK:  Well, no.  Your

19   Honor, the question is not whether it hurts

20   creditors.

21             I was going to take Your Honor back

22   to the STN case, which is out of the Second

23   Circuit.

24             THE COURT:  Which case?

1          MR. KORTANEK:  STN.

2          THE COURT:  Yeah.

3          MR. KORTANEK:  It's a Second Circuit

4    case, and it's a very important case.  It's a

5    1995 case.

6          The cite is 779 F. 2d 901.  And STN

7    and lot of cases that follow it articulated a

8    standard for when a party seeks to obtain

9    delegation of an estate cause of action.

10          First of all, when you think of the

11    whole Bankruptcy Codes and what a Trustee or

12    Debtor-in-possession has under 544, they have

13    things that are given to the Trustee.

14    Hypothetical creditor standing, without the

15    baggage, let's say that comes with being an

16    actual true creditor who would have to bring a

17    fraudulent transfer claim.

18          I thought it was very interesting to

19    hear questions and answers about potential cross

20    claims or counterclaims.  Because it will be

21    especially awkward for someone like Royal to be

22    standing in the shoes of a supposed fiduciary for

23    the estate, which I think one has to accept

24    someone bringing an estate cause of action, if

1    it's being delegated, not sold.

2              If it's being delegated, what comes

3    with that is the fiduciary duties that an estate

4    fiduciary would have, which I think they've

5    acknowledged begrudgingly that they would have to

6    file fee applications.

7              We appreciate that they have moved

8    our direction, but also they have to be free of

9    conflicts.

10             Take a look at 327(e), for example,

11   Your Honor.  That really -- you talk about the

12   lowest point of a professional's lack of conflict

13   as an example when an estate cause of action is

14   going to be pursued, you can bring in a special

15   litigation counsel.

16             But the most important thing

17   articulated in 327(e) is that they cannot hold an

18   interest or represent an interest.

19             THE COURT:  So why isn't that an

20   issue to be -- you heard that, in fact, if this,

21   in fact, happens, stop me if I'm misstating it --

22   you are -- they're going to come in with a motion

23   for permission to do that.

24             MR. WOLFSON:  Your Honor, that would

1   only happen in connection with the Paragraph 2

2   claims if the Trustee's counsel, all of them,

3   attempt to bail out of the case, and there's

4   nobody else left representing the Trustee.

5              THE COURT:  So --

6              MR. WOLFSON:  As to right now, as

7   the testimony indicated, it is the anticipation

8   of the parties that the Trustee is going to bring

9   all of the litigation.  What, as Your Honor

10  properly noted, Paragraph 7 is designed solely to

11  say that, in the event the Trustee chooses not to

12  bring a particular cause of action that Royal

13  believes ought to be pursued, then, at our own

14  cost and expense on behalf of the estate, we can

15  do it.

16             The one exception that we know about

17  today, and as far as we know the Trustee is going

18  to be bringing all of the other actions, but the

19  one exception we know about today at the request

20  of the Trustee is the CDI, DDI litigation.

21             And --

22             THE COURT:  All right.

23             MR. WOLFSON:  That's the only one.

24             THE COURT:  I don't want to waste

1   your time with something I've already decided.

2   I'm going to overrule your objection on

3   delegation.

4               Move on to the other points.

5               MR. KORTANEK:   Thank you, Your

6   Honor.

7               Your Honor, we'll be moving for a

8   stay pending appeal, because I think it's clearly

9   something that the Third Circuit or the District

10  Court will find important, and we shouldn't have

11  our rights prejudiced.

12              Your Honor, --

13              THE COURT:   What right is being

14  prejudiced by the right not to be sued by Royal?

15              MR. KORTANEK:   Not at all, Your

16  Honor.  But the right that's being prejudiced is

17  when an estate fiduciary who's -- the exercise of

18  his fiduciary duty to decide to settle the CDI's

19  claim has not been challenged as an appropriate

20  exercise of that duty.

21              Today, the Trustee, again, he

22  iterated he thought that was a good business

23  judgment as a Trustee and as a fiduciary.  That

24  right would now be given against a very -- the

1    very party that, by Royal's own choosing it, it

2    sued us on the same claims in Tennessee.

3              We have counterclaimed in a five or

4    seven-count complaint seeking from Royal all the

5    damages that our clients have suffered, seeking

6    doubling of those damages.  You have the Trustee

7    acknowledging that he has valid -- he believes he

8    has valid claims against Royal.

