1   been presented a claim to pursue, and the Trustee

2   has decided to delegate that.  And we should

3   know, as unsecured creditors, what the terms and

4   conditions of the agreement are.

5              You know, it could be that Royal

6   spends millions of dollars in that claim

7   defending, and we have another administrative

8   claim that we have to deal with.  There are no

9   checks and balances.

10             There is a complete delegation

11  responsibility.  I believe that Royal's counsel

12  said that, to the extent that there's any

13  obligation to seek Court approval, it only

14  applies to Paragraph 2.

15             I would ask Your Honor to consider

16  applying those same provisions to Paragraphs 7

17  and 11, which would then give the creditors a

18  fighting chance of at least knowing what's going

19  on.

20             Thank you, Your Honor.

21             THE COURT:  Thank you.

22  Mr. McMichael.

23             MR. McMICHAEL:  Your Honor, as a

24  matter of basic litigation strategy, I think it's

1    obvious why we cannot put on the open -- in the

2    open record the amount that we have agreed to

3    with Royal, by which we can give up Royal's

4    claim, knowing that would be a significant

5    litigation disadvantage.

6                    And we have those agreement letters

7    here, and I have prepared an envelope to file

8    them under seal, and would request that the Court

9    permit me to file them under seal for the Court's

10   inspection.

11                   THE COURT:   I will take them, but I

12   don't recall off hand whether there's a

13   requirement that you file a motion under the

14   local rules.

15                   THE CLERK:   Yes.

16                   THE COURT:   Give them to me.   File

17   your motion tomorrow.

18                   MR. McMICHAEL:   Yes, sir.   These

19   letters would be addenda to Exhibit A to our

20   settlement agreement, and are part of it.

21                   And they relate to Paragraph 6 and

22   to Paragraph 8.   Let me just point out the effect

23   of them, though.   It's less than meets the eye.

24                   In Paragraph 6, if we reach a

1    certain threshold of either recovery of

2    settlement of the claims against Pepper, we, the

3    Trustee, can bind Royal to it, so that Royal's

4    claims are settled at the same time.  If we

5    don't, it doesn't mean we can't litigate with

6    Pepper, and achieve whatever recovery we can

7    achieve.

8              It doesn't mean we can't settle.  We

9    can still settle.

10             We just couldn't settle by giving up

11   Royal's claim.  That's all that really amounts

12   to.

13             Paragraph 8, same thing.  We can

14   object to admin claims in the Chapter 11, and

15   have those allowed or disallowed as the Court

16   sees fit, or we can settle them.

17             And what Paragraph 8 says simply is

18   if we settle them for a certain amount or less,

19   Royal will give up its claim.  If Royal doesn't

20   give up its claim, we have the right to object to

21   the claim as well as any other claim.  Nothing is

22   given up there.

23             So I would submit that these are --

24   it is important for these things to not be on the

1    record at the same time.  They're not as

2    important as our adversaries would make them out

3    to be.

4              By the way, Your Honor, I am -- and

5    we're happy to file a motion tomorrow morning.

6    I'm advised by my local counsel that under Rule

7    9013, we can move orally in Court for permission

8    to file a document under seal.

9              THE COURT:  You may be able to, but

10   I don't --

11             MR. McMICHAEL:  That's fine.

12             THE COURT:  Oral motions are very

13   hard for people to read on the record.

14             So file a motion, and I will deal

15   with the motion.

16             But I -- you know, it's one thing to

17   have a signed agreement with good litigation

18   strategy protection, but I don't think that the

19   same applies to the Court entering orders.

20             MR. McMICHAEL:  Very well.

21             THE COURT:  Let me ask you a

22   question, counsel.

23             MR. McMICHAEL:  Yes, sir.

24             THE COURT:  The basis for your

1    expedited motion was that this was the last

2    omnibus hearing before the expiration of the

3    two-year statute of limitations.  But as I sit

4    here and listen to what I've been told, so what?

5              I mean, I didn't hear that there

6    were cases that couldn't be filed because the

7    two-year statute of limitations was about to

8    expire, nor have I heard anything today that

9    tells me that.

10             MR. McMICHAEL:  Your Honor, the

11   Trustee wasn't really asked that question.  And I

12   didn't address it in my proffer, not thinking it

13   was an issue.

14             But the answer is this:  The Trustee

15   has a broad range of claims that it believes

16   should be brought against many people.  It has --

17   the Trustee has some money in the estate, but not

18   nearly enough to litigate those claims.

19             THE COURT:  But not enough to

20   litigate them, but certainly to bring them?

21             MR. McMICHAEL:  Yes.

22             THE COURT:  I mean, the concern that

23   I have, I'm going to be very frank with you, is I

24   ruled on the delegation issue.  I'm feeling a

1    little uncomfortable about it, I must tell you.

2              And I'm not sure that -- you know,

3    sometimes you've got to be careful what you wish

4    for.

5              MR. McMICHAEL:  Mm-hmm.

6              THE COURT:  If I'm wrong, and if

7    you're wrong, you're going to spend the next year

8    fighting the delegation battle, rather than

9    dealing with the rest of the case.

10             MR. McMICHAEL:  Right.  We can --

11             THE COURT:  I am --

12             MR. McMICHAEL:  I'm sorry.

13             THE COURT:  I'm wondering if you

14   guys want to think about whether you want to talk

15   amongst yourselves.  I understand everybody's all

16   excited behind you, but --

17             MR. McMICHAEL:  That happens.

18             THE COURT:  I understand.  But think

19   about whether maybe you want to try to, and maybe

20   Royal ought to, too, because they don't want to

21   fight this battle and find out a year from now

22   that I was wrong, and you were wrong to ask me,

23   to give me the opportunity to be wrong.

24             Because that's just another waste of

```
 1    everybody's time and effort.  And maybe you ought
 2    to think about that, because I have no reason to
 3    disbelieve that they're going to ask for a stay.
 4              They're probably not going to get it
 5    from me, but they may well get it from someone
 6    else in this building.  And whether you want to
 7    fight that battle, and whether you want to just
 8    try to accommodate what their concerns are.
 9              And I'm particularly concerned about
10    the potential types of disinterested issues that
11    you end up with, and the analogy of the 327(e).
12              And the disinterested standard is
13    one.  I mean, I'm going to review this any way.
14              I'm not going to decide this today.
15    But whether you really want to just put this on
16    for perhaps the next time I'm here, and consider
17    whether you want to try to craft some, perhaps
18    insignificant in the real world, modifications in
19    the agreement, but ones that might accommodate
20    and deal with those particular issues.
21              MR. McMICHAEL:  I'll do it.
22              MR. ASTIN:  Your Honor, before you
23    rule --
24              THE COURT:  I'm not going to rule.
```

128

```
1              MR. ASTIN:   Just a moment with
2    Mr. McMichael?
3              MR. McMICHAEL:   He wants to make
4    sure I don't say anything really stupid.
5              THE COURT:   He wants to tell you
6    what they've been negotiating while you've been
7    talking.
8              (Following a discussion held off the
9    record:)
10             MR. McMICHAEL:   No.   Your Honor's,
11   suggestion that we think about this is exactly
12   the right suggestion.
13             The good news is we already did
14   that, and we did it while other things were
15   happening in the courtroom.   And we can solve the
16   problem right here.
17             The only case as to which there is a
18   current issue concerning delegating to Royal the
19   ability to bring on behalf of the estate is CDI,
20   DDI, Mr. Kortanek's client.   The Trustee will
21   simply bring that case.
22             It won't be an issue.   The reason
23   that we were doing it this way was because we
24   felt since we had tried to settle the case, and
```

1    the Court has overruled us on that, and we accept

2    the Court's ruling.  And that's the basis for

3    which we now go forward.

