**Gagne, Roderick**

| | |
|---|---|
| **From:** | Grant, M. Duncan |
| **Sent:** | Tuesday, April 30, 2002 6:17 PM |
| **To:** | Wilcox, Alfred; Gagne, Roderick |
| **Subject:** | RE: Nielsen v. SFC --- transfer of case to new counsel |

Hello Chub and Rod.  See the following reply from Perry Turnbull.  I suspect that we don't want to recommend anyone to him, but rather that we want to ask him to ask the Fox Rothschild folks for alternatives if SFC doesn't want to use Fox -- do I have that right? Also you can see that we have no problems with their view of the work we did for them, although Perry has frequently made that same point to me over the phone and in person during the last several years.

-----Original Message-----
From: Perry Turnbull [mailto:Pturnbull@sfcorp.com]
Sent: Tuesday, April 30, 2002 6:09 PM
To: 'Grant, M. Duncan'
Subject: RE: Nielsen v. SFC --- transfer of case to new counsel

Duncan,

Thank you.  We will most likely send this to the Fox Rothschild group, but we are exploring alternatives.

Can you make any recommendations as to who might serve SFC as well as you did?

Not to be embarrass, but we would like to clone you.

Sincerely,
Perry

-----Original Message-----
From: Grant, M. Duncan [mailto:GRANTM@pepperlaw.com]
Sent: Tuesday, April 30, 2002 4:00 PM
To: 'Perry Turnbull'
Subject: Nielsen v. SFC --- transfer of case to new counsel

Dear Perry:

As you know, the Nielsen case has not been active for several months, almost all of Nielsen's claims have been resolved in SFC's and Andrew's favor, the court has ruled in favor of SFC on its counterclaim, and there are no deadlines facing SFC at the moment.  In view of Pepper's withdrawal from SFC matters, I suggest that you contact Mike Maransky or others at the Fox Rothschild firm and request that they take over the representation from us. I have checked Fox Rothschild's web page, and it says they have two litigators in their Delaware office.  In addition, if the Fox Rothschild firm wishes to do so, they could utilize lawyers from their other offices to work on the case.

If SFC would prefer to use Delaware counsel other than the Fox Rothschild firm, that is of course fine, too.  Although there is no urgency at the moment, we would like to make the transfer within the next week or two. Once you have told us which new firm will be representing SFC, we can make the appropriate arrangements to transfer our pleadings file, etc.

Regards, Duncan

*****************************************************

1

B-116

PEPPER 052576

This electronic mail transmission contains confidential
information intended only for the person(s) named.
Any use, distribution, copying or disclosure
by another person is strictly prohibited.
*****************************************************

2

B-117

PEPPER 052577

# MEMORANDUM



TO:        W. Roderick Gagné

FROM:    Sheilah Gibson

DATE:     July 22, 2001

RE:        Third-Party Beneficiary

SUBJECT:    Student Loan Processing Agreement and Student Loan Purchase Agreement

You have named the "Loan Originator" in the Student Loan Processing Agreement and the "Purchaser" in the Student Loan Purchase Agreements as a "third-party beneficiary" to the respective agreements. I cannot understand how the "Loan Originator" and "Purchaser" can be bound to the contracts by naming them as "third-party beneficiaries." This memorandum outlines my understanding of the meaning of "third-party beneficiary" and proposes several options for resolving this issue.

<u>Definition of Third-Party Beneficiary</u>

In the Student Loan Processing Agreement and the Student Loan Purchase Agreement (the "Agreements"), the Loan Originator and the Purchaser, respectively, are explicitly given the rights of third-party beneficiaries under the Agreements. A "third-party" beneficiary is defined as "one who may receive a benefit under a contract without being a party to the contract, e.g., the beneficiary under a life insurance policy stands to receive the proceeds of the policy, but never signs or agrees to the policy. Two parties may validly contract to confer benefits on a third party, even though the party provides no consideration."[1]

---

[1]    *See* Gilbert's Law Dictionary 251 (1994).

