# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| STUDENT FINANCE CORPORATION, | : |
| Debtor. | :  Chapter 7 |
| | : |
| CHARLES   A.   STANZIALE,   JR., | :  Bankruptcy Case No.: 02-11620-JBR |
| CHAPTER  7  TRUSTEE  OF  STUDENT | : |
| FINANCE CORPORATION, | : |
| Plaintiff, | : |
| v. | :  Adversary No.: 04-56423-PBL |
| | : |
| PEPPER    HAMILTON    LLP;    W. | :  Civil Action No.: 04-1551-JJF |
| RODERICK GAGNÉ; ROBERT L. BAST; | : |
| PAMELA   BASHORE   GAGNÉ;   W. | : |
| RODERICK   GAGNÉ,   TRUSTEE   OF | : |
| TRUST UNDER DEED OF ELIZABETH B. | : |
| BRENNAN DATED JANUARY 12, 1994; | : |
| W. RODERICK GAGNÉ, TRUSTEE OF | :  JURY TRIAL DEMANDED |
| TRUST UNDER DEED OF ELIZABETH B. | : |
| BRENNAN DATED JANUARY 12, 1994, | : |
| FBO   W.   RODERICK   GAGNÉ;   W. | : |
| RODERICK   GAGNÉ,   TRUSTEE   OF | : |
| TRUST UNDER DEED OF ELIZABETH B. | : |
| BRENNAN DATED JANUARY 12, 1994, | : |
| FBO PHILLIP B. GAGNÉ; W. RODERICK | : |
| GAGNÉ, TRUSTEE OF TRUST UNDER | : |
| DEED OF ELIZABETH B. BRENNAN | : |
| DATED   JANUARY   12,   1994,   FBO | : |
| ELIZABETH L. GAGNÉ; W. RODERICK | : |
| GAGNÉ, TRUSTEE OF TRUST UNDER | : |
| DEED OF JAMES T. BRENNAN DATED | : |
| APRIL  8,  1991,  FBO  W.  RODERICK | : |
| GAGNÉ;   W.   RODERICK   GAGNÉ, | : |
| TRUSTEE OF TRUST UNDER DEED OF | : |
| JAMES T. BRENNAN DATED APRIL 8, | : |
| 1991, FBO PHILLIP B. GAGNÉ; W. | : |
| RODERICK   GAGNÉ,   TRUSTEE   OF | : |
| TRUST UNDER DEED OF JAMES T. | : |
| BRENNAN DATED APRIL 8, 1991, FBO | : |
| ELIZABETH L. GAGNÉ, | : |
| Defendants. | |

## SECOND AMENDED COMPLAINT

## I. INTRODUCTION

1.    Charles A. Stanziale, Jr., Esquire, Chapter 7 Trustee ("Trustee" or "Stanziale") of the Student Finance Corporation ("SFC" or "Debtor"), by and through his undersigned counsel, brings this Complaint against Pepper Hamilton LLP ("Pepper"), its partner W. Roderick Gagné ("Gagné"), Gagné's wife Pamela Gagné, Gagné's uncle Robert Bast, and various trusts created by relatives and for the benefit of Gagné, who served as trustee of those trusts, and for the benefit of his relatives. The conduct of Pepper and Gagné in representing SFC (i) implicated multi-layered conflicts of interest; (ii) elevated personal and familial interests above that of SFC and its creditors; (iii) fell below the standard of care owed to SFC; (iv) occurred with awareness of SFC's deteriorating financial condition and (v) foreseeably contributed to the financial demise of SFC to the detriment of SFC and its creditors. As described in further detail in this Complaint, SFC paid Pepper approximately $3.2 million in legal fees over approximately six years. No lawyer or law firm acting reasonably, with the requisite care and in the best interests of its multiple clients would have represented SFC at the same time that the lawyer's family was loaning millions of dollars of personal wealth to SFC (the transactional documents for which Gagné himself drafted, apparently on behalf of SFC and his family). No lawyer or law firm acting with the requisite care would have enabled a client to continue to incur debt with the obvious – and ultimate – consequence of not being able to satisfy its financial obligations to the material detriment of the client's creditors and investors. No lawyer or law firm acting reasonably and with the requisite care would have facilitated a bail-out of a partner's family's investment by SFC's principal immediately prior to bankruptcy, when it knew or should have known that less assets would be available for recovery by other creditors of SFC in bankruptcy. Only after its actions caused and contributed to SFC's insolvency and it became clear that Gagné and his family would no longer benefit from their investment with SFC and that SFC would no

2

longer be able to pay Pepper's fees, did Pepper withdraw from the representation, preceding the commencement of bankruptcy proceedings by just six weeks. For these reasons, *inter alia*, the Trustee asserts the following claims against defendants:

## II. PARTIES

2.      Charles A. Stanziale, Jr., Esquire is the Chapter 7 Trustee of SFC, a Pennsylvania business corporation with its principal place of business located at 170 Lukens Drive, New Castle, Delaware.

3.      Pepper is a Pennsylvania Limited Liability General Partnership with its principal business address at 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103. Pepper has more than 400 lawyers practicing out of nine offices, the largest of which is in Philadelphia, Pennsylvania. Pepper provided legal services to SFC (and other relevant clients as described herein) from its Philadelphia office, primarily under the guidance of Gagné. Pepper is liable for the acts of Gagné and other Pepper partners and employees. All allegations herein asserted against Gagné or other Pepper lawyers or employees are allegations asserted against Pepper as well. Plaintiff is asserting a professional liability claim against this defendant.

4.      Gagné is an adult individual residing at 515 Cresheim Valley Road, Wyndmoor, Pennsylvania 19038. Gagné practices law primarily out of Pepper's Philadelphia office. Plaintiff is asserting a professional liability claim against this defendant.

5.      Pamela Bashore Gagné is an adult individual residing at 515 Cresheim Valley Road, Wyndmoor, Pennsylvania 19038. On information and belief, Mrs. Gagné has been married to Gagné at least since 1995.

6.      Robert L. Bast is an adult individual residing at 110 Spruce Lane, Ambler, Pennsylvania 19002. Mr. Bast is Gagné's uncle. On information and belief, Bast and Andrew N. Yao ("Yao"), SFC's founder, have had a relationship spanning approximately 20 years.

3

7.    W. Roderick Gagné, Trustee of Trust Under Deed of James T. Brennan dated April 8, 1991, FBO W. Roderick Gagné ("James Brennan Trust FBO Gagné"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.

8.    W. Roderick Gagné, Trustee of Trust Under Deed of James T. Brennan dated April 8, 1991, FBO Phillip B. Gagné ("James Brennan Trust FBO Phillip Gagné"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.  On information, Phillip B. Gagné is a relative of Roderick Gagné.

9.    W. Roderick Gagné, Trustee of Trust Under Deed of James T. Brennan dated April 8, 1991, FBO Elizabeth L. Gagné ("James Brennan Trust FBO Elizabeth Gagné"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.  On information, Elizabeth Gagné is a relative of Roderick Gagné.

10.    W. Roderick Gagné, Trustee of Trust Under Deed of Elizabeth B. Brennan dated January 12, 1994 ("Elizabeth Brennan Trust"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.

11.    W. Roderick Gagné, Trustee of Trust Under Deed of Elizabeth B. Brennan dated January 12, 1994, FBO W. Roderick Gagné ("Elizabeth Brennan Trust FBO Gagné"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.

12.     W. Roderick Gagné, Trustee of Trust Under Deed of Elizabeth B. Brennan dated January 12, 1994, FBO Phillip B. Gagné ("Elizabeth Brennan Trust FBO Phillip Gagné"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.

13.     W. Roderick Gagné, Trustee of Trust Under Deed of Elizabeth B. Brennan dated January 12, 1994, FBO Elizabeth L. Gagné ("Elizabeth Brennan Trust FBO Elizabeth Gagné"), had and on belief has an address of c/o W. Roderick Gagné, 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.

### III.  JURISDICTION AND VENUE

14.     Jurisdiction is proper pursuant to 28 U.S.C. § 1334 and §157(b), and §§ 547, 548, 550 and 551 of Title 11 of the United States Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 7001, to, *inter alia*, avoid transfers and to recover the transfers for the benefit of the bankruptcy estate.

15.     The Trustee brings this Complaint pursuant to 11 U.S.C. § 541(a) as successor to the interests in property of the Estate and pursuant to 11 U.S.C. § 544(a) on behalf of, and for the benefit of, SFC's creditors ("Creditors"), and asserts both core and non-core claims pursuant to 28 U.S.C. §157(b).

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV.  PROCEDURAL HISTORY

17.     On June 5, 2002 ("Filing Date"), four trucking schools filed an involuntary petition against the Debtor, SFC.

18.     With the consent of SFC, on November 4, 2002, the Court entered an Order for Relief under Chapter 11 of the Bankruptcy Code.

19.    On September 29, 2003, the Court appointed Mr. Stanziale as Chapter 11 Trustee for the Debtor.

20.    On November 14, 2003, upon the expedited motion of Mr. Stanziale, this Court converted this matter to Chapter 7.

21.    On November 20, 2003, Mr. Stanziale was appointed as the Chapter 7 Trustee of SFC.

## V.  FACTUAL BACKGROUND

### A.    SFC's Business And Financing

22.    SFC, a Pennsylvania corporation, was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements ("Student Loan Accounts") primarily from truck driving schools.

### 1.    SFC's Board And Officers

23.    Immediately prior to the Filing Date, Yao was SFC's sole shareholder and its Chief Executive Officer and treasurer.

24.    During all relevant periods, Yao's business address was Five Radnor Corporate Center, Radnor, Pennsylvania, and his home address was 107 Leighton Drive, Bryn Mawr, Pennsylvania.

25.    As of the Filing Date, the directors of SFC ("Board") were Yao, Perry R. Turnbull, David Zulauf and Gary J. Hawthorne.

26.    Pepper employee Maria E. DeCarlo ("DeCarlo") served as an officer, Assistant Secretary, of SFC.

27.    On information and belief, from September 2001 through the Filing Date, approximately $9.6 million in dividend distributions were credited to Yao.

### 2.  Pepper's Representation Of And Functioning As General Counsel To SFC

28.    From December 1, 1996 through April 2002, Pepper acted in the capacity of SFC's general counsel and performed a wide range of legal and legal-related services for SFC, including, *inter alia*: general corporate representation (including preparation and editing of corporate documents, minutes, unanimous consents and maintenance of SFC minute books); corporate finance representation; assisting SFC in refinancings and seeking financing from the capital and lending markets and private investors; wholesale and permanent securitizations; transactional closings and documentation for SFC's financial transactions and private investments; tax advice; consumer finance advice; licensing advice; employment advice; immigration advice and representation of SFC in litigation. The comprehensive nature of these services and Pepper's involvement therein, *inter alia*, establish and confirm Pepper's position as an insider of SFC.

29.    More than 100 Pepper partners, associates, legal assistants and other employees worked on a host of SFC-related matters, for which Pepper billed SFC approximately $3.2 million, from 1996 through 2002.

30.    At most of the closings on SFC transactions, the Closing Certificates of the Secretary of SFC made representations with respect to SFC's corporate documents such as resolutions, charter documents and bylaws. Such certifications were issued by Pepper paralegal DeCarlo in her capacity as Assistant Secretary of SFC.

31.    SFC's legal work was primarily performed by, or under the supervision and guidance of, Gagné; Gagné was listed by Pepper as the originating attorney, billing attorney and principal attorney handling SFC.

