# **EXHIBIT E**

LEXSEE 2005 U.S. DIST. LEXIS 9299

△
Caution
As of: May 11, 2007

UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff, v. BILT-RITE CONTRACTORS, INC., SUN BUILDING SUPPLY CO., INC., VALTS ROOFING, INC., D&V ASSOCIATES, INC., PETERIS VALTS, JOAN T. VALTS, JOSEPH T. DECKER and EILEEN DECKER, Defendants.

CIVIL ACTION NO. 04-1505

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2005 U.S. Dist. LEXIS 9299*

May 16, 2005, Decided
May 17, 2005, Filed; May 17, 2005, Entered

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff surety sought amounts paid in a mediation settlement with a project owner, costs, and attorneys' fees, against defendants, a general contractor and other indemnitors under an indemnity agreement. On the surety's partial summary judgment motion, the indemnitors argued the surety acted in bad faith. The surety argued some of the indemnitors' evidence was barred under the mediation privilege of *42 Pa. Cons. Stat. § 5949* (2005).

**OVERVIEW:** The indemnity agreement provided that evidence of the surety's payments were prima facie evidence of the fact and amount of the indemnitors' liability. Thus, the burden shifted to the indemnitors to prove a violation of the indemnity agreement's good faith standard, which excluded payments made with deliberate and willful malfeasance from those made in good faith. That standard was very similar to the common law bad faith or fraudulent payment standard. Certain portions of the contractor's president's affidavit were not considered under § 5949, as they pertained to mediation communications or mediation documents. A document stating it was for mediation purposes only was also inadmissible. The indemnity agreement did not require notice to the indemnitors of the surety's payments. Despite incendiary language as to the president's conduct and veracity in letters between counsel, ill will was not imparted to the surety. Counsel's poor opinion of the president did not establish a motivation of ill will. The settlement amount, $ 2.15 million, was not bad faith based on the owner's $ 3 million demand. Costs and fees were also recoverable.

**OUTCOME:** The surety's motion for partial summary judgment was granted and a judgment entered for the surety against the indemnitors.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > General Overview*
*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Contract Interpretation > General Overview*
[HN1] Under Pennsylvania law, when construing a contract, including indemnity agreements, the court must determine the intentions of the parties. Courts should ascertain the intentions of the parties by examining the language used in the agreement.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*

[HN2] In a diversity case, the court must determine the substantive state law to apply. To determine the substantive law to apply, the court must look to the conflict of law rules of the forum state.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > Significant Relationships*
*Torts > Procedure > Conflicts of Laws > Significant Relationships*
[HN3] The conflicts scheme employed by Pennsylvania courts is a hybrid of the most significant relationship approach and the governmental interest approach. This scheme applies to contract and tort actions.

*Civil Procedure > Remedies > Bonds > Sureties > Liability*
*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN4] Courts have enforced prima facie evidence clauses, which state that vouchers or other evidence of payments made by a surety are to be prima facie evidence of the fact and amount of liability of the indemnitor, in surety contracts. A prima facie evidence clause, coupled with appropriate evidence, will shift the burden to the indemnitor to prove that the indemnitee cannot recover the costs and fees incurred in defense of the obligation.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN5] Courts have allowed attorneys fees in surety cases, where the surety agreements permit such damages.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Types of Contracts > Guaranty Contracts*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN6] The standard for determining what an indemnitor must demonstrate to escape liability is determined by the language of the surety agreement. The standard of proof is preponderance of the evidence.

*Civil Procedure > Remedies > Bonds > Sureties > Liability*
*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN7] Where the reasonableness standard does not appear in an indemnity agreement, the reasonableness standard does not apply. Courts have recognized bad faith or fraudulent payment as the one exception to the enforcement of the indemnitor's liability for the surety's disbursements and expenses.

*Civil Procedure > Remedies > Bonds > Sureties > Liability*
*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN8] In surety cases where the indemnity contract contains no standard, bad faith or fraudulent payment is the sole limiting factor of a surety's enforcement of an indemnity agreement. Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; bad faith requires a showing of recklessness or improper motive such as self-interest or ill will.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Evidence > Privileges > Government Privileges > Official Information Privilege > Reports Privilege*
*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*
[HN9] See *Fed. R. Evid. 501*.

*Administrative Law > Agency Adjudication > Hearings > Evidence > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Evidence > Privileges > General Overview*
[HN10] Pursuant to *42 Pa. Cons. Stat. § 5949 (2005)*, entitled "Confidential mediation communications and documents," all mediation communications and mediation documents are privileged, subject to four exceptions listed in *42 Pa. Cons. Stat. § 5949(b)*. *42 Pa. Cons. Stat. § 5949(a) (2005)*. Specific to its application to the admissibility of evidence, § 5949(a) reads in part that mediation communications and mediation documents shall not be admissible as evidence in any action or proceeding, including, but not limited to, a judicial, administra-

Case 1:04-cv-01551-JJF    Document 232-6    Filed 05/11/2007    Page 4 of 13

Page 3
2005 U.S. Dist. LEXIS 9299, *

tive, or arbitration action or proceeding. The statute defines mediation as the deliberate and knowing use of a third person by disputing parties to help them reach a resolution of their dispute. *42 Pa. Cons. Stat. § 5949(c)* (2005). As to the timing of the mediation privilege, mediation commences at the time of initial contact with a mediator or mediation program. *42 Pa. Cons. Stat. § 5949(c)* (2005).

