## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MBIA INSURANCE CORPORATION, et al.,<br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>ROYAL INDEMNITY COMPANY,<br>Defendant/Counterclaim Plaintiff. | C.A. No. 02-1294-JJF |
| CHARLES A. STANZIALE, JR., Ch. 7 Trustee,<br>Plaintiff,<br><br>v.<br><br>PEPPER HAMILTON LLP, et al.,<br>Defendants. | C.A. No. 04-1551-JJF |
| CHARLES A. STANZIALE, JR., Ch. 7 Trustee,<br>Plaintiff,<br><br>v.<br><br>McGLADREY & PULLEN LLP, et al.,<br>Defendants. | C.A. No. 05-72-JJF |
| ROYAL INDEMNITY COMPANY,<br>Plaintiff,<br><br>v.<br><br>PEPPER HAMILTON LLP, et al.,<br>Defendants. | C.A. No. 05-165-JJF |

## COMPENDIUM OF UNREPORTED CASES CITED IN MEMORANDUM OF ROYAL INDEMNITY COMPANY IN OPPOSITION TO THE MOTION OF PEPPER HAMILTON AND W. RODERICK GAGNE TO STRIKE EXPERT REPORTS AND PRECLUDE TESTIMONY

ASHBY & GEDDES
Lawrence C. Ashby (#468)
Philip Trainer, Jr. (#2788)
Tiffany L. Geyer (#3950)
Andrew D. Cordo (#4534)
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19899
(302) 654-1888
(302) 654 2067 (Fax)

SONNENSCHEIN NATH & ROSENTHAL LLP
Michael H. Barr
Alan S. Gilbert
John Grossbart
Kenneth J. Pfaehler
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700
(212) 768-6800 (Fax)

*Attorneys for Royal Indemnity Company*

May 22, 2007

# UNREPORTED CASES

**Case**                                                                                                    **Tab**

*Beneville v. Pileggi,*
    No. Civ.A. 03-474-JJF, 2005 WL 1026947 (D.Del. Apr. 22, 2005) ...................................1

*Sippel Development Co., Inc. v. Western Surety Co.,*
    Civ. A. No. 05-46, 2007 WL 1115207 (W.D.Pa. Apr. 13, 2007).......................................2

*Block Drug Co., Inc. v. Sedona Laboratories, Inc.,*
    No. Civ.A. 06-350, 2007 WL 1183828 (D.Del. Apr. 19, 2007)...........................................3

*Amalgamated Bank of New York v. The Pennsylvania Companies,*
    No. Civ.A. 93-6703, 1995 WL 429130 (E.D.Pa. July 19, 1995)........................................4

*Newman & Associates v. J.K. Harris & Company, LLC,*
    No. 04Civ.9264(RJH)(MHD), 2005 WL 3610140 (S.D.N.Y. Dec. 15, 2005)...................5

*Cook v. CTC Communications Corp.,*
    Civil No. 06-cv-058-JD, 2006 WL 3313838 (D.N.H. Nov. 13, 2006) .............................6

*Rates Technology, Inc. v. Cablevision Systems Corp.,*
    No. 05-CV-3583 (DRH)(WDW), 2007 WL 1176732 (E.D.N.Y. Apr. 20, 2007)..............7

*Performance Aftermarket Parts Group, Ltd. v. TI Group Automotive Systems, Inc.,*
    Civ.A. No. H-05-4251, 2007 WL 1428628 (S.D.Tex. May 11, 2007)................................8

*Irwin Seating Company v. International Business Machines Corporation,*
    No. 1:04-CV-568, 2006 WL 3446584 (W.D.Mich. Nov. 29, 2006) ..................................9

*Irwin Seating Company v. International Business Machines Corporation,*
    No. 1:04-CV-568, 2006 WL 3446584 (W.D.Mich. Feb. 15, 2007) ................................10

*Borden v. Ingersoll-Rand Co.,*
    No. 01-CV-5455, 2003 WL 21488511 (E.D.Pa. Jan. 17, 2003).......................................11

*DiFlorio v. Nabisco Biscuit Company,*
    No. Civ.A. 95-0089, 1995 WL 710592 (E.D.Pa. Nov. 13, 1995)....................................12

*Robertson v. Horton Brothers Recovery, Inc.,*
    No. Civ.A. 02-1656-JJF, 2006 WL 2917377 (D.Del. Oct. 10, 2006)...............................13

*Cherry Line, S.A. v. Muma Services,*
    No. Civ.A. 03-199-JJF, 2006 WL 1237034 (D.Del. May 8, 2006) ..................................14

*Conopco, Inc. v. Wein*,
    No. 05Civ.9899(RCC)(THK), 2007 WL 1040676 (S.D.N.Y. Apr. 4, 2007) ....................15

*Matsushita Electric Industrial Co., Ltd. v. Mediatek, Inc.*,
    No. C-05-3148-MMC (JCS), 2007 WL 963975 (N.D.Cal. Mar. 30, 2007) .....................16

*St. Marys Area Water Authority v. St. Paul Fire & Marine Insurance Company*,
    Civil No. 1:CV-04-1593, 2006 WL 1670281 (M.D.Pa. June 15, 2006)...........................17

180808.1

# TAB 1



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
**(Cite as: 2005 WL 1026947 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Edward BENEVILLE, Jr., Winchester Insurance
Company, Ltd., Plaintiffs,
v.
Francis PILEGGI, Esquire, and Fox Rothschild, LLP,
Defendants.
**No. Civ.A. 03-474 JJF.**

April 22, 2005.

Kevin W. Gibson, of Gibson & Perkins, P.C., Wilmington, Delaware, for Plaintiffs Edward Beneville, Jr.
and Winchester Insurance Company, Ltd.

Jeffrey M. Weiner, of Law Offices of Jeffrey M.
Weiner, Wilmington, Delaware, for Defendants Francis Pileggi, and Fox Rothschild, LLP.

*MEMORANDUM OPINION*
FARNAN, J.

INTRODUCTION

*1 This action was brought by Plaintiffs, Edward Beneville, Jr. and Winchester Insurance Company, Ltd.
("Winchester"), against Defendants, Francis Pileggi
and Fox Rothschild LLP, alleging that Defendants
committed legal malpractice by failing to inform Mr.
Beneville, of material changes in a business transaction document. A three day bench trial was held on
the claims and defenses raised by the parties. This
Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the issues
tried before the Court.

JURISDICTION AND VENUE
The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the
amount in controversy exceeds $75,000, exclusive of
interest and costs, and the matter arises between citizens of different states.

Venue in this judicial district is uncontested and is
appropriate pursuant to 28 U.S.C. § 1391 because the
acts allegedly giving rise to Plaintiffs' cause of action

occurred in the District of Delaware.

PROCEDURAL BACKGROUND
Plaintiffs filed their Complaint in this action on May
15, 2003, alleging claims for negligence against Defendant Mr. Pileggi individually, and against Fox
Rothschild LLP pursuant to the doctrine of respondeat superior. On March 8, 2004, Plaintiffs filed an
Amended Complaint (D.I.50) adding a count of
Breach of Fiduciary Duty against Defendant Pileggi.
However, at trial, Plaintiffs withdrew the count of
Breach of Fiduciary Duty. (Trial Tr. at B-112-13.)

Defendant Fox Rothschild filed a counterclaim alleging that Fox Rothschild is entitled to the entry of
judgment against Plaintiffs, jointly and severally, in
the amount of $251,070.34 plus pre- and postjudgment interest since July 31, 2002 for legal services rendered between February 2001 and October
2002.

In addition to naming Defendants in their Amended
Complaint, Plaintiffs also sued Juristaff, Inc. and
Robert Unterberger, Esquire. On October 17, 2003,
the parties stipulated to dismiss all claims and
crossclaims against Juristaff, Inc. On September 16,
2004, during trial, the parties stipulated to dismiss all
claims and crossclaims against Mr. Unterberger.
(Trial Tr. at B-112.)

Separate motions to dismiss were filed by Mr. Pileggi
and Fox Rothschild, and Mr. Unterberger. The Court
denied both motions.

Trial commenced on September 15, 2004, and was
completed on September 17, 2004. Post-trial briefing
was completed in October 2004.

FINDINGS OF FACT
The Court makes the following findings with regard
to the factual background related to this action. The
Court makes additional findings where necessary in
the context of its legal analysis under the heading
"Conclusions of Law."

I. Parties

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
**(Cite as: 2005 WL 1026947 (D.Del.))**

1. Plaintiff Edward Beneville, Jr. is a citizen of California. (D.I. 153 at 1.)

2. Plaintiff Winchester Insurance Company, Ltd. ("Winchester") is incorporated in the British Virgin Islands. (D.I. 153 at 1.)

3. Mr. Beneville established Winchester as an offshore insurance company and transferred two-thirds of his shares in CARNET into Winchester. (Trial Tr. at A-23.)

**\*2** 3. Defendant Francis Pileggi, Esquire is a citizen of Pennsylvania. (D.I. 153 at 1.) Mr. Pileggi is licensed to practice law and does practice law in the state of Delaware. (D.I. 50 at 2.)

4. Defendant Fox Rothschild, LLP is a Pennsylvania Limited Liability Partnership. (D.I. 153 at 1.)

II. Escrow Agreement

6. Mr. Beneville, along with a business associate, Michael York, were founders and shareholders in a general insurance agency, the CARNET Holding Corporation ("CARNET"). (Trial Tr. at A-14.)

7. CARNET was a Delaware corporation. (D.I. 153 at 1.)

8. At the time of the events at issue in this lawsuit, Mr. Beneville and Winchester owned 37% of the capital stock in CARNET. (Trial Tr. at A-24.)

9. By 2000, the relationship between Mr. Beneville and the other shareholders deteriorated. (D.I. 153 at 1.)

10. In the fall of 1999, Mr. Beneville retained Mr. Pileggi to file a derivative lawsuit against CARNET. (Trial Tr. at A-20, 43.)

11. The derivative lawsuit was filed in Delaware Chancery Court in December 1999. (Trial Tr. at B-51.)

12. In January 2000, the parties to the derivative lawsuit "came to the table and agreed that they would sell the company." (Trial Tr. at A-20.)

13. On or about October of 2000, PC Group Acquisition I, Inc. ("PC Group"), a Florida corporation, expressed an interest in purchasing the capital stock in CARNET. (D.I. 153 at 2.)

14. Mr. Beneville and the other CARNET shareholders negotiated the purchase directly with PC Group. As Mr. Beneville received draft versions of the Stock Purchase Agreement from the other CARNET shareholders and PC Group, he would make changes to them. Mr. Beneville forwarded some of the draft Stock Purchase Agreements to Mr. Pileggi. (Trial Tr. at A-25-A-27.) Mr. Pileggi was reviewing the Stock Purchase Agreement's legal aspects; Mr. Beneville was reviewing the insurance aspects. (Trial Tr. at B-140.)

15. The Stock Purchase Agreement dated February 28, 2001, provided that PC Group would pay $1,925,000 for 77% of CARNET's outstanding stock, which included Plaintiffs' 407 shares. The purchase price was to be paid as follows: $194,583 at closing and the remaining sum of $1,730,417 to be secured by a Promissory Note, Escrow Agreement, and a guarantee from Atlantic Financial Services, LLC, a Georgia Limited Liability Company, related to the buyer and to be paid out in quarterly installments pursuant to a certain formula as defined in the Promissory Note. (PX 3.)

16. The Stock Purchase Agreement provided that the PC Group would purchase a one million dollar life insurance policy for Mr. Beneville. (PX 3.)

17. On February 23, 2001, Mr. Pileggi advised Mr. Beneville of the risks of closing without a clear, signed Escrow Agreement. (DX 19, 30.)

18. On February 23, 2001, Mr. Pileggi expressed his concerns to Mr. Beneville that the Purchase Agreement was a very poor quality document, and insisted that changes be made to the document. (PX 22.)

**\*3** 19. On February 24, 2001, prior to closing, Mr. Beneville expressed Mr. Pileggi's concerns to Mr. York. In his email to Mr. York, Mr. Beneville states that "Frank Pileggi is very concerned over what he believes to be a lack of clarity in the Escrow Agreement and in the Promissory Note. He has offered to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
(Cite as: 2005 WL 1026947 (D.Del.))

rewrite both documents...." (DX 20.)

20. On February 24, Mr. Beneville communicated to Mr. Pileggi that the parties to the purchase, "[o]n a handshake, ... agreed on ... the substance of the agreement.... Carlos [Lidksy] will work with you on the form of the Promissory Note and Escrow Agreement." (DX 20.)

