# EXHIBIT B

### Page 1

```
 1   UNITED STATES DISTRICT COURT
 2      DISTRICT OF DELAWARE
 3   ---------------------------
     MBIA INSURANCE CORPORATION AND  :
 4   WELLS FARGO BANK, N.A.(f/k/a    :
     WELLS FARGO BANK MINNESOTA N.A.):
 5   AS TRUSTEE OF SFC GRANTOR TRUST :
     SERIES 2000-1, SFC GRANTOR TRUST,:
 6   SERIES 2000-2, SFC GRANTOR TRUST,:
     SERIES 2000-3, SFC GRANTOR TRUST,:
 7   SERIES 2000-4, SFC GRANTOR TRUST,:
     SERIES 2001-1, SFC GRANTOR TRUST,:
 8   SERIES 2001-2, SFC OWNER TRUST, :
     SERIES 2000-I, AND SFC GRANTOR  :
 9   TRUST, SERIES 2001-3,           :
10        Plaintiffs/               :
          Counterclaim Defendants,  :
11                                  :
          vs.                       :
12                                  :
     ROYAL INDEMNITY COMPANY,       :
13                                  :
          Defendant/       : C.A. No.
14        Counterclaim Plaintiff. : 02-1294-JJF
     ---------------------------
15   ROYAL INDEMNITY COMPANY,       :
                                    :
16        Third-Party Plaintiff,   :
                                    :
17        vs.                       :
                                    :
18   ANDREW N. YAO, STUDENT LOAN    :
     SERVICING LLC, STUDENT LOAN    :
19   ACCEPTANCE II LLC, STUDENT LOAN :
     ACCEPTANCE III LLC, STUDENT LOAN :
20   ACCEPTANCE V LLC, STUDENT LOAN   : DATE:
     ACCEPTANCE VIII LLC, STUDENT LOAN : AUGUST 17, 2007
21   ACCEPTANCE IX LLC, SFC FINANCIAL : TRACK II WITNESS:
     LLC I, SFC FINANCIAL LLC II,    : GEOFFREY C. HAZARD, JR.
22   SFC FINANCIAL LLC VI, SFC       :
     FINANCIAL LLC VII,              :
23                                   :
          Third-Party Defendants,    :
24   ---------------------------
          DEPOSITION OF GEOFFREY C. HAZARD, JR.
25            AUGUST 17, 2007
```

### Page 2

```
 1   ---------------------------:
                                :
 2   ROYAL INDEMNITY COMPANY,   :
                                :
 3        Counter-Claimant,     :
                                :
 4        vs.                   :
                                :
 5   MBIA BANK AND WELLS FARGO BANK :
 6   MINNESOTA N.A.,            :
                                :
 7        Counter-Defendants.   :
     ---------------------------:
 8   CHARLES A. STANZIALE, JR., :
     CHAPTER 7 TRUSTEE OF STUDENT :
 9   FINANCE CORPORATION,       :
                                :
10        Plaintiff,            :
                                :
11        vs.           : C.A. No.
                                :
12   PEPPER HAMILTON LLP, et al., : 04-1551-JJF
                                :
13        Defendants.           :
     ---------------------------:
14   CHARLES A. STANZIALE, JR., :
     CHAPTER 7 TRUSTEE OF STUDENT :
15   FINANCE CORPORATION,       :
                                :
16        Plaintiff,            :
                                :
17        vs.           : C.A. No.
                                :
18   McGLADREY & PULLEN LLP AND : 05-72-JJF
     MICHAEL AQUINO,            :
19                             :
          Defendants.           :
20   ---------------------------:
                                :
21   ROYAL INDEMNITY COMPANY,   :
                                :
22        Plaintiff,   : C.A. No.
                                :
23        vs.          : 05-165-JJF
     PEPPER HAMILTON LLP, et al., :
24                             :
          Defendants.           :
25   ---------------------------:
```

### Page 3

```
 9        Deposition of GEOFFREY C. HAZARD, JR., Track II,
10   taken on behalf of the Plaintiffs, at One Montgomery Street,
11   Suite 2100, San Francisco, California, commencing at
12   9:35 a.m., Friday, August 17, 2007, before Deirdre F. Cram,
13   C.S.R. 9339.
```

