# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

```
-------------------------------------- X
CHARLES A. STANZIALE, JR.,              :
CHAPTER 7 TRUSTEE OF
STUDENT FINANCE CORPORATION,            :
                                            C.A. No. 04-1551-JJF
          Plaintiff,                    :

     -against-                          :

PEPPER HAMILTON LLP, et al.,            :

          Defendant.
-------------------------------------- X

-------------------------------------- X
                                        :
ROYAL INDEMNITY COMPANY,
                                        :
          Plaintiff,                        C.A. No. 05-165-JJF
                                        :
     -against-
                                        :
PEPPER HAMILTON LLP, et al.,
                                        :
          Defendant.
-------------------------------------- X
```

## **EXPERT REPORT OF PETER HUMPHREYS, ESQ.**

Pursuant to the schedule established in the Second Amended Case Management Order #1 dated June 14, 2007 and the requirements of Fed. Civ. P. 26(a)(2)(B), and consistent with the preliminary disclosure of subject matters of expert testimony by letter dated March 12, 2007, Defendant Pepper Hamilton LLP ("Pepper Hamilton") submits as follows the Expert Report of Peter Humphreys (the "Report") in response to the reports of Donald W. Glazer ("Mr. Glazer") and Myron S. Glucksman ("Mr. Glucksman"), submitted on behalf of Plaintiff Charles A. Stanziale, Jr., Chapter 7 Trustee (the "Trustee") of Student Finance Corporation ("SFC"), and Plaintiff Royal Indemnity Company ("Royal"), and in support of the defenses of Pepper

Hamilton and W. Roderick Gagné ("Mr. Gagné") to the claims asserted against them in both the Trustee and Royal actions.

The Qualifications of the Witness

I was admitted to practice law in the District of Columbia in 1981 and in the State of New York in 1984. Since then I have practiced corporate law in New York City and have over 20 years of experience in the securitization business. I was co-head of the securitization practice at Dewey Ballantine LLP and am now head of the securitization practice at McDermott Will & Emery LLP ("McDermott"). I have been a partner at McDermott since February 1, 2005. I have represented issuers, underwriters, placement agents, trustees, a rating agency and investors in a wide range of securitizations of various asset classes in both public and private transactions. I am familiar with the market and the standards used by lawyers in representing clients in securitization transactions. I regularly render legal opinions in such transactions and review legal opinions rendered by other law firms. My resume and a list of articles I have recently written and recent speaking engagements and testimony are included as Exhibit A to this Report.

Compensation

My firm will be provided with a $10,000 retainer in this matter. With respect to my work, the firm is compensated at the rate of $850 per hour. As circumstances have warranted, other lawyers and non-professionals have assisted me with respect to the review of documents and preparation of testimony, and the firm is compensated pursuant to those individuals' regular hourly rates. In addition, the firm is reimbursed for its reasonable expenses. My compensation is not contingent on the conclusions I draw or the results of the litigation.

<u>Prior Testimony</u>

I have not previously testified as an expert witness at trial or by deposition.

<u>The Information I Have Considered</u>

I have reviewed and relied on certain of the information contained in the documents listed in Exhibit B hereto. I have also relied on my many years of experience as an attorney specializing in the area of asset-backed securitizations.

I have no personal knowledge of the facts of this case. I have been provided with a statement of facts, which I have assumed to be true. The statement of facts is attached as Exhibit C hereto.

I have conducted no independent factual investigation, other than my review of the materials listed in Exhibits B and C.

<u>The Opinions to Be Expressed</u>

As set forth below, at trial I expect to offer testimony relating to the views set forth below.

This Report addresses (1) the process of securitization, (2) the role of an attorney in a typical securitization transaction, and (3) certain issues raised in the Expert Reports submitted by Mr. Glazer and Mr. Glucksman.

<u>My Opinion Concerning the Process of Securitization</u>

The growth of securitization in the United States over the past 20 years has been rapid. In 2006, almost $1.5 trillion of assets were securitized in a wide range of asset classes. These deals were sold as bonds in public offerings and private placements, packaged into securities purchased by commercial paper conduits, and repackaged into collateral debt obligations.

- 3 -

There has been a continual expansion of the market from its beginnings in the securitization of residential mortgages, through its growth into other classes of assets such as home equity loans, credit card receivables and auto loans and on into new areas such as securitizations of leases, utility receivables, health care receivables and other types of financial assets such as student loans. Lawyers, accountants, and regulators have joined together to facilitate the growth of the asset-backed market.   Today it is equivalent in volume to the corporate debt market.

