# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | : |
| STUDENT FINANCE CORPORATION, | : |
| Debtor. | : |
| CHARLES A. STANZIALE, JR., CHAPTER 7 TRUSTEE OF STUDENT FINANCE CORPORATION, | : Civil Action No. 04-1551 (JJF) |
| Plaintiff, | : |
| v. | : |
| PEPPER HAMILTON LLP, et al., | : |
| Defendants. | : |

## CERTIFICATION OF MICHAEL S. WATERS IN OPPOSITION TO FAMILY DEFENDANTS' MOTION TO STRIKE CERTAIN TRUSTEE'S CLAIMS FOR DAMAGES

MICHAEL S. WATERS, of full age, hereby certifies as follows:

1.      I am an attorney of the State of New Jersey and a member of the firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys for Charles A. Stanziale, Jr., Chapter 7 Trustee for Student Finance Corporation (the "Trustee").

2.      I submit this Certification in opposition to the Motion to strike certain claims for damages filed by Defendants Robert L. Bast, Pamela Bashore Gagné, the Brennan Trusts, and W. Roderick Gagné as trustee of the Brennan Trusts (collectively the "Family Defendants").

3.      Attached hereto as Exhibit A is a true copy of the Trustee's Supplemental Responses to the Family Defendants' First Set of Interrogatories, served June 7, 2006.

631196v1

4.    Attached hereto as Exhibit B are excerpts from a true copy of the transcript of the deposition of Robert L. Bast conducted on April 4, 2007.

5.    Attached hereto as Exhibit C is a true copy of a letter dated February 5, 2000, detailing the stock purchase agreement between Robert L. Bast and Andrew N. Yao (Deposition Exhibit 72-III).

6.    Attached hereto as Exhibit D is a true copy of the Trustee's Responses to the Family Defendants' Third Set of Interrogatories, and the undersigned's letter of May 7, 2007 serving the responses on the Family Defendants.

7.    Attached hereto as Exhibit E is a true copy of an e-mail, dated March 30, 2007, from Lois Goodman to Neil Epstein, confirming extension of time to respond to Family Defendants' Third Set of Interrogatories, Third Set of Request for Production of Documents, and First Set of Requests for Admissions until the end of fact discovery.

8.    Attached hereto as Exhibit F is a true copy of an e-mail, dated April 5, 2007, from Lois Goodman to Neil Epstein, confirming extension of time to respond until May 7, 2007.

9.    Attached hereto as Exhibit G is a true copy of the expert report of William Hecht, C.P.A., including Exhibit A attached to report.

10.    Attached hereto as Exhibit H is a true copy of a letter, dated May 24, 2007, from Neil Epstein to Lois Goodman requesting additional documents regarding the loan commitment fees issue.

11.    Attached hereto as Exhibit I is a true copy of a letter, dated March 12, 2007, from Neil Epstein to all counsel advising the Family Defendants would present

expert testimony on the loan commitment fees paid to them by Student Finance

Corporation.

I certify that the foregoing statements made by me are true. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

Michael S. Waters

Dated: September 17, 2007

631196v1

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| STUDENT FINANCE CORPORATION | : | |
| | : | |
| Debtor | : | Civil Action No. 04-1551 (JJF) |
| | : | |
| CHARLES A. STANZIALE, JR., | : | |
| CHAPTER 7 TRUSTEE OF STUDENT | : | |
| FINANCE CORPORATION | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| PEPPER HAMILTON LLP, et al | : | |
| Defendants | : | |

SUPPLEMENTAL OBJECTIONS AND RESPONSES OF TRUSTEE, CHARLES A.
STANZIALE, JR., CHAPTER 7 TRUSTEE OF STUDENT FINANCE
CORPORATION, TO THE FAMILY'S FIRST SET OF INTERROGATORIES

Charles A. Stanziale, Jr., Chapter 7 Trustee for Student Finance Corporation, (the "Trustee"), pursuant to Federal Rule of Civil Procedure 33, as made applicable by Bankruptcy Rule 7033, by and through his undersigned attorneys, hereby supplements his responses and objections to Defendants, W. Roderick Gagné, Robert L. Bast, Pamela Bashore Gagné and the Trusts' (the "Family") First Set of Interrogatories.

Each of the responses is subject to and incorporates the General Statement and General Objections as set forth hereinafter. These answers are based upon information known or believed to be true to at the time of responding to this First Set of Interrogatories. Trustee has not completed his discovery, investigation, or preparation for trial, nor has he concluded his analysis of information gathered to date. Future discovery and independent investigation may supply additional facts or information, add meaning to known facts, and may establish entirely

1

new factual conclusions or contentions. Therefore, the Trustee reserves the right to supplement

or amend these answers pursuant to the Federal Rules of Civil Procedure and applicable law.

## I. GENERAL STATEMENT

1.    Without waiving the objections set forth and subject to the limitations stated, the Trustee has provided information he believes is responsive and the subject of legitimate discovery that has been uncovered by reasonable investigation.

2.    The Responses are made without in any way waiving or intending to waive, but on the contrary intending to preserve and preserving the right to raise all questions of authenticity, relevancy, materiality, privilege, admissibility or any other objections as to evidence offered for any purpose in any proceeding, hearing or trial of this or any other action.

3.    The Trustee objects because contention interrogatories are premature at this early stage of the litigation. Document discovery is not complete and depositions have not yet begun. The Trustee further objects to the extent information sought by these contention interrogatories is or may be the subject of expert opinions in this case.

4.    The Trustee has not yet completed his investigation of all the facts relating to this action and is continuing to collect and review documents and may produce additional responsive non-privileged documents. As such, the Trustee reserves the right to amend and/or supplement these responses as well as produce additional documents if and when additional facts or documents are discovered. Additionally, because these responses are based on facts and documents that have been identified to date, it does not preclude the Trustee from later relying on facts or documents discovered pursuant to subsequent investigation or discovery.

5.    Specific objections to interrogatories are made in each response. In addition to those specific objections the Trustee generally objects to the interrogatories for the reasons stated below. The Trustee incorporates the General Objections below into each response whether or not explicitly referenced.

## II. GENERAL OBJECTIONS

1.    The Trustee objects to the Interrogatories to the extent that they exceed the scope permitted under or seek to impose obligations upon the Trustee in excess of those required or contemplated by Federal Rule of Civil Procedure 33.

2.    The Trustee objects to the Interrogatories to the extent they seek production of documents or information protected by the attorney-client privilege, work product doctrine, or any other privilege or immunity from disclosure.

3.    The Trustee objects to the Interrogatories to the extent that they pertain to matters neither relevant to the issues involved in this proceeding nor reasonably calculated to lead to the discovery of admissible evidence.

2

4.    The Trustee objects to the Interrogatories to the extent they seek information equally, more readily or exclusively available to Defendants or not within the possession, custody or control of the Trustee.

5.    The Trustee reserves the right to amend or supplement these Responses as and when additional relevant information becomes available.

6.    The Trustee submits these objections and responses without conceding the relevancy, materiality or admissibility of any request or response thereto.

7.    The Trustee objects to each of these Interrogatories insofar as it seeks information protected from disclosure on the grounds that the information sought is confidential.

8.    The Trustee objects to each of these Interrogatories insofar as it seeks information which requires the Trustee to speculate about or provide information not in his possession, custody or control.

9.    The Trustee objects to each of these Interrogatories to the extent they are overly broad and unduly burdensome as to render them impossible to respond in any reasonable manner or amount of time.

10.    The Trustee objects to each of these Interrogatories insofar as they seek personal information concerning current or former employees of Debtor and/or the Trustee and that is personal or confidential and the disclosure of which would be improper and inappropriate.

11.    The Trustee objects to each of these Interrogatories to the extent they seek information for an unreasonable or irrelevant period of time.

12.    The Trustee objects to each of these Interrogatories to the extent they request the Trustee to provide information or perform analyses or compilations beyond the duties imposed by the Federal Rules of Civil Procedure.

13.    The Trustee incorporates by reference, as if fully set forth below in each individual response, the General Objections to Defendants' Interrogatories.

14.    The Trustee objects to contention interrogatories as premature because document discovery is not yet complete, discovery requests are outstanding to Defendants, and depositions have not yet begun.

15.    Each Response is given subject to the General Objections. All such objections and grounds therefore are reserved and may be interposed at the time of trial. Asserting a specific objection in response to any discovery request does not waive the Trustee's right to assert any applicable general objection thereto. These Responses are made solely for purposes of, and in relation to, this action.

16.    The Trustee objects to these interrogatories to the extent they attempt to compartmentalize the knowledge or activities of Roderick Gagné.

3

### III. TRUSTEE'S RESPONSES TO INTERROGATORIES

1.     Separately for Bast, Pamela Gagné and the Trusts, describe in detail all actions, if any, taken by Bast, Pamela Gagné or the Trusts to exercise control or authority over SFC.

**RESPONSE:**

Trustee objects because contention interrogatories are premature at this stage of the litigation. Document discovery is not yet complete and depositions have not yet begun. The Trustee further objects to this Interrogatory as overly broad, unduly burdensome and vague. The Trustee further objects to the Family's use of the phrase "control or authority" which is undefined, and is vague and ambiguous as set forth in these Interrogatories. This Interrogatory is further objectionable to the extent it calls for a legal conclusion.

Subject to this objection and the General Objections and without waiving these objections, the Family's ability to exercise authority and control over SFC primarily arises out of Pepper and Roderick Gagné's functioning as general counsel for SFC. As such, Gagné had the opportunity to know what was going on at SFC and to direct and structure investment opportunities for the Family's benefit. In representing SFC, Yao and the Family, Gagné was in a position to obtain knowledge and assert influence and control over many of the dealings among them.

Gagné was also active in networking on behalf of SFC in the financial community and providing business advice to SFC. Also, the Family provided sizable loans to SFC between 1996 and 2002. Gagné prepared loan transaction documents for all of the transactions between SFC and his own family members and family trusts (including but not limited to at least one trust of which Gagné personally was the beneficiary), for which he served as trustee on terms very favorable to the Family.

4

In 2000, the Family loaned $6 million to SFC, which was converted to common stock via a Buy –Sell Agreement (the "Agreement"), where, upon execution of the Agreement the Trusts, Bast and Gagné would acquire 180 shares of stock of SFC for a capital contribution of $5,000,000.00 by Bast and the conversion of $1,000,000.00 of debt to equity while earning an interest rate of 14% with a 7% payoff premium to be paid when shares were redeemed. Schedules of debts as between SFC and the Family evidence that certain shares were still outstanding as of December 31, 2000, thereby indicating shareholder status of the Family for approximately one year.

Furthermore, Gagné routinely advised SFC concerning payments due to the Family under the various loan transactions. Yao also testified, "[The Family] had always continued to express interest, and by they I mean the Bast family as communicated to me through Rod Gagné, expresses interest in continuing to be involved at an investor level. . . . Rod knew the company intimately, so to the extent there were any investment opportunities for bridge financing or equity participation on any basis, he would know about it and we would talk about whether his family would be interested." *See* transcript of Yao August 27, 2004 deposition at 332.

The Family's involvement with and influence over SFC and SFC's finances were further heightened by the Family's business relationships with limited partnerships such as Day Hill Partners, LP, One Summit Place, LP and CEC Partnership, LP (later renamed Premier Education Group, LP). Gagné, Bast and some of the Family Trusts of which Gagné was trustee were limited partners of Premier Education Group, and Yao was the director and sole shareholder of Premier Education Group, GP, Inc., the general partner of Premier Education Group. On or about May 5, 2002, pursuant to his personal guarantee to the Family, Yao pledged his interests in Day Hill Partners, LP, One Summit Place, LP and Premier Education Group, to the Family. Gagné documented the transaction. In an e-mail, dated April 23, 2002, Yao wrote to Gagné, "[p]lease be assured, in return, that I will protect your family's investment in SFC, notwithstanding any

5

adverse outcome that may result, should Royal make an uneconomic decision with respect to our recovery and repurchase proposal."

See also the answer to Interrogatory number 2. Trustee is still investigating and reserves the right to amend and/or supplement this Interrogatory as necessary.

2.    Separately for Bast, Pamela Gagné and the Trusts, identify every fact that Bast, Pamela Gagné or the Trusts knew or should have known regarding SFC's use of Forbearance Payments, and for each fact, state when and how such person or entity knew or should have known of the fact.

**RESPONSE:**

Trustee objects to this Interrogatory as overly broad, unduly burdensome and vague. This Interrogatory is also objectionable to the extent it seeks information that is not within the Trustee's possession or control. The Trustee further objects to this Interrogatory to the extent that any information responsive to this request is in the Defendants' equal possession and control.

Subject to these objections and the General Objections and without waiving these objections, Bast, Pamela Gagné and the Trusts knew or should have known about SFC's use of Forbearance Payments because of Gagné's knowledge of SFC's use of Forbearance Payments. Moreover, Gagné's knowledge of SFC's use of forbearance payments must be imputed to the Trusts for which he served as Trustee, as well as to his wife Pamela Gagné and uncle Robert Bast. The Trustee incorporates his response to Pepper Interrogatory No. 8.

