## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                                      :
STUDENT FINANCE CORPORATION,                                :
                Debtor.                                :
_____                     :
                              :    CIVIL ACTION No. 04-1551 (JJF)
CHARLES A. STANZIALE, JR.,                                  :
CHAPTER 7 TRUSTEE OF STUDENT                                :
FINANCE CORPORATION,                                        :
                              :
               Plaintiff,                             :
      v.                                             :
                              :
PEPPER HAMILTON LLP, et al.,                                :
                              :
               Defendants.                            :
_____                     :

## MEMORANDUM OF LAW IN SUPPORT OF THE FAMILY
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated:  September 28, 2007

KAREN LEE TURNER (No. 4332)
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, DE  19801
Telephone:  (302) 425-0430
Fax:      (302) 425-0432
E-mail:    kturner@eckertseamans.com

Neil G. Epstein
Carol L. Press
Charles F. Forer
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone: (215) 851-8400
Fax:   (215) 851-8383

Attorneys for Defendants Robert L. Bast,
Pamela Bashore Gagné, the Brennan Trusts
and W. Roderick Gagné, as Trustee of the
Brennan Trusts

## TABLE OF CONTENTS

I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS...................1

II.  SUMMARY OF ARGUMENT............................................................................2

III. FACTS............................................................................................................5

    A. Fraudulent Conveyance Claim................................................................5

        1.   The Limited Partnerships........................................................5

        2.   The Family Defendants' Loans To SFC....................................7

        3.   Yao's Personal Guaranties.....................................................10

        4.   SFC's Default And Yao's Pledge Of The Gp Stock...............10

        5.   SFC's Further Default And The Assignment And Assumption Agreements.......11

        6.   Other Relevant Facts And Lack Of Evidence..........................12

    B. Preference Claims...................................................................................15

        1.   Ordinary Course Of Business.................................................15

            (a)   Monthly Interest Payments................................16

            (b)   Principal Repayments........................................17

            (c)   Payments Of Fees And Accrued Interest On The 2001 Loans.....19

        2.   Insider....................................................................................20

        3.   New Value...............................................................................23

IV.  ARGUMENT................................................................................................26

A.   The Standard For Summary Judgment....................................................26

B.   Summary Judgment Should Be Granted On The Fraudulent Conveyance Claim..........27

C.   Summary Judgment Should Be Granted On The Preference Claims...............................31

        1.   Ordinary Course Of Business Defense...................................32

2.    None Of The Family Defendants Was An Insider Of SFC..............................36

3.    New Value Defense...........................................................................................38

V.    CONCLUSION..........................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 26

*AstraZeneca LP v. TAP Pharm. Products, Inc.*,
444 F. Supp. 2d 278 (D. Del. 2006) ........................................................................... 27

*Beard v. DeVito (In re DeVito)*, 111 B.R. 529 (Bankr. W.D. Pa. 1990) ......................... 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 26

*Claycomb v. Playtex Products, Inc.*, 06-120 JJF, 2007 U.S. Dist LEXIS 44769
(D. Del. June 19, 2007) .............................................................................................. 27

*Commonwealth Nat'l Bank v. Miller*, 437 A.2d 1012 (Pa. Super. 1981) ........................ 31

*Erie Marine Enters., Inc. v. Nationsbank, N.A. (In re Erie Marine Enters., Inc.)*, 216 B.R. 529
(Bankr. W.D. Pa. 1998) ..................................................................... 3, 27, 28, 30

*Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods.)*,
18 F.3d 217 (3d Cir. 1994) .............................................................................. 4, 35, 36

*Hechinger Inv. Co. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.)*,
489 F.3d 568 (3d Cir. 2007) ....................................................................................... 33

*Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.)*,
320 B.R. 541 (Bankr. D. Del. 2004) ......................................................................... 33

*HLI Creditor Trust v. Metal Techs. Woodstock Corp. (In re Hayes Lemmerz Int'l Inc.)*,
339 B.R. 97 (Bankr. D. Del. 2006) ...................................................................... 3, 33

*In re Formed Tubes, Inc.*, 46 B.R. 645 (Bankr. E.D. Mich. 1985) ................................. 39

*In re Kroh Brothers*, 930 F.2d 648, 653-54 (8th Cir. 1991) .......................................... 39

*Intercontinental Polymers, Inc. v. Equistar Chems., LP (In re Intercontinental Polymers, Inc.)*,
359 B.R. 868 (Bankr. E.D. Tenn. 2005) ................................................................... 39

*Lacy v. AMTRAK*, 06-68-JJF, 2007 U.S. Dist. LEXIS 54683 (D. Del. July 23, 2007) ............... 26

*Lichtenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys. Inc.)*, 284 B.R. 415
(Bankr. E.D. Pa. 2002) .............................................................................................. 31

*Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods)*, 280 B.R. 103
  (Bankr. E.D. Pa. 2002) .................................................................................. 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................. 26

*Maxwell v. Begler (In re March First, Inc.)*, Case No. 01 B 24742, Adv. No. 03 A 241, 2007
  *Bankr. LEXIS 2513, at *13-16 (Bankr. N.D. Ill. July 20, 2007)* ............................................ 39

*Merrill v. Abbot (In re Independent Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987) ............. 30

*Morse Operations, Inc. v. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.)*,
  155 B.R. 666 (Bankr. E.D. Pa. 1993) ...................................................................... 28

*New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.)*,
  880 F.2d 679 (3d Cir. 1989) ................................................................................. 39

*Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital
  Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820 (Bankr. D. Del. 2006) ........... 4,37

*Protocomm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 459 (E.D. Pa. 2001) ...... 2, 28

*Provident Life & Accident Ins. Co. v. Gen Syndicators of Am. (In re Laramie Assoc.)*,
  No. 97-3135, 1997 U.S. Dist. LEXIS 14170 (E.D. Pa. Sept. 8, 1997) ................................. 28

*Safety-Kleen Creditor Trust v. Eimco Process Equip. Co. (In re Safety-Kleen Corp.)*,
  331 B.R. 591 (Bankr. D. Del. 2005) ....................................................................... 32

*Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130 (Bankr. E.D. Pa. 2004) .......... 27, 30

*Schaps v. Just Enough Corp. (In re Pinto Trucking Serv., Inc.)*, 93 B.R. 379
  (Bankr. E.D. Pa. 1988) ....................................................................................... 28

*Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234 (Bankr. D. Del.
  2005) ................................................................................................................. 37

*Stanziale v. Pepper Hamilton, LLP (In re Student Finance Corp.)*, 335 B.R. 539
  (D. Del. 2005) ........................................................................... 1, 2, 27, 29, 30

*Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329 (5th Cir. 1999) .... 39

*Wilson v. Am. Postal Workers Union*, 433 F. Supp. 2d 444 (D. Del. 2006) ................................. 27

*Zechman v. Christiana Care Health Sys.*, 05-159-JJF, 2007 U.S. Dist. LEXIS 47349
  (D. Del. June 26, 2007) ...................................................................................... 26

## **STATUTES**

11 U.S.C. § 101 ................................................................................................... 36, 37

11 U.S.C. § 542 ........................................................................................................ 35

11 U.S.C. § 544 ........................................................................................................ 27

11 U.S.C. § 547 ...................................................................................................... 3, 4

12 Pa. C.S. § 5103 ................................................................................................... 28

12 Pa. C.S. § 5104 ........................................................................................... 3, 12, 28

## **RULES**

Federal Rules of Civil Procedure Rule 56 ................................................................ 26

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.

This Motion for Summary Judgment is being filed on behalf of Robert L. Bast

("Bast"), Pamela Bashore Gagné ("Pamela Gagné"), seven trusts created by Elizabeth B.

Brennan and James T. Brennan ("Brennan Trusts"), and W. Roderick Gagné ("Gagné") as a

trustee of the Brennan Trusts (collectively "Family defendants").  The case was commenced as

an adversary action by the filing of a Complaint in the Bankruptcy Court on November 1, 2004

(Adversary No. 04-56423 D.I. 1).  Plaintiff, Charles A. Stanziale, Jr., Chapter 7 Trustee

("Trustee") of Student Finance Corporation ("SFC"), alleged various claims against defendants

Pepper Hamilton, LLP, Gagné as a partner practicing at Pepper Hamilton, and the Family

defendants.  Defendants moved to withdraw the reference, which motion was granted on January

7, 2005.  (D.I. 51).

By Order and Opinion dated December 22, 2005, reported at *Stanziale v. Pepper

Hamilton, LLP (In re Student Finance Corp.),* 335 B.R. 539 (D. Del. 2005), this Court granted in

part the Family defendants' Motion to Dismiss, leaving only two Counts against the Family

defendants:  (1) Count VII, which seeks to avoid transfers of stock in three corporations[1] by

Andrew Yao ("Yao"), owner and CEO of SFC, to certain Family defendants under the

Pennsylvania Uniform Fraudulent Transfers Act, 12 Pa. Cons. Stat. §§ 5101-5110 ("PUFTA")

and (2) Count XI, which seeks, under section 547 of the Bankruptcy Code, to avoid payments of

$4,229,093, consisting of interest, fees and principal repayments on outstanding loans, that were

made by SFC to the Family defendants within one year preceding the filing of the bankruptcy

---

[1]  These corporations were general partners in limited partnerships of which Bast and the Elizabeth Brennan Trusts
were the limited partners.

petition on June 5, 2002 ("Filing Date"). On January 23, 2006, the Trustee filed a First

Amended Complaint (D.I. 76), which did not add any claims against the Family defendants.

On July 7, 2007, the Trustee served a Rule 26(a)(1)(C) Disclosure Statement that

asserted two new damage claims against the Family defendants that had not been pled in the

Complaint or in the First Amended Complaint and had not been previously asserted. On August

28, 2007, the Family defendants filed a Motion to Strike those improper damage claims. That

motion remains pending. Because the improper damage claims are not part of any cause of

action pled against the Family defendants in the First Amended Complaint, this Motion for

Summary Judgment does not address them. If the Trustee moves to amend his Complaint to

assert those claims, the Family defendants will oppose the motion at that time.

Pursuant to Item 10 of this Court's Second Amended Case Management Order

# 1, the Family defendants submitted a letter to the Court dated July 30, 2007, setting forth the

issues that they wished to raise on summary judgment. On September 21, 2007, this Court

entered an Order permitting the Family defendants to file a Motion for Summary Judgment on or

before September 28, 2007. This Motion is being submitted pursuant to the September 21, 2007

Order. Trial of this case is scheduled to commence on October 10, 2007.

