IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:  :
STUDENT FINANCE CORPORATION,  :
                    Debtor.  :
_____  :  CIVIL ACTION No. 04-1551 (JJF)
CHARLES A. STANZIALE, JR.,  :
CHAPTER 7 TRUSTEE OF STUDENT  :
FINANCE CORPORATION,  :
                    Plaintiff,  :
     v.  :
PEPPER HAMILTON LLP, et al.,  :
                  Defendants.  :

**DECLARATION OF ROBERT L. BAST IN SUPPORT OF THE FAMILY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Robert L. Bast, state as follows under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am an adult individual over the age of eighteen and have personal knowledge of the facts set forth in this Declaration.

2. I am a co-trustee of the seven trusts that have been named as defendants in this lawsuit, namely, the Elizabeth Brennan Trust (now terminated), the Elizabeth Brennan Trust f/b/o Philip B. Gagné, the Elizabeth Brennan Trust f/b/o Elizabeth L. Gagné, the Elizabeth Brennan Trust f/b/o W. Roderick Gagné, the James Brennan Trust f/b/o Philip B. Gagné, the James Brennan Trust f/b/o Elizabeth L. Gagné and the James Brennan Trust f/b/o W. Roderick Gagné. Elizabeth Brennan (now deceased) was my sister, and Philip B. Gagné, Elizabeth L. Gagné and W. Roderick Gagné are my niece and nephews. W. Roderick Gagné ("Rod Gagné") is also a co-trustee of each of the Brennan Trusts. Pamela Bashore Gagné ("Pamela Gagné"), who has also been named as a defendant in this lawsuit, is the wife of my nephew, Rod Gagné.

3. Premier Education Group LP (formerly named CEC Partnership LP) was formed as a limited partnership in 1993. Exhibit 5 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Limited Partnership Agreement for CEC Partnership LP dated February 1, 1993.

4. As set forth in the Limited Partnership Agreement, I was one of the initial limited partners of Premier Education Group LP. The other limited partner was the Elizabeth Brennan Trust.

5. The general partner of Premier Education Group LP was Premier Education Group GP, Inc. (formerly named CEC GP, Inc.). From the time the partnership was formed through June 14, 2002, all of the stock of Premier Education Group GP, Inc. was owned by Andrew Yao ("Yao").

6. Article VI of the Premier Limited Partnership Agreement contained a formula for distribution of cash from operations and dissolution. Under the formula, distribution to the general partner ranges from 5% to 40%. Increase of the percentage share in the distribution above 5% depended upon the limited partners receiving certain returns on their capital contributions as defined in the Agreement.

7. The limited partners of Premier never agreed with Yao to any change in this distribution formula. The limited partners and Yao did agree to give the CEO of Premier, Gary Camp, options to acquire a minority (up to 20%) interest in the partnership, but this did not change the distribution formula as between the limited partners and general partner inter se. During the time that Yao owned the stock of Premier Education Group GP, Inc. and operated as the general manager of the partnership, I was not involved at all in its day-to-day operations and did not review or have any input into any filings it made with state or federal agencies.

8. Article 9.02 of the Premier Limited Partnership Agreement provided that the general partner could not transfer its interest in the partnership, except with the prior consent of the limited partners holding a majority of the partnership interests.

9. Premier's business, since its formation, has been the operation of vocational schools, primarily providing paralegal, medical assistant, health claims, culinary arts, HVAC and technology training. When Premier was formed, it owned one school, known as Branford Hall. By June 2002, it owned five schools, located on ten campuses.

10. I was one of the limited partners of One Summit Place Partners LP when it was formed in 1994. The other limited partners were the Elizabeth Brennan Trust f/b/o Philip Gagné and the Elizabeth Brennan Trust f/b/o W. Roderick Gagné. The general partner was One Summit Place GP, Inc., which was wholly owned by Yao. Exhibit 6 in the Appendix to the Motion for Summary Judgment is a true and correct copy of portions of the Limited Partnership Agreement for One Summit Place Partners dated June 1, 1994.

11. Article II, Section 2.19, and Exhibit A of the One Summit Place Partners Limited Partnership Agreement provided that the general partner had a one-third interest in partnership distributions. Article IX of the Agreement provided that the general partner could not transfer its interest in the partnership, except with the prior consent of the limited partners holding a majority of the partnership interests, which consent could not be unreasonably withheld.

12. I was one of the limited partners of Day Hill Partners LP when it was formed in 1996. The other limited partners were the Elizabeth Brennan Trust f/b/o Philip Gagné, the Elizabeth Brennan Trust f/b/o W. Roderick Gagné and the Elizabeth Brennan Trust f/b/o Elizabeth Gagné. The general partner was DHP GP, Inc., which was wholly owned by Yao.

