# Expert Report

## of

## Owen Carney

## Bank Capital Markets Consulting

## in the

## Student Finance Corporation Litigation

# I. My Qualifications

1. I have been engaged by Cahill Gordon & Reindel LLP, Eckert Seamans Cherin & Mellott LLC and Schnader Harrison Segal & Lewis LLP representing Pepper Hamilton LLP and Pamela Gagné, W. Roderick Gagné, Robert Bast and various related Trusts to provide my opinions on matters relating to the claims made in the actions brought by Charles A. Stanziale, Jr., Chapter 7 Trustee of Student Finance Corporation and by the Royal Indemnity Company.

2. I am qualified to provide such opinions by virtue of my forty years of experience in the financial service industry that includes twenty-seven years as a bank regulator employed by the Office of the Comptroller of the Currency (OCC), and thirteen years of operating my own financial services consulting business.

3. In 1967 I graduated from Boston College with a degree in Finance and joined the OCC as an assistant national bank examiner. I then spent much of the next eight years conducting reviews of bank loan portfolios. The purpose of these reviews was to assess the quality of bank loans and the effectiveness of bank management. When performing loan reviews, I had thousands of occasions to review credit relationships with corporate borrowers and to make judgments about the quality of the loans and the relative costs of different types of borrowings, including bridge loans[1].

---

[1] A bridge loan is a form of higher-priced transition financing which is to be paid back once the borrower obtains other financing; it is often used to allow a borrower to take advantage of an opportunity to purchase assets and fund them until longer-term and less expensive financing can be arranged.

2

4. In 1975 I transferred to the OCC's Washington headquarters to become part of a small group of National Bank Examiners selected to modernize the OCC's examination procedures. Beginning in 1976, I served as the organizer and director of the OCC's Investment Securities Division, and later as the Senior Advisor for Investment Securities to the Chief National Bank Examiner. In these roles I was responsible for national policy development in supervisory areas involving all types of bank capital market activities.

5. During the 1980s and 90s, as the capital markets divisions of commercial banks became increasingly active in loan based securities products that involved substantial credit risks, I was involved in designing regulatory reviews for these activities. Ultimately, I became the agency expert in securitization and provided training and day-to-day support to teams of bank examiners conducting in depth reviews of the securitization activities of national banks, and in doing this work I had many opportunities to review the cost of credit provided to securitization funded non-bank lenders.

6. Since my 1995 retirement from the OCC, I have performed consulting services for clients such as federal agencies, international organizations, government sponsored enterprises and a number of banks, credit sureties and law firms. I have served as an instructor in a number of training programs on various securitization issues for OCC, commercial and investment bankers, credit analysts, foreign central banks, the World Bank, and the Federal Financial Institutions Examination Council. In 1999 I briefly served as the president of a commercial bank that was engaged in securitizing subprime and high loan-to-value home equity mortgages.

7. My curriculum vitae[2] is attached as Exhibit 1 to this report. Also attached, as Exhibit 2 is a listing of the documents I reviewed in forming my opinions. A list and description of my engagements as an expert witness is detailed in Exhibit 3. I am being compensated at the rate of $300 per hour for preparing and writing this report and will be compensated at the same rate for testifying. My compensation is not dependent on the opinions expressed or the outcome of this litigation.

## II. My Opinion

8. It is my opinion that the interest rates and loan fees paid by Student Finance Corporation (SFC) to lenders Pamela Gagné, Robert Bast and related Trusts (GBT) and to other individual lenders were fair and reasonable in light of: the nature of SFC's business; its business need for short term financing; and the risk premiums required by the insurance companies providing credit insurance and by other lenders. It is also my opinion that SFC could not have obtained better financing terms on similar types of loans from other lenders customarily making bridge loans to this type of business.

9. The loans supplied to SFC by GBT and other individuals were made without the benefit of credit insurance. The interest rates and fees paid by SFC on the loans supplied by GBT and other individuals were, in my opinion, a fair and reasonable Risk Premium to compensate these lenders for the added degree of default risk associated with the uninsured and unsecured student loans made to subprime borrowers that were pledged as collateral, and for the lenders' willingness to quickly make funds available upon SFC's request.

---

[2] I have authored one article in the last ten years and a copy has been furnished to counsel.

4

21. The interest rates and fees paid by SFC on bridge loans were high, but not out of line with interest and fees paid for similar loans during this period. SFC's investment bankers have testified[17] that the terms of the bridge loans provided to SFC by SWH Funding Corp. (SWH), that were collateralized by insured student loans were fair and reasonable, and not inconsistent with what was available in the market at that time. Moreover, the all-in costs to SFC of these SWH bridge loans were certainly higher than the interest rates and fees paid on the bridge loans provided by GBT and other individual lenders that were collateralized by uninsured student loans. Therefore, because the terms of the SWH loans were fair and reasonable, it follows that the terms of the less expensive GBT loans were fair and reasonable.

22. An article[18] regarding bridge loans used to finance real estate was published in April 2001 on Bankrate.com[19]. While the article may not apply to the borrowers and lenders in this case, the article does establish a framework to judge the terms of bridge loans made during this period. The article lists the interest rates, fees and other terms that a hard money lender[20] would require on a bridge loan to carry residential real estate until longer term financing could be arranged. The article listed interest rates of 12 to 18 percent, and fees of 4 to 8 percent, on a loan with an advance rate of no more than 70 percent of the appraised market value of the

---

[17] See, e.g., the February 2, 2007 deposition of John Loofbourrow at 752 and the November 6, 2006 deposition of Scott Schauer at 75:22, 622:21 and 625:16.

[18] See *'Hard money' lenders: The source for last-resort loans* by Michael D. Larson as published on Bankrate.com April 27, 2001; attached as Exhibit 5.

[19] Bankrate.com is a web site that lists the loan and savings rates being offered by thousands of financial services companies, along with articles on consumer finance.

[20] Hard money lenders are lending companies offering specialized financing for deals that do not conform to bank standards. They typically charge higher rates and fees than banks for loans based on the value of collateral. They perform a useful service in real estate lending, and other forms of asset based lending.

10

mortgaged real estate. The rates, fees and other terms noted in the article were attributed to knowledgeable sources.

23. Interest rates as high as 18 percent and fees as large as 8 percent on a bridge loan secured by a first mortgage on a hard asset like real estate with a marketable value of at least 30 percent more than the amount of the loan, support the conclusion that the fees paid by SFC to GBT and the other individual lenders were fair and reasonable, given the far less tangible nature of the unrecorded liens on the uninsured and unsecured student loans made to subprime borrowers that were pledged as collateral.

24. Interest on the GBT loans was paid monthly and the principal was paid off when SFC obtained other financing, as is the standard industry practice for bridge loans. The fees paid on the GBT loans were called commitment fees; but unlike the commitment fees paid to SWH, the fees paid on the GBT loans were paid at the time the loan was paid off. This allowed SFC the use of the entire loan proceeds for the full term of the loans, and was clearly a benefit to SFC.

The Plaintiff's Expert and His Report

25. The Plaintiff's expert, Mr. William Hecht, is mistaken in his opinion that the fees charged on the GBT loans were above the market rates charged on similar loans during the same time period. Mr. Hecht's report indicates his opinion is largely based on his analysis of a loan database that is composed of "over 170 loans made during the same time period to companies

11