```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2                           - - -
       MBIA INSURANCE           :
 3     CORPORATION AND WELLS     :
       FARGO BANK, N.A. (f/k/a   :
 4     WELLS FARGO BANK          :
       MINNESOTA N.A.) AS        :
 5     TRUSTEE OF SFC GRANTOR    :
       TRUST, SERIES 2000-1, SFC :
 6     GRANTOR TRUST, SERIES     :
       2000-2, SFC GRANTOR       :
 7     TRUST, SERIES 2000-3, SFC :
       GRANTOR TRUST, SERIES     :
 8     2000-4, SFC GRANTOR       :
       TRUST, SERIES 2001-1, SFC :
 9     GRANTOR TRUST, SERIES     :
       2001-2, SFC OWNER TRUST   :
10     2001-I, AND SFC GRANTOR   :
       TRUST, SERIES 2001-3,     :
11        Plaintiffs/Counterclaim:
                      Defendants, :
12                               :
                       vs.       :
13                               :
       ROYAL INDEMNITY COMPANY,  :
14        Defendant/Counterclaim :C.A. NO.
                      Plaintiff. :02-1294-JJF
15     -----------------------------------------------
       ROYAL INDEMNITY COMPANY,  :
16        Third-Party Plaintiff, :
                                 :
17                    vs.        :
                                 :
18     ANDREW N. YAO, STUDENT    :
       LOAN SERVICING LLC,       :
19     STUDENT LOAN ACCEPTANCE II:
       LLC, STUDENT LOAN         :
20     ACCEPTANCE III LLC,       :
       STUDENT LOAN ACCEPTANCE   :
21     III LLC, STUDENT          :
       LOAN ACCEPTANCE V LLC,    :
22     STUDENT LOAN ACCEPTANCE   :
       VIII LLC, STUDENT LOAN    :
23     ACCEPTANCE IX LLC, SFC    :  TRACK(II)WITNESS:
       FINANCIAL LLC I, SFC      :  PATRICIA KARTHA
24     FINANCIAL LLC II, SFC     :  VOLUME I
       FINANCIAL LLC VI, SFC     :
       FINANCIAL LLC VII,        :  DATE:
25        Third-Party Defendants.:  OCTOBER 4th, 2006
```

Page 11

```
 1                    PATRICIA KARTHA, having been      09:37:06

 2    duly sworn, was examined and testified as

 3    follows:

 4                        -   -   -

 5                    EXAMINATION                       09:37:06

 6                        -   -   -

 7    BY MR. BARNOWSKI:

 8    Q.    Good morning.

 9    A.    Good morning.

10    Q.    Could you state your full name for the     09:37:18

11    record?

12    A.    Patricia Marjorie Kartha.

13    Q.    How old are you, Ms. Kartha?

14    A.    42.

15    Q.    Where do you live?                          09:37:27

16    A.    Do you need my address?

17    Q.    Sure.

18    A.    5901 Castor Avenue, Philadelphia,

19    Pennsylvania  19149.

20    Q.    Have you ever given a deposition before?   09:37:39

21    A.    Yes.

22    Q.    I think I know the answer to this, but

23    I'll ask it anyway.  The answer is yes?

24    A.    Yes.

25    Q.    How many times?                            09:37:45
```

```
 1          Did you have a title, a formal title, at   09:48:50
 2    SFC?
 3    A.    Accounting manager.
 4    Q.    Were there any other accountants on
 5    staff ever?                                      09:49:00
 6    A.    Yes.  There were internal auditors at
 7    the end.  Well, before I left.  And -- there
 8    were people with accounting I think degrees,
 9    but ...
10    Q.    Did they work for you?                      09:49:29
11    A.    No.  Most of the people that worked for
12    me were clerical.
13    Q.    Okay.  You said there were internal
14    auditors.  Who were the internal auditors at
15    the end?  You know what, strike that.  Let me    09:49:39
16    ask you a different question.  When you say
17    "at the end", are you talking about the end of
18    your employment?
19    A.    Of my employment, thank you.
20    Q.    So, you're talking about in 2000?           09:49:48
21    A.    In 2000.
22    Q.    Who were the internal auditors in 2000?
23    A.    I think the first one -- her first name
24    was Kathleen or Katherine and I don't remember
25    her last name and after she left, there was      09:49:56
```

Page 337

1    such conversations?                              10:03:37

2    A.    Correct.

3    Q.    Did you ever wonder whether it was

4    proper?

5                    MR. SHAPIRO:  Form.              10:03:45

6                    THE WITNESS:  I don't

7    remember.

