```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2                       - - -
      MBIA INSURANCE          :
 3    CORPORATION AND WELLS   :
      FARGO BANK, N.A. (f/k/a :
 4    WELLS FARGO BANK        :
      MINNESOTA N.A.) AS      :
 5    TRUSTEE OF SFC GRANTOR  :
      TRUST, SERIES 2000-1, SFC :
 6    GRANTOR TRUST, SERIES   :
      2000-2, SFC GRANTOR     :
 7    TRUST, SERIES 2000-3, SFC :
      GRANTOR TRUST, SERIES   :
 8    2000-4, SFC GRANTOR     :
      TRUST, SERIES 2001-1, SFC :
 9    GRANTOR TRUST, SERIES   :
      2001-2, SFC OWNER TRUST :
10    2001-I, AND SFC GRANTOR :
      TRUST, SERIES 2001-3,   :
11      Plaintiffs/Counterclaim:
                  Defendants, :
12                           :
                  vs.        :
13                           :
      ROYAL INDEMNITY COMPANY, :
14      Defendant/Counterclaim :C.A. NO.
                  Plaintiff. :02-1294-JJF
15    ------------------------------------------------
      ROYAL INDEMNITY COMPANY, :
16      Third-Party Plaintiff, :
                             :
17                vs.        :
                             :
18    ANDREW N. YAO, STUDENT  :
      LOAN SERVICING LLC,     :
19    STUDENT LOAN ACCEPTANCE II:
      LLC, STUDENT LOAN       :
20    ACCEPTANCE III LLC,     :
      STUDENT LOAN ACCEPTANCE :
21    III LLC, STUDENT        :
      LOAN ACCEPTANCE V LLC,  :
22    STUDENT LOAN ACCEPTANCE :
      VIII LLC, STUDENT LOAN  :
23    ACCEPTANCE IX LLC, SFC  :WITNESS:
      FINANCIAL LLC I, SFC    :DIANE MESSICK
24    FINANCIAL LLC II, SFC   :VOLUME I, TRACK I
      FINANCIAL LLC VI, SFC   :
      FINANCIAL LLC VII,      :DATE:
25      Third-Party Defendants.:JANUARY 17th, 2007
```

1          VIDEO OPERATOR:  We're on the        08:37:15

2    record.  This is a videotape deposition for

3    the United States District Court for the

4    District of Delaware.  My name is Robert

5    Higham.  I'm the videotape operator.  I'm        09:34:32

6    employed by Veritext New York.  The court

7    reporter is David Walsh.  The caption for

8    today's case is as follows:  It's a multi

9    caption case.  The first caption being MBIA

10   Insurance Corporation, et al versus Royal        09:34:43

11   Indemnity Insurance Company.  The case number

12   is 021294 (JJF).  All other captions will be

13   reflected on the stenographic record.

14              This video deposition is

15   taking place at the Law Offices at 1201 North        09:34:58

16   Market Street, Wilmington, Delaware.  All

17   counsel will be reflected on the stenographic

18   record.  The deponent for today is Diane

19   Messick.  Today's date is January 17th, 2007.

20   The camera time is 9:35.        09:35:12

21              The reporter will now swear

22   in the witness.

23                  -  -  -

24              DIANE MESSICK, having been

25   duly sworn, was examined and testified as        09:35:17

Page 10

1    follows:                                              09:35:17

2                         - - -

3                    EXAMINATION

4                         - - -

5    BY MS. AINSLIE:                                       09:35:25

6    Q.    Good morning, Ms. Messick.  I'm

7    Elizabeth Ainslie.  As I think you know, I

8    represent Pepper Hamilton and Rod Gagne in his

9    capacity as a lawyer at Pepper Hamilton and we

10   have some questions for you.  I am well aware    09:35:36

11   that you've been deposed, especially about

12   SFC, perhaps about other things as well, on a

13   number of different occasions.

14        You know the general rules.  We're not

15   supposed to talk at the same time.  If there's  09:35:50

16   any question that you don't understand, and I

17   do sometimes ask confusing questions, let me

18   know and I'll try to do better.

19        What we're looking for is an accurate

20   depiction of what you remember about the time   09:36:04

21   that you spent at SFC.

22        Is that all acceptable to you?

23   A.    Yes.

24   Q.    Okay.  And, again, I start with an

25   apology.  I know you have been deposed a        09:36:16

Page 31

```
 1                    MR. MEROUSE:  Objection.       09:56:41

 2    BY MS. AINSLIE:

 3    Q.    Did Mr. Gagne come to SFC's offices

 4    frequently?

 5    A.    No.                                      09:56:49

 6    Q.    How often in the course of a year would

 7    you say that Mr. Gagne came to SFC's offices?

 8    A.    I actually only remember one time in the

 9    three times I was there that he came to SFC.

10    Q.    In the three years?                      09:57:05

11    A.    Sorry, yes.  That's all that I

12    specifically remember, yes.

13    Q.    Okay.  There may have been a few more,

14    but one is the only one that sticks in your

15    mind?                                          09:57:14

16    A.    That's correct.

17    Q.    Okay.  And was he -- I take it he was

18    not part of any board of directors, any

19    finance committee, anything like that?

20                    MR. MEROUSE:  Objection.       09:57:23

21                    THE WITNESS:  Oh, no.

22    BY MS. AINSLIE:

23    Q.    Okay.  I will rephrase the question.

24    Did Mr. Gagne have any affiliation with any of

25    the business operations by way of committees   09:57:32
```