9              So what you have is an inherent and

10   irreconcilable conflict of interest that I've

11   never seen in all the STN or Cybergenic-type

12   cases.

13             So Your Honor, I want to be clear

14   that the conflict issue is the remaining point

15   for us and for the estate, and we think it's

16   irreconcilable as far as Royal's interests are

17   concerned.

18             Think about how the litigation will

19   be prosecuted.  There are hundreds --

20             THE COURT:  I've given you my

21   ruling.

22             MR. KORTANEK:  Thank you, Your

23   Honor.

24             Your Honor, I guess what I'm getting

108

1    into, we'll submit papers for motion for stay,

2    and we'll do that in writing.

3              Your Honor, as to the --

4              THE COURT:  Did you argue the 327(e)

5    issue --

6              MR. KORTANEK:  We did raise that

7    section, Your Honor.

8              THE COURT:   -- in your objection?

9              MR. KORTANEK:  Yes.  I raised it as

10   a benchmark because, to me, it was important to

11   think about how the Bankruptcy Code was written,

12   that even where there's --

13             THE COURT:  Counsel, you know your

14   virtue of protecting the system is very

15   impressive, but raising these things out of the

16   dozens, perhaps hundreds of creditors, your

17   virtue is -- I'm not going to question your

18   virtue, but your motives are suspect.

19             MR. KORTANEK:  That's fine, Your

20   Honor.  And in fairness, the same can be said for

21   Royal and seeking the delegation only against us.

22             THE COURT:  But Royal's putting up

23   the bucks, too.  And, you know, if you want to

24   stall and do that, fine.

1          The worse that happens is that

2   somebody else will sue you.  I mean, you know...

3          MR. KORTANEK:  Well, that's fine,

4   Your Honor.

5          THE COURT:  You're being sued.

6   You're a defendant.

7          Defend the case.  Don't waste a lot

8   of time, effort, and money on side issues.

9          Let's move onto your other

10  arguments.

11         MR. KORTANEK:  Your Honor, the

12  second point is a process.  You have an agreement

13  in front of you that it's interesting that they

14  have decided, evidently in response to the

15  objections, that they will now file these

16  material side agreements under seal.  But they

17  haven't been filed yet.

18         It's admitted that they are

19  material, and they haven't been disclosed to Your

20  Honor.  I think that alone is cause --

21         THE COURT:  I'm not going to approve

22  the agreement until I get them.

23         MR. KORTANEK:  I appreciate that,

24  Your Honor.  That's certainly an important

```
1    point --
2                    THE COURT:  You do understand that
3    by -- if they filed them in open Court, at least
4    their uncontroverted testimony is there being
5    competitive disadvantage to which you -- or you
6    have a claim in this case.
7                    MR. KORTANEK:  I understand.
8                    THE COURT:  I really don't want to
9    do that.  Do you?
10                    MR. KORTANEK:  I don't disagree with
11   that, Your Honor.  Again, it's a process.  I
12   think it's important.
13                    THE COURT:  All right.
14                    MR. KORTANEK:  Now, on the merits,
15   Your Honor, I thought it was -- the one thing
16   that really sticks out to me when you look at a
17   half a billion dollar claim, that will be
18   irrevocably allowed today if Your Honor were to
19   grant the motion, the case is essentially over,
20   and -- as to all other creditors are concerned.
21                    Did you read -- rhetorical question.
22   Did you really hear enough today to "end the case
23   for other creditors"?  Specifically the Trustee
24   told Your Honor that -- what I think is the
```

1    biggest potential neutron bomb as to the claim,

2    the contract-based claim back against the estate.

3            To me a 510(c) claim is a very, very

4    important issue.  And it has not been explored as

5    to any potential 510(c) predicated on the aiding

6    and abetting claim that was only refiled a few

7    months ago by the Trustee.

8            So it looks to us, and I think the

9    record shows that since that complaint was filed

10   in April, very little has actually been done.  We

11   don't -- I didn't hear any clear evidence that

12   there were actual depositions or examinations

13   taken in that litigation.

14           I thought the cross by the other

15   objecting counsel was also important, that there

16   was no expert retained at any time to look at the

17   aiding and abetting claims, and other claims that

18   could be leverage -- leverage under a 510(c).

19           Maybe not a meritorious one, but

20   certainly having a lot of value to other

21   creditors of the estate.