4              That is our foundation.  We thought

5    that under those circumstances, it might be less

6    awkward for Royal to do it, but it's not really a

7    significant matter.  And we're happy to do it.

8              So there will be no other

9    delegation, unless the Trustee decides not to

10   bring a claim, or Royal wants to bring it.  And

11   the Court can take that up when, and if, it

12   happens.

13             THE COURT:  But that's what I

14   thought it was, but it's not.  Apparently,

15   Paragraph 2 is different than Paragraph 7.

16             MR. McMICHAEL:  Well, Paragraph 2

17   isn't going to happen unless the Court agrees to

18   it.

19             THE COURT:  But what I'm

20   suggesting -- it's late.  We are all tired.

21             What I'm suggesting is take a look

22   and see whether you can make everybody happy and

23   accomplish what you want.  And take a few days,

24   if necessary, talk to the other side, look at

130

1    this whole new world.

2              You guys are sitting on the same

3    side of the table.  Maybe you can sit on the same

4    side of the table with them.

5              I will rule if I have to.  What I'd

6    like you to do is submit to me a black lined with

7    whatever you decide you want to do that modifies

8    the term sheet that's there.  I think in spite of

9    the fact that I think everybody's acting in good

10   faith, your agreement says the term sheet's got

11   to be signed.  I think it should be signed.

12             MR. McMICHAEL:  The agreement?

13             THE COURT:  The modifications don't

14   have to be in writing.  I'd feel better if I'm

15   approving something that at least both sides have

16   signed off on.

17             Take a few days.  I'm going to take

18   this under advisement.  I'm going to await a

19   black lined from you with whatever amendments you

20   want, and then I will rule if it's necessary.

21             If you resolve the issues, or if you

22   think you've accommodated things, just black line

23   it.  I'll look at them, and I'll give you my

24   ruling.

1              I will tell you that I'm not

2    troubled by the 510(c) issue.  I think that I'm

3    satisfied with the economics of the transaction.

4              I'm prepared to approve it on the

5    basis that it does not, or it reaches at least

6    the lowest -- what's the exact words?  I forget.

7              I don't want to misstate this.  The

8    lowest end of the spectrum of reasonableness, I

9    think you've satisfied me on that.  It's these

10   other issues that are raised, and that raise real

11   issues.

12             Now, I think I'm right on the

13   delegation issue, but you know, I've been

14   reversed before.  I know that may be shocking to

15   you.

16             But I don't want to put you through

17   another year, a year and a half of unnecessary

18   litigation if a couple of corrective points

19   that -- and I'm not trying to interject myself

20   into the Royal litigation.  I mean, if you can't

21   resolve it, if there's no change to the

22   agreement, just submit a signed agreement, and I

23   will rule.

24             Okay.

1           MR. McMICHAEL:  Your Honor, that's

2   fine.  And we will be guided by what the Court

3   wants, and we'll do that.

4           I have two observations, though,

5   that -- just so I am accurately communicating

6   with the Court on these subjects.

7           The first is the statute of

8   limitations is not an unimportant date for us,

9   because it effects Mr. Stanziale's judgment as

10  to --

11          THE COURT:  So when is it?  What day

12  is it?

13          MR. McMICHAEL:  It's November 3rd.

14          THE COURT:  Oh, that's light years

15  away.

16          MR. McMICHAEL:  It's next week.

17          THE COURT:  Well, is that before or

18  after the parade in Boston?

19          MR. McMICHAEL:  It will be after the

20  parade in Boston.

21          THE COURT:  You can skip the game

22  and do it tonight.  I don't really care.

23          Get me something.

24          MR. McMICHAEL:  We will.  We will.

1              THE COURT:  You will have a ruling.

2    You get me materials, you'll have a ruling.

3              What's the 3rd?

4              MR. McMICHAEL:  The 3rd is next

5    Wednesday.

6              THE COURT:  Okay.

7              MR. McMICHAEL:  Okay.  We will.

8              THE COURT:  I'm here all day

9    tomorrow if you want to submit something

10   tomorrow.

11             MR. McMICHAEL:  We will.

12             THE COURT:  Fine.

13             MR. McMICHAEL:  We will.

14             My second question is -- I think

15   Your Honor has answered it -- we don't need to

16   have another hearing.  We need to submit --

17            THE COURT:  Not unless you think,

18   after due consideration, that you need another

19   hearing.

20            MR. McMICHAEL:  Okay.

21            THE COURT:  You know, the

22   probability of you getting another hearing

23   between now and the 3rd is low.  If you think

24   there's a need for another hearing, then you will

1    tell me.

2                    MR. McMICHAEL:  We don't think

3    there's need for another hearing.  In fact, we

4    prefer there not to be one for wanting to get

5    this resolved before the 3rd for obvious reasons.

6                    So we know we have this deal that

7    will -- in place before we dive head first into a

8    large pool of litigation.

9                    THE COURT:  Fine.

10                   MR. McMICHAEL:  That is all right.

11   I think that's all we have today on this issue.

12                   THE COURT:  That takes care of the

13   matter.  We took -- the small matter, we took out

14   of order.

15                   You gentlemen are excused if you

16   want to.  We have several other matters.  Don't

17   run away.

18                   MR. STANZIALE:  May I make it clear

19   to the Court that, as Trustee, I am going to

20   pursue the action against CDI, DDI.  I'm not

21   going to delegate that right to Royal.

22                   Royal understands that, and Royal

23   agrees with that.