PEPPER 197283

B-118

A third person may, in his own right and name, enforce a promise made for his benefit even though he is not a party to the contract and to the consideration.[2]

The Loan Originator and Purchaser are not explicitly named in the Agreements. In order for a third person to recover on a contract, however, it is not essential that the third person knew of the contract at the time it was made[3] since the identity of the third-party beneficiary need not be set forth in the contract or even known at the time of its execution.[4] The fact that the third party did not act upon the faith of, or in reliance upon, the contract does not defeat his right of recovery.[5] However, when contracts are made for the benefit of another, but without his agency or even his consent, they may be either rejected or accepted or affirmed by him.[6]

If the Loan Originator and Purchaser were simply not named, but were third-party beneficiaries whose identity could be determined later, the Agreements would be enforceable with respect to the rights of the Loan Originator and Purchaser. The problem with the Agreements, however, is that they also impose contractual obligations on the Loan Originator and Purchaser, not just benefits.

**Rights of Third-Party Beneficiaries**

A search of case law revealed some cases that at first seemed applicable. In *Equitable Life Assur. Soc. v. Weightman*, 160 P. 629, the court found that before the beneficiary may accept the benefits of the contract, he or she must accept all of its implied, as well as

---

[2]    See 17A Am. Jur. 2d *Contracts* § 435 (1991).

[3]    See 17A Am. Jur. 2d *Contracts* § 454 (1991).

[4]    See *MK West Co. v. Meridien Hotels, Ind.*, 184 A.D.2d 312.

[5]    See *Baker v. Bryan*, 21 NW 83.

[6]    See *Stone v. Walker*, 77 So 554.

-2-

PEPPER 197284

B-119

express, obligations. The court's holding, however, was specifically addressed to the beneficiary of a life insurance policy who forfeited her rights under public policy by murdering the insured. Thus, the court found that an implied term of the contract was the public policy doctrine in regard to applying a constructive trust in the case of a beneficiary murdering the insured and this implied term prevented the beneficiary from taking under the insurance contract. The plaintiff in *Sanders v. American Casualty Co.*, 269 Cal App 2d 306, a materialman, was attempting to argue that his claim was not barred by the one-year limitation contained in a subcontract labor and material payment bond issued on behalf of the subcontractor and in favor of the prime contractor since he was not a party to the contract and was not aware of its existence or contents until after the one-year period had expired. The court held that a third-party beneficiary must take the contract as he finds it and cannot select the parts favorable to him and reject those unfavorable to him. Although the holding of the courts in these cases at first seemed applicable to our situation, upon closer examination of the facts, the rights of the third-party beneficiaries in the cases were limited by contract or public policy but the contracts imposed no obligations on the third-party beneficiaries.

There were no cases found where a third-party beneficiary was required to perform contractual obligations without being a party to the contract. The definition of third-party beneficiary is limited in case law to benefits bestowed on a third party and the cases require the third-party to comply with procedural requirements within the contracts or public policy, but not to actually have required duties (including payment by the third-party) under the contract.

<u>Obligations imposed on Third-Parties</u>

If the Loan Originator and the Purchaser were simply "third-party beneficiaries" under the Agreements, they would be entitled to enforce any rights and benefits that run directly

-3-

PEPPER 197285

B-120

to them. The problem with the Agreements is that they attempt to impose contractual obligations as well as benefits on unnamed parties. Generally, the obligation of contracts is limited to the parties making them and, ordinarily, only those parties to contracts are liable for their breach.[7] Parties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract.[8] A person that is not a party to a contract will not, as a matter of law, be held liable for any breach that might occur.[9] In order to bind a third person contractually, an expression of assent by such person is necessary.[10] In the case of a written contract, a person who is not named in, or bound by, the terms of a written contract cannot be rendered liable on it by a mere intention that the party should be bound, even though he was known to and was in direct communication with the obligee when the contract was executed.[11]

Courts have, however, been somewhat lenient in finding parties bound when the person or entity is not identified exactly. A contract entered into under an assumed, fictitious, or representative name is generally valid or binding.[12] Individuals may be bound contractually though not named in the contract but merely described by a trade or partnership or association name or otherwise.[13] In the cases cited, however, the party to the contract was ascertainable from the description. In our Agreements, this is not the case. In the Student Loan Processing Agreement, for example, the Loan Originator is defined as anyone that Student Marketing

---

[7]     See 17A Am. Jur. 2d Contracts § 421 (1991).