32.     Gagné devoted a substantial portion of his time at Pepper to the business of SFC, its related entities and Yao. Having this group of fee-generating clients annually paying fees in the hundreds of thousands of dollars increased Gagné's compensation and status at Pepper.

33.     Expanding upon the traditional role of general counsel, Gagné became part of the fabric of SFC, and his interests became intertwined with those of SFC, including with respect to the active involvement in procuring funding for SFC in order to perpetuate the survival of the enterprise and his relationship with that enterprise.

34.     Gagné represented Yao for more than seventeen years and Pepper performed estate and asset planning services for Yao as well; and Bast, Gagné's uncle, was a regular source of additional funding needed for Yao's enterprises.

35.     Among other things, in light of the extent and scope of its representation of SFC, Gagné and his family's relationship to SFC as equity holders and creditors, and DeCarlo's role as an SFC officer, Pepper and Gagné, at all relevant times, were insiders in a position to and actually did influence and exercise dominion and control over SFC.

### 3.     SFC's Originating And Acquiring Student Loan Accounts

36.     At the outset of its operations, SFC limited its activities to traditional lending arrangements, including purchasing bundles of pre-packaged Student Loan Accounts at a discount using funds borrowed from either commercial banks or private investors.

37.     As SFC expanded its program, its method of financing evolved. With expansion, SFC financed its operations through asset-backed securities transactions and loans from third parties.

38.     The securitization process began with SFC's acquisition of Student Loan Accounts at a discount using funds from a warehouse line of credit provided to certain SFC

affiliates. SFC, through its affiliated entity, would pool the Student Loan Accounts. The warehouse lenders would obtain security interests in the acquired Student Loan Accounts.

39.     Wilmington Trust Company, another client of Pepper, was one of the warehouse lenders. On information and belief, in or around January 1999, Wilmington Trust entered into a $25 million line of credit with certain of SFC's affiliates to fund the purchase of student loans from SFC.

40.     To complete the securitization transaction, SFC would sell the pooled Student Loan Accounts to an affiliated special purpose entity. The special purpose entity would transfer the Student Loan Accounts to a trust created by the special purpose entity. To fund the special purpose entity's purchase of the Student Loan Accounts from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors.

41.     Both the Certificates and Notes were backed by the principal and interest received from the Student Loan Accounts and represented an undivided interest in the Student Loan Accounts transferred to those trusts.

42.     In order to provide additional security for the warehouse lender and purchasers of the Notes and Certificates, the income streams created from the Student Loan Accounts were backed by credit risk insurance policies issued by Royal Indemnity Company ("Royal"), another client of Pepper.

43.     Through these credit risk policies, Royal insured the payment of principal and ninety days interest in the event of default on the Student Loan Accounts. As defined by the Royal policies, "default" and hence Royal's obligation to pay, did not occur unless a Student Loan Account was more than ninety days delinquent.

44.    The Certificates and Notes were sold to investors in private placement transactions for which Private Placement Memoranda ("PPM") were issued.    The PPMs purported to describe the securitized assets, including information concerning performance of the Student Loan Accounts.

45.    Pepper, under the direction of Gagné, prepared the PPMs and related documents for all SFC securitizations and performed, or should have performed, due diligence focusing on the nature and quality of the assets (*i.e.*, the Student Loan Accounts) being securitized for each of those transactions.

46.    A different trust was created to complete each securitization transaction ("Securitization Trusts").

47.    Because the Student Loan Accounts were sold to the special purpose entities and subsequently transferred to the Securitization Trusts, payments by the borrowers underlying the Student Loan Accounts (the income stream) were remitted to the Securitization Trusts.

48.    Using the proceeds of the securitizations, SFC would pay the outstanding amounts owed to the warehouse lenders for SFC's acquisition of the Student Loan Accounts. Thus, through securitization, SFC replenished its warehouse lines of credit.

### 4.    The "Forbearance Payments"

49.    With rapid expansion, however, SFC failed to implement adequate controls governing the quality of the Student Loan Accounts.

50.    As a result, SFC originated or acquired numerous Student Loan Accounts that eventually went into default.

51.    To avoid classifying student loans as in "default," SFC made payments from reserve accounts and from its own funds on behalf of the Student Loan Accounts and treated

such payments as though they had been made by the student borrowers themselves.  SFC characterized these payments, made on behalf of the borrowers, as "Forbearance Payments." Through employment of Forbearance Payments, default rates on the student loans appeared to be very low, but, in fact, were very high.

52.    The fact that SFC utilized such Forbearance Payments was not disclosed to all creditors.

53.    Neither SFC nor Pepper disclosed in any of the PPMs prepared by Pepper and issued in connection with the eight securitizations that SFC was making the Forbearance Payments and preventing certain Student Loan Accounts from appearing to be in default.

54.    Over time, the number of students failing to make timely payments on the Student Loan Accounts began to rise.  With the rise in delinquency rates, the rate and amount of Forbearance Payments increased.

55.    In 1999, SFC made Forbearance Payments of approximately $2 million.  By 2000, that amount had multiplied almost five-fold, to nearly $9.5 million.  During the year leading up to the filing of the involuntary petition, SFC made Forbearance Payments of in excess of $45 million.

56.    As a result of the Forbearance Payments, by May 2001, at the latest, SFC was rendered insolvent.  To create the impression that SFC was still viable, proceeds from new loans and securitizations were being used to make Forbearance Payments, rather than to fund SFC's obligations to creditors.

57.    Beginning in May 2001, using a balance sheet test (with the exception of October and November 2001, when SFC had recently completed a large securitization), SFC was insolvent.

58.    SFC was unable to pay its obligations as they came due. In September 2001, SFC was unable to fund payments for student loan agreements from trucking schools. The monies that would be used to fund this purchase had been allocated to making Forbearance Payments. Not until SFC was able to securitize newer loans was SFC able to fund its past purchase of Student Loan Accounts.

59.    To sustain itself financially, SFC was required to use assets acquired in new financings to cure past due debts. SFC was caught in a cycle whereby, to survive, it was required to expand, but to expand, it was required to purchase and sell noncredit-worthy Student Loan Accounts.

60.    In February 2002, SFC was unable to fund any additional purchases of new Student Loan Accounts. Notwithstanding its agreements to purchase and take possession of additional Student Loan Accounts, SFC could not fund the approximately $27 million needed for this purchase.

61.    Pepper was aware of SFC's practice of utilizing "reserves" and Forbearance Payments to manipulate reported Student Loan Account default rates, or, at the very least, should have been aware of this practice. Additionally, on information and belief, in certain instances truck driving schools were "seasoning" loans by making the first two payments due; and, on belief, Pepper knew or should have known of this practice.

62.    At least as early as December 1998, Gagné had involvement with school reserves and was asked to include a definition or explanation for "school reserves," a forerunner to SFC's use of "Forbearance," with regard to an "SFC/Royal Policy Draft."

63.    In February 1999, referring to the application of "school reserves" to cover defaults, Gagné wrote in an email to Yao that: "This is great news. I consider the issue resolved

in the easiest manner possible. You will just have to hit the school reserves in the normal course to fund the defaults...."

64.    Advising SFC concerning the impact of applying school reserves, in April 1999, Gagné sent an email to Yao suggesting: "I guess you can hit the school reserves immediately and thus you should not be out of pocket, but it will put pressure on the system to make sure all of the claims are paid and filed almost simultaneously."

65.    In May 1999, in an email, subject "PPM, Royal, Endorsement and other matters," Gagné wrote to Yao, *inter alia*, that "you can access the school reserves for a portion of the losses…and … you can arduously begin to service the loans to keep the default rates down."

66.    Gagné was copied on other emails in April and May 1999, concerning the use of school reserves, including an April 1, 1999 email "Re: School Reserves" from Yao.

67.    The transition from use of "school reserves" to use of "forbearance" coincided, in or around Spring 2000, with a dramatic expansion of SFC's business, raising capital through securitizations and formation of SMS, all of which Pepper was instrumental in accomplishing.

68.    Gagné prepared PPMs for the securitizations beginning in April 2000, and approximately quarterly thereafter. Pepper's billing records and Gagné's emails show that Gagné knew in early March 2000 that SFC intended to use Forbearance Payments.

69.    Yao consulted Pepper about issues concerning forbearance and Pepper researched and advised Yao regarding this issue in 2000. For example, Gagné billed SFC for time spent on March 2, 2000, in accordance with the following entry: "Review materials on consumer loans and for forbearance projects; review with Andrew Yao use of school reserves regarding monthly payments on forbearance loans and discuss implications; prepare lengthy e-

mail on same...." Gagné billed SFC for time incurred on May 19, 2000, for, *inter alia*, "review[ing] forbearance structure and begin research of same."

70. In a March 2, 2000 email, subject "Forbearance Agreements," Gagné advised Yao:

> "Andrew,
>
> As you can tell, I think the use of the School Reserves to make monthly payments on the Student Loans will take a considerable amount of thought and work to wind through the bankruptcy issues, the consumer finance laws, the School Agreements, the Royal Policy and the Term Securitizations. The confluence of parties and disciplines and the need to track the payments from another source may make the problem not feasible but we will take a crack at it.
>
> In addition, we will have to see how the Capital Markets will react. I alluded to the fact that the market already is leery of how complicated the deals are for there [sic] size. Adding this factor will considerably compound the complexity. I know you said that they should not rely on it. However, if they should not then it looks like SFC is manipulating the pool performance. It seems to have some arbitrary elements. In short, this is something that we will need to bring on after discussing it with several parties, including Rusty Sailor and John.
>
> The final element is the Royal who will be directly affected and is if the plan is being used now. The discussion with the Royal will be difficult. They are a little skittish right now because you are having difficulty going to market and laying a major restructuring on them may be untimely. In addition, if the payments have been made in this pool it would impact them and they will be concerned that it affects the experience account. I will also have to look at the Bankruptcy implications before the 3/22 meeting, which I have been asked to attend by the Royal, if it is okay with you.
>
> To implement the new program is not impossible, but it will not be easy.
>
> Rod"

71. In December 2001, Pepper represented SFC with respect to the resignation of Kirk Monteverde, SFC's Managing Director of Risk Management, who worked for SFC between November 19 and December 3, 2001. On his resignation letter, Monteverde hand-wrote that "[i]t is my belief that the Company misrepresented its financial position and that the work I have been asked to supervise misrepresents the operating position of the Company."

14

72.    Pepper invoices to SFC show that Pepper attorneys evaluated the resignation issue, spoke and met with Monteverde, prepared an agreement for Monteverde and conferred with Gagné regarding same.    Pursuant to their agreement, SFC agreed to pay Monteverde $150,000 in exchange for his agreeing to maintain confidentiality.