*Evidence > Privileges > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN11] The general rule is that the party asserting a privilege has the burden of establishing it and that it must be strictly construed.

*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Evidence > Privileges > Government Privileges > Official Information Privilege > Reports Privilege*
[HN12] Discussions among parties outside the presence of the mediator and not occurring at a mediation proceeding are not privileged under *42 Pa. Cons. Stat. § 5949* (2005). Where the mediator has no direct involvement in the discussions and where the discussions are not designated by the parties to be a part of an ongoing mediation process, the rationale underlying the mediation privilege (i.e., that confidentiality will make the mediation more effective) is not implicated. The mere fact that discussions subsequent to a mediation relate to the same subject as the mediation does not mean that all documents and communications related to that subject are "to further the mediation process" or prepared for the purpose of, in the course of, or pursuant to mediation.

*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Evidence > Privileges > General Overview*
*Evidence > Procedural Considerations > Mediation Evidence*
[HN13] Included in the "core" of the materials privileged under *42 Pa. Cons. Stat. § 5949* (2005) are documents such as mediation position papers and specific information prepared for mediation sessions. Also included are other documents created by, and communications between parties in preparation for the mediation sessions. Documents created subsequent to the mediation process may be protected by the privilege to the extent that they have a clear nexus to the mediation.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
*Evidence > Procedural Considerations > Mediation Evidence*
[HN14] See *Fed. R. Civ. P. 56(e)*.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN15] An affidavit under *Fed. R. Civ. P. 56(e)* should contain facts rather than opinions or conclusion. Statements prefaced by the phrases, "I believe" or "upon information or belief," or those made upon an "understanding," are properly subject to a motion to strike.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN16] Some courts have held that allegations of excessive payments do not rise to the level of bad faith by a surety. While an excessive payment may be negligent or even reckless, overpayment by itself does not evince any ill will.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN17] Courts have found the fact that a surety made payments without giving notice to the indemnitor is not evidence of bad faith.

**COUNSEL:** [*1] For UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff: JANE LANDES FOSTER, PATRICK R. KINGSLEY, STRADLEY RONON STEVENS & YOUNG LLP, PHILADELPHIA, PA.

For BILT-RITE CONTRACTORS, INC., SUN BUILDING SUPPLY CO., INC., VALTS ROOFING, INC., D&V ASSOCIATES, INC., PETERIS VALTS, JOAN T. VALTS, JOSEPH E. DECKER, EILEEN DECKER, Defendants: JEFFREY P. WALLACK, WISLER PEARLSTINE TALONE, CRAIG GARRITY & POTASH, LLP, BLUE BELL, PA.

**JUDGES:** RONALD L. BUCKWALTER, S.J.

OPINION BY: RONALD L. BUCKWALTER

OPINION:

**MEMORANDUM**

BUCKWALTER, S. J.

May 16, 2005

Presently before the Court are Plaintiff's Motion for Partial Summary Judgment (Docket No. 5), Defendants' response thereto (Docket No. 6) and Plaintiff's Reply (Docket No. 7). As explained below, Plaintiff's Motion for Partial Summary Judgment is granted.

**I. FACTUAL AND PROCEDURAL HISTORY**

On or about November 24, 1998, Bilt-Rite Contractors, Inc. ("Bilt-Rite"), Sun Building Supply Co., Inc., Valts Roofing, Inc., D&V Associates, Inc., Peteris Valts, Joan T. Valts, Joseph T. Decker, and Eileen Decker (collectively "Defendants" and "Undersigned") executed a General Agreement of Indemnity (the "Indemnity Agreement") in favor of Plaintiff ("Surety"). [*2] Relying on the Indemnity Agreement, Plaintiff issued performance and payment bonds on certain projects on which Defendant Bilt-Rite wanted to act as the general contractor. These projects included Southern Lehigh Middle School, K.D. Markley Elementary School, East Penn Middle School, Salford Hills Elementary School and Owen J. Roberts High School (collectively known as the "Bonded Projects").

Paragraph 6 of the Indemnity Agreement includes the following provisions:

> The UNDERSIGNED will indemnify the SURETY and hold it harmless from and against all liability, losses, costs, damages, attorneys' fees, disbursements and expenses of every nature which the SURETY may sustain or incur by reason of, or relating to, having executed or procured the execution of any such BOND, or that may be sustained or incurred by reason of making any investigation of any matter, or prosecuting or defending any action in connection with such BOND, or recovering any salvage or enforcing any provision of this Agreement. The UNDERSIGNED shall pay to the SURETY all money which the SURETY or its representatives may pay or cause to be paid and shall pay to the SURETY such sum as may be necessary to exonerate [*3] and hold it harmless with respect to any liability which may be asserted against the SURETY as soon as liability exists or is asserted against the SURETY, whether or not the SURETY shall have made any payment therefor. In the event of any payment by the SURETY, the UNDERSIGNED further agrees that in any accounting between the SURETY and the UNDERSIGNED, the SURETY shall be entitled to charge for any and all disbursements made by it in good faith under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. As used herein, "payments made in good faith" shall be deemed to include any and all payments made by the SURETY except those made with delierate and willful malfeasance. The SURETY, in its sole discretion, from time to time may advance funds to or for the account of any CONTRACTOR for or relating to the completion of the work under any contract in connection with which it has executed or may execute a BOND or BONDS (hereinafter sometimes referred to as BONDED CONTRACT), and for the discharge of obligations incurred in connection therewith [*4] or relating thereto, and such advances shall be deemed "losses" under the terms of this Agreement whether or not such advances have been so used by the CONTRACTOR.