21. On February 24, Thad Bracegirdle of the law firm Richards Layton & Finger became the escrow agent. (DX 20.)

22. On February 25, 2001, Mr. Pileggi expressed concerns to Mr. Beneville about the payout terms in the Purchase Agreement. (DX 22.)

23. On February 25, Mr. Beneville dismissed Mr. Pileggi's concerns as "a minimal risk." (DX 22.)

24. On February 26, 2001, at Mr. Pileggi's request, David Funk, Esquire emailed to Mr. Beneville, Mr. Lidsky, and Mr. Pileggi, a draft Escrow Agreement in "skeletal form," which required "additional information to be included as the Stock Purchase Agreement is finalized." (DX 24.)

25. On February 28, 2001, Mr. Lidsky filled in the blanks in Mr. Funk's draft Escrow Agreement and attached it as pages 16-19 of the 2/28/01 Stock Purchase Agreement. (DX 29 at 16-19.)

26. On February 28, 2001, Mr. Pileggi communicated to Mr. Beneville that the closing documents were not in the condition that Mr. Pileggi preferred. (DX 30.)

27. The purchase of CARNET closed on February 28, 2001. (Trial Tr. at B-56.)

28. At the time of the closing, no escrow agreement was signed. (Trial Tr. at B-60.)

29. All drafts of the Escrow Agreement created through March 6 provided that PC Group would make monthly deposits in the First Union Account of a sum equal to 4.5 percent of the earned premium for the first year and 4 percent of the earned premium for subsequent years ("the Earned Premium language"). (DX 42, PX 6.)

30. On March 2, 2001, Han Choi, counsel for escrow agent First Union National Bank, revised Mr. Lidksy's draft and forwarded the March 2 draft to Mr. Pileggi and Mr. Lidsky. CompareRite software indicated that 32 changes were made in the text. (DX 42.)

31. The March 2 draft contained the Earned Premium language in paragraph 3, and was 4 pages in length. (DX 42 at 3.)

32. On March 5, 2001, Mr. Pileggi sent an email to Mr. Choi and Mr. Lidsky requesting seven changes be made to the March 2 draft. (DX 40.)

33. On March 6, Mr. Choi sent a revised draft of the agreement to Mr. Pileggi and Mr. Lidsky. The revised draft was "red-lined," and contained the "Earned Premium" language in paragraph 3. The March 6 draft was 18 pages in length. (PX 6.)

34. Robert Unterberger, Esquire, another lawyer working at Fox Rothschild, sent a memorandum to Mr. Pileggi indicating that he had reviewed the March 6 draft to be sure the changes Mr. Pileggi requested in the March 5 email (DX 40) had been implemented therein. (DX 41.)

*4 35. On the morning of March 9, Laurie Tidwell, Mr. Choi's secretary, sent to Mr. Pileggi, Mr. Lidsky, and Paul Henderson of First Union National Bank what she identified as the final version of the Escrow Agreement. (DX 44.)

36. The email accompanying the March 9 Escrow Agreement did not indicate that the March 9 version contained any changes. (DX 44.)

37. The March 9 Escrow Agreement was not a red-lined document and no changes were indicated therein. (DX 45.)

38. Approximately one half-hour after sending what she identified as the final version of the Escrow Agreement on March 9, Ms. Tidwell sent the parties an updated agreement which corrected the agreement's wiring instructions. (DX 45.)

39. The email accompanying the second March 9 version did not indicate that the second March 9 version

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
**(Cite as: 2005 WL 1026947 (D.Del.))**

contained any changes other than modified wiring in-structions for the escrow account. In her email, Ms. Tidwell stated "[t]his agreement now final." (DX 45.)

40. The second March 9 Escrow Agreement was not a red-lined document and no changes were indicated therein. (DX 46.)

41. In both March 9 versions of the Escrow Agreement, the term "Earned Premium" had changed to "Annualized Net Income" ("the Changes"), thus reducing substantially the amount of money the PC Group was required to deposit in the Escrow Account. (DX 44, 46.)

42. Both March 9 drafts were 19 pages in length. (DX 44, 45.)

43. On March 9, Mr. Pileggi forwarded the first March 9 version of the Escrow Agreement to Mr. Beneville for his review. (DX 46.)

44. In the email accompanying the Escrow Agreement, Mr. Pileggi instructed Mr. Beneville, "Please review and, if agreeable to you, sign and return by fax to First Union's lawyer, (with a copy to me) the signature page for the attached escrow agreement." (PX 13.)

45. In the March 9 email, Mr. Pileggi did not bring the Changes to Mr. Beneville's attention. (PX 13.)

46. Mr. Pileggi billed Mr. Beneville for 24 minutes of time on March 9, 2004 for "follow-up on escrow agreement." (PX 41.)

47. By fax to Mr. Pileggi dated March 9, 2001, escrow agent Thad Bracegirdle requested that two changes be made an earlier draft of the Escrow Agreement. (DX 47.)

48. On March 9, 2005, Mr. Pileggi communicated to Mr. Bracegirdle that Mr. Pileggi "made all the changes you requested for the Escrow Agreement." (DX 48.)

49. On March 11, 2001, Mr. Beneville communicated to Mr. Pileggi that "I have just carefully reviewed the Stock Purchase Agreement and find that, under its terms, I don't get the life insurance policy.... I am

driven to conclude that this change in terms was sinister and explains the huge rush at the end of the deal to wrap everything up. I think PC Group set us up." (DX 49.)

50. In response, on March 12, Mr. Pileggi reiterated to Mr. Beneville that Mr. Pileggi was "not comfortable with the way the deal was rushed." Further, Mr. Pileggi stated that he "wanted to wait to close," but that Mr. Beneville had said he needed the money. (DX 49.)

**\*5** 51. On March 14, Mr. Beneville contacted Mr. Pileggi regarding the March 9 Escrow Agreement. Mr. Beneville stated that he had a "bifold problem with the [Escrow Agreement]," and indicated two changes he wanted made. First, Mr. Beneville objected to the Escrow Agreement's entirety provision in paragraph no. 17 of page 14. Second, he criticized the agreement for not stating what would happen to the stock certificates if the terms of the purchase agreement were not met. (DX 50.)

52. Mr. Beneville's March 14 email made no mention of the Changes. (DX 50.)

53. On March 16, 2001, Mr. Unterberger sent Mr. Bracegirdle "a mark-up and final version of the Escrow Agreement" that reflected changes Mr. Bracegirdle had requested. (DX 51.)

54. On March 27, Mr. Unterberger mailed Mr. Beneville a final version of the Escrow Agreement, requesting Mr. Beneville's "review and signature." (DX 52.)

55. Mr. Beneville signed, but did not read or review, the Escrow Agreement attached to Mr. Unterberger's March 27 letter. (DX 89 at 131-33.)

56. On May 11, Mr. Pileggi faxed Mr. Beneville another version of the Escrow Agreement, stating, "Please review the attached, sign and return asap." (DX 55.)

57. Mr. Beneville did not read or review the Escrow Agreement attached to Mr. Pileggi's May 11 letter. (DX 89 at 133-34.)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
**(Cite as: 2005 WL 1026947 (D.Del.))**

58. On May 14, Mr. Unterberger sent Mr. Beneville another copy of the May 11 draft. (DX 56.)

59. Mr. Beneville did not read or review the Escrow Agreement attached to Mr. Unterberger's May 14 letter. (DX 89 at 139.)

60. On May 14, 2001, Mr. Pileggi, by letter to James C. Strum, acknowledged receipt of "additional proposed changes to the escrow agreement." (DX 56.)

61. On May 31, Mr. Unterberger sent Mr. Beneville a version of the Escrow Agreement containing the changes requested by Mr. Strum, instructing Mr. Beneville to, "Please review it and return your signed signature page to me at your earliest convenience." (DX 57.)

62. On June 5, 2001, Mr. Unterberger sent a final version of the Escrow Agreement to Paul Henderson at First Union National Bank. Mr. Unterberger indicated that Schedule A of the Agreement was incomplete. (DX 59.)

63. On June 7, Mr. Beneville emailed Mr. Pileggi about the Escrow Agreement. He wrote, "Please consider the terms of the escrow agreement, as outline by Carlos [Lidsky] in the attachment, to be approved by yours truly." (DX 60.)

64. On June 8, Mr. Unterberger sent a letter to Mr. Beneville and the other relevant parties, copying Mr. Pileggi, which enclosed an Escrow Agreement that reflected a complete Schedule A and Ms. Zehnpfennig's new address. (DX 61.)

65. Mr. Unterberger's June 8 letter stated that the Escrow Agreement was open and that payment was due by June 10 according to the Stock Purchase Agreement. (DX 62.)

66. Mr. Beneville signed and returned each forwarded draft of the First Union Agreement. (D.I. 1 at ¶ 50.)

67. On June 11, 2001, Mr. Unterberger notified Mr. Lidsky that Mr. Unterberger considered PC Group to be in default under the Stock Purchase Agreement for failure to make the first quarterly payment into the

Escrow Account. (DX 64.)

*6 68. Pursuant to Section 11(c) of the Stock Purchase Agreement, mediation was sought as a result of Plaintiffs' June 11, 2001, Notice of Default. (D.I. 153 at 5.)

69. During the mediation hearing held on or about October 26, 2001, Mr. Beneville discovered the Changes for the first time. (Trial Tr. at A-71.)

70. Following the mediation hearing, Mr. Beneville informed Mr. Pileggi that he would like to have the matter listed for arbitration. (D.I. 153 at 5; DX 72.)

71. By decision dated July 3, 2002, the Arbitrators awarded Mr. Beneville $253,506.44. (DX 86.)

III. Legal Fees

72. Mr. Pileggi was employed by Manta and Welge at the time the derivative lawsuit was filed in 1999. (Trial Tr. at B-43.)

73. On or about October 31, 1999, Mr. Beneville entered into a special Fee Arrangement with Mr. Pileggi. (DX 96.)

74. Effective February 1, 2001, Mr. Pileggi joined the Fox Rothschild, LLP ("Fox Rothschild") law firm and Mr. Beneville agreed to the Fox Rothschild firm continuing to represent him. (PX 24.)

75. On or about March 2, 2001, Mr. Beneville agreed to pay $80,000 towards legal fees and disbursements. Of that sum, $53,333 was allocated to past accounts receivables and the remaining $26,667 was considered as a retainer by Fox Rothschild and held in escrow for future services. (DX 36.)

76. Fox Rothschild billed Mr. Beneville for professional services rendered through October 2002. (DX 97-109, 111-117.)

77. Mr. Beneville made a payment of $17,780 to Fox Rothschild in June 2001. (DX 101.)

78. Mr. Beneville and Fox Rothschild signed another fee agreement prior to the arbitration hearing. (DX 110.)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
(Cite as: 2005 WL 1026947 (D.Del.))

79. From February 1, 2002 to October 15, 2002, Plaintiffs incurred unpaid legal fees and disbursements of $251,070.34. (DX 36, 97-109, 111-117.)

## CONCLUSIONS OF LAW
### I. Applicable Legal Standards

#### A. Legal Malpractice

In order to sustain a claim of professional negligence against a Delaware attorney, a plaintiff must establish the applicable standard of care through the presentation of expert testimony, a breach of that standard of care, and a causal link between the breach and the injury. *Giordano v. Heiman*, 2001 WL 58952, at *1 (Del. January 18, 2001). It is well settled law that claims of legal malpractice must be supported by expert testimony. [FN1] An exception to this rule exists, however, when the professional's mistake is so apparent that a layman, exercising his common sense, is perfectly competent to determine whether there was negligence. *Larrimore v. Homeopathic Hosp. Assoc. of Del.*, 181 A.2d 573, 577 (Del.1962).

> FN1. Delaware cases holding that claims of legal malpractice must be supported by expert testimony include *Giordano v. Heiman*, 2001 WL 58952, at *1 (Del. January 18, 2001) (citing *Alston v. Hudson*, 1997 WL 560883, at *2 (Del.); *Weaver v. Lukoff*, 1986 WL 17121, at *1 (Del. July 1, 1986); *Seiler v. Levitz Furniture Co. of Eastern Region, Inc.*, 367 A.2d 999, 1008 (Del.1976)); and *Brett v. Berkowitz*, 706 A.2d 509, 517-18 (Del.1998).