### Page 4

```
 1   APPEARANCES OF COUNSEL:
 2
 3
 4        FOR THE ROYAL INDEMNITY COMPANY:
 5
 6        SONNENSCHEIN NATH & ROSENTHAL LLP
 7        BY: JOHN I. GROSSBART, ESQ.
 8        8000 Sears Tower
 9        233 South Wacker Drive
10        Chicago, Illinois 60606
11        312-876-8095
12        jgrossbart@sonnenschein.com
13
14             -and-
15
16        SONNENSCHEIN NATH & ROSENTHAL LLP
17        BY: DANIEL PANCOTTI, ESQ.
18        (Via Telephone/Internet Stream)
19        1221 Avenue of the Americas
20        New York, New York 10020-1089
21        212-768-6700
22        dpancotti@sonnenschein.com
```

**Page 21**

1 exclusively thereafter.
2 Q. Okay. So in March or April, you received
3 one or two phone calls, and at that point in time,
4 you accepted the representation?
5 A. No. I accepted an assignment to be an
6 expert witness on behalf of Pepper Hamilton.
7 Q. Okay. Sorry. Thank you.
8 And you received -- you may have received
9 some papers from Ms. Ainslie?
10 A. Yeah. I think she sent me a couple of
11 letters, as I recall, but that was it.
12 Q. Is what she sent you described in the
13 attachment to your report as material --
14 A. I don't -- well, it may be referred to in
15 general terms, but it's not specifically identified,
16 as far as I can recall.
17 Q. Would it have been the waiver letters?
18 A. It might have been.
19 Q. Did you have any communication -- when did
20 you receive the communication from Mr. Gilman?
21 A. I would say sometime in early May is the
22 best recollection I have.
23 Q. What did you do with the material that you
24 received from Ms. Ainslie? Have you retained that?
25 A. Yeah. I think I did. It's in the file.

**Page 22**

1 Q. Did you have any communication with anyone
2 at all, between this March-April phone call and your
3 early May 2007 communication with Mr. Gilman, with
4 respect to the subject of SFC, Pepper Hamilton, or
5 your retention?
6 A. No.
7 Q. Did you receive any documents or material
8 from anyone with respect to those subjects during
9 that same time period?
10 A. Not before I talked to Mr. Gilman, as far
11 as I can remember.
12 Q. Okay. What was the nature of your
13 communication with Mr. Gilman? Was it a phone call?
14 A. Yes.
15 Q. Okay. And did he convey any substantive
16 information to you in that conversation about the
17 engagement or the issues?
18 A. Well, as I recall, he said -- I said what
19 happened to Schnader, because my first contact had
20 been with Ainslie. He said, well, Cahill Gordon was
21 representing Pepper Hamilton, and he inferred that
22 Schnader would continue to represent Gagne, if I
23 understood it. So he said, "I'm representing Pepper
24 Hamilton," and I said, "Fine. We can proceed on that
25 basis."

**Page 23**

1 Then he said it's a big messy lawsuit, and
2 I said I understood that, and I said I would like to
3 see, you know, various documents that tell me what
4 the case is about, and thereafter, he sent me some.
5 Q. And is what he sent you the documents that
6 are described in the attachment to your expert
7 report?
8 A. Yes.
9 Q. If you would like to have it in front of
10 you, I'm happy to mark the expert report so --
11 A. That's all right. Whatever.
12 Q. So we have it on the more formal basis.
13 A. That's fine. It's part of the report.
14 Maybe you want to mark the report.
15     MR. GROSSBART: Let's mark the report --
16     MR. WATERS: Yeah.
17     MR. GROSSBART: -- just so we --
18     MR. WATERS: Know what's in front of him.
19     MR. GROSSBART: Just so we have a
20 consistent record.
21     (Deposition Exhibit 2002-II was marked
22     for identification.)
23 BY MR. WATERS:
24 Q. Did you receive, from Mr. Gilman or anyone
25 else, a document that included facts that you were to