The essence of securitization is the isolation of cash flows on financial assets from the bankruptcy risk of the originator of such financial assets. Thus, unlike a borrowing by an originator where the lender looks to the credit-worthiness of the originator, investors in securitizations look to the performance of the financial assets, and not to the solvency of the sponsor of the transaction. This is possible because repayment risks can be estimated actuarially using data on the credit performance of the underlying assets.

Securitization transactions follow a general pattern. A typical structure is illustrated below.



(1) Collections on assets go directly to pay securities.

The originator of the assets transfers them to a special purpose entity ("SPE"), which in turn issues securities backed by those assets. The SPE may be a corporation, a trust, a limited liability company or a partnership, the choice often being decided by tax or accounting considerations.

Sometimes more than one SPE is used, particularly with revolving assets such as credit card receivables, but essentially it is the isolation from bankruptcy risk on which the success of the securitization turns. Typically, although not always, the originator acts as servicer of the assets and collects and remits payments on a periodic basis, usually monthly.

The bankruptcy isolation of the SPE allows securities based on pools of assets to be rated at a higher credit level than that of the originator. And, with a higher credit rating, comes a lower cost of funds. Without bankruptcy isolation, cash flows are subject to an automatic stay in a bankruptcy of the originator and the rating of the transaction generally would be capped at the originator's rating level. Accordingly, two legal opinions related to bankruptcy matters must be rendered for the deal to be rated, the true sale opinion and the non-consolidation opinion. The true sale opinion states that, in the event of a bankruptcy of the originator, the transaction will not be recharacterized as a financing by the originator - in other words, that there has been a true sale of the assets to the SPE that conducts the financing. The non-consolidation opinion states that, in the event of a bankruptcy of the originator, the SPE and the originator will not be treated as the same entity, *i.e.* consolidated for bankruptcy purposes. Obviously, to the extent the two entities are consolidated, the structure has not worked, for the assets have not been isolated from the credit risk of the originator.

SPEs are structured in a manner to render them bankruptcy-remote. They are not exempt from bankruptcy proceedings but, because they have limited purposes, the purchase of assets and the issuance of securities, and they are passive in nature, the chance of a bankruptcy of an SPE in a properly structured transaction is small. The SPE usually remains an affiliate of the originator, and under its control to some degree. Accordingly, to prevent the originator from overriding the structure by causing a voluntary bankruptcy filing by the SPE, the SPE is often required to have an independent director or manager who will have veto rights over such action.

The separateness of the SPE underlies the success of securitization structures. Investors rely on an essentially passive entity that acts as a legal receptacle of payments on the assets and funnels them to payments on the securities. Except in a limited manner, the originator does not step in to guarantee payments on the assets or the securities. Similarly, the originator must not ignore the separate legal status of the SPE in its dealings with obligors on the assets or its future treatment of collections.

Securitization transactions are usually rated by one or more of the major rating agencies, Moody's Investor Services Inc. ("Moody's"), Standard and Poor's Corporation and Fitch Inc. In order to obtain a rating, credit enhancement will have to be provided for the transaction to absorb losses on the underlying assets.    Often, this credit enhancement is provided by overcollateralization, either in the form of excess assets, by means of a cash reserve or by means of making one class of certificates or bonds senior to another unrated class.  In some instances, the underlying assets are individually insured, as was the case in Royal's insurance of the student loans.  In other cases, the securities issued by the SPE are guaranteed ("wrapped") by a surety insurance company such that the rating of the transaction is elevated to that of the surety.

the information provided by his client. The lawyer's due diligence obligation is to ask questions when issues arise or when it is clear that information material to investors is omitted, not to conduct a cross-examination of his client when reasonable answers to questions are received.

Attorneys to issuers are not responsible for conducting due diligence on behalf of other parties to the transaction. Underwriters, sureties, or other parties should and typically do conduct their own due diligence. Royal presumably made its own business decision to insure the student loans. The offering documents for the securitization would not have been written to induce Royal to enter into insurance contracts, but would have been written to enable investors to assess the risks of the offering, bearing in mind the loans were <u>already</u> insured by Royal and the notes guaranteed by the surety.

While an attorney, as a matter of good practice, should correct any misapprehension he knows is suffered by another party to a transaction, Pepper Hamilton, in its role as issuer's counsel, had no obligation to advise Royal about issues Royal should have investigated or the manner in which Royal should have done so. An insurance company such as Royal should have had adequate opportunity to ask whatever questions and obtain whatever additional information it felt necessary, including information not available to investors. Thus, it was perfectly reasonable for Pepper Hamilton to have assumed that Royal, as a sophisticated insurance company, had conducted its own due diligence in a reasonable and competent business manner. It would also have been reasonable for Pepper Hamilton, seeing that Royal was willing to do business with SFC after its own due diligence, to treat such willingness as confirmation of Pepper Hamilton's own belief that it had conducted appropriate levels of due diligence itself. Pepper Hamilton, seeing the multiplicity of professionals that had reviewed the business of SFC and were willing to participate in the deals, was entitled to treat such participation as evidence of

such parties' belief in the soundness of SFC's business model and SFC's ability to perform the proposed transactions.