Gagné acted as general counsel to SFC, as well as its related entities. Andrew Yao testified at his August 27, 2004 deposition that Gagné was counsel on all transactions relating to SFC and was "intimately familiar" with the company and would have reviewed all relevant

6

documents pertaining to SFC's use of Forbearance Payments in his capacity as counsel to the company and as an investor.

As reflected in invoices to SFC and related entities, Gagné through Pepper billed SFC for services rendered relating to the forbearance program used by SFC. For example, see the time entries on March 2, 2000, "Review materials on consumer loans and for forbearance projects; review with Andrew Yao use of school reserves regarding monthly payments on forbearance loans and discuss implications . . ."; May 19, 2000, for ". . . review[ing] forbearance structure and begin research of same."

In December 2001, Gagné through Pepper represented SFC with respect to the resignation of Kirk Monteverde, SFC's Managing Director of Risk Management, who worked for SFC between November 19 and December 3, 2001, which raised issues relating to the propriety of using so-called forbearance payments to pay student loans. In addition, Gagné, through Pepper, represented SFC in litigation brought by Nielsen Electronics Institute, in which similar issues and claims that Yao was operating a fraudulent scheme were raised.

The Trustee is still investigating and reserves the right to amend and/or supplement this Interrogatory as necessary.

3.    Separately for Bast, Pamela Gagné and the Trusts, identify every fact that Bast, Pamela Gagné or the Trusts knew or should have known regarding SFC's insolvency or financial difficulty, and for each fact, state when and how such person or entity knew or should have known the fact.

7

**RESPONSE**:

Trustee objects to this Interrogatory as overly broad, unduly burdensome and vague. The Trustee further objects to the Family's use of the phrase "financial difficulty" which is undefined, and is vague and ambiguous as set forth in these Interrogatories. The Trustee further objects to this Interrogatory to the extent that any information responsive to this request is in the Defendants' equal possession and control.

Subject to these objections and the General Objections and without waiving these objections, the Family, through Gagné, was aware or should have been aware of SFC's escalating financial problems and growing inability to meet its financial obligations. Bast, Pamela Gagné and the Trusts knew or should have known about SFC's insolvency or financial difficulty, due to Gagné's direct knowledge of SFC's financial condition. Moreover, Gagné's first hand knowledge of SFC's financial difficulty must be imputed to the Trusts for which he served as Trustee and to his family members, wife Pamela Gagné and uncle Robert Bast. The Trustee incorporates his answer to Pepper Interrogatory No. 16.

For example, in December 1998, Yao communicated with Gagné by e-mail, concerning his need to reach out to Gagné's uncle Robert Bast to "invest the $1.5 million shortfall for December." On, April 1, 1999, Gagné was copied on an e-mail wherein Yao stated that "[w]e barely [have] positive cash flow at the warehouse stage after paying Royal's premium" and other professional fees. That same day, Yao sent another e-mail to Gagné to which he "attach[ed] SFC's bridge financing requirements for the next 60 days" and stated that he had "underestimated our April requirement -- we need $2.0M, not just $1.0M" and planned to call certain private investors. Later SFC had to resort to making regular payments on Pepper's outstanding bill.

8

Additionally, SFC's tax returns for 2000 report shareholder losses to the Family. See the K-1 issued to Robert Bast for tax year 2000. GBT 003095-003103.

Trustee is still investigating and reserves the right to amend and/or supplement this Interrogatory as necessary.

4.      Separately for Bast, Pamela Gagné and the Trusts, describe in detail all actions, if any, taken by Bast, Pamela Gagné or the Trusts that deepened the insolvency of SFC.

**RESPONSE:**

This Interrogatory is objectionable to the extent it calls for a legal conclusion. The Trustee further objects to this Interrogatory to the extent that any information responsive to this request are in the Defendants' equal possession and control. This Interrogatory is further objectionable to the extent Count II of Trustee's Complaint titled Deepening Insolvency, to which this Interrogatory relates, has been dismissed by the Court Order dated December 22, 2005. Without waiver of his objections, the Trustee incorporates his answers to Interrogatory Nos. 1 to 3 above.

5.      Describe in detail all actions taken by SFC or any officer, director, employee or agent of SFC with regard to incurring debt that SFC had no prospect of being able to repay.

**RESPONSE:**

This Interrogatory is objectionable to the extent it calls for a legal conclusion. This interrogatory is also ambiguous in whether it intends to include Gagné as an agent of SFC. This Interrogatory is further objectionable to the extent Count II of Trustee's Complaint titled Deepening Insolvency, to which this Interrogatory relates, has been dismissed by the Court

9

Order dated December 22, 2005. Without waiver of his objections, the Trustee incorporates his answers to Interrogatory Nos. 1 to 3 above and his Answer and his supplemental answers to the interrogatories of Pepper Hamilton.

6.    Describe in detail all actions taken by any officer, director, employee or agent of SFC which constituted a breach of fiduciary duty to SFC.

RESPONSE:

This Interrogatory is objectionable to the extent it calls for a legal conclusion. This interrogatory is also objected to as ambiguous in whether it intends to include Gagné as an agent of SFC. This Interrogatory is further objectionable to the extent Count V of Trustee's Complaint titled Aiding and Abetting Breach of Fiduciary, to which this Interrogatory relates, has been dismissed by the Court Order dated December 22, 2005. The Trustee incorporates his answers to Interrogatory Nos. 1 to 3 above and its answers to any Supplemental Objections and Responses to the Interrogatories of Pepper Hamilton.

7.    Describe in detail all unlawful actions taken by any officer, director, employee or agent of SFC which resulted in actual damage to SFC.

RESPONSE:

This Interrogatory is objectionable to the extent it calls for a legal conclusion. This interrogatory is also objected to as ambiguous in whether it intends to include Gagné as an agent of SFC. This Interrogatory is further objectionable to the extent Count VI of Trustee's Complaint titled Civil Conspiracy, to which this Interrogatory relates, has been dismissed by Court Order dated December 22, 2005. The Trustee incorporates his answers to Interrogatory

10

Nos. 1 to 3 above and its Answers and Supplemental Objections and Responses to the Interrogatories of Pepper Hamilton.

      8.     Separately for Bast, Pamela Gagné and the Trusts, describe in detail all unlawful actions taken by one or more members of SFC's Board of Directors, in combination with Gagné, Bast, Pamela Gagné or the Trusts, which resulted in damage to SFC.

**RESPONSE:**

      This Interrogatory is objectionable to the extent it calls for a legal conclusion. The Trustee further objects to this Interrogatory to the extent that any information responsive to this request are in the Defendant's possession and control. This Interrogatory is further objectionable to the extent Count VI of Trustee's Complaint titled Civil Conspiracy, to which this Interrogatory relates, has been dismissed by Court Order dated December 22, 2005. Without waiver of his objection, the Trustee incorporates his answers to Interrogatory Nos. 1 to 3 above and its Supplemental Objections and Responses to the Interrogatories of Pepper Hamilton.

      9.     Separately for Bast, Pamela Gagné and the Trusts, identify all property of SFC that is in the possession of Bast, Pamela Gagné or the Trusts, and for each such item of property, identify SFC's interest in the property and how and when it obtained that interest.

**RESPONSE:**

      This Interrogatory is objectionable to the extent it calls for a legal conclusion. The Trustee further objects to this Interrogatory to the extent that any information responsive to this request are in the Defendant's equal possession and control. This Interrogatory is further objectionable to the extent Count VIII of Trustee's Complaint titled Turnover of Estate Property,

11

to which this Interrogatory relates, has been dismissed by Judge Farnan's Court Order dated December 22, 2005. Without waiver of his objection the Trustee incorporates his answer to Interrogatory Nos. 1 and 10 herein.

10.    Provide a calculation of any category of damages you claim in this matter, specifying as to each element of damages the parties against whom you claim such damages are recoverable.

RESPONSE:

The Trustee seeks a return of all money and items of value obtained by the Family Defendants directly or indirectly from SFC, including those obtained from Yao. This includes but is not limited to $4,293,179.40 million in payments within one year of the filing date, together with the value of other transfers that are identified in discovery, interest, costs, and attorneys' fees.

Michael S. Waters
Lois H. Goodman
McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
3 Gateway Center - 100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711

Daniel K. Astin
Ashley B. Stitzer
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
Special Counsel to Charles A. Stanziale Jr.
Chapter 7 Trustee Student Finance
Corporation

Dated: June 7, 2006

12

**EXHIBIT B**

```
                                                              1
 1    IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE
 2
      MBIA INSURANCE CORPORATION   :
 3    and WELLS FARGO BANK,        :
      N.A. (f/k/a WELLS FARGO      :
 4    BANK MINNESOTA N.A.) as      :
      TRUSTEE OF SFC GRANTOR       :
 5    TRUST, SERIES 2000-1, SFC    :
      GRANTOR TRUST, SERIES        :
 6    2000-2, SFC GRANTOR TRUST,   : C.A. NO.
      SERIES 2000-3, SFC GRANTOR   : 02-1294-JJF
 7    TRUST, SERIES 2000-4, SFC    :
      GRANTOR TRUST, SERIES 2001-1,:
 8    SFC GRANTOR TRUST, SERIES    :
      2001-2, SFC OWNER TRUST      :
 9    2001-I, AND SFC GRANTOR      :
      TRUST, SERIES 2001-3,        :
10        Plaintiffs/Counterclaim :
              Defendants,         : WITNESS:
11                                : ROBERT BAST
              v.                  : TRACK III, VOLUME I
12    ROYAL INDEMNITY COMPANY,     :
          Defendant/Counterclaim  : DATE:
13            Plaintiff.          : APRIL 4, 2007
      _____
14    ROYAL INDEMNITY COMPANY,
          Third-Party Plaintiff,
15
      vs.
16
      ANDREW N. YAO, STUDENT LOAN
17    SERVICING LLC, STUDENT LOAN
      ACCEPTANCE II LLC, STUDENT LOAN
18    ACCEPTANCE III LLC, STUDENT LOAN
      ACCEPTANCE III LLC, STUDENT LOAN
19    ACCEPTANCE V LLC, STUDENT LOAN
      ACCEPTANCE VIII LLC, STUDENT LOAN
20    ACCEPTANCE IX LLC, SFC FINANCIAL LLC
      I, SFC FINANCIAL LLC II, SFC
21    FINANCIAL LLC VI, SFC FINANCIAL LLC
      VII,
22        Third-Party Defendants.
      _____
23    ROYAL INDEMNITY COMPANY,
          Counter-Claimant,
24    vs.
      MBIA BANK and WELLS FARGO BANK
      MINNESOTA, N.A.,
25        Counter-Defendants.
```

66

1  Michelle Shedrick to Mr. Gagne' and
2  it is in the GBT file, from the GBT
3  file. I ask you to take a look at
4  it and tell me if you recall if Mr.
5  Gagne' ever passed this on to you,    11:11:44
6  if you have ever seen it.
7        MS. PRESS: Objection.
8        THE WITNESS: Excuse me.
9  What is GBT file?
10 BY MR. WATERS:
11 Q. It is the number given by your
12 counsel to the documents that they
13 produced in this litigation.
14 A. GBT stands for what?
15 Q. Gagne' Bast trust. They get to    11:12:14
16 make it up, but I would think --
17        MR. EPSTEIN: That's a
18 good guess.
19        THE WITNESS: I don't
20 recall seeing this document, at    11:12:26
21 all.
22        MR. WATERS: We will, in
23 that case, move on.
24 BY MR. WATERS:
25 Q. You have testified that you knew    11:12:58

67

1  that Mr. Gagne' represented SFC, and
2  you have also testified that you are
3  a lawyer.
4        My question is, did you
5  ever have a conversation with Mr.    11:13:16
6  Gagne' about the subject of his
7  potential conflict of interest for
8  Pepper Hamilton and Mr. Gagne'?
9        MS. PRESS: Objection.
10        THE WITNESS: As an    11:13:36
11 attorney, I was aware of potential
12 conflicts, and I only recall that
13 Mr. Gagne' said that he had obtained
14 waivers wherever he saw that was --
15 thought that was necessary.    11:13:48
16 BY MR. WATERS:
17 Q. Did he raise that subject with
18 you or did you raise it with him?
19 A. I don't recall.
20 Q. Are we talking now about the    11:14:04
21 earlier -- the early time frame of
22 your investment in the '90s?
23        MS. PRESS: Objection.
24        THE WITNESS: We are
25 talking about an ongoing situation.    11:14:18

68

1  BY MR. WATERS:
2  Q. No, I'm sorry. When I say are
3  we talking about -- the conversation
4  that you have mentioned to me, when
5  did that --    11:14:26
6  A. I don't recall when the
7  conversation occurred.
8  Q. Well, do you recall that it took
9  place in -- some time in the 1990s
10 as distinguished from --    11:14:36
11 A. Yes, yes.
12 Q. Do you recall anything more of
13 your conversation with Mr. Gagne'
14 about the subject of conflict of
15 interest, other than what you told    11:14:52
16 me a moment ago?
17 A. No.
18 Q. Did he ever show you a waiver?
19 A. No.
20        - - -    11:16:04
21        (Whereupon the court
22 reporter marked document as Exhibit
23 72-III for identification.)
24        - - -
25        THE WITNESS: Sir?    11:17:26