## II.    SUMMARY OF ARGUMENT.

1.    Under this Court's opinion on the Motion to Dismiss, the only fraudulent

conveyance claim on which the Trustee may proceed is a claim that Yao transferred his general

partner stock to certain of the Family defendants with actual intent to defraud his creditors.

*Stanziale*, 335 B.R. at 552-53. The Trustee bears the burden to prove actual fraudulent intent by

clear and convincing evidence. *See, e.g., Protocomm Corp. v. Novell Advanced Servs., Inc*, 171

F. Supp. 2d 459, 468 (E.D. Pa. 2001). Under any evidentiary standard, no facts have been

adduced that would allow the Trustee to prove that Yao transferred the general partner stock to those Family defendants with actual intent to hinder, delay or defraud his other creditors. To the contrary, the uncontroverted evidence shows that at the time Yao transferred the general partner stock to the Family defendants, he owed them approximately $7 million, by virtue of guaranties he had given on loans those Family defendants made to SFC between 1995 and 2002, which loans were in default. The evidence conclusively refutes any argument by the Trustee that the Family defendants received more than Yao owed them. Under the undisputed facts of record and the applicable law, there is no basis upon which the Trustee can colorably argue, let alone prove, that the transfer made by Yao to partially satisfy his debt to the Family defendants was made with actual fraudulent intent. *See* 12 Pa. C.S. § 5104(b); *Erie Marine Enters., Inc. v. Nationsbank, N.A. (In re Erie Marine Enters., Inc.)*, 216 B.R. 529, 538 (Bankr. W.D. Pa. 1998) (payment of a justly owed debt is not a fraudulent transfer). Therefore, the Court should enter summary judgment in favor of the Family defendants on the fraudulent conveyance claim.

2.    The Trustee's preference claims fail in their entirety as a matter of law because the uncontroverted evidence establishes that each and every payment made by SFC to the Family defendants in the year preceding the Filing Date was made in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2). The loans made by the Family defendants, and SFC's payments of principal, fees and interest on those loans during the year before the Filing Date, were completely consistent with the transactions between SFC and the Family defendants before that period. *See, e.g., HLI Creditor Trust v. Metal Techs. Woodstock Corp. (In re Hayes Lemmerz Int'l Inc.)*, 339 B.R. 97, 106 (Bankr. D. Del. 2006) (touchstone of first two prongs of the ordinary course defense is the consistency of the transactions between the debtor and the creditor before and during the preference period). Further, the payments made during the year before the Filing

3

Date were in accord with the terms of the debentures and loans agreements, the parties' six-year relationship, and industry practice, and were therefore made according to ordinary business terms. *See Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 224 (3d Cir. 1994) (key to third prong of ordinary course defense is whether dealings are so extraordinary as to fall outside the broad range of credit arrangements defined by the parties' relationship and industry norms). For these reasons, the Court should enter summary judgment in favor of the Family defendants on the preference claims.

       3.      Even if the ordinary course defense did not bar the Trustee's preference claims in their entirety, which it does, those claims should be reduced, as a matter of summary judgment, on two grounds. First, to be able to use a one-year rather than 90-day preference period, the Trustee would have to prove that the Family defendant who received each allegedly preferential payment was an insider of SFC at the time the payment was made. Discovery has established that there are no facts upon which the Trustee will be able to prove insider status. Neither Gagné in any capacity, nor any of the Family defendants, was a director, officer or person in control of SFC. *See Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 840-41 (Bankr. D. Del. 2006) ("person in control" is someone who exercises "day-to-day" control over an entity's business affairs). Therefore, the applicable preference period is 90 days, not one year, leaving a preference claim of only $146,387. Second, under 11 U.S.C. § 547(c)(4), even if the applicable preference period were one year (and it is not), the Trustee's claim must be reduced by the new value that certain Family defendants gave to SFC on March 5, 2002, when they made loans to SFC totaling $3.3 million. Application of the new value defense leaves a preference claim of only $952,239, consisting of claims of $805,852 for transfers made between June 5, 2001 and

March 5, 2002, and $146,387 for transfers made thereafter.  Based on the facts developed in

discovery and the applicable law, the Family defendants are entitled to summary judgment on

both insider status and new value, either of which dramatically reduces the amount of the

Trustee's alleged preference claims.

### III.    FACTS.

#### A.    Fraudulent Conveyance Claim.

The Trustee claims that the transfer by Yao of his stock in Premier Education

Group GP, Inc., One Summit Place GP, Inc. and DHP GP, Inc. (the "GP stock") to the Family

defendants was a fraudulent conveyance.  Set forth below are the material facts that are not

subject to reasonable dispute regarding (1) the limited partnerships of which these three

corporations were the general partners, (2) the loans made by the Family defendants to SFC,

Yao's guaranties of those loans and SFC's defaults under the loan agreements and (3) Yao's

transfer of the GP stock to satisfy his obligations under the guaranties.

#### 1.    The Limited Partnerships.

Premier Education Group LP (formerly named CEC Partnership LP) was formed

as a limited partnership in 1993.  (Exh. 1, Bast Decl. ¶ 3).[2]  As set forth in the Limited

Partnership Agreement dated February 1, 1993 (included in the Appendix as Exhibit 5), the

limited partners of Premier were Bast and the Elizabeth Brennan Trust[3] and the general partner

was Premier Education Group GP, Inc. (formerly named CEC GP, Inc.).[4]  (Exh. 24, Tr. Resp.

---

[2] Exhibit 1 is the Declaration of Robert L. Bast ("Bast Decl.").

[3] In approximately 1994, the Elizabeth Brennan Trust was divided into three trusts and, in 1999, the Elizabeth Brennan Trust was terminated.  The Elizabeth Brennan Trust's interest in Premier was distributed accordingly. After 1999, certain of the trust beneficiaries took the interests that had been created by the trust out of the trust.

[4] The name change from CEC to Premier is not material to any matter in dispute in this lawsuit.  Therefore, the partnership will be referred to as Premier, even though the name change did not occur until 2001.

RFAs ¶ 452;[5] Exh. 1, Bast Decl. ¶ 4).  All of the stock of Premier Education Group GP, Inc. was owned by Yao.  (Exh. 1, Bast Decl. ¶ 5).

      The Premier Limited Partnership Agreement contained a formula for distribution of cash from operations and dispositions.  (Exh. 1, Bast Decl. ¶ 6; Exh. 5, Ltd Ptrshp Agr. pp. 31-35).  Under the formula, the general partner's percentage interest in distributions ranged from 5% to 40%; an increase of the distribution percentage above 5% depended upon the limited partners receiving certain returns on their capital contributions.  (Exh. 1, Bast Decl. ¶ 6; Exh. 5, Ltd Ptrshp Agr. p. 32).  The Limited Partnership Agreement also contained restrictions on transfer of partnership interests and provided that the general partner could not transfer its interest in the partnership, except with the prior consent of the limited partners holding a majority of the partnership interests.  (Exh. 1, Bast Decl. ¶ 8; Exh. 5, Ltd Ptrshp Agr. pp. 49-50).

      One Summit Place Partners LP was formed in 1994, and Day Hill Partners LP was formed in 1996.  (Exh. 24, Tr. Resp. RFAs ¶¶ 465 and 473).  Bast and the Elizabeth Brennan Trusts were the limited partners of both partnerships.  (Exh. 1, Bast Decl. ¶¶ 10, 12).  The respective general partners were One Summit Place GP, Inc. and DHP GP, Inc., both of which were wholly owned by Yao.  (Exh. 24, Tr. Resp. RFAs ¶¶ 466 and 474; Exh. __, Bast Decl. ¶¶ 10, 12).  Under the One Summit and Day Hill partnership agreements, the general partner had a one-third interest in partnership distributions.  (Exh. 1, Bast Decl. ¶¶ 11, 13).  These two partnership agreements each provided that the general partner could not transfer its interest in the partnership, except with the prior consent of the limited partners holding a majority of the partnership interests, which consent could not be unreasonably withheld.  (Exhs. 6 and 7, Ltd Ptrshp Agrs. pp. 21-22 and 22-23; Exh. 1, Bast Decl. ¶¶ 11, 13).

---

[5]  Exhibit 24 is relevant paragraphs of the Trustee's Responses to the Family Defendants' Requests for Admissions ("Tr. Resp. RFAs").

Premier's business was (and is) the operation of vocational schools, primarily providing paralegal, medical assistant, health claims, culinary arts, HVAC and technology training. (Exhs. 1 and 3, Bast Decl. ¶ 9 and Gagné Decl. ¶ 9).[6]  When Premier was formed, it owned one school; several schools were added over time, and by June 2002, it owned five schools located on ten campuses. (Exhs. 1 and 3, Bast Decl. ¶ 9 and Gagné Decl. ¶ 9).  One Summit and Day Hill owned real estate, the greater portion of which is leased by Premier for some of its operations. (Exhs. 1 and 3, Bast Decl. ¶ 14 and Gagné Decl. ¶ 12).  From 1993 through 2001, Bast and the Brennan Trusts made substantial capital contributions and loans to the limited partnerships, primarily to Premier. (Exhs. 1 and 3, Bast Decl. ¶¶ 15-16 and Gagné Decl. ¶ 13).  By 2002, their investment totaled over $7.5 million (more than $4 million in equity and the remainder in outstanding loans). (Exhs. 1 and 3, Bast Decl. ¶¶ 15-16 and Gagné Decl. ¶ 14).  During the period from 1993 to 2002, other than interest payments on their loans, the limited partners received virtually no return on their investments in the partnerships. (Exhs. 1 and 3, Bast Decl. ¶ 17 and Gagné Decl. ¶ 15).[7]

## 2.    The Family Defendants' Loans to SFC.[8]

SFC was formed in 1992. (Exh. 25, Tr. Stmt. of Facts ¶ 2).[9]  It was in the business of making or originating loans to students at vocational schools, principally truck

---

[6]  Exhibit 3 is the Declaration of W. Roderick Gagné ("Gagné Decl.").

[7]  From 2000 to 2002, Bast and the Elizabeth Brennan Trust each received three $36,000 annual distributions from Premier.  From 1993 through 2002, they received no other distributions. (Exhs. 1 and 3, Bast Decl. ¶ 17 and Gagné Decl. ¶ 15).