Exhibit 7 in the Appendix to the Motion for Summary Judgment is a true and correct copy of portions of the Limited Partnership Agreement for Day Hill Partners LP dated June 1, 1996.

13. Article II, Section 2.19, and Exhibit A of the Day Hill Partners Limited Partnership Agreement provided that the general partner had a one-third interest in partnership distributions. Article IX of the Agreement provided that the general partner could not transfer its interest in the partnership, except with the prior consent of the limited partners holding a majority of the partnership interests, which consent could not be unreasonably withheld.

14. One Summit and Day Hill own real estate, the greater portion of which is leased by Premier for some of its operations.

15. From the time of the formation of Premier in 1993, I made a number of capital contributions to the partnership. Similarly, the Elizabeth Brennan Trusts made a number of capital contributions. We also made capital contributions to One Summit and Day Hill. In total, capital contributions made by me and by the Elizabeth Brennan Trusts from 1993 through 2001 totaled over $4 million.

16. I made a substantial number of loans to Premier, One Summit and Day Hill, as did the Elizabeth Brennan and James Brennan Trusts, and personally guaranteed certain debts of the One Summit and Day Hill partnerships. By 2001, the outstanding balance on these loans (not including the loans that were personally guaranteed) totaled approximately $3.5 million.

17. From 1993 to 2002, other than interest payments on the outstanding loans, I received almost no return on my investments in Premier, One Summit and Day Hill. The Elizabeth Brennan Trust likewise received almost no return. In 2000 through 2002, I received three $36,000 annual distributions from Premier, as did the Elizabeth Brennan Trust. As of

2002, neither I nor the Elizabeth Brennan Trust had received any other distributions from these partnerships.

18.     I purchased three subordinated debentures from Student Finance Corporation ("SFC"), one for $750,000 dated December 31, 1995, one for $600,000 dated August 1, 1997 and one for $500,000 dated August 7, 1998. The Elizabeth B. Brennan Trust purchased two subordinated debentures from SFC, one for $150,000 dated August 1, 1997 and one for $500,000 dated August 7, 1998. Interest payments on the debentures were to be made monthly, with the principal to be repaid at maturity.

19.     Exhibit 8 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Subordinated Debenture and Loan Agreement for the $750,000 debenture that I purchased on December 31, 1995. Exhibit 10 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Subordinated Debenture and Loan Agreement for the $600,000 debenture that I purchased on August 1, 1997. Exhibit 11 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Subordinated Debenture and Loan Agreement for the $500,000 debenture that I purchased on August 7, 1998.

20.     SFC made monthly interest payments on the debentures through April 2002. It never repaid any of the principal amounts.

21.     On March 22, 1999, I made a $3 million bridge loan to SFC. On May 20, 1999, $400,000 of this loan was refinanced and the $3 million loan was replaced by a $2.6 million loan. Thereafter, I entered an Amended and Restated Loan Agreement with SFC dated as of March 22, 1999, which provided that SFC would pay principal, interest and fees on the remaining $2.6 million in four payments. Exhibit 12 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Amended and Restated Secured Note and Amended and Restated Loan Agreement dated as of March 22, 1999 for this loan.

5

22.     SFC made three of the four payments of principal, interest and fees due under the aforesaid Amended and Restated Agreement for the March 22, 1999 loan, but never made the fourth payment, leaving a balance on the loan of $676,000. As of April 2002, the $676,000 balance was still outstanding.

23.     On March 5, 2002, I made a $2 million bridge loan to SFC. On this date, the Elizabeth Brennan Trust f/b/o Elizabeth L. Gagné loaned $400,000 to SFC, the James Brennan Trust f/b/o Elizabeth L. Gagné and the James Brennan Trust f/b/o W. Roderick Gagné each loaned $200,000 to SFC and the James Brennan Trust f/b/o Philip B. Gagné loaned $100,000 to SFC. Exhibit 15 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Secured Note and Loan Agreement dated as of March 5, 2002 for the $2 million loan that I made to SFC on that date.

24.     Under the March 5, 2002 loan agreements, SFC was to make monthly interest payments on the loans and to repay the principal at maturity. SFC made interest payments on each of the loans through the payment for April 2002, but then made no further payments.

25.     In connection with each of the subordinated debentures purchased by me and by the Elizabeth Brennan Trust, Yao executed a Conditional Guaranty. Exhibit 17 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the conditional guaranty for the $750,000 subordinated debenture that I purchased on December 31, 1995. Exhibit 18 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the conditional guaranty for the $600,000 subordinated debenture that I purchased on August 1, 1997. Exhibit 19 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the conditional guaranty for the $500,000 subordinated debenture that I purchased on August 7, 1998.