8    BY MR. BARNOWSKI:

9    Q.    You don't remember if you ever wondered

10   that?                                           10:03:53

11                   MR. SHAPIRO:  Same objection.

12                   THE WITNESS:  No, I don't

13   remember thinking that at all.

14                   (Whereupon, the court

15   reporter marked Exhibit 229 (II) for            10:04:08

16   identification.)

17   BY MR. BARNOWSKI:

18   Q.    I'm sorry, I seemed to have misplaced

19   something I wanted to use.  229, Roman two,

20   the exhibit.  Take a look at that, if you       10:06:32

21   would, for a second.  I have some questions

22   for you about it.

23                   MR. EPSTEIN:  Do you have

24   another one of these?

25                   MR. BARNOWSKI:  I don't.  I      10:06:55

Page 338

```
 1    passed them all around.                      10:06:55

 2    BY MR. BARNOWSKI:

 3    Q.     This is a general ledger printout.

 4    Pages from SFC's general ledger from 1996

 5    through 2002.  Have you ever worked with the  10:07:34

 6    general ledger of SFC before?

 7    A.     Yes.

 8    Q.     What does the general ledger show?

 9    A.     The financial transactions in and out of

10    the company.                                  10:07:52

11    Q.     The pages I printed are the payments,

12    the interest payments, made by SFC to the

13    various members of the Gagne family.  Would

14    you agree with that?

15    A.     Yes.                                    10:08:07

16    Q.     In 1996 I show Robert Bast as receiving

17    a $102,000 in interest payments from SFC and

18    Pamela Gagne receiving 34,000 for a total of

19    136,000.  Does that look about right to you?

20    A.     Yes.                                    10:08:28

21    Q.     Who is Pamela Gagne, do you know?

22    A.     Rod Gagne's wife.

23    Q.     Do you know why the company was paying

24    Robert Bast and Pam Gagne $136,000 in 1996?

25    A.     It's interest on loans.                 10:08:43
```

Page 373

```
 1    there's handwriting and highlighting.         11:02:12
 2              MR. SHAPIRO:  I'm sorry, I
 3    just gave you my highlighted copy, I
 4    apologize.
 5              MR. BARNOWSKI:  Okay.              11:02:49
 6    BY MR. SHAPIRO:
 7    Q.    Let me refer your attention to the
 8    e-mail on the top of the list which is from
 9    you to Carolyn Pontius, CCed Gary Hawthorne
10    and Frank Martinez dated October 29th, 1997.    11:03:21
11         Do you see that e-mail?
12    A.    Yes.
13    Q.    All right.  And the subject line says,
14    "RE reserve payments posting", do you see
15    that?                                          11:03:36
16    A.    Yes.
17    Q.    All right.  Now, in the last paragraph
18    before you say thanks, you say, "I consider
19    this document management material only".  You
20    have that underlined.  What did you mean by    11:03:46
21    that?
22    A.    That what is attached to this document
23    is only for the eyes of the management of the
24    company?
25    Q.    All right.  Now, I noticed that Rod      11:03:58
```

Page 374

```
1    Gagne and no one from Pepper is copied on this   11:04:02

2    e-mail?

3    A.    Correct.

4    Q.    All right.  Does that mean you did not

5    consider Rod Gagne or anyone from Pepper to be   11:04:08

6    part of the management of SFC?

7                    MR. BARNOWSKI:  Object to the

8    form.

9                    THE WITNESS:  No, I never

10   considered Rod Gagne part of management at       11:04:15

11   SFC.

12   BY MR. SHAPIRO:

13   Q.    Do you remember anything about the

14   information that is attached to this e-mail?

15   A.    Yes.                                         11:04:48

16   Q.    What do you remember?

17   A.    I believe I wrote it and it outlines how

18   the SFC loans were booked and how student

19   funding was booked through the accounting

20   system.                                           11:05:05

21   Q.    And it was this information on the

22   attached documents.  Just so I'm clear, on the

23   record it's WSFC0758839 through 41.  Three

24   pages at the end.  That's what you considered

25   to be management material only?                   11:05:25
```

```
 1   A.    Yes.                                  11:05:26

 2   Q.    I think you previously mentioned that

 3   SFC had a board of directors?

 4   A.    Yes.

 5   Q.    All right.  Do you remember who was on  11:05:45

 6   the board of directors?

 7   A.    I know that Andrew was on the board of

 8   directors.  I believe that Perry was.  It's

 9   possible that Frank was also, but I don't

10   remember for sure.                           11:06:03

11   Q.    Okay.  Do you know whether the board of

12   directors ever held meetings?

13   A.    I was never involved in that so, no, I

14   don't know.

15   Q.    Sort of anticipated my next question.   11:06:15

16   Did you ever attend a meeting of the board of

17   directors of SFC?

18   A.    No, not that I can remember.

19   Q.    Do you know whether SFC had management

20   committees?                                  11:06:27

21              MR. BARNOWSKI:  Object to the

22   form.

23              THE WITNESS:  I'm not sure

24   what you mean by that.

25
```