Page 32

1   or otherwise of SFC?                          09:57:35

2   A.    No.

3   Q.    Okay.  Did you, as the finance director,

4   and I'm jumping ahead, subsequently the

5   controller of SFC, ever disperse any funds at    09:57:49

6   Mr. Gagne's direction?

7   A.    No.

8   Q.    Whose direction would it have required

9   before you would disperse funds?

10  A.    Well, either Andrew Yao's or if it was a    09:57:59

11  bill to pay, to pay a bill, but I mean even

12  Pepper Hamilton bills at Andrew Yao's

13  direction were not to be paid until at least

14  60 days after receipt.

15  Q.    And so Andrew would have been calling    09:58:13

16  the shots on most of these?

17              MR. MEROUSE:   Objection.

18              THE WITNESS:   Yes.  On big

19  disbursements, unusual disbursements, other

20  than the regular operations of paying people    09:58:24

21  and, you know, payroll of SFC.

22  BY MS. AINSLIE:

23  Q.    Did Andrew Yao ever explain to you why

24  he had a practice of using different attorneys

25  for different purposes?                       09:58:34

Page 33

1                  MR. MEROUSE:  Objection.          09:58:36

2                  MR. WATERS:  Objection.

3                  MS. AINSLIE:  Maybe I'll try

4     that again.  What's the basis for the

5     objection?                                      09:58:43

6                  MR. MEROUSE:  You're

7     recategorizing what she said.  I don't think

8     anybody has said he had a practice of using

9     different attorneys on different occasions as

10    a general matter.                               09:58:50

11    BY MS. AINSLIE:

12    Q.    All right.  Did he have a practice of

13    using different attorneys on different

14    occasions?

15    A.    At one time Andrew did explain to me     09:58:56

16    that he thought it was better to have more

17    than one attorney on retainer to do different

18    things.  It's just better to spread your

19    business around a little bit.

20    Q.    Okay.  Now, at the outset, you said you   09:59:06

21    came in as finance director and you explained

22    your role in generating the servicer reports?

23    A.    Finance manager was the title.

24    Q.    Sorry.

25    A.    That's all right.                         09:59:31

Page 34

1    Q.    And at some point were you promoted?    09:59:32

2    A.    Yes.

3    Q.    When was that?

4    A.    I believe it was the beginning of 2000 I

5    was promoted to controller.    09:59:41

6    Q.    And at that time, was there any finance

7    person at SFC who was above you in rank?

8    A.    No.

9    Q.    So, you were in charge of the finances

10   more or less?    10:00:02

11   A.    Yes.  At that point, I was in charge of

12   the Accounting Department as well.  Before I

13   hadn't been.

14   Q.    Okay.  Now, tell us about that time, if

15   you can think back to the beginning of 2000,    10:00:04

16   what were the different departments at SFC

17   besides accounting, which you were at that

18   point heading?

19   A.    There was accounting, finance --

20   Q.    Can I interrupt you, is that okay?    10:00:19

21   A.    Pardon.

22   Q.    Is it okay if I interrupt you?

23   A.    Yes.

24   Q.    What is finance?

25   A.    Finance again is the servicer reports.    10:00:25

Page 1089

1    other attorneys were coming back saying          10:22:12

2    changes they wanted to make in documents.  Rod

3    would contact me to see how we felt about

4    those changes or if there were changes that we

5    wanted to make in the documents.               10:22:21

6    Q.    Do you know why he was contacting you as

7    opposed to Andrew Yao or Gary Hawthorne or

8    Perry Turnbull?

9    A.    I was responsible for the Capital

10   Markets Group.                                 10:22:30

11   Q.    Okay.

12   A.    I mean that was one of the first things

13   I did when I was hired by Student Finance

14   Corporation was take home the Wilmington Trust

15   warehouse line documentation and read it and    10:22:39

16   read it and read it and that was the first

17   time I ever met Rod and that's the only time I

18   remember him being at the offices because

19   there were some things I was not clear on.

20   The legalese, if you will.                     10:22:52

21   Q.    Did you also communicate with him by

22   e-mail?