22           Because if you subordinate just a

23   part of this claim, given what's been represented

24   about non-Royal creditors, that's of enormous

1   impact to other creditors.  Your Honor, our

2   litigation in Tennessee will, in fact, be

3   pursuing claims against Royal on many of those

4   theories.

5            And it will be interesting, Your

6   Honor, if the Tennessee District Court will be

7   hearing those things.  It's going to go to trial

8   at some point, perhaps a year from now.

9            And only time will tell whether, you

10  know, who proves right in terms of what Your

11  Honor is being asked to do today.

12           But those issues are engaged, and I

13  think it's a fair statement, just as Your Honor

14  was convinced that the Trustee should not have

15  approved the settlement with our client, based on

16  all the evidence that Royal brought up from the

17  Tennessee litigation without our participation.

18           Well, Your Honor, the same can be

19  said going the other direction.  So we didn't

20  bring that show to Your Honor, because quite

21  frankly, they didn't -- we didn't have the six or

22  seven weeks that Royal had when the Trustee filed

23  the motion as to our settlement.

24           So you really have a remarkable

1    mirror image as to what Royal knew, what it

2    didn't know.  And is there any basis for a

3    510(c)?

4              That ought to, with all respect,

5    have some seed of doubt that I think doesn't meet

6    the lowest range.

7              THE COURT:  Well, seed of doubt, I

8    mean, you know, yeah, I've got seeds of doubt all

9    over the place.  But he doesn't have to make a --

10   very much of a showing.  That's my point.

11             I mean, is the burden -- does he

12   have to get rid of all my seeds of doubt?

13             MR. KORTANEK:  Your Honor, that's a

14   poorly chosen phrase.

15             THE COURT:  But I mean --

16             MR. KORTANEK:  Your Honor --

17             THE COURT:  It's not my judgment,

18   would I do this?  It's his judgment measured by

19   the lowest end of the spectrum of reasonableness,

20   isn't it?

21             MR. KORTANEK:  Well, that's what

22   we've always thought, Your Honor.  And in fact,

23   you know, what Your Honor saw on the settlement

24   for our claim, although I was excluded from the

114

1    courtroom, was an awful lot of evidence with no

2    testimony from Royal.  Documents that were taken

3    out of context.

4              Where you are today is at least

5    we've had live testimony.  And through that

6    testimony, I think the most important tool in

7    dealing with the Royal claim has been that that

8    stone has been left completely unturned.

9              That's more than a seed of doubt.  I

10   don't think that passes muster as even satisfying

11   the lowest range of reasonableness under the

12   standard that Your Honor is supposed to apply.

13             Because even a partial

14   subordination -- if we're only talking about 10

15   million, or 20, or 30 in other claims, a partial

16   subordination of a half a billion dollar claim of

17   a few million -- few million dollars would mean

18   that those dollars go to other creditors first,

19   and then the rest can go to Royal.

20             As I understand the economics of

21   this deal, even leaving the three million on the

22   table, Royal's taking back 90 percent of it.  I

23   may be missing something, but that's how I see

24   it.

1           THE COURT:  Well, if there's -- I

2    don't see that at all.  I think it's 90 percent

3    of what's left as long as it's not -- and it's

4    only up to a million nine, and then they get --

5           MR. KORTANEK:  I can be corrected on

6    that.  I know they have the million nine

7    superpriority, but the three million typical bank

8    deal.

9           THE COURT:  Let me ask you, counsel:

10   You seem to think that -- you were very concerned

11   in your objection about the timing of this thing,

12   yet, you haven't honored that today.  And at

13   least two creditors, maybe more if they file

14   their statements, as they should have already

15   done are objecting.

16           Why do you think that is?

17           MR. KORTANEK:  Well, I asked the

18   witness, Your Honor, candidly.  I asked the

19   witness how much of a factor the time was to the

20   Trustee.

21           And I was going to get to that.

22   It's a tertiary argument.

23           I think it's clear from the motion,

24   Your Honor, that a very significant reason for

116

```
1    filing it when they're filing it is they need a

2    war chest.

3                 THE COURT:  You already heard, but

4    he also said he just filed -- he's already filed

5    more than 60 lawsuits.

6                 MR. KORTANEK:  That is right, Your

7    Honor.

8                 THE COURT:  And that there's money

9    in the estate.

10                MR. KORTANEK:  That's right.  I'm

11   not making that my first argument.

12                I still think the timing is suspect.

13   I don't think it's an issue.

14                THE COURT:  But I'm not suspect of

15   the timing.  I understand -- I get the sense that

16   you felt that things would be different and more

17   people would object if there was more time.

18                And I mean, I haven't seen any

19   creditor file a motion asking for more time.

20   I've only seen two out of the hundreds of

21   creditors even taking the interest to show up.

22                Now, is there something misleading

23   about the notice?

24                MR. KORTANEK:  For -- Your Honor,
```