24                   THE COURT:  Well, put it in the

```
 1    agreement.

 2                    MR. STANZIALE:  Okay.  I just wanted

 3    the Court to understand.

 4                    THE COURT:  Fine.  I appreciate

 5    that, and I understand that.

 6                    All right.  I'm going to exercise my

 7    extensive powers and defer -- there are no

 8    objections, is that true, to the fees anymore?

 9    Although there was a continuance to give Royal an

10    opportunity to get further information.

11                    MR. ASTIN:  That's correct, Your

12    Honor.  Three --

13                    THE COURT:  Do you have orders for

14    me?

15                    MR. ASTIN:  I have orders.

16                    THE COURT:  Does anybody want to be

17    heard on those fee applications in opposition to

18    them?  Fine.

19                    Give me your orders.

20                    MR. WOLFSON:  Your Honor, we

21    resolved the fee application and have agreed just

22    to a 20-percent hold back.  And on that basis --

23                    MR. ASTIN:  Your Honor, I have 10

24    seconds on what we've agreed to.
```

```
 1              THE COURT:  Go ahead.
 2              MR. ASTIN:  We have all made
 3    reductions by agreement with the U.S. Trustee or
 4    otherwise.  These orders will all reflect that.
 5              We've agreed that we go with a
 6    20-percent hold back on this application.
 7              THE COURT:  Is that in the order,
 8    too?
 9              MR. ASTIN:  That's in the order.
10    Then we're going to file at a hundred percent
11    several months.
12              THE COURT:  All right.
13              MR. ASTIN:  We're going to also put
14    another motion on, so that going forward
15    beginning about November, we'll start going with
16    an 80-20 hold back, if Your Honor signed that
17    order.
18              That's all I have.
19              THE COURT:  Very well.  Okay.
20              So five is under advisement.
21              Just put them over there with the
22    fees.  We'll deal with them tomorrow.
23              The motion to prove the settlement,
24    MBIA and Wells Fargo.
```

137

```
 1              MR. ASTIN:  There are no objections,
 2    Your Honor.
 3              MS. AUERBACH:  We have a slightly
 4    revised order.
 5              THE COURT:  Give me the order.  I'll
 6    take care of it tomorrow.
 7              What's that?
 8              MR. ASTIN:  Your Honor, we have the
 9    motion to quash, which Ms. Auerbach is handling,
10    which is not resolved.
11              THE COURT:  Okay.  Let me just put
12    these things aside.
13              MR. WINTER:  Your Honor, good
14    evening.  Chris Winter with Duane Morris.
15              Your Honor, I'm here for McGladrey &
16    Pullen and RSM McGladrey, Inc., and I'd like to
17    introduce the Court to Veronica Rendon of Thelen,
18    Reid & Priest.
19              We have filed papers for her
20    admission pro hac vice.  I'd like to supplement
21    that now with an oral motion.
22              THE COURT:  Go ahead.  Welcome,
23    Ms. Rendon.
24              MS. RENDON:  Thank you, Your Honor.
```

1    And I'll try to go as quickly as I can in light

2    of the hour that we're at.

3                THE COURT:  We've got an hour and 18

4    minutes.

5                MS. RENDON:  Okay.

6                THE COURT:  An hour and 38 minutes.

7    Security people might not think so, though.

8                MS. RENDON:  That's fine.

9                MR. WOLFSON:  Do you have tickets to

10   game five or not?

11               THE COURT:  Actually, I have tickets

12   to game six, and I'm prepared to -- they're

13   available for a small premium now.

14               MS. RENDON:  I'm guessing this is

15   not the right time to say I'm from New York, and

16   I'm a Yankees' fan.  So I won't.

17               THE COURT:  We all have our crosses.

18   I've been carrying one around for 60 years.

19               MS. RENDON:  Good luck.  Actually

20   I'm rooting for the Sox.

21               I'm here on behalf of McGladrey &

22   Pullen and RSM McGladrey's motion, emergency

23   motion to quash a subpoena that was served by

24   Royal on the bankruptcy Trustee, in which Royal

1    is seeking documents.

2              I'm just going to call them

3    McGladrey, and have that term cover both

4    McGladrey & Pullen, and RSM McGladrey, Inc. just

5    for the Court's convenience.

6              But we're here to quash the subpoena

7    that Royal served on the Bankruptcy Trustee in

8    which Royal is seeking the documents that

9    McGladrey made available to its Trustee earlier

10   this year.

11             And the basis for our objection

12   is -- there are a number of bases for our

13   objection.  The first is that the subpoena was

14   issued in a procedurally improper manner.

15             It was issued with too short notice.

16   There was less than 48 hours' notice given for

17   the subpoena.

18             THE COURT:  All right.  So let's --

19   if I was prepared to deny it on that, they'd

20   issue a new one.  Let's not spend a lot of time.

21             MS. RENDON:  It was not done on

22   notice.  But most importantly, Royal does not

23   have standing to have issued the subpoenas.

24             The basis for the issuance,

1    according to Royal's paper and the Trustee's

2    submission, is the settlement that the Court is

3    considering today.  Obviously, that settlement

4    was not in place when the subpoena was issued,

5    and it's still not in place.

6              So to the extent that the mechanism

7    from which Royal is standing to have issued the

8    subpoena, Royal doesn't have standing to have

9    issued that subpoena.

10             Secondly, the subpoena violates a

11   confidentiality agreement that McGladrey entered

12   into with the Trustee.  And I'll give you some

13   additional factual background on that.

14             But let me just outline quickly

15   that -- all the three bases for our objection.

16   And then our most substantive objection, going

17   past procedural issues, I think dovetails very

18   much with the Court's express concerns or some

19   concerns that the Court has about delegation to

20   Royal.

21             I think it's clear, and again, I'll

22   give you some factual background to support the

23   assertion I'm about to make, that the subpoena

24   issued by Royal is really an attempt to obtain

141

1    improper pre-claim discovery against McGladrey,

2    relating much more to a civil lawsuit that Royal

3    is contemplating against McGladrey, having

4    nothing to do with any type of action that the

5    estate would like to bring against McGladrey.

6           And let me explain that a little bit

7    further by giving you a factual background here

8    about the circumstances surrounding the issuance

9    of the subpoena.

10           Back in January of 2004, the Trustee

11    approached McGladrey asking for our documents.

12    McGladrey had acted as one of the accountants and

13    auditors for Student Finance Corporation for a

14    number of years.

15           Given the Trustee's broad 2004

16    powers --

17           THE COURT:  I'm sorry.  I was trying

18    to ask parties over there to quiet down, so that

19    I could hear you better.

20           MS. RENDON:  I have enough children,

21    I'm able to tune that out.

22           But thank you.

23           THE COURT:  But my children are

24    grown up.  I'm not as used to it as you, perhaps.

1           MS. RENDON; Okay. Given the

2      Trustee's broad 2004 powers and understanding

3      legitimacy of the Trustee's request to see our

4      documents, we were agreeable back in January 2004

5      to providing our documents to the Trustee.  We

6      only placed one condition upon providing our

7      documents to the Trustee, and that was that we

8      wanted to protect against third parties being

9      able to go directly to the Trustee to seek our

10     documents, instead of those same third parties

11     coming to McGladrey & Pullen to seek those

12     documents.

13           The reason why we had that type of

14     concern back in January of 2004 is we were aware

15     at the time of the number of civil litigations

16     that were pending that involved Student Finance

17     Corp., including the Royal and MBIA litigation

18     that was pending in which Your Honor well knows

19     at this point involves big numbers, over $500

20     million.