[8]     See Johnson v. Coleman (Ky) 288 SW2d 348.

[9]     See Candy v. Mann, 419 S.E. 2d 597.

[10]    See Mitchell v. Atlas Roofing Mfg. Co., 149 So 2d 298.

[11]    See Ferguson v. McBean, 27 P 518. (The fact that one of the parties intended that the successor of the other party should be bound by the contracts cannot make the successor liable.)

[12]    See State v. Tustin, 232 P 543.

[13]    See Carroll v. Sparks, 218 A.2d 517.

-4-

PEPPER 197286

B-121

Services arranges to receive and review "the student loan applications for loan programs." The definition includes loan programs sponsored by its affiliated company or companies or other lenders or finance companies. It is difficult from such a generic description to assign liability for breach of the obligations of the Loan Originator to any particular person or entity, making it impossible for the Institute to enforce any rights under the Student Loan Processing Agreement against the Loan Originator. Although, the Student Loan Purchase Agreement is less ambiguous by describing the "Purchaser" as the person as designated as such by Student Marketing Services, the Purchaser never signs the Student Loan Purchase Agreement. Therefore, if it is later identified by Student Marketing Services, it is not likely that it could be held liable for any of its obligations under the Student Loan Purchase Agreement.

If there were simply benefits that ran to the Loan Originator and Purchaser, these parties could make a claim as third-party beneficiaries. There are, however, obligations imposed on the Loan Originator and the Purchaser within the Agreements. It is doubtful that a court would uphold these contracts as written since it seems implausible that a court would find that the Loan Originator and Purchaser were entitled to the benefits of the Agreements, but at the same time, they could not be held liable for the obligations since they are not parties to the Agreements.

Options for the Agreements Already in Use.

1. Oral Contract. As you indicated, the Institutes and the Loan Originator, and the Schools and the Purchaser have been conducting transactions pursuant to the Agreements. There is no requirement under the Statute of Frauds that the transactions undertaken by the Agreements be in writing. Thus, while it is doubtful that a court would uphold the Agreements as written, there is nothing that prevents the parties from transacting business pursuant to oral

PEPPER 197287

B-122

agreements. The problem with this option is that the agreements between the parties will be limited to any terms they agreed to orally and will not necessarily incorporate any specific terms of the Agreements as drafted.

2.    <u>Assignment.</u>  An agreement could be drafted that will incorporate all of the benefits and obligations of the Institute and Loan Originator under the Student Loan Processing Agreement and similarly an assignment could be drafted between the Institute and the Purchaser that would incorporate the benefits and obligations of both parties under the Student Loan Purchase Agreement. Both types of contracts would name the parties and be executed by the Institute and Loan Originator or Purchaser, as applicable. Thus, it would not matter if a court were to find the Agreements unenforceable in regard to the Loan Originator and Purchaser since the agreements and assignments would be enforceable and would include the identical benefits and obligations.

<u>Options for Future Agreements.</u>

The Agreements could be redrafted and the assignments drafted in a number of ways as outlined below:

i.    The Purchaser could be named by reference to the Assignments, but is difficult to draft generic Student Loan Purchase Agreements that refer to generic Assignments. This would still leave the problem that without the signature of the Loan Originator and Purchaser, their obligations pursuant to the Agreements would not be enforceable. It is unclear whether the provisions with regard to third-party beneficiary rights would be enforceable even if the Loan Originator and Purchaser were to execute additional agreements or assignments in which they agreed to be bound by the obligations of the current Agreements.