**B.    Pepper, Gagné And Gagné's Family's Involvement with SFC**

**1.    The Gagné Family Loans To SFC**

73.    At the same time Pepper represented SFC, members of Gagné's family and trusts for which Gagné served as trustee made sizeable loans to SFC, between 1996 and 2002, at interest rates ranging from ten to fifteen percent per annum, in the following amounts:

a.    Pamela Gagné loaned approximately $5,746,895 to SFC and received payments from SFC of approximately $4,846,895 in principal and $1,357,587 in interest and fees.

b.    Robert Bast loaned approximately $21,921,278 to SFC and received payments from SFC of approximately $17,421,278 in principal and $3,316,680 in interest and fees.

c.    The Elizabeth Brennan Trust loaned approximately $3,162,125 to SFC and received payments from SFC of approximately $2,512,125 in principal and $647,963 in interest and fees.

d.    The Elizabeth Brennan Trust FBO Gagné loaned approximately $375,000 to SFC and received payments from SFC of approximately $375,000 in principal and $28,750 in interest and fees.

e.      The Elizabeth Brennan Trust FBO Phillip Gagné loaned approximately $250,000 to SFC and received payments from SFC of approximately $250,000 in principal and $18,583 in interest and fees.

f.      The Elizabeth Brennan Trust FBO Elizabeth Gagné loaned approximately $375,000 to SFC and received payments from SFC of approximately $375,000 in principal and $28,750 in interest and fees.

g.      The James Brennan Trust FBO Gagné loaned approximately $1,900,000 to SFC and received payments from SFC of approximately $1,700,000 in principal and $165,140 in interest and fees.

h.      The James Brennan Trust FBO Phillip Gagné loaned approximately $1,725,000 to SFC and received payments from SFC of approximately $1,625,000 in principal and $145,922 in interest and fees.

i.      The James Brennan Trust FBO Elizabeth Gagné loaned approximately $1,900,000 to SFC and received payments from SFC of approximately $1,700,000 in principal and $169,979 in interest and fees.

74.     Within one year of the Filing Date, SFC made principal and interest payments to Gagné's family of:

| | |
|---|---|
| Pamela Gagné | $64,106.78 |
| Robert Bast | $2,486,597.94 |
| Elizabeth Brennan Trust | $81,369.86 |
| Elizabeth Brennan Trust FBO Gagné | $403,750.00 |
| Elizabeth Brennan Trust FBO Phillip Gagné | $268,583.00 |
| Elizabeth Brennan Trust FBO Elizabeth Gagné | $403,750.00 |
| James Brennan Trust FBO Gagné | $192,217.00 |
| James Brennan Trust FBO Phillip Gagné | $136,483.00 |
| James Brennan Trust FBO Elizabeth Gagné | $192,217.00 |

75.    While counsel to SFC, Gagné prepared loan transaction documents for a number of transactions between SFC and his own family members and family trusts for which he served as trustee and of which he was the beneficiary.

76.    Pepper was purportedly representing SFC -- and billed SFC for time incurred in preparing transaction documents for transactions between SFC and Gagné's family -- with respect to transactions between SFC and Gagné's wife Pamela Gagné, his uncle Robert Bast and trusts created by his aunt Elizabeth Brennan and his uncle James Brennan for the benefit of Phillip Gagné, Elizabeth Gagné and Roderick Gagné himself.  (These relatives of Gagné and their trusts are referred to collectively herein as the "Family.")

77.    In 2000, the Family loaned $6 million to SFC, which was converted to common stock.  When these shares were redeemed, the Family was repaid principal plus interest and was paid a 7% "Payoff Premium."

78.    Gagné was trustee of each of the Family trusts and executed legal agreements on behalf of each of the Family trusts with respect to the Family loan documents, including intercreditor, servicing, loan and security agreements.

79.    On August 27, 1998 and March 5, 2002, Gagné issued purported conflict waiver letters for Yao to sign on behalf of SFC, stating that the Family had loaned substantial additional funds to SFC and referencing Gagné's alleged prior admonitions to Yao about the need for separate counsel due to the "inherent conflicts of interest."

80.    Despite having "admonished" Yao in purported conflict waiver letters that SFC should retain independent counsel based on Pepper's "inherent" conflict between SFC and Gagné's Family's interests, Pepper continued to represent SFC at the same time the Family had substantial loans outstanding to SFC.

81.    Pepper prepared documentation for loan and equity transactions involving SFC and the Family.  SFC minutes authorizing many of the Family transactions bear the legend "PHLEGAL" in the lower left corner, evincing that they were prepared by Pepper.

82.    Using Pepper letterhead, Gagné advised SFC concerning payments due to the Family under these loan transactions.  Loan payments by SFC to the Family, for example checks to Pamela Gagné, were routinely sent to Roderick Gagné at Pepper.

83.    Discussing Family debt and the structuring of interest payments in an April 1999 email to Yao regarding Yao's enterprises, Gagné included himself among the Family investor group, when he stated "we have been long term investors and I believe are willing to stay the course on our $5,050,000 investment."

84.    A letter from Pamela Gagné to SFC was sent on February 11, 2000 -- on Pepper letterhead -- waiving certain technical defaults in loan documents while "reserving any rights and defenses" she "may have in the event of a preference suit or other attempts to undo the benefits of the payments made under the loan agreements."

85.    The Family loaned approximately $3.3 million more to SFC as late as March 5, 2002 -- the date of Pepper's second conflict waiver letter to Yao -- when SFC, with the knowledge of Gagné, was experiencing great financial difficulty and was making Forbearance Payments.

86.    On information and belief, the Family made these additional March 2002 loans with the knowledge that such funds would be used by SFC for Forbearance Payments.

87.    On information and belief, the Family made these additional loans to SFC to keep SFC financially viable for long enough for the Family to recoup their investments, to the detriment of SFC and other creditors of SFC.

88.     Gagné's knowledge of SFC's financial situation must be imputed to the trusts for which he served as trustee, his wife Pamela Gagné and his uncle Robert Bast.

89.     Pepper billed SFC on and around March 5, 2002, for Gagné's time spent reviewing, preparing, revising and editing Loan Agreements and private investor documents.

90.     Yao personally guaranteed the total amount owed by SFC on the March 2002 loans that were extended to SFC by the Family.

91.     In addition to the Family's financial relationship with SFC, Yao had business relationships with the Family, including with respect to limited partnerships, such as Day Hill Partners, LP, One Summit Place, LP and CEC Partnership, LP (later renamed Premier Education Group, LP). Gagné, Bast and certain Family Trusts of which Gagné was trustee were limited partners of Premier Education Group. Yao was the director and sole shareholder of Premier Education Group, GP, Inc., the general partner of Premier Education Group.

92.     The Family also were lenders in 2000, for Yao's business supplying cash and related services for automated teller machines through Electronic Cash Management, LLC and its affiliates ("ECM"). SFC also transferred money to ECM.

93.     On information and belief, Pepper represented ECM, the Family and Bast as collateral agent, in transactions whereby the Family lent money to ECM and Yao personally guaranteed repayment of ECM's principal and interest obligations to the Family. As part of that representation, Pepper signed opinion letters addressed to Bast, as agent for the Family lenders (which lenders included a trust for the benefit of Gagné himself), and structured transactions so that the Family would be secured lenders and third party beneficiaries under ECM's various agreements, including having a security interest in the cash placed in ATM machines.

94.    Yao dissolved ECM sometime in 2001. On information and belief, ECM repaid the loans from the Family but did not repay the money owed to SFC.

95.    Yao also had a business relationship with Pamela Gagné with regard to Team Classic Golf Services, Inc.

### 2.    Pepper's And The Family's Growing Awareness Of SFC's Financial Condition

96.    Pepper and the Family, through Gagné, were aware or should have been aware of SFC's escalating financial problems and burgeoning inability to meet its financial obligations.

97.    On information and belief, Pepper and the Family were aware or should have been aware that SFC was causing payments to be made on student loans with reserves and SFC's own funds so that the loans would appear not to be in default.

98.    On information and belief, Pepper and the Family were aware or should have been aware that SFC was causing Forbearance Payments to be made to prop up the poor performance of Student Loan Accounts in order to conceal the default rate from others.

99.    As early as 1998, Gagné was or should have been aware that SFC was having cash flow problems. Yao communicated with Gagné by email in December 1998, concerning his need to reach out to Gagné's uncle Bob Bast to "invest the $1.5 million shortfall for December."

100.    In the above-referenced (see ¶ 66) April 1, 1999 email on which Gagné was copied, discussing, *inter alia*, school reserves, Yao stated that "[w]e barely [have] positive cash flow at the warehouse stage after paying Royal's premium" and other professional fees. That same day, Yao sent another email to Gagné to which he "attach[ed] SFC's bridge financing requirements for the next 60 days" and stated that he had "underestimated our April requirement – we need $2.0M, not just $1.0M" and planned to call certain private investors.

101.     Later that month, in an April 13, 1999 letter from Gagné to Royal concerning a PPM, Gagné informed Royal that SFC "cannot fund more Student Loans under the Policy until it clears out its warehouse lines with its lenders.  Consequently, the quicker this deal is sold, the quicker SFC can pay future premiums."

102.     In March 2000, Gagné recognized SFC's difficulty in going to market and Gagné and Yao communicated regarding the use of reserves to make monthly payments on student loans and whether it would appear to the capital markets that SFC was manipulating the pool performance.

103.     Continuing into 2001 and 2002, Pepper was aware, or, as SFC's counsel, at the very least should have been aware, of various business and financing arrangements which indicated SFC's deteriorating financial condition and insolvency or impending insolvency, including, *inter alia*:

a.     A certain percentage of student loan payments to SFC were to go into an account that had been established for Royal's protection, which could only build if payments were received.  In June 2001, because this account was not accumulating funds as planned, Royal took additional security for its issuance of the Royal policies in SFC's interest in the securitization trusts.

b.     As part of SFC's deal with Royal, SFC effectively paid a deductible to Royal for defaulting student loans from an account called the "Experience Account."  Thereby, as student default rates grew, so would payments from the Experience Account.  Between May and September 2001, payments from this account grew four-fold; between May 2001 and January 2002, payments from this account increased six-fold.

c.      In October, November and December 2001, Pepper prepared PPMs for the securitization trusts. Pepper's due diligence in the preparation of those documents either did, would have or should have alerted Pepper to the fact that SFC could no longer meet its obligations as they were becoming due.

d.      As of January 2002, although SFC had customarily paid Pepper's bills in full on a monthly basis, SFC ceased doing so and went on a flat $15,000 per week payment schedule in view of Pepper's outstanding legal fees. Gagné advised SFC's David Zuluaf that Pepper's Finance Committee approved that arrangement.

e.      A critical point for SFC's continuing financial viability came when Royal indicated that it was considering discontinuing credit enhancement coverage for SFC in the first half of 2002.

104.    On information and belief, at least as of early 2002, the Family was aware or should have been aware that the assets which they had invested in SFC were in jeopardy due to SFC's precarious financial position. SFC tax returns for the year 2001, copies of which were provided to the Family, including Gagné as Trustee, report shareholder losses to the Family.

105.    Pepper billed SFC for time incurred by Gagné in February 2002, for "negotiat[ing] and discuss[ing] need for private investors," "prepar[ing] issues on private lending" and "private equity raises."

### 3.    Pepper's Preparation Of PPMs And SFC's Insolvency

106.    Despite its knowledge, Pepper, as legal counsel to SFC, assisted SFC in inducing securitization lenders to acquire an interest in Student Loan Accounts that Pepper knew, or should have known, were unlikely to be repaid, and thereby caused SFC to continue to incur debt to the eventual and foreseeable detriment of SFC and its creditors.

22

107.    With Pepper's assistance, SFC was allowed to disguise not only the actual default rates of the Student Loan Accounts, but also the insolvency of SFC.  Creditors continued to extend credit to SFC.

108.    The PPMs prepared by Pepper contained a section entitled "Certain Yield And Prepayment Considerations," which discussed the potential impact that delinquencies, prepayments and defaults by students on their loans could have on the value of the loan portfolios.  The performance information included in each PPM reported only on the specific loans within the portfolio being securitized, but omitted reference to, and failed to inform potential investors about, the performance of earlier loans and default rates from prior securitizations.