(Pl.'s Compl. Ex. A P 6.)

Paragraph 8 of the Indemnity Agreement reads as follows: "The SURETY may settle or compromise any claim, liability, demand, suit or judgment upon any BOND or BONDS executed or procured by it, and any such settlement or compromise shall be binding upon the UNDERSIGNED." (Pl.'s Compl. Ex. A P 8.)

The majority of the funds demanded by Plaintiff concern a Defendant Bilt-Rite project involving Owen J. Roberts School District ("OJR School District"). In January 1999, OJR School District awarded Defendant Bilt-Rite a contract for the general trades construction work for alterations and additions to the Owen J. Roberts High School (the "Project"). OJR School District and Defendant Bilt-Rite entered into the contract, and Plaintiff is-

sued a performance bond and payment bond with respect to Defendant Bilt-Rite's work on the Project. Plaintiff issued these bonds pursuant to the Indemnity Agreement between Plaintiff and Defendants.

The Project was plagued with problems from its inception. According [*5] to Defendant Bilt-Rite, OJR School District blamed these problems, which caused delays and disruptions for OJR School District, on Defendant Bilt-Rite even though Defendant Bilt-Rite was not totally at fault. Defendant Bilt-Rite incurred substantial costs and damages during the Project and submitted claims in excess of $ 1.1 million to OJR School District. In turn, OJR School District asserted claims against Defendant Bilt-Rite and Plaintiff based on the Project. Because of the problems, Plaintiff became directly involved in the Project.

On or about June 18, 2003, OJR School District filed suit against Plaintiff and Defendant Bilt-Rite in the Philadelphia County Court of Common Pleas based on claims related to the Project, demanding over $ 3 million dollars. Subsequent to the filing, Plaintiff, Defendant Bilt-Rite and OJR School District agreed to mediate the dispute. According to Defendants, by the time of the mediation, Plaintiff's relationship with Defendant Bilt-Rite and Defendant Decker had deteriorated considerably, with Plaintiff's personnel treating Defendant Bilt-Rite and Defendant Decker with hostility and a lack of respect.

Defendant Bilt-Rite, Plaintiff and OJR School [*6] District held four mediation sessions. For the purposes of the mediation, Defendant Bilt-Rite claimed OJR School District owed it $ 1,105,395.00 in unpaid claims while OJR School District claimed that Plaintiff and Defendant Bilt-Rite owed it $ 3,788,590.00 for additional costs incurred on the project. At the end of the first day of mediation, following a suggestion of the mediator, Defendant Bilt-Rite and Plaintiff evaluated each claim of Defendant Bilt-Rite and OJR School District, and they agreed to offer OJR School District $ 197,000.00 net of Defendant Bilt-Rite's claims.

Throughout the remaining mediation sessions, Plaintiff continued to increase the settlement offer, allegedly without consulting Defendant Bilt-Rite. On the second day, Defendant Bilt-Rite claims Plaintiff offered OJR School District $ 1.1 million dollars while OJR School District countered with $ 2.7 million. Allegedly, after the offers were exchanged, an employee of Plaintiff told OJR School District that she could get authority to pay more money if OJR School District could provide her with additional documentation of OJR School District's claims against Defendant Bilt-Rite. On the fourth day of mediation, [*7] Plaintiff offered $ 1.5 million, and OJR School District responded with a counter-offer of $ 2.55 million.

After four mediation sessions, OJR School District agreed to settle for $ 2.15 million, allegedly over the objection of Defendant Bilt-Rite, and the parties involved in the mediation drafted a Memorandum of Understanding of Settlement (the "Memorandum"). Plaintiff, Defendant Bilt-Rite and OJR School District signed this Memorandum. As part of the settlement, Defendant Bilt-Rite received a release from OJR School District and released its claims against OJR School District. Defendants believe that Plaintiff's payment of $ 2.15 million to OJR School District was reckless and unreasonable and the product of ill will against Defendants Bilt-Rite and Decker. On February 18, 2004, Plaintiff sent a demand letter to Defendants requesting the current costs and fees incurred by Plaintiff associated with the investigation, defense and resolution of claims arising out of Bonded Projects, pursuant to the Indemnity Agreement.