## II. DISCUSSION

#### A. Negligence

*1. Duty*

Pursuant to Delaware case law, the standard of care applicable to a professional can only be established by way of expert testimony. [FN2]

> FN2. *See Giordano v. Heiman*, 2001 WL 58952, at *1 (Del. January 18, 2001) (citing *Alston v. Hudson*, 1997 WL 560883, at *2

(Del.); *Weaver v. Lukoff*, 1986 WL 17121, at *1 (Del. July 1, 1986); *Seiler v. Levitz Furniture Co. of Eastern Region, Inc.*, 367 A.2d 999, 1008 (Del.1976)); and *Brett v. Berkowitz*, 706 A.2d 509, 517-18 (Del.1998)

Defendants' expert, Mark D. Olson, testified at trial that "standard commercial practice in Delaware ... is that when a lawyer who controls the document makes changes, those changes are disclosed to the other parties, either directly or through their counsel.... [C]ounsel who controls the document is responsible for indicating to other counsel any changes that have been made." Mr. Olson testified that "[t]hat practice allows commercial transactions to proceed at a pace and a cost that clients find reasonably acceptable. The alternative would be that each lawyer involved in a transaction would have to re-read every document every time a change were made." (Trial Tr. at C-14-15.)

*7 Further, Mr. Olson testified that, in commercial transactional practice, "lawyers ... customarily adjust the level of their scrutiny to match what they understand or perceive to be the level of sophistication of their clients...." (Trial Tr. at C-15.) Mr. Olson testified that, in his view, "Mr. Pileggi might reasonably have expected that Mr. Beneville would review the agreement, particularly with respect to its business terms, and discuss any concerns ... he had with Mr. Pileggi." (Trial Tr. at C-15-16.)

Plaintiffs' expert, Kenneth J. Marino, testified at trial that "the attorney is responsible for reviewing all the changes to all the documents, no matter what the client reviews. That has always been my standard and my practice." (Trial Tr. at B-230.) With regard to relying on the representations of the lawyer who made the changes as to what has been changed, Mr. Marino testified that "it is up to the individual lawyer whether or not to do his own diligence or rely on what he gets from opposing counsel." (Trial Tr. at B-239.) In response to the question, "Can a commercial lawyer rely on his or her client to pick out material changes to a document," Mr. Marino testified "[a]s a general statement, it depends on the rules of engagement between the lawyer and that client." (Trial Tr. at B-229.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
**(Cite as: 2005 WL 1026947 (D.Del.))**

The standard for a claim of legal malpractice or negligence by a lawyer is not what would be ideal in a given situation; rather it is the "exercise the skill and knowledge ordinarily possessed by attorneys under similar circumstances." 3 Ronald E. Mallen *et al.*, *Legal Malpractice* § 19.2 (5th Ed.2000). Experts who testify as to the standard of care are familiar with the standard skill and care ordinarily practiced by Delaware attorneys. *Brett v. Berkowitz,* 706 A.2d 509, 517-18 (Del.1998).

The Court finds Defendants' expert, Mr. Olson, more persuasive than Plaintiffs' expert, Mr. Marino, concerning the standard of care a Delaware commercial lawyer must adhere to when retained to represent a party in a transaction similar to this one. Specifically, Mr. Marino testified as to his own practice with little rationale. He testified as to the standards that a lawyer might negotiate with his or her client, but did not testify to a recognized, standard practice for a commercial transaction for Delaware lawyers. Further, Mr. Olson testified that the standard to which he testified allows a commercial transaction "to proceed at a pace and a cost that clients find reasonably acceptable." (Trial Tr. at B-14.)

*2. Breach*

The court is persuaded by Mr. Olson's opinion that Mr. Pileggi conformed to the standard of care applicable to attorneys in commercial transaction practice in Delaware. (Trial Tr. at C-13.) In this regard, Mr. Olson testified that Mr. Pileggi could properly rely upon the absence of any changes having been disclosed to him in transmitting the March 9 document to his client. At least until the time Mr. Pileggi received the March 9 versions of the Escrow Agreement that contained the Changes, the Escrow Agreement was under the control of Mr. Choi, counsel for First Union National Bank. On March 5, 2001, Mr. Pileggi asked Mr. Choi to make several changes to the March 2 version of the Escrow Agreement. The March 6 version of the Escrow Agreement reflected those changes. The first March 9 version purportedly contained no changes. The second March 9 version contained corrected wiring instructions. The versions that First Union submitted to Mr. Pileggi on March 6 and March 9 did not indicate that any further changes

had been made beyond those requested by Mr. Pileggi or beyond the corrected wiring instructions.

**\*8** Further, the Court finds persuasive Mr. Olson's testimony that Mr. Beneville has substantial experience in the insurance industry and, therefore, "Mr. Pileggi might reasonably have expected that Mr. Beneville would review the agreement, particularly with respect to its business terms, and discuss any concerns that he had with Mr. Pileggi." (Trial Tr. at C-16.)

As of March 9, 2001, Mr. Beneville had seen the February 26 skeletal draft (DX 24) created by Mr. Funk and the February 28 Escrow Agreement attached as pages 16-19 of the Stock Purchase Agreement (DX 24) created by Mr. Lidsky. On March 9, Mr. Pileggi forwarded to Mr. Beneville the 19-page First Union draft sent by Ms. Tidwell. Two days later, on March 11, Mr. Beneville advised Mr. Pileggi that he had "very carefully reviewed the Stock Purchase Agreement" and found that the terms of the life insurance policy were not what Mr. Beneville had wanted. Mr. Beneville concluded that the change was sinister and that PC Group had "set us up." On March 14, 2001, Mr. Beneville responded to Mr. Pileggi's March 9 request that Mr. Beneville review the First Union Escrow Agreement. Mr. Beneville stated that he had two problems with that version of the Escrow Agreement. (DX 50.) The Court concludes that these facts establish that Mr. Pileggi was reasonable in his expectation that Mr. Beneville would review the terms of the Escrow Agreement before signing it.

In addition to the above, the Court finds the following evidence supports a conclusion that Mr. Pileggi acted reasonably. First, Mr. Beneville essentially co-authored the Stock Purchase Agreement with Mr. Lidsky and the other CARNET shareholders, changing the document himself and forwarding revisions to Mr. Pileggi after the fact. Mr. Pileggi was reviewing the Stock Purchase Agreement's legal aspects; Mr. Beneville was reviewing the insurance aspects. Second, Mr. Beneville closed on the CARNET sale on February 28, 2001, against Mr. Pileggi's advice, using documents that Mr. Pileggi warned were of poor quality and after rejecting Mr. Pileggi's offer to rewrite the documents. Further, every time Mr. Pi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)
**(Cite as: 2005 WL 1026947 (D.Del.))**

leggi sent a draft of the Escrow Agreement to Mr. Beneville, Mr. Pileggi clearly instructed Mr. Beneville to review the document before signing it.

In sum, the Court finds that Mr. Pileggi's conduct in handling the drafts of Escrow Agreement met the Delaware standard of care. Thus, the Court concludes that Mr. Pileggi did not breach any duty or commit negligence in the representation he provided Mr. Beneville with respect to the subject transaction.

II. Counterclaim for Fees and Disbursements

In their counterclaim, Defendants contend that they are entitled to the entry of judgment against Plaintiffs, jointly and severally, in the amount of $251,070.34, plus pre- and post-judgment interest since July 31, 2002, for fees and disbursements connected with Pileggi's representation of Plaintiffs. Defendants contend that, commencing February 1, 2001, and continuing through October 15, 2002, Plaintiffs incurred fees of $259,982.50 and disbursements of $35,513.06 towards which they have used credits of $26,667 and $17,780.

**\*9** Plaintiffs respond that, because Mr. Pileggi negligently failed to notice the Changes, Plaintiffs received no "value" from Defendants for any legal work after March 9, 2001.

Because the Court has concluded that Defendants are not liable for legal malpractice, the Court concludes that Defendants are entitled to the entry of judgment against Plaintiffs, jointly and severally, in the amount of $251,070.34, plus pre- and post-judgment interest since July 31, 2002 for fees and disbursements.

CONCLUSION

For the reasons discussed, the Court concludes that Plaintiffs have failed to prove their claims of professional negligence. Accordingly, the Court will enter final judgment in favor of Defendants and against Plaintiffs on all claims and counterclaims.

An appropriate Order will be entered.

FINAL JUDGMENT ORDER

At Wilmington, this *22* day of April 2005, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED AND ADJUDGED that:

1) Judgment be and is hereby entered in favor of Defendants, Francis Pileggi, Esquire and Fox Rothschild LLP, and against Plaintiffs, Edward Beneville, Jr. and Winchester Insurance Company Limited, on Plaintiffs' claims of negligence;

2) Judgment be and is hereby entered in favor of Defendant Fox Rothschild, LLP and against Plaintiffs, Edward Beneville, Jr. and Winchester Insurance Company Limited, jointly and severally, in the amount of Two Hundred Thousand Seventy Dollars and Thirty-Four Cents ($251,070.34) plus pre- and post-judgment interest since July 31, 2002 on Defendants' crossclaim.

Not Reported in F.Supp.2d, 2005 WL 1026947 (D.Del.)

END OF DOCUMENT

# TAB 2



Slip Copy                                                                                                                                                     Page 1
Slip Copy, 2007 WL 1115207 (W.D.Pa.)
**(Cite as: 2007 WL 1115207 (W.D.Pa.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
SIPPEL DEVELOPMENT CO., INC., Plaintiff,
v.
WESTERN SURETY COMPANY, Defendant.
**Civil Action No. 05-46.**

April 13, 2007.

Charles W. Robinson, Warrendale, PA, for Plaintiff.

Joshua B. Levy, Crivello, Carlson & Mentkowski, Milwaukee, WI, Peter G. Nychis, J. Michael McCague, Griffith, McCague & Wallace, Pittsburgh, PA, for Defendant.

### *MEMORANDUM ORDER*

AMY REYNOLDS HAY, United States Magistrate Judge.

**\*1** The instant case arises out of the construction project of a Sam's Club in Warren/Niles, Ohio. The owner of the project was Wal-Mart Stores, Inc. ("Wal-Mart"); the general contractor was Westra Construction Inc. ("Westra"); and Sippel Development Company, Inc. ("Sippel") was a subcontractor. The Warren/Niles contract was one of several contracts awarded to Westra by Wal-Mart for work on stores in various locations in Illinois, Indiana, Michigan, Minnesota, Ohio, Pennsylvania, and Wisconsin. Wal-Mart required Westra to obtain payment and performance bonds on each project. Western Surety Company ("Western") bonded the Warren/Niles project.

Prior to the completion of the Warren/Niles project, Westra ceased its business operations. Thereafter, Sippel filed the instant suit against Western on the payment bond, alleging an unpaid contract balance of $1,782,422.21. A substantial portion of this sum relates to a change order request by Westra for extra work by Sippel, which Wal-Mart apparently contested. [FN1]

> FN1. Westra sued Wal-Mart in the Middle District of Pennsylvania to recover

$911,429.72 on the work performed under the aforementioned change order. *See* Dkt. 56 at Exh. D.

Western joined Wal-Mart as a third-party defendant in this action. In turn, Wal-Mart filed a counterclaim against Western on this project and a third-party complaint against National Fire Insurance Company of Hartford ("National") on the performance bond on another project, namely Harbor Creek, Pennsylvania. Wal-Mart and the sureties settled all claims against each other on all of the Westra projects, including the Warren/Niles and Harbor Creek projects, and all claims filed by Western, National and Wal-Mart against each other in this action were dismissed with prejudice by Order dated June 21, 2006, effectively removing Wal-Mart and National from the suit.

During the course of discovery, Sippel requested that Western produce the following documents:
> *Requested Production No. 1:*
> Please produce any and all agreements between Western and Wal-Mart Stores, Inc.[ ] relating to any and all settlements, global or otherwise, of the disputed matter between them relating to this and/or any and all other lawsuits relating to Westra's entire book of contracts with Wal-Mart.
> *Requested Production No. [2]:*
> Please produce any and all correspondence relating ant and all agreements between Western and Wal-Mart Stores, Inc. [ ] relating to any and all settlements, global or otherwise, of the disputed matters between them relating to this and/or any and all other lawsuits relating to Westra's entire book of contracts with Wal-Mart.

*See* Western Surety Company's Response to Request for Production of Documents by Sippel Development Company, Inc. [Exh. A to dkt. 56]. Western objected to these requests on several grounds, including relevance and privilege. *Id.*

This court conducted a telephone discovery conference to determine the sufficiency of Western's objections. In the course of this conference, Sippel agreed to limit its request for production to a single document, i.e., the settlement agreement between Western

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Wal-Mart that resolved all of the above-noted projects, including the Warren/Niles project, and ultimately led to the dismissal of all claims between Western and Wal-Mart in this action. This court then ordered the parties to brief the issue of production of the specific settlement agreement. See dkt. entries 56 and 57. Western provided a copy of the settlement agreement at issue to the court for *in camera* review.