**Page 24**

1 assume for purposes of your opinions?
2 A. I guess the answer is yes. He sent me a
3 lot of stuff that's listed in this attachment to the
4 report, and a lot of those are facts and a lot of
5 them were not in dispute. For example, Mr. Gagne did
6 represent SFC, et cetera, et cetera.
7 Q. I'm talking about a specific document that
8 would have set forth certain specific facts which you
9 may have incorporated into your report as facts that
10 you would assume.
11 A. I see.
12 Q. Not the underlying documents.
13 A. Documents, yeah. I think the way we did
14 this, it varies from case to case. Sometimes I ask a
15 lawyer to write out a separate document called a
16 statement of facts. Here, I think what I did was to
17 ask Mr. Gilman to give me a beginning recitation of
18 facts as he wanted me to proceed, and then I used
19 that as a beginning place for writing my opinions.
20 Q. And was that beginning recitation of facts
21 in a document?
22 A. No, I think it was an e-mail.
23 Q. It was an e-mail?
24 A. Yeah.
25 Q. I see. Have you retained that e-mail?

25

1  A. Not as far as I know.
2  Q. Okay. How, physically, did you prepare
3  the report in this case? Do you type it yourself --
4  A. Well --
5  Q. Okay.
6  A. Yeah.
7  Q. So do you use a laptop?
8  A. Yeah.
9  Q. I'm sorry. You do?
10 A. Yes.
11 Q. On your laptop, you begin to create the
12 document, and as you revise it, do you write over, so
13 that there's --
14 A. Yeah, yeah.
15 Q. Okay. So that there's one document, and
16 the changes are shown in the memory?
17 A. Whatever happens. I don't know. I just,
18 in this case, I suspect it was probably mostly
19 augmentation, as distinct from writing over.
20 Q. Okay.
21 A. I mean, you start with what you've got,
22 and you add to it and change it as you go along.
23 Q. So is it fair to say, then, that you
24 started with a document that was put into your
25 computer from an e-mail from Mr. Gilman, and then you

26

1  added to that?
2  A. That's my recollection, yeah.
3  Q. And the final document that came out of
4  that process is the document that we have marked
5  Exhibit 2002-II?
6  A. Yeah.
7  Q. Now, were the exhibits prepared
8  differently? Let me ask you that.
9  A. Yeah. We prepared -- well, I sent him my
10 CV. I think that's one of them.
11 Q. Okay. So you sent him your CV. He put it
12 in electronic form and sent it back to you?
13 A. No. I sent it e-mail, and I told him to
14 make the list of stuff he'd sent me. That's my usual
15 practice.
16 Q. And that's Exhibit E?
17 A. Whatever, yeah.
18 Q. If you take a look, let's make sure.
19 A. Yeah.
20 Q. That's Exhibit E, and that was prepared by
21 Mr. Gilman?
22 A. Yeah.
23 Q. Have you reviewed it?
24 A. Yeah.
25 Q. And are these all the things that you look

27

1  at?
2  A. In writing the report, yeah. Since then,
3  he gave me the depositions of Bruce Green and
4  Mr. Glazer. I think that was it.
5    MR. GILMAN: I think also the two
6  supplemental reports of Professor Green and
7  Mr. Glazer. So there were four documents, in
8  addition to Exhibit E, the two depositions and the
9  two supplemental reports.
10 BY MR. WATERS:
11 Q. And, Professor, does that constitute the
12 full body of materials that you considered in the
13 preparation of your report, then? The documents that
14 are listed in Exhibit E and the four that have just
15 been identified in this deposition?
16 A. Well, the report was based on the ones in
17 Exhibit E.
18 Q. Oh, yes.
19 A. I'm just telling you that, in addition to
20 that, he gave me these other things.
21 Q. Thank you for correcting me.
22   That constitutes the full body of material
23 that you have reviewed with respect to this matter?
24 A. Yeah.
25 Q. Okay. Did you read the entire transcript