My Opinions Concerning the Report of Mr. Glazer

In his expert report, Mr. Glazer points to the fact that the officer's certificates provided by SFC in connection with Pepper Hamilton's opinions were signed on behalf of an entity, rather than an individual. Mr. Glazer suggests that this fact is "relevant to the possible need to make further inquiry." (Glazer Report at 6). In my experience, certificates delivered in connection with opinions are sometimes signed in the name of an entity rather than an individual, and I have worked on transactions where that has occurred. In deals worth many hundreds of millions of dollars, individuals may be reluctant to expose themselves to personal risk through an inadvertently erroneous certificate. One purpose of using corporations for transactions is to shield individuals from personal liability. It is consistent with this approach for an individual to confirm facts in a corporate capacity rather than taking on personal liability. Thus, given Pepper Hamilton's general knowledge of SFC and the individuals giving the certificate and its belief that the facts expressed therein were correct, there was no reason for Pepper Hamilton to have assumed the motives for executing the certificates in this manner were sinister.

Mr. Glazer also states in his report that the "negative assurance" given by Pepper Hamilton in its Authority and Enforceability Opinions raises the issue of "whether the facts known to Pepper would have led a reasonably prudent lawyer to have the belief that Pepper disclaims having." (Glazer Report at 6-7). Mr. Glazer appears to be implying that Pepper Hamilton's use of careful language is some indicia that it either actually knew of the alleged fraud or was taking on responsibility in some manner even if unaware. This does not make sense. Most lawyers who give these type of negative assurance opinions ("10b-5 opinions")

Consequently in the SFC transactions, MBIA Insurance Corporation (rated Aaa) wrapped the deal and Moody's rated the transaction Aaa.

## My Opinions Concerning the Role of an Attorney in a Typical Asset-Backed Securitization

In his expert report, Mr. Glucksman provides an overview of the roles of the many different parties in a securitization, including rating agencies, investors, servicers, trustees, accountants, warehouse lenders, insurers, sureties, and placement agents.    Although Mr. Glucksman very briefly summarizes the role of attorneys generally, his report appears to focus on SFC, not Pepper Hamilton, and his report says nothing specific about Pepper Hamilton's role in the transactions at issue.    At trial, I may testify concerning the role of various parties, including attorneys, in securitizations generally.

Here, Pepper Hamilton served as counsel for the issuer, SFC. In a typical securitization, the issuer's attorney has several responsibilities. Issuer's counsel, with input from others, often drafts the offering documents governing the deal, usually a prospectus, offering circular or private placement memorandum. The issuer's counsel, again with input from others, may also draft the operative documents for the transaction such as an indenture, a pooling and servicing agreement, a trust agreement or other documents that together provide a legal framework for the securities to be offered.

As part of the preparation of the offering documents, an attorney in the role of issuer's counsel should undertake an appropriate level of due diligence with respect to the issuer. This due diligence process would include making inquiries into the way loans were originated and how they will be serviced.    To the extent that the information received from these routine inquiries seemed reasonable on its face, no further inquiry would typically be undertaken, and

- 7 -

the information would be inserted into the offering documents as provided. The lawyer's role also includes discussing the structure of the deal with the client, determining whether the structure is viable and apprising the client of any risks or concerns emanating from the transaction. The attorney would also prepare disclosure as to the tax considerations related to the securities being offered and general legal issues related to the characteristics of the underlying assets. Although the lawyer will take responsibility for summarizing information accurately, he is entitled to rely on information supplied by employees of the originator or sponsor of the transaction, so long as that information appears reasonable on its face. These facts will be confirmed at closing in officer's certificates which attest to the correctness of the information in the offering documents, including any information that could have a material bearing on the issuer's ability to successfully conduct the offering.

An additional responsibility of the issuer's counsel is to provide the true sale and non-consolidation opinions. Issuer's counsel is also responsible for issuing a security interest opinion, which addresses the creation, attachment, perfection, and priority of a security interest in the collateral. In addition, the attorney may provide opinions as to compliance with corporate requirements and securities laws, including a "10b-5 opinion" named after the securities fraud rule to which it relates. This opinion states that the attorney is generally unaware of any misrepresentations or material omissions from the offering documents. Attorneys do not take responsibility for financial information contained in the offering documents and usually expressly exclude such responsibility in their opinion.