69

1  BY MR. WATERS:
2  Q. Could you identify this document
3  which has been marked as 72?
4  A. 72?
5  Q. I have given you the wrong    11:17:52
6  number? I'm sorry. There are so
7  many depositions being taken at the
8  same time, that there are tracks, so
9  the Roman numeral indicates that.
10 A. This page is my writing.    11:18:06
11 Q. And the following two pages are
12 a letter that you wrote and signed?
13        MS. PRESS: Objection.
14        THE WITNESS: It is a
15 letter that I signed.    11:18:24
16 BY MR. WATERS:
17 Q. Do you know who drafted it?
18 A. I believe Rod drafted it.
19 Q. Turning to the first page, is
20 this your handwriting?    11:18:42
21 A. Yes.
22 Q. And can you -- it appears to be
23 two separate notes, since you have
24 signed both of them, if you could
25 read into the record the first one?    11:18:56

18 (Pages 66 to 69)

70

1  A. "Andy agrees to his and Lore's
2  personal guarantee of the SFC
3  purchases. Please document for us.
4  Not included in this letter for a
5  variety of reasons."          11:19:10
6  Q. And why wasn't the guarantee
7  included in the letter?
8  A. I don't know.
9  Q. Anything that looking at the
10 letter indicates to you why it might  11:19:32
11 not have been included?
12 A. I can't judge that, because I
13 don't know the date of my note. It
14 could have been that my note was
15 written -- apparently was written    11:19:56
16 after the letter.
17 Q. Well, it said not included in
18 this letter for --
19 A. I don't know whether it is this
20 letter that you are referring to or   11:20:10
21 not.
22 Q. Well, this is the way that I got
23 it.
24 A. Okay.
25 Q. It all came together.          11:20:18

71

1  A. All I'm saying is, at this time,
2  I can't confirm that.
3  Q. Well, the next part of the note
4  is dated the same date as the --
5  A. I see that.              11:20:32
6  Q. Well, let me ask you, looking at
7  the letter, can you think of any
8  reason why you would not have
9  included in the letter the fact of
10 Andrew and Lori Yao's personal      11:20:48
11 guarantee?
12      MS. PRESS: Objection.
13      THE WITNESS: It is --
14 their personal guarantee could be a
15 separate document.           11:21:06
16 BY MR. WATERS:
17 Q. Well, there was going to be a
18 document to document what's in the
19 letter. Isn't that what the note is
20 about? It says please document --    11:21:20
21 A. That was to please document the
22 personal guarantee.
23 Q. Okay, I see. Well, then I will
24 rephrase the question.
25      Looking at the letter, can  11:21:34

72

1  you think of any reasons why the
2  personal guarantee should be put in
3  a separate document and not referred
4  to in the letter?
5      MS. PRESS: Objection.        11:21:46
6      THE WITNESS: I would be
7  speculating. I don't know.
8  BY MR. WATERS:
9  Q. If you were writing a letter
10 with the terms, wouldn't you        11:22:08
11 normally include the personal
12 guarantee or the requirement of a
13 personal guarantee when you are
14 listing the conditions of -- and
15 terms?                   11:22:22
16      MS. PRESS: Objection.
17      THE WITNESS: The personal
18 guarantee could be broader than for
19 this document, for this commitment
20 itself. In fact, I was requesting    11:22:36
21 that on a broader basis for Lore's
22 joinder in the guarantee.
23 BY MR. WATERS:
24 Q. In the second note, it says --
25 well, would you read it to me? It    11:22:58

73

1  is your handwriting.
2  A. It says: Revised per the
3  request of Michael Aquino.
4  Q. Saturday, PM?
5  A. Saturday PM, 2/5/00.        11:23:08
6  Q. Do you recall what revisions
7  were requested by Mr. Aquino?
8  A. No, I do not recall that. I do
9  not remember Michael Aquino.
10 Q. You don't know --           11:23:22
11 A. No, sir.
12 Q. Does it refresh your
13 recollection to know that he is an
14 accountant? You still don't recall?
15 A. No, sir.              11:23:32
16 Q. Now, in further --
17 A. Excuse me, sir. He is an
18 accountant with what firm?
19 Q. McGladrey.
20 A. McGladrey was employed by whom?  11:24:02
21      MS. PRESS: Mr. Bast --
22 BY MR. WATERS:
23 Q. I only mentioned it to you to
24 see if it would refresh your
25 recollection.              11:24:12

19  (Pages 70 to 73)

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

74

1      MS. PRESS: One more
2  question will do that.
3  BY MR. WATERS:
4  Q. McGladrey & Pullen, an
5  accounting firm for Student Finance   11:24:22
6  Corporation. Does that help you at
7  all?
8  A. It doesn't still -- I still
9  don't recall any conversations with
10 Michael Aquino or know why that was   11:24:32
11 done.
12 Q. Well, I thought you might,
13 because you seemed to put an
14 exclamation point after the fact
15 that it was on a Saturday night or   11:24:42
16 something.
17      MS. PRESS: Objection.
18      THE WITNESS: We always
19 like to get a little credit for
20 working on Saturday.       11:24:52
21 BY MR. WATERS:
22 Q. So I thought it might help you
23 remember the conversation.
24      Anyway, pursuant to this,
25 you decided to become a shareholder   11:25:06

75

1  in SFC?
2      MS. PRESS: Objection.
3  BY MR. WATERS:
4  Q. That's what this letter is
5  about, your becoming a shareholder?   11:25:14
6  A. I was agreeing to become a
7  shareholder.
8  Q. Do you recall a conversation
9  with Mr. Yao or Mr. Gagne' or anyone
10 else about the reasons for becoming   11:25:28
11 a shareholder in SFC?
12 A. Generally, yes.
13 Q. Who is it that you recall a
14 conversation with, generally?
15 A. It was either Mr. Gagne' or Mr.   11:25:48
16 Yao.
17 Q. Or both?
18 A. Probably -- or both, yes.
19 Q. And what do you recall of the
20 conversation?       11:25:54
21 A. That SFC wanted to broaden its
22 equity -- the percentage of its
23 equity holdings would include more
24 equity participation as
25 distinguished from loans.      11:26:18

76

1  Q. Why did SFC want to do that?
2  A. I don't recall. It had to do --
3  well, I would be speculating.
4  Q. And did you -- did it appear to
5  you to be a good idea that you   11:26:38
6  wanted to participate in it?
7  A. As I indicated, I like to be an
8  equity shareholder, so this was fine
9  with me. To the extent that I could
10 become -- have an opportunity to   11:26:52
11 become an equity holder in what we
12 believed to be a significantly
13 successful operation, that was
14 pleasing.
15 Q. Mark this 73.       11:27:30
16      - - -
17      (Whereupon the court
18 reporter marked document as Exhibit
19 73-III for identification.)
20      - - -
21 BY MR. WATERS:
22 Q. Mr. Bast, you were a shareholder
23 of Student Finance Corporation for
24 about a year?
25 A. Yes, sir.       11:28:32

77

1  Q. And did you ever during that
2  period of time see the bylaws of
3  Student Finance?
4  A. No, sir.
5  Q. Is this the first time you are   11:28:44
6  seeing them?
7  A. Yes, sir.
8  Q. Were you ever made aware of the
9  fact that under the bylaws, if you
10 take a look at Page 16, as a   11:29:06
11 shareholder you are entitled to
12 inspect the books and records of the
13 company, and that you are, unless
14 waived in writing, entitled to
15 annual financial statements?   11:29:18
16 A. Your question?
17 Q. Were you ever made aware of
18 that?
19 A. No.
20 Q. Did you ever discuss that with   11:29:28
21 Mr. Gagne'?
22 A. No.
23 Q. He was also a -- as trustee,
24 also a shareholder?
25      MS. PRESS: Objection.   11:29:36

20 (Pages 74 to 77)

78

```
1       THE WITNESS:  No.
2       THE VIDEO TAPE OPERATOR:
3   Ten minutes remaining on video.
4   BY MR. WATERS:
5   Q.  Did you ever make any request    11:29:56
6   for any financial records of SFC?
7   A.  No.
8   Q.  Were you ever asked to waive
9   your entitlement to financial
10  records of SFC?                  11:30:12
11  A.  No.
12               - - -
13       (Whereupon the court
14  reporter marked document as Exhibit
15  74-III for identification.)      11:30:46
16               - - -
17  BY MR. WATERS:
18  Q.  Mr. Bast, you received a K-1
19  from SFC in 2000 as a shareholder?
20       MS. PRESS:  Objection.     11:31:18
21       THE WITNESS:  I don't
22  recall.
23  BY MR. WATERS:
24  Q.  Do you see where it says
25  Halterman 1207 on the bottom of the  11:31:30
```

79

```
1   first page?  And if you would turn
2   to Halterman 1226?  I have got a
3   clip for that, if you would prefer.
4   It makes it harder to go through
5   it.                           11:31:44
6   A.  Almost there.  Yes, I have
7   that.
8   Q.  Can you identify that as your
9   K-1 for 2000 for Student Finance
10  Corporation?
11  A.  Yes.
12  Q.  And that -- I'm sorry.
13       MR. GROSSBART:  What's the
14  Halterman number again?
15       MR. WATERS:  1226.       11:32:18
16  BY MR. WATERS:
17  Q.  And that shows that you had a
18  loss or obtained a loss of $405,200
19  on the first line?
20  A.  Yes, I did.
21       THE VIDEO TAPE OPERATOR:
22  You blocked your mic with paper.
23  Can you repeat that answer?
24       THE WITNESS:  Yes, I did.
25  BY MR. WATERS:                 11:32:42
```

80

```
1   Q.  And this is an active
2   investment, as distinguished from a
3   passive investment for you?
4       MS. PRESS:  Objection
5       THE WITNESS:  I don't       11:32:50
6   know.
7   BY MR. WATERS:
8   Q.  You don't know?  You would
9   normally give this to your
10  accountant to deduct on your tax    11:32:56
11  return?
12  A.  Yes, sir.
13  Q.  And who was your accountant?
14  A.  Farley Drain & Company.
15  Q.  Have you ever seen -- bear with  11:33:22
16  me one second.  Move forward to
17  Halterman 1215.
18  A.  Yes.
19  Q.  And if you look at the pages
20  that follow 1216 and 7, do you    11:33:48
21  see it refers to shareholder --
22  A.  Yes.
23  Q.  Shareholder interests, of
24  changes in the interest.
25       Does this describe what    11:34:06
```

81

```
1   generally happened that year, Mr.
2   Bast?  Your shares were repurchased
3   by the company over the course of
4   the year?  Take a look at that.
5   A.  That's correct.           11:34:18
6   Q.  Do you see on the page prior to
7   that, on 1214, it addresses
8   compensation of officers?
9   A.  Yes, sir.
10  Q.  Have you ever seen that before?  11:34:50
11  A.  No, sir.
12  Q.  Have you ever seen the rest of
13  the tax return, besides the parts
14  that relate to you?
15  A.  No.                       11:34:56
16  Q.  Have you ever asked for the tax
17  return?
18  A.  No.
19  Q.  I think we are almost -- do you
20  want to take a five-minute break?   11:35:04
21       THE VIDEO TAPE OPERATOR:
22  This concludes Tape 2.  The time is
23  11:35.
24               - - -
25       (Whereupon a short break
```

21 (Pages 78 to 81)

162

1  you recall what that is?
2  A.  No.  It had to do with what
3  ultimately became litigation, but I
4  don't recall.
5  Q.  This is before the lawsuit?        15:00:20
6  A.  No, but by that time,
7  apparently, we were familiar with
8  certain acts that Andrew had taken
9  with respect to accessing Premier
10 Education or PEG funds.           15:00:38
11 Q.  Let me show you a copy of what
12 has been marked as Exhibit 1205-I.
13 She doesn't have to mark that one.
14 This is not a letter --
15 A.  February of 2000.        15:01:12
16 Q.  Yes.  This is not a letter that
17 goes to you, and I'm going to ask
18 you -- take a look at it, if you
19 like -- about one particular part of
20 it.                    15:01:22
21        Are you done?
22 A.  Yes.
23 Q.  The only paragraph I wanted to
24 ask you about is at the bottom of
25 the first page, and I will read it   15:02:38

163

1  to you:  SFC sold common stock to
2  demonstrate that it has the
3  capability to raise equity financing
4  on short notice and to signal SFC's
5  commitment to its long-term business 15:02:54
6  plan.  SFC did not need equity for
7  cash flow, nor did it need equity to
8  satisfy its external auditors.  SFC
9  intends to repurchase the stock in
10 2000.            15:03:12
11       Is that description by Mr.
12 Yao in this letter consistent with
13 what Mr. Yao told to you about the
14 raising of equity financing?
15 A.  Yes.              15:03:28
16
17
18
19
20
21
22
23
24
25

164

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

165

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

# EXHIBIT C

EXHIBIT
BAST
# 72-III
4-4-07

Revised per the
requests of Michael
Aquino

Sgt. BM
2-5-00

PH 184832

# Robert L. Bast

### Attorney at Law
110 Spruce Lane
Ambler, PA 19002
(215) 793-6000

Fax: (215) 793-0880
e-mail: bobbast@netreach.net

February 5, 2000

Mr. Andrew N. Yao, President
Student Finance Corporation
5 Radnor Corporate Center
Suite 501
100 Matsonford Road
Radnor, PA 19087

Re:     Purchase of $6,000,000 of SFC Common Stock

Dear Andrew:

I am writing you to provide you with a commitment to acquire $5 million of the common stock of Student Finance Corporation (herein "SFC") by myself individually and/or as agent for other individuals and Trusts. The other individuals and/or Trusts agree to convert existing debt in the amount of $1 million (with balloon payment due) into shares of SFC common stock, for a total of the above $6,000,000 of common stock investment.