[8]  Copies of the Subordinated Debentures, Secured Notes and Loan Agreements described in this section are included in the Appendix as Exhibits 8 through 16.  With regard to these documents and others, where there are several documents that differ only as to the individual Family defendant as lender and the principal amount of the loan involved, the Appendix includes a representative document only, so as not to burden the Court with a large volume of documents.  Thus, for example, although Bast and Pamela Gagné both purchased subordinated debentures from SFC on August 1, 1997, copies of only the Bast Subordinated Debenture and accompanying Loan Agreement dated as of August 1, 1997 are included in the Appendix.

driving schools, and purchasing loans made directly by these schools to their students. (Exh. 25, Tr. Stmt. of Facts ¶ 2). Yao was SFC's owner and CEO. (Exh. 26, SFC Org. Chart).[10]

From 1995 through 1998, three of the Family defendants made loans to SFC, in the form of subordinated debentures, in the total amount of $3 million. Bast purchased three subordinated debentures, on the following dates and in the following amounts: $750,000 on December 31, 1995, $600,000 on August 1, 1997 and $500,000 on August 7, 1998. (Exh. 24, Tr. Resp. RFAs ¶¶ 1, 33 and 78). Pamela Gagné purchased two subordinated debentures, each in the amount of $250,000, on December 31, 1995 and August 1, 1997. (Exh. 24, Tr. Resp. RFAs ¶¶ 17 and 48). The Elizabeth Brennan Trust purchased two subordinated debentures, one in the amount of $150,000 on August 1, 1997, and the other in the amount of $500,000 on August 7, 1998. (Exh. 24, Tr. Resp. RFAs ¶¶ 63 and 93). Interest payments on the debentures were to be made monthly, with the principal to be repaid at maturity. (Exhs. 1 and 2, Bast Decl. ¶ 18 and P. Gagné Decl. ¶ 3).[11] As of April 2002, SFC had made monthly interest payments on the debentures, but it had not repaid any of the principal amounts. (Exhs. 1 and 2, Bast Decl. ¶ 20 and P. Gagné Decl. ¶¶ 4, 10).

In 1998, Yao asked whether Bast or the Brennan Trusts might be willing to make short-term bridge loans to SFC. (Exh. 1, Bast Decl. ¶ 38). Bast understood that SFC sought these bridge loans in order to continue its business of originating or purchasing student loans at times when it was temporarily at the limit of its other, more permanent financing. (Exh. 1, Bast Decl. ¶ 38). Beginning in 1998, the Family defendants made a number of such bridge loans to

---

[9] Exhibit 25 is relevant portions of the Trustee's proposed Statement of Facts That Are Admitted and Require No Proof ("Tr. Stmt. of Facts"). While the Family defendants do not agree with all of the alleged facts in this statement, they assume that those facts with which they do agree are not disputed by the Trustee.

[10] Exhibit 26 is the first page of an SFC Organizational Chart dated June 9, 2000.

[11] Exhibit 2 is the Declaration of Pamela B. Gagné ("P. Gagné Decl."). Exhibit 37 is the transcript of relevant portions of the deposition of Pamela Gagné ("P. Gagné Dep.").

SFC. With the exception of the March 22, 1999 and March 5, 2002 loans described below, these bridge loans were repaid in accordance with the terms of the loan agreements.

On March 22, 1999, Bast made a bridge loan of $3 million to SFC. (Exh. 24, Tr. Resp. RFAs ¶ 118; Exh. 1, Bast Decl. ¶ 21). On May 20, 1999, $400,000 of this loan was refinanced and the $3 million loan was replaced by a $2.6 million loan. (Exh. 1, Bast Decl. ¶ 21). Under an Amended and Restated Loan Agreement dated as of March 22, 1999, SFC was to pay principal, interest and fees on the remaining $2.6 million in four payments, in the amounts and on the dates set forth in the agreement. (Exh. 1, Bast Decl. ¶ 21; Exh. 12, Loan Agr.). SFC made three of the four required payments, but never made the last required payment of $676,000. (Exh. 1, Bast Decl. ¶ 22). As of May 2002, SFC still owed Bast the $676,000 balance on this loan. (Exh. 1, Bast Decl. ¶ 22).

On March 5, 2002, six of the Family defendants made bridge loans to SFC totaling $3.3 million. Bast loaned SFC $2 million, the Elizabeth Brennan Trust f/b/o Elizabeth L. Gagné loaned SFC $400,000, the James Brennan Trust f/b/o Elizabeth L. Gagné and the James Brennan Trust f/b/o W. Roderick Gagné each loaned SFC $200,000 and the James Brennan Trust f/b/o Philip B. Gagné loaned SFC $100,000. (Exh. 24, Tr. Resp. RFAs ¶¶ 156, 192, 210, 228 and 246). Pamela Gagné loaned SFC $400,000. (Exh. 2, P. Gagné Decl. ¶ 6).[12] Under the loan agreements, SFC was to make monthly interest payments on the loans and to repay the principal at maturity. (Exhs. 1 and 2, Bast Decl. ¶ 24 and P. Gagné Decl. ¶ 6). SFC made the March and April interest payments on each of these loans, but then made no further payments. (Exhs. 1 and 2, Bast Decl. ¶ 24 and P. Gagné Decl. ¶ 7).

---

[12] The March 5, 2002 loan from Pamela Gagné to SFC was initially funded from the custody account of W. Roderick Gagné that was created on the termination of the Elizabeth Brennan Trust f/b/o W. Roderick Gagné; however, the loan was made by Pamela Gagné. (Exh. 2, P. Gagné Decl. ¶ 6; Exh. 37, P. Gagné Dep. 136-38). This is confirmed by the fact that the loan documents (included in the Appendix as Exhibit 16) are in her name.

As described above, as of April 2002, the total amount of the outstanding loans from the Family defendants to SFC was $6.976 million.

3.     **Yao's Personal Guaranties.**[13]

Each of the loans to SFC described above was personally guarantied by Yao, and in some cases by his wife, Lore Yao.  In connection with each of the seven subordinated debentures, Yao executed a Conditional Guaranty, which provided that he would pay the total amount of SFC's obligations to the lender in the event that SFC breached any representation, warranty or covenant of the loan agreement governing the debenture, which included a covenant that SFC would comply with all terms of the loan agreement and the debenture.  (Exhs. 1 and 2, Bast Decl. ¶ 25 and P. Gagné Decl. ¶ 8; Exhs. 17 through 19, Cond. Guaranties).  Yao, with his wife, executed a Conditional Guaranty of SFC's obligations to Bast in regard to his loan to SFC on March 22, 1999.  (Exh. 1, Bast Decl. ¶ 26; Exh. 20, Cond. Guaranty).  Each of the six loans made by the Family defendants to SFC on March 5, 2002 was personally guarantied by the Yaos in accordance with the Guaranties that they executed.  (Exhs. 1 and 2, Bast Decl. ¶ 27 and P. Gagné Decl. ¶ 8; Exh. 21, Guaranty).  These guaranties provided that upon an event of default under the loan agreements, the lenders each could treat all obligations as due and payable and collect the total amount of the debt from the guarantors.  (Exh. 21, Guaranty).

4.     **SFC's Default and Yao's Pledge of the GP Stock.**

As had all previous bridge loan agreements, the loan agreements for the March 5, 2002 bridge loans provided that SFC would use the loan proceeds solely to finance student loans and that the student loans would be provided to a custodian, to be held as collateral for the Family defendants' loans to SFC.  (Exhs. 1 and 3, Bast Decl. ¶ 28 and Gagné Decl. ¶ 9; Exh. 15, Loan Agr.).  For several weeks after the March 5, 2002 loans were made, Yao told the Family

---

[13]  Copies of the Guaranties described in this section are included in the Appendix as Exhibits 17 through 21.

defendants that the collateral was forthcoming; finally, toward the end of April 2002, he informed them that the required collateral would not be provided. (Exhs. 1 and 3, Bast Decl. ¶ 29 and Gagné Decl. ¶ 18). Under the loan agreements, the failure to provide this collateral constituted an event of default.[14] (Exh. 1, Bast Decl. ¶ 29). This event of default made Yao liable for the obligations of SFC to the Family defendants under the express terms of the guaranties. (Exh. 1, Bast Decl. ¶ 29).

On May 5, 2002, Yao pledged his stock in Premier Education Group GP, Inc., One Summit Place GP, Inc. and DHP GP, Inc. (the "GP stock") to Bast, Pamela Gagné and certain of the Brennan Trusts pursuant to a Pledge Agreement. (Exhs. 1 and 3, Bast Decl. ¶ 30 and Gagné Decl. ¶ 19; Exh. 22, Pledge Agr.).[15] As provided in the Pledge Agreement, because SFC was in default under the loan agreements, Yao pledged the GP stock as collateral to partially secure his obligations under the guaranties. (Exh. 1, Bast Decl. ¶ 30).

5.     **SFC's Further Default and the Assignment and Assumption Agreements.**

In May 2002, SFC again defaulted under the loan agreements, this time by failing to make interest payments due to the Family defendants on the outstanding loans. (Exhs. 1 and 2, Bast Decl. ¶ 31 and P. Gagné Decl. ¶ 7). As of June 14, 2002, the defaults remained uncured. (Exh. 1, Bast Decl. ¶ 31). Accordingly, Bast, on his own behalf and on behalf of the other Family defendants who were lenders on the outstanding debt, sent notice that the Family defendants were exercising their right under the loan agreements to accelerate the maturity date of the debt and to proceed against the guarantor. (Exh. 1, Bast Decl. ¶ 32). On that date, those Family defendants executed against the guaranties and Yao, in order to partially satisfy his

---

[14] Based on facts that the Family defendants have subsequently learned, they believe that there were additional defaults under the loan agreements at this time. In addition, the filing of the bankruptcy petition against SFC on June 5, 2002 constituted an event of default under the loan agreements.

[15] Exhibit 22 is a copy of the Pledge Agreement.

obligations under the guaranties, agreed to transfer his GP stock to those Family defendants. (Exh. 24, Tr. Resp. RFAs ¶ 414).