26. In connection with my loan to SFC on March 22, 1999, Yao and Lore Yao executed a Conditional Guaranty. Exhibit 20 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the conditional guaranty for the March 22, 1999 loan.

27. Yao and Lore Yao executed Guaranties in connection with each of the bridge loans made by me and by certain of the Brennan Trusts to SFC on March 5, 2002. Exhibit 21 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the guaranty for the $2 million loan that I made to SFC on March 5, 2002.

28. The loan agreements for the March 5, 2002 loans contained a representation that SFC would use the loan proceeds solely to finance student loans (paragraph 4.2) and a requirement that the student loans be provided to a custodian, to be held as collateral for the loans being made by me, and by the Brennan Trusts and Pamela Gagné (paragraph 3.1). It was always my understanding that the bridge loans that we were making to SFC would be used solely for the purpose of financing student loans and that a representation and requirement such as the one in the agreement for the March 5, 2002 loan was included in each loan agreement.

29. For several weeks after the March 5, 2002 loans were made, Yao told us that the collateral for the loans was forthcoming. Toward the end of April 2002, he informed us that SFC would not be providing the required collateral. Under the loan agreements, the failure to provide this collateral constituted an event of default. This default made Yao liable for the obligations of SFC under the guaranties that he had provided.

30. On May 5, 2002, Yao pledged his stock in Premier Education Group GP, Inc., One Summit Place GP, Inc. and DHP GP, Inc. (the "GP stock") to me, Pamela Gagné and certain of the Brennan Trusts pursuant to a Pledge Agreement. Because SFC was in default under the loan agreements, Yao pledged the GP stock as collateral to partially secure his obligations under the guaranties.

31. SFC failed to make the May 2002 interest payments on the subordinated debentures and outstanding bridge loans, which constituted an event of default under the loan agreements. As of June 14, 2002, these defaults remained uncured.

32. On June 14, 2002, on my own behalf and on behalf of the Brennan Trusts and Pamela Gagné, I gave notice that these lenders were exercising their right under the loan agreements to accelerate the maturity date of the debt and to proceed against the guarantor. On that date, we executed against the guaranties and Yao agreed to transfer his GP stock to me, the Brennan Trusts and Pamela Gagné.

33. In connection with the execution against the GP stock, I, the Brennan Trusts and Pamela Gagné entered Assignment and Acceptance Agreements with Yao, dated as of June 14, 2002. Exhibit 23 in the Appendix to the Motion for Summary Judgment is a true and correct copy of an Assignment and Acceptance Agreement between me and Yao with regard to my subordinated debenture dated December 31, 1995. With respect to each of the subordinated debentures and loans made by me to SFC that were in default, I entered Assignment and Acceptance Agreements that were the same in all material respects as the Agreement at Exhibit 23, as did the Brennan Trusts, except for differences that were on account of the different lenders and the principal amounts of the different subordinated debentures or secured notes referenced in each Agreement.

34. Under the Assignment and Acceptance Agreements, Yao transferred the GP stock to me, Pamela Gagné and certain of the Brennan Trusts, and the lenders then assigned to Yao the SFC loan agreements and debt instruments that were in default. Taken together, 100% of the GP stock previously owned by Yao was transferred to me, Pamela Gagné and certain of the Brennan Trusts under these Assignment and Acceptance Agreements.

35. The Assignment and Acceptance Agreements provided in paragraph 4 that if the GP stock were sold, and the amount received was less than the amount of principal, accrued interest and fees due under the loan agreements, the lenders would be entitled to receive the shortfall from Yao, but if the amount received was more than the amount of principal, accrued interest and fees due under the loan agreements, Yao would be entitled to the excess.

36. At the time Yao pledged the GP stock on May 5, 2002, and on June 14, 2002 when we executed on Yao's guaranties, I did not believe that the GP stock was worth an amount even close to the almost $7 million that was owed to me, the Brennan Trusts and Pamela Gagné by SFC. I agreed to accept the GP stock because I saw this as a way partially to protect the substantial investment that I and the Brennan Trusts, as limited partners, had made in Premier, One Summit and Day Hill.

37. Over the years, while I had several business dealings with Yao, I did not have a close personal relationship with him. I went out to dinner with him and his wife once during the years I knew him, but other than that had no contact with him socially.

38. In 1998, Yao asked whether I or the Brennan Trusts might be willing to make short-term bridge loans to SFC. I understood that SFC sought these bridge loans in order to continue its business of originating or purchasing student loans at times when it was temporarily at the limit of its other, more permanent financing. The terms offered by Yao included interest at a rate of 12% and at least two commitment fee structures, one of which was a flat commitment fee of 10%.