Page 376

```
 1   BY MR. SHAPIRO:                              11:06:35

 2   Q.    Well, for example, a credit committee?

 3                 MR. BARNOWSKI:  Object to the

 4   form.

 5                 THE WITNESS:  I don't know.     11:06:39

 6   Not that I know of.

 7   BY MR. SHAPIRO:

 8   Q.    Do you remember attending a meeting of

 9   any committee of SFC?

10   A.    Just managers meetings.  That's all I   11:06:47

11   can remember.

12   Q.    Do you ever remember any -- Rod Gagne

13   being present at any management -- managers

14   meeting that you attended?

15   A.    No, he was not present.                 11:07:00

16   Q.    Do you remember anyone else from Pepper

17   Hamilton ever being present at any managers

18   meeting that you attended?

19   A.    No, I don't.

20   Q.    Do you know who controlled the cash flow 11:07:24

21   at SFC?

22                 MR. BARNOWSKI:  Object to the

23   form.

24                 THE WITNESS:  Andrew Yao did.

25
```

Page 387

```
 1                    THE WITNESS:  I have no idea.   11:20:45
 2   BY MR. SHAPIRO:
 3   Q.    Was Rod Gagne or anyone from Pepper
 4   Hamilton required to approve payments from SFC
 5   to Andrew Yao?                                11:20:54
 6                    MR. BARNOWSKI:  Object to the
 7   form.
 8                    THE WITNESS:  Not that I know
 9   of.
10   BY MR. SHAPIRO:                               11:21:00
11   Q.    Do you know whether or not SFC's board
12   of directors was required to approve payments
13   from SFC to Andrew Yao?
14                    MR. BARNOWSKI:  Object to the
15   form.                                         11:21:12
16                    THE WITNESS:  I don't know.
17   BY MR. SHAPIRO:
18   Q.    Anyone ever tell you that?
19   A.    No.
20   Q.    And did anyone ever tell you that Rod   11:21:20
21   Gagne or anyone from Pepper Hamilton was
22   required to approve payments from SFC to
23   Andrew Yao?
24                    MR. BARNOWSKI:  Object to the
25   form.                                         11:21:29
```

Page 388

```
 1                THE WITNESS:  No.              11:21:30

 2    BY MR. SHAPIRO:

 3    Q.    Do you remember ever talking to Rod

 4    Gagne or anyone at Pepper Hamilton about any

 5    payments from SFC to Andrew Yao?             11:21:44

 6    A.    No, I don't remember.

 7    Q.    So, you don't remember any conversations

 8    like that?

 9    A.    I don't remember talking to anybody

10    about that.                                 11:22:01

11    Q.    Okay.  Toward the end of this exhibit --

12    well, strike that.  Most of the e-mails in

13    this exhibit are from Andrew to you.  Toward

14    the end, and specifically I'm looking at this

15    document it says "message 5559" at the top,  11:22:26

16    there is one e-mail coming from Diane Messick

17    to you?

18                MR. BARNOWSKI:  I'm sorry, I

19    don't mean to interrupt you, but where are

20    you?                                         11:22:38

21                MR. SHAPIRO:  It's the fourth

22    page from the end.

23                MR. BARNOWSKI:  Okay.

24    BY MR. SHAPIRO:

25    Q.    Do you know why Diane Messick became    11:22:47
```