23   A.    Yes.

24   Q.    Okay.  Did you -- were you including

25   e-mail communications in your answer to the     10:23:00

Page 1262

```
 1    the form.                                    16:12:17

 2                    MR. EPSTEIN:   Objection.

 3                    THE WITNESS:   I would think

 4    so, yes.

 5    BY MS. GOODMAN:                              16:12:21

 6    Q.    Did he discuss with you the business

 7    operations?

 8                    MR. SHAPIRO:   Objection to

 9    the form.

10                    THE WITNESS:   Not that I     16:12:32

11    really remember because actually there was a

12    time where Andrew Yao told me specifically

13    not to discuss business operations with Rod

14    Gagne because he was our attorney to give us

15    legal advice.   He wasn't an operations person  16:12:44

16    to give us operations advice or to be

17    involved in operations.   I can't remember

18    what the time frame was on that or quite

19    frankly what precipitated that.

20    BY MS. GOODMAN:                              16:12:57

21    Q.    So, if Mr. Gagne had a question, Mr. Yao

22    told you not to answer that question?

23    A.    He said if it was operations based.   He

24    said there's no need to discuss the operations

25    with -- I don't even remember if he said Rod  16:13:11
```

Page 1263

```
 1    Gagne or Pepper Hamilton.  It was they're      16:13:13
 2    there for legal advice.
 3    Q.     Did there ever come a time when
 4    Mr. Gagne asked you a question and you told
 5    him you could not answer it?                    16:13:21
 6    A.     I don't remember.
 7    Q.     Did Mr. Gagne ever ask you for
 8    information and you told him he couldn't have
 9    it?
10    A.     The only specific time I remember that   16:13:35
11    was Andrew Yao -- I would send out the
12    financial statements of the company based on
13    contractually who was supposed to get them and
14    Andrew Yao told me that Rod Gagne was not to
15    get them and that if Rod Gagne wanted them and  16:13:49
16    this was I think because of the loans with the
17    trust, the Gagne trusts, if Rod wanted the
18    financial statements, he would have to ask
19    Andrew personally and Andrew would then tell
20    me I could send the financial statements to     16:14:05
21    him.  I don't remember specifically anything
22    else.
23    Q.     Well, did Mr. Gagne ever ask you for the
24    financial statements and you told him he had
25    to ask Mr. Yao?                                 16:14:15
```

Page 1264

1   A.    Yes, I do remember that.          16:14:17

2   Q.    When was that?

3   A.    I don't remember the time frame.  It

4   would have either been after the '99

5   financials or the 2000 financials.  So, it was  16:14:23

6   in August of 2000 or April of 2001.  I just

7   don't remember specifically when it was.

8   Q.    Did he tell you why he wanted to see the

9   financials?

10  A.    Because it was part of the loan          16:14:40

11  contracts that they get the financial

12  statements.  The loans that the Gagne trusts

13  and Bob Bast had.

14  Q.    Do you know if Mr. Gagne ever received

15  the financial statements?                      16:14:53

16  A.    I don't remember.

17  Q.    Okay.

18  A.    I don't remember directly sending them

19  to him.

20  Q.    Do you recall when that conversation was  16:15:11

21  with Mr. Yao?

22               MR. EPSTEIN:   Objection.

23               THE WITNESS:   No.

24  BY MS. GOODMAN:

25  Q.    Was it early in your tenure at SFC?       16:15:20

Page 1265

```
 1   A.    I really don't remember at all.  I'm       16:15:24
 2   trying to picture what office I was sitting in
 3   because we moved often enough, that would give
 4   me some indication of the time frame and I
 5   just don't remember where I was.                  16:15:35
 6   Q.    Was it a face-to-face conversation?
 7   A.    No, it was a telephonic.
 8   Q.    Do you remember how it came up?
 9   A.    No, I do not remember what precipitated
10   it.                                               16:15:50
11   Q.    Was there anyone else that Mr. Yao told
12   you not to give information to or was this
13   strictly a conversation about Mr. Gagne?
14              MR. SHAPIRO:   Objection to
15   the form.                                         16:16:01
16              THE WITNESS:   Well, the
17   conversation could have had other -- we could
18   have discussed other things.  I don't
19   remember.  I just remember that because, no,
20   I -- simply because for that reason it kind       16:16:12
21   of did stand out because contractually it was
22   a party that was supposed to get the
23   financial statements and I was being told not
24   to send them.
25   BY MS. GOODMAN:                                   16:16:22
```

Page 1266

```
 1    Q.     Did you ask Mr. Yao why he didn't want    16:16:23

 2    you to send them?

 3    A.     No, I didn't ask Andrew Yao why when he

 4    gave directives.

 5    Q.     But did you think it was odd because it    16:16:31

 6    was in the contract?

 7                   MR. SHAPIRO:   Objection to

 8    the form.

 9                   THE WITNESS:   I just thought

10    that, you know, Andrew wanted to know when    16:16:37

11    Rod asks.  I didn't think why.  I just said,

12    okay, all right.  When Rod asked where are

13    the financial statements, I told him Andrew

14    said you have to ask him directly.

15                   Again, I don't remember if    16:16:53

16    that was the only part of the conversation,

17    but I do remember having that conversation

18    with both Andrew Yao and with Rod.  It was

19    uncomfortable for me.

20    BY MS. GOODMAN:                               16:17:08

21    Q.     Who at SFC -- was there someone at SFC

22    who was responsible for reviewing Pepper

23    Hamilton's invoices?

24    A.     I'm sure I looked at them.

25    Q.     Were you responsible for approving them    16:17:50
```

Page 1280

1          The last document you were shown          16:38:37

2    regarding a call at home from Mr. Gagne refers

3    to SWH.