1    for a settlement that's been negotiated for six

2    months, for a settlement that the story of the

3    case will tell, it has virtually changed the case

4    in a remote fashion.

5                THE COURT:  My view is somewhat

6    different than yours.  I see the Trustee spending

7    a very significant amount of time and energy

8    duking it out, very preliminary grounds with

9    Royal with no focus on other things.

10               And you may not have seen it all,

11   but it's -- I mean, it's been a war of attrition

12   on both sides.

13               And I understand why the Trustee

14   would like to get on with other things,

15   particularly, and I have no reason to disbelieve

16   them.  If their evaluation of the litigation was

17   what he said it was, I don't know why I should

18   disbelieve that.

19               MR. KORTANEK:  Well --

20               THE COURT:  I mean, I'm concerned,

21   510(c), that maybe he could have squeezed a

22   little more out of Royal.  You know, that's his

23   judgment, not yours.

24               MR. KORTANEK:  Well, that's right,

118

```
 1    Your Honor.  Although, respectfully, I don't
 2    think he exercised any -- I think that's what the
 3    evidence shows on that point, because he
 4    didn't -- he did not analyze if he were -- had
 5    any chance of success on the aiding and abetting
 6    claims as he said, whether that would dovetail
 7    into any 510(c).  So I don't think that's there.
 8              And Your Honor, that's essentially
 9    our argument, and we'll sit down.
10              Thank you.
11              THE COURT:  Thank you.
12              MR. STERN:  Your Honor, he
13    articulated the objections.  I won't repeat them.
14              I think what really -- what really
15    stood out in the testimony of the Trustee and
16    what bothered me most about the settlement is the
17    fact that it was clear that it wasn't -- was a
18    war of attrition.
19              That's something that motivated the
20    trust at the -- to do the settlement.  We all
21    understand that.
22              THE COURT:  It's part of litigation.
23    It's part of litigation.
24              MR. STERN: I question why the trust
```

119

1    didn't seek out other alternatives.  If the

2    Trustee thought it was too costly, too expensive

3    to handle it, didn't have the manpower or

4    whatever, I would say that prudence dictates the

5    minimum level that you see, if there's any other

6    alternatives.

7              The Trustee clearly testified that

8    he didn't consider offering this case to another

9    counsel who might be competent, who might be able

10   to handle it, who might have the capacity and the

11   resources to duke it out and benefit the estate.

12             What we've done here is it's a

13   capitulation to the 800-pound gorilla, with all

14   due respect, because they had the resources to

15   beat the Trustee based on their ability to fund

16   it.  And it was clear through the Trustee's own

17   testimony that, you know, he's called it a day.

18             Now, that may have been prudent for,

19   on his standpoint, to say, hey, you know, I

20   really have had enough of this litigation, but

21   from the standpoint, the bigger picture, and I

22   believe, and Your Honor, I represent many of the

23   schools here on 93 that I filed, and I will file

24   the statement, there is no litigation pending.

1        We are -- we represent the unsecured

2   creditors.  We have several million dollars in

3   claims.

4        I've been following the bankruptcy

5   since the Chapter 11 was filed.  I have not taken

6   a proactive stance, because there's nothing that

7   had to be done.

8        But, ultimately, we are, at the end

9   of the day with this big claim against Royal, and

10  there's really no benefit to the estate.  And

11  then Royal now calls the shots.

12       I think it is -- and I know Your

13  Honor had ruled.  I'll just add one more point.

14       If there was some oversight to the

15  delegation aspect that I feel more comfortable,

16  but what we have, in effect, is Royal's ability

17  now to sue whoever they want, when they want, and

18  to use the Bankruptcy Court as a forum for that.

19       Now, because they're 90 percent of

20  the unsecured claims, they have the most benefit

21  available.  I think the Court should have some

22  oversight over that.

23       I think that it should be noticed to

24  all the unsecured creditors that the Trustee has