21           And because we were concerned that

22     Royal or MBIA might try to circumvent coming to

23     McGladrey to seek our documents and may go right

24     to the Trustee.  We asked the Trustee to enter

143

1    into a confidentiality agreement with McGladrey,

2    in which we would protect against and ensure that

3    the Trustee would provide McGladrey with notice,

4    and an opportunity to intervene and object if a

5    third party were, in fact, to come to the Trustee

6    and seek our documents from the Trustee as

7    compared to coming to McGladrey directly.

8              We explained our concerns to the

9    Trustee, and back in February, on February 6th,

10   2004, the Trustee entered into a confidentiality

11   agreement with McGladrey to protect against

12   third-party access to our documents without us

13   having notice and an opportunity to intervene.

14             And Your Honor has a copy of that

15   confidentiality agreement.  It was attached as

16   Exhibit 2 to the affidavit of Richard Swanson,

17   which was submitted in support of our motion to

18   quash.

19             The clear purpose of the agreement

20   was to provide McGladrey with notice and an

21   opportunity to respond to any third-party request

22   for our documents.  And what Your Honor will see,

23   if you review that agreement, is that if, in

24   fact, a third party made a formal request for our

144

1    documents through notice motion or a subpoena to

2    the Trustee, the Trustee agreed to provide

3    McGladrey with notice of that subpoena and an

4    opportunity to object, to intervene and object.

5           THE COURT:  Which is why you're here

6    today.

7           MS. RENDON:  That's right.

8           If, on the other hand, a third party

9    came to the Trustee on an informal a verbal

10   basis, and requested our documents, the Trustee

11   agreed to provide McGladrey with notice of that

12   informal request, and agree that if McGladrey

13   requested that the Trustee go back to a third

14   party and ask that that request for documents be

15   made formal and be put in a formal written

16   notice, so that, again, McGladrey would have the

17   opportunity to intervene and object.

18           In entering into the confidentiality

19   agreement, the Trustee argued at this time that

20   there were too many limits being placed on

21   counsel's ability to utilize the McGladrey

22   documents, either in deposition or in Court

23   submissions.

24           So we added a paragraph into the

1    agreement confirming the Trustee counsel's right

2    to use our documents for those types of purposes.

3    And it's that paragraph that you'll see cited in

4    Royal's and the Trustee's opposition to our

5    motion to quash.

6              However, the manner in which they're

7    citing that paragraph is completely out of

8    context.  And tellingly, the way that they're

9    citing that paragraph, it leaves out the last

10   sentence of that paragraph, which again --

11             THE COURT:  Which paragraph is it?

12             MS. RENDON:  It is the second, Your

13   Honor.  It's the last large paragraph on the

14   second page.

15             It should be -- it's the second --

16   excuse me, the second substantive paragraph on

17   the second page of the letter agreement starting,

18   It should be noted.

19             THE COURT:  It should be noted.

20             MS. RENDON:  There it says that it

21   should be noted that in making this proposal, we

22   understand that the Trustee wishes to use the RSM

23   documents for the benefit of the estate without

24   limitation, and advanced notice is not requested.

146

1          By that I read for such use, thus,

2     we do not propose limiting the Trustee's right by

3     using the RSM documents as documents -- as

4     attachments to Court submissions or for

5     disclosure to the estate.  Retained professionals

6     agree to be bound by this letter or any other

7     purpose that the Trustee determines would benefit

8     the interest to the estate.

9          And counsel for the Trustee and

10     Royal highlights that last clause of the

11     sentence.

12          However, in citing this paragraph to

13     Your Honor, they leave out the last sentence,

14     which really articulates the purpose that we

15     entered into the confidentiality agreement.  And

16     that sentence says, All we are seeking is

17     protection against disclosure to third parties in

18     the circumstances outlined in the third and

19     fourth paragraph above without our awareness and

20     our opportunity to respond.

21          Clearly, the intent of the agreement

22     was to provide McGladrey with a notice and an

23     opportunity to object and respond to any

24     third-party request for our documents that are in

1    the Trustee's possession.

2            Believing that we would have that

3    opportunity, on February 10th, 2004, McGladrey

4    made the documents available to the Trustee.  And

5    we did so, again, a second time on October 1st of

6    2004, after the Trustee agreed to be bound again

7    by our confidentiality agreement when they --

8    when they wished to review McGladrey's documents

9    for a second time.

10            On September -- on September 15th,

11    2004, the Trustee notified us that Royal had

12    verbally requested access to our documents that

13    were in the Trustee's possession.  Knowing that

14    Royal had just had a motion for summary judgment

15    or motions for summary judgment granted against

16    it in the MBIA civil litigation, and knowing that

17    that may well result in an excess of a $500

18    million civil liability for Royal, and not

19    understanding any legitimate purpose for Royal to

20    be seeking our documents, we told the Trustee

21    that we objected to Royal's request.

22            And pursuant to our agreement with

23    the Trustee, we asked the Trustee to go back to

24    Royal and have Royal make a formal written

1    request for our documents.  The express purpose

2    being so that we could intervene and object.

3              On September 22nd, pursuant to our

4    request, Ms. Auerbach, counsel for the Trustee

5    wrote to Royal, and made that request, that Royal

6    put its request for our documents into -- make

7    it -- put it into a formal written request.

8              At that time, Ms. Auerbach clearly

9    understood that McGladrey planned on objecting to

10   Royal's request for our documents.  We did not

11   hear anything further after September 22nd until

12   October 13th.

13             On that day at 6:40 p.m. in the

14   evening, we received a subpoena from Royal.  I

15   should say it's the Royal subpoena that was

16   addressed to the Trustee, and the Trustee

17   provided it to us at 6:40 p.m. on the night of

18   October 13th.

19             It requested production of

20   McGladrey' documents in the Trustee's possession.

21   It requested that the production of those

22   documents occur at 10 o'clock a.m. that -- the

23   following Friday, October 15th, less than 48

24   hours later.

1           Clearly, the manner in which the

2     subpoena was issued was designed to craft

3     McGladrey's ability to intervene and object to

4     the subpoena, notwithstanding the existing

5     confidentiality agreement, and notwithstanding

6     the fact that they were well aware of the

7     existence of the confidentiality agreement.

8           It was explained to us much earlier

9     that Ms. Auerbach -- Royal had been provided with

10    our confidentiality agreement and that they

11    understood the terms.

12          Still being at my desk at 6:40 at

13    night, because that's just life in New York, I

14    responded to Ms. Auerbach's Email, and the

15    subpoena from Royal.  And I notified Ms. Auerbach

16    by Email that we plan on objecting to the Royal

17    subpoena, because it was procedurally improper,

18    because Royal lacks standing to issue the

19    subpoena, and because we believed it was an

20    improper attempt to obtain pre-claimed discovery

21    for a civil litigation that Royal may wish to

22    pursue against McGladrey some day.

23          THE COURT:  Is there -- there is no

24    litigation pending between the estate and

1    McGladrey, is there?

2                    MS. RENDON:    No.    In fact, I'll get

3    to that.

4                    It's our understanding that the

5    estate, at least the estate represented by

6    Ms. Auerbach's firm, has no, absolutely no

7    intention of bringing a lawsuit against

8    McGladrey.    And I think I understand if the

9    estate were to attempt to do that, they would

10   face insuperable in pari delicto questions in

11   trying to make that type of claim.