PEPPER 197288

B-123

ii.    The Agreements could be redrafted to leave the benefits that run to the Loan Originator and Purchaser, while removing their obligations and putting the obligations into separate agreements. The Loan Originator and Purchaser could remain as third-party beneficiaries. There is however, the problem, with respect to the provision that states that the Agreements cannot be amended without the consent of the Loan Originator and Purchaser. Since the Loan Originator and Purchaser definitions are ambiguous, it may not clear who is the Loan Originator and Purchaser for a specific Agreement. In all cases, where I have seen a similar provision in regard to amendments, the identity of the third-party beneficiary is stated within the agreement.

iii.    The Loan Originator and Purchaser could sign the Agreements without being named within the Agreements. The Institutes are not named within the body of the Agreements, but are bound since the text of the Agreements conclude with the phrase, "the parties hereto have executed this Agreement, intending to be legally bound."[14] Short Assignments could be drafted that assign the Student Loans to the Purchaser.

iv.    Any references and corresponding benefits and obligations to the Loan Originator and Purchaser could be removed and the remaining Agreements could be redrafted to be between Student Marketing Services and the Institute and assignments and agreements could be drafted between the Institutes and the Loan Originator and Purchaser incorporating the benefits and obligations, as applicable.

In conclusion, I feel that option 2. is the best for the Agreements currently in effect and that option iii. is the best and simplest for future Agreements, unless there is some reason that the Loan Originator or Purchaser do not want to sign the Agreements. If that is the

---

[14]    *See Wheeler v. Paterson*, 16 P. 713.

-7-

PEPPER 197289

B-124

case, option iv. would be my second choice. These are the only solutions that in my legal opinion would be "enforceable." Simply drafting Assignments to be attached to unenforeable Student Loan Purchase Agreements is not in the best interests of our client since any rights it may have under the Student Loan Purchase Agreements will remain unenforceable with or without the Assignments. Further, the rights of the Loan Originator would remain equally unenforceable in regard to the Student Loan Processing Agreements as currently drafted.

Please provide some direction as to what you would like me to do and I will be happy to comply.

-8-

PEPPER 197290

B-125

241

```
 1              IN THE UNITED STATES DISTRICT COURT
             IN AND FOR THE DISTRICT OF DELAWARE
 2
 3                  C.A. NO.:  02-1294-JJF            COPY
 4
 5   MBIA INSURANCE CORPORATION and              )
     WELLS FARGO BANK, N.A. (f/k/a WELLS         )
 6   FARGO BANK MINNESOTA N.A.) as              )
     TRUSTEE OF S.F.C. GRANTOR TRUST,            )
 7   SERIES 2000-1, S.F.C. GRANTOR TRUST,        )
     SERIES 2000-2, S.F.C. GRANTOR TRUST,        )
 8   SERIES 2000-3, S.F.C. GRANTOR TRUST,        )
     SERIES 2000-4, S.F.C. GRANTOR TRUST,        )
 9   SERIES 2001-I, S.F.C. GRANTOR TRUST,        )
     SERIES 2001-2, S.F.C. OWNER TRUST 2001-I    )
10   AND S.F.C. GRANTOR TRUST, SERIES 2001-3     )
                                                 )
11          Plaintiffs/Counterclaim Defendants,  )
                                                 )
12       V.                                      )
                                                 )
13   ROYAL INDEMNITY COMPANY,                    )
                                                 )
14          Defendant/Counterclaim Plaintiff,    )
     _____ )
15                                               )
     ROYAL INDEMNITY COMPANY,                    )
16                                               )
            Third-Party Plaintiff,               )
17                                               )
         V.                                      )
18                                               )
     ANDREW N. YAO, STUDENT LOAN SERVICING L.L.C,)
19   STUDENT LOAN ACCEPTANCE II L.L.C, STUDENT LOAN )
     ACCEPTANCE III L.L.C, STUDENT LOAN ACCEPTANCE )
20   III L.L.C, STUDENT LOAN ACCEPTANCE V, L.L.C,)
     STUDENT LOAN ACCEPTANCE VIII L.L.C, STUDENT LOAN )
21   ACCEPTANCE IX L.L.C, S.F.C. FINANCIAL L.L.C. I, )
     S.F.C. FINANCIAL L.L.C. II, S.F.C. FINANCIAL )
22   L.L.C. VI, S.F.C. FINANCIAL L.L.C. VII,     )
                                                 )
23          Third-Party Defendants.              )
     _____ )
24
25   VIDEOTAPED TRACK (I) DEPOSITION OF SHEILA GIBSON
```