109.    Rather than revealing what was known about performance, the Pepper-prepared PPMs stated that performance was "impossible to predict" and that "no estimate can be given," notwithstanding Pepper's knowledge and responsibility concerning actual default rate and historical performance information.

110.    The PPMs affirmatively represented that "[b]ecause the … number of defaults on the Student Loans covered by the Insurance Policy will depend on future events and a variety of factors (described more fully below), no assurance can be given as to such rates or the rate of principal prepayments or defaults in particular….  The extent of prepayments of principal or defaults on the Student Loans varies from time to time and may be affected by a number of factors including, without limitation, economic, demographic, geographic, social, legal and tax…. There can be no assurance as to the rate or frequency of … defaults on the Student Loans in the Trust ."

111.    Thus, the PPMs prepared by Pepper were further misleading in that they both (i) alluded to historic performance but failed to reveal the astronomical default rates known to it and (ii) expressly referred to the use of two specific types of forbearance but failed to mention the use of SFC's own unique forbearance practices to avoid reporting defaults by students.

112.    The PPMs also contained a section stating:  "Actual Cash Flow Results May Be Materially and Adversely Different:  Liability of Trustee to Liquidate Student Loans.  The interest and principal payments received with respect to the Student Loans … may vary greatly in both timing and amount from the payments actually due … for a variety of economic, social and other factors, including both individual factors, such as additional periods of deferral, customary servicer forbearance or forbearance required by applicable bankruptcy or insolvency laws prior to or after a borrower's commencement of repayment, and general factors, such as a general economic downturn which could increase the amount of defaulting Student Loans…. The occurrence of one or more of these factors is impossible to predict, and no estimate can be given of the point at which the effect of such factors would impair the Issuer's ability to pay principal and interest on the Certificates."

113.    From January 1999 to April 2002, actual default rates grew from approximately 25% to close to 70%.  Pepper played a crucial role in masking of this increase.  (Pepper represented SFC in an action filed by Nielsen Electronics against SFC and Yao, filed by complaint dated May 6, 1999.  That complaint contained allegations referring to student loan default rates, including allegations that SFC claimed that there were excessive student default rates and that SFC claimed a 65% default rate in order to avoid some of its obligations to Nielsen Electronics.)

114.    Since the income stream for the securitizations was the payments on the Student Loan Accounts, the loan pool characteristics were a material feature of the PPMs prepared by Pepper. A dominant loan pool characteristic was the historical default rates on the Student Loan Accounts, *i.e.*, if students were defaulting on their loans, potential investors would be disinclined to purchase the Certificates and Notes, and SFC could not acquire additional Student Loan Accounts.

115.    Mindful of and knowledgeable about SFC's use of forbearance as a way of camouflaging the true default rate (*see* above-referenced March 2, 2000 email from Gagné to Yao regarding forbearance agreements and Pepper invoices, in ¶¶ 69 and 70), Pepper either knew about and condoned the use of Forbearance Payments, or should have known and exercised its responsibility to analyze and disclose same in the PPMs.

116.    The April 2000 PPM prepared by Pepper includes Student Loan Accounts aged from 0-60 days and indicates that at least one-third of the Student Loan Accounts had been delinquent for more than 60 days, more than once. This PPM did not take into account the use of "school reserves" or Forbearance Payments to control delinquency rates.

117.    Less than six months later, in December 2000, Pepper prepared another PPM for a different securitization. None of the loans comprising the December 2000 portfolio was more than three months old. In this securitization, the PPM reported loan delinquency rates of only around 1%, without any reference to historical performance including delinquency and/or default data.

118.    Representation by Pepper of the delinquency rate of 1% in the PPM was misleading, because the loans being securitized were so new that they could not be in "default" as defined by the 90-day or more delinquent definition in the PPM.

119.    Also, the PPMs failed to inform investors of the material fact that once aged to the time that default could occur, SFC had been utilizing and was intending to continue to utilize Forbearance Payments to camouflage the actual default rate figures for each of the securitizations.

120.    The definition and discussion of "default" in the PPMs neither classified a Student Loan Account in "default" if SFC were making Forbearance Payments on behalf of the student borrowers nor disclosed defaults on loans from the prior securitizations which had been masked by third party payments.

121.    Pepper had a duty, but failed in that duty, to recommend to and advise SFC that it was required to fairly portray default information in the PPMs.

122.    Pepper continued to represent SFC as the PPMs continued to misrepresent default rate and performance information.

123.    Notwithstanding Gagné's remarks regarding SFC's "manipulating the pool performance" (*see* ¶ 70, March 2, 2000 email from Gagné to Yao) and the contrived meaning of "default," the PPMs did not disclose that SFC was making Forbearance Payments or was basing its default analysis in the newer PPMs only on new loans without reference to prior performance.

124.    The pool of loans in each new securitization consisted of loans to students from the same trucking schools as in earlier securitizations, such that default rates in earlier transactions would be material predictors for default rates on loans in later securitizations.

125.    Pepper knew, or should have known, that characterizing "default" rates without adequate explanation, would manipulate and mislead investors in the purchase of the Certificates and Notes and, through that means, induce creditors to provide credit.

126.    The PPMs prepared by Pepper again misleadingly reported that the delinquency rates were around 1% in November 2001, a time when Pepper knew or should have known that the loans in the earlier securitizations were actually defaulting at much higher rates and that it was likely that the default rates would be much higher on the loans in the instant securitization.

127.    In September 2001, after SFC used the proceeds from securitizations to make Forbearance Payments on aging loans, SFC could no longer fund the purchase of Student Loan Accounts. Pepper knew or should have known at that time that SFC was insolvent or operating in the zone of insolvency.

128.    Pepper was aware of SFC's use of the relevance of historic performance and of SFC's use of forbearance by virtue of SFC's underwriting policies and policy and procedures manual which were maintained in Pepper's files and referred to and incorporated into documents prepared and/or reviewed by Pepper.

129.    An insurance agreement prepared by Pepper, made as of October 5, 2001, defined "underwriting policies" as the policies of SFC with respect to "underwriting of Student Loans as reflected in the policy and procedures manual dated January of 2001 and the credit scoring model revised January 24, 2000."

130.    The January 24, 2000 credit scoring model was included in underwriting documents which were attached and incorporated as an exhibit to a certificate signed by Yao and executed as of February 11, 2000, and maintained in Pepper's files. That document contained various references to student defaults and delinquencies, including the statements that "[t]he SFC credit scoring model treats present delinquency as a strong indicator of lending risk" and that "[t]he SFC credit-scoring model treats ***historical delinquency*** during the ***prior 24 months*** as a strong indicator of lending risk." (Italics, underscoring and bold all in original.)

131.    These materials, maintained by and known to Pepper, show that SFC considered historical performance to be a strong risk indicator; yet Pepper prepared PPMs which omitted historical performance data.

132.    At best, Pepper failed to review the financial statements or perform due diligence with respect to factual information being disclosed in the PPMs and, thus, failed in its obligation to advise the issuer that it must not mislead potential securitization investors and creditors.

133.    The PPMs prepared by Pepper represented to investors that SFC affiliate Student Loan Servicing LLC ("SLS") would furnish the Issuer, Royal, MBIA Insurance Corporation and the Certificate holders with monthly and quarterly reports of collection, defaults, payments and other data in written or computer form.

134.    Gagné knew that if actual default rates were high, credit enhancement insurance coverage could be withdrawn and the company would fail.

135.    In view of the information possessed, knowledge of Yao's intentions concerning forbearance and the unexplained drops in reported delinquency rates, Pepper at the very least should have reviewed the monthly and quarterly servicer reports and other records, knowing that there could be serious repercussions.

### 4.    Pepper's Withdrawal From Representing SFC

136.    Although Pepper had represented SFC under a cloud of conflict for a number of years when the Family was reaping high interest payments on their loans and Pepper was collecting legal fees (of approximately $3.2 million), as SFC's financial wherewithal collapsed and as it became unlikely that his Family's investment would be entirely viable or that Pepper would be paid its outstanding fees in the event of bankruptcy, Gagné belatedly suggested to his partners that Pepper withdraw from representing SFC.

137.    In an April 18, 2002 memorandum from Gagné to his partners, Gagné expressed growing concerns regarding Pepper's representation of SFC.

138.    In that memo, Gagné addressed, *inter alia*, fee issues, the forbearance account, destruction of SFC Executive Committee minutes, lack of disclosure to investors and misrepresentations made by SFC as reasons justifying withdrawal.

139.    Gagné also acknowledged therein that performance data distributed by SFC did not identify the Forbearance Payments made by SFC, but rather reported the payments as if they were collections received from the students.

140.    Gagné identified a series of competing considerations regarding withdrawal in this memo, including that: (i) Yao would not pay Pepper's fees; (ii) withdrawal may raise a cloud over SFC with the capital markets and impair its ability to bring itself out of its liquidity crisis; (iii) the lack of financing could cause many of the truck driving schools, for whose students SFC made or purchased 80% of the loans, to go bankrupt, potentially causing damage to the trucking industry as a whole due to a shortage of drivers; (iv) the asset-backed securitization market could be impacted; and (v) Pepper's client Royal could be significantly damaged by the losses which had been estimated at between $150-$200 million.

141.    Gagné's April 18, 2002 memo further remarked upon the conflicts with the Family: "Adding to the ethical considerations is the fact that members of my family and trusts in which I am a beneficiary have made loans to Student Finance Corporation from time to time and most recently on March 5, at the request of Andrew Yao."

142.    Gagné acknowledged in the memo the possibility that Pepper would be sued and suggested that, in deciding whether or not to withdraw, Pepper should consider whether one course of action or another might better mitigate such a possibility.

143.    Pepper withdrew, effective "immediately" from representation of SFC (as well as from its affiliates, Student Marketing Services LLC ("SMS") and SLS), by letter to SFC of April 24, 2002, with one exception concerning "the matter of the loan from Royal Indemnity Company which is scheduled to close later this week."

144.    Shortly after Pepper's withdrawal, SFC's outside auditors refused to issue audited financial statements for 2001, citing Pepper's abrupt withdrawal.

145.    On April 25, 2002, Gagné directed other Pepper lawyers and personnel "to stop all work on Student Finance Corporation and its affiliates Student Marketing Services, LLC and Student Loan Servicing, LLC" and to "not say anything to anyone on this matter outside of the firm."

146.    An April 29, 2002 email from Yao to Gagné expressed that "we would prefer to say that Pepper and SFC mutually decided that using alternative counsel would be better due to the conflicts of interest between your representation of us, Royal, and your family. Please let me know if you are comfortable with this spin."

147.    By letter dated May 1, 2002, Pepper paralegal DeCarlo resigned as Assistant Secretary of SFC and related entities.

148.    Bankruptcy proceedings commenced within six weeks following Pepper's withdrawal.

149.    Pepper continued to serve as counsel for Yao personally and Premier Education Group (in which the Family held an interest and Yao remained general partner until 2003) following its withdrawal from representation of SFC.

###    5.    Yao Preferred The Family Loans

150.    Notwithstanding that Pepper owed a fiduciary obligation to its client SFC and was aware of the financial downfall of SFC, Gagné nonetheless arranged with Yao to elevate the Family's interests above that of SFC and its other investors and creditors.

151.    Having already paid substantial amounts of principal and interest to the Family on account of the loans, as of April 2002, the month during which Pepper withdrew from its representation of SFC, SFC remained obligated on the loans by the Family for an amount between $6 and 7 million.