In Count I of its Complaint, which is the subject of Plaintiff's Motion for Partial Summary Judgment, Plaintiff demands judgment on the contract against all Defendants [*8] for $ 2,832,016.96, which includes costs and attorneys' fees but excludes interest. Count II of the Complaint involves an action by Plaintiff against Defendant Bilt-Rite under common law for indemnification for amounts paid in satisfaction of liability under the bonds. With respect to Count III, Plaintiff brings an action against all Defendants for exoneration and *quia timet.*

## II. DISCUSSION

The Court has jurisdiction in this case under its diversity jurisdiction and will apply Pennsylvania law where appropriate. n1 [HN1] Under Pennsylvania law, when construing a contract, including indemnity agreements, the court must determine the intentions of the parties. *Fallon Elec. Co. v. Cincinnati Ins. Co., 121 F.3d 125, 127 (3d Cir. 1997)*(citing *Brotherton Constr. Co. v. Patterson-Emerson-Comstock, Inc., 406 Pa. 400, 178 A.2d 696, 697 (1962))*; *Fulmer v. Duquesne Light Co., 374 Pa.Super. 537, 543, 543 A.2d 1100 (1988))*. Courts should ascertain the intentions of the parties by examining the language used in the agreement. *Fallon Elec. Co., 121 F.3d at 127* (citing *Brotherton, 178 A.2d at 697)*(citation [*9] omitted).

n1 As this case is [HN2] a diversity case, the Court must determine the substantive state law to apply. To determine the substantive law to apply, the Court must look to the conflict of law rules of the forum state, Pennsylvania. *Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir. 1988)*. [HN3] The conflicts scheme employed by Penn-

Case 1:04-cv-01551-JJF    Document 232-6    Filed 05/11/2007    Page 7 of 13

Page 6
2005 U.S. Dist. LEXIS 9299, *

sylvania courts is a hybrid of the most significant relationship approach of the Restatement (Second) of Conflicts and the governmental interest approach. *Troxel v. A.I. DuPont Inst., 431 Pa. Super. 464, 636 A.2d 1179, 1180-81 (Pa. Super. Ct. 1994)*. The Third Circuit has held that this scheme applies to contract and tort actions. *Melville v. Am. Home Ins. Co., 584 F.2d 1306, 1311-13 (3d Cir. 1978)*. Employing the Pennsylvania conflicts scheme, the Court believes that Pennsylvania law should apply. Plaintiff and Defendants both cite Pennsylvania law in their briefs, implicitly agreeing to the application of Pennsylvania law.

### A. Prima Facie Evidence [*10] Provision

The Indemnity Agreement between Plaintiff and Defendants contains the following prima facie evidence clause: "The vouchers or other evidence of payments made by the SURETY shall be *prima facie* evidence of the fact and amount of liability of the UNDERSIGNED to the SURETY." (Pl.'s Compl. Exhibit A P 9.) [HN4] Courts have enforced these provisions in surety contracts. *Fallon Elec. Co., 121 F.3d at 129*. This prima facie evidence clause coupled with appropriate evidence will shift the burden to the indemnitor to prove that the indemnitee cannot recover the costs and fees incurred in defense of the obligation.

In the instant case, Plaintiff presents the prima facie evidence clause along with an affidavit and expense sheets. Specifically, Plaintiff provides the affidavit of Diane Schumaker, an employee of St. Paul Fire and Marine Insurance Company, which is the owner of Plaintiff. n2 Schumaker, as the attorney responsible for coordinating, reviewing and paying invoices reflecting the costs and fees incurred by Plaintiff arising out of the Bonded Projects, has personal knowledge of the instant case. (Schumaker Aff. P 4.) According to Schumaker's Affidavit, on [*11] February 18, 2004, Plaintiff sent Defendants a demand letter, asking for payment of the costs and fees arising out of the Bonded Projects, which combined came to $ 2,645,494,95. n3 (Schumaker Aff. at P 5.) Since sending the demand letter on February 18, 2004, Schumaker avers that Plaintiff expended an additional $ 105,420.00 on the Bonded Projects. n4 (Schumaker Aff. at P 6.)

n2 This affidavit is attached to Plaintiff's Motion for Partial Summary Judgment as Exhibit B.

n3 This letter and the relevant payment histories are attached as Exhibit B to Schumaker's Affidavit.

n4 The payment histories for the period after February 18, 2004 are attached to Schumaker's Affidavit as Exhibit C.

In her affidavit, Schumaker also avers as to Plaintiff's expenditures for legal fees, n5 some of which were not included in amounts referenced in the preceding paragraph. Specifically, according to Shumaker, Plaintiff paid $ 56,011.46 for legal work concerning the Project and East Penn Middle School. n6 (Schumaker Aff. [*12] at P 8.) In addition, Plaintiff has incurred $ 25,090.33 in legal fees for the current lawsuit, which have not been paid. n7 (Schumaker Aff. at P 10.)

n5 [HN5] Courts have allowed attorneys fees in surety cases, where the surety agreements permitted such damages. *Fallon Elec. Co., 121 F.3d at 129-30*. The Indemnity Agreement specifically mentions attorneys' fees in at least two sections. First, Paragraph 6 reads in part:

> The UNDERSIGNED will indemnify the SURETY and hold it harmless from and against all liability, losses, costs, damages, attorneys' fees, disbursements and expenses of every nature which the SURETY may sustain or incur by reason of, or relating to, having executed or procured the execution of any such BOND, or that may be sustained or incurred by reason of making any investigation of any matter, or prosecuting or defending any action in connection with such BOND, or recovering or enforcing any provision of this Agreement. (Pl.'s Compl. Ex. A P 6.)

Second, Paragraph 14 of the Indemnity Agreement includes the following clause:

> In any action, suit or proceeding brought by the SURETY to enforce any of the covenants of this Agreement, the SURETY shall be

entitled to receive from the UNDERSIGNED the costs and expenses, including attorneys' fees, incurred by the SURETY in connection therewith, and such costs or expenses may be included in any judgment or decree rendered against the UNDERSIGNED. (Pl.'s Compl. Ex. A P 14.)