**\*2** Western argues that the settlement agreement is protected by the settlement privilege. Western has not pointed to any authority to support the existence of a settlement privilege. In our view, the courts which have addressed this question have correctly determined that Federal Rule of Evidence 408 does not create a discovery privilege but, rather, addresses whether evidence relating to settlement discussions is admissible at trial. *Morse/Diesel, Inc. v. Fidelity and Deposit Company of Maryland, et al. ("Jackson"),* 122 F.R.D. 447, 449 (S.D.N.Y.1988)(" 'The policy of allowing open and free negotiations between parties by excluding conduct or statements made during the course of these discussions is not intended to conflict with the liberal rules of discovery embodied in the Federal Rules of Civil Procedure ... Therefore, a party is not allowed to use Rule 408 as a screen for curtailing his adversary's rights of discovery.' ") (*quoting* 2 J. Weinstein & M. Berger, *Evidence* ¶ 408[1] at 408-15 to 408-16 (1986)); *Morse/Diesel, Inc. v. Fidelity and Deposit Company of Maryland, et al. ("Trinity"),* 142 F.R.D. 80, 83-85 (S.D.N.Y.1992); *Center for Auto Safety v. Department of Justice,* 576 F.Supp. 739, 749 n. 23 (D.D.C.1983)("While [Rule 408's] intent is to foster settlement negotiations, the sole means chosen to effectuate that end is a limitation on their admission ... for the purpose of proving liability at trial, not the application of a broad discovery privilege. Otherwise, parties would be unable to discover compromised offers which could be offered for a relevant purpose."); *NAACP Legal Defense Fund v. Department of Justice,* 612 F.Supp. 1143, 1146 (D.D.C.1985)(Rule 408 "was never intended to be a broad discovery privilege"). Accordingly, we reject Western's claim of settlement privilege.

Western also claims that the settlement agreement is confidential and not subject to disclosure. As Sippel notes, the mere fact that settling parties have agreed

to maintain the confidentiality of their agreement does not automatically serve to shield the agreement from discovery. *Directv, Inc. v. Puccinelli,* 224 F.R.D. 677, 685 (D. Kansas 2004). We note that several courts have addressed the question of whether a non-settling party should have access to a settlement agreement that is confidential by agreement of the signatories, as is the case here. "None of these courts have blithely permitted discovery, but rather require some heightened showing of relevance or need." *Doe v. Methacton School District,* 164 F.R.D. 175, 176 (E.D.Pa.1995)(citing cases).

Sippel asserts that the settlement agreement is relevant for the following reasons: (1) to demonstrate that Western and Wal-Mart have conferred upon Sippel the status of a third-party beneficiary; (2) to counter Western's defenses, specifically, the "pay when paid" defense; (3) to show bias or prejudice; and (4) to demonstrate whether Western has taken a course of action in the settlement agreement that now makes it impossible for a resolution to be had on the issue of whether Wal-Mart owes Westra for the change order and, in turn, Westra owes Sippel.

**\*3** Sippel's basis for asserting the possibility of third-party rights stems from correspondence dated August 10, 2005, that "Wal-Mart is amenable to settlement of the Westra litigation, and payment of an agreed-upon sum directly to Sippel or into an escrow account." *See* Dk. 56, Exh. B, p. 4. [FN2] We note that this correspondence pre-dates the execution of the settlement agreement by some months. Further, it appears that Sippel inquired of Western about the existence of an escrow agreement with Wal-Mart, which Western denied. Finally, having reviewed the settlement agreement *in camera,* there is nothing in the agreement that is relevant to this assertion nor that would lead to the discovery of admissible evidence about this assertion.

> FN2. The "Westra litigation" is the afore-mention suit by Westra against Wal-Mart that was filed in the Middle District of Pennsylvania. The "Westra litigation" was settled and dismissed on August 9, 2006. *See Westra Construction, Inc. v. Wal-Mart Stores, Inc.,* Civil Action no. 1:CV-04-2582

Slip Copy                                                                                  Page 3
Slip Copy, 2007 WL 1115207 (W.D.Pa.)
**(Cite as: 2007 WL 1115207 (W.D.Pa.))**

(M.D.Pa.).

Likewise, this court has found nothing in the settle-
ment agreement that would be relevant to or lead to
the discovery of admissible evidence concerning Sip-
pel's remaining assertions. [FN3] We are mindful of
the broad scope of Rule 26(b) of the Federal Rules of
Civil Procedure which covers "not only evidence for
use at the trial but also inquiry into matters in them-
selves inadmissible as evidence but which will lead
to the discovery of such evidence." Fed.R.Civ.P.
26(b)(1) Advisory Committee Notes. The settlement
agreement at issue, however, lacks the requisite evid-
entiary value required for its production at this junc-
ture. Accordingly, the following Order is entered:

> FN3. Because Western has notified the court
> it intends to withdraw its "pay when paid"
> defense, we do not discuss the relevance, if
> any, of the settlement agreement to this de-
> fense.

AND NOW, this 13th day of April, 2007, upon con-
sideration of the Plaintiff's motion to compel produc-
tion and the Defendant's response in opposition
thereto, IT IS HEREBY ORDERED that the motion
[dkt. 56] is DENIED.

IT IS FURTHER ORDERED that if Plaintiff desires
review of this Order by the District Judge to whom
this case is assigned, Plaintiff must file an application
with the Clerk of Court within ten (10) days of the
date of this Order. Failure to do so may waive the
right to appeal. *Siers v. Morrash,* 700 F.2d 113 (3d
Cir.1983).

Slip Copy, 2007 WL 1115207 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Slip Copy                                                                                               Page 1
Slip Copy, 2007 WL 1183828 (D.Del.)
**(Cite as: 2007 WL 1183828 (D.Del.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
BLOCK DRUG COMPANY, INC., Plaintiff,
v.
SEDONA LABORATORIES, INC., et al., Defend-
ant.
**No. CIV A 06-350.**

April 19, 2007.

Steven J. Balick, John G. Day, Tiffany Geyer Lydon,
Ashby & Geddes, Wilmington, DE, for Plaintiff.

John W. Shaw, Karen Elizabeth, Keller Young, Con-
away, Stargatt & Taylor, John G. Day, Ashby &
Geddes, David S. Eagle, Patrick Andrew Costello,
Klehr, Harrison, Harvey, Branzburg & Ellers, Wilm-
ington, DE, Chad H. Conelly, Pro Hac Vice, David
B. Goldstein, Pro Hac Vice, for Defendant.

MEMORANDUM ORDER
THYNGE, Magistrate J.

*1 Block Drug seeks production of two agreements
between defendants Sedona Laboratories, Inc.
("SLI") and Nutri-Health Supplements, LLC
("NHS"), which SLI has refused to produce. Specific-
ally, in its written submission and argument presen-
ted during a telephonic conference on March 28,
2007, Block Drug seeks production of the November
1, 2006 Settlement Agreement and Limited Mutual
Release and the June 30, 2006 Agreement between
SLI and NHS regarding the Confidentiality of Shared
Opinion. SLI and NHS urge against production of
both documents.

Block Drug's Position

Block Drug argues that based upon the Stipulated
Protective Order entered on December 11, 2006,
privilege for both documents may be maintained and
as a result, both should be produced for outside coun-
sel's eyes only. Block Drug maintains that SLI's reli-
ance on FRE 408 is misplaced since it is directed to
the admissibility, and not the discoverability, of com-

promise and offers to compromise. [FN1] It asserts
that SLI improperly claims the applicability of the
joint defense or common interest privilege. In support
of its argument, Block Drug notes that both agree-
ments were entered into before any joint defense ef-
fort existed between SLI and NHS and relies on the
execution date of December 15, 2006 of the Joint De-
fense Agreement between defendants. Block Drug
contends that the signing of that Agreement in
December 2006, more than 2 months after the settle-
ment agreement was signed, evidences that SLI and
NHS previously had conflicting legal interests.

> FN1. During the teleconference, Block Drug
> commented that only SLI included the docu-
> ments in question on its privilege log. There-
> fore, it argues, since NHS failed to list either
> document as subject to privilege, NHS has
> waived any such claim.

SLI and NHS's Position

In opposing production, SLI and NHS point to cases
which suggest that the joint defense or common in-
terest privilege is an extension of the attorney-client
privilege and the attorney work product doctrine. As
background, they note that NHS, in January 2006, ac-
quired all rights and interest of SLI in a product con-
taining the alpha-galactosidase enzyme, which is in
issue in the instant patent action. They contend that
Block Drug fails to prove that their representations of
a joint defense effort, from the onset of litigation, are
inaccurate. [FN2] They maintain that the existence of
the Opinion Agreement (the June 30, 2006 Agree-
ment) alone is evidence of their joint cooperation as
early as June 2006, more than six months before the
execution of the Joint Defense Agreement, [FN3]
which memorializes defendants' prior understanding
regarding their joint defense efforts. SLI and NHS
rely on FRE 408 and its prohibition that acceptance
of an offer to settle "is not admissible to prove liabil-
ity for or invalidity of the claim or its amount." [FN4]

> FN2. Defendants' argument requires Block
> Drug to prove a negative and suggests that
> Block Drug bears the burden of disproving a

Slip Copy
Slip Copy, 2007 WL 1183828 (D.Del.)
(Cite as: 2007 WL 1183828 (D.Del.))

privilege before SLI and NHS are required to prove its existence.

FN3. The court understands that Block Drug is not requesting production of the Opinion Agreement and that it has not been produced.

FN4. During its oral presentation, Block Drug argued that the settlement agreement may be relevant to the issues of liability, damages, willfulness and knowledge--all matters that go directly to the validity or invalidity of and the amount of a claim.

Discussion

As a result of the parties' written and oral arguments, the court reviewed *in camera* the two agreements in dispute and the Joint Defense Agreement dated December 15, 2006. Below are the court's findings.

Pursuant to FRCP 26(b)(1), discovery is to be liberally allowed and parties "may obtain discovery regarding any matter not privileged, which is relevant to the claim or defense of any party...." Under the discovery rules, relevance is broader than admissibility at trial, and the rules recognize that "relevant information need not be admissible at trial if the discovery appears to be reasonably calculated to *lead to* ... admissible evidence." *See* FRCP 26(b)(1). (emphasis added). Moreover, "while admissibility and discoverability are not equivalent, it is clear that the object of the inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue." *Bottaro v. Hatton Assoc.*, 96 F.R.D. 158, 159 (E.D.N.Y.1982). Therefore, evidence of settlement negotiations may be discoverable under Rule 26's broad provisions. *Legal Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 561 (D.N.J.1994). SLI and NHS reason that their agreements at issue are inadmissible under FRE 408 "to prove liability for or invalidity of the claim or its amount." As noted in the 2006 *Advisory Committee Notes, Rule 408* cannot be read to immunize documents, such as pre-existing materials, merely because they were "presented to an adversary in compromise negotiations." Balancing FRE 408 with the breath of

discovery is a difficult exercise, however the focus of Rule 408 is to recognize the strong public policy favoring settlement and to promote that policy. Courts in this circuit and others, to effectuate the goals of both rules, have required a more " 'particularized showing' that the evidence sought is relevant and calculated to lead to the discovery of admissible evidence." *Legal Interiors, Inc.*, 153 F.R.D. at 562. *See also, Fidelity Federal Savings and Loan Assoc. v. Felicetti*, 148 F.R.D. 532 (E.D.Pa.1993); *Bottaro, supra*. The court does not find that that showing has been made by Block Drug. Moreover, it is unclear whether the Settlement Agreement contains information relevant to the issues in this case based on the court's present understanding of those issues.

\*2 SLI and NHS also maintain that neither document should be produced because of the joint defense or common interest privilege, which protects communications between individuals and entities and counsel for another person or company when the communications are " 'part of an on-going and joint effort to set up a common defense strategy." ' *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir.1986), *quoting Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir.1984). The burden is on the party asserting the privilege to establish its existence by showing that "(1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." *Id. citing, In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381 (S.D.N.Y.1975); *see also, Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 474 (3d Cir.1979). None of the cases cited by any litigant in the present matter addresses whether an agreement to share privileged information protects all contents of that agreement which prove and primarily relate to the *existence* of a common defense arrangement. Moreover, the cases cited do not address situations in which a protective order drafted, stipulated among the parties and ordered by the court exists and recognizes the need to and authorizes the disclosure of confidential, but not privileged, information under specific procedures. The Protective Order in the instant case deals with confidential information and Rule 26(c), in par-

Slip Copy                                                                                    Page 3
Slip Copy, 2007 WL 1183828 (D.Del.)
**(Cite as: 2007 WL 1183828 (D.Del.))**

ticular Rule 26(c)(7), levels of confidential information and the procedures regarding production for each level. Therefore, Block Drug's argument that production of the agreements is consistent with the Protective Order is misplaced. The Protective Order does not require nor is necessarily directed to production of documents which are subject to privilege. Further, from the court's review of the June 30, 2006 Agreement, a joint defense arrangement between SLI and NHS exists, at least on the issue of obtaining an opinion of counsel, because the common interests are identical and legal and not solely commercial. That being said, however, the court determines that certain relevant portions of that Agreement should be produced which directly evidence that a common interest privilege exists.