28

1  of the deposition of Roderick Gagne?
2  A. Oh, yeah.
3  Q. You've read no other depositions?
4  A. I read the deposition of Professor Green
5  and Professor Glazer, and I think that's all. There
6  is some reference, somewhere or other, to statements
7  made by some of the subordinate personnel in SFC, but
8  I think that was in -- that was something asked of
9  Mr. Gagne. That was a subject matter in the
10 interrogation of him in his deposition.
11 Q. And this list of cases in which you've
12 testified, did you prepare that? Which is Exhibit D
13 to your report.
14 A. Yeah. I don't know how up-to-date it is,
15 but yeah, that's my standard list, and let me just --
16 there may be some cases since then.
17   Yeah. There's -- I mean, yes, I prepared
18 this. This is what I provide when requested. There
19 is a further deposition on behalf of Don -- I'm
20 blanking on his name. He's down in L.A. I can
21 produce it for you, and Richard Zuckerman of the
22 Sonnenschein firm that was taken in July. I think
23 that's it.
24   MR. GROSSBART: We probably have a copy of
25 that.

**33**

1   Q. Now, could you take a look at
2   Exhibit 2002-II --
3   A. Sure.
4   Q. -- and tell me if you can identify for me,
5   in this document, any paragraphs that you are certain
6   you prepared completely by yourself and are not
7   paragraphs that Mr. Gilman sent and you worked on?
8   A. No. I think some of the description and
9   qualification of the witness is cast in terms that
10  are different from the ones I ordinarily use, so I
11  assume he put those in. For example, start from
12  there.
13  Q. Well, I'm asking you a narrower question.
14  I'm asking you whether you can identify for me, in
15  this document, a specific paragraph that you can tell
16  me you're certain that you prepared this document --
17  this paragraph by typing it yourself, as distinct
18  from modifying something that Mr. Gilman --
19  A. No.
20  Q. There's no paragraph you can point to and
21  tell me that about it?
22  A. I think that's right.
23  Q. Okay.
24       MR. WATERS: I would ask again to see the
25  e-mail that you sent to Professor Hazard. You told

**34**

1   me no document exists. Did you mean to exclude an
2   electronic document?
3       MR. GILMAN: No. You asked if there was a
4   statement of facts, for example.
5       MR. WATERS: No, if you go back --
6       MR. GILMAN: I haven't interrupted you
7   once, Michael. Please.
8       MR. WATERS: Okay.
9       MR. GILMAN: You asked if there was a
10  statement of facts that was provided to
11  Professor Hazard. Expert witnesses, for example,
12  Mr. Humphreys, has appended, to his report, a
13  statement of facts. Some witnesses may do that as a
14  separate exhibit, and then simply have an opinion
15  report that refers to it. Other experts do things
16  differently. They're all unique.
17      I have told you that there is no
18  free-standing statement of facts and that all of the
19  facts that are assumed by or were considered by
20  Professor Hazard in his report are set forth in haec
21  verba on the face of the document that you have
22  marked as Exhibit 2002-II. So you have it.
23      MR. WATERS: Bear with me just one moment.
24  Thank you. I think that my request to you
25  was broader than just statement of facts, if you have

**35**

1   the letter.
2       MR. GILMAN: I have my response back to
3   you.
4       MR. WATERS: You don't have the letter?
5       MR. GILMAN: I don't have your request to
6   me, but I have my response back to you that says the
7   only statements of facts provided to Professor Hazard
8   is that set forth in haec verba his report. I assume
9   I was paraphrasing your request accurately.
10      MR. WATERS: No. I think my request was
11  broader -- we can go back and establish what it is --
12  so that the statement of facts will be an example of
13  documents provided to Professor Hazard that
14  constitute material that's included in his report,
15  specifically wording, whether it be by way of a
16  statement of facts or anything else.
17      The witness has testified that an e-mail
18  from you contained a document from which he began his
19  report and is unable to identify specific additions,
20  at least not yet -- we'll certainly spend some more
21  time on this -- that he made to that document. I
22  think I'm entitled to have that e-mail document that
23  you sent to Professor Hazard.
24      Now, my question to you is, first, does
25  that exist? Have you retained that document?