Lawyers are not guarantors of the information in an offering document and rely on their client's input in document preparation. It is only to the extent that the information received is not reasonable on its face that a lawyer should undertake to ask questions to clarify or expand on

- 8 -

would say that such an opinion is based on a good faith belief after conducting due diligence, not a guaranty that no other law firm would have discovered additional facts. While opinions of different law firms often have slightly different formulations of language, the language used by Pepper Hamilton (including the use of the word 'would') is similar to formulations I have seen used by other law firms in these types of opinions.

Mr. Glazer also claims that Royal, although not an addressee of Pepper Hamilton's opinions, was "invited" to rely on them. (Glazer Report at 7-8). Opinions are given to specific addressees, many of whom are not the opinion giver's client. But lawyers in business transactions do not expect their opinions to be relied upon by non-addressees. This is why the opinion usually recites, as Pepper Hamilton's opinions did, that they may not be relied upon by non-addressees without written permission. Thus, since Royal was familiar with the transaction, and had not only seen the opinion but also the express statement that it could not be relied upon by non-addressees, it is hard to understand how Pepper Hamilton had "invited Royal to rely." (Glazer Report at 7). If Royal wished to rely on the opinion, it could simply have asked to be added as an addressee. In fact, it is common for such requests to be made in securitization transactions by parties not initially addressed on an opinion.

In any event, Royal's interest in the securitization structure was limited. Its only real concern with the structure was that it was paid part of its premiums from the cash flow on the underlying loans and related reserves. Royal did not insure the securitization. Royal insured the underlying loans. Other than payment of its premium (which as far as I know was paid), Royal had no real interest in the structure of the transaction, since, whether the structure worked or not, it would have to pay if the underlying loans defaulted. Royal took on the risk that the underlying loans would default, not that the securitization transactions were poorly structured. The true sale

- 11 -

and non-consolidation opinions are of primary interest to investors and the surety who guaranteed the securities. These parties wished to make sure that the financial assets were isolated from the bankruptcy estate of the originator so that if the securitization defaulted, they could proceed directly against the financial assets. Royal was liable to pay on its insurance policies whether or not the securitization structure worked, and whether or not the Pepper Hamilton opinions were correct. Moreover, the correctness of these opinions has not, to my knowledge been challenged. Pepper Hamilton has been criticized for the way in which it arrived at its conclusions, not the conclusion themselves. Mr. Glazer offers his view that if Mr. Gagné or other lawyers working on the opinions provided by Pepper Hamilton knew the true facts concerning forbearance payments made by SFC, then the opinions should not have been provided. (Glazer Report at 5). This is not necessary true. True sale opinions are reasoned, based on all the facts of the transaction. All that is true, therefore, is that the existence of forbearance payments would have been one additional factor to consider in the overall analysis. But whether or not the knowledge of the existence of "forbearance payments" would have caused Pepper Hamilton to reconsider its opinion, the fact remains that the transactions have not been recharacterized as a financing in the bankruptcy of SFC, nor have any of the special purpose entities been consolidated in SFC's bankruptcy estate. It would appear therefore that, in the crucible of an actual bankruptcy, Pepper Hamilton's opinions were correct, even with the existence of forbearance payments. And thus Mr. Glazer's criticisms of them are academic rather than substantive.

Exhibits

I may use as exhibits or demonstrative aids during testimony at trial relevant exhibits received in evidence at trial, summaries thereof pursuant to Fed. R. Evid. 1006, or excerpts from learned treatises.

Reservation

I reserve the right to supplement this Report and to respond to the opinions that may be offered by experts on behalf of the Trustee, Royal or other parties to the Trustee and Royal actions.

Dated: July 12, 2007

Peter Humphreys

## PETER HUMPHREYS

**Partner, McDermott Will & Emery LLP**
**340 Madison Avenue**
**New York, New York 10017**

### Education

J.D. cum laude, Northwestern University, 1981
B.C.L. (Honors), Oxford University, 1978
LL.B (Honors), University of London, King's College, 1976
    (Maxwell Prize – first in class)
Associate of King's College London

### Bar Admissions

District of Columbia, 1981
State of New York, 1984

### Professional Recognition

Selected for

*"The Legal Media Group Guide to the World's Leading Structured Finance and Securitization Lawyers (Euromoney)*, 2007"

Selected three times to:

BTI Consulting *"All Star Team"* (based on survey of Fortune 500 counsel)