The commitments provided herein are subject to (a) the following terms and conditions, (b) due diligence satisfactory to me, (c) preparation of stock purchase documents acceptable to me, and (d) normal warranties and conditions precedent to the purchase of stock from a corporation or an individual as are found in normal commitments:

1.     For the $6,000,000 purchase price, the purchasers will receive 12% of SFC authorized but unissued common stock , which shares of stock shall be held in escrow by the law firm of Pepper Hamilton and Sheetz subject to the direction of the undersigned which shall be consistent with the repurchase provisions hereinbelow set forth.

2.     SFC shall have the right and obligation to repurchase 1% of the purchased shares, on or before the 20th day of each of March, April, May, June, July , August, September, October, November and December of the year 2000, by paying to the purchasers, on each of such dates, an amount equal to $600,000 plus a return equal to 14% of stockholders' outstanding equity (the $6,000,000 purchase price less any amounts paid for the redemption of the SFC shares as above).

PH 184833

Mr. Andrew N. Yao
Page 2
February 3, 2000

3.      SFC shall have the right and obligation on or before Wednesday January 3, 2001 to purchase the remaining 2% of SFC shares from the purchasers by paying to them the sum of $420,000.

4.      The SFC shares of stock issued to the purchasers shall be subject to anti-dilution and such other protective provisions as shall be reasonably requested by me, in my capacity as an investor and/or as agent for the other investors.

5.      SFC shall provide the usual warranties as to its good corporate standing, authority to issue the above described shares of its common stock and other warranties as may be reasonably requested in a transaction for the sale of stock as has been hereinabove outlined.

6.      Purchasers shall pay $4,000,000 of the overall purchase price on or before February 7, 2000 and the balance of $2,000,000, including the conversion $1,000,000 of existing debt obligation, on or before February 11, 2000.

If the foregoing conditions and provisions relating to our purchase of SFC stock are acceptable, please so signify by signing this letter at the line indicated below and returning a copy of this letter, with written acceptance as above requested, to me no later than Monday , February 7, 2000..

Sincerely,

Robert L. Bast

WRG/bdw

The foregoing terms are agreed to an accepted on this        day of February, 2000.

Student Finance Corporation

_____

by Andrew N. Yao, President

(corporate seal).

PHLEGAL: #135934 v1 ffXXXG01LWPD

PH 184834

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| STUDENT FINANCE CORPORATION | : | |
| | : | |
| Debtor | : | Civil Action No. 04-1551 (JJF) |
| | : | |
| CHARLES A. STANZIALE, JR., | : | |
| CHAPTER 7 TRUSTEE OF STUDENT | : | |
| FINANCE CORPORATION | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| PEPPER HAMILTON LLP, et al | : | |
| Defendants | : | |

**OBJECTIONS AND RESPONSES OF CHARLES A. STANZIALE, JR.,
CHAPTER 7 TRUSTEE FOR STUDENT FINANCE CORP., TO THE THIRD
SET OF INTERROGATORIES BY THE FAMILY DEFENDANTS**

Charles A. Stanziale, Jr., Chapter 7 Trustee for Student Finance Corporation (the "Trustee"), pursuant to the Federal Rule of Civil Procedure 33, as made applicable by Bankruptcy Rule 7033, by and through his undersigned attorneys, hereby responds and objects to Defendants, W. Roderick Gagné, Robert L. Bast, Pamela Bashore Gagné and the Trusts' (the "Family Defendants") Third Set of Interrogatories.

Each of the responses is subject to and incorporates the General Statement and General Objections as set forth hereinafter. These answers are based upon information known or believed to be true to at the time of responding to this Third Set of Interrogatories. Fact discovery has only recently closed and expert discovery has not yet

commenced.  During fact discovery, more than 150 days of depositions were conducted.
In addition, document production, both by the parties and by third parties pursuant to
subpoenas, continued until the end of the fact discovery period.  The Trustee has not
completed review and analysis of the depositions and the millions of pages of documents
produced and the answers set forth below are subject to supplementation.

## GENERAL OBJECTIONS

1.    The Trustee objects to the Interrogatories to the extent that they exceed the
scope permitted under or seek to impose obligations upon the Trustee in excess of those
required or contemplated by Federal Rule of Civil Procedure 33.

2.    The Trustee objects to the Interrogatories to the extent they seek
production of documents or information protected by the attorney-client privilege, work
product doctrine, or any other privilege or immunity from disclosure.

3.    The Trustee objects to the Interrogatories to the extent that they pertain to
matters neither relevant to the issues involved in this proceeding nor reasonably
calculated to lead to the discovery of admissible evidence.

4.    The Trustee objects to the Interrogatories to the extent they seek
information equally, more readily or exclusively available to the Family Defendants or
not within the possession, custody or control of the Trustee.

5.    The Trustee reserves the right to amend or supplement these Responses as
and when additional relevant information becomes available.

6.    The Trustee submits these objections and responses without conceding the
relevancy, materiality or admissibility of any request or response thereto.

7.    The Trustee objects to each of these Interrogatories insofar as it seeks

2

information protected from disclosure on the grounds that the information sought is confidential.

8.    The Trustee objects to each of these Interrogatories insofar as it seeks information which requires the Trustee to speculate about or provide information not in his possession, custody or control.

9.    The Trustee objects to each of these Interrogatories to the extent they are overly broad and unduly burdensome as to render them impossible to respond in any reasonable manner or amount of time.

10.    The Trustee objects to each of these Interrogatories insofar as they seek personal information concerning current or former employees of Debtor and/or the Trustee and that is personal or confidential and the disclosure of which would be improper and inappropriate.

11.    The Trustee objects to each of these Interrogatories to the extent they seek information for an unreasonable or irrelevant period of time.

12.    The Trustee objects to each of these Interrogatories to the extent they request the Trustee to provide information or perform analyses or compilations beyond the duties imposed by the Federal Rules of Civil Procedure.

13.    The Trustee incorporates by reference, as if fully set forth below in each individual response, the General Objections to the Family Defendants' Interrogatories.

14.    Each Response is given subject to the General Objections. All such objections and grounds therefore are reserved and may be interposed at the time of trial. Asserting a specific objection in response to any discovery request does not waive the Trustee's right to assert any applicable general objection thereto. These Responses are

3

made solely for purposes of, and in relation to, this action.

## TRUSTEE'S RESPONSES TO INTERROGATORIES

20.    For each and every denial to one or more of the specific requests contained in the Requests for Admissions, (i) state the basis or bases for such denial; (ii) identify all facts that support all of the basis or bases for such denial; (iii) identify all documents that support all the basis or bases for such denial; and (iv) identify all persons with knowledge of the basis or bases for such denial.

ANSWER:

The Trustee objects to this Interrogatory to the extent that such request is vague, ambiguous, overbroad, unduly burdensome and duplicative. Subject to and without waiving these objections, and the General Objections that are incorporated herein by reference, the Trustee further objects to the Request for Admissions in its entirety, in that it contains 569 separate requests, many of which ask the Trustee to admit to documents that were produced by third parties and as to which he, as trustee in bankruptcy for SFC, has no knowledge. The service of 569 requests in and of itself is highly burdensome and harassing. The Trustee has responded to the 569 Requests for Admissions to the best of his ability, based on the information available, given his role as trustee in bankruptcy for SFC. In so answering, the Trustee has set forth the bases for his inability to answer in his responses to the specific requests. The Trustee objects further because such an interrogatory with so many subparts is in clear violation of limitation on the number of interrogatories allowed. Further, the Trustee proposed that the parties seek to agree to stipulate to the authenticity of the core documents.

21.    For each and every response to one or more of the specific requests

4

contained in the Requests for Admissions that is anything other than a denial or an unqualified admission, (i) state the basis or bases for such response; (ii) identify all facts that support all of the basis or bases for such response; (iii) identify all documents that support all the basis or bases for such response; and (iv) identify all persons with knowledge of the basis or bases for such response.

**ANSWER:**

See response to Interrogatory No. 20 incorporated herein.

22.    Identify each and every asset of Yao or Lore Yao with a value over $10,000 from 2001 to the present of which you have knowledge.

**ANSWER:**

The Trustee objects to this Interrogatory as unduly burdensome, overly broad and vague. The Trustee further objects to this Interrogatory to the extent that any information responsive to this request is in the Family Defendants' equal possession and control. Subject to and without waiving these objections, and the general objections that are incorporated herein by reference, any responsive information in the Trustee's possession has been previously provided and/or made available to the Family Defendants. Specifically, the Trustee refers the Family Defendants to the settlement filing made in the Bankruptcy Court regarding Yao's assets and to deposition transcripts and exhibits obtained at the depositions of Andrew Yao and Lore Yao. Depositions of Andrew Yao were taken on 10/14/99, 11/30/99, 10/25/02, 02/07/03, 08/27/03, 08/28/03, 09/04/03, 09/19/03, 10/24/03, 02/11/04, 08/26/04, 08/27/04, 10/05/04, and 10/06/04. Depositions of Lore Yao were taken on 09/18/03 and 08/26/04. See answer to Interrogatory 23, incorporated herein.

23.     Describe in detail all attempts that you have made to obtain a judgment against Yao.

**ANSWER:**

The Trustee objects to this Interrogatory as unduly burdensome, overly broad and vague. This Interrogatory is further objectionable to the extent it calls for a legal conclusion. Subject to and without waiving these objections, and the general objections that are incorporated herein by reference, on September 14, 2004, the Trustee filed an adversary proceeding against Defendants Yao, Lore North Yao, DCC I Aircraft Corporation and DCC II Aircraft Corporation ("Complaint"), in the US Bankruptcy Court for the District of Delaware, Bankr. Docket No., bearing Adversary Number 04-55218. The Complaint alleges, *inter alia*, that Yao was liable for breach of fiduciary duty; misrepresentation; SFC's deepening insolvency; waste of corporate assets; conversion; unjust enrichment; fraudulent conveyance; fraudulent transfer; preference claims; and equitable subordination. The Trustee has served Yao with discovery, including Requests for Admissions, Requests for Production of Documents, and Interrogatories.

During the pendency of the case and before Yao produced any information in response to discovery, Yao was indicted by the United States Government in the United States District Court for the District of Delaware in the case United States v. Andrew N. Yao, Crim. Action No. 06-27. Due to the alleged commonality of issues between the pending criminal case and the adversary proceeding, Yao has refused to provide responses to any discovery requests, asserting his Fifth Amendment right against self-incrimination. The Trustee has filed a Motion to Compel defendant Andrew N. Yao to answer the aforementioned discovery.

6

In addition, in conjunction with the prosecution of Adversary Number 04-55218, during April of 2006, the Trustee, Lore Yao, Andrew Yao and Royal Indemnity Company entered into a Settlement Agreement. The terms of that Settlement Agreement were made public by *Motion to Approve Settlement Agreement with Andew Yao, Lore Yao and Royal Indemnity and for Authorization to Sell Certain Real Property Located at 209 & 209R Polpis Road, Nantucket, Massachusetts,* filed on April 24, 2006, and approved by the Court by Order dated May 17, 2006. One facet of the Settlement Agreement was the transfer of the real property located at 209 & 209R Polpis Road, Nantucket, Massachusetts to the Trustee. The Trustee is currently in the process of marketing said property for sale.

The Trustee is still conducting discovery and prosecuting Adversary Number 04-55218 and reserves the right to amend and/or supplement this answer to Interrogatory as necessary.

24.    Describe in detail all attempts that you have made to execute on or otherwise obtain any assets of Yao incorporated herein.

**ANSWER:**

See response to Interrogatory No. 23 incorporated herein.

25.    Identify all assets of Yao that you have made an attempt to execute on or otherwise obtain and, for each such asset, state the present status of your attempts to execute on or otherwise obtain such asset.

**ANSWER:**

See response to Interrogatory No. 23 incorporated herein.