In connection with the Family defendants' execution against the GP stock that they held as collateral, the Family defendants and Yao entered into a series of Assignment and Acceptance Agreements dated as of June 14, 2002, under which Yao transferred the GP stock to the Family defendants and the Family defendants assigned to Yao the SFC loan agreements and debt instruments then in default. (Exhs. 1 and 3, Bast Decl. ¶ 33 and Gagné Decl. ¶ 22; Exh. 23, Ass'n and Acceptance Agr., pp. 1-2).[16] The Assignment and Acceptance Agreements provided that if the GP stock were sold, and the amount received was less than the amount of principal, accrued interest and fees due under the loan agreements, the Family defendants would be entitled to receive the shortfall from Yao. (Exh. 1, Bast Decl. ¶ 35; Exh. 23, Ass'n and Acceptance Agr., p. 2). Conversely, if the amount received was more than the amount of principal, accrued interest and fees, Yao would be entitled to the excess. (Exh. 1, Bast Decl. ¶ 35; Exh. 23, Ass'n and Acceptance Agr.).

### 6.    Other Relevant Facts and Lack of Evidence.

Regarding the factors set forth in PUFTA that might be used to establish fraudulent intent under a badges of fraud analysis, *see* 12 Pa. C.S. § 5104(b), the evidentiary record is as follows. There is evidence that certain of the Family defendants had several business dealings with Yao, but no evidence that they had a close personal relationship with him such that they would be deemed insiders. (Exhs. 1, 2 and 3, Bast Decl. ¶ 37, P. Gagné Decl. ¶ 12 and Gagné Decl. ¶ 24). As the Trustee testified at his deposition, Yao, or Yao and his wife, had other

---

[16] Exhibit 23 is a copy of the Bast Assignment and Acceptance Agreement with respect to the December 31, 1995 subordinated debenture. The Assignment and Acceptance Agreements entered by the Family defendants all contain the same terms and provisions, except for differences on account of the different lenders and different principal amounts of the loans involved, so the Bast Assignment and Acceptance Agreement is included as a representative agreement.

very substantial assets besides the GP stock. In real estate alone, their assets included three

homes; one, in Nantucket, was appraised in excess of $6 million, and the other two, in the

Philadelphia suburbs, were worth approximately $1.5 million each. (Exh. 46, Stanziale Dep. at

225-31).[17] No evidence has been adduced that the transfer of the GP stock to the Family

defendants was concealed, that Yao incurred a substantial debt shortly before or after the

transfer, that Yao was sued or threatened with suit before the transfer occurred, that Yao

absconded, that Yao removed or concealed assets, or that Yao was insolvent or became insolvent

as a result of the transfer of the GP stock.

Much evidence was developed in discovery regarding the value of Premier, One

Summit and Day Hill. As explained below, although there are factual disputes on this point,

those disputes do not constitute genuine issues of material fact precluding summary judgment.

To the extent that the Court deems this issue to be material on summary judgment, the only

evidence of record on the fair market value of the GP stock that Yao transferred to the Family

defendants was provided by experts for the Family defendants, who determined that the fair

market value of the stock of Premier Education Group GP, Inc. on June 14, 2002, the date of

transfer to certain of the Family defendants, was $1.76 million, and that the fair market value of

the stock of One Summit Place GP, Inc. and DHP GP, Inc. on that date was $211,000 and

$298,000, respectively. (Exh. 31, Penny Report at 3-4).[18] Proffered experts for the Trustee

appraised the real estate held by One Summit Place Partners LP and Day Hill Partners LP as of

June 1, 2002 (Exh. 34, Houck Report at 1-2)[19] and, subtracting the mortgages and adding the net

---

[17]  Exhibit 46 is the transcript of relevant portions of the deposition of Charles A. Stanziale, Jr., Chapter 7 Trustee of
SFC ("Stanziale Dep.").

[18]  Exhibit 31 is relevant portions of the Valuation and Analysis of J. Mark Penny, ASA, dated July 13, 2007
("Penny Report").

[19]  Exhibit 34 is relevant portions of the Appraisal of John W. Houck, dated May 4, 2007 ("Houck Report").

book value of other assets, calculated that the amount of a one-third interest in One Summit and

Day Hill on that date would be $281,820 and $397,650, respectively. (Exh. 33, Hecht Report at

8).[20] However, the Trustee's proffered expert testified at deposition that he had not determined,

and those amounts did not represent, the fair market value of the general partner stock in these

entities. (Exh. 40, Hecht Dep. at 107).[21] Likewise, another proffered expert for the Trustee

opined that the fair market value of a 100% equity interest in Premier Education Group LP as of

March 31, 2002 would be $30,320,000,[22] but did not offer any opinion on the fair market value

of the stock of Premier Education Group GP, Inc., which is the only interest in Premier that Yao

transferred to the Family defendants. (Exh. 35, Lieberman Report at 26).[23]

        The Trustee has, at times, asserted that Yao owned a one-third interest in Premier

Education Group LP. The basis for this assertion appears to be filings made by Premier with

state authorities, during the time that Yao owned the stock of Premier Education Group G.P. and

functioned as the general partner of Premier, which identified Yao as a one-third owner.

However, there is no evidence that the parties to the Limited Partnership Agreement ever agreed

to change the distribution formula in the agreement. In fact, they did not. (Exhs. 1 and 3, Bast

Decl. at ¶ 7 and Gagné Decl. at ¶ 8). Although it was possible, at certain distribution levels, for

the general partner's share to be as high as 40%, even at the asserted fair market value of Premier

Education Group L.P. put forth by the Trustee's proffered expert, the general partner's

percentage distribution under the Limited Partnership Agreement would not exceed 20%, as

---

[20]  Exhibit 33 is relevant portions of the Report of William Hecht, CPA, dated May 7, 2007 ("Hecht Report").

[21]  Exhibit 40 is the transcript of relevant portions of the deposition of William Hecht ("Hecht Dep.").

[22]  The Family defendants' expert placed a fair market value of $13.3 million on Premier Education Group LP as of June 14, 2002, so the Family defendants vigorously dispute the $30.32 million figure. However, for purposes of this motion, the Court need not address this dispute, since it is undisputed that Yao owed, and transferred, only the general partner stock, not a 100% equity interest in the limited partnership.

[23]  Exhibit 35 is relevant portions of the Report of Martin J. Lieberman, ASA, dated May 14, 2007 ("Lieberman Report").

demonstrated by the unrebutted calculations of the Family defendants' expert. (Exh. 32,

Waddington Report at 7-8).[24]

**B.    Preference Claims.**

       The Trustee claims that all payments made by SFC to the Family defendants in

the one year before the Filing Date, totaling $4,229,093, constitute avoidable preferences.  Set

forth below are the material facts that are not subject to reasonable dispute which show that

(1) all of the payments were made in the ordinary course of business between SFC and the

Family defendants and, therefore, are not avoidable preferences, (2) there is no evidence to

support the Trustee's claim of insider status on the part of the Family defendants, which means

that the applicable preference period is 90 days, not one year as the Trustee contends, and

(3) new value given by the Family defendants to SFC bars a substantial part of the Trustee's

preference claims.

     **1.    Ordinary Course of Business.**

       The payments that the Trustee has challenged as preferences are (a) monthly

payments of interest on bridge loans and subordinated debentures, (b) repayment on November

12 and 13, 2001 of the principal on bridge loans that were made by the Family defendants to

SFC on September 25, 2001 and October 2, 2001 and (c) payment on November 12 and 13, 2001

of the commitment fees and accrued interest on the September and October 2001 loans.  The

following are the undisputed material facts which demonstrate that these payments all were made

in the ordinary course of business between the Family defendants and SFC.

---

[24]  Exhibit 32 is relevant portions of the Report of Edward M. Waddington, CPA ("Waddington Report").

(a)    **Monthly Interest Payments.**

According to the First Amended Complaint, between June 2001 and April 2002,

SFC made eleven payments of $26,842.00 to Bast, $5,136.98 to Pamela Gagné and $7,397.26 to

the Elizabeth Brennan Trust.  (D.I. 76, First Am. Compl. ¶ 314).  These amounts constituted

monthly interest payments on the outstanding subordinated debentures and, for Bast, on the

balance of the March 22, 1999 loan.  (Exhs. 1 and 2, Bast Decl. ¶ 45 and P. Gagné Decl. ¶ 13).

Additional payments in April 2002 alleged in the First Amended Complaint were the March and

April interest payments on the loans that had been made by certain of the Family defendants on

March 5, 2002.  (Exhs. 1 and 2, Bast Decl. ¶ 46 and P. Gagné Decl. ¶ 14).  The interest payments

on the March 2002 loans were in the amounts of $38,000 to Bast (payments of $18,000 and

$20,000[25] on his $2 million loan), $7,600 to Pamela Gagné (payments of $3,600 and $4,000 on

her $400,000 loan), $3,800 to each of the James Brennan Trust f/b/o Elizabeth Gagné and the

James Brennan Trust f/b/o W. Roderick Gagné (payments of $1,800 and $2,000 on their

$200,000 loans) and $1,900 to the James Brennan Trust f/b/o Philip Gagné (payments of $900

and $1,000 on the $100,000 loan).  (*See* D.I. 76, First Am. Compl. ¶ 314; Exhs. 1 and 2, Bast

Decl. ¶ 46 and P. Gagné Decl. ¶ 14_).

Interest payments by SFC to the Family defendants on the outstanding

subordinated debentures and bridge loans had been regularly and consistently made since the

Family defendants made the loans underlying the subordinated debentures in 1995.  Patricia

Kartha, SFC accounting manager from 1996 to 2000, and Diane Messick, SFC finance manager,

controller and assistant treasurer from 1999 through 2002, both testified at deposition to the

regularity of these interest payments.  (Exhs. 41 and 43, Kartha Dep. at 856-58 and Messick Dep.

---

[25]  The First Amended Complaint does not list the $20,000 payment separately, but lists a payment of $46,842, which is a combination of the $26,842 interest regularly paid on the subordinated debentures and on the balance of the March 22, 1999 loan, with the $20,000 interest payment on the March 5, 2002 loan.

at 1311-13).[26]  A document created by counsel for Royal Indemnity Company[27] containing

excerpts from the SFC general ledger confirms that interest payments by SFC to the Family

defendants were consistently made for approximately five years before the beginning of any

asserted preference period.  (Kartha Dep. at 338; Exh. 28, Gen. Ledger excerpts).  Although the

payments were sometimes late, SFC never failed to make an interest payment on the outstanding

debt to the Family defendants until it failed to make the interest payments for May 2002.  (Exhs.