39. Beginning in August 1998, I and the Brennan Trusts made a number of bridge loans to SFC. All had a 12% interest rate. The earlier loans had a flat commitment fee of 10%. The later ones typically had a fee that ranged from 6% to 10%, depending on how long the loan was outstanding. Most of the loan agreements provided that the principal, together with the

commitment fee and accrued interest, would be repaid on the earlier of a date certain or SFC's obtaining warehouse or other financing.

40. On September 25, 2001, I loaned SFC $2 million, the Elizabeth Brennan Trust f/b/o Elizabeth Gagné loaned SFC $375,000, the James Brennan Trust f/b/o Elizabeth Gagné and the James Brennan Trust f/b/o W. Roderick Gagné each loaned SFC $175,000, and the James Brennan Trust f/b/o Philip Gagné loaned SFC $125,000. On October 2, 2001, the Elizabeth Brennan Trust f/b/o Philip Gagné loaned SFC $250,000. Exhibit 13 in the Appendix to the Motion for Summary Judgment is a true and correct copy of the Secured Note and Loan Agreement dated as of September 25, 2001 for the $2 million loan that I made to SFC on that date.

41. In connection with these loans, SFC agreed to repay the entire unpaid principal amount, together with interest and other amounts payable under the agreement, on the maturity date, which was defined as the earlier of SFC receiving funds in a warehouse financing or August 20, 2002. These loans had an interest rate of 12%, and a commitment fee ranging from 6% to 10%, payable at maturity, depending on the length of time the loan was outstanding.

42. SFC repaid the September 25 and October 2, 2001 loans on November 12 and 13, 2001.

43. At the same time that SFC repaid the principal on the loans, it paid the 6% commitment fee and the accrued interest on these loans. The total amount of commitment fees and accrued interest paid on November 12 and 13, 2001 was $153,334 to me (fee of $120,000 and interest of $33,334), $28,750 to the Elizabeth Brennan Trust f/b/o Elizabeth Gagné (fee of $22,500 and interest of $6,250), $18,583 to the Elizabeth Brennan Trust f/b/o Philip Gagné (fee of $15,000 and interest of $3,583), $13,417 to the James Brennan Trust f/b/o Elizabeth Gagné

and the James Brennan Trust f/b/o W. Roderick Gagné (fee of $10,500 and interest of $2,917) and $9,583 to the James Brennan Trust f/b/o Philip Gagné (fee of $7,500 and interest of $2,083).

44. The 6% commitment fee and the 12% interest rate paid by SFC on the September and October 2001 were the same as the commitment fees and interest rates paid on all previous bridge loans, dating back to 1998, except that some of the loans had a flat commitment fee of 10% and one had a commitment fee higher than 10%.

45. From June 2001 through April 2002, the eleven payments of $26,842.00 each made to me by SFC, and the eleven payments of $7,397.26 each made to the Elizabeth Brennan Trust by SFC, were monthly interest payments on the outstanding subordinated debentures and on the balance of my March 22, 1999 loan to SFC.

46. The other payments made by SFC to me and the Brennan Trusts in April 2002 were the March and April interest payments on the loans we made to SFC on March 5, 2002. The amounts of these interest payments were $38,000 to me (payments of $18,000 and $20,000 on my $2 million loan), $3,800 to each of the James Brennan Trust f/b/o Elizabeth Gagné and the James Brennan Trust f/b/o W. Roderick Gagné (payments of $1,800 and $2,000 on their $200,000 loans) and $1,900 to the James Brennan Trust f/b/o Philip Gagné (payments of $900 and $1,000 on the $100,000 loan).

47. Interest payments by SFC to me and the Brennan Trusts on the outstanding subordinated debentures and bridge loans had been regularly and consistently made since I made the first loan underlying a subordinated debenture in 1995. Although the payments were sometimes late, SFC never failed to make an interest payment on the outstanding debt to me or the Brennan Trusts until it failed to make the May 2002 interest payments.

48.  I was never an officer or director of SFC. I was not involved in any way in the management or business operations of SFC, was not a part of the management structure of SFC, was never present at management meetings, was not involved in the financial decisions made at SFC and never participated in any discussions or decisions regarding the management or business operations of SFC or the disbursement of cash by SFC. My only involvement with SFC was with regard to the loans that I, Pamela Gagné and the Brennan Trusts made to SFC, and with regard to our ownership of a small amount of stock of SFC for a period of approximately a year, from February 2000 to January 2001.

I declare under penalty of perjury that the foregoing statements made by me are true.

*/s/ Robert L. Bast*
Robert L. Bast

Dated: 09-27-07