Page 394

```
 1   A.    I don't remember that one either.        11:30:08

 2   Q.    Back on the exhibit we were just looking

 3   at, which is 237.  Did Andrew Yao ever tell

 4   you he had consulted with Rod Gagne or anyone

 5   at Pepper Hamilton before directing you to     11:30:32

 6   make one of these payments?

 7              MR. BARNOWSKI:  Object to the

 8   form.

 9              THE WITNESS:  I don't recall

10   him ever telling me that, no.                  11:30:39

11   BY MR. SHAPIRO:

12   Q.    Do you remember Rod Gagne or anyone from

13   Pepper Hamilton ever directing you to transfer

14   any funds?

15   A.    No, I don't.                             11:30:56

16   Q.    Did you ever ask Andrew Yao for an

17   explanation as to why he was asking you to

18   transfer funds?

19   A.    No.

20   Q.    I'm just going to run through a couple    11:31:13

21   names and tell me if you recognize these

22   names.  Sheilah Gibson?

23   A.    No.

24   Q.    Maria DeCarlo?

25   A.    No.                                       11:31:24
```

```
 1   Q.    Shari Richardson?              11:31:26

 2   A.    No.

 3   Q.    Joanne Fungaroli?

 4   A.    No.

 5   Q.    Darcy Lee?                     11:31:34

 6   A.    No.

 7   Q.    Brad Barricka?

 8   A.    No.

 9   Q.    Tom Cole?

10   A.    No.                           11:31:45

11   Q.    Jim Lawlor?

12   A.    No.

13   Q.    David Sirbeck?

14   A.    No.

15   Q.    Okay.  In your experience, did Rod Gagne  11:31:55

16   or anyone from Pepper Hamilton ever do

17   anything that you considered to be unethical?

18               MR. BARNOWSKI:  Object to the

19   form.

20               THE WITNESS:  Not that I know  11:32:05

21   of, no.

22   BY MR. SHAPIRO:

23   Q.    Yesterday I think you testified that you

24   met with Rod Gagne in person maybe once or

25   twice.                              11:32:18
```

Page 396

1    Do you remember how many times you met    11:32:19

2  with Rod Gagne in person?

3              MR. BARNOWSKI:  Object to the

4  form.

5              THE WITNESS:  I remember the    11:32:24

6  first time I met him.  I remember it was a

7  couple years after I had been working there.

8  Maybe I met with him once after that, but I

9  don't remember specifically.

10  BY MR. SHAPIRO:                              11:32:39

11  Q.    Do you remember where these meetings

12  took place?

13  A.    At the offices of Student Finance

14  Corporation.

15  Q.    Which one?                            11:32:44

16  A.    Wilmington or Newark, where ever they

17  happened to be at that time in Delaware.

18  Q.    But you're not referring to the Radnor

19  office or Wayne, I think you have referred to

20  it as Wayne?                                11:32:58

21  A.    No.

22  Q.    Do you remember participating in any

23  conversations with others at SFC about Rod

24  Gagne?

25  A.    Not specifically, no.                 11:33:19

Page 400

1    Q.     Do you have any reason to believe that    11:37:30

2    Rod Gagne or anyone from Pepper Hamilton was

3    involved in that process?

4                    MR. BARNOWSKI:  Object to the

5    form.                                            11:37:41

6                    THE WITNESS:  Other than

7    writing up loan documents or -- because I

8    believe they used form documents after a

9    while.  The original documents, I don't know

10   that they would have been involved in the       11:37:53

11   process.

12   BY MR. SHAPIRO:

13   Q.    Do you have any reason to believe Rod

14   Gagne or anyone from Pepper Hamilton decided

15   which loans SFC would originate or purchase?     11:38:00

16                   MR. BARNOWSKI:  Object to the

17   form.

18                   THE WITNESS:  No, no.

19   BY MR. SHAPIRO:

20   Q.     You mentioned documents involved in this  11:38:11

21   process.  What documents are you referring to?

22   A.     The process was set up before I was

23   there.  So, I don't know specifically that

24   Pepper Hamilton had anything to do with

25   drafting the loan documents, but the student     11:38:31

Page 491

```
 1                THE WITNESS:  I really don't      15:30:25

 2   remember specific conversations with Rod and

 3   I don't remember what was in the

 4   conversations.  So, I'm sorry, I don't know

 5   how to answer that.                           15:30:37

 6   BY MR. SHAPIRO:

 7   Q.    Do you remember anything about this

 8   Bankers Trust issue that is being referred to

 9   here?

10   A.    I don't have any memory of it.  Peter    15:31:06

11   Becker was working with Bankers Trust who was

12   the backup servicer on the first grantor

13   trust?

14   Q.    Do you have any reason to believe that

15   Rod Gagne or anyone from Pepper Hamilton ran   15:31:29

16   SFC?

17                MR. BARNOWSKI:  Object to the

18   form.

19                MS. GOODMAN:  Objection.

20                THE WITNESS:  No, I don't         15:31:36

21   have any reason to believe that.

22   BY MR. SHAPIRO:

23   Q.    Do you have any reason to believe that

24   Rod Gagne or anyone from Pepper Hamilton

25   controlled SFC's operations?                  15:31:42
```