4          What was SWH?

5    A.    They were a temporary lender of funds to    16:38:51

6    Student Finance Corporation.

7    Q.    Short term loan, loans?

8    A.    Yes, short term loans.

9    Q.    Was this the first time in 2001 that you

10   had heard of SWH?                                 16:39:04

11   A.    I don't remember when I first heard of

12   them.  I mean there was more than one loan

13   that SWH made to Student Finance Corporation.

14   I don't think October 5th, 2001 was the first

15   one.                                             16:39:19

16   Q.    Do you recall what the largest of those

17   loans was?

18   A.    I don't.

19   Q.    Does 40 million ring a bell at all?

20   A.    It rings a bell.  I don't specifically     16:39:32

21   remember the dollar amount.

22   Q.    Did you have any role in negotiating the

23   terms of the loan with SWH?

24   A.    I believe I did.

25   Q.    Did you negotiate with their lawyers?      16:39:42

Page 1281

1    A.    I don't remember who I negotiated with.    16:39:47

2    Q.    Who finally approved the terms of the

3    loans with SWH?

4    A.    Well, Andrew Yao would have the final

5    approval on it.  To be quite honest, there    16:39:58

6    wasn't a lot of negotiations with SWH.  They

7    were let's refer to as hard money lenders.

8    Q.    What do you mean by hard money lenders?

9    A.    They charged high fees.  They charged

10   high interest rate.    16:40:11

11   Q.    As a matter of fact, if you take a look

12   at Exhibit 1457, you may have to help me

13   actually, but one of the law firms listed is

14   Solomon and Weinberg.

15         Do you know that law firm?    16:40:32

16   A.    Yes, Solomon and Weinberg are the S-W in

17   SWH.

18   Q.    I could not tell whether the $191,251

19   that's listed on that page refers to Solomon

20   and Weinberg or Sherman and Howard, the name    16:40:51

21   above them.

22         Can you help me with that?

23              MS. GOODMAN:  Object to the

24   form.

25              THE WITNESS:  Yeah, that    16:41:00

Page 1282

```
 1   would refer to the Solomon and Weinberg.      16:41:00

 2   BY MR. EPSTEIN:

 3   Q.    So, this is a law firm that represented

 4   SWH in its negotiations with Student Finance

 5   for a loan and that law firm was paid 191,000;  16:41:11

 6   is that correct?

 7              MS. GOODMAN:  Objection.

 8              MR. MEROUSE:  Objection to

 9   the form.

10              THE WITNESS:  It could have      16:41:19

11   been more than one loan, but it could have

12   been two.

13   BY MR. EPSTEIN:

14   Q.    But in any event, some 190,000 was paid

15   to them for the work that they did           16:41:27

16   representing their client SWH, correct?

17              MS. GOODMAN:  Objection to

18   the form.

19              MR. MEROUSE:  Objection to

20   the form.                                    16:41:35

21              THE WITNESS:  Correct.

22   BY MR. EPSTEIN:

23   Q.    Staying on that document for a minute.

24   This is a healthy list of law firms on here.

25   Blank, Rome, do you know anything about that  16:41:46
```

Page 1286

```
 1                    MR. MEROUSE:  Objection to      16:43:44

 2   the form.

 3                    THE WITNESS:  Yes.  At that

 4   time, yes.

 5   BY MR. EPSTEIN:                                  16:43:46

 6   Q.    At that time.  Thank you for correcting

 7   me.  Going back to SWH now, Student Finance

 8   did indeed enter into loan agreements with

 9   SWH, did they not?

10   A.    Yes.  If I remember correctly, there      16:44:04

11   were three during my tenure there.

12   Q.    And, again, that would have been after

13   Mr. Yao approved the terms, correct?

14   A.    Yes.

15   Q.    Do you know whether Mr. Yao himself        16:44:16

16   engaged in any negotiations with SWH?

17   A.    I don't know.

18   Q.    With respect to other lenders to Student

19   Finance, short term lenders, does the name

20   Ticor mean anything to you?                     16:44:35

21   A.    No.

22   Q.    T-I-C-O-R?

23   A.    No.

24   Q.    Other than the clients that I represent,

25   which are Mr. Bast, Pamela Gagne, Rod as Rod    16:44:46
```

Page 1287

```
 1   Gagne as trustee and Mr. Bast as trustee and    16:44:50

 2   the trusts, were there any other individuals

 3   or entities other than SWH that provided short

 4   term loans?

 5   A.    There might have -- well, Best Bank was    16:45:03

 6   involved with Student Finance.  I don't

 7   remember the relationship there, but they

 8   provided funds.  Whether they bought loans or

 9   it was a loan, I don't remember.  I think

10   there might have been a couple of other         16:45:20

11   individuals.  I just don't remember the names.

12   Q.    Does the name Jacoby ring a bell?

13   A.    Yes.

14   Q.    Was Jacoby a lender?

15   A.    I believe so.                             16:45:31

16   Q.    A short term lender?

17   A.    I believe so.  And I also think there

18   was also a Mr. Packer.

19   Q.    Mr. Packer?

20   A.    Yes.                                      16:45:36

21   Q.    Mr. Welsh, does that ring a bell?

22   A.    That one doesn't ring a bell?

23   Q.    Okay.  With respect to all of those

24   loans, and I'm excluding what I will call the

25   Family Loans, the Gagne or Bast family loans    16:45:47
```