12                    But let me get to that in just a

13   moment.    If that's in pari delicto, when I wrote

14   back to Ms. Auerbach, the note of October 19th, I

15   asked her in my Email to please confirm

16   consistent with the confidentiality agreement

17   that the Trustee would not produce our documents

18   to Royal until we had an opportunity to intervene

19   and object to Royal's request for our documents.

20                    The next morning, October 14th, less

21   than one day after, with less than one day to go

22   before production was supposed to occur,

23   Ms. Auerbach Emailed me back to say they planned

24   on complying with the subpoena.

1           I called Ms. Auerbach later in the

2    day to inquire why it was that she was planning

3    on complying when I believed that was a clear

4    breach of the confidentiality agreement that had

5    been entered into between McGladrey and the

6    Trustee.  And I also -- and Ms. Auerbach's answer

7    was because she believed it would be a benefit

8    of -- a benefit to the estate to produce the

9    documents to Royal.

10          I asked Ms. Auerbach to explain how

11   the would be of benefit to the estate, and she

12   said that she couldn't say anything further

13   except that it would be consistent with the

14   Trustee's settlement with Royal.

15          When I told her I was not aware of

16   any kind of settlement with Royal, could she

17   explain that to me, and explain the terms of the

18   settlement to me, she said -- she said that she

19   couldn't tell me anything further, that it was --

20   it should be on the public docket, and that she

21   had probably already told me too much.

22          We believe Royal's subpoena is

23   simply an attempt to obtain improper pre-claim

24   discovery for a civil lawsuit that has absolutely

152

1    no bearing on the interest of the estate.

2              Let me tell you initially why we

3    think that's clear.  On October 14th, having

4    received the Royal subpoena, my partner Richard

5    Swanson contacted Mr. Gilbert and counsel for

6    Royal to talk about Royal's request for our

7    documents.

8              Mr. Swanson, in the course of that

9    conversation, asked Mr. Gilbert what he believed

10    the benefit to the estate would be for Royal to

11    obtain our documents.

12              Mr. Gilbert refused to respond to

13    that inquiry.  My partner, Mr. Swanson, also

14    asked Mr. Gilbert whether Mr. Gilbert would agree

15    to accept McGladrey's documents pursuant to a

16    protective order, pursuant to which an ethical

17    wall would be erected between people at Royal who

18    are interested in pursuing estate claims, and

19    people at Royal who would be interested in

20    pursuing civil litigation claims against

21    McGladrey.

22              Tellingly, Mr. Gilbert refused that

23    request, as reasonable as it was.  It's clear to

24    us, based upon our conversations with

1    Ms. Auerbach and Mr. Gilbert, that Royal is

2    trying to use the settlement or the proposed

3    settlement with the Trustee to obtain our

4    documents.

5            But even were a settlement to be in

6    place, there's no legitimate reason for Royal to

7    be obtaining our documents.  In its opposition

8    papers to our motion to quash, Royal allowed the

9    necessity of exploring claims against McGladrey.

10   Yet, the Trustee has had our documents for over

11   eight months for exactly that purpose.

12           And the Trustee has clearly

13   indicated to us that, and said that it has

14   absolutely no intention of seeking any claims

15   against McGladrey.  Those statements were made by

16   Mr. Derrick Dyer in a letter to me in connection

17   with our second production of documents to the

18   Trustee.

19           And in that letter, Mr. Dyer

20   clarified that the reason why the Trustee wanted

21   to review our documents was not to investigate

22   claims against McGladrey, but rather to

23   investigate claims that the Trustee was likely

24   going to make against Pepper Hamilton.

154

1             Following that, Ms. Auerbach wrote

2      back and softened Mr. Dyer's letter.  But in a

3      conversation that I had with Ms. Auerbach, she

4      clearly stated to me that there was no current

5      intention of bringing a claim against McGladrey,

6      and likely never would be.  She simply could not

7      make that official, because it would be

8      inappropriate, given the procedural stance of the

9      case.

10             The terms of the settlement and

11      everything we heard today indicates that

12      McGladrey is not being considered for a lawsuit,

13      and with good reason.  The estate would clearly

14      face insuperable in pari delicto -- in pari

15      delicto problems if it were to attempt to claim

16      against McGladrey.

17             As Mr. Stanziale testified today,

18      their allegations are fraud all over the place,

19      and it's a fraud that was committed by

20      Mr. Yao.

21             And if that's the case, the estate

22      cannot sue McGladrey for not having caught that

23      fraud without facing an insuperable in pari

24      delicto case.

155

```
1              THE COURT:  I don't have to decide
2    that today, do I?
3              MS. RENDON:  I think you're right.
4              THE COURT:  I mean, the estate's got
5    the documents.  You have no problem -- I gather
6    you knew that there was a possibility that they
7    might sue you and use those documents.
8              MS. RENDON:  That's correct, Your
9    Honor.
10             THE COURT:  I mean, you took that
11   risk.
12             MS. RENDON:  Yes.
13             THE COURT:  Which what you are
14   saying is you didn't take the risk that Royal,
15   acting on their own behalf, would have access to
16   those documents?
17             MS. RENDON:  I think --
18             THE COURT:  By way of the Trustee or
19   anybody else that might choose to sue you?
20             MS. RENDON:  That's exactly right,
21   Your Honor.  In fact, when we entered into the
22   confidentiality agreement, we were specifically
23   trying to guard against exactly that risk by --
24   and that is why we entered into the
```

156

1    confidentiality agreement, because we were not

2    willing to sign on for that risk.

3                We were certainly willing to

4    cooperate with counsel for the Trustee, though,

5    and Your Honor, it just appears so clear to us,

6    given Mr. Gilbert's unwillingness to enter into

7    the protective order, and given a complete

8    failure even as of right now to articulate a real

9    need for Royal to have our documents when the

10   Trustee has had them for eight months, and had

11   the ability to analyze them for our documents to

12   be made available to Royal.

13               And it's clear that Royal's 2004, as

14   broad as it is, cannot -- does have its limits.

15   It cannot be used to circumvent the requirements

16   of Federal Rules of Civil Procedure.

17               Rule 9016 of the Bankruptcy

18   Procedure Rules incorporates Rule 45, which in

19   turn is governed by rule, Federal Rules of Civil

20   Procedure Rule 26.

21               And under those rules, you cannot

22   take pre-claim discovery until after a claim is

23   filed.  Those types of concerns were raised in

24   the In Re:  Continental Forge case, in the In Re:

1    Enron case, in the In Re:  Nyder versus Society

2    Bank case.

3                    And in all of these cases, Royal's

4    2004 requests for documents were turned down

5    because the belief was that they were really

6    trying to obtain information for interests

7    unrelated to the estate, but interests to further

8    a private litigation.  And that is clearly an

9    improper purpose of Rule 2004.