242

```
 1   ROYAL INDEMNITY COMPANY,                        )
                                                      )
 2           Counter-Claimant,                       )
                                                      )
 3       v.                                           )
                                                      )
 4   MBIA BANK and WELLS FARGO BANK MINNESOTA, N.A.   )
                                                      )
 5           Counter-Defendants.                     )
                                                      )
     ─────────────────────────────────────────────   )
 6                                                    )
     CHARLES A. STANZIALE, JR., Chapter 7             )
 7   Trustee of Student Finance Corporation,          )
                                                      )
 8           Plaintiff,                               )
                                                      )
 9       v.                                           )
                                                      )
10   PEPPER HAMILTON L.L.P., et al.,                  )
                                                      )
11           Defendants.                              )
     ─────────────────────────────────────────────   )
12                                                    )
     CHARLES A. STANZIALE, JR., Chapter 7             )
13   Trustee of Student Finance Corporation,          )
                                                      )
14           Plaintiff,                               )
                                                      )
15       v.                                           )
                                                      )
16   MCGLADREY & PULLEN L.L.P. and                    )
     MICHAEL AQUINO,                                  )
17                                                    )
             Defendants.                              )
18   ─────────────────────────────────────────────   )
                                                      )
19   ROYAL INDEMNITY COMPANY,                         )
                                                      )
20           Plaintiff,                               )
                                                      )
21       v.                                           )
                                                      )
22   PEPPER HAMILTON L.L.P., W. RODERICK GAGNE,       )
     FREED MAXICK & BATTAGLIA, CPAs, MCGLADREY &      )
23   PULLEN L.L.P., and MICHAEL AQUINO,               )
                                                      )
24           Defendants.                              )
     ─────────────────────────────────────────────   )
25
```

243

Videotaped Track (I) Deposition of SHEILA GIBSON - Volume III

Morning Session

Taken On Behalf Of The

Defendant/Counterclaim Plaintiff

Royal Indemnity

Date Taken:        September 7, 2006

Time:              9:08 a.m. - 12:05 p.m.

Place:             The Law Offices of Trenman-Kemker

                   101 E. Kennedy Blvd., Suite 2700

                   Tampa, Florida  33602

Stenographically Reported By:

Randall Jon Belsvik

Registered Merit Reporter

309

| | | |
|---|---|---|
| 1 | Q.    Did you ever meet Mr. Snyder? | 10:29:29 |
| 2 | A.    I must have, I believe.  I am not sure. | 10:29:42 |
| 3 | MR. GROSSBART:  We are running out of | 10:29:54 |
| 4 | videotape, and I am running out of questions, so why | 10:29:56 |
| 5 | don't we stop and take a break.  He will change his -- | 10:29:58 |
| 6 | MR. SHAPIRO:  Hold on one second, before we go | 10:30:04 |
| 7 | off the record.  How much time -- | 10:30:06 |
| 8 | THE VIDEOGRAPHER:  You have about four | 10:30:07 |
| 9 | minutes. | 10:30:09 |
| 10 | MR. SHAPIRO:  All right.  Let me just do a | 10:30:09 |
| 11 | quick -- for purposes of the privilege discussion | 10:30:11 |
| 12 | we had yesterday, Ms. Gibson, since the end of | 10:30:13 |
| 13 | the deposition yesterday, did you have the | 10:30:22 |
| 14 | opportunity to review a memo dated July 22nd, | 10:30:23 |
| 15 | 2001, from you to Gagne. | 10:30:27 |
| 16 | THE WITNESS:  I did. | 10:30:31 |
| 17 | MR. SHAPIRO:  And did that memo contain a | 10:30:32 |
| 18 | reference to S.M.S., just within the actual words | 10:30:36 |
| 19 | in the memo? | 10:30:40 |
| 20 | THE WITNESS:  It did. | 10:30:42 |
| 21 | MR. SHAPIRO:  Upon review of that memo, did | 10:30:42 |
| 22 | you reach a conclusion about what client you | 10:30:44 |
| 23 | were -- the client for which you prepared that | 10:30:48 |
| 24 | memorandum? | 10:30:52 |
| 25 | THE WITNESS:  Yes. | 10:30:53 |