152.    On information and belief, Yao learned that the Family wanted to be repaid on their loans by way of a telephone call with either Gagné or Bast.

153.    In an email from Yao to Gagné, dated April 23, 2002, Yao wrote "please be assured, in return, that I will protect your family's investment in SFC, notwithstanding any adverse outcome that may result, should Royal make an uneconomic decision with respect to our recovery and repurchase proposal."

154.    To protect the Family's interests and "satisfy" Yao's personal responsibility to repay the Family's loans under his personal guarantee, on or about May 5, 2002, Yao pledged his interests in several related business entities (Day Hill Partners, LP, One Summit Place, LP and Premier Education Group) to the Family.

155.    These entities owned interests in a chain of trade schools (with twelve to fourteen locations) and office buildings in Connecticut.  While Yao retained residual interests in these entities, as a result of the pledge, the Family became entitled to receive any distributions on account of the pledged interests.

156.    Yao pledged and the Family accepted the pledge of these interests at a time when SFC was insolvent, notwithstanding that said interests were assets that could and should have been available to SFC on claims which SFC had against Yao.

157.    After having withdrawn, Pepper billed SFC for time incurred by Gagné on May 2, 2002, for "review[ing] issues on private investors" and, on May 3, 2002, for "preparing Pledge Agreement for A. Yao and other matters regarding transaction."

158.    On information and belief, documentation memorializing this deal was prepared and/or reviewed by Gagné.

159.    On information and belief, the Family loans were the only SFC loans on which Yao had "fulfilled" a personal guarantee in 2002.

160.    After having represented SFC since its inception, including with respect to its financial arrangements, and having withdrawn only approximately six weeks earlier, on June 3, 2002, Gagné sent a letter to his uncle Robert Bast, on Pepper letterhead, enclosing "an execution copy of the Pledge Agreement and all three stock certificates to be held as security for our loans," indicated that he had "spoke[n] with Andrew [Yao] and learned that we will not be receiving the SFC checks for a while," and recommended to Bast that he "should determine if you intend to execute against the Pledge Agreement and take possession of the stock."

161.    Pepper prepared a series of Assignment and Acceptance of Loan and Security Agreements between Bast, Pamela Gagné and the Family Trusts on the one hand and Yao on the other, with an effective date of June 14, 2002, pursuant to Yao's guarantees of August 7, 1998, August 15, 1999 and March 5, 2002 loan agreements between the Family and SFC.

162.    These agreements, *inter alia*, provided for the transfer and assignment to the Family of Yao's right, title and interest in a specified number of shares of DHP GP, Inc., One

Summit Place GP, Inc. and Premier Education Group GP, Inc., and substituted Yao as Lender under the SFC loan agreements, purportedly transferring the Family's rights under the SFC loan agreements to Yao.

163.    Gagné continued to represent Bast with respect to SFC following the commencement of bankruptcy proceedings. In May 2003, Gagné spoke with Royal's attorneys regarding a subpoena issued to Bast and other issues pertinent to the SFC bankruptcy. In June 2003, Gagné, as attorney for Bast, again spoke with Royal's attorneys in the bankruptcy concerning Bast's responses to Royal's subpoena.

### C.    Harm To And Losses Of SFC And Its Creditors

164.    The conduct of Pepper, Gagné and the Family directly and foreseeably caused harm to SFC and its creditors.

165.    Although the Family was elevating its interests in being repaid by Yao on its loans to SFC, other creditors were not paid and have filed Proofs of Claim against SFC in amounts in excess of $500 million.

166.    As alleged herein, Pepper embroiled itself in unwaivable conflicts of interest involving, *inter alia*, Gagné, Gagné's Family, Royal, Yao, SMS, SLS, Wilmington Trust, PEG and ECM; elevated the Family's interests over that of SFC and its creditors; failed to properly disclose SFC's financial condition; and induced third-party reliance on material, misleading information.

167.    As a proximate result of Pepper's wrongful conduct, SFC was able to continue operating, incurring additional debt without regard to SFC's ability to repay.

168.    Had Pepper properly discharged its duties to SFC, SFC and its creditors could have taken steps to prevent SFC from incurring additional indebtedness and suffering additional

harm, including, if necessary, seeking bankruptcy protection at an earlier date, preserving SFC's assets and delimiting SFC's insolvency.

169.    Pepper, Gagné and the Family perpetuated and protected their own financial interests, as well as those of Yao, at the expense and to the harm of SFC and its creditors.

170.    But for the within described actions and omissions of Pepper, Gagné and the Family, SFC would not have taken on the amount of debt it incurred and creditors of SFC would not have been misled into believing that SFC's financial situation and the value of the Notes and Certificates were more favorable than portrayed.

171.    SFC and its creditors were harmed as a proximate, direct and foreseeable result of the wrongful conduct of Pepper, Gagné and the Family.

172.    Such harm includes, but is not limited to, SFC's expenditures, dissipation of assets and incurring more debt between the time SFC became insolvent or entered the zone of insolvency and the Filing Date.

173.    More specifically, SFC and its creditors were damaged by Pepper, Gagné and the Family in amounts relating to, *inter alia*:

> a.    the incurring of additional debt while SFC was insolvent, made possible by Pepper's actions, omissions and assistance to conceal the true state of SFC's financial condition, including:

> > (i) the $12,302,150.88 loan from Royal to SFC (made in March and April 2002), secured by interest only certificates, for the purpose of making additional Forbearance Payments, which loan was documented by Pepper;

(ii)  $29 million in additional debt owed to Royal under the promissory notes supporting the Experience Account;

(iii) approximately $27 million of debt that accumulated in February and March 2002, due to SFC's having purchased loans from trucking schools in February 2002, which was not paid; and

(iv) $3.3 million in debt relating to the loan extended to SFC by the Family in March 2002;

b.  Other payments made or expenses incurred by SFC during the period of insolvency, about which Pepper was aware or should have been aware, including:

(i)  $20,760,867.60 paid to Royal under the promissory notes supporting the Experience Account within one year of the Filing Date;

(ii)  Approximately $45 million paid to make Forbearance Payments;

(iii) Premiums paid on the Royal policies in an amount of at least $30 million;

c.  $9.6 million in distributions credited to Yao himself, at a time when Pepper and Gagné knew or should have known that SFC was insolvent or operating in the zone of insolvency and had a duty to advise SFC directors and officers concerning the consideration and impact of making such distributions to insiders upon the viability of SFC and obligations to creditors;

d.  in excess of $500 million, representing Proofs of Claim filed by those asserting positions as creditors of SFC, to the extent to which the estate is determined to be liable.

174.    The Trustee stands in the shoes of hypothetical creditors under section 544(a)(1) of the Bankruptcy Code and also has the authority to assert the within claims pursuant to section 541(a) of the Bankruptcy Code.

## COUNT I

### BREACH OF FIDUCIARY DUTY

Against Pepper and Gagné

175.    Paragraphs 1 through 174 above, and Paragraphs 205 through 323 below, are incorporated by reference as if set forth in full herein.

176.    The attorney-client relationship demands undivided loyalty and prohibits an attorney from engaging in conflicts of interest, and in other action adverse to the client.

177.    Pepper and Gagné unreasonably, negligently, recklessly and/or intentionally failed to act in a manner consistent with their fiduciary duty owed to and solely for the benefit of SFC, and took action in breach of that duty, including:

a.    Pepper and its partners with managerial responsibility breached their duty to SFC by failing to adequately monitor, supervise and/or prevent the action of Gagné described in this pleading;

b.    Pepper and Gagné breached their duty to SFC by effectuating, facilitating and/or failing to prevent action adverse to SFC, such as the fraudulent conveyances and preferences described in this pleading;

c.    Pepper and Gagné breached their duty to SFC by effectuating, facilitating and/or failing to prevent the false, fraudulent, incomplete and misleading information used and contained in documents such as the PPM; and

d.    Pepper and Gagné breached their duty to SFC by assuming and pursuing conflicting and divided loyalties during their representation of SFC as described in this pleading.

178.    Pepper placed itself in a position in which it had unavoidable and inevitable divided loyalties by virtue of its relationships with, representation of and concerns regarding the legal and financial interests, *inter alia*, of the Family, SMS, SLS, Royal, Yao, Wilmington Trust, PEG and ECM, which prejudiced SFC and its creditors, resulting in hundreds of millions of dollars of harm.

179.    Pepper continuously and on an ongoing basis breached its fiduciary duty of loyalty to SFC as a result of the conflicting interests of the Family and Gagné's interests by:

a.    representing SFC in transactions with Gagné's Family;

b.    permitting Gagné's Family to loan approximately $24 million to SFC and to become equity holders in SFC;

c.    elevating Gagné's Family's interests above that of SFC and its creditors;

d.    billing SFC for work performed on behalf of or for the benefit of the Family;

e.    representing or considering the Family's interests in transactions with SFC and Yao; and

f.    representing Yao personally or as CEO of SFC in transactions where Yao's interests were adverse to SFC, but were in the individual and/or joint interests of Yao and/or the Family.  (For example, in February 2002, Gagné consulted with Yao concerning transferring Yao's interests in SFC, SMS or SLS to trusts proposed for Yao's children and nephews.)

180.    On information and belief, due to its concern for the Family's interests, including its desire to enable the Family to continue to reap high interest payments, to recoup its principal on investments and to protect the Family from being implicated in the financial downfall of SFC, Pepper continued to promote the business of SFC and to create the impression of its viability by, *inter alia*, concealing material loan performance information and SFC's making of Forbearance Payments.

181.    Pepper not only represented SFC in its financing, refinancing, insurance and securitization transactions, but also represented Royal during the same time frame Pepper was involved in SFC/Royal matters, including when Royal's interest had become adverse to SFC.

182.    While representing SFC, Pepper considered the impact of SFC's business practices on Royal.    In Gagné's March 2, 2000 email to Yao concerning the use of school reserves/forbearance (*see* ¶ 70), Gagné raised that "the Royal who will be directly affected and is if the plan is being used now."

183.    Two years later, Gagné further highlighted the inevitable conflict between SFC and Royal in his April 18, 2002 memo to his partners, citing, *inter alia*, that "Royal Indemnity Company, another client of Pepper, could be significantly damaged by the losses which have been estimated at between $150 Million and $200 Million Dollars," among his stated considerations concerning whether or not to  withdraw from representation of SFC.

184.    Considering the impact of its own withdrawal on Royal, Pepper's April 24, 2002 withdrawal letter to Yao made one exception to Pepper's immediate withdrawal, whereby Pepper was "willing to continue with the matter of the loan from Royal Indemnity Company which is scheduled to close later this week," but "only on the condition that you agree that in connection

with that transaction, Pepper Hamilton will furnish no legal opinion to Royal Indemnity Company as to any matter whatsoever."

185.    Pepper also continuously breached its fiduciary duty by virtue of its multiple representations of SFC, SMS and SLS, which had some common officers and directors.

186.    SMS, which was formed by Pepper in the summer of 2000, performed marketing services for SFC and was owned 100% by Yao.

187.    SLS, which was owned 70% by Yao and 30% by SFC, collected and serviced student loans originated by SFC.

188.    SLS and SMS were "separate" companies with interests that conflicted with those of SFC. On information and belief, Pepper represented SLS and SMS in compensation arrangements and transactions with SFC.

189.    Pepper was aware of the compensation arrangements among these entities, whereby SFC paid SMS and SLS substantial sums for marketing and administering student loans.