[*13]

n6 These invoices are attached to Schumaker's Affidavit as Exhibit D.

n7 These unpaid invoices are attached to the affidavit as Exhibit E.

The Court finds the prima facie evidence clause and accompanying proofs sufficient to shift the burden to Defendants to provide evidence that Plaintiff cannot recover the costs, fees and expenses it incurred with respect to the Bonded Projects.

### B. Applicable Standards

The next issue to discuss is the standards applicable to the instant case. First, the Court believes that Defendants must provide evidence that Plaintiff acted in bad faith in making the payments on the costs, fees and expenses with respect to the Bonded Projects. In Fallon Elec. Co., the Third Circuit concluded that [HN6] the standard for determining "what an indemnitor must demonstrate to escape liability" is determined by the language of the surety agreement. *121 F.3d 125 at 129*. The Court finds that the good faith language of Paragraph 6 of the Indemnity Agreement controls. n8 Paragraph 6 reads in part, "as used herein, 'payments made in good faith' shall be deemed [*14] to include any and all payments made by the SURETY except those made with deliberate and willful malfeasance." n9 (Pl.'s Compl. Ex. A P 6.) Defendants must show that Plaintiff's payments violated the good faith standard of the Indemnity Agreement in order to escape their obligation. The standard of proof is preponderance of the evidence. *Mountbatten Sur. Co. v. Jenkins, 2004 U.S. Dist. LEXIS 20653, No. CIV.A.02-8421, 2004 WL 2297405, at *6 (E.D. Pa. Oct. 13, 2004)*.

n8 In response to Defendants' claims that a reasonableness standard applies to the instant case, Plaintiff writes that "the indemnity agreement in this case contains no standard whatsoever...only the common law standard of good faith applies." (Pl.'s Reply Br. at 5). As cited above, courts are instructed to ascertain the intentions of the parties by examining the language used in the agreement. *Fallon Elec. Co., 121 F.3d at 127* (citations omitted). After reviewing the Indemnity Agreement, the Court believes that the Indemnity Agreement contains a good faith standard, which is found in Paragraph 6 of the Indemnity Agreement. As it is instructed to do, the Court will apply the good faith standard of the Indemnity Agreement, which is very similar to the common law standard, which is examined in Footnote 9 of the Memorandum.

In its pleadings, Defendants argue that reasonableness should be the applicable standard. This argument is incorrect [HN7] because the reasonableness standard does not appear in the Indemnity Agreement, and if absent from the agreement, the reasonableness standard does not apply. Courts have recognized bad faith or fraudulent payment as the one exception to the enforcement of the indemnitor's liability for the surety's disbursements and expenses. *Mountbatten Sur. Co., Inc. v. Jenkins, 2004 U.S. Dist. LEXIS 20653, No. CIV.A.02-8421, 2004 WL 2297405, at *5 (E.D. Pa. Oct. 13, 2004)*(citing *International Fidelity Ins. Co. v. United Constr., Inc., 1992 U.S. Dist. LEXIS 3358, No. CIV.A.91-2361, 1992 WL 46878, at *2 (E.D. Pa. March 4, 1992))*.

The cases cited by Defendants for the proposition that reasonableness should apply are miscited, from other states, or pertain to agency relationships or insurance contracts. For example, Defendants cite Fallon Elec. Co. as "holding that a surety's lack of reasonableness is 'tantamount to a showing of bad faith.'" (Defs.' Reply. Br. at 14.) This is incorrect. The Third Circuit in fact held that a showing that the indemnitee "did not actually believe it was liable for the fees or that [indemnitee] did not actually believe that the payment of such fees was reasonable under all the circumstances would be tantamount to a showing of bad faith or fraud." *Fallon Elec Co., 121 F.3d at 129*. In actuality, the test would not be whether the payment was reasonable but rather whether the indemnitee knew it was unreasonable. Further, it is important to note that Fallon Elec Co. involved an indemnity contract which used reasonableness as the limiting standard. Defendants also cite appellate courts from Maryland, Connecticut and Tennessee to support the reason-

Case 1:04-cv-01551-JJF   Document 232-6   Filed 05/11/2007   Page 9 of 13

Page 8
2005 U.S. Dist. LEXIS 9299, *

ableness argument even though the cases did not apply Pennsylvania law. Finally, Defendants cite four cases from the Eastern District Pennsylvania, which have no applicability. *Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614 (E.D. Pa. 2003)*, concerned an agency relationship, and Defendants fail to display how the case and Defendants' theorems regarding it apply to the instant matter. The other three cases cited by Defendants pertained to the Pennsylvania Bad Faith Statute, *42 Pa. Con. Stat. § 8371*, which does not apply in the instant matter.

[*15]

n9 [HN8] In surety cases where the indemnity contract contains no standard, bad faith or fraudulent payment is the sole limiting factor of a surety's enforcement of an indemnity agreement. *Mountbatten Sur. Co., 2004 U.S. Dist. LEXIS 20653, 2004 WL 2297405, at *5* (citing *Int'l Fidelity Ins. Co. v. United Const., Inc., 1992 U.S. Dist. LEXIS 3358, 1992 WL 46878, at *2*). According to the court of United States Fid. & Guar. Co. v. Feibus, "bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. . . bad faith requires a showing of recklessness or improper motive such as self-interest or ill will." *15 F. Supp. 2d 579, 585 (M.D. Pa. 1998)*(internal citations omitted). As the bad faith or fraudulent payment standard is very similar to the standard found in the Indemnity Agreement, the Court will examine cases applying the common law standard for guidance.