Regarding Block Drug's brief argument that privilege has been waived because NHS failed to include either agreement on its privilege log, the court finds that in light of the relationship between the parties as evidenced by the Agreements, the responsibility for maintaining the privilege rested with SLI, who did include the Agreements on its privilege log. As a result, no waiver occurred. Therefore,

IT IS ORDERED that:

1. Certain portions of the June 30, 2006 Agreement shall be produced consistent with the provisions of the Protective Order for outside counsel's eyes only. They are as follows:

**\*3** a. The first paragraph through Recital paragraph C.

b. Regarding Recital paragraph D from the words "Nutri-Health" through "retained", then from the words "to" through "Letter" and then from "in" through "Litigation."

c. Recital paragraph E.

d. Concerning Recital paragraph F from "the Parties to "("Opinion Letter")" and from "in light" to "Litigation."

e. Recital paragraph G.

f. Regarding paragraph 1, page 2 from "SLI shall use" through "Letter."

g. Regarding paragraph 2, page 2 from the beginning of the of the paragraph through "Agreement."

2. Certain portions of the Settlement Agreement and Limited Mutual Release Agreement dated November 1, 2006 shall be produced consistent with the Protective Order for outside counsel's eyes only, which include the title of the Agreement through the opening paragraph.

END OF DOCUMENT

# TAB 4



Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1995 WL 429130 (E.D.Pa.)
**(Cite as: 1995 WL 429130 (E.D.Pa.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
AMALGAMATED BANK OF NEW YORK,
Plaintiff,
v.
THE PENNSYLVANIA COMPANIES, DEFEND-
ANT.
No. CIV.A. 93-6703.

July 19, 1995.

GREEN.

MEMORANDUM/ORDER

**\*1** Presently before the Court are the parties'
(plaintiff, "Amalgamated," defendant, "PCI") cross
motions for summary judgment. Fed.R.Civ.P. 56(c).
Upon consideration of the motions and the responses,
and for the reasons stated below, both motions will
be denied.

I. FACTUAL AND PROCEDURAL BACK-
GROUND

Amalgamated, which made a $500,000 loan (the
"Note") to PCI, brought this action against PCI to
foreclose on a mortgage (the "Mortgage"), which PCI
executed in its favor, upon PCI's default and failure
to cure the default. Amalgamated asserts that it is en-
titled to judgment as a matter of law because there is
no dispute that it has stated its prima facie case for
mortgage foreclosure.

PCI, in response, asserts Section 29(b) of the Securit-
ies Exchange Act of 1934 (the "1934 Act") as a de-
fense to plaintiff's foreclosure action and as a basis
for summary judgment in its favor. 15 U.S.C.A. §
78cc(b) (West 1981 & Supp.

1995). [FN1] PCI claims that Amalgamated procured
the Note and Mortgage by violating Regulation U
("Reg.U"), 12 C.F.R. § 221 et seq., of the 1934 Act
and therefore, the Note and Mortgage are void. [FN2]

The Court has diversity jurisdiction pursuant to 28

U.S.C.A. § 1332(a) (West 1993). There is no dispute
that the law of Pennsylvania governs this case.

II. DISCUSSION
A. Standard of Review

A party is entitled to summary judgment as a matter
of law where there is no genuine issue of material
fact. Fed. R. Civ. P. 56(c). The movant bears the bur-
den of demonstrating the absence of a genuine issue
of material fact. Celotex Corp. v. Catrett, 477 U.S.
317, 322-23, 106 S.Ct. 2548, 2552-53 (1986). Once
this burden is met, the party opposing the motion
must show by depositions, answers to interrogatories,
admissions or affidavits that a genuine issue of ma-
terial fact exists. Anderson, 477 U.S. at 255, 106
S.Ct. at 2514. The court must examine the record in
the light most favorable to the nonmoving party and
must resolve any doubts against the moving party.
Goodman v. Mead Johnson & Co., 534 F.2d 566, 573
(3d Cir.1976), cert. denied, 429 U.S. 1038 (1977).

The standards by which a court decides a summary
judgment motion do not change when the parties file
cross motions. Southeastern Pennsylvania Transp.
Auth. v. Pennsylvania Pub. Utility Comm'n, 826
F.Supp. 1506, 1512 (E.D.Pa.1993), aff'd, 27 F.3d 558
(3d Cir.1994). When ruling on cross motions for
summary judgment, the court must consider the mo-
tions independently, Williams v. Philadelphia Hous.
Auth., 834 F.Supp. 794, 797 (E.D.Pa.1993), aff'd, 27
F.3d 560 (3d Cir.1994), and view the evidence in
each motion in the light most favorable to the party
opposing the motion. Matsushita, 475 U.S. at 587,
106 S.Ct. at 1356.

B. Application of Standard

This Court will deny both motions as genuine issues
of material fact exist. A material fact in the instant
case is one which pertains to the creation of the mort-
gage. This is true as under Pennsylvania law the only
affirmative defense that bars a mortgagee from fore-
closing on a valid mortgage is one that arises out of
or is incident to the creation of the mortgage.
Chrysler First Business Credit Corp. v. Gourniak,

Not Reported in F.Supp.                                                                                      Page 2
Not Reported in F.Supp., 1995 WL 429130 (E.D.Pa.)
**(Cite as: 1995 WL 429130 (E.D.Pa.))**

411 Pa.Super. 259, ---, 601 A.2d 338, 341 (1992); *Federal Land Bank of Baltimore v. Fetner,* 269 Pa.Super. 455, --- 410 A.2d 344, 347 (1979).

**\*2** PCI's affirmative defense of a Reg. U violation raises genuine issues of material facts. If PCI can establish that Amalgamated violated Reg. U, this Court may ultimately conclude that such violation sufficiently relates to the creation of the Mortgage to bar Amalgamated's foreclosure. Disputes of material fact exist as to the elements of PCI's defense, namely, the purpose of the Note, Amalgamated's knowledge of the Note's purpose, the security for the Note, and whether the Note exceeded margin requirements. The Court is precluded from deciding these factual issues on a summary judgment motion and is thereby, precluded from concluding, as a matter of law, that Amalgamated is entitled to foreclose on the Mortgage. [FN3]

An appropriate Order follows. [FN4]

### ORDER

AND NOW, this day of July, 1995, IT IS HEREBY ORDERED that the cross motions for summary judgment are denied.

> FN1. Section 29(b), in relevant part, states: Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract ... heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract ...
> 15 U.S.C.A. § 78cc(b).

> FN2. The elements of a Reg. U claim are as follows:
> 1) A bank must extend credit to the borrower for the purpose of buying and carrying registered securities;
> 2) the bank knew the loan was made for

such purposes;
> 3) the loan was secured directly or indirectly by any stock; and
> 4) the loan was in excess of margin requirements. *Freeman v. Marine Midland Bank-New York,* 494 F.2d 1334, 1338 (2d Cir.1974).

> FN3. The Court notes that in disposing of these motions it only considered evidence that is within the ambit of the Federal Rules. Accordingly, it did not consider the deposition testimony of former Amalgamated Vice President, Raymond Marsh as Amalgamated was neither a party nor present or represented when Marsh's deposition was taken during the Securities and Exchange Commission's (the "SEC") suit against Mr. Scardino. Fed.R.Civ.P. 32(a); *see also,* 10A William, *et al., Federal Practice and Procedure* § 2722 at 48-49 (1983) ("Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion").
> However, in disposing of the motions, the Court did consider a schedule prepared by Amalgamated which depicted the transactions in PCI's clearance account (the "Schedule"). Fed.R.Evid. 408 does not preclude the Court from considering the Schedule even though Amalgamated used it to settle another suit with the SEC. Rule 408 does not preclude the discovery of a piece of evidence simply because it is presented during settlement negotiations. The Rule bars evidence of conduct which occurred during the settlement session as opposed to evidence of past conduct which was presented during negotiations.
> The Court notes, however, that whether Marsh's deposition testimony or the Schedule are considered is ultimately not controlling as the other submissions show that genuine issues of material fact exist.

> FN4. PCI also urges this Court to grant its summary judgment motion because Amalgamated improperly elected its remedies by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1995 WL 429130 (E.D.Pa.)
**(Cite as: 1995 WL 429130 (E.D.Pa.))**

seeking a judgment on the Note, which is in personam relief, as well as foreclosure on the Mortgage, which is in rem relief. *PCI's Summary Judgment Motion,* p. 32, *see also Complaint,* pp. 34. This Court is not required to deny Amalgamated's motion on this basis. If the Court concluded that Amalgamated impermissibly sought in personam relief, it could simply dismiss such claim. The Court does not reach this issue.

PCI also argues that service in this action was improper as Amalgamated failed to serve Mrs. Scardino, who is in possession of the mortgaged property with Mr. Scardino. Pa. R. Civ. P. 410(b)(1). This argument is similarly unavailing. In a diversity action, federal courts apply state substantive law and federal procedural law. *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136 (1965). Under *Hanna,* plaintiff was required to execute service in accordance with Fed.R.Civ.P. 4. The record shows that Mr. Scardino accepted service of process on behalf of PCI. Therefore, Mr. Scardino cannot credibly claim that he was denied notice of this action or an opportunity to defend his interests. Moreover, failure to give the notice required by Pa. R. Civ. P. 410(b) involving possession would not bar this proceeding in foreclosure as the person or persons in possession do not become parties to the foreclosure action and failure to give notice may be cured.

Not Reported in F.Supp., 1995 WL 429130 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 3610140 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C

Newman & Associates v. J.K. Harris & Co., LLC
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
NEWMAN & ASSOCIATES, Plaintiff,
v.
J.K. HARRIS & COMPANY, LLC, and John Harris,
Defendants.
J.K. HARRIS & COMPANY, LLC, Third-Party
Plaintiff,
v.
NEWMAN & ASSOCIATES and Randall Newman,
Third-Party Defendants.
**No. 04Civ.9264(RJH)(MHD).**

Dec. 15, 2005.

*MEMORANDUM & ORDER*
DOLINGER, Magistrate J.
**\*1** Defendants have objected to a number of plaintiff's interrogatories and document requests, some on the basis of privilege and others on the basis of burden. At the court's direction, the parties have briefed the issues of privilege and burden, and defendants have proffered a supporting affidavit. We address the issues in the order presented by defendants, and we uphold some, but not all, of their objections.

Plaintiff's interrogatory 10 asks defendants to identify "each and every client residing in New York for which JKH successfully prepared and negotiated an IRS OIC (including the date the client retained JKH, the amount of back taxes owed the IRS, the fee paid to JKH, the amount the IRS accepted and the date of acceptance)." Defendants report that the company has no list of such clients and would have to search approximately 163,000 files-some in their offices and some in storage-to identify the clients in question. (Affidavit of Monica Linder, sworn to Dec. 5, 2005, at pp. 2-3).[FN1] They also suggest that the demand is unclear.

> FN1. It bears mention that defendants, perhaps somewhat surprisingly, do not assert any privacy rights that may belong to their clients.

We find the request sufficiently specific. We also note that a party's failure to maintain its documents in a searchable manner does not ordinarily justify its invoking what is, in effect, a self-created burden as an excuse not to produce otherwise relevant documents. *See, e.g., Chemtex, LLC v. St. Anthony Enterprises, Inc.,* 2004 WL 764781, \*1 (S.D.N.Y. Apr. 9, 2004) (citing cases). The apparent breadth of plaintiff's demand, however, raises a serious question as to whether, in weighing relevance against burden, the court can justifiably direct defendants to provide the requested information.

Under the circumstances, we decline to order production at this time. Plaintiff is free, however, to depose either Ms. Linder or any other knowledgeable employee of J.K. Harris as to its record-keeping procedures to determine whether the degree of burden asserted in her affidavit is correct.[FN2]

> FN2. We note, for example, that the figure cited in Ms. Linder's affidavit-163,000 files-appears to represent the total of all of defendant's clients nationwide, whereas the request is solely for the identification of New York clients. It is also not at all clear that the files of all of J.K. Harris's clients are kept in one location and not organized by state.