**36**

1       MR. GILMAN: I don't think so.
2       MR. WATERS: It doesn't exist anymore?
3       MR. GILMAN: If you had listened to what
4   Professor Hazard said, he said --
5       MR. WATERS: You and I should not --
6       MR. GILMAN: You're interrupting me again.
7       MR. WATERS: No. But you and I should not
8   have a kind of a conversation that might interfere --
9   if you want to have a conversation, you can ask the
10  witness --
11      MR. GILMAN: I'll tell you what we do.
12  You ask your questions so that we can get the
13  deposition over. If you want to make any request for
14  me to produce things, make it to me, and I'll take it
15  under advisement. Let's not waste the deposition.
16  Next question.
17      MR. GROSSBART: Well, I would like the
18  e-mail. I will make the request.
19      MR. GILMAN: I'll take it under
20  advisement.
21      MR. GROSSBART: I would like the e-mail
22  today before the conclusion of the deposition.
23  That's under advisement, too?
24      MR. GILMAN: Sure. Next question.
25      MR. WATERS: I would join in

37

1  Mr. Grossbart's request to have the e-mail, or a
2  printout of the e-mail, given to us this afternoon
3  from your office, from whatever computer person that
4  you have, so that we can have it before us before we
5  conclude Professor Hazard's deposition, and maybe, at
6  the lunch break, you could consider that request.
7        MR. GILMAN: I understand your request.
8  Next question.
9  BY MR. WATERS:
10       Q. About how much time have you spent with
11  respect to this matter, Professor, since your
12  engagement?
13       A. Somewhere around 25-30 hours, I think.
14       Q. Have you rendered a bill?
15       A. No, I usually wait until after the
16  deposition.
17       Q. After the deposition, you plan to render a
18  bill? And then an additional bill after the trial?
19       A. Oh, sure.
20       Q. Okay. Your engagement -- the terms of
21  your engagement are set forth in your report. Is the
22  $5,000 applied against any time, or is that in
23  addition to $800 an hour for the time?
24       A. It's in addition.
25       Q. Okay. And you have received the $5,000?

38

1       A. I can't recall.
2       Q. And does that continue to be your rate,
3  your hourly rate for this work, $800 an hour?
4       A. Yes.
5       Q. Is there a different rate for testifying?
6       A. No.
7       Q. Is there a different rate for travel time?
8       A. Usually I charge 500 an hour for travel,
9  particularly if there's something else I can do,
10  flying across country.
11       Q. Okay. Now, if we could spend a little
12  time with this exhibit in which you have listed the
13  other cases in which you have testified by way of
14  deposition or trial testimony.
15            These pages are not numbered.
16       A. Just refer to them by the name on the top
17  line.
18       Q. I'm at the first one, Jay Lefkowitz.
19       A. That's a long time ago.
20            MR. GILMAN: I haven't checked, but I
21  think they're in chronological order.
22            THE WITNESS: They are.
23  BY MR. WATERS:
24       Q. I take it the "D" means you've testified
25  by way of deposition?

39

1       A. Yes. And "T" means trial.
2       Q. "T" means trial testimony?
3       A. Yeah.
4       Q. These are all the cases -- this goes back
5  over a period, then, of eight years?
6       A. Yeah.
7       Q. Okay. If you would go to the third case,
8  Jeff Shumway --
9       A. Yes.
10      Q. What was the issue in that case, in a
11  little more detail than --
12            MR. GROSSBART: Sorry. Which case are you
13  starting with?
14            MR. WATERS: Jeff Shumway, the third one
15  down.
16            THE WITNESS: That's a long time ago.
17            MR. GILMAN: It's twice as far as the
18  federal rules would require disclosure, but if you
19  want to waste your time on it, go ahead.
20            THE WITNESS: In that case, somebody in
21  the Meyer firm represented two entrepreneurs in a
22  real estate venture, and they were -- the two
23  entrepreneurs had a consistent interest at the
24  beginning, but then they got into a dispute, and the
25  question is whether the lawyer properly -- as I