### Recent Speaking Engagements

*"Toll Road Securitization,"* NASHTU Conference, Washington DC, May 2007

*"Considerations for Issuers New to Market"*, IMN Conference, Miami, Florida, April 2007

*"Equipment Leasing Finance & Securitization,"* ELA Conference, New York, New York, March 2007

Testimony on Toll Road Securitization before New Jersey Assembly Committee, Trenton, New Jersey, February 2007

*"Securitization Alternatives for First Time Issuers,"* IMN Conference, Orlando, Florida, November 2006

*"The Changing Landscape of Equipment Leasing Finance: New Structures and Trends in Funding Opportunities,"* ELA Conference, New York, New York, March 2006

*"Why Securitize? The Role of Securitization in an Issuer's Funding Strategy,"* IMN Conference, Phoenix, Arizona, February 2006

*"The Role of Securitization in an Issuer's Overall Funding Strategy,"* IMN Conference, Boca Raton, Florida, September 2005

## Recent Articles

*"Toll Road Securitization,"* Total Securitization, April 2, 2007

Lease Securitization: New Challenges for Issuers in an Evolving Regulatory Environment (March 2007)

*"United States Supreme Court Declines to Take Appeal of Third Circuit's Substantive Consolidation Ruling,"* Asset Securitization Report, May 22, 2006

*"New Challenges for Issuers,"* Monitor Magazine, July/August 2005

*"Lease Securitization Challenges for Issuers,"* Securitization News, June 13, 2005

*"Substantive Consolidation in the Owens Corning Bankruptcy Case – Impact on Analysis of Structured Finance Transactions,"* 122 Banking Law Journal 354, (2005)

*"Structured Finance Challenges for New Issuers and New Assets: An Overview,"* The Journal of Structure Finance, Fall 2004

**MATERIAL CONSIDERED**

Trustee's First Amended Complaint

Royal Indemnity Company's Third Amended Complaint

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2000-1 (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2000-2 (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2000-3 (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2000-4 (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2001-I (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2001-1 (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2001-2 (Ex. 69-I)

Private Placement Memorandum issued with respect to SFC Grantor Trust Series 2001-3 (Ex. 69-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2000-1 (Ex. 79-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2000-2 (Ex. 80-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2000-3 (Ex. 81-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2000-4 (Ex. 82-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2001-I (Ex. 83-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2001-1 (Ex. 84-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2001-2 (Ex. 85-I)

Nonconsolidation Opinion Letter issued with respect to SFC Grantor Trust Series 2001-3 (Ex. 86-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2000-1 (Ex. 79-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2000-2 (Ex. 80-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2000-3 (Ex. 81-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2000-4 (Ex. 82-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2001-I (Ex. 83-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2001-1 (Ex. 85-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2001-2 (Ex. 85-I)

Perfection of Security Interest, Authority and Enforceability Opinion Letter issued with respect to SFC Grantor Trust Series 2001-3 (Ex. 86-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2000-1 (Ex. 79-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2000-2 (Ex. 80-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2000-3 (Ex. 81-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2000-4 (Ex. 82-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2001-I (Ex. 83-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2001-1 (Ex. 84-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2001-2 (Ex. 85-I)

Tax Opinion Letter issued with respect to SFC Grantor Trust Series 2001-3 (Ex. 86-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2000-1 (Ex. 79-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2000-2 (Ex. 80-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2000-3 (Ex. 81-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2000-4 (Ex. 82-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2001-I (Ex. 83-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2001-1 (Ex. 84-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2001-2 (Ex. 85-I)

True Sale Opinion Letter issued with respect to SFC Grantor Trust Series 2001-3 (Ex. 86-I)

Student Finance Corporation and Subsidiaries Report on Consolidated Financial Statements for the Years ended December 31, 1999 and 1998  (Ex. 769-I)

Student Finance Corporation and Subsidiaries Report on Consolidated Financial Statements for the Years ended December 31, 2000 and 1999 (Ex. 58-I)

Independent Accountant's Reports of McGladrey & Pullen, LLP regarding SFC Grantor Trust Series 2000-1  (Ex. 173-I)

Independent Accountant's Reports of McGladrey & Pullen, LLP regarding SFC Grantor Trust Series 2000-2 (Ex. 173-I)

Independent Accountant's Reports of McGladrey & Pullen, LLP regarding SFC Grantor Trust Series 2000-3 (Ex. 173-I)

Independent Accountant's Reports of McGladrey & Pullen, LLP regarding SFC Grantor Trust Series 2000-4 (Ex. 173-I)

Transcripts of the deposition of W. Roderick Gagné and exhibits

Report of Donald W. Glazer

Report of Myron S. Gluckman

Report of Geoffrey C. Hazard, Jr.