26.    If in response to the Requests for Admissions, you deny, or do not

7

unqualifiedly admit, that each and every payment made by SFC to Bast, Pamela Gagné or the Trusts between June 5, 2001 and June 5, 2002 was made in the ordinary course of business or financial affairs of SFC and Bast, Pamela Gagné and the Trusts, then identify each and every payment made to Bast, Pamela Gagné and the Trusts from 1996 through 2002 and, for each payment, identify the obligation on account of which the payment was made, the date of payment, the method of payment and the identity of the payee.

ANSWER:

The Trustee objects to this Interrogatory to the extent that such Interrogatory is vague, ambiguous, overbroad, and unduly burdensome. This Interrogatory is further objectionable to the extent it calls for a legal conclusion. The normal and ordinary course of business relates to an affirmative defense on which the Family Defendants' bear the burden of proof. The Trustee further objects to this Interrogatory to the extent that any documents responsive to this request are in the Family Defendants' equal possession and control. Subject to and without waiving these objections, and the general objections that are incorporated herein by reference, the Trustee responds as follows:

In 2000 and 2001, the Family Defendants sold to SFC stock in SFC, for which they were paid 6,931,636. As SFC was insolvent at the time, the stock was worthless and the payment was a fraudulent conveyance.

As SFC was operated as a fraudulent business scheme for much of its existence, all of the payments to the Family Defendants were fraudulent conveyances.

As one of the Family Defendants, Roderick Gagné, breached his fiduciary duties to SFC mandating the return, *inter alia*, of all ill-gotten gains, the profits received by Gagné and the other Family Defendants must be included in those gains to be returned to

8

the estate of SFC.

The Stock in Premier Education Group obtained by the Family Defendants from Mr. Yao vastly exceeded in value the amount of the obligation against which it was transferred. Yao, as General Partner, was intended to have an interest between 30% and 40% of Premier Education Group. The family still holds that interest for Yao's benefit once it exceeds any obligation to them, which it has.

The Trustee refers to and incorporates herein by reference the Mediation Statement of the Trustee, with exhibits, and the Mediation Statement of Royal Insurance Company, with exhibits, all of which have previously been served upon counsel for the Family Defendants.

The Trustee refers to and incorporates herein by reference the expert reports of Weiser LLP and Professor Nancy Moore, which are this date being served.

27.    State the Bates numbers of the following SFC General Ledgers, if such documents with Bates numbers have been previously produced:

(a)    SFC General Ledger for the calendar year 1996 as of December 31, 1996;

(b)    SFC General Ledger for the calendar year 1997 as of December 31, 1997;

(c)    SFC General Ledger for the calendar year 1998 as of December 31, 1998;

(d)    SFC General Ledger for the calendar year 1999 as of December 31, 1999;

(e)    SFC General Ledger for the calendar year 2000 as of

9

December 31, 2000;

      (f)    SFC General Ledger for the calendar year 2001 as of December 31, 2001; and

      (g)    SFC General Ledger for the calendar year 2002 as of December 31, 2002.

**ANSWER:**

The Trustee objects to this Interrogatory to the extent that such request is vague, ambiguous, overbroad, unduly burdensome and duplicative. The Trustee further objects to this Interrogatory to the extent that any documents responsive to this request are in the Family Defendants' equal possession and control. Subject to and without waiving these objections, and the general objections that are incorporated herein by reference, the Trustee has made available, through Guidance Software, Inc., a DVD copy of the non-privileged portions of the DiSimplico laptop, containing the SFC QuickBooks files which are essentially the SFC General Ledgers. Because it was produced in this format, the documents on the DVD copy of the DiSimplico laptop containing the SFC QuickBooks files was not Bates numbered. In addition, upon information and belief, a copy of the contents of the SFC QuickBooks program was made available in discovery by Royal.

28.    Identify each and every document, if any, that you contend materially amends or alters the terms of the Subordinated Debentures, Secured Notes, Loan Agreements, Loan and Security Agreements, Conditional Guaranties, Guaranties and Amendments to Loan Agreements that are referred to by Bates number in the Requests for Admissions, if any such document is not already identified in the Requests for Admissions or in your responses to the Requests for Admissions.

**ANSWER:**

The Trustee objects to this Interrogatory to the extent that such request is vague, ambiguous, overbroad, unduly burdensome and duplicative. The Trustee further objects to this Interrogatory to the extent that any documents responsive to this request are in the Family Defendants' equal possession and control. This Interrogatory is further objectionable to the extent it calls for a legal conclusion. Without waiving objection, the Trustee responds:

The Trustee refers to and incorporates herein by reference the expert reports of Weiser LLP and Professor Nancy Moore, which are this date being served.

The Trustee also refers to the Mediation Statement of the Trustee, with exhibits, and the Mediation Statement of Royal Insurance Company, with exhibits, all of which have previously been served upon counsel for the Family Defendants.

The Trustee reserves his rights to supplement same.

Michael S. Waters
McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
3 Gateway Center - 100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711

Ashley B. Stitzer
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
Special Counsel to Charles A. Stanziale Jr.
Chapter 7 Trustee Student Finance
Corporation

Dated: May 7, 2007

11

## McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
ATTORNEYS AT LAW

THREE GATEWAY CENTER
100 MULBERRY STREET
NEWARK, NEW JERSEY 07102-4079
(973) 622-7711
FACSIMILE (973) 622-5314

MICHAEL S. WATERS
Direct Dial: (973) 565-2011
E-mail: mwaters@mdmc-law.com

May 7, 2007

### VIA ELECTRONIC MAIL

Neil G. Epstein, Esq.
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102

RE: *Student Finance Corporation*

Dear Neil:

We serve upon you herewith the following documents:

- Trustee's Objections and Responses to the Third Set of Interrogatories by the Family Defendants;
- Trustee's Objections and Responses to the Third Set of Request for Production of Documents by the Family Defendants; and
- Trustee's Objections and Responses to First Set of Requests for Admissions by the Family Defendants.

A hard copy of the document will be forwarded to you by first class mail. A certification will be provided for the interrogatories. If you have any questions, please feel free to give me a call.

Very truly yours,

McElroy, Deutsch, Mulvaney & Carpenter, LLP

Michael S. Waters, Esq.

McElroy, Deutsch, Mulvaney & Carpenter, LLP

Page 2

cc: <u>Via E-Mail</u>
    John I. Grossbart, Esq. (w/enclosure)
    Veronica E. Rendon, Esq. (w/enclosure)
    Andre G. Castaybert, Esq. (w/enclosure)
    John H. Eickemeyer, Esq. (w/enclosure)
    Stephen J. Shapiro, Esq. (w/enclosure)
    Charlene D. Davis, Esq. (w/o enclosure

**EXHIBIT E**

**From:**        Lois Goodman
**Sent:**        Friday, March 30, 2007 2:29 PM
**To:**          nepstein@eckertseamans.com
**Cc:**          Michael S. Waters
**Subject:**     sfc


Neil, this is to confirm our conversation earlier this afternoon.  You agreed to extend the time for the Trustee to respond to the discovery you recently served, including the requests for admissions, until the end of fact discovery (April 30).  In addition, you agreed to revisit the Family Defendants' responses to the Trustee's contention interrogatories and advise as to whether any need to be updated.

Thanks for the courtesy.

Have a good weekend,

Lois

*Lois H. Goodman, Esq.*
*McElroy, Deutsch, Mulvaney & Carpenter, LLP*
*3 Gateway Center*
*Newark, NJ 07102*
*Tel. (973) 565-2079*
*Fax (973) 622-5314*
*lgoodman@mdmc-law.com*

**EXHIBIT F**

From:           Lois Goodman
Sent:           Thursday, April 05, 2007 2:46 PM
To:             'NEpstein@eckertseamans.com'
Cc:             Michael S. Waters; 'cpress@eckertseamans.com'; Elizabeth A. Kenny
Subject:        FW:


Neil, this will confirm that we have agreed that responses to the pending discovery
between the Trustee and the Family Defendants (including the responses to requests for
admissions) is similarly extended to May 7.  Lois

Lois H. Goodman, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
3 Gateway Center
Newark, NJ 07102
Tel: (973) 565-2079
Fax: (973) 622-5314
lgoodman@mdmc-law.com


-----Original Message-----
From: Shapiro, Stephen [mailto:SShapiro@schnader.com]
Sent: Thursday, April 05, 2007 9:13 AM
To: Lois Goodman
Subject: RE:

Lois,

This is to confirm that we just orally agreed to extend the deadline for Pepper/Gagne to
respond to the Trustee's outstanding written discovery requests and for the Trustee to
respond to Pepper's outstanding written discovery requests until May 7, 2007.

-Steve

-----Original Message-----
From: Lois Goodman [mailto:lgoodman@mdmc-law.com]
Sent: Friday, March 30, 2007 12:11 PM
To: Shapiro, Stephen
Cc: Michael S. Waters
Subject:

Steve, this is to confirm our conversation with regard to pending discovery between the
Trustee and Pepper.  Specifically, we both agreed to extend until the end of discovery
(April 30) the deadline to respond to the discovery requests we recently served on each
other.  In addition, I advised that it is my intention to get the documents relating to
Royal's communications with the Trustee prior to their settlement to you by the end of
next week (at the latest, the beginning of the following week) and you indicated that that
was not a problem.

As always, thanks for the courtesy.

Have a good weekend,

Lois

Lois H. Goodman, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
3 Gateway Center
Newark, NJ 07102
Tel. (973) 565-2079
Fax (973) 622-5314
lgoodman@mdmc-law.com

**EXHIBIT G**

**Report on Related Party Loans &
Valuation of Andrew Yao's Interest in
One Summit Place Partners, LP and Day Hill Partners, LP**

May 7, 2007

Prepared by:

William Hecht, CPA
Weiser LLP

Table of Contents

SECTION

| | |
|---|---|
| 1.0) | INTRODUCTION AND OPINION |
| 2.0) | ANALYSIS OF 55 RELATED PARTY LOANS |
| 3.0) | $ 6 MILLION IN CAPITAL RAISED IN FEBRUARY 2000 AND REDEEMED OVER 12 MONTHS |
| 4.0) | STUDY OF PRICING FOR COMPARABLE LOANS |
| 5.0) | CONCLUSION – RELATED PARTY LOAN COMMITMENT FEES IN EXCESS OF MARKET RATES |
| 6.0) | VALUATION OF ANDREW YAO'S INTEREST IN DAY HILL PARTNERS, LP AND ONE SUMMIT PLACE PARTNERS, LP |



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 2 of 8

## 1.0)    INTRODUCTION AND OPINION

At the request of McElroy, Deutsch, Mulvaney & Carpenter, LLP, Weiser LLP and
William Hecht, have been asked to:

➢ **Evaluate** the reasonableness of the interest rates and commitment fees charged on a
series of 55 loans made from related parties to Student Finance Corporation (hereafter
referred to as "Related Parties") between December 1995 and March 2002 from:

- Pamela Gagne,
- Robert Bast,
- Elizabeth Brennan Trust,
- James Brennan Trust FBO W.Roderick Gagne,
- James Brennan Trust FBO Phillip Gagne, and
- James Brennan Trust FBO Elizabeth Gagne.

➢ **And value** the general partnership interests of Andrew Yao in Day Hill Partners, LP
and One Summit Place Partners, LP based upon appraised values for the properties
owned by those entities.

This report and its appendices provide explanation and background supporting the expert
opinion of William Hecht and Weiser LLP that the commitment fees charged on 33 of
these loans were above the market rates charged on similar loans during the same time
period.

Incorporated in 1993, Student Finance Corporation ("SFC" or the "Company") was in the
business of originating student tuition loans directly from students or purchasing student
tuition loans from various vocational schools (primarily commercial truck driving
schools). On June 5, 2002, certain creditors of SFC filed an involuntary bankruptcy
petition against SFC. Thereafter, Charles A. Stanziale, Jr. Esq. was appointed Chapter 7
Trustee of SFC. See the report of Harry Steinmetz of Weiser LLP for additional
background information.

The opinions presented in this report are based on the consideration of the documents set
forth as exhibits to this report and my over 40 years of experience as an accountant and
business advisor to middle-market companies in many different industries including but
not limited to real estate and leasing concerns as well as my experience in forensic
accounting and providing testimony in such matters. My experience, along with a list of
the other cases in which I have testified as an expert in the preceding four years, either at
trial or at deposition, is included in an exhibit to this report. In connection with this
assignment, I have been assisted by and consulted by others at Weiser LLP, all of whom
have worked under my direction and supervision. Our fee is not dependent on the
outcome of the litigation and our time will be charged at hourly rates; my hourly rate is
$425.



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 3 of 8

As additional information is provided in depositions and as additional documents or facts become known during the course of this matter, I may be asked to perform additional analyses. In addition, I may rely upon, or respond to, the opinions of other experts in this matter. Accordingly, the opinions expressed herein (and the bases therefore) may be modified or supplemented based upon further analysis.

The procedures we performed to arrive at our conclusions are as follows:

1. We read the various documents produced in this matter that are identified in the attached Exhibit B, including, but not limited to: financial statements, financial records of Student Finance Corporation, tax returns, appraisals and related loan documents.
2. We compared the interest rates and commitment fees charged on these loans to other loans of similar size made to companies in the same industry as SFC.
3. We discussed interest rates and commitment fees with a former bank executive familiar with higher risk commercial loans.