1, 2 and 3, Bast Decl. ¶ 47, P. Gagné Decl. ¶ 15 and Gagné Decl. ¶ 16).

**(b)**     **Principal Repayments.**

Beginning in August 1998, the Family defendants made a number of short term

bridge loans to SFC.  (Exh. 1, Bast Decl. ¶ 39).  SFC sought these bridge loans in order to

continue its business of originating or purchasing student loans at times when it was temporarily

at the limit of its other, more permanent financing.  (Exh. 1, Bast Decl. ¶ 38).  All of the Family

defendants' bridge loans to SFC had an interest rate of 12%, and all had a commitment fee; all

but one of the earlier bridge loans had a flat commitment fee of 10% and the later ones typically

had a commitment fee that ranged from 6% to 10%, depending on how long the loan was

outstanding.  (Exh. 1, Bast Decl. ¶ 39).  The loan agreements typically provided that the

principal, together with the commitment fee and accrued interest, would be repaid on the earlier

of a date certain or SFC's obtaining warehouse or other financing.  (Exh. 1, Bast Decl. ¶ 39).

This repayment provision was in accord with standard industry practice to repay bridge loans

---

[26]  Exhibit 41 is the transcript of relevant portions of the deposition of Patricia Kartha ("Kartha Dep.").  Exhibit 43 is
the transcript of relevant portions of the deposition of Diane Messick ("Messick Dep.").  Exhibit 28 is Exhibit
229-II, marked at the Kartha deposition, composed of excerpts of the SFC general ledger and two other pages.

[27]  The interests of Royal and the Trustee have been aligned since early in the litigation and they have, by agreement,
cooperated in the prosecution of these actions.

17

when other financing became available. (Exh. 30, Carney Report ¶ 24).[28]  The testimony of

Diane Messick, SFC's controller, was that all of the Family defendants' loans, with the exception

of the March 2002 loans, were paid according to the terms or amended terms of the loan

agreements. (Exh. 43, Messick Dep. at 1292, 1295).

On September 25, 2001 and October 2, 2001, seven of the Family defendants

made bridge loans to SFC totaling $3.475 million.  Bast loaned SFC $2 million, Pamela Gagné

loaned SFC $375,000, the Elizabeth Brennan Trust f/b/o Elizabeth Gagné loaned SFC $375,000,

the Elizabeth Brennan Trust f/b/o Philip Gagné loaned SFC $250,000, the James Brennan Trust

f/b/o Elizabeth Gagné and the James Brennan Trust f/b/o W. Roderick Gagné each loaned SFC

$175,000, and the James Brennan Trust f/b/o Philip Gagné loaned SFC $125,000. (Exh. 24, Tr.

Resp. RFAs ¶ 146).  As had been the case with previous bridge loans, the loan agreements for

the 2001 loans required SFC to repay the entire unpaid principal amount, together with interest

and other amounts payable under the agreements, on the maturity date, which was defined as the

earlier of SFC receiving funds in a warehouse financing or August 20, 2002. (Exh. 1, Bast Decl.

¶ 41; Exh. 13, Loan Agr.).  Consistent with earlier loans, the 2001 loans had an interest rate of

12%, and a commitment fee ranging from 6% to 10%, payable at maturity. (Exh. 1, Bast Decl.

¶ 41).

SFC obtained funds from a warehouse financing on or about November 7 and 9,

2001. (Exh. 27, SFC Gen. Ledger 11/30/01).[29]  On November 12 and 13, 2001, the Family

defendants' September 25 and October 2, 2001 loans were repaid. (D.I. 76, First Am. Compl.

¶ 314).

---

[28] Exhibit 30 is relevant portions of the Report of Owen Carney ("Carney Report").

[29] Exhibit 27 is relevant pages from an SFC General Ledger dated November 30, 2001.

(c)    **Payments of Fees and Accrued Interest on the 2001 Loans.**

At the same time that SFC repaid the principal on the loans made by the Family defendants in September and October 2001, it paid the 6% commitment fee and the accrued interest on these loans. The total amount of commitment fees and accrued interest paid on November 12 and 13, 2001 was $153,334 to Bast (fee of $120,000 and interest of $33,334), $28,750 to Pamela Gagné and to the Elizabeth Brennan Trust f/b/o Elizabeth Gagné (fee of $22,500 and interest of $6,250), $18,583 to the Elizabeth Brennan Trust f/b/o Philip Gagné (fee of $15,000 and interest of $3,583), $13,417 to the James Brennan Trust f/b/o Elizabeth Gagné and the James Brennan Trust f/b/o W. Roderick Gagné (fee of $10,500 and interest of $2,917) and $9,583 to the James Brennan Trust f/b/o Philip Gagné (fee of $7,500 and interest of $2,083). (D.I. 76, First Am. Compl. ¶ 314; Exhs. 1 and 2, Bast Decl. ¶ 43 and P. Gagné Decl. ¶ 18).

The 6% commitment fee and the 12% interest rate paid by SFC on the September and October 2001 bridge loans were identical to the commitment fees and interest rates paid on all previous bridge loans, dating back to 1998, except that some of the earlier bridge loans had a flat commitment fee of 10% and, in one instance, higher. (Exh. 1 and 2, Bast Decl. ¶ 44 and P. Gagné Decl. ¶¶ 16-17). The Trustee's expert opined, based on a telephone conversation with a former banker who did not describe any bridge loans with which he was involved and was not asked whether he had experience with bridge loans where the collateral was similar to the collateral for the Family defendants' bridge loans, that the 6% commitment fee for the Family defendants' loans was 2% higher than market. (Exh. 33, Hecht Report at 6-7; Exh. 40, Hecht Dep. at 73-79). Even if that opinion were relevant to the ordinary course defense, which it is not for the reasons set forth in the legal argument below, the undisputed evidence of record nevertheless establishes that the terms of the Family defendants' bridge loans were as favorable

or more favorable to SFC than the terms of other third-party bridge loans available to SFC and actually obtained by SFC.

For example, during the period from September 4, 1998 through December 19, 2001, SWH Funding Corp., a bridge lender, sent six term sheets to Yao for proposed loans to SFC. (Exh. 24, Tr. Resp. RFAs ¶¶ 534, 538, 545, 549, 555 and 562). Two of the proposed loans closed, the first for $5 million and the second for $40 million. (Exh. 24, Tr. Resp. RFAs ¶¶ 541, 559). The combined fees applicable on the SWH loans and proposed loans were always in excess of the 6% commitment fee that SFC paid on the Family defendants' September and October 2001 bridge loans to SFC and, in most cases, higher than the 10% commitment fee that SFC had paid on some of the earlier Family defendants' bridge loans. (Exh. 30, Carney Report ¶ 21). Further, each of the SWH term sheets except for the last and each of the two loans that closed required credit risk insurance on that the underlying collateral (the student loans SFC was purchasing, which were considered sub prime). (Exh. 43, Messick Dep. at 1289-90). The Family defendants' loans required no such credit risk insurance and, consequently, were of higher risk than the SWH loans. Despite this, as confirmed by the deposition testimony of SFC's controller, the SWH loans were more costly to SFC than the Family defendants' loans. (Exh. 30, Carney Report ¶ 21; Exh. 43, Messick Dep. at 1298-99).

    2.    **Insider.**

There is no evidence that Bast, Pamela Gagné or Gagné was an officer or director of SFC. Further, the Trustee does not appear to contend that Bast or Pamela Gagné were persons in control of SFC. Any such contention would be completely without support in the record, which establishes that Bast and Pamela Gagné were not involved in the management or present at management meetings, were not involved in the financial decisions made at SFC and never

20

participated in any discussions or decisions regarding the management or business operations of

SFC.   (Exhs. 1 and 2, Bast Decl. ¶ 48 and P. Gagné Decl. ¶ 19; Exhs. 41 and 43, Kartha Dep. at

858-61, Messick Dep. at 1300-03).

      In response to an Interrogatory asking him to state separately for each Family

defendant all actions, if any, taken to exercise control or authority over SFC, the Trustee stated:

> The Family's ability to exercise authority and control over SFC
> primarily arises out of Pepper and Roderick Gagné's functioning
> as general counsel for SFC.  As such, Gagné had the opportunity to
> know what was going on at SFC and to direct and structure
> investment opportunities for the Family's benefit.  In representing
> SFC, Yao and the Family, Gagné was in a position to obtain
> knowledge and assert influence and control over many of the
> dealings among them.

The Trustee went on to state that the Family defendants provided sizable loans to SFC between

1996 and 2002, that some of the Family defendants owned stock of SFC for approximately one

year (February 2000 to January 2001), that Yao testified in another proceeding that the Family

defendants expressed interest in providing bridge financing or obtaining an equity participation

in SFC, that some of the Family defendants were limited partners in Yao-related entities, that

pursuant to his personal guaranties to the Family defendants, Yao pledged the GP stock to the

Family defendants and that Yao wrote to Gagné and assured him that Yao would protect the

Family defendants' investment in SFC.  (Exh. 29, Tr. Intg. Resp. No. 1).[30]  The Trustee asserted

no facts regarding any alleged control or even influence by any Family defendant over the

decisions on business matters of SFC management during the year preceding the Filing Date or

at any other time.  (Exh. 29, Tr. Intg. Resp. No. 1).