Page 492

```
1                    MR. BARNOWSKI:  Object to the   15:31:44

2    form.

3                    THE WITNESS:  No, I don't

4    have any reason to believe that.

5    BY MR. SHAPIRO:                                  15:31:48

6    Q.   Do you have any reason to believe that

7    Rod Gagne or anyone from Pepper Hamilton can

8    make business decisions for SFC?

9                    MR. BARNOWSKI:  Object to the

10   form.                                            15:31:55

11                   THE WITNESS:  No, I don't

12   have any reason to believe that.

13   BY MR. SHAPIRO:

14   Q.   Is there any reason to believe that

15   anyone from Pepper Hamilton or Rod Gagne could   15:32:03

16   control the transfer or expenditure of SFC's

17   funds?

18                   MR. BARNOWSKI:  Object to the

19   form.

20                   THE WITNESS:  No, I don't        15:32:11

21   believe they could.

22   BY MR. SHAPIRO:

23   Q.   Do you have any reason to believe that

24   Rod Gagne or anyone from Pepper Hamilton ever

25   contacted any of the schools from whom SFC       15:32:21
```

Page 493

1    either originated or purchased loans?        15:32:25

2                    MS. GOODMAN:  Objection.

3                    THE WITNESS:  I don't know if

4    they did or not.

5    BY MR. SHAPIRO:                              15:32:31

6    Q.    Do you know if Rod Gagne or anyone from

7    Pepper Hamilton decided what interest rate

8    should be charged to the students who took SFC

9    loans?

10                    MR. BARNOWSKI:  Object to the  15:32:45

11   form.

12                    THE WITNESS:  I don't know if

13   he was involved in that or not, no.

14   BY MR. SHAPIRO:

15   Q.    Do you know if Rod Gagne or anyone from  15:32:52

16   Pepper Hamilton decided which loans should be

17   transferred into the warehouse facilities?

18                    MR. BARNOWSKI:  Object to the

19   form.

20                    THE WITNESS:  No, I don't.    15:33:01

21   BY MR. SHAPIRO:

22   Q.    Do you know if Rod Gagne or anyone from

23   Pepper Hamilton decided which loans should be

24   transferred from the warehouse facilities to

25   the securitizations?                          15:33:12

Page 494

1              MR. BARNOWSKI:  Object to the    15:33:13

2    form.

3              THE WITNESS:  No, I don't.

4    BY MR. SHAPIRO:

5    Q.    Do you know if Rod Gagne or anyone from    15:33:19

6    Pepper Hamilton decided what interest rate the

7    institutional investors who purchased the

8    certificates should receive?

9              MS. GOODMAN:  Objection.

10             MR. BARNOWSKI:  Object to the    15:33:33

11   form.

12             THE WITNESS:  No, I don't.

13   BY MR. SHAPIRO:

14   Q.    Do you know if Rod Gagne or anyone from

15   Pepper Hamilton solicited the institutional    15:33:38

16   investors who would purchase the notes?

17             MS. GOODMAN:  Objection.

18             MR. BARNOWSKI:  Objection to

19   the form.

20             THE WITNESS:  No, I don't.    15:33:49

21   BY MR. SHAPIRO:

22   Q.    Do you know if Rod Gagne or anyone from

23   Pepper Hamilton was in anyway involved in the

24   servicing of the student loans?

25             MR. BARNOWSKI:  Objection to    15:33:56

Page 495

```
 1    the form.                                      15:33:57

 2                    MS. GOODMAN:  Objection.

 3                    THE WITNESS:  Not that I know

 4    of.

 5    BY MR. SHAPIRO:                                15:34:00

 6    Q.    Do you know if Rod Gagne or anyone from

 7    Pepper Hamilton contacted any of the students

 8    who took SFC loans?

 9                    MR. BARNOWSKI:  Objection to

10    the form.                                      15:34:07

11                    THE WITNESS:  I don't know if

12    they did or not.

13                    MS. GOODMAN:  Objection.

14    BY MR. SHAPIRO:

15    Q.    Do you know if Rod Gagne or anyone from  15:34:13

16    Pepper Hamilton had access to SFC's computer

17    systems?

18                    MS. GOODMAN:  Objection.

19                    MR. BARNOWSKI:  Objection to

20    the form.                                      15:34:20

21                    THE WITNESS:  No, I don't

22    know if they did or not.

23    BY MR. SHAPIRO:

24    Q.    Do you know if Rod Gagne or anyone from

25    Pepper Hamilton evaluated your performance as  15:34:29
```