Page 1288

```
 1  for a moment.                            16:45:50

 2       With respect to all of the other short

 3  term loans, were you the one at Student

 4  Finance that negotiated the terms of those

 5  loans?                                    16:45:59

 6  A.    No, I don't remember being the one who

 7  negotiated the terms of those loans.

 8  Q.    Do you know who did?

 9  A.    No.

10  Q.    Did you ever see any documents or hear  16:46:09

11  any conversations in which it was stated that

12  Mr. Yao was the one that negotiated the terms?

13  A.    My assumption always was that it was

14  Andrew Yao.  Again, I think those loans were

15  all prior to my either employment or becoming  16:46:26

16  a part of the Accounting Department.

17  Q.    And we're talking about loans which are

18  not part of what I will call the family loans?

19  A.    Correct.

20  Q.    Now, with respect to the family loans,   16:46:39

21  there were loans made during the time that you

22  were at Student Finance, correct?

23  A.    Yes.

24  Q.    Did you negotiate the terms of the

25  loans?                                    16:46:52
```

Page 1289

1   A.    I don't remember doing that.                16:46:52

2   Q.    Do you know who did on behalf of Student

3   Finance, if anyone?

4   A.    If I didn't, it would have been Andrew

5   Yao.                                              16:47:02

6   Q.    Did you ever see any documents such as

7   term sheets regarding such loans that Mr. Yao

8   would send to people, including the family or

9   the people who I represent?

10  A.    I don't remember.                           16:47:17

11  Q.    Did Mr. Yao ask your input with respect

12  to the terms of the loans that were eventually

13  made by my clients to Student Finance?

14  A.    I don't remember.

15  Q.    Do you know whether the loans that were   16:47:32

16  made by my clients to Student Finance required

17  that Student Finance purchase insurance to

18  guarantee payment of those loans?

19  A.    I don't believe that they did.

20  Q.    With respect to the SWH loans that you     16:47:48

21  mentioned before, did those loans require the

22  purchase of insurance to insure those loans?

23  A.    Yes.

24  Q.    Do you know what company provided the

25  insurance for those loans?                        16:48:03

Page 1290

```
 1   A.    Royal.                              16:48:05

 2                  MR. MEROUSE:   Objection to

 3   the form.

 4   BY MR. EPSTEIN:

 5   Q.    Royal.  So, Royal indeed then knew about  16:48:07

 6   the SWH loans, correct?

 7                  MR. MEROUSE:   Objection to

 8   the form.

 9                  MS. GOODMAN:   Objection to

10   the form.                                 16:48:15

11                  THE WITNESS:   Yes.

12   BY MR. EPSTEIN:

13   Q.    And would you expect from your

14   involvement with respect to Student Finance

15   and the SWH loans, that Royal knew the terms  16:48:25

16   of the SWH loans?

17                  MR. MEROUSE:   Objection to

18   the form.

19                  MS. GOODMAN:   Objection.

20                  THE WITNESS:   I don't      16:48:36

21   remember.

22   BY MR. EPSTEIN:

23   Q.    Okay.  Did you ever review any of the

24   loan documents between SFC and my clients?

25   A.    Not that I remember.                16:48:50
```

· Page 1291

1    Q.    And that would include the loans from    16:48:52

2    the beginning of your tenure with SFC until

3    you left, would that be correct?

4    A.    Yes.

5    Q.    And, in fact, are you aware of any loans    16:49:04

6    that were made by my client, Student Finance,

7    in March of 2002?

8    A.    Yeah, I believe it was a

9    February/March 2002 time frame there were

10   loans made.                                      16:49:19

11   Q.    And how long was it after those loans

12   were made that you left Student Finance?

13   A.    I left the beginning of May.  Gave

14   notice sometime in April.

15   Q.    Okay.  Do you have any idea in your --    16:49:37

16   as you sit here today as to the number of

17   loans that were made by my clients to Student

18   Finance from the time that you first came on

19   board at Student Finance?