10                   Each one of those cases I just cited

11   to Your Honor express the concern that Rule 2004

12   discovery cannot be used to circumvent the

13   safeguards of the Federal Laws of Civil

14   Procedure, and that is exactly what Royal is

15   attempting to do for all these reasons, because

16   Royal does not have standing to have issued the

17   subpoena, because it was improperly noticed,

18   because it wasn't done on a notice motion.

19                   And most importantly, because the

20   subpoena is trying to be used to circumvent the

21   requirements of the Federal Rules of Civil

22   Procedure.  We respectfully request that the

23   subpoena be quashed.

24                   Thank you, Your Honor.

1          THE COURT:   Thank you.

2          Royal.

3          MR. BICKS:   Good evening, Your

4    Honor.   John Bicks of Sonnenschein, Nath &

5    Rosenthal for Royal Indemnity.

6          Your Honor, obviously to hear the

7    presentation from McGladrey, you might lose sight

8    of a couple of the basic touchstones of the issue

9    that's really before you.

10          We are talking about documents that

11   are indisputably not privileged documents that

12   have already been produced to the Trustee.

13          THE COURT:   What right do you have

14   to them?

15          MR. BICKS:   Your Honor, you heard a

16   lot of testimony today from Mr. Stanziale, a lot

17   of argument about Royal's willingness to step up,

18   put the money where its mouths is, and put almost

19   $5 million of seed capital into this estate.

20          And the principal purpose of that

21   settlement from the estate's perspective is it

22   gives the estate the ability to investigate

23   claimants, and it certainly is clear why

24   McGladrey ought to be concerned that the estate

1    might very well want to assert not only claims --

2            THE COURT:  But if this is an estate

3    claim, why does Royal have a right to these

4    documents?

5            MR. BICKS:  I think, were we not

6    before you, Your Honor, this afternoon also on

7    the motion to approve the settlement, whereby

8    Royal was going to act in partnership with the

9    Trustee, to help the Trustee.

10           THE COURT:  But even if that's the

11   case, this would be a Paragraph 7 action, if, in

12   fact, the Trustee determined not to bring the

13   action.

14           MR. BICKS:  It could qualify if the

15   Trustee chose not to bring the action.  That's

16   absolutely true.

17           THE COURT:  So you haven't any right

18   at the moment to bring an action on behalf of the

19   Trustee, do you?

20           MR. BICKS:  We don't have an

21   approved settlement.  Your Honor has taken it

22   under advisement.

23           THE COURT:  Even if I did, does the

24   approved settlement give you automatic right to

1    bring action?

2              MR. BICKS:  Only after the Trustee

3    takes a pass.

4              THE COURT:  And the Trustee hasn't

5    taken a pass.

6              MR. BICKS:  That is correct.  I

7    think it's also important that the record be

8    accurate, what the Trustee has done, and what the

9    Trustee has said and not said about what its

10   willingness is to --

11             THE COURT:  Well, I would assume --

12   I mean, whether the Trustee told them they didn't

13   think it was going to sue them at all, I don't

14   really care what at this point.

15             If you had a settlement and if the

16   provisions were triggered that you could bring

17   the action, maybe you might have the right to the

18   documents from the Trustee.  But we're not there

19   now, are we?

20             MR. BICKS:  We are not there in the

21   sense that two things have not happened, Your

22   Honor.

23             One, Your Honor has not approved the

24   settlement.

```
 1              And, two, the Trustee has not

 2     reviewed and taken a pass.

 3              The other issue that you have to

 4     look at, this whole issue, I think in fairness

 5     under the real life time line that we're

 6     currently presented with, and that is that next

 7     week certain statutes of limitation will arise

 8     and will bar or may bar.

 9              THE COURT:  Hey, I didn't create

10     that problem, gentlemen and ladies.  That date

11     was set two years ago, and you just got around to

12     settling your case.

13              You may have to bring your own

14     lawsuits.

15              MR. BICKS:  Understood.  I

16     understand Your Honor.

17              That may very well happen.

18              THE COURT:  That may be.  But what

19     you're telling me is that part of what you bought

20     is the right to get information from the Trustee

21     even before the settlement came before me.

22              MR. WOLFSON:  Your Honor --

23              THE COURT:  That I find a little

24     offensive, frankly.
```

1           MR. WOLFSON:  First -- first couple

2    of points.

3           Under 2004, I think that we, as a

4    creditor of the estate, have the absolute right

5    to try to review any and all documents that

6    impact the action, conduct, property of this

7    estate.  To the extent these documents impact the

8    act, conduct and property of the estate, I don't

9    understand counsel's point of view that we

10   have -- just because we might have some other

11   potential claims which we have not brought

12   against them, the fact that I might have another

13   potential individual claim doesn't mean that we

14   can't exercise our rights under 2004, and look at

15   the act, conduct, property of this estate.

16           That's point number one.

17           Point number two is we are trying to

18   cooperate with the Trustee.  We are trying to

19   work with the Trustee and understand where the

20   Trustee is coming out.

21           On the McGladrey issue, they have

22   not definitively said to us that they are or are

23   not going to bring the action, although clearly

24   they're leaning on not bringing it.  A good

1       portion of why they're leaning that way is

2       because of what we perceived may be a

3       misunderstanding of the in pari delicto defense

4       where, while it may be applicable under a 541

5       action, it is not applicable under a Section 544

6       action.

7                    And we are working diligently with

8       the estate in order to enable the Trustee to

9       better understand our perspective.  This may be

10      an important asset of the estate for an estate

11      claim, not an individual creditor claim.

12                   And to the extent it's an estate

13      claim, we just want to be able to have the

14      information.

15                   THE COURT:  When does the statute of

16      limitations run?

17                   MR. WOLFSON:  You have two -- my

18      understanding is you have two years to bring the

19      action from the commencement of the case.

20                   THE COURT:  So it ends --

21                   MR. WOLFSON:  November 3rd, it ends.

22      It ends next week.

23                   So we have a couple of days.

24                   THE COURT:  So that's why you felt

164

```
 1    you could issue a subpoena on 36 hours' notice?

 2                 MR. WOLFSON:  We told them -- first,

 3    we believe that this subpoena was issued.

 4                 THE COURT:  Why wasn't the subpoena

 5    issued on them?

 6                 MR. WOLFSON:  Well, because --

 7                 THE COURT:  Why do you need the

 8    Trustee if you truly are doing a 2004?

 9                 MR. WOLFSON:  Right.

10                 THE COURT:  And you want somebody's

11    documents.

12                 MR. WOLFSON:  Well, I can take a

13    2004 of a Trustee.

14                 THE COURT:  Yeah, I know you can.

15                 MR. WOLFSON:  That is what we're

16    trying to do.

17                 THE COURT:  Yeah, but the Trustee --

18    you're putting the Trustee in the position of the

19    soft confidentiality agreement being entered and

20    now you're basically prostituting him by making

21    him give up those documents because of the

22    settlement.  The settlement isn't approved.

23                 MR. WOLFSON:  I understand.

24                 THE COURT:  And if you want me to
```

1      deny the settlement because you're doing an end

2      run around instead of going directly to the

3      source, you're very close to it.