310

| | | |
|---|---|---|
| 1 | MR. SHAPIRO:  Which client was that? | 10:30:53 |
| 2 | THE WITNESS:  Student finance corporation. | 10:30:55 |
| 3 | MR. SHAPIRO:  Student finance as opposed to | 10:30:57 |
| 4 | S.M.S.? | 10:30:59 |
| 5 | THE WITNESS:  Right. | 10:30:59 |
| 6 | MR. SHAPIRO:  And as far as you know, did | 10:31:00 |
| 7 | anyone convey the actual memorandum that you | 10:31:03 |
| 8 | prepared for Mr. Gagne to anyone at S.F.C.? | 10:31:04 |
| 9 | THE WITNESS:  I don't know. | 10:31:06 |
| 10 | MR. SHAPIRO:  All right.  For the record, we | 10:31:07 |
| 11 | will produce -- based on those answers, we will | 10:31:09 |
| 12 | no longer assert the privilege with respect to | 10:31:13 |
| 13 | that privilege.  We will produce it, and I have | 10:31:16 |
| 14 | it here, and I will circulate it when we take a | 10:31:18 |
| 15 | break. | 10:31:22 |
| 16 | MS. GOODMAN:  Thank you. | 10:31:22 |
| 17 | THE VIDEOGRAPHER:  We are going off the video | 10:31:23 |
| 18 | record.  We have been on the record an hour and | 10:31:27 |
| 19 | 27 minutes.  Off the video record. | 10:31:29 |
| 20 | [Recess] | 10:31:33 |
| 21 | THE VIDEOGRAPHER:  We are on the video record. | 10:55:40 |
| 22 | MR. SHAPIRO:  For the record, the document | 10:55:50 |
| 23 | that I handed out during the break is Bates | 10:55:53 |
| 24 | stamped Pepper 197283 through 197290. | 10:55:54 |
| 25 | And, also, to clear up the one issue that we | 10:55:59 |

1

```
 1    IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE

 2

      MBIA INSURANCE CORPORATION    :      COPY
 3    and WELLS FARGO BANK,         :
      N.A. (f/k/a WELLS FARGO       :
 4    BANK MINNESOTA N.A.) as       :
      TRUSTEE OF SFC GRANTOR        :
 5    TRUST, SERIES 2000-1, SFC     :
      GRANTOR TRUST, SERIES         :
 6    2000-2, SFC GRANTOR TRUST,    :  C.A. NO.
      SERIES 2000-3, SFC GRANTOR    :  02-1294-JJF
 7    TRUST, SERIES 2000-4, SFC     :
      GRANTOR TRUST, SERIES 2001-1,:
 8    SFC GRANTOR TRUST, SERIES     :
      2001-2, SFC OWNER TRUST       :
 9    2001-I, AND SFC GRANTOR       :
      TRUST, SERIES 2001-3,         :
10         Plaintiffs/Counterclaim  :
              Defendants,           :  TRACK(I)WITNESS:
11                                  :  M. DUNCAN GRANT
              v.                    :  VOLUME I
12    ROYAL INDEMNITY COMPANY,      :
           Defendant/Counterclaim:  DATE:
13         Plaintiff.              :  OCTOBER 10, 2006
      _____
14    ROYAL INDEMNITY COMPANY,
           Third-Party Plaintiff,
15
      vs.
16
      ANDREW N. YAO, STUDENT LOAN
17    SERVICING LLC, STUDENT LOAN
      ACCEPTANCE II LLC, STUDENT LOAN
18    ACCEPTANCE III LLC, STUDENT LOAN
      ACCEPTANCE III LLC, STUDENT LOAN
19    ACCEPTANCE V LLC, STUDENT LOAN
      ACCEPTANCE VIII LLC, STUDENT LOAN
20    ACCEPTANCE IX LLC, SFC FINANCIAL LLC
      I, SFC FINANCIAL LLC II, SFC
21    FINANCIAL LLC VI, SFC FINANCIAL LLC
      VII,
22         Third-Party Defendants.
      _____
23    ROYAL INDEMNITY COMPANY,
           Counter-Claimant,
24    vs.
      MBIA BANK and WELLS FARGO BANK
      MINNESOTA, N.A.,
25         Counter-Defendants.
```

27

1  A.  I don't remember, but I imagine

2  he did.