190.    SMS and SLS had significant conflicts of interest with SFC due to the large amounts of money and compensation arrangements received by them from SFC for marketing and administering student loans, of which Pepper knew or should have known. For instance, SMS received a commission of 1% of each loan originated plus a flat fee.

191.    On information and belief, as the entity chiefly responsible for dealing with the individual truck driving schools, SMS was aware or should have been aware of rising default rates on student loans. Notwithstanding its knowledge of the higher than expected default rates, SMS continued to market to these schools for its own benefit, but to the detriment of SFC.

192. These compensation arrangements among SFC, SLS and SMS, and within SMS and SLS, depleted SFC of assets which would have been available to SFC and its creditors.

193. In an October 24, 2000 email from Yao to Gagné regarding "Preferential Ownership of SFC in SMS, Yao wrote:

> "Rod,
>
> I was not aware until now that SFC had a preferential interest in SMS. I knew that SFC has one in SLS.
>
> I would prefer that SFC not have a preferred interest, so that I can make distributions out of SMS.
>
> One of the principle reasons I wanted to form SMS was to facilitate distributions to me. SMS will get less scrutiny than either SFC or SLS, since it is not involved in the ABS's.
>
> Thank you."

194. On information and belief, in 2001, an officer of both SFC and SMS -- who, notwithstanding his awareness of issues relating to potential "fraud" by truck driving schools, insisted that SFC continue to purchase Student Loan Accounts from these schools -- received in excess of $1 million in compensation from SMS. SMS's compensation of that officer was made possible by SFC's continued compensation to SMS.

195. Despite this ongoing conflict and the doubtful fairness of the compensation arrangements, Pepper continued to represent all these entities without any independent approval or waiver by the SFC Board.

196. On information and belief, although it had separate written retention agreements with SMS and SLS, Pepper never sought or obtained conflict waivers between or among SFC, SMS and SLS.

197.    As the foregoing demonstrates, throughout its representation of SFC, Pepper was concerned with the effects of SFC's business (and its own withdrawal) on other parties and its judgment was clouded by its consideration of others' interests.

198.    Pepper's failure to fulfill and breaches of its fiduciary duty to its client SFC directly and foreseeably caused SFC's injuries.

199.    No disinterested lawyer, acting reasonably and in the best interests of his client, could have concluded that SFC should not have had independent counsel under the circumstances nor that Pepper and Gagné could have properly asked for conflict waivers or provided representation on the basis of Yao's consent.

200.    No lawyer, acting reasonably and with the requisite degree of care, could have perceived that his representation of SFC might not be materially impacted or limited by his responsibility to others and by his own self-interest.

201.    Any law firm acting reasonably, responsibly and in a disinterested manner would have concluded that under the circumstances, no waiver or consent to such obvious conflicts was proper or valid.

202.    To the extent that Pepper purportedly sought or obtained waivers of any of these conflicts, such conflicts were obvious, continuing, substantial and unwaivable and any such waivers were therefore invalid, for each of the following reasons:

    a.    Pepper could not reasonably have believed that its representation of SFC would not be adversely affected by Gagné's or the Family's personal interests or by Pepper's representation of the Family, Yao, SLS, SMS, Royal, Wilmington Trust, PEG and/or ECM;

    b.    Pepper failed to provide full and complete disclosure of all present and potential conflicts of interest;

41

c.    Pepper did not properly obtain SFC Board approval for conflict waivers;

d.    Pepper and Gagné's interested transactions and the terms thereof were not fully disclosed and transmitted to SFC;

e.    SFC was not given a genuine opportunity to obtain advice of independent counsel; and

f.    SFC failed to consent in writing to all conflicts and transactions.

203.    As a direct, proximate and foreseeable result of each and all of the foregoing breaches of fiduciary duty, SFC was ultimately driven into insolvency, and operated well beyond the point of insolvency, finally resulting in the filing of the involuntary bankruptcy petition.

204.    As a direct, proximate and foreseeable result of each and all of the foregoing breaches of fiduciary duty, SFC and its creditors were injured in the collapse of Debtor's business and loss of property and assets that would otherwise have been available to SFC and the creditors, who have sustained actual damages.

WHEREFORE, Pepper and Gagné are liable for damages, including, without limitation, forfeiture and disgorgement of fees paid and/or owed by SFC to Pepper, in an amount to be determined at trial together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT II

Deepening Insolvency

Against Pepper, Gagné and the Family

205.    Paragraphs 1 through 204 above are incorporated by reference as if set forth in full herein.

206.    Pepper's wrongful, negligent, careless, reckless and/or intentional conduct allowed SFC to incur significant debt that SFC had no prospect of being able to repay.

42

207.    Pepper and Gagné had detailed knowledge of SFC's business and declining financial health and knew or should have known that SFC was approaching insolvency, by, at the latest, May 2001, and this knowledge must be imputed to the Family through Gagné.

208.    On information and belief, the Family knew that SFC was approaching insolvency when it loaned an additional $3.3 million to SFC in March 2002.

209.    Exercising control over and influencing the course of SFC's financial condition, Pepper, Gagné and the Family are responsible for the consequences of their conduct in causing and contributing to the deepening insolvency of SFC.

210.    The conduct of Pepper, Gagné and the Family contributed to and resulted in the collapse of SFC.

211.    The funding of Forbearance Payments, made possible by the actions and omissions of Pepper, Gagné and the Family, including the contribution thereto, further delayed the filing of a bankruptcy petition.

212.    The Forbearance Payments delayed the filing of a bankruptcy petition, depriving unsecured creditors of an earlier opportunity to examine SFC's financial information and of sources of repayment for their claims.

213.    Pepper's role in masking the insolvency of SFC, not adequately disclosing the Forbearance Payments and omission of true default rate information enabled SFC to continue operating and to incur additional expenses and debt, including: (i) approximately $12 million loaned from Royal to SFC; (ii) approximately $20 million paid to Royal and $29 million in additional debt owed to Royal under the promissory notes funding the Experience Account; (iii) approximately $27 million of debt accumulated in February and March 2002, on loans purchased

from trucking schools; (iv) $3.3 million in debt relating to the loan extended to SFC by the Family in March 2002; and (v) $45 million in Forbearance Payments.

214.   The delay in seeking bankruptcy protection caused SFC to increase the total amount of its debt and diminished the amount available to distribute to its creditors.

215.   Because the actions and omissions of Pepper, Gagné and the Family allowed SFC to delay its eventual bankruptcy filing while it was insolvent, they caused additional harm to creditors of SFC and are liable for damages as a result thereof.

216.   As a direct, proximate and foreseeable result of the foregoing acts, SFC was ultimately rendered insolvent, and operated well beyond the point of insolvency, finally resulting in SFC's bankruptcy.

217.   As a direct, proximate and foreseeable result of the foregoing acts, SFC and its creditors were injured in the collapse of Debtor's business and loss of property and assets that would have otherwise been available to SFC and its creditors, which have suffered actual damages.

WHEREFORE, Pepper, Gagné and the Family are liable for damages in an amount to be determined at trial, together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

### COUNT III

Negligent Misrepresentation

Against Pepper and Gagné

218.   Paragraphs 1 through 217 above are incorporated by reference as if set forth in full herein.

219.   Pepper, in the course of its representation of SFC, intentionally, negligently or recklessly misrepresented or omitted from the PPMs material facts related to SFC's financial

condition and operations, including, *inter alia*, that SFC was insolvent or in the zone of insolvency and regarding the true rate of the Student Loan Account defaults.

220.   The PPMs prepared by Pepper were the vehicles by which SFC raised money through securitizations.

221.   Pepper, knowing that the lenders and investors (now creditors), would reasonably rely, and did rely, on such representations, failed to exercise reasonable care or diligence in preparing the PPMs.

222.   Pepper provided the PPMs knowing that the Student Loan Account default rate was a material fact upon which creditors would rely.

223.   As a result of the negligent misrepresentations and omissions concerning performance and Forbearance Payments which Pepper made in the PPMs, the securizations were funded, enabling SFC to continue to operate and to incur additional debt and make additional expenditures.

224.   Pepper's material misrepresentations and omissions furthered Pepper's pecuniary interests in that Pepper continued to collect fees for its services and Gagné and the Family continued to reap the benefits of high interest loans to SFC.

225.   Pepper knew, or should have known, that its misrepresentations and omissions were likely to prevent creditors and others from discovering the facts concealed.

226.   Pepper knew or believed that statements in the PPMs were false and/or that it was proceeding in a reckless disregard for the truth.

227.   Pepper and the Board acted intentionally, willfully, for profit and without just cause or excuse, resulting in actual legal damages.

228.    As a result of Pepper's actions, creditors reasonably relied, to their detriment, on Pepper and were misled into believing that SFC was solvent and that the Certificates and Notes were of greater than their actual value; and SFC was permitted to continue incurring debt which it had no prospect of being able to repay.

229.    Pepper's having issued PPMs which did not accurately reveal default rate information or the insolvency of SFC, and did not disclose the making of Forbearance Payments, misled and harmed those who relied on the misrepresentation and/or omission, caused SFC to incur additional debt and expenses, and has left the estate facing Proofs of Claim of more than $500 million as a result.

230.    As a direct, proximate and foreseeable result of the foregoing acts, SFC was ultimately driven into insolvency, and operated well beyond the point of insolvency, finally resulting in SFC's bankruptcy.

231.    As a direct, proximate and foreseeable result of the foregoing acts, SFC and its creditors were injured in the collapse of Debtor's business and loss of property and assets that would otherwise have been available to SFC and its creditors, which have sustained actual damages.

WHEREFORE, Pepper and Gagné are liable for damages in an amount to be determined at trial together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT IV

### PROFESSIONAL MALPRACTICE

### Against Pepper and Gagné

232.    Paragraphs 1 through 231 above are incorporated by reference as if set forth in full herein.

233.   As its counsel, Pepper owed SFC a duty of care that required Pepper to exercise the necessary, proper and ordinary skill and knowledge of members of the legal profession required in connection with such representation.

234.   On information and belief, on an ongoing and continuous basis, Pepper breached its contractual obligation to SFC and the standard of care that a reasonable attorney would have exercised under the circumstances, in failing to, *inter alia*:

  a.   advise SFC regarding its obligations in approaching and eventual insolvency;

  b.   advise SFC regarding the requirement that proper disclosures be made in the PPMs;

  c.   avoid conflicts of interest discussed herein;

  d.   advise SFC that it was required to consider distributions to and compensation arrangements with Yao, including with regard to their impact on SFC and the interests of creditors, customers and students; and

  e.   perform adequate due diligence in connection with the PPMs.

235.   Acting as its general counsel and intimately representing SFC in a broad range of substantive matters, Pepper owed both an implied and actual contractual duty to SFC.

236.   Pepper further breached its duty of care to SFC by failing to adequately advise SFC regarding conflicts of interest and by continuing to represent SFC in the face of multiple obvious and unwaivable conflicts of interests.

237.   As described, Pepper's clouded judgment caused its legal advice to SFC to fall below the standard of care, resulting, *inter alia*, in SFC's incurring damage.

238.    As counsel to SFC, Pepper was under a duty to advise the Board that as SFC approached the zone of insolvency it owed a fiduciary duty to its creditors.

239.    As counsel to SFC, Pepper had the obligation to advise the Board to supervise Yao and not to participate in or otherwise facilitate actions that would harm SFC.