### C. Admissibility of Defendants' Evidence

The following analysis will focus on the admissibility of Defendants' evidence, but before addressing the admissibility [*16] of specific pieces of evidence, it is necessary to discuss the Pennsylvania mediation privilege and *FED. R. CIV. PRO. 56(e)*. This is an important step as it would not be proper to consider evidence which would be inadmissible at trial in ruling on Plaintiff's Motion for Partial Summary Judgment. *Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 387 n. 13 (3d Cir. 1999)*.

In support of its opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants offer certain communications and documents from the mediation between Plaintiff, Defendant Bilt-Rite and OJR School District. In its Reply Brief, Plaintiff raises the issue of whether these documents and communications are admissible as evidence. Pursuant to *Rule 501 of the Federal Rules of Evidence*, [HN9] "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or subdivision thereof shall be determined in accordance with State law." *FED. R. EVID. 501*. As this is a diversity [*17] case and Pennsylvania law applies, the Court will examine the Pennsylvania mediation statute and cases applying it to determine whether the Court should consider such evidence.

[HN10] Pursuant to *42 PA. CONS. STAT. § 5949*, entitled "Confidential mediation communications and documents," "all mediation communications and mediation documents are privileged," subject to four exceptions listed in *Section 5949(b)*. *42 PA. CONS. STAT. § 5949(a) (2005)*. Specific to its application to the admissibility of evidence, *Section 5949(a)* reads in part, "mediation communications and mediation documents shall not be admissible as evidence in any action or proceeding, including, but not limited to, a judicial, administrative or arbitration action or proceeding." *42 PA. CONS. STAT. § 5949(a) (2005)*. The statute defines mediation as "the deliberate and knowing use of a third person by disputing parties to help them reach a resolution of their dispute." *42 PA. CONS. STAT. § 5949(c)(2005)*. As to the timing of the mediation privilege, "mediation commences at the time of initial contact with a mediator [*18] or mediation program." *42 PA. CONS. STAT. § 5949(c)(2005)*. n10

n10 In Lake Utopia Paper Ltd. v. Connelly Containers, Inc., the Second Circuit provided a good explanation of the reasons for keeping mediation communications and documents confidential:

> If participants cannot rely on the confidential treatment of everything that transpires during [mediation] sessions then counsel of necessity will feel constrained to conduct themselves in a cautious, tightlipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of a program which has led to settlements . . ., thereby expediting cases at a time when . . .

judicial resources . . . are sorely taxed. *608 F.2d 928, 930 (2d Cir.1979)*, quoted in *Sheldone v. Pa. Tpk. Comm'n, 104 F. Supp. 2d 511, 513 (W.D. Pa. 2000)*.

[*19]

The district court in *U.S. Fid.& Guar. Co. v. Dick Co., 215 F.R.D. 503 (W.D. Pa. 2003)*, construed *42 PA. CONS. STAT. § 5949*. In that case, the defendants reached a settlement agreement among themselves and several entities, who were not parties to the lawsuit, following a mediation conducted by a professional mediator. *215 F.R.D. at 504*. The plaintiff sought discovery of the documents comprising the settlement agreement. *Id. at 504*. The district court reviewed a decision of the special master, in which the special master determined that two documents, including the settlement agreement, were discoverable under Pennsylvania's statutory mediation privilege. *Id. at 505*. The district court confirmed the special master's view of the facts, that the parties involved in the mediation met on one occasion with the mediator, spoke with the mediator on at least two occasions and agreed to settlement without the assistance of the mediator, two months after the mediation session. *Id. at 505*. As to the admissibility of the documents at issue, the district court wrote:

> We follow the [*20] [HN11] general rule that the party asserting a privilege has the burden of establishing it and that it must be strictly construed. Based upon the language of the statute and what little case law there is on the subject, we conclude that [HN12] discussions among parties outside the presence of the mediator and not occurring at a mediation proceeding are not privileged. Where the mediator has no direct involvement in the discussions and where the discussions were not designated by the parties to be a part of an ongoing mediation process, the rationale underlying the mediation privilege (i.e., that confidentiality will make the mediation more effective) is not implicated. The mere fact that discussions subsequent to a mediation relate to the same subject as the mediation does not mean that all documents and communications related to that subject are "to further the mediation process" or prepared for the purpose of, in the course of, or pursuant to mediation. *Id. at 506*.

Because the defendants failed to establish any nexus between the mediation process and the documents, which were created subsequent to the mediation, the mediation privilege did not apply. *Id. at 507*. [*21] In ruling that the documents were not privileged, the district court explained what documents it thought were covered under the privilege, writing:

> [HN13] included in the "core" of these materials are documents such as mediation position papers and specific information prepared for mediation sessions. Also included are other documents created by, and communications between parties in preparation for the mediation sessions. We believe that documents created subsequent to the mediation process may be protected by the privilege to the extent that they have a clear nexus to the mediation. *Id. at 507*.

Applying *Section 5949* to the instant case, certain evidence presented by Defendants is inadmissible as the communications and documents have a clear nexus to the mediation between Plaintiff, Defendant Bilt-Rite and OJR School District.