Interrogatory 11 seeks the same information for tax liabilities owed to the State of New York. For largely the same reasons, we dispose of defendants' objections on the same terms as those pertaining to the preceding interrogatory.

Document request 12 asks for "[a]ll correspondence received from a current or former client requesting a refund of fees paid to JKH from January 1, 2000 to present." Defendants oppose this request, at least in part, and they do so on the ground of burden. They reiterate the fact that J.K. Harris has 163,000 client files, and they observe that correspondence is kept in those files. They admit that the company has "a computer list of individuals who have requested refunds", but they assert that to pull the correspondence would require them "to pull the client's files and make copies of correspondence responsive to this request", and they characterize this process as "an onerous burden." (Linder Aff. at p. 3).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 3610140 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Nonetheless, they volunteer to provide to plaintiff the list of clients who asked for a refund, with the proviso that plaintiff's counsel then go to the J.K. Harris office in Charleston, South Carolina and an unidentified storage facility in order to review and copy the files. (*Id.* at p. 3).

**\*2** This argument is entirely unpersuasive. It is the burden of the party resisting discovery to demonstrate the degree of burden that would be involved in production. *See, e.g., Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 42 (S.D.N.Y.1984); *accord, e.g ., Breon v. Coca-Cola Bottling Co. of New England,* 2005 WL 3071501, \*6 (D. Conn. Nov. 4 2005); *Lineen v. Metcalf & Eddy, Inc.,* 1997 WL 73763, \*7 (S.D.N.Y., Feb. 21, 1997). In this case defendants fail to do so; indeed, they offer no meaningful evidence that production would be-as they say-"onerous". In particular, they avoid indicating how lengthy the list of refund-requesting clients is, and they fail as well to demonstrate the degree of the burden involved in simply pulling the clients' files and either copying the pertinent correspondence or alternatively simply sending the pertinent documents to their New York counsel. In any event, defendants implicitly concede-as they must-that they will be required to pull the files of the clients whose names appear on the list, and hence the only work that they are proposing to avoid is copying the documents and/or shipping them to New York.

There is no justification for relieving defendants of those tasks. The documents are indisputably pertinent to the claims, counterclaims and defenses in this case, and defendants do not demonstrate that providing the responsive documents to plaintiff in New York will be unduly burdensome.

Plaintiff's document request 14 asks for "[a]ll correspondence between [J.K. Harris and] any federal or state governmental agency and/or quasi-agency alleging that JKH's advertisements are false, deceptive or misleading." [FN3] In a related vein, request 16 seeks "[a]ll correspondence between [J.K. Harris] and any federal or state governmental agency and/or quasi-agency alleging that JKH violated any consumer protection statute including statutes protecting consumers against unfair business practices." Defendants oppose production, invoking a claimed privilege for settlement negotiations pursuant to Fed.R.Evid. 408. They also say, without any specification, that "JKH is precluded from producing some documents pursuant to various confidentiality agreements in the respective actions." (Linder Aff. at

p. 4; Defts' Memo of Law at 3-7).

> FN3. At a conference with counsel on November 30, 2005, we observed that requests 14 and 16, although poorly worded, were intended to seek communications between government agencies and J.K. Harris, and not communications between government agencies. (Nov. 30, 2005 Tr. at 30-32).

These claims fail in several respects. There is no independent settlement privilege, and defendants fail, in any event, to establish any facts pertinent to the court's invocation of its discretionary authority to relieve a party of its obligation to produce relevant discovery.

Plaintiff asserts two claims, one of which arises under federal law. (*See* Compl. at ¶ ¶ 2, 37-44) (asserting claim under the Lanham Act, 15 U.S.C. § 1125(a)). Accordingly, pursuant to Fed.R.Evid. 501, the source of legal authority pertinent to the defendants' privilege claims is federal law. *See, e.g., von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987); *Scheiner v. Wallace,* 1995 WL 753931, \*4 (S.D.N.Y. Dec. 19, 1995). Under federal law, courts have generally declined to recognize a privilege that would preclude discovery for the purpose of settlements or settlement negotiations. *See, e.g., In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1124 (7th Cir.1979); *In re Subpoena Issued to Commodity Futures Trading Comm'n,* 370 F.Supp.2d 201, 207-212 (D.D.C.2005); *Primetime 24 Joint Venture v. Echostar Communications Corp.,* 2000 WL 97680, \*4 & n. 5 (S.D.N.Y. Jan. 28, 2000); *Morse/Diesel, Inc. v. Fidelity & Deposit Co. Of Maryland,* 122 F.R.D. 447, 449 (S.D.N.Y.1988); *Bennett v. LaPere,* 112 F.R.D. 136, 138-39 (D.R.I.1986); *NAACP Legal Defense Fund, Inc. v. U.S. Dep't of Justice,* 612 F.Supp. 1143, 1146 (D.D.C.1985). *But see Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976, 980-81 (6th Cir.2003) (holding that settlement negotiations are never relevant but apparently excluding settlement agreements). This outcome is not surprising in view of the fact that Rule 408 explicitly authorizes the admission of statements made in the course of settlement discussions for a number of purposes and excludes their introduction only for the purpose of proving liability or the amount of damages. *See, e.g., Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 293 (2d Cir.1999); *In re Subpoena,* 370 F.Supp.2d at 211 (quoting *inter alia Weinstein's*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 3610140 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Federal Evidence* § 408.07 at 408-26 (2005)). *See also American Society of Composers, Authors & Publishers v. Showtime/The Music Channel, Inc.*, 912 F.2d 563, 580-81 (2d Cir.1990) (reproducing Memorandum & Order) (citing cases).

**\*3** To the extent that defendants rely on the existence of such a privilege, their argument fails as a matter of law. Moreover, even if we agreed with their legal premise, the privilege claim would have to be rejected because they have offered no evidence that would support their implicit contention that all (or some unstated portion) of the universe of documents sought by plaintiff in requests 14 and 16 come within the scope of the asserted privilege. It is well-settled that the party invoking a privilege has the burden of proving the facts on which the privilege claim is based, and it must do so with competent and specific evidence and may not rely on conclusory assertions. *See, e.g., United States v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996); *In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459, 467 (S .D.N.Y.1996). Defendants entirely fail to make this showing, choosing instead to rely solely on a conclusory statement by Ms. Linder that, "[a]s set forth more fully in the accompanying memorandum of law, said requests encompass confidential settlement negotiations". (Linder Aff. at p. 4). Moreover, apart from this failure, Ms. Linder's affidavit fails to justify defendants' objections, since plaintiff's requests plainly call for a variety of documents that are unlikely to fit the description she offers.

Even if we creatively give defendants' arguments concerning requests 14 and 16 the most persuasive alternative interpretation that we can discern, the result would not change. We assume that they seek to press the notion that, even if not privileged, some of the requested documents should be withheld because they reflect ongoing negotiations, or perhaps because they are not relevant, or-as they more explicitly suggest-because they are protected by confidentiality agreements. Even if we accept this liberal reading of defendants' arguments, they fail to justify precluding discovery.

A number of courts that have confronted the question of whether to order production of settlement agreements or other settlement materials have acknowledged the policy of encouraging settlements of otherwise litigable disputes and hence have recognized a variety of specific circumstances that may counsel against production absent a showing of need. *See, e.g., Primetime 24*, 2000 WL 97680, \*4 &

n. 5 (declining to order disclosure of ongoing settlement negotiations, which the court deemed irrelevant); *ABF Capital Mgt. v. Askin Capital Mgt.*, 2000 WL 191698, \*2 (S.D.N.Y. Feb. 10, 2000) (finding settlement agreement irrelevant since production was sought only to assist discovering party in settlement negotiations). In this case, however, defendants fail to demonstrate any specific circumstances that might counsel against production of the requested materials.

It cannot be said that the materials in question-correspondence with government entities pertaining to accusations of misleading advertising or other deceptive business practices-are not pertinent. Indeed, any allegations that defendants had engaged in deceptive or misleading advertising or other unfair business practices and defendants' responses to those accusations plainly would be highly relevant both to the claims of the plaintiff and to the counterclaims of the defendants. Moreover, although defendants cite *Primetime 24*, they do not even attempt to demonstrate that any of the responsive documents embody ongoing negotiations, much less do they purport to identify which portion of the universe of the contested materials would come within this category. Finally, although Ms. Linder refers in general terms to confidentiality agreements, she neither identifies any such agreements nor offers any explanation as to why such an agreement-which would presumably have been entered into for the benefit of the investigated party, that is, defendant J.K. Harris-can be used by defendant to block otherwise relevant discovery in this case.

**\*4** In sum, defendants' privilege claims cannot be sustained on the present record. The documents in question must therefore be produced.

Document request 18 seeks "[a]ll correspondence between the Better Business Bureau and JKH from January 1, 200 to the present." Defendants object on grounds similar to those articulated in response to request 12, that is, that J.K. Harris has 163,000 client files. (Linder Aff. at p. 4). Since, however, defendants concede that they have a list of complaining clients, they agree to pull the pertinent client files, although they assert that they will produce them only in South Carolina. (*Id.*). Again, we see no justification for requiring plaintiff's counsel to travel there, particularly in the complete absence of any showing as to why it would be unduly burdensome for defendants to produce the pertinent files (or documents from them) in New York.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3610140 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

Finally, defendants resist document request 24, which asks for "[a]ll documents referring to or concerning the Plaintiff in this matter." Defendants are prepared to produce documents concerning a direct-mailing letter sent by plaintiff in January 2005, which apparently triggered defendants' defamation counterclaim, but they assert that locating any other documents would require a search through all of the client files. Rather than order such a search, we leave to plaintiff the option to depose someone employed by defendants who has personal knowledge of the handling and disposition of other documents pertaining to the plaintiff.

*CONCLUSION*

For the reasons noted, we direct that defendants produce the documents sought by plaintiff in requests 12, 16 and 18, and that they do so within two weeks of the date of this Order.

S.D.N.Y.,2005.
Newman & Associates v. J.K. Harris & Co., LLC
Not Reported in F.Supp.2d, 2005 WL 3610140 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 3313838 (D.N.H.)
(Cite as: Slip Copy)

**H**

Cook v. CTC Communications Corp.
D.N.H.,2006.
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,D. New Hampshire.
Karen COOK
v.
CTC COMMUNICATIONS CORP.
**Civil No. 06-cv-058-JD.**

Nov. 13, 2006.

Lauren S. Irwin, Upton & Hatfield LLP, Concord,
NH, for Karen Cook.
Mary L. Marshall, Samantha C. Halem, Marshall
Law Group, Wellsley, MA, for CTC
Communications Corp.

*ORDER*

JOSEPH A. DiCLERICO, JR., District Judge.

*1 CTC Communications Corporation has filed an objection to the magistrate judge's ruling that granted Karen Cook's motion to compel the production of documents related to the termination of Tracy Bradstreet. CTC requests a hearing on its objection. Cook has responded to CTC's objection and opposes a hearing.

### I. *Hearing*

Under the local rules in this district, the court ordinarily will decide motions without oral argument. LR 7.1(d). To overcome that presumption, a party must provide a written statement "outlining the reasons why oral argument may provide assistance to the court." *Id.* CTC has not provided any reasons to support its request for a hearing. Therefore, a hearing will not be held on this matter.

### II. *Objection to Magistrate Judge's Order*

CTC objects to the magistrate judge's order that requires it to produce the requested documents pursuant to the parties' stipulated protective order. CTC, therefore, seeks review of the order pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a). Cook opposes CTC's motion.

### *Background*

Karen Cook worked at CTC as Regional Human Relations Manager for the Northern Region from August until November of 2005. Her direct supervisor was Tracy Bradstreet. Cook alleges that she immediately became aware that CTC was making employment decisions in violation of federal law and that Bradstreet was authorizing or, at least, not correcting those decisions. Cook's role in bringing those issues to Bradstreet's attention and then to the attention of Ray Allieri, CTC's president and CEO, led to acrimonious relations with Bradstreet. CTC's in-house counsel, James Prenetta, investigated Cook and Bradstreet. During a telephone conference on November 10, 2005, Allieri announced that Bradstreet would be leaving her job at the end of the month. After the meeting ended, Allieri told Cook that her employment was terminated.