40

1  recall, whether he terminated trying to handle both
2  of them on time, and whether he, after the next stage
3  of it, continued to represent one of the disputing
4  parties, even though he had, at an earlier stage in
5  the transaction, represented both of them.
6            That's my best recollection.
7  BY MR. WATERS:
8       Q. And were you -- on whose behalf were you
9  offered as an expert?
10      A. Con. If you look at it, it says that it
11  was critical of the lawyer.
12      Q. I didn't know what that meant. Okay.
13  That helps.
14           If you would turn to the one that says
15  Howard Jacobs, can you tell me, very briefly, what
16  the conflict issue is there?
17      A. That was a divorce case involving Mr. and
18  Mrs. Camuto or Camuto. I don't know how to pronounce
19  it.
20           Mr. Camuto went around to see the lawyer
21  and had a preliminary interview with him about that
22  lawyer's representing Mr. Camuto, and then -- it was
23  a two-person law firm, as I remember -- that lawyer's
24  partner undertook the representation of the wife.
25           So the question was whether the

105

1  on SFC matters, were deposed?
2      Are you at least aware generally of that?
3      A. Yes.
4      Q. And you were not provided with any of
5  those depositions; correct?
6      A. That's correct.
7      Q. And you didn't ask to look at them, I take
8  it; is that right?
9      A. I assume that counsel would have provided
10 them to me if they had stuff that was important to
11 know.
12     Q. So without looking at those depositions or
13 considering that testimony, you're not in a position,
14 sitting here today, to say how that review may or may
15 not, or might or might not, impact your opinions; is
16 that right?
17     A. Of course.
18     Q. You, at various places, for example,
19 Page 9 of your report -- and I believe there are
20 other examples, I don't need to belabor it -- but you
21 have, for example in the paragraph numbered 2 on
22 Page 9 of your report, the sentence, "There is no
23 evidence that the Family had such knowledge...,"
24 et cetera.
25     Do you see that?

106

1      A. Yeah.
2      Q. When you say there's no evidence, you
3  don't purport to be making a statement about all the
4  evidence in this case, do you? You were, rather,
5  commenting on there is no evidence, in your opinion,
6  within the more limited subset of materials that
7  you've received.
8      A. That's correct.
9      Q. That would be a more fair way of saying
10 the point; right?
11     A. Differently, I've not been provided any
12 evidence that.
13     Q. Okay. Are you currently doing any work on
14 other matters with other attorneys from the Cahill
15 firm?
16     A. No.
17     Q. Have you --
18     A. Wait a minute. I take that back. I'm not
19 currently doing any work. I think I have one open
20 file, but it's been dormant for two years, and for
21 all I know, it might be dormant always. It has to do
22 with the conduct of litigation in asbestos cases.
23     Q. And other than that, have you done any
24 work with Cahill attorneys?
25     A. In years past, I've done some.

107

1      Q. How about in the last four or five years?
2      A. No, I don't think so.
3      Q. Okay. And with Schnader -- attorneys at
4  the Schnader firm, say, for last four or five years,
5  whether or not it resulted in testimony or not, any
6  work with the Schnader firm?
7      A. Yeah. I did some work with Schnader.
8      Q. Can you describe, generally, what that
9  was?
10     A. It was not as an expert witness, and it
11 was with the guy that succeeded Bernie Segal as the
12 managing partner, and I can't bring his name to bear.
13 It was something very short in time and span. That's
14 about all I can do.
15     Q. And that's all your recollection?
16     A. That's all I can recall.
17     Q. I know some materials were produced with
18 respect to other Pepper Hamilton-related work --
19     A. Yeah.
20     Q. -- but have you worked with Pepper
21 Hamilton, not where they were the subject of the
22 work, but where they were representing --
23     A. You mean working with that law firm on
24 something?
25     Q. Correct.

108

1      A. If so, I can't remember any.
2      Q. Have you done any work consulting with
3  Pepper Hamilton, outside of the report situations
4  that have been disclosed?
5      A. Well, I have had some very modest co-work
6  with Barbara Mather, who is the managing partner, I
7  think, but that has to do with alumni business at
8  college. You didn't care about that.
9      Q. No. I'm really focused on where Pepper
10 Hamilton had an issue, perhaps, and sought your
11 consultative role.
12     A. Not that I recall. I've worked with other
13 firms, but I can't recall handling for them.
14     Q. One more question about this e-mail that
15 got the process started.
16     A. Yep.
17     Q. Just in round numbers, your report is
18 23 pages, single-spaced.
19     A. Yeah.
20     Q. Was the e-mail approximately that long as
21 well?
22     A. No. I can't recall, but I think --
23 obviously, a lot -- I mean, the stuff, for example,
24 in Mr. Glazer's book, that stuff was provided by
25 counsel, and probably was in an early draft.