Report of Daniel M. Reser

Royal Credit Risk Policies Issued to SFC with the following policy numbers: RST 321276, RST 293334, RST 293309, RST 293309 (Amended), RST 147522, RST 147522 (Amended), RST 147524, RST 147524 (Amended), RST 147525, RST 147525 (Amended), RST 147526, RST 147526 (Amended), RST 147529, RST 147533, RST 147538, and RST 147536 (Ex. 316-I)

**EXHIBIT C**

STATEMENT OF FACTS PROVIDED BY CAHILL GORDON & REINDEL LLP

Student Finance Corporation ("SFC") was formed in 1992. Its business was to originate or purchase loans to students at vocational schools (principally truck driving schools) and later sell trust certificates in securitizations backed by those student loans. Because these students tended to have poor credit histories, the loans were sub-prime, high interest rate loans. SFC purchased or originated the student loans as a first step in the securitization process with funds from a line of credit supplied for that purpose from banks serving as warehouse lenders. Royal Indemnity Company ("Royal") insured the acquired student loans for payment of principal and 90 days interest. SFC would then sell the loans to a special purpose vehicle ("SPV"), which was set up to hold the loans while they were warehoused. After the warehoused loans were pooled, they were sold into a term securitization by way of another SPV. In turn, insured trust certificates, rated by the leading rating agencies, were then sold to qualified institutional buyers ("QIBs").

Royal is a large and sophisticated insurance company. During the relevant time frame, part of Royal's business was to issue credit enhancement insurance in connection with securitization transactions. "Credit insurance is used to cover default losses." *See* ROY 164743-744 (Royal's Financial Enhancements Underwriting Manual). Credit enhancement insurance has the effect of "improv[ing] or remov[ing] the credit risk of the obligor's to the investor and in its place is the credit risk that the insurer, [Royal], will not pay on their coverage." *Id.*

The credit enhancement insurance issued by Royal permitted the trust certificates to receive an investment grade "A" rating (which was Royal's rating) by having Royal insure the payment of principal and 90 days interest on any student loan that defaulted, thereby shifting to Royal the risk of loss of the performance of the student loans underlying the securitizations. There was also a second insurer, MBIA Insurance Corp. ("MBIA"), which guaranteed the payments to the QIBs who purchased the trust certificates. This second "wrap" of insurance allowed the rating agencies to give the trust certificates a "AAA" rating, because that was the rating of MBIA.

There were numerous other participants in each securitization transaction, each of whom fulfilled a distinct and separate role in the multi-step securitization process.

- Warehouse lenders, such as Wilmington Trust Company ("Wilmington Trust") and PNC Bank, provided SFC with the liquidity to originate or purchase the student loans by extending lines of credit to SFC for that purpose.

- Investment banks, such as Loofbourow & Associates ("Loofbourow"), PNC Capital Markets, Inc., Fleet Securities, Inc. and Salomon Smith Barney, acted as underwriters or placement agents with respect to the securitizations. The underwriters had their own counsel, which was Mayer, Brown & Platt in many cases.

- Professional Trustees, such as Bankers Trust Company and Wells Fargo Bank Minnesota, National Association ("Wells Fargo"), acted as Trustee with respect to

most of the trusts that issued the certificates to the QIBs. The Trustee had its own counsel, which was Dorsey & Whitney in most cases.

- Royal (and before that AIU, a subsidiary of American International Group) insured the student loans (principal and 90 days interest), and was represented by attorneys in its law department.

- MBIA guaranteed payment on the trust certificates, and was represented by the Kutak Rock law firm.

- Both Moody's Investors Service ("Moody's") and Fitch IBCA ("Fitch") rated the trust certificates — Aaa and AAA, respectively, in all cases.

- Virgil Baker Associates gave SFC an "A" rating as a "Servicer."

- The QIBs that purchased the certificates were generally large, sophisticated companies such as GE Credit, New York Life and PruBache, and were typically represented by their own counsel.

Throughout the relevant time period, SFC had independent auditors — first BDO Seidman, then Freed Maxick Sachs & Murphy, PC ("Freed Maxick") and finally McGladrey & Pullen LLP ("McGladrey"). Freed Maxick audited SFC's financial statements and issued unqualified independent auditor's reports for the years ended December 31, 1998 and December 31, 1999. McGladrey audited SFC's financial statements and issued an unqualified independent auditor's reports for the year ended December 31, 2000. In addition, McGladrey issued independent auditor's reports with respect to Agreed Upon Procedures examining the Monthly Servicing Reports ("MSRs"), which reports contained information about the performance of the pools of loans for each of the four securitizations closed by SFC in 2000. SFC provided to Royal each independent auditor's report.