OPINION

Based upon our analysis and the facts and circumstances surrounding SFC and these loans, it is the opinion of William Hecht and Weiser LLP that the commitment fees charged on 33 loans were above the comparable commitment fees charged on similar loans during the same time period (See Exhibit A pages 5 through 8).

The general partnership interests of Andrew Yao in Day Hill Partners, LP and One Summit Place Partners, LP through his ownership of the corporate general partner in each partnership as of June 2002 was approximately $679,470.

Sincerely,

William Hecht, CPA

Partner
Weiser LLP

May 7, 2007



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 4 of 8

2.0)        ANALYSIS OF 55 LOANS

Exhibit A provides a listing of 55 loans made to Student Finance Corporation with a
personal guaranty of Andrew Yao and his wife, Lore, between December 1995 and
March 2002 from:

- Pamela Gagne,
- Robert Bast,
- Elizabeth Brennan Trust,
- James Brennan Trust FBO W.Roderick Gagne,
- James Brennan Trust FBO Phillip Gagne, and
- James Brennan Trust FBO Elizabeth Gagne.

We prepared a table of the loans with their terms and obtained loan principal, interest and
commitment fee payment amounts from SFC's Quickbooks files.

**Summary table – Loan Statistics**

| | |
|---|---|
| Number of loans | 55 |
| Minimum loan size | $50,000 |
| Maximum loan size | $3,500,000 |
| Average loan size | $577,727 |
| Number of loans above $ 1 million | 10 |
| Sum equal to or greater than $ 1 million | $18,700,000 |
| Sum less than $ 1 million | $13,075,000 |
| Number of loans less than $ 1 million | 45 |
| Average loan size less than $ 1 million | $290,556 |
| Interest rate - lowest | 10% |
| Interest rate - highest | 15% |
| Term (months) - Minimum | - |
| Term (months) - Maximum | 61 |
| Average maturity (months) | 14 |
| Secured loans ($) | $28,775,000 |
| Secured loans (#) | 48 |
| Subordinated debt ($) | $3,000,000 |
| Subordinated debt (#) | 7 |
| Commitment fee paid (# loans) | 33 |
| Commitment fee paid ($) | $1,845,500 |
| Commitment fee terms | 6% ~ 14.5% |
| Average loan term (stated maturity date) when fee pd (mos) | 7 |



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 5 of 8

3.0)   CAPITAL RAISED IN FEBRUARY 2000 AND REDEEMED OVER 12
       MONTHS

In February 2000, SFC raised $ 6 million of capital from the Related Parties. SFC's
financial statement footnotes for the year 1999 (auditor's report dated July 26, 2000),
describe this as " On February 2000, the Company received a commitment from various
individuals and trusts to purchase 12% of the Company's common stock at a purchase
price of $ 6,000,0000. Of the $6,000,0000 purchase price, $1,000,000 of existing debt was
converted to common stock. The Company received $6,000,000 of the overall purchase
price in February 2000, including $1,000,000 of converted debt obligations" (these notes
are referenced in our Exhibit A as notes #39 through #42).

The following year, SFC's financial statement footnotes for the year 2000 (auditor's
report dated April 6, 2001) describe the transaction somewhat differently indicating a
date one-month earlier adding more detail. "During January 2000, the Company sold an
additional 1,370 shares of its common stock for approximately $5,000,012, net of
issuance costs. A portion of the proceeds was used to repay certain note holders with the
balance to be used for general corporate purposes. During 2000, the Company authorized
the repurchase of 180 shares of its common stock issued and converted during 2000 at
various dates through January 2001. As of December 31, 2000, the Company re-acquired
164 shares for approximately $5,885,000. During January 2001, the Company re-
acquired the remaining 16 shares for approximately $1,047,000, which resulted in all of
the Company's issued and outstanding common stock being owned by one individual."

The following chart provides the stock redemption amounts ($5,885,000 and $1,047,000
listed in the paragraph above), by each of the Related Parties, paid from 2000 through
January 2001:

| Ref # | Date | | Name | | Paid |
|---|---|---|---|---|---|
| 1 | Feb-00 | | Elizabeth B. Brennan Trust | | $462,125 |
| 2 | Feb-00 | | James T. Brennan Trust FBO Elizabeth L. Gagne | | $375,446 |
| 3 | Feb-00 | | James T. Brennan Trust FBO Philip B. Gagne | | $375,446 |
| 4 | Feb-00 | | James T. Brennan Trust FBO W. Roderick Gagne | | $375,446 |
| 5 | Feb-00 | | Pamela Gagne | | $721,895 |
| 6 | Feb-00 | | Robert Bast | | $4,621,278 |
| | | | | | $6,931,636 |



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 6 of 8

4.0)    STUDY OF PRICING FOR COMPARABLE LOANS

We obtained a database of over 170 loans made during the same time period to
companies of similar size and in the same industry as SFC. This loan information was
obtained from Reuters Loan Pricing Corporation (http://www.loanpricing.com) who
maintains and sells information obtained from loan syndicators, lenders, institutional
investors and other market participants.

The <u>maximum</u> commitment fee for loan transactions in Reuters' loan database was 2%;
the loan maturity dates on such loans was greater than 6 months.

5.0)    LOAN COMMITMENT FEES IN EXCESS OF MARKET RATES

Our review of the 33 SFC loans where commitment fees were paid indicated that fees
ranged from 6% to 14.5% on loan maturities from 1 month to 18 months. We noted that
some loan maturity dates preceded the date of the loan agreement (See Exhibit Col (J) –
where note (a) is listed). Additionally we also noted that a commitment fee of $377,000
(14.5%) was paid on loan referenced as #27 in Exhibit A on page 6 of 8 where the loan
agreement indicated a maximum fee of $260,000 (10%).

An unusual feature of many of these loan commitment fees was that the fee was to be
paid at the back-end of the loan instead of at inception. This suggests that these fees were
some type of deferred interest charge. Other commitment fees were based on an
escalating fee scale where the fee was 6% of principal amount if the loan was repaid
within 60 days; 8% if repaid after 60 days but before 91 days; 10% if repaid after 91
days. This fee structure offered a financial motivation to repay the debt faster.

As a benchmark for the overall reasonableness of these fees, we calculated the effective
annual interest rate combining the interest and commitment fees on a $3.5 million loan
from Pamela Gagne revealing a 77% effective interest rate (June 18, 1999 – due
November 1999 and repaid August 2, 1999, six weeks after its inception. The
commitment fee paid was $210,000.) In selecting another two loans with principal
amounts of $500,000 and $1,500,000, we computed effective annual interest rates of
approximately 46% on each loan.

Also, to gain additional information on loan pricing during this time period, I spoke with
a former bank executive familiar with such transactions for smaller companies. He



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 7 of 8

conveyed that 1% to 2% commitment fees were customary and that there were also
transactions on higher-risk deals with 4% commitment fees.

Taken together, all these factors combined with my experience in advising privately-held
middle-market companies for over 40 years, indicates to me that the commitment fees
paid in these loan transactions were above market rates and that a 4% rate (at most)
would have been appropriate. Accordingly, we have computed the difference between
the fees paid and a 4% charge to calculate the portion of the fee that was above market
rates. (See Exhibit A pages 5 through 8, columns T through V).



Student Finance Corporation Ch 7
Report of William Hecht and Weiser LLP – May 7, 2007
Page 8 of 8

6.0)    VALUATION OF ANDREW YAO'S INTEREST IN DAY HILL
        PARTNERS, LP AND ONE SUMMIT PLACE PARTNERS, LP

I have reviewed the appraisals prepared by John Houck of Weiser Realty for the
properties owned by these partnerships, as well as the Federal tax returns filed for the
year 1999, 2000 and 2001.

In the table, I have computed the value of Andrew Yao's 33% interest through his
ownership of the corporate general partner in each partnership as of June 2002.

**I. Valuation of Andrew Yao's Interest in Day Hill Partners, LP**

| | | |
|---|---|---|
| Real estate appraisal of 995 Day Hill Road, Windsor, CT (6/1/2002) | $2,600,000 | |
| Less: mortgage on 995 Day Hill Road property (12/31/01 tax return) | ($1,724,000) | |
| Plus: book value of other assets, net of liabilities, on Day Hill Partners, LP tax return | $329,000 | |
| Value of Day Hill Partners, LP 100% partnership interests | $1,205,000 | |
| Multiplied by 33% A.Yao interest Day Hill Partners GP, Inc. | X  33% | |
| Value of A.Yao's interest in Day Hill Partners GP, Inc. | | $397,650 |

**II. Valuation of Andrew Yao's Interest in One Summit Place Partners, LP**

| | | |
|---|---|---|
| Real estate appraisal of One Summit Place, Branford, CT (6/1/2002) | $1,700,000 | |
| Less: mortgage on One Summit Place (12/31/01 tax return) | ($1,088,000) | |
| Plus: book value of other assets, net of liabilities, on One Summit Place Partners, LP tax return | $242,000 | |
| Value of One Summit Place Partners, LP 100% partnership interests | $854,000 | |
| Multiplied by 33% A.Yao interest One Summit Place GP, Inc. | X  33% | |
| Value of A.Yao's interest in One Summit Place GP, Inc. | | $281,820 |

**III. Total Value of Andrew Yao's Interest in Day Hill Partners LP
and One Summit Place Partners, LP**                                    $679,470



# EXHIBIT A



SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Loan Amount | Loan Repaid | Loan Balance Outstanding @ June 2002 | Interest Rate | Maturity | | Term In Months | Date Loan Repaid | # Mos Outstd Until Pd | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/31/95 | SD | Pamela Gagne | $250,000 | $0 | | 15% | 12/1/00 | | 60 | Not repaid | | |
| 2 | 12/31/95 | SD | Robert Bast | $750,000 | $0 | | 15% | 12/20/00 | | 61 | Not repaid | | |
| 3 | 8/1/97 | SD | Elizabeth B. Brennan Trust | $150,000 | $0 | | 10% | 7/31/02 | | 61 | Not repaid | | |
| 4 | 8/1/97 | SD | Pamela Gagne | $250,000 | $0 | | 10% | 7/31/02 | | 61 | Not repaid | | |
| 5 | 8/1/97 | SD | Robert Bast | $600,000 | $0 | | 10% | 7/31/02 | | 61 | Not repaid | | |
| 6 | 8/7/98 | SD | Elizabeth B. Brennan Trust | $500,000 | $0 | | 15% | 7/31/03 | | 61 | Not repaid | | |
| 7 | 8/7/98 | SD | Robert Bast | $500,000 | $0 | | 15% | 7/31/03 | | 61 | Not repaid | | |
| 8 | 8/31/98 | SN | Elizabeth B. Brennan Trust | $250,000 | $250,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 5 | Maturity - earlier of 6/30/98 or warehouse financing date |
| 9 | 8/31/98 | SN | Robert Bast | $250,000 | $250,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 5 | Maturity - earlier of 6/30/98 or warehouse financing date |
| 10 | 9/18/98 | SN | Elizabeth B. Brennan Trust | $500,000 | $500,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 4 | Maturity - earlier of 6/30/98 or warehouse financing date |
| 11 | 9/18/98 | SN | Robert Bast | $1,500,000 | $1,500,000 | $0 | 12% | 11/20/99 | (a) | 14 | 1/22/1999 | 4 | Maturity - earlier of 11/20/99 or warehouse financing date |
| 12 | 10/30/98 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $50,000 | $50,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 3 | Maturity - earlier of 6/30/98 or warehouse financing date |
| 13 | 10/30/98 | SN | James T. Brennan Trust FBO Philip B. Gagne | $50,000 | $50,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 3 | Maturity - earlier of 6/30/98 or warehouse financing date |
| 14 | 10/30/98 | SN | James T. Brennan Trust FBO W.Roderick Gagne | $500,000 | $500,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 3 | Maturity - earlier of 6/30/98 or warehouse financing date |
| 15 | 10/30/98 | SN | Robert Bast | $1,000,000 | $1,000,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 3 | Maturity - earlier of date or warehouse financing date |
| 16 | 11/20/98 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $250,000 | $250,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 2 | Maturity - earlier of date or warehouse financing date |
| 17 | 11/20/98 | SN | James T. Brennan Trust FBO Philip B. Gagne | $250,000 | $250,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 2 | Maturity - earlier of date or warehouse financing date |
| 18 | 12/18/98 | SN | Elizabeth B. Brennan Trust | $200,000 | $200,000 | $0 | 12% | 6/30/98 | (a) | - | 1/27/1999 | 1 | Maturity - earlier of date or warehouse financing date |
| 19 | 12/18/98 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $200,000 | $200,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 1 | Maturity - earlier of date or warehouse financing date |
| 20 | 12/18/98 | SN | James T. Brennan Trust FBO Philip B. Gagne | $200,000 | $200,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 1 | Maturity - earlier of date or warehouse financing date |
| 21 | 12/18/98 | SN | Robert Bast | $1,400,000 | $1,400,000 | $0 | 12% | 6/30/98 | (a) | - | 1/22/1999 | 1 | Maturity - earlier of date or warehouse financing date |
| 22 | 1/20/99 | SN | Elizabeth B. Brennan Trust | $500,000 | $600,000 | $0 | 15% | 7/20/00 | | 18 | 7/27/2000 | 18 | Maturity - earlier of date or SFC's purchase of a Student Loan pool from FDIC |
| 23 | 1/20/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $500,000 | $600,000 | $0 | 15% | 7/20/00 | | 18 | 7/27/2000 | 18 | Maturity - earlier of date or SFC's purchase of a Student Loan pool from FDIC |
| 24 | 1/20/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | $500,000 | $600,000 | $0 | 15% | 7/20/00 | | 18 | 7/27/2000 | 18 | Maturity - earlier of date or SFC's purchase of a Student Loan pool from FDIC |