      With regard to the Trustee's contention that Gagné was an insider of SFC and,

therefore, that the Family defendants were insiders because they are relatives of Gagné, the

---

[30]  Exhibit 29 is relevant portions of the Trustee's Supplemental Objections and Responses to the Family's First Set
of Interrogatories.

undisputed evidence that had been adduced in discovery is to the contrary. Gary Hawthorne, who started at SFC as vice president of operations in 1997, and later became the President of SFC, testified that he only saw Gagné at SFC's offices only a couple of times in the four or five years that he worked for SFC, that Gagné never attended board or committee meetings, that Gagné had no role in deciding compensation or in the hiring or firing of employees, and that Gagné did not tell anyone at SFC what to do. (Exh. 39, Hawthorne Dep. at 973-74). Patricia Kartha, SFC's former accounting manager, testified that Gagné did not attend managers meetings at SFC, that she did not consider Gagné to be part of the management of SFC, that she saw Gagné at SFC's offices only once, and that Gagné could not control the transfer or expenditure of SFC funds. (Exh. 41, Kartha Dep. at 374-76, 387-88, 394-96, 491-97). Deborah Pike, SFC's former compliance/administrative manager, testified that Gagné's role was to provide legal advice to the company, that her only contact with him was asking where documents were, which occurred less than half a dozen times in her tenure at SFC, that Gagné never directed her to transfer funds, that Gagné did not have access to SFC's computer system, and that she only met Gagné in person once. (Exh. 44, Pike Dep. at 49-50, 52-61). Diane Messick, SFC's finance manager, controller and assistant treasurer from 1999 to 2002, testified that Gagné was not part of the board of directors, finance or any other committee, that Gagné never directed the disbursement of funds and that she remembered Gagné being at SFC's offices only once; she also testified that Yao instructed her not to discuss business operations with Gagné because Gagné's role was only as an attorney to give legal advice. (Exh. 43, Messick Dep. at 31-34, 1262). The testimony of all other SFC witnesses on this issue was completely in accord. (Exhs. 36, 38, 42, 45 and 47, DiSimplico Dep. at 92-93, 134, Harris Dep. at 260, Lafferty Dep. at 37, Scola Dep. at 40-42 and Zulauf Dep. at 58-61, 69-70).[31] No employee of SFC, or any other

---

[31] Exhibits 36, 38, 39, 42, 44, 45 and 47 are transcripts of relevant portions of the depositions of Guy DiSimplico,

person for that matter, testified to any alleged control by Gagné over the management, business operations or business affairs of SFC.

**3.      New Value.**

As described above, on March 5, 2002, six of the Family defendants made new loans totaling $3.3 million to SFC. Also as described above, the collateral for these loans was never provided by SFC. Therefore, as explained in the legal argument below, these loans constitute new value that can be applied against allegedly preferential payments by SFC to the Family defendants.

The following charts show the impact of these March 2002 loans as new value under section 547(c)(4) of the Bankruptcy Code on transfers made by SFC to those Family defendants during the period from June 5, 2001, one year before the Filing Date, through March 5, 2002.[32] The charts also show the transfers made by SFC to these Family defendants after March 5, 2002, and the total preference claims against each of these Family defendants that are not subject to the new value defense. The numbers stated for "Total transfers received from SFC 6/5/01 through 3/5/02" and "Total transfer after 3/5/02" come from paragraph 314 of the Trustee's First Amended Complaint, with an exception explained in the footnote to the charts.

**Robert Bast**

| | |
|---|---|
| Total transfers received from SFC 6/5/01 through 3/5/02 | $ 2,394,912.00 |
| New value given to SFC 3/5/02 | 2,000,000.00 |
| Total transfers received from SFC 6/5/01 through 3/5/02 which exceed the new value given to SFC 3/5/02 | 394,912.00 |
| Total transfers after 3/5/02 | 91,684.47 |

---

Mark Harris, Gary Hawthorne, Dennis Lafferty, Deborah Pike, Stephanie Scola and David Zulauf.

[32] The Elizabeth Brennan Trust f/b/o Philip Gagné and the Elizabeth Brennan Trust f/b/o W. Roderick Gagné did not make loans to SFC on March 5, 2002, so did not provide any new value on that date. Payments of $375,000 and $28,750 incorrectly made by SFC to the Elizabeth B. Brennan Trust f/b/o W. Roderick Gagné rather than to Pamela Gagné have been included on the Pamela Gagné chart.

| | | |
|---|---|---|
| Total Preference Claim Against Robert Bast Not Subject to New Value Defense | $ | 486,596.47 |

### Pamela Gagné

| | | |
|---|---|---|
| Total transfers received from SFC 6/5/01 through 3/5/02 | $ | 444,845.84[33] |
| New value given to SFC 3/5/02 | | 400,000.00 |
| Total transfers received from SFC 6/5/01 through 3/5/02 which exceed the new value given to SFC 3/5/02 | | 44,845.84 |
| Total transfers after 3/5/02 | | 23,010.94 |
| Total Preference Claim Against Pamela Gagné Not Subject to New Value Defense | $ | 67,856.78 |

### Elizabeth Brennan Trust f/b/o Elizabeth Gagné

| | | |
|---|---|---|
| Total transfers received from SFC 6/5/01 through 3/5/02 | $ | 403,750.00 |
| New value given to SFC 3/5/02 | | 400,000.00 |
| Total transfers received from SFC 6/5/01 through 3/5/02 which exceed the new value given to SFC 3/5/02 | | 3,750.00 |
| Total transfers after 3/5/02 | | -0- |
| Total Preference Claim Against Elizabeth Brennan Trust f/b/o Elizabeth L. Gagné Not Subject to New Value Defense | $ | 3,750.00 |

### James Brennan Trust f/b/o Philip Gagné

| | | |
|---|---|---|
| Total transfers received from SFC 6/5/01 through 3/5/02 | $ | 134,583.00 |
| New value given to SFC 3/5/02 | | 100,000.00 |
| Total transfers received from SFC 6/5/01 through 3/5/02 which exceed the new value given to SFC 3/5/02 | | 34,583.00 |
| Total transfers after 3/5/02 | | 1,900.00 |
| Total Preference Claim Against James Brennan Trust f/b/o Phillip B. Gagné Not Subject to New Value Defense | $ | 36,483.00 |

---

[33] This includes payments of $375,000 and $28,750 made by SFC on or about November 12, 2001, in payment of a $375,000 loan made by Pamela Gagné to SFC on or about September 25, 2001 (Exh. 14, Loan Agr.) and of interest and fees with respect to that loan, which payments were incorrectly made by SFC to the Elizabeth Brennan Trust f/b/o W. Roderick Gagné.

### James Brennan Trust f/b/o Elizabeth Gagné

| | |
|---|---:|
| Total transfers received from SFC 6/5/01 through 3/5/02 | $    188,417.00 |
| New value given to SFC 3/5/02 | 200,000.00 |
| Total transfers received from SFC 6/5/01 through 3/5/02 which exceed the new value given to SFC 3/5/02 | -0- |
| Total transfers after 3/5/02 | 3,800.00 |
| Total Preference Claim Against James Brennan Trust f/b/o Elizabeth L. Gagné Not Subject to New Value Defense | $     3,800.00 |

### James Brennan Trust f/b/o W. Roderick Gagné

| | |
|---|---:|
| Total transfers received from SFC 6/5/01 through 3/5/02 | $    188,417.00 |
| New value given to SFC 3/5/02 | 200,000.00 |
| Total transfers received from SFC 6/5/01 through 3/5/02 which exceed the new value given to SFC 3/5/02 | -0- |
| Total transfers after 3/5/02 | 3,800.00 |
| Total Preference Claim Against James Brennan Trust f/b/o W. Roderick Gagné Not Subject to New Value Defense | $     3,800.00 |

As shown above, as applied to transfers before the March 5, 2002 loans, the new value of $3.3 million offsets $3,276,834 of allegedly preferential transfers of $4,082,686 made by SFC to the Family defendants during the period from June 5, 2001, one year before the filing date, to March 5, 2002, when the new value was given by six of the Family defendants. This leaves only $805,852 which, added to the transfers of $146,387 made by SFC to the Family defendants after March 5, 2002, results in a total preference claim of $952,239 against the Family defendants. Therefore, even if the Trustee could prove insider status, which he cannot, and even if his claims were not barred by the ordinary course defense, which they are, the new value would reduce his preference claim to $952,239, rather than the $4,229,093 alleged.

## IV.     ARGUMENT.

### A.     The Standard for Summary Judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, the Court shall "forthwith render" a summary judgment motion if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To defeat a summary judgment motion, the non-moving party must establish a genuine issue of fact on those elements for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A summary judgment motion "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'").

As this Court recently reiterated in granting summary judgment motions, "the mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue." *Lacy v. AMTRAK*, Civil Action No. 06-68-JJF, 2007 U.S. Dist. LEXIS 54683, at *5 (D. Del. July 23, 2007) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)); *see also Zechman v. Christiana Care Health Sys.*, Civil Action No. 05-159-JJF, 2007 U.S. Dist. LEXIS 47349, at *8-*9 (D. Del. June 26, 2007);

*Claycomb v. Playtex Products, Inc.*, Civil Action No. 06-120, JJF, 2007 U.S. Dist. LEXIS 44769, at *6-*7 (D. Del. June 19, 2007).

Both this and other courts in this District have not hesitated to grant summary judgment motions even where intent was a material issue. *See, e.g., AstraZeneca LP v. TAP Pharm. Products, Inc.*, 444 F. Supp. 2d 278 (D. Del. 2006) (intent to infringe patent); *Wilson v. Am. Postal Workers Union*, 433 F. Supp. 2d 444 (D. Del. 2006) (bad faith constituting breach of duty of fair representation). Similarly in fraudulent conveyance cases, courts have not hesitated to enter summary judgment, even where the actual intent of the transferor, or the good faith of the transferee, was at issue. *See, e.g., Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 135-39 (Bankr. E.D. Pa. 2004); *Erie Marine Enterprises, Inc. v. NationsBank, N.A. (In re Erie Marine Enterprises, Inc.)*, 216 B.R. 529, 537-30 (Bankr. W.D. Pa. 1998).

**B.      Summary Judgment Should Be Granted on the Fraudulent Conveyance Claim.**

In its December 22, 2005 Opinion and Order, this Court dismissed the Trustee's fraudulent conveyance claim in part, holding that (1) the Trustee did not have standing to bring a fraudulent conveyance claim under 11 U.S.C. § 544, because the transfer the Trustee sought to avoid was of Yao's property, not the property of the debtor, SFC; (2) the Trustee had standing to bring a claim under PUFTA, but could not proceed on a theory of constructive fraudulent transfer, because he did not allege that Yao had not received a reasonably equivalent value in exchange for the challenged transfer; and (3) for purposes of the motion to dismiss, the general allegation that "Yao pledged the assets with actual intent to defraud his creditors" was sufficient to allege fraudulent intent, and therefore the Trustee could proceed to discovery on an actual fraudulent intent theory under PUFTA. *Student Finance Corp.*, 335 B.R. at 552-53. Therefore,

the remaining claim against the Family defendants is that Yao allegedly transferred the GP stock to them with actual fraudulent intent.