Page 496

```
 1    an employee of SFC?                         15:34:31

 2              MS. GOODMAN:  Objection.

 3              MR. BARNOWSKI:  Object to the

 4    form.

 5              THE WITNESS:  No, I don't        15:34:36

 6    believe they do.

 7    BY MR. SHAPIRO:

 8    Q.   Do you know if Rod Gagne or anyone from

 9    Pepper Hamilton played any role in setting

10    your salary?                               15:34:42

11              MR. BARNOWSKI:  Object to the

12    form.

13              THE WITNESS:  Not that I know

14    of.

15              MS. GOODMAN:  Objection.         15:34:45

16    BY MR. SHAPIRO:

17    Q.   Did Rod Gagne or anyone from Pepper

18    Hamilton ever tell you how to do your job?

19              MR. BARNOWSKI:  Object to the

20    form.                                      15:34:51

21              THE WITNESS:  Not that I know

22    of.

23    BY MR. SHAPIRO:

24    Q.   Did Rod Gagne or anyone from Pepper

25    Hamilton supervise your work?              15:34:57
```

Page 497

1          MR. BARNOWSKI:  Object to the    15:35:00

2    form.

3          THE WITNESS:  Not that I know

4    of.

5    BY MR. SHAPIRO:                          15:35:09

6    Q.    Are you aware that SFC was placed into

7    bankruptcy in 2002.

8    A.    Yes, I am.

9    Q.    Do you have any understanding as to why

10   that happened?                           15:35:16

11   A.    No.  I don't have the particulars as to

12   how or why that happened.

13   Q.    Generally, do you have any general

14   understanding?

15   A.    Generally, I understand that the    15:35:29

16   forbearance payments were stopped being made

17   and the loans all defaulted and it sent them

18   into bankruptcy.  That's what I generally

19   understand.

20   Q.    And from whom did you obtain this    15:35:42

21   understanding?

22   A.    I'm not sure.

23   Q.    Can you pull out Exhibits 202 and 203

24   from yesterday.  Exhibit 202, do you have any

25   idea who drafted that document?           15:36:35

Page 843

1    to form.

2              THE WITNESS:  Yes, I

3    believe they would.

4    BY MR. EPSTEIN:

5    Q.  All right, now, I would like to    14:59:18

6    take a look at the ledger.  And I'm

7    a little -- can you look at it?

8    229, Exhibit 229.  And again, I'm

9    having difficulties reading it.  I

10   don't know if your copy is any    14:59:30

11   better.

12             But do I understand that

13   the ledger, the general ledger with

14   respect to these transactions, if

15   you had tried to see them at the    14:59:44

16   time that you were working there,

17   you would actually see the ledger in

18   the form that we have been given in

19   229?

20   A.  You can see it detailed like    14:59:56

21   this or you could see just the total

22   that had been paid year to date.

23   Q.  But it would be by each

24   individual lender?

25   A.  Yes.    15:00:08

Page 844

```
 1   Q.  And if there were any other

 2   lenders to Student Finance during

 3   that period, would you expect that

 4   there would be ledger sheets with

 5   respect to each of those lenders?    15:00:26

 6   A.  Yes.

 7   Q.  Would there have to be under the

 8   accounting system that you were in

 9   charge of?

10   A.  Yes, I set the loans up, so that  15:00:46

11   each loan is listed separately.

12   Q.  Do you recall the names of any

13   other individuals who loaned money

14   to Student Finance?

15   A.  No, I don't.                       15:01:02

16   Q.  Do you know whether, in fact,

17   there were any loans from any other

18   individuals, other than Pamela

19   Gagne, Robert Bast and the Trust

20   that we have mentioned?               15:01:12

21   A.  Not that I can remember.

22   Q.  The name Jacoby doesn't ring a

23   bell with you?

24   A.  I can't remember who he was, no.

25   Q.  You don't remember whether he     15:01:32
```

Page 845

1   was, indeed, a lender or a person

2   that lent money?

3   A.  No, I don't remember.

4   Q.  Do you know a company called

5   SWH?                                    15:01:42

6   A.  No, I don't.

7   Q.  You never heard of them?  Did

8   Mr. Yao himself ever lend money to

9   the company, do you know?

10  A.  I don't remember.                   15:01:58

11  Q.  Do you recall whether you ever

12  set up a sheet, a ledger sheet for

13  Mr. Yao with respect to loans that

14  he may have made to the company?

15  A.  No, I don't remember.               15:02:12

16  Q.  Would you consider the ledger --

17  and again, I may use the wrong term,

18  and correct me, but the general

19  ledger, the ledger sheets that you

20  set up, would you consider them to     15:02:24

21  be records that are kept in the

22  ordinary course of business?