20   A.    I don't remember.                          16:49:52

21   Q.    Was it a substantial number of loans?

22            MS. GOODMAN:  Objection.

23            THE WITNESS:  Yeah, there

24   were loans made.  They were repaid.  There

25   were loans made, they were repaid.              16:50:01

Page 1292

```
 1    BY MR. EPSTEIN:                              16:50:04

 2    Q.    Indeed, isn't it true that with respect

 3    to every loan that was paid -- I'm sorry, that

 4    was made by my clients to Student Finance,

 5    with the exception of the March 2002 loans,    16:50:22

 6    that every single one of those loans was paid

 7    either according to its terms or according to

 8    amended terms with respect to those loans?

 9                    MS. GOODMAN:  Objection to

10    the form.                                     16:50:29

11                    MR. MEROUSE:  Objection to

12    the form.

13                    THE WITNESS:  That's what I

14    remember, yes.

15    BY MR. EPSTEIN:                               16:50:33

16    Q.    And that every payment was made

17    consistent with the terms of either the

18    original loans or the amended -- the amended

19    documents for those loans?

20                    MS. GOODMAN:  Objection.       16:50:42

21                    MR. MEROUSE:  Objection to

22    the form.

23                    THE WITNESS:  You're talking

24    every repayment to pay back the loans, yes,

25    that's what I recall.                         16:50:46
```

Page 1293

```
 1   BY MR. EPSTEIN:                              16:50:48

 2   Q.    Would your answer be the same with

 3   respect to interest payments that they were

 4   made with respect to each of the loans in

 5   accord with the terms of the loans?          16:50:56

 6                   MS. GOODMAN:   Objection to

 7   the form.

 8                   MR. MEROUSE:   Objection to

 9   the form.

10                   THE WITNESS:   That's what I   16:51:01

11   recall, yes.

12   BY MR. EPSTEIN:

13   Q.    And do you recall what those terms were,

14   the payment of interest, with respect to those

15   loans?                                       16:51:06

16   A.    No, I don't.

17   Q.    Would it refresh your recollection if

18   you looked at the general ledger of Student

19   Finance to see whether those loans were paid

20   on a monthly base?                           16:51:15

21                   MS. GOODMAN:   Objection.

22                   THE WITNESS:   It still

23   wouldn't help me with the interest rate, was

24   that your question?

25   BY MR. EPSTEIN:                              16:51:22
```

Page 1294

1  Q.    Well, it was.                                    16:51:24

2  A.    Unless I had a calculator or an

3  amortization schedule.

4  Q.    Well, let me ask you this, would the

5  general ledger for Student Finance for a          16:51:35

6  particular year show what payments were made

7  with respect to a particular loan each and

8  every month during that year?

9              MR. MEROUSE:  Objection to

10  the form.                                          16:51:45

11              THE WITNESS:  Yes.

12  BY MR. EPSTEIN:

13  Q.    And would it be your conclusion that if

14  with respect to each of those loans for every

15  month that the loan was outstanding, the same     16:51:53

16  amount was paid month after month until the

17  loan was repaid, that the interest was paid in

18  accord with the terms of the loan documents?

19              MS. GOODMAN:  Objection to

20  the form.                                          16:52:08

21              MR. MEROUSE:  Objection to

22  the form.

23              THE WITNESS:  Yes.  No, I

24  agree with that, I just don't remember what

25  the interest rate was.                             16:52:11

Page 1295

```
 1   BY MR. EPSTEIN:                              16:52:12

 2   Q.    Do you recall there ever being a time

 3   when interest was not paid when due on any

 4   loans to my clients?

 5               MR. MEROUSE:  Objection to       16:52:20

 6   the form.

 7               THE WITNESS:  Not that I

 8   remember.

 9   BY MR. EPSTEIN:

10   Q.    Do you recall any instance when any    16:52:24

11   principal was not paid when due to any of my

12   clients?

13               MR. MEROUSE:  Same objection.

14               THE WITNESS:  Not that I

15   remember.                                    16:52:37

16   BY MR. EPSTEIN:

17   Q.    Did you ever review the terms of the

18   loans to my clients?

19               MS. GOODMAN:  Objection to

20   the form.                                    16:52:43

21               THE WITNESS:  Review -- I'm

22   sure I must have seen the terms of the loans

23   in order to come up with a payment schedule.

24   BY MR. EPSTEIN:

25   Q.    Were each of the loans that were made by  16:52:58
```

Page 1296

1    my clients to Student Finance, were they            16:53:01

2    reported on the books and records of Student

3    Finance?

4    A.    Yes.

5    Q.    And would the initial -- you know, back        16:53:09

6    when I was learning accounting as an

7    undergraduate, there actually used to be a

8    book called the general ledger which you would

9    go to and look at.  I assume that at Student

10   Finance that is not true or is not true?           16:53:30

11   A.    It's automated.

12   Q.     It's automated.  So, that the general

13   ledger that we refer to is really a printout,

14   is it not, of information that you put in a

15   computer?                                          16:53:43

16   A.    Correct.

17   Q.    With respect to each of the loans that

18   my clients made, were entries made on the

19   general ledger or into the computer with

20   respect to each of those loans setting up an      16:53:54

21   account, giving it a name, giving it a proper

22   name, and then carrying forward either a debit

23   or a credit with respect to each of those

24   accounts?