4                    MR. WOLFSON:  No, we don't.  We're

5      not basing our right to the documents on the

6      settlement.  Either they're approved or not

7      approved.

8                    What we understood from the Trustee

9      who has said to us -- we have been collaborating

10     and working with the Trustee to try and get into

11     a better -- a better arrangement, so that we're

12     working cooperatively instead of at odds.  And we

13     have been sharing information.

14                    We have been trying to share our

15     point of view.  They've been sharing their point

16     of view.

17                    Of all the lawsuits out there, this

18     is one -- this is one potential lawsuit that

19     we've been exploring with them.  And what we

20     wanted to do is see what documents they're

21     looking at.

22                    Now, yes, we understand there's a

23     confidentiality agreement.  We read the

24     confidentiality agreement, and candidly, we

1    thought that that confidentiality agreement

2    absolutely permits the Trustee in the context of

3    this sort of a collaboration, with or without a

4    settlement agreement, given it has the right to

5    share this sort of a document with another

6    creditor of the estate in order to help the

7    Trustee determine what to do on that action.

8              We asked for it.  And I believe my

9    understanding is that counsel for the Trustee

10   believes that that's the appropriate analysis of

11   that agreement, also.

12             But counsel for McGladrey objected,

13   and out of an abundance of caution, counsel for

14   the Trustee said, Look, we read this agreement.

15   We think we can give it to you.

16             We think McGladrey is making a big

17   fuss about it.  We don't want to get sued by

18   McGladrey, because we're giving you documents

19   that we thought we could.

20             So would you give us a subpoena?

21   That's how that came about.

22             And, yes, we are faced with a time

23   line by which the Trustee needs to decide whether

24   to bring a lawsuit, and with or without this

```
 1    agreement, and whether we're ever authorized to

 2    sue McGladrey on behalf of the estate.

 3                    We'd like the opportunity to work as

 4    closely as we can with the Trustee to try to

 5    persuade them so that it is or is not proper.

 6    And if they have information that we don't know,

 7    we may be wrong.  We may -- we may not be right

 8    that there's a cause of action, but I do not

 9    believe --

10                    THE COURT:  Let me ask McGladrey,

11    why if they subpoenaed you directly, why couldn't

12    they get this?  This isn't privileged

13    information, is it?

14                    MS. RENDON:  Some of the documents,

15    I think, are arguably privileged.

16                    THE COURT:  Did you give them -- a

17    privilege log to the Trustee?

18                    MS. RENDON:  We did not.  What we

19    did is we copied documents that the Trustee

20    requested, and those didn't necessarily -- were

21    not necessarily the privileged documents.

22                    So I just -- we have a larger volume

23    of documents.

24                    THE COURT:  I'm not sure I
```

```
 1    understand.  You gave the Trustee privileged
 2    documents or you didn't?
 3                MS. RENDON:  I don't believe we did.
 4                THE COURT:  Why couldn't they
 5    subpoena those from you right now?  If this was a
 6    motion for me to authorize them to take a 2004
 7    examination, why wouldn't I -- I mean, it's sort
 8    of an obscure way of getting to the same point.
 9                Why wouldn't they be entitled to
10    that under the usual scope of 2004(b)?
11                MS. RENDON:  Your Honor, because I
12    believe there really is no other purpose for
13    Royal seeking our documents except to further a
14    civil lawsuit that they're contemplating on
15    behalf for their own personal reasons, having
16    nothing to do with the benefit of the estate.
17                They are -- there really is an in
18    pari delicto problem that applies to the estate.
19                THE COURT:  There may be, and that's
20    an affirmative defense.  And you can plead it at
21    the time.
22                MS. RENDON:  But --
23                THE COURT:  But if I take them at
24    their word that they're working with the Trustee,
```

```
 1   why shouldn't they have the right to see these
 2   documents?  And maybe they can convince the
 3   Trustee that he's wrong on his -- on your
 4   analysis of in pari delicto.  Maybe the Trustee,
 5   maybe not the Trustee.
 6             MS. RENDON:  Your Honor, if that
 7   were the case, and if that really were Royal's
 8   motivation, I don't understand why Royal would
 9   dis -- would not agree to enter into a protective
10   order with us wherein people that -- that at
11   Royal, people at Royal, the only people at Royal
12   who could look at our documents are those
13   interested in analyzing estate claims and not
14   those people who are interested in analyzing
15   civil lawsuits on Royal's personal behalf.
16             I think it is very telling that
17   Mr. Gilbert would not agree to enter into that
18   agreement.  The real purpose underlying Royal's
19   interest in the McGladrey documents is for its
20   pursuit of a civil lawsuit that they simply could
21   not bring in good faith on behalf of the estate.
22             I don't think you can divorce out
23   the in pari delicto analysis.
24             THE COURT:  Why shouldn't I enter an
```

1    order limiting that?

2                MR. WOLFSON:   Because it's

3    impossible.  People -- we don't have a big enough

4    time, and we're not Merrill Lynch.  We don't

5    have, you know, a big enough time.

6                It's totally uneconomical for the

7    commitment.  You'd be asking people who have no

8    familiarity of the issues to be looking at.  What

9    we will agree with, though, Your Honor, we'll

10   agree to abide by the same confidentiality

11   agreement that the Trustee is.

12               And we're not looking to, you know,

13   open up the flood gates.  If anyone else wants to

14   see it, let them go through the same exercises

15   there, whether it's 2004 --

16               THE COURT:   I mean, what you're

17   really forcing here is them to bring a lawsuit,

18   and the Trustee to bring a lawsuit, and then sort

19   it out afterwards.

20               That's what you are facing by next

21   Wednesday if I deny -- if I quash the subpoena.

22               MS. RENDON:   That's possible, Your

23   Honor.  I will say this, Your Honor, in response

24   to what counsel just said, believing that they

1    don't have the resources when they're entering

2    into a $5 million settlement, they're worried

3    about a $500,000 liability.

4            It strings the bound of credibility,

5    and so I think it's very telling.

6            THE COURT:  Given the number of

7    days, it may be not impractical to do that.

8            MS. RENDON:  Well, Your Honor, I

9    will also say that it was back on September 15

10   that we were first notified that Royal had some

11   interest in our documents.  We did not receive a

12   Royal 2004 notice proceedings motion.

13           At this time, we did not directly

14   receive a subpoena, and there was no reason why

15   Royal couldn't have issued it at that point.

16   Royal has put themselves in a procedural

17   quandary.  And they're looking to abuse the

18   processes of this Court to try to get our

19   documents.

20           And, Your Honor, frankly, I believe

21   it's for an improper purpose.  It's to benefit

22   their possible civil lawsuit against McGladrey.

23           They've already referenced us in

24   proceedings that they've submitted in the MBIA

1    lawsuit.  They have already indicated in those

2    pleadings why they think there might be a basis

3    for a civil lawsuit against McGladrey.