3  Q.  But you don't remember?

4  A.  Correct.

5  Q.  Do you recall looking at the        10:27:24

6  contract between SFC and Nielsen at

7  that time?

8  A.  I do.

9  Q.  Did Mr. Turnbull tell you

10  anything at those early               10:27:34

11  conversations about Codes 12 and

12  60?  You remember those coming up,

13  don't you?

14  A.  Which part shall I answer?

15  Q.  Well, why don't you answer the     10:27:44

16  first one?  Sorry.

17  A.  I do not remember Mr. Turnbull

18  talking to me then about Codes 12

19  and 60.

20  Q.  How involved did Mr. Gagne stay    10:27:56

21  in the matter after you started?

22  A.  Minimally involved.

23  Q.  Did you give him periodic

24  updates as to how the matter was

25  progressing?                          10:28:10

29

1    A.    Sure.    And are we focusing now

2    on this 1998 period or the entire

3    dispute?

4    Q.    The entire duration of the

5    matter.                                    10:29:20

6    A.    Well, some of the events I

7    remember reporting to him included

8    the retention of Arthur Andersen as

9    an expert witness, completion of the

10    Arthur Andersen report and its basic    10:29:36

11    conclusions, moving to dismiss parts

12    of the Complaint, judge's reaction

13    or ruling with respect to such a

14    motion, moving for summary judgment,

15    events of that sort.                    10:29:50

16    Q.    How about deposition testimony

17    given by SFC witnesses?    Did you

18    ever report on those to Mr. Gagne

19    that you recall?

20    A.    I recall giving the most        10:30:04

21    surface-level, undetailed reports to

22    him occasionally about depositions.

23    I think focusing more on depositions

24    given by the Nielsen people than on

25    depositions given by the SFC          10:30:20

53

1   PH 150229 through 231.

2        Now, with that in mind, do

3   you recognize the exhibit?

4   A.   I do.

5   Q.   Okay, and that's your response    10:56:34

6   to Mr. McNally's letter of February

7   6th; correct?

8   A.   Correct.

9   Q.   And I see that you blind-copied

10   Mr. Gagne on that letter; is that    10:56:52

11   right?

12   A.   It is.

13   Q.   And did you routinely copy Mr.

14   Gagne on all correspondence and

15   pleadings that you received on the    10:57:00

16   Nielsen matter?

17   A.   No.

18   Q.   Do you recall -- well, the

19   letter says, among other things, it

20   says, in response to Mr. McNally's    10:57:16

21   request for the exchange of student

22   loan histories, that you will do

23   that, right?

24   A.   Right.

25   Q.   Do you recall any discussions    10:57:22

113

1    filed, we had a mediation with the

2    federal Magistrate Judge, but I took

3    you not to be asking about that.

4    Q.   You took it correctly.

5                At any point in time in        12:19:28

6    your representation of SFC in the

7    Nielsen matter, did you hear the

8    phrase or term forbearance?

9    A.   Not that I remember.

10   Q.   Used?                                  12:19:40

11   A.   No.

12   Q.   Did anyone ever tell you about

13   what they understood SFC's

14   forbearance process to be?

15   A.   No.                                    12:19:50

16   Q.   Did you ever see any documents

17   that purported to describe SFC's

18   forbearance process or something

19   referred to as a forbearance

20   process?                                    12:20:02

21   A.   None that I recall.

22   Q.   How closely did you keep in

23   touch with Terrence Gill?

24   A.   Very unclosely.

25   Q.   How about Mr. Gagne?  Was he in        12:20:12

148

1   remember ever following up on it.

2   Q.   Do I take it, then, that you are

3   not aware of anything Ms.

4   Unterberger -- forgive me if I

5   mispronounced her name.

6   A.   Unterberger.

7   Q.   Unterberger did to follow up

8   this particular document?

9   A.   I am not aware of anything she

10  did, if anything.                        14:05:38

11  Q.   And you don't obviously then

12  don't recall discussing it with Mr.