240.    This duty also required Pepper to advise the Board, among other things, that SFC could not make distributions to Yao if SFC were insolvent.  Dividend distributions and other compensation to Yao depleted SFC of assets that would otherwise have been available for SFC's business and ultimately for the benefit of its creditors.  (As late as March 2002, Pepper reviewed distributions to Yao.  Pepper billed SFC for time spent on March 13, 2002, for "[r]eview[ing] distribution to Andrew Yao." (*See also* ¶ 193 above.))

241.    Pepper's actions and omissions with regard to SFC's use of Forbearance Payments, camouflaging default rate information and misrepresentations in PPMs as described above also fell below the standard of care owed to SFC and constitute a breach of Pepper's duty.

242.    These breaches directly caused and resulted in the collapse of SFC and the filing of Proofs of Claim in excess of $500 million against the estate.

243.    In its representation of SFC, Pepper failed to perform with the degree of specialized skill and care that it held itself out as possessing.

244.    Pepper's continuing failure to exercise the skill and knowledge demanded of it by law directly, proximately and foreseeably caused the injuries complained of herein.

245.    Had Pepper met its standard of care in representing and rendering legal advice to SFC, Pepper could have prevented, or at least ameliorated, the damage to SFC and its creditors alleged herein.

246. As a direct, proximate and foreseeable result of the foregoing acts and omissions, SFC was ultimately driven into insolvency and operated well beyond the point of insolvency, finally resulting in SFC's bankruptcy.

247. As a direct, proximate and foreseeable result of the foregoing acts and omissions, SFC and its creditors were injured in the collapse of Debtor's business and loss of property and assets that would otherwise have been available to SFC and its creditors.

WHEREFORE, Pepper and Gagné are liable for damages in an amount to be determined at trial, together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT V

Aiding and Abetting Breach of Fiduciary Duty

Against Pepper and Gagné

248. Paragraphs 1 through 247 above are incorporated by reference as if set forth in full herein.

249. The members of the Board and officers of SFC, by virtue of their positions with SFC, owed a fiduciary duty to SFC to act in good faith, with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances, in the best interests of SFC.

250. The Board members and officers of SFC also owed a fiduciary duty to SFC's creditors as early at May 2001, the date SFC was either insolvent on a balance sheet or, at the very least, operating in the zone of insolvency.

251. The Board members and officers of SFC breached their fiduciary duty by engaging, *inter alia*, in the following wrongful conduct:

a.    failing to segregate the interests of SFC from SLS, SMS, Yao (and his other business ventures) and/or the Family;

b.    authorizing or failing to properly authorize distributions to Board members adverse to the interests of SFC and at a time when SFC was not adequately capitalized;

c.    failing to disclose to lenders/investors/creditors and thereby misleading them regarding the true nature of student loan default rates and thereby incurring debt that ultimately led to bankruptcy; and

d.    failing to timely file for bankruptcy protection in order to preserve assets.

252.    Pepper had knowledge, both actual and constructive, of the above tortious activity and offered substantial assistance and encouragement to SFC Board members and SFC officers in furtherance of their breaches of fiduciary duty.

253.    Pepper, on an ongoing and continuous basis, knowingly and directly participated in the Board members and officers' breaches of fiduciary duty.

254.    Pepper induced, participated in and/or assisted with, *inter alia*, the following:

a.    SFC's highly speculative, unsound and poorly documented lending practices;

b.    SFC's transactions with the Family;

c.    distributions and other compensation to Yao and others, as well as substantial payments from SFC to SMS and SLS to support lucrative compensation arrangements with the entities' overlapping principals;

d.    misrepresentations or omissions regarding default rate information and the use of Forbearance Payments to obscure actual default rates;

e.    failing to timely file for bankruptcy protection;

      f.     SFC's insolvency;

      g.    knowingly preparing contracts to facilitate and implement the fraud;

      h.    misleading regulatory authorities regarding SFC contracts;

      i.     preparing misleading PPMs with material omissions;

      j.     issuing opinions to facilitate the fraud; and

      k.    facilitating the purchase of student loans without liquidity, and loan transactions for forbearance payments.

255.    Pepper provided such assistance with actual or constructive knowledge that the effect thereof would be a breach of the Board and officers' fiduciary duties to SFC and its creditors.

256.    Pepper acted intentionally, willfully, for profit and without just cause or excuse, and derived benefits from the foregoing, including substantial legal fees derived from its representation of SFC (as well as other entities in which Yao and the Family were financially involved).

257.    By aiding and abetting the breaches of fiduciary duty, Pepper contributed to SFC's incurring additional expenses and debt including: (i) approximately $12 million loan from Royal to SFC; (ii) approximately $20 million paid to Royal and $29 million in additional debt owed to Royal under the promissory notes funding the Experience Account; (iii) approximately $27 million of debt accumulated in February and March 2002, on loans purchased from trucking schools; (iv) $3.3 million in debt relating to the loan extended to SFC by the Family in March 2002; (v) the $9.6 million in distributions credited to Yao himself; and (vi) $45 million in Forbearance Payments; and additionally caused and contributed to the estate's having proofs of claim in excess of $500 million being filed against it.

258.    As a direct, proximate and foreseeable result of Pepper's aiding and abetting, SFC was ultimately driven into insolvency and operated well beyond the point of insolvency, finally resulting in SFC's bankruptcy.

259.    As a direct, proximate and foreseeable result of Pepper's aiding and abetting, SFC and its creditors were injured in the collapse of Debtor's business and loss of property and assets that would have otherwise been available to SFC and its creditors, which have sustained actual damages.

WHEREFORE, Pepper and Gagné are liable for damages in an amount to be determined at trial, together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT VI

### Civil Conspiracy

### Against Gagné and the Family

260.    Paragraphs 1 through 259 above are incorporated by reference as if set forth in full herein.

261.    As described above, Gagné and the Family combined with one or more members of SFC's Board to perform a number of unlawful acts resulting in actual legal damage as described herein.

262.    Gagné and the Family had a personal stake in the conduct of SFC and its Board beyond just a professional interest and beyond an interest in merely collecting legal fees.

263.    Gagné, the Family and one or more members of the SFC Board conspired, combined and/or agreed wrongfully to deplete, divert or waste SFC's assets for the self-interested, personal economic benefit of Gagné and his Family, as well as for Yao personally (and for this other business dealings), to the detriment of SFC.

264.    Gagné and the Family acted and/or failed to act with the intent to injure the business activity of SFC including, without limitation, depleting, diverting and wasting the assets of SFC.

265.    Gagné and the Family wrongfully acted to protect their interests at the expense of SFC in a manner that was intentional, willful, for profit and without just cause or excuse, resulting in actual legal damage.

266.    The actions of Gagné and the Family enabled SFC to continue to operate into and beyond the zone of insolvency and to incur additional expense and debt including:    (i) approximately $12 million loan from Royal to SFC; (ii) approximately $20 million paid to Royal and $29 million in additional debt owed to Royal under the promissory notes funding the Experience Account; (iii) approximately $27 million of debt accumulated in February and March 2002, on loans purchased from truck driving schools; (iv) $3.3 million in debt relating to the loan extended to SFC by the Family in March 2002; and (v) $45 million in Forbearance Payments.

267.    As a direct, proximate and foreseeable result of the foregoing acts, SFC was ultimately driven into insolvency and operated well beyond the point of insolvency, finally resulting in SFC's bankruptcy.

268.    As a direct, proximate and foreseeable result of the foregoing acts, SFC and its creditors were injured in the collapse of Debtor's business and loss of property and assets that would have otherwise been available to SFC and its creditors, which have suffered actual damages.

WHEREFORE, Gagné and the Family are liable for damages in an amount to be determined at trial together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT VII

Fraudulent Conveyance Claim

Against the Family

269.    Paragraphs 1 through 268 above are incorporated by reference as if set forth in full herein.

270.    On account of his personal guarantee to the Family, on or about May 5, 2002, Yao pledged his interests in Day Hill Partners, LP, One Summit Place, LP and Premier Education Group, LP.

271.    Specifically, Yao pledged his interest in One Summit Place GP, Inc., DHP GP, Inc., and Premier Education Group GP, Inc.  One Summit Place GP, Inc. was the corporate general partner of One Summit Place, LP.  DHP GP, Inc. was the corporate general partner of Day Hill Partners, LP.  Premier Education Group GP, Inc. is the corporate general partner of Premier Education Group, LP.

272.    On information and belief, the limited partners of One Summit Place, LP, Day Hill Partners, LP, and Premier Education Group, LP, were members of the Family.

273.    Had Yao not pledged his interest in each of these entities to the Family, thereby entitling the Family to receive the distributions in the pledged interests, these assets would have been available to SFC and its creditors in any action to collect against Yao for his activities relating to SFC.

274.    Yao pledged these assets to the Family in May 2002, after Royal had indicated that it was no longer providing a credit risk enhancement and after Yao had disclosed to Royal that SFC was no longer able to make the Forbearance Payments.

275.    On information and belief, at the time of the pledge, Yao was aware that creditors may hold him liable for his actions related to SFC.

276.    On information and belief, Yao retained a residual interest in the assets that allowed him to recover the assets from the Family.

277.    On information and belief, Yao pledged the assets with an actual intent to defraud his creditors.

278.    The transaction may be avoided and recovered from the Family pursuant to 11 U.S.C. §§ 544(b) and 550, and 12 Pa. C.S.A. §§5101-5119.

WHEREFORE, the Family is liable for damages in an amount to be determined at trial together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT VIII

TURNOVER OF ESTATE PROPERTY CLAIM

Against the Family

279.    Paragraphs 1 through 278 above are incorporated by reference as if set forth in full herein.

280.    On or about June 1994, Yao acquired all of the interest in One Summit Place GP, Inc.

281.    On information and belief, One Summit Place GP, Inc., was the corporate general partner of One Summit Place, LP, and the limited partners of One Summit Place, LP consisted of certain members of the Family.

282.    On information and belief, Yao acquired his interest in One Summit Place GP, Inc. using funds inappropriately obtained from SFC.

283.    On or about May 1996, Yao acquired all of the interest in DHP GP, Inc., which is the corporate general partner of Day Hill Partners, LP.

284.    On information and belief, Yao acquired his interest in DHP GP, Inc. using funds inappropriately obtained from SFC.

285.    Yao's interests in DHP GP, Inc. and One Summit Place GP, Inc., therefore, were property of SFC.

286.    The Family is in possession of Yao's interests in DHP GP, Inc. and One Summit Place GP, Inc.

287.    Pursuant to 11 U.S.C. § 542, the Family is required to deliver to the Trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

WHEREFORE, the Family is liable for damages in an amount to be determined at trial together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT IX

### EQUITABLE SUBORDINATION

### Against Pepper

288.    Paragraphs 1 through 287 above are incorporated by reference as if set forth in full herein.

289.    On January 31, 2003 and May 9, 2003, Pepper filed Proofs of Claim in the amounts of $526,161.86 and $971.49 respectively against SFC.

290.    Pursuant to section 510(c) of the Bankruptcy Code, a Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

291.    Through engaging in the wrongful and inequitable conduct described herein, Pepper has injured creditors and/or given an unfair advantage to Pepper.

292.    Pepper's wrongful, inequitable conduct was continuing and occurred while SFC was insolvent and owed fiduciary duties to its creditors.

293.    Pepper knew or should have known that as a result of its conduct described herein, SFC would be driven, or driven deeper, into insolvency and would continue to incur debt beyond that which it had any chance of being able to repay.