In addition to refusing to consider evidence pertaining to the mediation, the Court will not consider evidence which would be inadmissible under *Rule 56(e) of the Federal Rules of Civil Procedure*. Pursuant to *Rule 56(e)*, [HN14] "supporting or opposing affidavits shall be made on personal knowledge, shall [*22] set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Fed. R. Civ. P. 56*. [HN15] An affidavit should contain facts rather than opinions or conclusion. *Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985)*. "Statements prefaced by the phrases, 'I believe' or 'upon information or belief' or those made upon an 'understanding'. . . are properly subject to a motion to strike." *Carey v. Beans, 500 F. Supp. 580, 583 (E.D. Pa. 1980)*(internal citations omitted).

First, the Court will address the affidavit of Defendant Joseph Decker, who is the President of Defendant Bilt-Rite. This affidavit is attached by Defendants in support of their opposition to Plaintiff's Motion for Partial Summary Judgment. Paragraphs 18, 19 and 22 - 45 of Decker's Affidavit would not be admissible as they pertain to mediation communications or mediation documents. Therefore, the Court will not consider those paragraphs in its ruling. In addition, Paragraphs 15, 16,

48 and 49 would not be admissible at trial as they violate *Rule 56(e)*. The Court [*23] will not consider those paragraphs.

Exhibit D, presented by Defendants, was prepared by Defendant Bilt-Rite and Plaintiff at the request of the mediator. (Decker Aff. at P 29.) According to Defendant Decker, the purpose of this document was to evaluate each claim of Defendant Bilt-Rite and OJR School District so as to make an offer to OJR School District, which the parties did in offering $ 197,000.00 net of Defendant Bilt-Rite's claims. This document was prepared at the mediation and for the purposes of mediation. The document's title reads "FOR MEDIATION PURPOSES ONLY." (Defs.' Reply Ex. D.) The Court finds that this document would be inadmissible as it was prepared for the mediation and, therefore, subject to the mediation privilege.

Exhibit E is a letter from Defendant Bilt-Rite's counsel to Plaintiff's counsel concerning the mediation. This letter contains information on mediation offers and mediation communications. Because this exhibit pertains to the mediation and addresses documents and communications from the mediation, it would not be admissible. The Court will not consider it. D. Examination of Defendants' Remaining Evidence/Application of Standard

As stated above, [*24] Defendants argue that the payments made, and costs incurred, by Defendants with respect to the Project were the product of bad faith. Defendants' remaining evidence supporting this claim are the September 26, 2003 letter from Plaintiff's counsel to Defendant Bilt-Rite's counsel, n11 October 2, 2003 letter from Defendant Bilt-Rite's counsel to Plaintiff's counsel, n12 and Paragraphs 1-14, 17 and 46-47 of the Decker affidavit. n13 Defendants' arguments of bad faith center on allegations of ill will on the part of Plaintiff against Defendants n14 and Defendants' belief that Plaintiff settled with OJR School District for too much money. n15 n16

> n11 As their Exhibit C, Defendants present a letter dated September 26, 2003 from Jane Landes Foster, counsel for Plaintiff, to Mason Avrigian, Jr., counsel for Defendant Bilt-Rite. In the letter, counsel for Plaintiff wrote the following:
>
>> Mr. Decker's behavior is consistent with everything that OJR is complaining about with respect to Bilt-Rite and its performance on the job. Mr. Decker is not reliable. He does not bring things to completion. He is disorganized. He is not considerate of other people's schedules or time. He does not take responsibility for his obligations and, if he is confused as to when he should be somewhere, does not make the necessary inquiries to determine his obligations and meet them. His behavior is Exhibit "A" in OJR's case. I have seen evidence of these kind of traits in the past. This morning, they all came together. Mr. Decker and the other Indemnitors should understand that, in weighing the credibility of what OJR had to say and what Bilt-Rite had to say and the merits of various claims, this morning's performance proved very negative for Bilt-Rite. (Defs.' Reply Ex. C.)

[*25]

> n12 Defendants' Exhibit B is the October 2, 2003 letter from Mason Avrigian, Jr., counsel for Defendant Bilt-Rite, to Jane Landes Foster, counsel for Plaintiff. In commenting on the conduct of personnel of Plaintiff at a meeting held on October 1, 2003, counsel wrote in part:
>
>> Your client's approach at the end of the meeting, essentially to put Joe Decker in a corner and demand specific information, commitments and admissions, was unprofessional and inappropriate. If USF&G desired or intended to discuss those matters yesterday, we should have known about it beforehand. Diane Schumacher took up the role of inquisitioner, and I thought her tone and manner showed absolutely no respect for Joe and Bilt-Rite. Even more, all of this came after she was handed checks for $ 850,000 and we delivered a written undertaking by the indemnitors to reimburse USF&G more than $ 750,000. In my opinion, she carries the badge of 'St. Paul Surety' in a very heavy-handed and disrespectful manner in matters relating to Bilt-Rite. (Defs.' Reply Ex. B.)

This section is emblematic of the entire letter. The letter is comprised mostly of opinions of Defendant Bilt-Rite's counsel, not facts. The Court will consider the letter despite questions as to its admissibility.

[*26]

n13 Exhibit A of Defendants' Reply, which is the Complaint filed by OJR School District in the Court of Common Pleas of Philadelphia County against Plaintiff and Defendants, does not provide any substantial support to Defendants' claims so it will not be addressed.

n14 In Mountbatten, an employee of the surety-plaintiff, who represented the surety at the settlement conference and assisted in negotiating the settlement at issue in the case, referred to defendants-indemnitors as "scumbag contractors" at his deposition. *2004 U.S. Dist. LEXIS 20653, 2004 WL 2297405, at *7*. The defendants alleged that the surety acted in bad faith because the employee's impression of the defendants caused him to ignore the defendants' defenses. *2004 U.S. Dist. LEXIS 20653, [WL] at *7*. The court found the fact that the employee had a poor opinion of the defendants did not establish that he allowed his opinion to motivate his negotiations or influence the settlement of claims, and the court found the employee's opinion was insufficient to establish bad faith. *2004 U.S. Dist. LEXIS 20653, [WL] at *7*.

n15 According to the court in United States Fid. & Guar. Co. v. Feibus, [HN16] "some courts have held that allegations of excessive payments do not rise to the level of bad faith." *15 F.Supp.2d at 587*. The court in Mountbatten also declined to find bad faith based on allegations of overpayment by the surety, commenting, "while excessive payment may have been negligent or even reckless, overpayment by itself does not evince any ill will...." *2004 U.S. Dist. LEXIS 20653, 2004 WL 2297405, at *7* (citations omitted).

[*27]

n16 As to Bilt-Rite's contention that Plaintiff's alleged failure to give notice to Defendants before paying OJR School District constituted bad faith, the Court will not address this claim as there is no remaining evidence which concerns this allegation. Further, the Indemnity Agreement reads, "the SURETY may settle or compromise any claim, liability, demand, suit, or judgment upon any BONDS or BONDS executed or procured by it, and any such settlement or compromise shall be binding upon the UNDERSIGNED." (Pl.'s Compl. Ex. A P 8.) Pursuant to the Indemnity Agreement, Plaintiff was not required to notify Defendants before settling claims. Finally, [HN17] courts have found the fact that a surety made payments without giving notice to the indemnitor is not evidence of bad faith. *U.S. Fid. & Guar. Co. v. Feibus, 15 F.Supp.2d at 586* (citing *Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 719 (5th Cir.1995)); Fid. & Guar. Ins. Co. v. Keystone Contrs., Inc., 2002 U.S. Dist. LEXIS 15403, No. CIV.A.02-1328, 2002 WL 1870476, *4 (E.D. Pa. Aug. 14, 2002)*.

Defendants' allegation [*28] that ill will caused Plaintiff to pay and incur expenses, costs and fees in bad faith is based on the September 26, 2003 letter from Plaintiff's counsel to Defendant Bilt-Rite's counsel and October 2, 2003 letter from Defendant Bilt-Rite's counsel to Plaintiff's counsel. These letters are the only remaining pieces of evidence offered by Defendants to support their argument concerning Plaintiff's ill will. Defendants offer no deposition testimony, no interrogatories and no other admissible documents. Despite the September 26, 2003 letter's incendiary language, the letter does not impart any ill will on Plaintiff, only Plaintiff's counsel. Because Plaintiff's counsel had a poor opinion of Defendant Decker does not establish that ill will motivated Plaintiff in settling the claims with OJR School District. With respect to the October 2, 2003 letter, it adds little support to Defendants' claim of bad faith; it just shows the opinions of Defendant Bilt-Rite's counsel.

As to Defendants' argument that Plaintiff settled with OJR School District for too much money, this too is insufficient. On its face, the amount of the payment to OJR School District, $ 2.15 million, is not bad faith based [*29] on the amount demanded by OJR School District in its Complaint filed in Philadelphia County Court of Common Pleas. In the Complaint, OJR School District sought over $ 3 million dollars. Defendants offer no additional admissible evidence to support their claim of excessive payment.

Viewing the record in the light most favorable to Defendants, the Court finds that the evidence as to ill will and excessive payment is insufficient to establish that Plaintiff acted in bad faith in its payment of costs,

fees and expenses with respect to the Bonded Projects as a matter of law.

## IV. CONCLUSION

In conclusion, Defendants fail to provide enough evidence to sustain its burden of showing that Plaintiff violated the good faith clause of the Indemnity Agreement in its payment of costs, fees and expenses with respect to the Bonded Projects. Therefore, the Court grants partial summary judgment in favor of Plaintiff and awards Plaintiff $ 2,832,016.96, plus prejudgment interest. The Court cannot determine the amount of prejudgment interest based on the record. Plaintiff shall file its calculations and accompanying proofs as to prejudgment interest within ten days of the Order, and Defendants [*30] shall file their response to this calculation within five days thereafter.

An Order follows.

**ORDER**

AND NOW, this 16th day of May, 2005, upon consideration of Plaintiff's Motion for Partial Summary Judgment (Docket No. 5), Defendants' response thereto (Docket No. 6) and Plaintiff's Reply (Docket No. 7), it is hereby **ORDERED** that Plaintiff's Motion for Partial Summary Judgment is **GRANTED**.

It is **FURTHER ORDERED** that Plaintiff shall file its calculations and accompanying proofs as to prejudgment interest within ten (10) days of this Order. Defendants shall file their response within five (5) days thereafter.

BY THE COURT:

RONALD L. BUCKWALTER, S.J.