Cook brought suit in early 2006. In her amended complaint she alleges wrongful discharge and violations of federal employment laws: the Uniformed Services Employment and Reemployment Act of 1994, the Fair Labor Standards Act, and the Family and Medical Leave Act. Cook sent a request for production of documents, which included the following: "Please provide any documents that relate to the termination of Craig Smith, Joey Sutton, Lisa Mayo, Tracy Bradstreet, and/or Ms. Cook." CTC's counsel responded: "Defendant objects to Document Request No. 4 on the grounds that it seeks documents regarding Company employees that may be protected by state or federal privacy laws. Defendant further objects to Document Request No. 4, as it relates to Tracy Bradstreet on the grounds that Ms. Bradstreet's termination is not relevant to this action."

In the course of deposing James Prenetta on June 14, 2006, Cook learned that Bradstreet had consulted with counsel after she was terminated and that her counsel had sent a demand letter to CTC, alleging that Bradstreet was terminated based on her age and gender. Since then, CTC and Bradstreet have entered into a settlement agreement.

### *Discussion*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2006 WL 3313838 (D.N.H.)
**(Cite as: Slip Copy)**

**\*2** In her motion to compel, Cook asked that CTC be required to produce any and all documents that are related to CTC's termination of Bradstreet's employment, including any documentation of the settlement between CTC and Bradstreet. CTC responded that all the documents requested by Cook are not discoverable because Cook is seeking "inadmissible documents related to the settlement of a separate matter raising unrelated claims." Def. Opp. at 1. CTC further responded that the settlement documents are protected by privilege. The magistrate judge ruled: "Production is to be made pursuant to the stipulated protective order."

Under § 636(b)(1)(A) and Rule 72(a), the court may refer non-dispositive matters to be decided by the magistrate judge. Parties are permitted to file objections to orders issued by the magistrate judge, which are reviewed by the district court judge. *Id.* The court will not modify or set aside the objected-to ruling unless "it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." § 636(b)(1)(A).

CTC has not offered an explanation, in its objection to the magistrate judge's ruling, as to why documents related to Bradstreet's termination, other than the settlement documents, are not discoverable. Therefore, CTC has not provided any reasoned basis to contest the magistrate judge's order to the extent it addresses documents covered by Cook's production request that are not settlement documents.

In support of its objection, CTC argues strenuously in favor of a settlement privilege based on Federal Rule of Evidence 408. The party who invokes a privilege to avoid a discovery request bears the burden of showing that it applies. Fed.R.Civ.P. 26(b)(5); *see also In re Keeper of Records,* 348 F.3d 16, 22 (1st Cir.2003). Because CTC did not comply with the requirements of Rule 26(b)(5), to the extent it asserts a federal settlement privilege as the basis of its objection, its objection is without merit. *See, e.g., In re Subpoena Duces Tecum,* 439 F.3d 740, 751-55 (D.C.Cir.2006).

Further, it is far from being clearly established that any federal settlement privilege exists. CTC asserts, relying on older decisions from around the country but not from this district or the First Circuit, that "courts that have considered this issue have consistently held that the party seeking to discover documents protected by Federal Rule of Evidence 408 must make a 'particularized showing' that the document sought will lead to *admissible evidence* and

is not being used for an improper purpose." Def. Opp. to Mot. at 7; Surreply at 2 (both citing *Bottaro v. Hatton Assocs.,* 96 F.R.D. 158, 160 (E.D.N.Y.1982)). That version of the legal landscape, however, fails to account for the diversity of opinion this issue has generated. More importantly, CTC fails to address a case from this district and the First Circuit that is on point.

In the course of litigating an employment discrimination case, plaintiff's counsel moved to compel production of a settlement agreement reached between the defendants and a different plaintiff in a separate but related case. *Sheppard v. River Valley Fitness One, L.P.,* 428 F.3d 1, 4-5 (1st Cir.2006). In response, defendants' counsel, who represented the defendants in both cases, asserted that the settlement agreement was irrelevant to this case and moved for a protective order, which was granted to the extent that it allowed "eyes-only review of the settlement agreement." *Id.* at 5. After reading the agreement, the plaintiff's counsel moved for relief from the protective order and for sanctions. *Id.* The motion was granted by the magistrate judge; that decision was modified by the district court, and the First Circuit modified the result further. *Id.* at 5-13.

**\*3** In its opinion, the First Circuit quoted the defendants' counsel's argument that " '[s]ettlement agreements with related parties-absent a showing of identity of issues or factual stipulations having bearing on the subsequent case-are generally held as not relevant.' " *Id.* at 12. The First Circuit noted that the cases cited for that proposition, some of which CTC relies on here, actually acknowledge "that settlement agreements may be used to impeach a witness," which was an issue in the *Sheppard* case. *Id.* The First Circuit affirmed the monetary sanctions assessed against the defendants' counsel for opposing disclosure of the settlement agreement. *Id.*

In addition, the Eastern District of New York, the court that issued the *Bottaro* decision requiring a "particularized showing," has reconsidered that rule and rejected it. *Rates Tech. Inc. v. Cablevision Sys. Corp.,* 2006 WL 3050879, at \*3 fn.3 (E.D.N.Y. Oct. 20 2006) ("[T]o the extent the *Botarro* court may have applied a heightened standard to the discoverability of settlement agreements by requiring a 'particularized showing of a likelihood that admissible evidence will be generated,' this result is contrary to Rule 26 which permits discovery of any relevant information 'reasonably calculated to lead to the discovery of admissible evidence.' "). The District of Rhode Island also considered and rejected

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3313838 (D.N.H.)
**(Cite as: Slip Copy)**

Page 3

the *Bottaro* standard. *Bennett v. Pere, M.D.*, 112 F.R.D. 136, 139-40 (D.R.I.1986) (Selya, J.). Although the Sixth Circuit has recognized a narrow privilege limited to protecting the content of settlement negotiations, *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir.2003), it is the only circuit to have done so, *see In re Supbpoena,* 429 F.3d at 754. Other courts have rejected a settlement privilege arising from Rule 408. *See, e.g., Clark v. Experian Info. Solutions, Inc.,* 2006 WL 931677 at *3-*4 (N.D.Ill. Apr. 10, 2006) (citing cases); *Newman & Assocs. v. J.K. Harris & Co.,* 2005 WL 3610140 at *2 (S.D.N.Y. Dec. 15, 2005) ("Under federal law, courts have generally declined to recognize a privilege that would preclude discovery for the purpose of settlements or settlement negotiations.").

CTC has not shown that the magistrate judge's ruling, granting Cook's motion to compel "is clearly erroneous or contrary to law." § 636(b)(1)(A).

### *Conclusion*

For the foregoing reasons, the defendant's objection to the magistrate judge's ruling (document no. 25) is denied.

SO ORDERED.

D.N.H.,2006.
Cook v. CTC Communications Corp.
Slip Copy, 2006 WL 3313838 (D.N.H.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7



Slip Copy
Slip Copy, 2007 WL 1176732 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 1

**H**
Rates Technology Inc. v. Cablevision Systems Corp.
E.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
RATES TECHNOLOGY INC., Plaintiff,
v.
CABLEVISION SYSTEMS CORP., Defendant.
**No. 05-CV-3583 (DRH)(WDW).**

April 20, 2007.

Burke, Williams & Sorensen LLP, by James B. Hicks, Esq., Los Angeles, CA, for Plaintiff.
Goodwin Proctor LLP, by Benjamin Hershkowitz, Esq., New York, NY, for Defendant.

### ORDER
HURLEY, Senior District Judge.

### BACKGROUND

#### I. *Procedural Background*

*1 Plaintiff Rates Technology Inc. ("Plaintiff") filed this patent infringement case on July 29, 2005, alleging, inter alia, that the sale of Optimum Voice, Optimum Online VoIP and voice messaging services by Cablevision Systems Corp. ("Defendant") infringed upon two of Plaintiff's patents. Plaintiff seeks actual damages in the amount of $950 million and requests trebling to $2.85 billion under 35 U.S.C. § 284.

On April 11, 2006, Defendant filed a motion to compel responses to document demands and interrogatories. Specifically, Defendant sought an order directing Plaintiff to produce any licenses, settlement agreements, covenants not to sue, and other agreements between the Plaintiff and various non-parties concerning both of the patents at issue in this case. Plaintiff opposed the motion, primarily on the ground that discovery of such information would ultimately be inadmissible under Federal Rule of Evidence ("FRE") 408.

#### A. *The Magistrate Judge's Order*

On April 14, 2006, Magistrate Judge William D. Wall granted Defendant's motion, finding that "the materials sought are discoverable in that they may lead to the discovery of admissible evidence, and [Plaintiff's] reliance on FRE 408 is, at best, premature." (Apr. 14, 2006 Order at 2.) The order provides in pertinent part as follows:
During the course of this litigation, [Plaintiff] has bolstered its claims that its patents are universally accepted by stating that "over 120 companies have been covered under" the patents, and that [Plaintiff] has only had to litigate patent infringement claims "approximately 25 times out of some 740 covered companies." Having raised this information to its benefit, [Plaintiff] now seeks to bar inquiry into how or why those companies were "covered." Simply put, RTI cannot have it both ways.
The court takes no position on whether the information sought will be admissible at trial. FRE 408 states, in part, that evidence [of] accepting "valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." In its opposition papers, [Plaintiff] repeatedly asserts that its agreements with non-parties are settlements and not licenses. Prior communications from RTI, however, characterize the agreements somewhat differently: "[o]ur past 'licensing' practice has been to grant Covenant Not To Sue ('CNS') agreements and not formal licenses, in exchange for one-time payments." It is possible that the documents at issue wouldn't be considered settlement materials under FRE 408. Since discovery is ongoing and the question of admissibility is not currently before the court, it is premature to make a determination as to the nature of [Plaintiff's] other "agreements."

(*Id.* at 2-3.) Judge Wall directed Plaintiff to produce any licenses, settlement agreements, covenants not to sue, and other agreements between Plaintiff and various non-parties concerning both of the patents at issue.

#### B. *This Court's October 20, 2006 Order*

*2 Plaintiff appealed Judge Wall's decision to this Court. By Memorandum of Decision and Order dated October 20, 2006 (the "October 20, 2006 Order"), the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1176732 (E.D.N.Y.)
(Cite as: Slip Copy)

Court affirmed Judge Wall's Order in its entirety and gave Plaintiff ten days to produce the relevant documents. Finding that Judge Wall's Order was neither clearly erroneous nor contrary to law, the Court stated:

The premise of Plaintiff's objection-that these documents will be inadmissible at trial pursuant to FRE 408-is, as Judge Wall correctly pointed out, premature and irrelevant to the question of discoverability before the Court. While Rule 408 of the Federal Rules of Evidence limits the introduction at trial of evidence regarding settlement negotiations, this rule does not itself govern discovery. Instead, settlement agreements are governed by Rule 26, which allows discovery thereof so long as such disclosure "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

(*Id.* at 5 (citations and internal quotation marks omitted).) Thus, even assuming that the documents at issue could be classified as settlement agreements, they would still be subject to discovery so long as Federal Rule of Civil Procedure ("Rule") 26 was satisfied. Here, that condition was met because in the patent context, "settlement of patent litigation may be functionally identical to a license." (*Id.* at 6 (citations and internal quotation marks omitted).) As the Court further explained:[I]n "settling" claims with alleged infringers, it is of no import that Plaintiff may have styled its agreements as "covenants not to sue" rather than licenses because in the patent context, "[a] license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention." *Ortho Pharm. Corp. v. Genetics Inst. Inc.,* 52 F.3d 1026, 1031 (Fed.Cir.1995).

(*Id.* at 6.) Thus, regardless of their classification, to the extent these agreements reflect the industry's acquiescence to Plaintiff's patents, they may be relevant to show the validity thereof.[FN1] (Id. n. 1) Accordingly, the Court found that they may lead to the discovery of admissible evidence and were discoverable.

> FN1. Notably, Plaintiff itself at one point characterized the agreements as licenses. (Apr. 14, 2006 Order at 2.)

In the October 20, 2006 Order, the Court also rejected Plaintiff's argument that public policy concerns dictated that the documents, if settlement agreements, remain confidential. (*See id* . at 8

("[A]lthough the Sixth Circuit may have recognized a settlement privilege under federal law, other 'courts have generally declined to recognize a privilege that would preclude discovery for the purpose of settlements or settlement negotiations,' " *Newman & Assocs. v. J.K. Harris & Co., LLC,* No. 04CV9264, 2005 WL 3610140, at *2 (S.D.N.Y. Dec. 15, 2005) (collecting cases), including the lower courts in this Circuit as well as other Circuit Courts of Appeals.").)

### C. *Plaintiff's Subsequent Applications*

*3 Thereafter, Plaintiff moved for certification of this Court's October 20, 2006 Order so that it could seek an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Plaintiff also sought a stay of the October 20, 2006 Order. Plaintiff argued:

[W]hen [Plaintiff] entered into confidential settlements, it promised the other parties that it would keep those settlements confidential-indeed, often at the other's party demand. [Plaintiff] won't break its promises, especially since the Magistrate's April 14 Order is flat-out wrong ... and [Plaintiff] would rather face terminating sanctions, and see this case dismissed, then produce confidential settlements in violation of its constitutional contract rights....

(Letter by James B. Hicks, dated Oct. 24, 2006, at 1.)

By Order dated November 16, 2006, the Court denied Plaintiff's application and extended the time within which Plaintiff was to produce the relevant documents to December 1, 2006. That same day, Plaintiff submitted a second application to stay production of the documents, asserting that "Magistrate Wall's underlying order and this Court's October 20 and November 16 Orders are invalid." (Letter by James B. Hicks, dated Nov. 16, 2006, at 1.) Plaintiff repeated its intention not "to produce these documents, even if this case is dismissed as a result." (*Id.* at 2.)

By Order dated November 17, 2006, the Court directed Defendant to respond to Plaintiff's most recent application. The Court noted that because it intended "to move promptly on this matter, no stay [would] be granted at this time." (Nov. 17, 2006 Order.) Defendant responded by letter dated November 21, 2006, and Plaintiff replied by letter dated November 27, 2006.

By Order dated November 30, 2006, the Court found that none of Plaintiff's arguments had "any merit" and denied Plaintiff's request for a stay. (Nov. 30,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 Order at 2, 3.) Plaintiff was directed to produce all documents concerning any licenses, settlement agreements, covenants not to sue, or any other agreements concerning either or both of the patents at issue, on an "attorneys' eyes only" basis, on or before December 11, 2006. The Court noted that "[s]hould Plaintiff indicate to the Court that it will not comply with this Order, Defendant shall promptly advise the Court how it wishes to proceed." (*Id.* at 3.)

### D. *The Current Application*

By letter dated December 5, 2006, Plaintiff "respectfully note[d] that the orders requiring it to produce these documents are defective" and indicated that "it does not intend to produce those settlement agreements, even if this case is dismissed as a result." (Letter by James B. Hicks, dated Dec. 5, 2006, at 1, 2.) By letter dated December 8, 2006, Defendant responded by moving for a dismissal of Plaintiff's claims with prejudice and an award of attorneys' fees and costs. (Letter by Benjamin Hershkowitz, dated Dec. 8, 2006, at 1.) In a footnote, Defendant also noted that under Rule 37(b)(2)(A), "the Court would be justified in light of [Plaintiff's] failure to produce, ... for example, take as established that: (1) [Defendant's] suppliers are licensed and that [Defendant] is entitled to the benefit of those licenses; (2) that the license agreements do not support [Plaintiff's] damages theories; and (3) that [Plaintiff] cannot rely on secondary considerations to refute [Defendant's] obviousness defense." (*Id* . at 4 n. 4.)

*\*4* Plaintiff responded by stating that though it was aware that the Court would likely dismiss its case for refusing to produce the documents, it objected to Defendant's request for monetary sanctions because Plaintiff's refusal to comply with the various orders was "substantially justified." (Letter by James B. Hicks, dated Dec. 12, 2006, at 1, 2.) Plaintiff also objected to Defendant's suggestion that the Court take certain facts as established based upon Plaintiff' failure to produce the agreements. Finally, Plaintiff argued that if the Court did dismiss Plaintiff's complaint, it should also dismiss Defendant's counterclaim for declaratory relief as moot. (*Id.* at 1.)

By letter dated December 15, 2006, Defendant reiterated its request for monetary sanctions and for findings of fact in its favor. (Letter by Benjamin Hershkowitz, dated Dec. 15, 2006, at 1.) In addition, Defendant, for the first time, explicitly requested that the Court take the facts supporting its counterclaims

as established. (*Id.*)

Plaintiff wrote a final letter on December 18, 2006, objecting to Defendant's request for judgment on its counterclaim as untimely, as Defendant "never requested such sanctions before." (Letter by James B. Hicks, dated Dec. 18, 2006, at 1.) In addition, Plaintiff "ask[ed] the Court to dismiss its claims with prejudice if that is the necessary alternative to being forced to produce confidential settlements to untrustworthy adverse counsel." (*Id.* at 2.)

For the reasons stated below, the Court dismisses Plaintiff's claims with prejudice, declines to take facts supporting Defendant's counterclaims as established, and finds that Defendant is entitled to an award of attorneys' fees in an amount to be subsequently determined.

### DISCUSSION

### I. *Plaintiff's Claims are Dismissed Pursuant to Rule 37(b)(2)(C)*

Rule 37 provides in pertinent part as follows:
If a party ... fails to obey an order to provide or permit discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:....
(C) An order ... dismissing the action or proceeding....

Fed.R.Civ.P. 37(b)(2)(C). The imposition of sanctions under Rule 37 lies within the broad discretion of the district court. *See, e.g., Corporation of Lloyd's v. Lloyd's U.S.,* 831 F.2d 33, 36 (2d Cir.1987). "[D]ismissal with prejudice is a harsh remedy to be used only in extreme situations, and then only when a court finds willfulness, bad faith, or any fault on the part of the [sanctioned party]." *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990) (citations and internal quotation marks omitted). As the Supreme Court has noted, however, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643 (1976); *see also Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d

Slip Copy
Slip Copy, 2007 WL 1176732 (E.D.N.Y.)
(Cite as: Slip Copy)

67, 73 (2d Cir.1988) (affirming magistrate judge's decision to award summary judgment against party who failed to comply with discovery orders: "[W]e wish to emphasize the importance we place on a party's compliance with discovery orders. Such compliance is necessary to the integrity of our judicial process. A party who flouts such orders does so at his peril. If one suggests that our decision today is strong medicine, that is precisely what it is intended to be.").

**\*5** The record in this case demonstrates Plaintiff's sustained and wilful refusal to comply with multiple court orders to produce the agreements at issue based upon Plaintiff's belief that the orders are "flat-out wrong" and "invalid." Such blatant disregard for the rules and procedures of this Court clearly demonstrates willfulness and bad faith. Accordingly, the Court finds that dismissal of Plaintiff's claims with prejudice is warranted under Rule 37.[FN2]

> FN2. Plaintiff cannot claim that it is unfairly surprised by the Court's dismissal of its claims as Plaintiff has repeatedly petitioned for such relief as an alternative to being required to produce the documents.

## II. Defendant's Counterclaims Rule 37(b)(2)(A)

### A. The Counterclaims are not Dismissed for Lack of Subject Matter Jurisdiction

Defendants' Answer asserts four counterclaims, to wit: (1) declaratory judgment that Defendant has not infringed upon Plaintiff's patents; (2) declaratory judgment that Plaintiff's patents are invalid; (3) declaratory judgment that Plaintiff's patents are unenforceable due to inequitable conduct; and (4) declaratory judgment that Plaintiff is barred from maintaining this action under the doctrine of unclean hands. Plaintiff moves for dismissal of Defendant's counterclaims, arguing that should the Court dismiss Plaintiff's complaint with prejudice, Defendant's counterclaims will be moot and the Court will lack subject matter jurisdiction over them pursuant to *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed.Cir.1995).

In *Super Sack*, the Federal Circuit held that a patentee's promise not to "assert the patent at issue against the putative infringer with respect to any of its past, present, or future acts" divests the court of jurisdiction over the case. *Id.* at 1058. The court

reasoned that the patentee's covenant not to sue resolved the actual controversy between the parties, i.e., the question of infringement of the actual patent, such that the court no longer had jurisdiction to hear a declaratory judgment action regarding the validity or enforceability of the patent. *Id.*

Here, Plaintiff has not filed a covenant not to sue Defendant for infringement based upon its patents. Moreover, although this Court has dismissed Plaintiff's claims with prejudice, Plaintiff has "reserve[d] its right to appeal a dismissal." (Letter by James B. Hicks, dated Dec. 12, 2006, at 1 n. 1.) Thus, as opposed to the circumstances present in *Super Sack*, where the patentee was "forever estopped ... from asserting liability against" the alleged infringer and thus had no "reasonable apprehension that it [would] face an infringement suit," 57 F.3d at 1059, the possibility of suit against Defendant has not been permanently foreclosed. Accordingly, based on the argument proffered, the Court declines to dismiss Defendant's counterclaims for lack of subject matter jurisdiction.

### B. The Court Declines to Award Judgment to Defendant on its Counterclaims

Rule 37(b)(2)(A) provides that if a party fails to obey a discovery order, the Court may issue "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order." As noted above, by Order dated November 30, 2006, the Court directed Defendant to "promptly advise the Court how it wishe[d] to proceed" with regard to Plaintiff's failure to produce the documents. Defendant responded by moving for dismissal of Plaintiff's claims with prejudice and an award of attorneys' fees and costs. In a footnote, Defendant noted that the Court would "also be justified" in taking certain facts as established pursuant to Rule 37(b)(2)(A). It was not until Plaintiff responded, by letter dated December 12, 2006, and requested dismissal of Defendants' counterclaim, that Defendant explicitly moved the Court to "take facts supporting [its] counterclaims as established." (*See* Letter by Benjamin Hershkowitz, dated Dec. 15, 2006, at 1.)

**\*6** In the Court's view, Defendant's sparsely-worded letter application has not satisfactorily explained why this Court, in the exercise of its discretion, should grant Defendant's request. Essentially, Defendant

Slip Copy                                                                    Page 5
Slip Copy, 2007 WL 1176732 (E.D.N.Y.)
**(Cite as: Slip Copy)**

asks this Court to take as established that its suppliers are covered under the unproduced licenses and that Defendant is therefore entitled to the benefit thereof. Such a factual finding would effectively result in judgment in Defendant's favor on its first counterclaim that it has not infringed upon Plaintiff's patents. The Court has already found that Plaintiff is not entitled to the affirmative relief it seeks in its Complaint based upon its discovery violations. Defendant now asks the Court to go one step further and find that Defendant's position is correct. At this juncture, and based upon the papers submitted, the Court declines to do so. Accordingly, Defendant's application to take facts supporting its counterclaims as established pursuant to Rule 37(b)(2)(A) is denied.

### C. Attorneys' Fees

Defendant moves for an award of attorneys' fees under Rule 37(b), which provides, in pertinent part:
In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(b). Plaintiff's opposition to such an award is twofold. First, Plaintiff argues that its resistance was "substantially justified." Next, Plaintiff raises due process objections, claiming that Defendant failed to provide it with sufficient notice and that Plaintiff has not had an adequate opportunity to respond.

Plaintiff's first objection is easily disposed of. The Court has repeatedly found that Plaintiff's position has no merit because even if the documents at issue could be characterized as settlement agreements, they are still subject to discovery pursuant to Rule 26. Plaintiff's refusal to comply with these orders based upon its opinion that they are "invalid" cannot be countenanced. Accordingly, the Court finds that Plaintiff has not offered adequate justification for its conduct.

As for Plaintiff's due process argument, the Court notes that "[a]s a general rule, a court is not obliged to give a formal warning that sanctions might be imposed for violation of the court's orders." *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 102 (2d Cir.1997). Further, because Defendant

brought its sanctions application under Rule 37, which expressly provides that the Court "shall" impose monetary sanctions under specified circumstances, Plaintiff clearly had notice of the possibility of such sanctions. *See id.* Accordingly, the Court finds that an award of attorneys' fees is warranted in this case. Nonetheless, given Defendant's complete failure to support its fee application with *any* specifics, including what fees it is seeking, for what work, at what hourly rate, etc., the Court cannot make a fee determination on the present record. Accordingly, this matter is respectfully referred to Magistrate Judge Wall for a report and recommendation on the proper amount of attorneys' fees to be awarded.

### CONCLUSION

**\*7** For the foregoing reasons, the Court So Orders the following relief: (1) Defendant's application to dismiss Plaintiff's claims with prejudice pursuant to Rule 37(b)(2)(C) is granted; (2) Defendant's application to take facts supporting its counterclaims as established pursuant to Rule 37(b)(2)(A) is denied; and (3) Defendant's application for attorneys' fees is granted and the matter is respectfully referred to Magistrate Judge Wall for a report and recommendation on the proper amount of attorneys' fees to be awarded.

Plaintiff is directed to advise the Court what effect, if any, this decision has on its pending magistrate judge appeal, docket number 79.

**SO ORDERED.**

E.D.N.Y.,2007.
Rates Technology Inc. v. Cablevision Systems Corp.
Slip Copy, 2007 WL 1176732 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.