109

1  Q. So there really was more than one
2  e-mail —
3  A. I think there were two.
4  Q. — where you got input or suggested input
5  from the Cahill firm; is that right?
6  A. Yeah.
7  Q. In written form?
8  A. Right.
9  Q. Do you have the second e-mail?
10  A. All I've got — I don't think I have
11  either.
12  Q. So, were the e-mails typically such that
13  they contained the text or suggested text in the body
14  of the e-mail, or were they e-mails transmitting, for
15  example, Word or Word Perfect documents that you then
16  used to insert into your report?
17  A. I don't see the difference between those.
18  I think the e-mails had, as attachments, a draft
19  document to work on.
20  Q. Okay, and you got one such e-mail when the
21  report preparation process started, and at least one
22  more e-mail with suggested textual input midway
23  through the process or thereabouts?
24  A. Something like that, yeah.
25  Q. And do you think that's all there was, two

110

1  e-mails?
2  A. That's my recollection.
3  Q. As a result of Mr. Waters' testimony, you
4  had a chance to —
5  MR. GILMAN: You mean Mr. Waters'
6  questioning? He tried, but I think it was still
7  questioning.
8  MR. GROSSBART: I did mean his
9  questioning.
10  Q. You've been through the report this
11  morning. As a result of that exercise, are you able
12  to identify a single paragraph within your report
13  that you drafted entirely?
14  A. No.
15  Q. Okay. In the Enron case, you defended the
16  conduct of the law firm of Vinson & Elkins; is that
17  correct?
18  A. I spoke on their behalf, yes.
19  Q. Did you give a deposition?
20  A. Yes.
21  Q. Do you have that deposition?
22  A. No.
23  Q. And did you write a report?
24  A. There was a report written before the
25  deposition.

111

1  Q. Right.
2  A. Yeah, oh, yes.
3  Q. Do you have that report?
4  A. No.
5  Q. In describing your work in that case, you
6  stated that Vinson & Elkins — and I'm quoting as
7  best as I could write down, "suitably raised
8  questions," and notwithstanding that effort,
9  information was not available to it that would
10  indicate fraud, or words to that effect.
11      Is that a fair statement?
12  A. Yeah, yeah.
13  Q. What were you referring to when you said
14  that Vinson & Elkins suitably raised questions? What
15  kinds of questions, and what made them suitable?
16  A. I remember, not very distinctly, one kind
17  of thing. It had to do with the preparation of, as I
18  recall, a quarterly filing with the SEC, and the
19  inside general counsel's office — inside counsel's
20  office in Enron — did a draft which they sent by
21  Vinson & Elkins's lawyer for review, and the
22  Vinson & Elkins lawyer said he thought that there
23  should be more detail in that disclosure than their
24  draft was prepared — was going to do.
25      And he took it up with, I think, the

112

1  general counsel, certainly with the associate general
2  counsel — I think it was the associate general
3  counsel, and said, you know, I think we ought to do
4  this. The associate general counsel was a very
5  experienced security lawyer. Indeed, he had been
6  with the SEC for a substantial period, and the
7  document that Enron finally submitted was closer to
8  what that guy wanted to do, and had less information,
9  less detail, than what the Vinson & Elkins lawyer was
10  saying he thought ought to be in it.
11      My position or my opinion was that the
12  ultimate filing by the company, the ultimate
13  authority was being exercised by the in-house general
14  counsel's staff, particularly this fellow — I've
15  forgotten what his name was — and that I thought it
16  had an arguable question whether what the terms of
17  the disclosure ought to be. That is, it wasn't, as
18  far as I could see, clearly wrong, or wrong,
19  positively wrong, for the disclosure to be as limited
20  or as the general counsel's office wanted to make it.
21      I said, look, V&E raised the question,
22  presented their view, said we recommend, but got
23  turned down. I thought that was an adequate
24  disposition of it.
25      Another situation was in connection with

93

1   MR. WATERS: So you won't produce, because
2   it doesn't -- you refuse to produce the e-mail.
3   MR. GILMAN: You have not provided drafts
4   of your reports. We are not providing drafts of our
5   reports. What we have done is complied with Rule 26.
6   We've provided you with all of the information and
7   materials that were considered by the witness, and we
8   have provided you with his final report. So that's
9   where we are on that. I don't know that any of this
10  stuff exists. It doesn't exist in the witness's
11  files in any event.
12  MR. WATERS: Well, what you are now
13  calling a draft of the report sounds to me, from the
14  witness's testimony, like a draft of a report that
15  you prepared and sent to him.
16  MR. GILMAN: I think you're not
17  understanding, Mike. You can try to recharacterize
18  and put spins on things, but if you and I sit down
19  and have a conversation, and you explain to me what
20  you would like reflected, whether I put my fingers on
21  the keys or you put your fingers on the keys, it's
22  what you want reflected. It's your report.
23  MR. WATERS: This is a scrivener defense
24  that I've heard before, but --
25  MR. GILMAN: Now, look, why don't we do

94

1   this? I'm not here to have that kind of colloquy
2   with you. If you want to make light, if you want to
3   be sarcastic, we can do that after the deposition.
4   John, could you just ask your questions,
5   please?
6   MR. WATERS: No. I want to may clear my
7   request for the e-mail that you sent to
8   Professor Hazard, and the attachment, which appears
9   to be a draft of the report prepared by you, whether
10  you claim as a scrivener or otherwise. I think I'm
11  entitled to it, and I think I requested it before. I
12  think it's different from what's otherwise happening.
13  In any case, that's my request, and if
14  you're telling me that you refuse to produce it and
15  we've exhausted that, then tell me that, and we'll
16  proceed.
17  MR. GILMAN: I'll take your request under
18  advisement.
19  John, if you have questions, let's use the
20  time permitted.
21  MR. GROSSBART: I'm just waiting for you
22  guys to finish.
23
24      EXAMINATION
25  BY MR. GROSSBART:

95

1   Q. Professor Hazard, the e-mail that started
2   the process of report preparation that's been the
3   subject of the colloquy you've just witnessed, do you
4   still have the e-mail in the original form sent to
5   you?
6   A. I don't think so.
7   Q. Okay. Where were you, physically, when
8   you worked on the report?
9   A. At home.
10  Q. All right. Do you have a copy of
11  Mr. Glazer's book at your house?
12  A. No.
13  Q. Did you go to the library to get it?
14  A. No.
15  Q. Were the quotes from Mr. Glazer's book
16  that appear throughout the report provided to you in
17  the e-mail that was sent to you by counsel?
18  A. In an e-mail. I think there were two, and
19  I don't know whether it was the first or second.
20  Q. All right. So the block quotations
21  selected for your report were selected for you by
22  counsel; correct?
23  A. Right, uh-huh.
24  Q. And throughout your report, you cite to a
25  number of reported cases. Did you read all of those

96

1   cases?
2   A. I have read all of them previously. I
3   didn't read them on this occasion.
4   Q. Okay. Were they selected for this report
5   for you by counsel?
6   A. Yes.
7   Q. You mention on the Materials Considered
8   page of your report, Exhibit 2002-II, Track II, the
9   transcript of the deposition of Mr. Gagne. Do you
10  see that?
11  A. Yes.
12  Q. Were you provided the exhibits that were
13  marked during the course of that deposition?
14  A. I think some of them, but I don't think
15  all of them.
16  Q. All right. What about the exhibits that
17  were referred to and utilized in that deposition, but
18  not actually marked in that deposition?
19  A. I don't know about that.
20  Q. Can you identify -- well, you would agree
21  with me that no specific exhibit from Mr. Gagne's
22  deposition or, for that matter, any deposition, is
23  identified as such on this -- let me rephrase that.
24  Does the last page of your report identify
25  documentary exhibits to Mr. Gagne's deposition, to