Pepper Hamilton LLP ("Pepper Hamilton"), represented SFC in eight of the nine securitizations closed by SFC. W. Roderick Gagné ("Mr. Gagné"), a partner at Pepper Hamilton, was involved in the preparation of private placement memoranda used in the sale of the securitized trust certificates to qualified institutional buyers.

In connection with each transaction, Mr. Gagné also drafted four separate legal opinions which (i) related to the perfection of the security interest in the collateral; (ii) reasoned that the sale of the loans to the SPVs was a "true sale"; (iii) reasoned that the assets of the SPVs would not be consolidated with those of SFC if SFC were to declare bankruptcy; and (iv) related to tax issues attendant to the transaction. Each opinion was addressed to the QIBs, the Trustee, the investment bankers, MBIA, Moody's and Fitch. None of Pepper Hamilton's opinions in connection with any of the securitizations was addressed to Royal. All of the opinions delivered by Pepper Hamilton in connection with SFC's securitizations state in words or substance: "This opinion is rendered only to the addressees set forth above and is solely for the benefit of such addressees. This opinion may not be quoted or relied upon by any other person or entity without express prior written consent of a partner of this firm." *See, e.g,* ROY 011194.

The Insurance Policies and Securitizations

From the start of Royal's relationship with SFC in November 1998 through the end of that relationship in March 2002, Royal wrote approximately $650 million worth of credit enhancement insurance on SFC student loans.

The private placement memorandum for SFC's first securitization is dated August 28, 1996. At that time, Mr. Gagné was a partner at the law firm of Clark Ladner, Fortenbaugh & Young, which represented SFC in the transaction. This transaction was effected prior to Royal's or Pepper Hamilton's involvement with SFC. AIU, which was a subsidiary of American International Group, issued the credit enhancement insurance. Bankers Trust Company was the Trustee and Loofbourrow was the underwriter. The deal was rated Aaa by Moody's Investor Services, Inc. and raised approximately $7.5 million for SFC. Subsequent to this first securitization, AIU left the field of credit enhancement insurance and in November 1998, SFC was introduced to Royal through an insurance broker, T.E. Moore.

On January 22, 1999, Royal issued its first credit enhancement insurance policy on SFC student loans. The insurance was used in connection with a $75 million warehouse loan to SFC from Wilmington Trust, which was named as the beneficiary of the policy. In exchange for writing the policy, Royal received an approximately $5.4 million premium.

On December 1, 1999, Royal committed to write $200 million in credit enhancement insurance for SFC loans. On December 3, 1999, Royal issued its first $50 million policy pursuant to that commitment. In return, Royal received an approximately $4.25 million premium. This policy was amended on August 17, 2000 to reflect an approximately $53 million liability limit in connection with the GT 2000-2 securitization.

The private placement memorandum for SFC's second securitization is dated April 11, 2000. Norwest Bank Minnesota, National Association acted as the trustee. Loofbourrow, Havenwood Capital Markets LLC and PNC Capital Markets acted as the underwriters. Royal issued the credit enhancement insurance on April 17, 2000 in the amount of $50 million, for which it received an approximately $3.6 million premium. MBIA, represented by Kutak Rock, provided the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. For the first time, Pepper Hamilton represented SFC in a term securitization.[1]

On April 30, 2000, Royal issued another $50 million credit enhancement insurance policy on SFC loans. PH 020202-218. In return, Royal received an approximately $4.75 million premium. This policy was amended on October 7, 2000 to reflect an approximately $48 million liability limit in connection with the GT 2000-3 securitization.

The PPM for SFC's third securitization, in the amount of approximately $53 million, is dated August 15, 2000. Ex. 69-I (ROY 009720-841). Wells Fargo acted as the Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc. acted as the underwriter,

---

[1] Later, on April 26, 2001, McGladrey would issue an Independent Accountant's Report regarding the Agreed Upon Procedures examining the MSRs which provided information regarding the performance of the pool of loans in this securitization.

represented by Mayer Brown & Platt. Royal amended its April 11, 2000 policy on August 18, 2000 (ROY 020374-384) to reflect the $53 million limit on liability. MBIA, represented by Kutak Rock, issued the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. Pepper Hamilton represented SFC.[2]

On August 30, 2000, Royal issued another $50 million in credit enhancement insurance on SFC loans. (PH 020531-548). In return, Royal received an approximately $4.2 million premium. This policy was amended on December 16, 2000 to reflect an approximately $30 million limit on liability in connection with the GT 2000-4 securitization. At this point, Royal had written $278 million in credit enhancement insurance on SFC loans, for which had it received $22.2 million in premiums.

On October 3, 2000 Royal amended its $50 million April 30, 2000 policy in connection with an approximately $48 million securitization. With respect to this securitization, Wells Fargo acted as the Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc. acted as the underwriter, represented by Mayer Brown & Platt. MBIA, represented by Kutak Rock, issued the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. Pepper Hamilton represented SFC.[3]

On November 27, 2000 Royal issued another approximately $45 million in credit enhancement insurance on SFC loans. In return, Royal received an approximately $3.8 million premium. This policy was amended on April 24, 2001 to reflect an approximately $55.6 million limit on liability in connection with the GT 2001-1 securitization. At this point, Royal had written $321 million in credit enhancement insurance on SFC loans, for which it had received $26 million in premiums.

On December 16, 2000, Royal amended its $50 million August 30, 2000 policy in connection with an approximately $30 million securitization. With regard to that securitization, Wells Fargo acted as the Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc. acted as the underwriter, represented by Mayer Brown & Platt. MBIA, represented by Kutak Rock, issued the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. Pepper Hamilton represented SFC.[4]

On January 31, 2001, Royal issued another $50 million in credit enhancement insurance on SFC loans. In return, Royal received an approximately $4.1 million premium. This policy was amended on August 17, 2001 to reflect an approximately $48 million limit on liability in connection with the GT 2001-2 securitization.

---

[2]  Later, on April 26, 2001, McGladrey would issue an Independent Accountant's Report regarding the Agreed Upon Procedures examining the MSRs which provided information regarding the performance of the pool of loans in this securitization.

[3]  Later, on April 26, 2001, McGladrey would issue an Independent Accountant's Report regarding the Agreed Upon Procedures examining the MSRs which provided information regarding the performance of the pool of loans in the securitization.

[4]  Later, on April 26, 2001, McGladrey would issue an Independent Accountant's Report regarding the Agreed Upon Procedures examining the MSRs which provided information regarding the performance of the pool of loans in this securitization.

On April 24, 2001, Royal amended its $45 million November 27, 2000 policy in connection with an approximately $55 securitization. Wells Fargo acted as the Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc. acted as the underwriter, represented by Mayer Brown & Platt. MBIA, represented by Kutak Rock, issued the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. Pepper Hamilton represented SFC.

On June 19, 2001 Royal issued $150 million of credit enhancement insurance in connection with a warehouse lending facility provided by PNC Bank, N.A, bringing its total commitment at that point to approximately $511 million. Royal received an approximately $1.67 million premium.

On August 17, 2001, Royal amended its $50 million January 31, 2001 credit enhancement insurance policy in connection with a $48 million securitization. Wells Fargo Bank Minnesota, National Association acted as the Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc. acted as the underwriter, represented by Mayer Brown & Platt. MBIA, represented by Kutak Rock, provided the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. Pepper Hamilton represented SFC. That same day, Royal also issued an interim credit enhancement policy on SFC loans in the amount of $5.5 million. In return, it received a $200,000 premium.

On October 19, 2001, Royal issued an additional $100 million in credit enhancement insurance in connection with a securitization for which it received an approximately $1.67 million premium. Wilmington Trust Company acted as the Owner Trustee. Wells Fargo acted as the Indenture Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc., represented by Mayer Brown & Platt, and Salomon Smith Barney, represented by Squire Sanders, acted as the underwriters. MBIA, represented by Kutak Rock, provided the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA, respectively. Squire Sanders took the lead role in drafting the PPM. Pepper Hamilton represented SFC.

SFC would accomplish one last securitization on November 14, 2001 in the amount of $80 million. Wells Fargo Bank Minnesota, National Association acted as the Trustee, represented by Dorsey & Whitney. PNC Capital Markets, Inc. acted as the underwriter, represented by Mayer Brown & Platt. Royal issued the credit enhancement insurance and received an approximately $1.27 million premium. MBIA, represented by Kutak Rock, issued the wrap insurance. Moody's and Fitch rated the deal Aaa and AAA. Pepper Hamilton represented SFC.

In total, Royal received $34,981,008.60 in premiums for the approximately $650 million in credit enhancement insurance it issued to SFC.

In March 2002, Mr. Gagné and Pepper Hamilton learned that SFC had been using its own money to make payments into the securitizations, which payments appeared to have had the effect of distorting the delinquency statistics for the loans in those pools and making them seem like they were performing better than they were. Pepper Hamilton resigned its representation of SFC. Royal alleges that SFC did not disclose its practice of what has been referred to as forbearance payments, and that Royal was defrauded thereby.