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Loan Amount | Loan Repaid | Loan Balance Outstanding @ June 2002 | Interest Rate | Maturity | Term In Months | Date Loan Repaid | # Mos Outstd Until Pd | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 1/20/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | $500,000 | $500,000 | $0 | 15% | 7/20/00 | 18 | 7/27/2000 | 18 | Maturity - earlier of date or SFC's purchase of a Student Loan from FDIC |
| 26 | 1/20/99 | SN | Robert Bast | $2,000,000 | $2,000,000 | $0 | 15% | 7/20/00 | 18 | 7/27/2000 | 18 | Maturity - earlier of date or SFC's purchase of a Student Loan from FDIC |
| 27 | 3/22/99 | SN | Robert Bast | $2,600,000 | $1,950,000 | $650,000 | 12% | 10/20/99 | 7 | 8/31/1999 | 5 | Maturity - earlier of date or warehouse financing date $3.0M per loan docs. |
| 28 | 4/21/99 | SN | Elizabeth B. Brennan Trust | $600,000 | $600,000 | $0 | 12% | 10/20/99 | 6 | Converted to term note 5/20/99 | | Maturity - earlier of date or warehouse financing date |
| 29 | 4/21/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $75,000 | $75,000 | $0 | 12% | 10/20/99 | 6 | Converted to term note 5/20/99 | | Maturity - earlier of date or warehouse financing date |
| 30 | 4/21/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | $50,000 | $50,000 | $0 | 12% | 10/20/99 | 6 | Converted to term note 5/20/99 | | Maturity - earlier of date or warehouse financing date |
| 31 | 4/21/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | $75,000 | $75,000 | $0 | 12% | 10/20/99 | 6 | Converted to term note 5/20/99 | | Maturity - earlier of date or warehouse financing date |
| 32 | 5/20/99 | SN | Elizabeth B. Brennan Trust | $600,000 | $600,000 | $0 | 15% | 11/20/00 | 18 | 11/30/2000 | 19 | Maturity earlier of date or SFC purchasing a Student Loan from the FDIC. |
| 33 | 5/20/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $75,000 | $75,000 | $0 | 15% | 11/20/00 | 18 | 11/30/2000 | 19 | Maturity earlier of date or SFC purchasing a Student Loan from the FDIC. |
| 34 | 5/20/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | $50,000 | $50,000 | $0 | 15% | 11/20/00 | 18 | 11/30/2000 | 19 | Maturity earlier of date or SFC purchasing a Student Loan from the FDIC. |
| 35 | 5/20/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | $75,000 | $75,000 | $0 | 15% | 11/20/00 | 18 | 11/30/2000 | 19 | Maturity earlier of date or SFC purchasing a Student Loan from the FDIC. |

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Loan Amount | Loan Repaid | Loan Balance Outstanding @ June 2002 | Interest Rate | Maturity | Term In Months | Date Loan Repaid | # Mos Outstd Until Pd | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 5/20/99 | SN | Robert Bast | $1,200,000 | $1,200,000 | $0 | 15% | 11/20/00 | 18 | 11/20/2000 | 19 | Maturity earlier of date or SFC purchasing a Student Loan pool from the FDIC. |
| 37 | 6/18/99 | SN | Pamela Gagne | $3,500,000 | $3,500,000 | $0 | 12% | 11/20/99 | 5 | 8/2/1999 | 2 | Maturity – earlier of 11/20/99 or warehouse financing date |
| 38 | 6/18/99 | SN | Robert Bast | $1,500,000 | $1,500,000 | $0 | 12% | 11/20/99 | 5 | 8/2/1999 | 2 | Maturity – earlier of 11/20/99 or warehouse financing date |
| 39 | 10/20/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $125,000 | $125,000 | $0 | 12% | 5/20/00 | 7 | 2/14/2000 | 4 | Maturity – earlier of date or warehouse financing date |
| 40 | 10/20/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | $125,000 | $125,000 | $0 | 12% | 5/20/00 | 7 | 2/14/2000 | 4 | Maturity – earlier of date or warehouse financing date |
| 41 | 10/20/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | $125,000 | $125,000 | $0 | 12% | 5/20/00 | 7 | 2/14/2000 | 4 | Maturity – earlier of date or warehouse financing date |
| 42 | 10/20/99 | SN | Pamela Gagne | $625,000 | $625,000 | $0 | 12% | 5/20/00 | 7 | 2/14/2000 | 4 | Maturity – earlier of date or warehouse financing date |
| 43 | 9/25/01 | SN | Elizabeth B. Brennan Trust | $375,000 | $375,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 2 | Maturity – earlier of date or warehouse financing date |
| 44 | 9/25/01 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $175,000 | $175,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 2 | Maturity – earlier of date or warehouse financing date |
| 45 | 9/25/01 | SN | James T. Brennan Trust FBO Philip B. Gagne | $125,000 | $125,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 2 | Maturity – earlier of date or warehouse financing date |
| 46 | 9/25/01 | SN | James T. Brennan Trust FBO W. Roderick Gagne | $175,000 | $175,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 2 | Maturity – earlier of date or warehouse financing date |

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Loan Amount | Loan Repaid | Loan Balance Outstanding @ June 2002 | Interest Rate | Maturity | Term In Months | Date Loan Repaid | # Mos Outstd Until Pd | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 9/25/01 | SN | Pamela Gagne | $375,000 | $375,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 2 | Maturity - earlier of date or warehouse financing date |
| 48 | 9/25/01 | SN | Robert Bast | $2,000,000 | $2,000,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 2 | Maturity - earlier of date or warehouse financing date |
| 49 | 10/2/01 | SN | Elizabeth B. Brennan Trust | $250,000 | $250,000 | $0 | 12% | 8/1/02 | 10 | 11/12/2001 | 1 | Maturity - earlier of date or warehouse financing date |
| 50 | 3/5/02 | SN | Elizabeth B. Brennan Trust | $400,000 | $0 | $400,000 | 12% | 8/20/02 | 6 | Not repaid | | Maturity - earlier of date or warehouse financing date |
| 51 | 3/5/02 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | $200,000 | $0 | $200,000 | 12% | 8/20/02 | 6 | Not repaid | | Maturity - earlier of date or warehouse financing date |
| 52 | 3/5/02 | SN | James T. Brennan Trust FBO Phillip B. Gagne | $100,000 | $0 | $100,000 | 12% | 8/20/02 | 6 | Not repaid | | Maturity - earlier of date or warehouse financing date |
| 53 | 3/5/02 | SN | James T. Brennan Trust FBO W. Roderick Gagne | $200,000 | $0 | $200,000 | 12% | 8/20/02 | 6 | Not repaid | | Maturity - earlier of date or warehouse financing date |
| 54 | 3/5/02 | SN | Pamela Gagne | $400,000 | $0 | $400,000 | 12% | 8/20/02 | 6 | Not repaid | | Maturity - earlier of date or warehouse financing date |
| 55 | 3/5/02 | SN | Robert Bast | $2,000,000 | $0 | $2,000,000 | 12% | 8/20/02 | 6 | Not repaid | | Maturity - earlier of date or warehouse financing date |
| | | | | $31,775,000 | $24,825,000 | $6,950,000 | | | | | | |

Footnotes:
Key: SD: Subordinated debenture and SN: secured note.
(a) Loan maturity date for 6-30-98 which was prior to date of note

May 6, 2007

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Commitment Fees Description | Commitment Fees | | | Fee Paid | Welser Calculation of 4% Fee | Excess Fee Paid |
| | | | | | 0-30 or 0-60 days | 31-60 or 61-90 days | After 60 or after 90 days | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/31/95 | SD | Pamela Gagne | No Commitment Fees | | | | | | |
| 2 | 12/31/95 | SD | Robert Bast | No Commitment Fees | | | | | | |
| 3 | 8/1/97 | SD | Elizabeth B. Brennan Trust | No Commitment Fees | | | | | | |
| 4 | 8/1/97 | SD | Pamela Gagne | No Commitment Fees | | | | | | |
| 5 | 8/1/97 | SD | Robert Bast | No Commitment Fees | | | | | | |
| 6 | 8/7/98 | SD | Elizabeth B. Brennan Trust | No Commitment Fees | | | | | | |
| 7 | 8/7/98 | SD | Robert Bast | No Commitment Fees | | | | | | |
| 8 | 8/31/98 | SN | Elizabeth B. Brennan Trust | 10% of principal amount at maturity | | | | $25,000 | $10,000 | $15,000 |
| 9 | 8/31/98 | SN | Robert Bast | 10% of principal amount at maturity | | | | $25,000 | $10,000 | $15,000 |
| 10 | 9/18/98 | SN | Elizabeth B. Brennan Trust | 10% of principal amount at maturity | | | | $50,000 | $20,000 | $30,000 |
| 11 | 9/18/98 | SN | Robert Bast | 10% of principal amount at maturity | | | | $150,000 | $60,000 | $90,000 |
| 12 | 10/30/98 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 10% of principal amount at maturity | | | | $5,000 | $2,000 | $3,000 |
| 13 | 10/30/98 | SN | James T. Brennan Trust FBO Philip B. Gagne | 10% of principal amount at maturity | | | | $5,000 | $2,000 | $3,000 |
| 14 | 10/30/98 | SN | James T. Brennan Trust FBO W.Roderick Gagne | 10% of principal amount at maturity | | | | $50,000 | $20,000 | $30,000 |
| 15 | 10/30/98 | SN | Robert Bast | 10% of principal amount at maturity | | | | $100,000 | $40,000 | $60,000 |
| 16 | 11/20/98 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 10% of principal amount at maturity | | | | $25,000 | $10,000 | $15,000 |
| 17 | 11/20/98 | SN | James T. Brennan Trust FBO Philip B. Gagne | 10% of principal amount at maturity | | | | $25,000 | $10,000 | $15,000 |
| 18 | 12/18/98 | SN | Elizabeth B. Brennan Trust | 10% of principal amount at maturity | | | | $20,000 | $8,000 | $12,000 |
| 19 | 12/18/98 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 10% of principal amount at maturity | | | | $20,000 | $8,000 | $12,000 |
| 20 | 12/18/98 | SN | James T. Brennan Trust FBO Philip B. Gagne | 10% of principal amount at maturity | | | | $20,000 | $8,000 | $12,000 |
| 21 | 12/18/98 | SN | Robert Bast | 10% of principal amount at maturity | | | | $140,000 | $56,000 | $84,000 |
| 22 | 1/20/99 | SN | Elizabeth B. Brennan Trust | No Commitment Fees | | | | | | |
| 23 | 1/20/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | No Commitment Fees | | | | | | |
| 24 | 1/20/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | No Commitment Fees | | | | | | |

May 6, 2007

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Commitment Fees Description | 0-30 or 0-60 days | 31-60 or 61-90 days | After 60 or after 30 days | Fee/Paid | Welsor Calculation of 4% Fee | Excess Fee/Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 1/20/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | No Commitment Fees | | | | | | |
| 26 | 1/20/99 | SN | Robert Bast | | | | | | | |
| 27 | 3/22/99 | SN | Robert Bast | Paid $377,000 a commitment fee ($357,500 in 1999 and $19,500 in 2000) which was higher than the contractual maximum amount of $260,000. 6%/60days, 8% (60-90days),10%---. | $156,000 | $208,000 | $260,000 | $377,000 | $104,000 | $273,000 |
| 28 | 4/21/99 | SN | Elizabeth B. Brennan Trust | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days | $36,000 | $48,000 | $60,000 | | | |
| 29 | 4/21/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days | $4,500 | $6,000 | $7,500 | | | |
| 30 | 4/21/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days | $3,000 | $4,000 | $5,000 | | | |
| 31 | 4/21/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days | $4,500 | $6,000 | $7,500 | | | |
| 32 | 5/20/99 | SN | Elizabeth B. Brennan Trust | 6% of the principal amount if paid within 30 days of date of Loan Agreement; 8% if paid after 30 days but before 61 days; 10% if paid after 61 days from date of the Loan Agreement. | $36,000 | $48,000 | $60,000 | $60,000 | $24,000 | $36,000 |
| 33 | 5/20/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 6% of the principal amount if paid within 30 days of date of Loan Agreement; 8% if paid after 30 days but before 61 days; 10% if paid after 61 days from date of the Loan Agreement. | $4,500 | $6,000 | $7,500 | $7,500 | $3,000 | $4,500 |
| 34 | 5/20/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | 6% of the principal amount if paid within 30 days of date of Loan Agreement; 8% if paid after 30 days but before 61 days; 10% if paid after 61 days from date of the Loan Agreement. | $3,000 | $4,000 | $5,000 | $5,000 | $2,000 | $3,000 |
| 35 | 5/20/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | 6% of the principal amount if paid within 30 days of date of Loan Agreement; 8% if paid after 30 days but before 61 days; 10% if paid after 61 days from date of the Loan Agreement. | $4,500 | $6,000 | $7,500 | $7,500 | $3,000 | $4,500 |

May 6, 2007

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Commitment Fees Description | Commitment Fees | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0-30 or 0-60 days | 31-60 or 61-90 days | After 60 or after 90 days | Fee Paid | Welser Calculation of 4% Fee | Excess Fee Paid |
| 36 | 5/2/09 | SN | Robert Bast | 5% of the principal amount if paid within 30 days of date of Loan Agreement; 8% if paid after 30 days but before 61 days; 10% if paid after 61 days from date of the Loan Agreement. | $72,000 | $96,000 | $120,000 | $120,000 | $48,000 | $72,000 |
| 37 | 6/18/99 | SN | Pamela Gagne | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days | $210,000 | $280,000 | $350,000 | $210,000 | $140,000 | $70,000 |
| 38 | 6/18/99 | SN | Robert Bast | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days | $90,000 | $120,000 | $150,000 | $90,000 | $60,000 | $30,000 |
| 39 | 10/20/99 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $7,500 | $10,000 | $12,500 | $12,500 | $5,000 | $7,500 |
| 40 | 10/20/99 | SN | James T. Brennan Trust FBO Philip B. Gagne | 5% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days from date of Loan Agreement | $7,500 | $10,000 | $12,500 | $12,500 | $5,000 | $7,500 |
| 41 | 10/20/99 | SN | James T. Brennan Trust FBO W. Roderick Gagne | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days from date of Loan Agreement. | $7,500 | $10,000 | $12,500 | $12,500 | $5,000 | $7,500 |
| 42 | 10/20/99 | SN | Pamela Gagne | 6% of principal amount if paid within 60 days; 8% if paid after 60 days but before 91 days; 10% if paid after 91 days from date of Loan Agreement. | $37,500 | $50,000 | $62,500 | $62,500 | $25,000 | $37,500 |
| 43 | 9/25/01 | SN | Elizabeth B. Brennan Trust | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $22,500 | $30,000 | $37,500 | $22,500 | $16,000 | $7,500 |
| 44 | 9/25/01 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $10,500 | $14,000 | $17,500 | $10,500 | $7,000 | $3,500 |
| 45 | 9/25/01 | SN | James T. Brennan Trust FBO Philip B. Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $7,500 | $10,000 | $12,500 | $7,500 | $5,000 | $2,500 |
| 46 | 9/25/01 | SN | James T. Brennan Trust FBO W. Roderick Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $10,500 | $14,000 | $17,500 | $10,500 | $7,000 | $3,500 |

May 6, 2007

SFC Ch 7 - Related Party Loans - Summary Activity Schedule

| Ref # | Loan Date | Key | Name | Commitment Fees Description | Commitment Fees | | | | | |
| | | | | | 0-30 or 0-60 days | 31-60 or 61-90 days | After 60 or after 90 days | Fee Paid | Weiser Calculation of 4% Fee | Excess Fee Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 9/25/01 | SN | Pamela Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $22,500 | $30,000 | $37,500 | $22,500 | $16,000 | $7,500 |
| 48 | 9/25/01 | SN | Robert Bast | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $120,000 | $160,000 | $200,000 | $120,000 | $80,000 | $40,000 |
| 49 | 10/2/01 | SN | Elizabeth B. Brennan Trust | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $15,000 | $20,000 | $25,000 | $15,000 | $10,000 | $5,000 |
| 50 | 3/5/02 | SN | Elizabeth B. Brennan Trust | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $24,000 | $32,000 | $40,000 | | | |
| 51 | 3/5/02 | SN | James T. Brennan Trust FBO Elizabeth L. Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $12,000 | $16,000 | $20,000 | | | |
| 52 | 3/5/02 | SN | James T. Brennan Trust FBO Phillip B. Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $6,000 | $8,000 | $10,000 | | | |
| 53 | 3/5/02 | SN | James T. Brennan Trust FBO W. Roderick Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $12,000 | $16,000 | $20,000 | | | |
| 54 | 3/5/02 | SN | Pamela Gagne | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $24,000 | $32,000 | $40,000 | | | |
| 55 | 3/5/02 | SN | Robert Bast | 6% of principal amount if paid within 60 days from date of Loan Agreement; 8% if paid after 60 days, but before 91 days; 10% if paid after 91 days from date of Loan agreement. | $120,000 | $160,000 | $200,000 | | | |
| | | | | | | | | $1,845,500 | $827,000 | $1,018,500 |

Footnotes:
Key: SD: Subordinated debenture and SN: secured note.
(a) Loan maturity date for 6-30-98 which was prior to date of note

.

# EXHIBIT H



Eckert Seamans Cherin & Mellott, LLC     TEL 215 851 8400
Two Liberty Place                        FAX 215 851 8383
50 South 16th Street                     www.eckertseamans.com
22nd Floor
Philadelphia, PA 19102


Neil G. Epstein
215.851.8408
nepstein@eckertseamans.com

May 24, 2007

**VIA ELECTRONIC MAIL AND FIRST CLASS MAIL**

Lois H. Goodman, Esquire
McElroy, Deutsch, Mulvaney & Carpenter, LLP
3 Gateway Center
100 Mulberry Street
Newark, NJ  07102-4079

Re:     **Stanziale v. Pepper Hamilton LLP, et al.,**
        **Civil Action No.: 04-1551-JJF (D. Del.)**

Dear Lois:

Please forward to me as soon as possible copies of the following documents listed on <u>Appendix</u> <u>C</u>: Sources of Information of the Martin J. Lieberman Report on Valuation of Premier Education Group, LP, dated May 7, 2007:

    (1)    Federal Reserve System-Statistical Releases – pages reviewed by Mr. Lieberman;

    (2)    Pratt, Shannon P. and others – Valuing a Business, 4th ed. (New York, NY: McGraw-Hill 2000) – pages reviewed by Mr. Lieberman;

    (3)    Morningstar SBBI 2007 Valuation Edition – pages reviewed by Mr. Lieberman;

    (4)    Ibbotson Associates, Stocks Bonds Bills and Inflation 2003 Valuation Edition – pages reviewed by Mr. Lieberman;

    (5)    Ibbotson Associates, Stocks Bonds Bills an Inflation 2007 Valuation Edition – pages reviewed by Mr. Lieberman;

    (6)    RMA Annual Statement Studies 2001-2002 and 2005-2006 Financial Ratios Benchmark – pages reviewed by Mr. Lieberman;

    (7)    The Wall Street Journal Database Database on Companies – material downloaded by or on behalf of Mr. Lieberman and pages reviewed by Mr. Lieberman;

    (8)    SEC website and Edgar files – material downloaded by or on behalf of Mr. Lieberman and pages reviewed by Mr. Lieberman;

**ECKERT**
**SEAMANS**

Lois H. Goodman, Esquire
May 24, 2007
Page 2

  (9)   Premier Education Group, Strategic Plan by Gary Camp, CEO, January 2006 –
        provide a copy or Bates numbers of document;

  (10)  Premier Education Group, First Quarter Results 2004 by Gary Camp, CFO –
        provide a copy or Bates numbers of document;

  (11)  Mergerstat Review-2006 – pages reviewed by Mr. Lieberman; and

  (12)  "Other information, reviews and analyses that we deemed appropriate" – all such
        information, reviews and analyses.

Also, please forward to me copies of the following documents listed on Exhibit C – Documents
Reviewed of the William Hecht Report dated May 7, 2007:

  (1)   SFC's QuickBooks accounting records – material downloaded by or on behalf of
        Mr. Hecht and pages reviewed by Mr. Hecht;

  (2)   Database of over 170 loans obtained from Reuters Loan Pricing Corporation –
        material downloaded by or on behalf of Mr. Hecht and pages reviewed by
        Mr. Hecht;

  (3)   Shannon Pratt's Valuation Update – pages reviewed by Mr. Hecht;

  (4)   Chapter 7 Trustee, Charles Stanziale's Complaint Against Andrew Yao, et al. –
        provide a copy or Bates numbers of document;

  (5)   One-Year LIBOR rates 1997-2002 – material downloaded by or on behalf of
        Mr. Hecht and pages reviewed by Mr. Hecht;

  (6)   Permanent Mortgage Proposal, Day Hill Partners, LP – August 7, 1996 – provide a
        copy or Bates numbers of document;

  (7)   Lease Agreement between One Summit Place Partners, LP and Premier Education
        Group LP dated August 1, 2003 (unsigned) – provide a copy or Bates numbers of
        document;

  (8)   Investment Summary One Summit Place Partners, LP, dated April 1, 1994, –
        provide a copy or Bates numbers of document; and

  (9)   Real estate appraisal, dated June 17, 1994, for One Summit Place – Branford,
        Conn. – provide a copy or Bates numbers of document;

**ECKERT**
**SEAMANS**

Lois H. Goodman, Esquire
May 24, 2007
Page 3

With respect to the John W. Houck Appraisal Report dated May 4, 2007, please forward to me the following documents:

(1)     Institute of Real Estate Management 2002 Edition of Income/Expense Analysis of Office Buildings (referenced on page 12 of the Houck Appraisal Report) – pages reviewed by Mr. Houck;

(2)     Wall Street Journal and Federal Reserve Board (referenced on page 14 of the Houck Appraisal Report) – pages reviewed by Mr. Houck;

(3)     First Quarter 2002, Korpacz Real Estate Investor Survey (referenced on page 14 of the Houck Appraisal Report) – pages reviewed by Mr. Houck;

(4)     REIS reports (referenced on page 14 of the Houck Appraisal Report) – pages reviewed by Mr. Houck; and

(5)     Houck Appraisal Report, Exhibit C – all documents reviewed by Mr. Houck in preparing Exhibit C.

Please contact me if you have any questions.

Very truly yours,

Neil G. Epstein

NGE:jg
M0594985.DOC

cc:     Counsel on E-Mail List (via E-mail)

**EXHIBIT I**



**ECKERT SEAMANS**

Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street
22nd Floor
Philadelphia, PA 19102

TEL 215 851 8400
FAX 215 851 8383
www.eckertseamans.com

Neil G. Epstein
215.851.8408
nepstein@eckertseamans.com

March 12, 2007

<u>VIA ELECTRONIC MAIL AND FIRST CLASS MAIL</u>

Michael S. Waters, Esquire
McElroy, Deutsch, Mulvaney
& Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102-4079

John I. Grossbart, Esquire
Sonnenschein Nath & Rosenthal LLP
8000 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606

Thomas H.L. Selby, Esquire
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005

Veronica E. Rendon, Esquire
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022

Andre G. Castaybert, Esquire
Proskauer Rose LLP
1585 Broadway
New York, NY 10036

John H. Eickemeyer, Esquire
Vedder Price Kaufman & Kammholz, P.C.
805 Third Avenue
New York, NY 10022

Stephen J. Shapiro, Esquire
Schnader Harrison Segal & Lewis LLP
1800 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Re:    Stanziale v. Pepper Hamilton LLP, et al.,
       <u>Civil Action No.: 04-1551-JJF (D. Del.)</u>

Dear Counsel:

Defendants Robert Bast, Pamela Gagné and the Brennan Trusts expect to present expert testimony on the following subject matters:

1.    The payments of principal, interest and fees by SFC with respect to loans made and debentures purchased by these defendants were made in payment of a debt incurred by SFC in the ordinary course of business or financial affairs of SFC and the party making the loan or purchasing the debenture, were made in the ordinary course of business or financial affairs of SFC and the party making the loan or purchasing the debenture and were made according to ordinary business terms;

**ECKERT
SEAMANS**

Michael S. Waters, Esquire, et al.
March 12, 2007
Page 2

2.  The terms of the short term, bridge loans made by these defendants were fair and reasonable and were consistent with the terms of similar loans which SFC obtained or were available to SFC from other lenders providing such loans;

3.  The fair and reasonable value on June 14, 2002, of the shares of stock of Premier Education Group G.P., Inc., DHP G.P., Inc. and One Summit Place G.P., Inc. that Andrew Yao transferred to these defendants in partial satisfaction of Yao's and his wife's written guarantees of SFC's debenture and loan obligations;

4.  Any other subject matter relating to the Trustee's claims against these defendants with respect to which the Trustee states his intention to present expert testimony or produces expert reports;

5.  Any other subject matter relating to the Trustee's claims against these defendants which arises during the remainder of fact discovery and which requires expert testimony.

Very truly yours,

Neil G. Epstein

NGE:jg
M0585958.DOC