The Trustee bears the burden of proving intent to defraud by clear and convincing evidence. *See, e.g., Protocomm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 459, 468 (E.D. Pa. 2001); *Morse Operations, Inc. v. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.)*, 155 B.R. 666, 674 (Bankr. E.D. Pa. 1993); *Schaps v. Just Enough Corp. (In re Pinto Trucking Serv., Inc.)*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988). As described above, no evidence has been adduced in discovery with which the Trustee could meet this evidentiary burden, or a lesser one. To the contrary, the undisputed facts establish that Yao did nothing more than partially satisfy a debt due under his guaranties after SFC, the primary obligor, defaulted, and that the Family defendants did nothing more than exercise their rights under the loan agreements and guaranties. Counsel for the Family defendants have located no cases in which a court has found a fraudulent conveyance under PUFTA or its predecessor statute on facts such as these. As one Court concluded, "[i]t is difficult to perceive how the payments made by the Debtor . . . on a debt which was justly owed can be tortured into an act done with the intent to hinder, delay and defraud creditors." *Erie Marine*, 216 B.R. at 538; *see also* 12 Pa. C.S. § 5103(a) (value is given for a transfer when an antecedent debt is secured or satisfied).

PUFTA provides that in determining actual intent to defraud, consideration may be given to a list of factors, commonly referred to as badges of fraud. *See* 12 Pa. C.S. § 5104(b) (listing factors). To prevail on a fraudulent transfer claim using these factors, the Trustee must establish a "goodly number" of them. *See, e.g., Provident Life & Accident Ins. Co. v. Gen. Syndicators of Am. (In re Laramie Assoc.)*, No. 97-3135, 1997 U.S. Dist. LEXIS 14170, at *15 (E.D. Pa. Sept. 8, 1997); *Pinto Trucking*, 93 B.R. at 386.

Based on the undisputed facts developed in discovery, as described above, the Trustee will not be able to establish fraudulent intent using the so-called badges of fraud. The Family defendants are not relatives or otherwise insiders with regard to Yao. The GP stock did not constitute substantially all of Yao's assets. There is no evidence that the transfer of the GP stock to the Family defendants was concealed, that Yao incurred a substantial debt shortly before or after the transfer, that Yao was sued or threatened with suit before the transfer occurred, that Yao absconded, that Yao removed or concealed assets, or that Yao was insolvent or became insolvent as a result of the transfer of the GP stock. Yao did not retain possession or control of the GP stock. The provision in the Assignment and Acceptance Agreements under which Yao might be entitled to receive certain amounts upon sale of the GP stock did not give Yao possession or control of the GP stock and in any event is not evidence of fraudulent intent, since any amounts received by Yao under this provision would be available to his creditors. As this Court has already ruled, there is no issue regarding lack of reasonably equivalent value, since this was not pled by the Trustee. *See Student Finance Corp.,* 335 B.R. at 553. Moreover, under the Assignment and Acceptance Agreements, if the Family defendants ever do receive more from the sale of the GP stock than they are owed, Yao would be entitled to receive such excess amount; therefore, the facts cannot support any argument by the Trustee that Yao received less than reasonably equivalent value for the transfer of the GP stock.

On August 14, 2007, Charlene D. Davis, counsel for the Trustee, sent a letter to the Court opposing the Family defendants' request for leave to file a motion for summary judgment. In that letter, the Trustee stated that the Family defendants should not be permitted to move for summary judgment on the issue of actual fraudulent intent for two reasons. First, the Trustee argued that the Family defendants should not be permitted to move for summary

judgment because determination of intent to defraud is fact intensive (August 14 letter, p. 9).

However, even issues that may be fact intensive are appropriately decided on summary judgment

where, as here, there are no genuine issues of material fact to be tried. *In re Burry*, 309 B.R. at

135-39; *Erie Marine*, 216 B.R. at 538.

               Second, the Trustee argued that he would rely on the proposition that "the

existence of a fraudulent scheme in the nature of a Ponzi scheme is, in and of itself, sufficient to

establish an inference of fraudulent intent," citing *Liebersohn v. Campus Crusade for Christ, Inc.*

*(In re C.F. Foods, L.P.)*, 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002) and *Merrill v. Abbot (In re*

*Indep. Clearing House Co.)*, 77 B.R. 843, 860-61 (D. Utah 1987) (August 14 letter, p. 9).  The

Family defendants disagree with the assertion that SFC was a Ponzi scheme and do not believe

that the Trustee can present evidence showing a triable issue of fact on this point.  However,

even if he could do so, it would not be material.  As the Court held in *C.F. Foods*, when

allegedly fraudulent transfers are made to present investors by a debtor that is running a Ponzi

scheme, fraudulent intent may be inferred because, by definition, investors at the end of the line

will lose their money. *CF Foods* at 111. Here, even if the Trustee could come forward with

evidence sufficient to create a triable issue of fact as to whether SFC was operating as a Ponzi

scheme, the reasoning of *C.F. Foods* would apply only to transfers made by SFC.  As this Court

has already held, however, the allegedly fraudulent transfer of the GP stock was a ***"transfer of***

***Yao's property, not the property of the debtor, SFC."*** *Student Finance Corp.*, 335 B.R. at

553 (emphasis added). Therefore, the Trustee's Ponzi scheme argument is inapposite, and cannot preclude the granting of summary judgment on this claim.[34]

       The Trustee's fraudulent conveyance claim really boils down to an argument, at most, that Yao favored the Family defendants over other creditors. Based on the undisputed facts of record, this argument rings hollow, but even if it were true, the law is clear that absent fraudulent intent, a preferential transfer is not a fraudulent conveyance. *See, e.g., Lichtenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys. Inc.)*, 284 B.R. 415, 420 n.9 (Bankr. E.D. Pa. 2002); *Beard v. DeVito (In re DeVito)*, 111 B.R. 529, 530-31 (Bankr. W.D. Pa. 1990); *Commonwealth Nat'l Bank v. Miller*, 437 A.2d 1012, 1014 (Pa. Super. 1981). Because there is no triable issue of material fact that Yao had actual fraudulent intent in transferring the GP stock to the Family defendants, summary judgment on this claim should be entered.

## C.    Summary Judgment Should Be Granted on the Preference Claims.

       The Trustee asserts preference claims against the Family defendants in the amount of $4,229,073, which is the total of all payments made by SFC to the Family defendants within one year before the Filing Date. Each payment was for interest, fees or repayment of

---

[34]  The family defendants believe that the Trustee may also attempt to rely on an inapposite e-mail. The e-mail was from Gagné to Yao and dated October 3, 2002, almost five months after the pledge. Gagné stated:

> I want to begin the process of the change in control at PEG [Premier Education Group] for several reasons, but most importantly I want the filings with the state and federal departments of education to represent the actual holdings. I have raised this consistently in the past and I think this is a propitious time to move forward. Moreover, we need to do so to reflect various changes in the trust. As an aside, it is also important to evidence our consented to execution against the stock of Premier Education Group G.P. Inc., One Summit Place Partners G.P. Inc. and DHP G.P., Inc. on June 18, 2002 in the event that Wilmington Trust attempts to overturn the same. In fact, Bob has asked that we enter judgment to assert our claims against your other assets in an effort to assist you in thwarting WTC. I have been negligent in passing this along to you.

Since the GP stock only partially satisfied the Family defendants' claims against Yao under his guaranties, it indisputably would have been their right to enter judgment against him to assert their claims against his other assets. Thus, there can be no argument that the entry of judgment would have been wrongful, even if it did thwart WTC. In any event, judgment was never entered. Moreover, the e-mail does not discuss Yao's intent in transferring the GP stock to the Family defendants four or five months earlier and cannot somehow, after the fact, render that earlier transfer fraudulent. Therefore, despite the Trustee's focus on this e-mail in discovery, it does nothing to support his fraudulent conveyance claim.

principal in accord with the terms of debentures that SFC sold to certain of the Family defendants or loan agreements with respect to loans made by the Family defendants to SFC. Based on the undisputed material facts elicited in discovery, summary judgment should be entered on these claims on three separate grounds, one of which bars them entirely, and two of which dramatically reduce the amount of the preference claims.

1.    **Ordinary Course of Business Defense.**

Whether the preference period is 90 days, as the Family defendants contend, or one year, as the Trustee argues, the Family defendants are entitled to summary judgment on the Trustee's preference claims because all allegedly preferential payments made by SFC to the Family defendants were indisputably made in the ordinary course of business. Section 547(c)(2) of the Code, before its amendment for bankruptcy cases filed after October 17, 2005, provided that a "trustee may not avoid under this section a transfer . . . (2) to the extent that such a transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms." The purpose of this section is "to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Safety-Kleen Creditor Trust v. Eimco Process Equip. Co. (In re Safety-Kleen Corp.)*, 331 B.R. 591, 596 (Bankr. D. Del. 2005).

The determination of whether a creditor has met its burden under the ordinary course of business provision of subsections 547(c)(2)(A) and (B) is a subjective test involving the consistency of transactions between the debtor and the creditor before and during the

preference period. *See, e.g., Hayes Lemmerz Int'l, Inc.*, 339 B.R. at 106; *Hechinger Liquidation Trust v. James Austin Co.* (*In re Hechinger Inv. Co. of Del., Inc.*), 320 B.R. 541, 548 (Bankr. D. Del. 2004). The uncontested evidence in this case establishes that there is complete consistency in the transactions between SFC and the Family defendants with respect to loans and payments before and during the one year preceding the Filing Date. *See Hechinger Inv. Co. v. Universal Forest Prods., Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 489 F.3d 568, 576-79 (3d Cir. 2007) (holding that the Bankruptcy Court properly rejected the creditor's ordinary course of business defense where the changes in credit arrangements were "so extreme, and so out of character with the long historical relationship between these parties").

From 1998 to 2002, the Family defendants made some 39 bridge loans to SFC. Each of these loans, with the exception of six loans made on March 5, 2002, and part of a loan made by Robert Bast in March 1999, was paid off between 1999 and 2001. All of the evidence of record establishes that these loans had similar documentation and collateral requirements, had the same interest rate and similar commitment fees, and had the substantively same payment terms and default provisions. Each loan required that the proceeds be used solely to finance the business and operating needs of SFC in the ordinary course of SFC's business, and each contained a representation by SFC that the proceeds would be used solely in connection with the business by SFC for the purpose of financing more loans to students/customers of SFC. In addition to the bridge loans, three Family defendants purchased a total of $3 million in subordinated debentures from SFC in 1995, 1997 and 1998. All payments received by the Family defendants during the year preceding the Filing Date were made by SFC with respect to the outstanding debentures and loans. These undisputed facts of record establish that those

payments were made by SFC in payment of debts incurred by SFC in the ordinary course of business or financial affairs of SFC and the Family defendants.

The SFC general ledger compilation discussed at page 17 of the Fact Section shows interest and fee payments made by SFC to the Family defendants during the period from 1996 through 2002. That exhibit and the testimony of former SFC employees Kartha and Messick, SFC's accounting manager and controller, establish that the interest and fee payments made by SFC to the Family defendants on outstanding loans during the year preceding the Filing Date were entirely consistent with the interest and fee payments made on outstanding loans during the preceding five years.

Similarly, the evidence uncontrovertedly establishes that the repayment by SFC in November 2001 of the principal amounts of the September and October 2001 bridge loans made by the Family defendants was in the ordinary course of business. As had occurred between the parties numerous times in the past, SFC requested short-term bridge loans so that it could continue its business of originating and purchasing student loans; the Family defendants made bridge loans to SFC for this purpose; and SFC repaid the bridge loans several weeks later when it received warehouse financing from PNC. It is difficult to conceive how the Trustee can even argue that there was anything extraordinary about this well-established pattern of repayment, let alone show that there is a genuine issue of material fact in this regard. Significantly, the repayment of principal constitutes over 80% ($3,475,000 of $4,229,073) of the Trustee's preference claim.

Nor can there be any reasonable dispute that payments made by SFC to the Family defendants met the third prong of section 547(c)(2), that is, were made according to

ordinary business terms.  In *Molded Acoustical Prods.*, 18 F.3d at 224, the Third Circuit defined "ordinary business terms" in subsection 547(c)(2)(C) as follows:

> "ordinary business terms" refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so unusual as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

Recognizing that the "preference provisions are designed not to disturb normal debtor-creditor relationships, but to derail unusual ones," the Court adopted the following rule of construction with respect to the definition:  "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)." *Id.* at 224-25.

Here, each and every payment made by SFC to the Family defendants during the year preceding the Filing Date was made in accord with the terms of the debentures and loan agreements, the six year "cemented" relationship between the parties, and the industry practice. Under the definition and rule of construction in *Molded Acoustical Products*, all such payments were made in accord with ordinary business terms under subsection 542(c)(2)(C).

From Ms. Davis' August 14, 2007 letter, it appears that the Trustee intends to oppose the Family defendants' ordinary course defense on the grounds that the loan transactions between the Family defendants and SFC were not "reasonable." (August 14 letter, p. 8).  As set forth above, other than the opinion of the Trustee's purported expert, which was demonstrably without any foundation, the evidence on this point shows that the terms of all of the loans were consistent with the market.  But the Court need not decide this issue, because it is not material. The only issue under the ordinary course defense is whether the ***payments*** were made in the

ordinary course, not whether the terms of the underlying obligation were "reasonable." *See Molded Acoustical Products*, 18 F.3d at 225 (question is whether the credit terms were in the ordinary course). Further, given that $3,475,000 of the Trustee's $4,229,073 preference claim is solely for repayment of principal, and only $69,500 of the $4,229,073 preference claim has any relationship at all to the Trustee's "reasonableness" arguments, this argument is not only legally wrong, but specious.[35]

###   2.   None of the Family Defendants Was an Insider of SFC.

The Trustee seeks to use a one-year preference period against the Family defendants, rather than the 90-day period provided in section 547(b)(4)(A) of the Code, by contending that the Family defendants were insiders of SFC. By making an insider allegation, the Trustee increased his alleged preference claim by $4,082,686, from $146,387 (payments within 90 days of the Filing Date) to $4,229,073 (payments within one year of the Filing Date). However, discovery has established that there are no facts that support the Trustee's insider status claim.

Section 547(b)(4)(B) of the Code provides that the trustee may avoid any transfer of an interest of the debtor in property made "between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider." Section 101(31)(B) provides that where the debtor is a corporation, "insider" includes a director, officer or person in control of the debtor or a relative of such persons. Section 101(45) in part defines "relative" as meaning an "individual."

---

[35] The only way in which the Trustee has claimed that loan terms were "unreasonable" is that the commitment fee was allegedly too high. The Trustee's purported expert claimed (based on a telephone conversation with a former banker) that only a 4% fee would be reasonable. The difference between a 4% fee and the 6% fee that was actually paid during the one-year period is $69,500.

None of the Family defendants was a director or officer of SFC. Likewise, none was a person in control of SFC. To be a person in control of a debtor under Section 101(45), a person must be found to have exercised "day-to-day control" over the debtor's business affairs. *See Radnor Holdings Corp.,* 353 B.R. at 840-41; *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.),* 348 B.R. 234, 279 (Bankr. D. Del. 2005). Here, there is no evidence that any of the Family defendants ever participated in any discussions or decisions regarding the management or business operations of SFC, let alone exercised the requisite "day-to-day control" over SFC's business affairs to be found an insider.

The Trustee's response to the Family defendants' interrogatories in effect concedes that the Family defendants did not control SFC. Interrogatory 1 required the Trustee to state separately for each Family defendant all actions, if any, taken to exercise control or authority over SFC. The Trustee's response, which did not point to a single specific act that supported his contention that the Family defendants controlled SFC, is quoted and described at page 21 in the Fact Section and is not repeated here. Suffice it to say that the Trustee's contention that the Family defendants were insiders of SFC is based entirely on his contention that Gagné was a person in control of SFC and that the Family defendants, as relatives of Gagné, are derivatively insiders under Section 101(31)(B) of the Code, notwithstanding the absence of any actions on their part other than lending money to SFC. Of the scores of people that have been deposed, not one has given testimony that supports the Trustee's contention that Gagné was an insider of SFC. The uncontroverted deposition testimony of former mid to high-level SFC employees described and referred to at pages 21-23 of the Fact Section establishes beyond reasonable question that Gagné was not a person in control of SFC. The testimony establishes that Gagné was not involved in the management or business operations of SFC, that Gagné was

never present at directors, management or committee meetings and that Gagné was not involved in the financial decisions made at SFC. The facts elicited by the extensive discovery in this case establish that at all times and in all respects, Gagné acted as an outside attorney giving legal advice and rendering legal services to SFC and in no other capacity.

For these reasons, the Family defendants are entitled to summary judgment that they were not insiders of SFC and, therefore, that payments of $4,082,686 made between 90 days and one year before the Filing Date cannot be avoided, leaving preference claims of $146,387, at most.

3.    **New Value Defense.**

Even if the Trustee could establish a factual basis for a one-year preference period, which he cannot, most of that preference claim would be barred by the Family defendants' new value defense. Section 547(c)(4) of the Bankruptcy Code provides that a "Trustee may not avoid under this section a transfer . . . (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." Here, the indisputable facts establish that the requirements of section 547(c)(4) have been met, and that the Trustee is precluded from avoiding payments made by SFC to each Family defendant prior to March 5, 2002, to the extent of that Family defendant's part of the total $3.3 million new value that the Family defendants gave to SFC on March 5, 2002. Consequently, of the $4,082,686 paid to the Family defendants during the period from June 5, 2001, one year prior to the Filing Date, to March 5, 2002, the Trustee is precluded by the new value defense from avoiding all but $805,852.

While the loan agreements for the $3.3 million loaned to SFC by six Family

defendants on March 5, 2002, granted to those Family defendants a security interest in all assets

of SFC, including student loans, the uncontroverted evidence is that those security interests were

never perfected. Therefore, they are not "otherwise unavoidable security interests" which would

preclude the application of the $3.3 million new value against prior preferences. *See, e.g.,*

*Williams v. Agama Sys., Inc.* (*In re Micro Innovations Corp.*), 185 F.3d 329, 335-36 (5th Cir.

1999); *Intercontinental Polymers, Inc. v. Equistar Chems., LP (In re Intercontinental Polymers,*

*Inc.)*, 359 B.R. 868, 876-79 (Bankr. E.D. Tenn. 2005).

Finally, SFC made no unavoidable transfer to or for the benefit of the Family

defendants on account of the new value of $3.3 million given to SFC on March 5, 2002. The

only payments made to the Family defendants by SFC after March 5, 2002 were interest

payments in March and April on outstanding loans, including those loans made on

March 5, 2002, all of which payments were made in the ordinary course of business between

SFC and the Family defendants. The fact that the Family defendants received GP stock from

Yao that in part could be on account of the March 5, 2002 loans is irrelevant to the new value

issue. As stated by the Third Circuit in *New York City Shoes, Inc .v. Bentley Int'l, Inc. (In re*

*New York City Shoes, Inc.)*, 880 F.2d 679 (3d Cir. 1989), the requirement of section 547(c)(4)(B)

is that "*the debtor* must not have fully compensated the creditor for the 'new value' as of the date

that it filed its bankruptcy petition." *Id.* at 680 (emphasis added). Here, the consideration

received by the Family defendants came not from SFC, the debtor, but from Yao, and was

received after the Filing Date. *See In re Formed Tubes, Inc.*, 46 B.R. 645 (Bankr. E.D. Mich.

1985); *see also In re Kroh Brothers*, 930 F.2d 648, 653-54 (8th Cir. 1991); *Maxwell v. Begler (In*

*re March First, Inc.)*, Case No. 01 B 24742, Adv. No. 03 A 241, 2007 Bankr. LEXIS 2513, at *13-16 (Bankr. N.D. Ill. July 20, 2007).

## V. CONCLUSION.

For the reasons set forth above, the Family defendants respectfully request that the Court grant their motion for summary judgment, and enter judgment in their favor on Counts VII and XI of the First Amended Complaint.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Dated: September 28, 2007

*Karen Lee Turner /clp*

KAREN LEE TURNER (No. 4332)
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801
Telephone: (302) 425-0430
Fax:        (302) 425-0432
E-mail:     kturner@eckertseamans.com

Neil G. Epstein
Carol L. Press
Charles F. Forer
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone: (215) 851-8400
Fax:        (215) 851-8383

Attorneys for Defendants Robert L. Bast,
Pamela Bashore Gagné, the Brennan Trusts
and W. Roderick Gagné, as Trustee of the
Brennan Trusts

M0611051.DOC

40