23  A.  Yes, I would.

24  Q.  Okay, I would like you to take a

25  look at these pages, because I have    15:02:40

1    a couple of questions.  Maybe you

2    could help me a little bit on this.

3              On the second page, which

4    is -- I'm sorry, this is going to be

5    very difficult.  It is the page          15:02:54

6    where the top entry is dated January

7    22, '97.

8    A.  Yes.

9    Q.  And it represents a payment to

10   Mr. Bast; correct?                        15:03:08

11   A.  Yes.

12   Q.  If you go down about eight or --

13   about eight, nine lines, there is a

14   notation there that says 15 percent,

15   31 days.                                  15:03:20

16             Do you know what that is?

17   A.  I believe that it was 15 percent

18   interest and being paid for 31

19   days.

20   Q.  And the second entry would be 10   15:03:34

21   percent interest for 31 days?

22   A.  Yes.

23   Q.  Would you actually put that into

24   the ledger sheet or would that do it

25   automatically?  And again, correct      15:03:46

Page 847

1    me if my terminology is wrong.

2    A.  I would actually enter that as a

3    memo to the transaction.

4    Q.  And how would you know that it

5    was 31 days of interest that you        15:04:00

6    were paying with that particular

7    payment?  Would you go to the

8    underlying documents?

9    A.  I am not sure that I would pull

10   the underlying documents out every      15:04:22

11   time.  I think that I had a list of

12   what the loans were, what the

13   interest rates were, and then

14   whatever month I was paying for was

15   30 days, 31 days, 28 days, whatever     15:04:32

16   it might be.

17   Q.  So you maintained your own

18   little schedule or your own little

19   notes, which would help you, so you

20   wouldn't have to pull out all the       15:04:40

21   documents every month; correct?

22   A.  Yes, I believe I did.

23   Q.  Now, a couple of lines down,

24   there is some entries, October 20, I

25   think November 20, December -- can      15:04:52

Page 848

1    you tell us, would you insert those

2    entries as well or did you insert

3    those entries as well?

4    A.  Yes, I did.

5    Q.  And what do they reflect?          15:05:02

6    A.  I believe that they are interest

7    payments that didn't go out until

8    December for those time periods.

9    Q.  And why didn't they go out?

10   A.  I don't remember.               15:05:16

11   Q.  Could it have been lack of funds

12   at a particular time?

13          MR. BARNOWSKI:  I object

14   to form.

15          THE WITNESS:  Not usually  15:05:34

16   lack of funds.  There never usually

17   was a lack of funds.

18   BY MR. EPSTEIN:

19   Q.  So what would be a reason?

20   A.  Just a simple error that they    15:05:42

21   didn't go out.

22   Q.  Okay.

23          So it was part of the

24   relationship with these people that

25   the payments would be made          15:05:48

Page 849

1    regularly, once a month?

2    A.   Yes, I believe so.

3    Q.   And that if a payment didn't go

4    out, it would really be an unusual

5    situation which would be remedied;    15:06:00

6    correct?

7    A.   Correct.

8    Q.   If we go down further, we see

9    similar entries, and I assume that

10   with respect to each of these, you    15:06:12

11   are the person that made the entries

12   or the notations in the middle

13   column?

14   A.   Yes.  During this time period,

15   it would have been me.                 15:06:22

16   Q.   The next page, I don't see any

17   notes along those lines.  The next

18   page, no notes.

19           And then I see, on a page

20   where the first entry is January 15,   15:06:40

21   1999, for the James T. Brennan

22   Trust, I see the word deposit on the

23   second line.

24           Do you know what that

25   means?                                 15:06:54

Page 856

```
 1              (Whereupon a short break

 2    was taken at this time.)

 3              THE VIDEO TAPE OPERATOR:

 4    Back on the record.  The time is

 5    15:20.                          15:20:16

 6    BY MR. EPSTEIN:

 7    Q.  Would you please again take a

 8    look at Exhibit 229, second track?

 9    A.  (Witness complies.)

10    Q.  It would appear from these     15:20:30

11    documents that the first year that

12    is shown on here is 1996, and the

13    last year is 2002; is that correct?

14    A.  Yes.

15    Q.  And would you flip through, if   15:20:52

16    you would, the various pages of this

17    exhibit, and tell us whether this

18    document confirms your testimony

19    before, that for the most part,

20    interest payments were made on a     15:21:08

21    monthly basis on each of these

22    loans?

23    A.  Yes, it appears that for the

24    most part, interest was paid

25    monthly.                            15:22:14
```

Page 857

1    Q.  And that was through this entire

2    period; correct?

3    A.  Correct.

4    Q.  From 1996 to 2002?

5            MS. GOODMAN:  Objection.   15:22:24

6            THE WITNESS:  Correct.

7    BY MR. EPSTEIN:

8    Q.  With respect to each of the

9    payments that are shown on this

10   exhibit, would the process be the    15:22:40

11   same as you described when I first

12   started questioning you on how

13   checks were actually issued or how

14   wire transfers were actually made?

15   A.  Yes.                            15:22:52

16   Q.  In other words, you would sign a

17   check requisition or check request

18   form or whatever, if it was to go

19   out by check?

20   A.  Yes.                            15:23:02

21   Q.  And if it was to go out by wire,

22   and a couple of these suggest that

23   payments were made by wire, would

24   you get authorization from Mr. Yao

25   to do that?                         15:23:12

1    A.  Yes.

2    Q.  So these payments were made in

3    roughly the same ordinary course of

4    business that you would pay other

5    payables as well; correct?         15:23:28

6           MR. BARNOWSKI:  I object

7    to form.

8           THE WITNESS:  Correct.

9    BY MR. EPSTEIN:

10   Q.  There was nothing unusual or    15:23:36

11   different about the payments that

12   are reflected in this exhibit?

13          MR. BARNOWSKI:  I object

14   to form.

15          THE WITNESS:  No.          15:23:42

16   BY MR. EPSTEIN:

17   Q.  Did you ever meet Mr. Bast,

18   Robert Bast?

19   A.  No, I do not believe I ever met

20   him.                              15:23:56

21   Q.  Did you ever speak to him?

22   A.  I don't remember if I did or

23   not.

24   Q.  Did you ever meet Mrs. Pamela

25   Gagne?                            15:24:10

Page 859

1    A.  No, I do not believe I did.

2    Q.  Did you ever speak to her?

3    A.  No.

4    Q.  During the entire time that you

5    were at Student Finance, did you        15:24:22

6    ever see a memorandum that was

7    either authored -- or a message that

8    was either authored by Mr. Bast or

9    Ms. Gagne or in which either was a

10   recipient of a message or memo or       15:24:40

11   communication?

12              MS. GOODMAN:  Objection.

13              THE WITNESS:  Not that I

14   remember seeing, no.

15   BY MR. EPSTEIN:                          15:24:50

16   Q.  To your knowledge, did they ever

17   attend any of your managers

18   meetings?

19   A.  Not that I know of, no.

20   Q.  To your knowledge, did they ever  15:24:58

21   offer any advice with respect to the

22   business operations of Student

23   Finance?

24   A.  Not that I know of, no.

25   Q.  Did they exercise any control to  15:25:08

Page 860

1    your knowledge with respect to the

2    operations of Student Finance?

3              MR. BARNOWSKI:  I object

4    to form.

5              THE WITNESS:  Not that I     15:25:14

6    know of, no.

7    BY MR. EPSTEIN:

8    Q.  Did you on occasion have

9    conference calls with people who

10   were interested in the business of    15:25:26

11   Student Finance, like auditors or

12   other people of that type?

13   A.  Yes.

14   Q.  Did you ever have a conference

15   call, where either Mr. Bast or Mrs.    15:25:38

16   Gagne were members or participants

17   in the call?

18   A.  Not that I remember, no.

19   Q.  Did Mr. Yao ever say to you

20   something along the lines, before I    15:25:50

21   make that decision, I better get on

22   the phone and get permission from

23   Mr. Bast or Mrs. Gagne?

24   A.  No.

25   Q.  As a matter of fact, did he say    15:26:00

Page 861

1    that about anyone in the world?

2    A.  No.

3    Q.  He was, in fact, the boss;

4    correct?

5            MR. BARNOWSKI:  I object    15:26:10

6    to the form.

7            THE WITNESS:  Definitely

8    my boss, yes.

9    BY MR. EPSTEIN:

10   Q.  Was he recognized by the other    15:26:18

11   employees of Student Finance when

12   you were there as being the boss?

13           MR. BARNOWSKI:  I object

14   to form.

15           THE WITNESS:  Yes.    15:26:26

16   BY MR. EPSTEIN:

17   Q.  And the last word and the last

18   decision maker in the company?

19           MR. BARNOWSKI:  I object

20   to form.    15:26:30

21           THE WITNESS:  Yes.

22   BY MR. EPSTEIN:

23   Q.  In the securitizations, can you

24   tell me, as best you can, who the

25   investors were?    15:27:32