25              MS. GOODMAN:  Objection to             16:54:06

Page 1297

```
 1   the form.                                    16:54:06
 2                   MR. MEROUSE:   Objection to
 3   the form.
 4                   THE WITNESS:   Yes.
 5   BY MR. EPSTEIN:                               16:54:08
 6   Q.    So, these were treated at least from an
 7   accounting standpoint as what I would call an
 8   ordinary lending relationship between Student
 9   Finance and my clients, correct?
10                   MR. MEROUSE:   Objection to   16:54:23
11   the form.
12                   MS. GOODMAN:   Objection.
13                   THE WITNESS:   Yes.
14   BY MR. EPSTEIN:
15   Q.    And it would be no different with       16:54:25
16   respect to loans made by banks; is that
17   correct?
18                   MS. GOODMAN:   Objection.
19                   MR. MEROUSE:   Objection to
20   the form.                                     16:54:32
21                   THE WITNESS:   Yes.
22   BY MR. EPSTEIN:
23   Q.    In terms of setting up an account and
24   making appropriate debits and credits when
25   payments are made or extensions of credit are  16:54:38
```

Page 1298

```
 1   granted or additions to credit, whatever; is    16:54:41
 2   that correct.
 3                  MS. GOODMAN:  Objection.
 4                  THE WITNESS:  Correct.
 5   BY MR. EPSTEIN:                                  16:54:46
 6   Q.    Treated no differently?
 7   A.    Correct.
 8   Q.    Than any other loan?
 9                  MR. MEROUSE:  Objection to
10   the form.                                        16:54:50
11   BY MR. EPSTEIN:
12   Q.    Your answer is yes?
13   A.    Correct.  I didn't know there was a
14   question, I'm sorry.
15   Q.    I probably didn't ask it, that's         16:54:56
16   probably why you didn't think there was one.
17         Did you ever sit down and compare the
18   terms of the loans that my clients made to
19   Student Finance with the loans that any other
20   entity made to Student Finance, and I'm         16:55:16
21   talking short term loans.  I'm talking bridge
22   loans.
23         Did you ever do that?
24                  MS. GOODMAN:  Objection.
25                  THE WITNESS:  Not that I         16:55:25
```

Page 1299

1    remember.                                    16:55:25

2    BY MR. EPSTEIN:

3    Q.    Is there anything in your recollection

4    that the terms that my clients charged were

5    any greater than the terms of any other loans    16:55:32

6    that were obtained by Student Finance on a

7    short term basis?

8                    MS. GOODMAN:   Objection.

9                    MR. MEROUSE:   Objection to

10   the form.                                    16:55:41

11                   THE WITNESS:   Not that I

12   remember.

13   BY MR. EPSTEIN:

14   Q.    Indeed, did you ever come to a

15   conclusion that the loans that Student Finance    16:55:45

16   obtained from SWH were quite a bit more

17   expensive than the loans that my clients made

18   to Student Finance?

19                   MR. MEROUSE:   Objection to

20   the form.                                    16:55:57

21                   MS. GOODMAN:   Objection.

22                   THE WITNESS:   My recollection

23   is the loans made by SWH were the most

24   expensive loans that Student Finance got from

25   any sources.                                 16:56:05

Page 1300

```
 1   BY MR. EPSTEIN:                              16:56:17

 2   Q.    Do you know whether the loans my clients

 3   made to Student Finance were secured with any

 4   collateral?

 5   A.    I don't remember.                      16:56:44

 6   Q.    Do you know whether they were guaranteed

 7   by anybody?

 8   A.    I don't know.

 9   Q.    Were you the person that would

10   authorize -- we talked about the monthly       16:56:58

11   interest payments or interest payments.

12         Would you need authorization from

13   Mr. Yao to make those payments?

14   A.    I don't remember that.

15   Q.    So that your answer would be no?         16:57:12

16   A.    To the best of my recollection, I don't

17   remember needing that.

18   Q.    What about repayment of principal, would

19   you need his authorization to do that?

20   A.    Not that I remember.                     16:57:22

21   Q.    I'm going to ask you generally, did you

22   ever meet Robert Bast?

23   A.    No.

24   Q.    Did you ever talk to him over the phone?

25   A.    I think I did.                           16:57:43
```

Page 1301

```
1    Q.    Do you remember what you talked about?    16:57:44

2    A.    No.

3    Q.    Did Mr. Bast ever give you instructions

4    or directions as to how to perform your job?

5    A.    No.                                        16:57:53

6    Q.    Was he ever in attendance at any meeting

7    at Student Finance?

8    A.    No, not that I'm aware of.

9    Q.    Do you know whether he was a member of

10   the board or any committee at Student Finance?  16:58:03

11   A.    I know he wasn't.

12   Q.    Did you ever see him at Student Finance?

13   A.    No.

14   Q.    Was he the power behind the throne in

15   your opinion?                                    16:58:12

16              MR. MEROUSE:  Objection to

17   the form.

18              MS. GOODMAN:  Objection.

19              THE WITNESS:  No.

20   BY MR. EPSTEIN:                                  16:58:16

21   Q.    Who sat on the throne?

22              MS. GOODMAN:  Objection.

23              THE WITNESS:  Andrew Yao.

24   BY MR. EPSTEIN:

25   Q.    To your knowledge, there was no one in    16:58:21
```

Page 1302

```
 1   back of that throne, was there?              16:58:23
 2                MR. MEROUSE:  Objection to
 3   the form.
 4                MS. GOODMAN:  Objection.
 5                THE WITNESS:  Not to my        16:58:27
 6   knowledge.
 7   BY MR. EPSTEIN:
 8   Q.   What about Pamela Gagne, if I asked you
 9   the same series of questions involving
10   directions to you as to how to perform your   16:58:37
11   job, a member of the board, a member of any
12   committees, any participation whatsoever in
13   the operations of the business of Student
14   Finance, would your answer be no?
15                MS. GOODMAN:  Objection.        16:58:53
16                MR. MEROUSE:  Objection to
17   the form.
18                THE WITNESS:  My answer would
19   be no.
20   BY MR. EPSTEIN:                               16:58:56
21   Q.   And that's for the entire period you
22   were at Student Finance, correct?
23                MS. GOODMAN:  Objection.
24                THE WITNESS:  Correct.
25   BY MR. EPSTEIN:                               16:59:01
```

Page 1303

1  Q.    Did you ever hear any rumors that she or    16:59:02

2  Bob Bast were involved in running or operating

3  Student Finance?

4  A.    No.

5  Q.    You were asked some questions regarding    16:59:16

6  the family of Student Finance, okay.  I would

7  imagine the schools that you purchased loans

8  for were pretty important to Student Finance,

9  weren't they?

10             MS. GOODMAN:  Objection.       16:59:33

11             THE WITNESS:  Yes.

12  BY MR. EPSTEIN:

13  Q.    Without those schools, what would happen

14  to Student Finance?

15  A.    No business.                          16:59:38

16             MR. MEROUSE:  Objection to

17  the form.

18  BY MR. EPSTEIN:

19  Q.    Do you consider those schools to be in

20  the family?                                 16:59:42

21             MR. MEROUSE:  Objection to

22  the form.

23             MS. GOODMAN:  Objection.

24             THE WITNESS:  I had not heard

25  that term before, so I didn't consider      16:59:46

1              THE WITNESS:  Yes.              17:07:49

2              MR. EPSTEIN:  Okay.  If you

3    just give me a minute.  Why don't we go off

4    for a minute, so I can see if I really need

5    any of these.                            17:07:59

6              VIDEO OPERATOR:  Off the

7    record, the time is 17:07.

8              Back on the record, the time

9    is 17:17.

10   BY MR. EPSTEIN:                          17:17:13

11   Q.    I'm showing you an exhibit that was

12   previously marked as 229, Track II, which was

13   introduced as an exhibit at the Kartha

14   deposition and I'd like you to look through it

15   before, you know, I ask you any questions.  17:17:35

16   A.    Okay.

17   Q.    Okay.  Now, most of the pages relate to

18   1999 from what I can see, but some of the

19   pages also relate to subsequent years.

20         Is this a compilation of accounts taken  17:18:13

21   from different or general ledgers from

22   different years to your knowledge?

23              MR. MEROUSE:  Objection to

24   the form.

25              THE WITNESS:  That's what it  17:18:27

Page 1312

```
 1   appears to be.                                  17:18:28

 2   BY MR. EPSTEIN:

 3   Q.    Okay.  And, again, if you would grab any

 4   one page and look at it, would that show

 5   monthly payments of interest with respect to    17:18:35

 6   loans that my clients made to Student Finance?

 7   A.    Yes, that's what it looks like it is.

 8              MS. GOODMAN:  Note my

 9   objection to the question, I'm sorry.

10   BY MR. EPSTEIN:                                  17:18:52

11   Q.    And without spending a lot of time going

12   page-by-page-by-page, I'd like you to thumb

13   through it and tell me whether you see a

14   regular systematic monthly payment of interest

15   with respect to the loans that were             17:19:06

16   outstanding made by my clients to Student

17   Finance?

18              MS. GOODMAN:  Objection to

19   the form.

20              THE WITNESS:  Yes.                    17:19:15

21   BY MR. EPSTEIN:

22   Q.    To your knowledge, during the entire

23   time you were at Student Finance, was there

24   ever a payment made to my clients that was not

25   in the ordinary course of business of Student   17:19:26
```

Page 1313

```
 1   Finance and my clients?                    17:19:29

 2                    MS. GOODMAN:   Objection.

 3                    MR. MEROUSE:   Objection to

 4   the form.

 5                    THE WITNESS:   Not that I      17:19:33

 6   remember.

 7                    MR. EPSTEIN:   Okay.  I'm not

 8   going to mark this.  I'm done.  Pass the

 9   witness.

10                    VIDEO OPERATOR:   Off the      17:19:45

11   record, the time is 17:19.  That completes

12   videotape number three.

13                    Back on the video record.

14   This is the beginning of tape number four.

15   The camera time is 17:26.                   17:26:13

16   BY MR. CASTAYBERT:

17   Q.    Good afternoon, Ms. Messick.

18        My name is Andre Castaybert and I

19   represent -- I'm from Proskauer and I

20   represent Wells Fargo, the trustee, and we    17:26:27

21   have been representing MBIA in this matter as

22   well.

23        To finish up the day today and before we

24   go on tomorrow, I would like to ask you a

25   couple questions to get started.             17:26:40
```