4              And even if you look at Royal's

5    papers submitted in opposition to our motion to

6    quash, it speaks in terms of a private civil

7    lawsuit.  It does not speak in terms of claims

8    brought on behalf of the estate.

9              It speaks in terms of reliance by

10   Royal as an investor on financial statements,

11   audited financial statements issued by the

12   accountant and the auditor, and not about

13   whether -- where the estate is.

14             The estate was not an investor in

15   Student Finance.  It is Student Finance, and

16   that's why there's an in pari delicto problem.

17             I just disbelieve, Your Honor, that

18   the stated purposes of Royal's counsel are just

19   belied by the fact that there is no desire and an

20   unwillingness to enter into the protective order

21   that's very reasonable for McGladrey to have

22   asked for them to enter into.

23             MR. WOLFSON:  Judge, these are not

24   privileged documents, and we're ultimately going

1    to get them any way. All we want to do is

2    interface with the Trustee, see whether or not we

3    can resolve this one remaining issue.

4                Maybe the Trustee is right, and they

5    have to -- after we look at documents, we agree

6    with the Trustee, and the Trustee doesn't bring a

7    lawsuit.  We don't bring a lawsuit.

8                But we're going to get documents any

9    way.  We're entitled to under the 2004 rule.

10               They're not privileged.  It's only

11   confidential because McGladrey is trying to hide

12   them.  It doesn't make any sense.

13               MS. RENDON:  Your Honor, the offer

14   to enter into a similar confidentiality

15   agreement, well really serves no purpose.  Royal

16   is the third party that we're trying to protect

17   ourselves from.

18               So Royal saying they would -- they

19   have a potential $5 million liability, it's clear

20   that if they're facing a $500 million liability,

21   that they're likely going to seek any possible

22   source to offset that liability, including

23   McGladrey.

24               And it's for that purpose they're

1    seeking their documents.  And we would just

2    submit again that it's --

3                    THE COURT:  All right.  I've heard

4    enough.

5                    What do you have to say?  A new

6    voice.

7                    MS. AUERBACH:  A couple points as

8    the person in the middle here.  Sheryl Auerbach.

9                    I don't regard this agreement as a

10   confidentiality agreement.  I sent two letters

11   before it was signed to McGladrey saying, Please

12   don't call it a confidentiality agreement,

13   because it's not a confidentiality agreement.

14   And that's the very --

15                    THE COURT:  Well, whatever it's

16   called.

17                    MS. AUERBACH:  The reason -- very

18   reason I inserted the paragraph that Ms. Redon

19   read was because I wanted the Trustee to be able

20   to use the documents for this, for whatever

21   purpose he thought was proper to benefit the

22   estate.

23                    I did give notice as asked for in

24   the first paragraph of the letter to Ms. Redon as

1    soon as Royal told me they wanted these

2    documents, which was several weeks before they

3    issued the subpoena.  And it is true, and I'm

4    representing to the Court that Royal has been

5    urging the Trustee to reconsider and to bring the

6    suit against RSM McGladrey.

7              In fact, the second exhibit to the

8    response we filed is a letter that I sent to

9    Thelen Reid, counsel for RSM McGladrey, which

10   indicated we were still investigating the claim.

11             THE COURT:  Thank you.  All right.

12             On the limited issue that's before

13   me, because that is how I'm supposed to deal with

14   these things, although there may be other ways to

15   get the documents, I don't think the subpoena was

16   proper.

17             You might get what you wish for,

18   counsel.  You may have two lawsuits next week.

19             But the subpoena was not issued with

20   appropriate time.  I'm going to enter the order

21   quashing the subpoena.

22             That doesn't mean that I might not

23   grant a motion for 2004 at some point in time,

24   and I might not allow a subpoena in the

1    appropriate circumstances.

2              But based on the subpoena that's out

3    there now, the method it was served, and the

4    like, I'm granting the order quashing the

5    subpoena.

6              I'm not sure that's the most

7    practical thing you could have asked for, but

8    that's what you asked for.  Looking at the letter

9    of the Federal Rules, and the Rules of Bankruptcy

10   Procedure, at this point in time, I think you're

11   correct that I don't have a 2004 motion before

12   me.  And I'm going to order the quashing of the

13   subpoena.

14             The Trustee can do what the Trustee

15   feels is appropriate under the terms of the

16   agreement that they have.

17             And you'll have what remedies you

18   might have out there in the world if they violate

19   the agreements, and you have to sue them.  I'm

20   not going to make a judgment on that right now.

21             But as far as a subpoena, and this

22   subpoena, it's quashed.

23             MS. RENDON:  Thank you, Your Honor.

24             THE COURT:  Anything else on the

1    agenda, folks?

2              MR. ASTIN:  Nothing else, Your

3    Honor.

4              THE COURT:  Very well.  I will be

5    looking for either a statement, or an Email, or

6    something to my deputy telling me that you're

7    going to modify the term sheet, that you've

8    talked to people, you haven't talked to people.

9    Just let me know what you're going to do.

10             MR. ASTIN:  We can Email it as an

11   attachment to His Honor?

12             THE COURT:  You do it all the time,

13   don't you?

14             MR. ASTIN:  I mean, this particular

15   item?

16             THE COURT:  Yeah.  You don't have to

17   file it.

18             First, we'll file it.  I'll attach

19   it to an order.  If you want to modify the

20   agreement.

21             MR. ASTIN:  And on the motion -- and

22   on the motion to file under seal?

23             THE COURT:  A motion to file, just

24   file the motion.

1           MR. ASTIN:  All right.

2           THE COURT:  Just file it in the

3   usual fashion.  If you want to E-file the term

4   sheets, that's fine, too.  Just let her know it

5   is there.

6           MR. ASTIN:  I wasn't sure how to

7   handle the objection, that's fine, Your Honor.

8           THE COURT:  Okay, either way.

9           MR. ASTIN:  Mm-hmm.

10          THE COURT:  Just get it to me.  You

11  can use the old fashioned way, just have it

12  delivered.

13          MR. McMICHAEL:  You'll have them

14  tomorrow.

15          THE COURT:  I'll be here.

16          All right.  Thank you all.

17          Please leave the building promptly,

18  because they'll have the search dogs looking for

19  you.

20          (Court was recessed at 7:08 p.m.)

21

22

23

24

1  State of Delaware    )
                        )
2  New Castle County    )

3

4

5              CERTIFICATE OF REPORTER

6

7         I, Heather M. Triozzi, Registered

8  Professional Reporter, Certified Shorthand

9  Reporter, and Notary Public, do hereby certify

10 that the foregoing record, Pages 1 to 179

11 inclusive, is a true and accurate transcript of

12 my stenographic notes taken on October 27, 2004,

13 in the above-captioned matter.

14

15        IN WITNESS WHEREOF, I have hereunto

16 set my hand and seal this 28th day of October,

17 2004, at Wilmington.

18

19

20 _____

21        Heather M. Triozzi, RPR, CSR

22

23

24