13  Gagne?

14  A.   I don't.

15  Q.   Does -- putting aside whether    14:05:54

16  this actual phone call occurred, as

17  indicated here, does the explanation

18  that's given for Nielsen's confusion

19  about the loan balances, does that

20  sound familiar to you as something   14:06:06

21  you learned in the course of the

22  Nielsen litigation?

23  A.   No.

24           MS. AINSLIE:   Objection.

25  BY MR. GROSSBART:                       14:06:14

149

1   Q.   Is this the type of document

2   that had it been brought to your

3   attention specifically in the

4   context of your representation of

5   SFC, you would have followed up on      14:06:30

6   with the folks at SFC to see if it

7   had any truth or veracity?

8              MS. AINSLIE:   Objection.

9              THE WITNESS:   It is

10  difficult for me to answer that.       14:06:42

11  Probably not, in the sense that my

12  focus was on defending my client

13  against fraud and contract claims

14  that had been brought against it.

15  Also pursuing the counterclaim, but    14:06:54

16  let's set that aside.

17             Whatever the explanation,

18  this document makes it clear that

19  the Nielsen company, through two of

20  its -- I think its two very most       14:07:08

21  senior officers -- had been made

22  aware of some information.

23             What that would have meant

24  to me is that being aware of it,

25  they were not being defrauded.  And    14:07:22

288

1  this case, dated October 20th, and a

2  disk containing student payment

3  history?  Do you see that?

4  A.  I do.

5  Q.  And she made you aware of the        17:12:14

6  fact that that information was being

7  produced as indicated on the BCC

8  page, right?

9  A.  Correct.

10  Q.  And she also made Mr. Gagne        17:12:26

11  aware that that information was

12  being produced?

13  A.  She did.

14  Q.  And to your knowledge, Mr. Gagne

15  never asked Ms. Unterberger to see        17:12:36

16  what it was she was turning over?

17  A.  No, not to my knowledge.

18  Q.  Do you have any reason to

19  believe that in blind-copying Mr.

20  Gagne, Ms. Unterberger actually        17:12:52

21  included the enclosures in her

22  giving the letter to Mr. Gagne or

23  just the cover letter itself?

24  A.  I have reason to believe it was

25  just a blind copy or a double-blind        17:13:06

289

1  copy, perhaps, of the letter

2  itself.  We did not send production

3  documents to Mr. Gagne.

4  Q.  After you got the cover letter,

5  if you wanted to see them, he was          17:13:18

6  made aware of their availability by

7  dint of getting the cover letter?

8  That was the intent, right?

9  A.  No, I would say -- I mean, I'm

10  now read Andrea's mind, but our            17:13:30

11  normal practice was to send blind

12  copies internally within the firm,

13  often including Mr. Gagne, not so

14  much as to say, in this instance,

15  these documents are available to           17:13:42

16  you, which is the last thing we

17  would have had in mind, but rather,

18  to say, we want you to know we are

19  sending certain documents to Arthur

20  Andersen, the retained expert.             17:13:54

21  Q.  Well, if Mr. Gagne thought they

22  were important enough to look at, he

23  could call you or Ms. Unterberger up

24  and ask to look at them?

25  A.  Sure.                                  17:14:04

# MEMORANDUM

**TO:**    Chubb Wilcox

**FROM:**    W. Roderick Gagné

**DATE:**    August 6, 2002

**RE:**    Insurance Application

---

I am responding to your memorandum dated July 22, 2002. I will restate the interrogatories and provide an answer to each:

1. Have any claims, suits, or demands been made during the past five years against you, whether you were with Pepper or some other firm, relating to the practice of law? **Answer:** To my knowledge, no claims have been filed against me personally with respect to the practice of law in the past five years.

2. Are you aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of the claim or suit for lawyers professional liability? **Answer:** The only two matters of which I am aware are the Student Finance Corporation transactions of which you are familiar and

## REDACTED

With regard to the Student Finance Corporation action, two law suits have been filed in two different states and to date, we have not been named in either action. I am not certain as to whether we will be joined in the future.

PEPPER 199236

PHLEGAL: #1296477 v1 (RSD901L.DOC)

B-140