294.    As a result of Pepper's inequitable conduct, SFC's creditors have been deprived of valuable assets.

295.    By reason of the foregoing, SFC's unsecured creditors were harmed.

296.    Allowing Pepper to receive payments on its claim prior to payment of the general unsecured creditors would be unfair and inequitable.

297.    Equitable subordination of Pepper's claim is consistent with the Bankruptcy Code.

298.    Because of the actions and omissions described herein, and without waiver of or prejudice to and expressly reserving the Trustee's rights to object to Pepper's Proofs of Claim, Pepper's claims against SFC should be equitably subordinated to the claims of general unsecured creditors pursuant to section 510 of the Bankruptcy Code.

WHEREFORE, Pepper's claims for fees against SFC should be equitably subordinated to the claims of all general unsecured creditors.

## COUNT X

### PREFERENCE CLAIM

Against Pepper

299.    Paragraphs 1 through 298 above are incorporated by reference as if set forth in full herein.

300.    Within one year of the Filing Date, Pepper performed services on behalf of the Debtor.

301.    Within one year of the Filing Date, on account of services rendered, Pepper received payments totaling $985,475 from SFC.

302.    Pepper received the following payments within one year of the Filing Date:

| Date | Preference Payment |
| --- | --- |
| June 13, 2001 | $87,741.46 |
| June 26, 2001 | $75,232.10 |
| July 27, 2001 | $176,127.77 |
| August 29, 2001 | $113,721.46 |
| September 28, 2001 | $91,443.95 |
| October 11, 2001 | $45,122.81 |
| November 29, 2001 | $101,955.77 |
| December 13, 2001 | $55,316.98 |
| January 31, 2001 | $208,721.85 |
| March 28, 2002 | $15,000.00 |
| April 2, 2002 | $15,000.00 |
| April 11, 2002 | $15,000.00 |
| April 19, 2002 | $15,000.00 |
| April 24, 2002 | $15,000.00 |
| May 3, 2002 | $15,000.00 |
| May 10, 2002 | $15,000.00 |
| May 16, 2002 | $15,000.00 |
| May 24, 2002 | $15,000.00 |
| May 30, 2002 | $15,000.00 |

303.    Pepper was an insider within the meaning of 11 U.S.C. § 101(31), and for purposes of 11 U.S.C. § 547(b)(4)(B).

304.    Within 90 days of the Filing Date, Pepper received payments totaling $150,000 from SFC.

305.    Pepper received the following payments within 90 days of the Filing Date:

| Date | Preference Payment |
|------|--------------------|
| March 28, 2002 | $15,000.00 |
| April 2, 2002 | $15,000.00 |
| April 11, 2002 | $15,000.00 |
| April 19, 2002 | $15,000.00 |
| April 24, 2002 | $15,000.00 |
| May 3, 2002 | $15,000.00 |
| May 10, 2002 | $15,000.00 |
| May 16, 2002 | $15,000.00 |
| May 24, 2002 | $15,000.00 |
| May 30, 2002 | $15,000.00 |

306.    These payments were received to and/or for the benefit of Pepper.

307.    These payments were for and/or on account of an antecedent debt owed by SFC before such transfer was made.

308.    These payments were made while SFC was insolvent.

309.    SFC was insolvent on a balance sheet test at least as of May 2001.

310.    These payments enabled Pepper to receive more than it would have received if the case were a case under Chapter 7 of the Bankruptcy Code, the transfer had not been made and such creditor received the payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

311.    The transaction should be avoided pursuant to 11 U.S.C. § 547, and recovered for the benefit of the estate under 11 U.S.C. § 550.

WHEREFORE, the Trustee respectfully requests that this Court enter an Order requiring Pepper to pay the sum of $985,475, together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT XI

### PREFERENCE CLAIM

Against the Family Defendants

312.    Paragraphs 1 through 311 above are incorporated by reference as if set forth in full herein.

313.    Within one year of the Filing Date, SFC made principal and interest payments to the Family of:

| | |
|---|---|
| Pamela Gagné | $64,106.78 |
| Robert Bast | $2,486,596.94 |
| Elizabeth Brennan Trust | $81,369.86 |
| Elizabeth Brennan Trust FBO Gagné | $403,750.00 |
| Elizabeth Brennan Trust FBO Phillip Gagné | $268,583.00 |
| Elizabeth Brennan Trust FBO Elizabeth Gagné | $403,750.00 |
| James Brennan Trust FBO Gagné | $192,217.00 |
| James Brennan Trust FBO Phillip Gagné | $136,483.00 |
| James Brennan Trust FBO Elizabeth Gagné | $192,217.00 |

314.    The Family received the following payments within one year of the Filing Date:

| Transferee | Payment Date | Payment Amount |
|---|---|---|
| *Robert L. Bast* | June 28, 2001 | $26,842.00 |
| | July 30, 2001 | $26,842.00 |
| | August 30, 2001 | $26,842.00 |
| | September 27, 2001 | $26,842.00 |
| | October 23, 2001 | $26,842.00 |
| | November 13, 2001 | $2,000,000.00 |
| | November 13, 2001 | $153,334.00 |
| | November 30, 2001 | $26,842.00 |
| | December 21, 2001 | $26,842.00 |
| | February 1, 2002 | $26,842.00 |
| | February 27, 2002 | $26,842.00 |
| | March 28, 2002 | $26,842.00 |
| | April 2, 2002 | $18,000.00 |
| | April 29, 2002 | $46,842.47 |
| *Pamela Bashore Gagné* | June 26, 2001 | $5136.98 |
| | July 27, 2001 | $5136.98 |
| | August 29, 2001 | $5,136.98 |
| | September 27, 2001 | $5,136.98 |
| | October 30, 2001 | $5,136.98 |
| | November 29, 2001 | $5,136.98 |
| | December 27, 2001 | $5,136.98 |
| | February 1, 2002 | $5,136.98 |

| | March 14, 2002 | $5,136.98 |
|---|---|---|
| | March 28, 2002 | $5,136.98 |
| | April 11, 2002 | $3,600.00 |
| | April 24, 2002 | $5,136.98 |
| | April 24, 2002 | $4,000.00 |
| Elizabeth B. Brennan Trust | July 26, 2001 | $7,397.26 |
| | July 27, 2001 | $7,397.26 |
| | August 29, 2001 | $7,397.26 |
| | September 27, 2001 | $7,397.26 |
| | October 30, 2001 | $7,397.26 |
| | November 29, 2001 | $7,397.26 |
| | December 27, 2001 | $7,397.26 |
| | February 1, 2002 | $7,397.26 |
| | March 14, 2002 | $7,397.26 |
| | March 28, 2002 | $7,397.26 |
| | March 28, 2002 | $7,397.26 |
| Elizabeth B. Brennan Trust FBO W. Roderick Gagné | November 12, 2001 | $375,000.00 |
| | November 12, 2001 | $28,750.00 |
| Elizabeth B. Brennan Trust FBO Phillip B. Gagné | November 12, 2001 | $250,000.00 |
| | November 12, 2001 | $18,583.00 |
| Elizabeth B. Brennan Trust FBO Elizabeth L. Gagné | November 12, 2001 | $375,000.00 |
| | November 12, 2001 | $28,750.00 |
| James T. Brennan Trust FBO Phillip B. Gagne | November 12, 2001 | $125,000.00 |
| | November 12, 2001 | $9,583.00 |
| | April 2, 2002 | $900.00 |
| | April 24, 2002 | $1,000.00 |
| James T. Brennan Trust FBO Elizabeth L. Gagné | November 12, 2001 | $175,000.00 |
| | November 12, 2001 | $13,417.00 |
| | April 2, 2002 | $1,800.00 |
| | April 24, 2002 | $2,000.00 |
| James T. Brennan Trust FBO W. Roderick Gagné | November 12, 2001 | $175,000.00 |
| | November 12, 2001 | $13,417.00 |
| | April 2, 2002 | $1,800.00 |
| | April 24, 2002 | $2,000.00 |
| James T. Brennan Trust FBO Phillip B. Gagne | April 2, 2002 | $900.00 |
| | April 24, 2002 | $1,000.00 |

315. Based on the relationships between Gagné and the Family, Gagné's position as trustee of the Family Trusts, Gagné's influence over SFC as described herein, Bast's long-standing relationship with Yao, and the Family's position as major private investors in SFC, each Family defendant was an insider within the meaning of 11 U.S.C. § 101(31) and for purposes of 11 U.S.C. § 547(b)(4)(B).

316. Within 90 days of the Filing Date, the Family received payments totaling $146,387.66 from SFC.

317. The Family received the following payments within 90 days of the Filing Date:

| Transferee | Payment Date | Payment Amount |
|---|---|---|
| Robert L. Bast | March 28, 2002 | $26,842.47 |
| | April 2, 2002 | $18,000.00 |
| | April 29, 2002 | $46,842.47 |
| Pamela Bashore Gagné | March 14, 2002 | $5,136.98 |
| | March 28, 2002 | $5,136.98 |
| | April 11, 2002 | $3,600.00 |
| | April 24, 2002 | $5,136.98 |
| | April 24, 2002 | $4,000.00 |
| Elizabeth B. Brennan Trust | March 14, 2002 | $7,397.26 |
| | March 28, 2002 | $7,397.26 |
| | March 28, 2002 | $7,397.26 |
| James T. Brennan Trust FBO Phillip B. Gagne | April 2, 2002 | $900.00 |
| | April 24, 2002 | $1,000.00 |
| James T. Brennan Trust FBO Elizabeth L. Gagné | November 12, 2001 | $175,000.00 |
| | November 12, 2001 | $13,417.00 |
| | April 2, 2002 | $1,800.00 |
| | April 24, 2002 | $2,000.00 |
| James T. Brennan Trust FBO W. Roderick Gagné | November 12, 2001 | $175,000.00 |
| | November 12, 2001 | $13,417.00 |
| | April 2, 2002 | $1,800.00 |
| | April 24, 2002 | $2,000.00 |

318. These payments were transferred by SFC to or for the benefit of the Family.

319.    These payments were for or on account of an antecedent debt owed by SFC before such transfer was made.

320.    These payments were made while SFC was insolvent.

321.    SFC was insolvent on a balance sheet test at least as of May 2001.

322.    These payments enabled the Family to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, the transfers had not been made and such creditors received the payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

323.    These transactions should be avoided pursuant to 11 U.S.C. § 547, and recovered for the benefit of the estate under 11 U.S.C. § 550.

WHEREFORE, the Trustee respectfully requests that this Court enter an Order requiring Pamela Gagné to pay the sum of $64,106.78, Robert Bast to pay the sum of $2,486,596.94, the Elizabeth Brennan Trust to pay the sum of $81,369.86, the Elizabeth Brennan Trust FBO Gagné to pay the sum of $403,750, the Elizabeth Brennan Trust FBO Phillip Gagné to pay the sum of $268,583, the Elizabeth Brennan Trust FBO Elizabeth Gagné to pay the sum of $403,750, the James Brennan Trust FBO Gagné to pay the sum of $192,217, the James Brennan Trust FBO Phillip Gagné to pay the sum of $136,483, and the James Brennan Trust FBO Elizabeth Gagné to pay the sum of $192,217, each together with interest, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

THE BAYARD FIRM

Charlene D. Davis (No. 2336)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000
(302) 658-6395
cdavis@bayardfirm.com

-and-

Michael S. Waters, Esq.
Lois H. Goodman, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079
(973) 622-7711
(973) 622-5314

Attorneys for Plaintiff, Charles A. Stanziale, Jr.,
Chapter 7 Trustee for Student Finance Corporation

Dated: