# EXHIBIT 1A

**Exhibit 1 to the Proposed Pretrial Order**

**STATEMENT OF FACTS THAT ARE ADMITTED
<u>AND REQUIRE NO PROOF</u>**

1.      Student Finance Corporation, or SFC, is a corporation that was located in New Castle, Delaware.  Student Finance Corporation has been in bankruptcy since June 5, 2002.  While in bankruptcy, the affairs of SFC are being directed by a trustee, Charles A. Stanziale, Jr.

2.      From the time it was formed in 1992 until its bankruptcy in 2002, SFC was in the business of making or originating loans to students at vocational schools (principally truck driving schools) and purchasing loans made directly by vocational schools to students.

3.      Plaintiff Royal Indemnity Company, or "Royal," is a Delaware insurance company with its main office in Charlotte, North Carolina.

4.      Wells Fargo Bank, N.A, formerly known as Wells Fargo Bank Minnesota, N.A., referred to as "Wells Fargo," is a banking association with its principal place of business in Minneapolis, Minnesota.

5.      From time to time, SFC would bundle the student loans and then sell them to Trusts.  The Trusts would then issue certificates to investors.  Payments to the investors on the certificates were backed by, among other things, the payment stream from the student loans.  These transactions were called "securitizations."

6.      As a first step in the securitization process, SFC obtained lines of credit usually from Wilmington Trust Company or PNC Bank.  SFC would use the money in the lines of credit from Wilmington Trust and PNC to fund the student loans.

7.      In the next step in the securitization process, SFC would sell the loans to special companies called SPVs, or Special Purpose Vehicles, that were created by SFC to hold the loans until enough loans existed that could be pooled together for a securitization.

8.     Once there were enough loans in the SPV, SFC would bundle the loans and then sell them to another SPV created by SFC where they were held in a Trust.  The Trust would sell certificates to investors that were backed by the pools of loans held in the various trusts.  SFC would receive money from the sale of the loans.

9.     SFC completed the following eight securitization transactions, collectively referred to as the "SFC Securitizations," between April 2000 and November 2001:

> a.  SFC Grantor Trust, Series 2000-1, closed April 19, 2000;
>
> b.  SFC Grantor Trust, Series 2000-2, closed August 17, 2000;
>
> c.  SFC Grantor Trust, Series 2000-3, closed October 7, 2000;
>
> d.  SFC Grantor Trust, Series 2000-4, closed December 18, 2000;
>
> e.  SFC Grantor Trust, Series 2001-1, closed April 24, 2001;
>
> f.  SFC Grantor Trust, Series 2001-2, closed August 17, 2001;
>
> g.  SFC Owner Trust, Series 2001-I, closed October 19, 2001; and
>
> h.  SFC Grantor Trust, Series 2001-3, closed November 15, 2001.

10.     Student Loan Servicing, LLC, or SLS, is a Delaware corporation located in New Castle, Delaware.  SLS, an affiliate of SFC, was responsible for servicing the student loans in the SFC programs and providing information on the performance and status of the SFC student loans to other companies involved in the SFC program.

11.     Pooling and Servicing Agreements, or "PSAs," were executed in connection with each of the SFC Securitizations, namely:

> a.  Pooling and Servicing Agreement Dated as of April 19, 2000 between Student Loan Servicing LLC, Servicer, SFC Acceptance II, LLC, Settlor, FINOVA Loan Administration Inc., Master Servicer, and Norwest Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2000-1;
>
> b.  Pooling and Servicing Agreement Dated as of August 16, 2000 between Student Loan Servicing LLC, Servicer, SFC Acceptance III, LLC, Settlor, and Wells

- 2 -

Fargo Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2000-2;

c.   Pooling and Servicing Agreement Dated as of October 6, 2000 between Student Loan Servicing LLC, Servicer, SFC Acceptance IV, LLC, Settlor, and Wells Fargo Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2000-3;

d.   Pooling and Servicing Agreement Dated as of December 18, 2000 between Student Loan Servicing LLC, Servicer, SFC Acceptance V, LLC, Settlor, and Wells Fargo Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2000-4;

e.   Pooling and Servicing Agreement Dated as of April 24, 2001 between Student Loan Servicing LLC, Servicer, SFC Acceptance VI, LLC, Settlor, and Wells Fargo Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2001-1;

f.   Pooling and Servicing Agreement Dated as of August 17, 2001 between Student Loan Servicing LLC, Servicer, SFC Acceptance VII, LLC, Settlor, and Wells Fargo Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2001-2;

g.   Servicing Agreement Dated as of October 1, 2001 between Student Loan Servicing LLC, Servicer, SFC Owner Trust 2001-I, Issuer, and Wells Fargo Bank Minnesota, National Association, Indenture Trustee, in connection with SFC Owner Trust, Series 2001-I;

h.   Pooling and Servicing Agreement Dated as of November 15, 2001 between Student Loan Servicing LLC, Servicer, SFC Acceptance VIII, LLC, Settlor, and Wells Fargo Bank Minnesota, National Association, Trustee, in connection with SFC Grantor Trust, Series 2001-3.

12.   Royal issued insurance policies that said Royal would pay the principal and 90 days interest if any student loan went into default within the meaning of the policy. Royal's policies covered loans that were in the SPVs or that were sold in the SFC Securitizations.

13.   The Royal polices are listed below:

a.   Policy No. RST 321276, effective January 22, 1999 with a liability limit of $75,000,000. Policy No. 321276 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and named Wilmington Trust as beneficiary.

b.   Policy No. RST 293334, effective January 22, 1999. On or about April 19, 2000, this Policy No. 293334 was issued to cover the GT 2000-1 securitization transaction. The insured under Policy No. 293334 was SFC Acceptance II, LLC,

- 3 -

the beneficiary originally was Norwest Bank Minnesota, N.A. (subsequently Wells Fargo Bank Minnesota, N.A.), and the policy was written to cover $50,000,000 in SFC student loans.

c.    Policy Number RST 293309, effective December 3, 1999.  Policy No. 293309 was originally issued in connection with warehouse loans obtained by SFC Financial I, LLC and SFC Financial II, LLC and named both Wilmington Trust and Market Street Funding Corporation ("MSFC"), a commercial paper conduit sponsored by PNC, as beneficiary.  On or about August 17, 2000, this policy was amended and restated to cover a securitization transaction.  As amended, the insured under Policy No. 293309 was SFC Acceptance III, LLC, the beneficiary was Wells Fargo, and the policy was written to cover $53,053,642.08 in SFC student loans.

d.    Policy Number RST 147522, effective April 30, 2000.  Policy No. 147522 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named both Wilmington Trust and MSFC as beneficiary.  On October 7, 2000, this policy was amended and restated to cover a securitization transaction.  As amended, the insured under Policy No. 147522 was SFC Acceptance IV, Wells Fargo was the beneficiary, and the policy was written to cover $48,459,255.76 in SFC student loans.

e.    Policy Number RST 147524, effective August 30, 2000.  Policy No. 147524 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named both Wilmington Trust and MSFC as beneficiary.  On December 16, 2000, this policy was amended and restated to cover a securitization transaction.  As amended, the insured under Policy No. 147524 was SFC Acceptance V, LLC, the beneficiary was Wells Fargo, and the policy was written to cover $29,999,999.94 in SFC student loans.

f.    Policy No. RST 147525, effective November 27, 2000.  Policy No. 147525 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named Wilmington Trust and MSFC as beneficiary.  On April 24, 2001, this policy was amended and restated to cover a securitization transaction.  As amended, the insured under Policy No. 147525 was SFC Acceptance VI, LLC, the beneficiary was Wells Fargo, and the policy was written to cover $55,616,550 in SFC student loans.

g.    Policy No. RST 147526, effective January 31, 2001.  Policy No. 147526 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named Wilmington Trust and MSFC as beneficiary.  On August 17, 2001, this policy was amended and restated to cover a securitization transaction.  As amended, the insured under Policy No. 147526 was SFC Acceptance VII, LLC, the beneficiary was Wells Fargo, and the policy was written to cover $48,286,713.44 in SFC student loans.

h.    Policy No. RST 147529, effective June 19, 2001.  Policy No. 147529 was issued in connection with a warehouse loan obtained by SFC Financial II, LLC from

PNC Bank, N.A.  The insured under Policy No. 147529 was SFC Financial II, LLC, the beneficiary was PNC Bank, N.A., and the policy was written to cover $150,000,000 in SFC student loans.

i.   Policy No. RST 147533, effective August 17, 2001.  Policy No. 147533 was issued in connection with a warehouse loan obtained by SFC Financial I, LLC from Wilmington Trust. The insured under Policy No. 147533 was SFC Financial I, LLC, the beneficiary was Wilmington Trust, and the policy was written to cover $5,518,459 in SFC student loans.

j.   Policy No. RST 147538, effective October 19, 2001.  The insured under Policy No. 147538 was SFC Acceptance IX, LLC, the beneficiary was Wells Fargo, and the policy was written to cover $100,000,000 in SFC student loans.

k.   Policy No. RST 147536, effective November 15, 2001.  The insured under Policy No. 147536 was SFC Acceptance VIII, LLC, the beneficiary was Wells Fargo, and the policy was written to cover $80,000,000 in SFC student loan.

14.   MBIA Insurance Corporation issued a "Certificate Guaranty Insurance Policy" that guaranteed scheduled payments to the purchasers of the trust certificates sold in each SFC Securitization.

15.   Moody's Investors Service and Fitch IBCA rated the trust certificates Aaa and AAA, respectively, in each of the SFC Securitizations.

16.   Wells Fargo was the Trustee of each of the Trusts described in paragraph 11 above. Wells Fargo executed and agreed to be bound by the terms of the PSAs described in paragraph 13 above.

17.   Wells Fargo, or a subcontractor to Wells Fargo called Finova Loan Administration, Inc., or "Finova", received or was supposed to receive weekly Tapes from SFC on or about the following dates for the following trusts:

| Date | GT Trust(s) |
|---|---|
| April 24, 2000 | GT 2000-1 |
| May 1, 2000 | GT 2000-1 |

| | | |
|---|---|---|
| May 8, 2000 | GT 2000-1 | |
| May 15, 2000 | GT 2000-1 | |
| May 22, 2000 | GT 2000-1 | |
| May 29, 2000 | GT 2000-1 | |
| June 5, 2000 | GT 2000-1 | |
| June 12, 2000 | GT 2000-1 | |
| June 19, 2000 | GT 2000-1 | |
| June 26, 2000 | GT 2000-1 | |
| July 5, 2000 | GT 2000-1 | |
| July 10, 2000 | GT 2000-1 | |
| July 21, 2000 | GT 2000-1 | |
| July 24, 2000 | GT 2000-1 | |
| July 31, 2000 | GT 2000-1 | |
| August 7, 2000 | GT 2000-1 | |
| August 14, 2000 | GT 2000-1 | |
| August 21, 2000 | GT 2000-1<br>GT 2000-2 | |
| August 28, 2000 | GT 2000-1<br>GT 2000-2 | |
| September 4, 2000 | GT 2000-1<br>GT 2000-2 | |
| September 11, 2000 | GT 2000-1<br>GT 2000-2 | |
| September 18, 2000 | GT 2000-1<br>GT 2000-2 | |
| September 25, 2000 | GT 2000-1<br>GT 2000-2 | |
| October 2, 2000 | GT 2000-1<br>GT 2000-2 | |
| October 9, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |

| | | |
|---|---|---|
| October 16, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| October 23, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| October 30, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| November 6, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| November 13, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| November 20, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| November 27, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| December 4, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| December 11, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| December 18, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3 |
| December 26, 2000 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| January 2, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| January 8, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| January 15, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| January 22, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| January 29, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| February 5, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| February 12, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| February 19, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| February 26, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| March 5, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| March 12, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| March 19, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |

| | | |
|---|---|---|
| March 26, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| April 2, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| April 9, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| April 16, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| April 23, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| April 30, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| May 7, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| May 14, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| May 21, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| May 28, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| June 4, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| June 11, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| June 18, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| June 25, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| July 2, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| July 9, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| July 16, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| July 23, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| July 30, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| August 6, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| August 13, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| August 20, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |
| August 27, 2001 | GT 2000-1 | GT 2000-3 |
| | GT 2000-2 | GT 2000-4 |

| | | |
|---|---|---|
| September 3, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| September 10, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| September 17, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| September 24, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| October 1, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| October 8, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| October 15, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| October 22, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |
| October 29, 2001 | GT 2000-1<br>GT 2000-2 | GT 2000-3<br>GT 2000-4 |

18.    After October 31, 2001, Finova no longer received weekly Tapes.  It was replaced as Wells Fargo's subcontractor by an affiliate of Wells Fargo, Wells Fargo Financial America, Inc.

19.    Wells Fargo Financial America, Inc. had already begun receiving weekly Tapes from SFC or its affiliate in August 2001, and continued to receive weekly Tapes through June 2002.  The weekly Tapes were received by the following Wells Fargo Financial employees on or about the following dates by the methods listed below:

| Date | GT Trust(s) | Method of Delivery | Employee |
|---|---|---|---|
| August 19, 2001 | GT 2001-1 | Electronic Mail | Dianna Turner |
| August 26, 2001 | GT 2001-1 | Electronic Mail | Dianna Turner |
| September 4, 2001 | GT 2001-1 | Electronic Mail | Dianna Turner |
| September 10, 2001 | GT 2001-1 | Electronic Mail | Dianna Turner |
| September 17, 2001 | GT 2001-1 | Electronic Mail | Dianna Turner |

- 9 -

| September 25, 2001 | GT 2001-1 | | Electronic Mail | Dianna Turner |
|---|---|---|---|---|
| October 1, 2001 | GT 2001-1 | | Electronic Mail | Dianna Turner |
| October 7, 2001 | GT 2001-1<br>GT 2001-2 | | Electronic Mail | Dianna Turner |
| October 15, 2001 | GT 2001-1<br>GT 2001-2 | | Electronic Mail | Dianna Turner |
| October 22, 2001 | GT 2001-1<br>GT 2001-2 | | Electronic Mail | Dianna Turner |
| October 29, 2001 | GT 2001-1<br>GT 2001-2 | | Electronic Mail | Dianna Turner |
| November 5, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2 | Electronic Mail | Dianna Turner |
| November 12, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2 | Electronic Mail | Dianna Turner |
| November 19, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2 | Electronic Mail | Cory Koester |
| November 26, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2 | Electronic Mail | Cory Koester |
| December 4, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2<br>GT 2001-3 | Electronic Mail | Cory Koester |
| December 10, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2<br>GT 2001-3<br>OT 2001-I | Electronic Mail | Cory Koester |
| December 17, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2<br>GT 2001-3<br>OT 2001-I | Electronic Mail | Cory Koester |
| December 27, 2001 | GT 2000-1<br>GT 2000-2<br>GT 2000-3<br>GT 2000-4 | GT 2001-1<br>GT 2001-2<br>GT 2001-3<br>OT 2001-I | Electronic Mail | Cory Koester |
| January 7, 2002 | GT 2000-1<br>GT 2000-2<br>GT 2000-3 | GT 2001-1<br>GT 2001-2<br>GT 2001-3 | Electronic Mail | Cory Koester |

|  | GT 2000-4 | OT 2001-I |  |  |
|---|---|---|---|---|
| January 14, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| January 22, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| January 28, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| February 4, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| February 11, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| February 19, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| February 25, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| March 4, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| March 12, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| March 18-19, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| April 2, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| April 10, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |

|  | GT 2000-3 | GT 2001-3 |  |  |
|---|---|---|---|---|
|  | GT 2000-4 | OT 2001-I |  |  |
| April 23, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| May 2, 2002 | GT 2000-1 | GT 2001-1 | Electronic Mail | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| May 7, 2002 | GT 2000-1 | GT 2001-1 | Compact Disk | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| May 14, 2002 | GT 2000-1 | GT 2001-1 | Compact Disk | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| May 21, 2002 | GT 2000-1 | GT 2001-1 | Compact Disk | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |
| June 4, 2002 | GT 2000-1 | GT 2001-1 | Compact Disk | Cory Koester |
|  | GT 2000-2 | GT 2001-2 |  |  |
|  | GT 2000-3 | GT 2001-3 |  |  |
|  | GT 2000-4 | OT 2001-I |  |  |

20. Wells Fargo received monthly Servicer Reports from SFC or its affiliate for the months and trusts listed below:

| Month | Trust(s) |
|---|---|
| April 2000 | GT 2000-1 |
| May 2000 | GT 2000-1 |
| June 2000 | GT 2000-1 |
| July 2000 | GT 2000-1 |
| August 2000 | GT 2000-1<br>GT 2000-2 |
| September 2000 | GT 2000-1<br>GT 2000-2 |
| October 2000 | GT 2000-1<br>GT 2000-2<br>GT 2000-3 |

| | | |
|---|---|---|
| November 2000 | GT 2000-1 | |
| | GT 2000-2 | |
| | GT 2000-3 | |
| December 2000 | GT 2000-1 | |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| January 2001 | GT 2000-1 | |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| February 2001 | GT 2000-1 | |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| March 2001 | GT 2000-1 | |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| April 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| May 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| June 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| July 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | |
| | GT 2000-3 | |
| | GT 2000-4 | |
| August 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | |
| | GT 2000-4 | |
| September 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | |
| | GT 2000-4 | |
| October 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | |

- 13 -

| November 2001 | GT 2000-1 | GT 2001-1 |
|---|---|---|
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | GT 2001-3 |
| December 2001 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | GT 2001-3 |
| January 2002 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | GT 2001-3 |
| February 2002 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | GT 2001-3 |
| March 2002 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | GT 2001-3 |
| April 2002 | GT 2000-1 | GT 2001-1 |
| | GT 2000-2 | GT 2001-2 |
| | GT 2000-3 | OT 2001-I |
| | GT 2000-4 | GT 2001-3 |

21.   Exhibit 81-II is a true and correct copy of several emails and loan transaction histories received by Marianna Stershic, Dianna Turner and James Willoughby on April 18, 2001, and includes Dianna Turner's handwritten notations made on or about that date or soon thereafter.

- 14 -

# EXHIBIT 1B

**Exhibit 1B to the Proposed Pretrial Order**

**STATEMENT OF FACTS THAT ARE ADMITTED
<u>AND REQUIRE NO PROOF</u>**

1.      Student Finance Corporation ("SFC") is a corporation that was located in New

Castle, Delaware.  Student Finance Corporation has been in bankruptcy since June 5, 2002.

Charles A. Stanziale, Jr. was appointed Chapter 7 Trustee of SFC.

2.      From the time it was formed in 1992 until its bankruptcy in 2002, SFC was in the

business of making or originating loans to students at vocational schools (principally truck

driving schools) and purchasing loans made directly by vocational schools to students.

3.      Pepper Hamilton LLP ("Pepper") is a law firm with its principal office in

Philadelphia, Pennsylvania.  Pepper also has an office in Wilmington, Delaware.  Pepper

represented SFC in various matters from 1996 through April 2002.

4.      W. Roderick Gagné ("Roderick Gagné") is a partner in the Pepper law firm and has

been since 1996.  Roderick Gagné office is in Pepper's Philadelphia office.  Roderick Gagné

represented SFC in various matters from approximately 1994 through April 2002.

5.      Maria DeCarlo, an employee of Pepper, was an Assistant Secretary of SFC from

1998 until her resignation from that position in May 2002.

6.      Pepper and Roderick Gagné represented Andrew Yao, the President of SFC, and his

wife Lore Yao, with respect to several matters.

7.      Pepper and Roderick Gagné formed Student Loan Servicing and Student Marketing

Services, affiliates of SFC, and represented them in several matters.

8.      Roderick Gagné is a trustee of the Elizabeth B. Brennan Trust, the Elizabeth B.

Brennan Trust #2 f/b/o Elizabeth L. Gagné, the Elizabeth B. Brennan Trust #2 f/b/o Philip B.

Gagné, the James T. Brennan Trust f/b/o Elizabeth L. Gagné, the James T. Brennan Trust f/b/o

Philip B. Gagné, and the James T. Brennan Trust f/b/o W. Roderick Gagné, and a beneficiary of the last trust.  These trusts are referred to as the Brennan Trusts.

9.    Pepper and Roderick Gagné represented the Brennan Trusts in various matters.

10.    Certain of the Brennan Trusts, Pamela Gagné (Gagné's wife), and Robert Bast (Gagné's uncle) were shareholders of SFC from February 2000 until January 2001.

11.    CEC Partnership L.P. changed its name to Premier Education Group, L.P. on or about October 4, 2001.

12.    CEC G.P., Inc. changed its name to Premier Education Group G.P., Inc. on or about October 4, 2001.

- 2 -

# EXHIBIT 2

**<u>Royal's Statement of Issues of Fact That Remain to be Litigated</u>**

1.    Whether SFC, SLS, Yao and/or the SFC Entities, in causing or helping SFC to make payments on behalf of students in order to mask the true default rates of the student loans, defrauded Royal.

2.    Whether Wells Fargo breached its contractual obligation under Section 8.19 of the PSAs for the Grantor Trusts and 6.17 of the Servicing Agreement to compare information contained on Tapes it alone received from SFC with information contained in the Servicer Reports provided to Royal (and others), and to notify Royal of the discrepancies between them concerning default ratios and delinquencies.

3.    Whether Wells Fargo breached its contractual obligation under Section 8.21 of the PSAs for the Grantor Trusts and 6.19 of the Servicing Agreement to verify that electronic loan servicing data balances conformed to trial balance reports received from the Servicer and to verify information contained in each Servicer Report using the data, which verifications if attempted would have revealed SFC's fraudulent self payments.

4.    Whether Wells Fargo's breaches of contract, including its failures to notify Royal and inform Royal of discrepancies, damaged Royal and, if so, the amount of those damages.

# EXHIBIT 3

**Royal's Statement Of Intended Proofs**

In this action Royal will show that SFC and its affiliated entities, including Andrew Yao, conducted a massive insurance fraud resulting in over $400 million in damages to Royal. Royal will show that SFC lied to Royal by reporting false default rates on SFC-issued student loans insured by Royal. SFC was required to report all student loan defaults once a student had failed to make a payment on a loan for 90 days. When a student loan defaulted, SFC was also required to make a claim on Royal's insurance. Instead of doing these things, when a student loan defaulted, SFC sometimes would pay on selected student loans so SFC could hide the default. SFC did this in order to make Royal and others believe that SFC's student loans overall were performing better than they really were. By lying to Royal in this way, SFC was able to convince Royal to continue issuing insurance on higher and higher numbers of SFC-issued student loans.

Royal will show that it was the beneficiary to eight, essentially identical, contracts entered into by Wells Fargo Bank, which was a trustee responsible for monitoring students' loan payments on their student loans. Under these contracts, Wells was supposed to review certain data provided by SFC which only Wells received. The differences between the payments SFC made to hide defaults and actual student payments stood out starkly in that data: a large percentage of the total payments each month were made on one day in the last week of the month, these payments were coded differently than normal student payments, and these payments mostly had no principal component, unlike almost all actual student payments. But Wells never bothered to look at this data. Had Wells done so, Wells would have known or learned that SFC was misleading Royal.

Finally, Royal will show that the actions of Wells, in breaching its agreement with Royal by failing to perform its duties, directly caused Royal damage.  Royal ultimately issued nearly $650 million in credit risk insurance policies and has been obligated to pay over $500 million in claims on those policies.  Royal will show that, because of the actions and inactions of Wells, Royal would not have issued most, or all, of those policies.  After adjustments for funds Royal has recovered from others involved with SFC, Royal's damages in this action exceed $400 million.

# EXHIBIT 4

<u>**Exhibit 4**</u>

<u>**Trustee's Statement of Issues of Fact that Remain to be Litigated**</u>

Plaintiff the Trustee expects to present the below issues of fact at trial.  Many of the issues presented are mixed issues of law and fact, and are therefore included in the Statement of Issues of Law to be Litigated as well.  The Trustee may also rely on the Statement of Issues of Fact submitted by Royal and Wells.

<u>**Issues Presented**</u>**:**

1.  Whether Gagné and the Family Defendants were insiders of SFC.

2.  Whether SFC was operated as a fraudulent endeavor akin to a Ponzi scheme.

3.  Whether  Gagné's conduct assisted Yao and SFC in that endeavor.

4.  Whether the Family Defendants' financial dealings with Yao and SFC were a part of that endeavor.

5.  Whether certain payments to the Family Defendants are voidable as  preferences.

6.  Whether SFC was insolvent at the time certain transfers were made to the Family Defendants.

7.  Whether certain payments to the Family Defendants were fraudulent conveyances under Bankruptcy Law.

8.  Whether certain payments to the Family Defendants were fraudulent conveyances under the applicable Pennsylvania statute.

9.  Whether the Trustee is entitled to prejudgment interest on any damages awarded against the Family Defendants.

# EXHIBIT 5

**EXHIBIT  5**

**The Trustee's Statement of Intended Proofs**

In this action, the Trustee will show that the Family Defendants were insiders of
SFC, and payments made to them in the one-year period prior to the bankruptcy should
be avoided as preferences.  In addition, several transfers of assets were fraudulent
conveyances and should also be avoided.

The Trustee intends to show that Gagné was an insider of SFC under the
Bankruptcy Code.  Because the Family Defendants' opportunities were all derivative of
Gagné's close relationship with SFC, Gagné acted on behalf of the Family Defendants in
dealing with SFC, and the Family realized benefits and perquisites that were not available
to others without the benefit of that relationship, transfers to the Family in the year prior
to the filing of bankruptcy should be avoided as preferences.

Gagné functioned as SFC's outside General Counsel.  The paralegal that worked
for him was the Assistant Secretary of SFC for years.  As such, she had authority to sign
corporate documents.  In addition, Gagné gave non-legal business advice to SFC, and he
and his family traveled on the SFC private jet.

The facts will show that Gagné knew about SFC's operations.  SFC took the
student loans that it originated or acquired and bundled them for sale as asset backed
securities.  Gagné and his law firm, Pepper Hamilton, represented SFC in the preparation
of the securitization documents and the preparation of school contracts.  One of the
reasons SFC was able to find investors for the securitizations was the high performance
of the student loans.  The Trustee further intends to show that the high performance of the
student loans was in large part due to the fact that SFC was taking money from recent

securitizations or from loans to make payments on the earlier student loans, and masking

the fact that it was SFC making the payments rather than the students. SFC called those

payments "forbearance payments." The Family Defendants' investments facilitated this

scheme. Without those payments, the loans would have gone into default and the scheme

would have collapsed.

     The Trustee will show that Gagné had good reason to know of the fraud at SFC.

He was the partner at Pepper Hamilton in charge of the representation and billed the work

the firm did for SFC and related entities, as well as for Yao personally. Pepper was paid

millions of dollars for the services provided to SFC, its related entities, and Yao, with all

of those fees accruing to the benefit of Gagné as the originating and billing partner.

When SFC was sued by Nielsen Electronics Institute, a trucking school that alleged that

SFC was engaged in a massive Ponzi scheme, Gagné and his partner Duncan Grant had

in Pepper files documents supporting Nielsen's claims that SFC was making payments

into securitizations on behalf of students. Gagné and Grant did not act on this

information with SFC.

     Gagné represented not only SFC but also Yao personally. He set up separate

companies, which he also represented. He was aware of Yao's diverting assets of SFC

through those separate companies.

     At the same time that Gagné was representing SFC, Gagné and his family

invested in SFC, for which Gagné prepared the documents. The Trustee will show that

the multiple representations, and his own interests, gave rise to conflicts of interest which

were never effectively waived.

As a shareholder, Gagné expressly ratified the actions of Yao and the other directors of SFC. Gagné did all of this, while protecting his own interests, as well as the interests of his family, to the detriment of SFC itself and its other creditors.

When SFC was unable to complete another securitization, Andrew Yao turned to Gagné and the Family Defendants, who advanced funds that Yao used to pay the next round of forbearance payments, again furthering the fraudulent scheme. As the company was unraveling in the spring of 2002, it was Gagné who, in response to an urgent request from Yao, put together the Family funds for SFC. Over that weekend in March, Gagné and the other Family Defendants, including Bast, who immediately flew back from Florida, came up with $3 million, which Yao used to fund the February forbearance payments that were made in early March.

Gagné and the other Family Defendants were involved with Yao in other investments, including Premier Education Group. When the fraud became known in the spring of 2002, and SFC could no longer continue acquiring loans or making forbearance payments, and bankruptcy was imminent, Gagné prepared documents that allowed Yao to transfer his valuable stock in Premier to the Family.

It was through their family relationship with Gagné that the Family Defendants, as a group, were able to take advantage of the excessive fees and preferred payments they received. Accordingly, they were insiders of SFC, and the more than $4 million that the Family received in payments during the twelve months prior to the filing of SFC's bankruptcy, when SFC was insolvent and operated as a fraudulent endeavor, are preferences under the Bankruptcy Code.

The Family Defendants bear the burden of proving the affirmative defenses they have asserted. The Trustee believes that they cannot meet that burden and the payments made to them in the year prior to bankruptcy cannot be shielded as payments in the ordinary course or as payments followed by new value.

The loans made by the Family Defendants to SFC in March 2002 do not constitute new value. In fact, they were part of a scheme devised by Yao to continue making the forbearance payments while he searched for new sources of funding. Yao needed the money and the Family came up with it but they did not do so at their own risk, as is required for the new value defense. Instead, they received security. Andrew Yao gave them his personal guaranty, secured by the assets of SFC. Yao later gave them a pledge of Premier stock – a security which took away any risk on the part of the Family. They were secure that they would be re-paid. The pledge of Premier stock and the Family Defendants' subsequent execution on it were done with the intent to shield that asset from other creditors of Yao, including SFC.

Similarly, the Family Defendants will fail in showing that payments they received in the year prior to filing of the bankruptcy were made in the ordinary course. First, payments made in furtherance of a fraud cannot be in the ordinary course. In addition, the conduct of the parties was not in the ordinary course, in that SFC gave the Family fees and rates that were well in excess of what the market would bear at the time and were not arms length, and transactions based on such excessive fees were not in the ordinary course.

The Trustee also intends to show that the Family Defendants received millions of dollars in fees on loans, pledges of stock, and redemption of stock in the years preceding

SFC's bankruptcy.  These payments constitute a fraudulent conveyance under the Pennsylvania Fraudulent Transfer Act ("PUFTA").

The Trustee intends to show that the redemption of SFC stock, made while the company was deeply insolvent, was a fraud on SFC's other creditors.  In 2000, the Family Defendants became shareholders of SFC.  Structuring the transaction as an equity investment, rather than as a loan, was part of a scheme devised by Yao to make SFC appear more creditworthy, and the Family Defendants participated.  Within a year, their stock was redeemed and they were paid $6.7 million.  At that time, the stock was in fact worthless because of SFC's insolvency.  Under PUFTA, those monies should be returned to the estate.

The payment by SFC of over $1 million in commitment fees was also a fraudulent conveyance.  SFC was insolvent at the time and was paying fees well in excess of the market rate, such that there was no reasonably equivalent value received by the company for those fees.

The Trustee will also prove that Andrew Yao's pre-SFC bankruptcy transfer of stock in Premier to the Family Defendants was intended to defraud the creditors of Yao, including SFC, by diverting a valuable asset away from the reach of the bankruptcy estate.  At the time of the pledge, bankruptcy of SFC was imminent and, as a result, the exposure of Yao to substantial claims also was imminent.  Yao made the pledge, and then later transferred the stock into the hands of the Family Defendants.  After the bankruptcy, the Trustee brought claims against Yao arising out of, inter alia, his diversion of assets from the estate.  Because of the criminal proceedings against Yao, the civil action has not

proceeded to judgment yet, but the claim remains pending, and SFC is a creditor of Yao, as that is defined under the PUFTA.

The Trustee's damages claims include the following:

Claims Against Family Defendants:

      A.     Fraudulent conveyance to the Family Defendants of Andrew Yao's stock in Premier Education Group G.P., Inc., DHP G.P., Inc., and One Summit Place G.P., Inc.

      B.     Overpayment of commitment fees to the Family Defendants in the amount of $1,018,500.

      C.     Fraudulent conveyance to the Family Defendants by redemption of SFC stock in the amount of $6,932,000.

      D.     Recovery of principal and interest payments to the Family Defendants within one year of filing petition for SFC's bankruptcy as follows:

| | |
|---|---|
| Pamela Gagné | $92,856.78 |
| Robert Bast | $2,486,596.94 |
| Elizabeth Brennan Trust | $81,369.86 |
| Elizabeth Brennan Trust FBO Gagné | $375,000.00 |
| Elizabeth Brennan Trust FBO Phillip Gagné | $268,583.00 |
| Elizabeth Brennan Trust FBO Elizabeth Gagné | $403,750.00 |
| James Brennan Trust FBO Gagné | $192,217.00 |
| James Brennan Trust FBO Phillip Gagné | $136,483.00 |
| James Brennan Trust FBO Elizabeth Gagné | $192,217.00 |
| Total: | $4,229,073.40 |

# EXHIBIT 6

**[Exhibit 6]**

**Wells Fargo's Statement of Issues of Fact that Remain to be Litigated**

Wells Fargo submits that there are no genuine issues of fact that would preclude the entry of summary judgment in its favor.  If the Court nonetheless conducts a trial in this action, Wells Fargo will introduce evidence concerning the matters listed below.  To the extent that any of the issues of law set forth by Wells Fargo in this pre-trial order may be considered issues of fact, Wells Fargo incorporates those issues by reference.

1.     Whether Wells Fargo breached any contractual obligation under Section 8.19 of the Pooling and Servicing Agreements ("PSAs") or Section 6.17 of the Servicing Agreement (collectively with the PSAs, the "Agreements").

2.     Whether Royal was a third party beneficiary of Section 8.21 of the PSAs or Section 6.19 of the Servicing Agreement, and if so, whether Wells Fargo breached any contractual obligations to Royal under those sections.

3.     Whether, even assuming Wells Fargo breached any provision of the Agreements in some actionable way, proper performance of such provision would have obliged Wells Fargo to discover and report to Royal SFC's program of forbearance payments.

4.     Whether Wells Fargo's alleged failure to discern and to report the numerical codes and loan payment patterns that Royal claims were indicative of forbearance payments was the but-for and proximate cause of any of Royal's losses.

5.     Whether the substantial causes of Royal's losses were the fraud by SFC and various trucking schools; Royal's failure to conduct minimally adequate due diligence; Royal's willful or reckless disregard of information it received that directly revealed the fact and amount

of SFC's forbearance payments; and the complicity of McGladrey & Pullen, and Pepper

Hamilton, in SFC's fraud.

      6.      Whether, the parties' agreement in each securitization that Wells Fargo would

serve as Trustee contemplated that, if Wells Fargo were to breach the contract, it would be liable

to indemnify Royal for losses that Royal might incur on new credit risk insurance policies that

Royal might choose to issue in the future in connection with different deals.

# EXHIBIT 7

**[Exhibit 7]**

**Wells Fargo's Statement of Defenses Intended to be Proven**

Though Royal bears the burden of proof on all issues, if Royal's counterclaim against Wells Fargo is not dismissed on summary judgment or at the close of Royal's case in chief, Wells Fargo will show that it met all of its obligations under the Agreements that Royal claims Wells Fargo breached; that Royal was not a party to any of the Agreements and was not a third party beneficiary of the back-up servicing provisions in those Agreements; and that Wells Fargo was not contractually obligated to make any comparison between monthly Servicer Reports and weekly back-up tapes, as Royal alleges. Wells Fargo's only obligations to Royal under any of the provisions Royal claims were breached was to compare certain electronic data that were to be transmitted by the loan servicer to Wells Fargo each month, with the same information contained in the servicer's corresponding monthly Servicer Report with respect to delinquencies, ratios and aggregate principal balances of the student loans; to check the monthly Servicer Reports for mathematical accuracy; and to report any unresolved discrepancies as to those items. Wells Fargo performed the required comparisons and mathematical checks, and there were no unresolved discrepancies to report.

Wells Fargo had no duty to analyze any of the weekly electronic data that Royal claims reflected SFC's forbearance payments, which data were not the data to be used to conduct the above-described monthly comparisons. Moreover, those weekly electronic data did not reveal forbearance payments and in any case did not reflect "discrepancies" with the monthly Servicer Reports within the meaning of the Agreements.

Further, Wells Fargo had no obligation to determine the source of any payment on any student loan. In this regard, its responsibility as Trustee was limited to assuring that any funds

received in payment of a student loan, from whatever source, were properly used to satisfy obligations to certificateholders and others, as specified in the Agreements. Wells Fargo discharged this obligation.

Wells Fargo will also show that its alleged failure to report unusual payment patterns that Royal claims were indicative of forbearance payments was neither the but-for cause, nor the proximate cause, of any of Royal's losses. Rather, those losses were caused by the fraud of Student Finance Corporation ("SFC") and various trucking schools as alleged by Royal; by Royal's failure to conduct minimally adequate due diligence before unilaterally taking on enormous risks, in many cases before Wells Fargo had undertaken to perform any contractual duties as Trustee at all; by Royal's willful or reckless disregard of information it received that directly revealed the fact and amount of SFC's forbearance payments, as compared with the alleged suggestive information on that subject that Wells Fargo purportedly should have discerned and reported to Royal; and by the complicity of the McGladrey & Pullen accounting firm and the Pepper Hamilton law firm in SFC's fraud. Wells Fargo will further show that Royal continued to issue the insurance policies at issue in this case even though it recognized that it had become embroiled in a type of Ponzi scheme being conducted by SFC. In doing so, Royal sought to keep the transactions at issue in operation until it could formulate and manage an exit strategy for itself. Thus, Royal's contention that it would have avoided its losses on the later policies if only Wells Fargo had brought SFC's conduct to its attention is false.

Wells Fargo will also show that, the parties' agreement in each securitization that Wells Fargo would serve as Trustee and undertake specific duties with respect to that securitization did not contemplate that, if Wells were to breach that contract, it would be liable to indemnify Royal for losses that Royal might incur on credit risk insurance policies that it might thereafter choose

2

to issue in connection with future warehouse loan facilities or securitizations.  As a matter of

settled law, Wells Fargo may not have any liabilities that were not within the contemplation of

the parties at the time of contracting.  Further, the PSAs expressly exempted Wells Fargo from

the liabilities Royal seeks to have imposed on Wells Fargo in this case.

# EXHIBIT 8

**Exhibit 8**

## FAMILY DEFENDANTS' STATEMENT OF
## <u>ISSUES OF FACT THAT REMAIN TO BE LITIGATED</u>

The following issues of fact remain to be litigated at trial. Most are mixed questions of fact and law and are also included in the Family Defendants' Statement of Issues of Law To be Litigated.

1.      Whether the Family defendants were insiders of SFC at the time of each challenged payment made by SFC during the period between 90 days and one year prior to the Filing Date.

2.      Whether the payments made by SFC to the Family defendants during the applicable period (either 90 days prior to the Filing Date or one year prior to the Filing Date if the Family defendants were insiders at the time of such payments) are subject to being avoided as preferences.

3.      Whether SFC was insolvent at the time of each such payment.

4.      Whether any or all of such payments were made in payment of a debt incurred by SFC in the ordinary course of business or financial affairs of SFC and the Family defendants, were made in the ordinary course of business or financial affairs of SFC and the Family defendants and were made according to ordinary business terms.

5.      Whether after any such payment to a Family defendant, that Family defendant gave new value to or for the benefit of SFC (a) not secured by an unavoidable security interest; and (b) on account of which new value SFC did not make an otherwise unavoidable transfer to or for the benefit of that Family defendant.

6.    Whether the challenged transfer by Yao of his stock in One Summit Place, GP, Inc., DHP, GP, Inc. and Premier Education Group GP, Inc. to certain of the Family defendants was made with actual intent to hinder, delay or defraud other creditors of Yao.

7.    Whether at the time of the challenged transfer, Yao owed approximately $7 million to the Family defendants to whom the transfer was made.

8.    Whether those Family defendants who received the challenged transfer received the transfer in good faith and for a reasonably equivalent value.

9.    What was the fair market value on or about June 14, 2002, of the stock in One Summit Place, GP, Inc., DHP, GP, Inc. and Premier Education Group GP, Inc. that Yao transferred to certain Family defendants.

# EXHIBIT 9

**Exhibit 9**

## FAMILY DEFENDANTS' STATEMENT OF INTENDED PROOFS

It will be the Trustee's burden to prove, by clear and convincing evidence, that Andrew Yao conveyed his stock in One Summit Place, GP, Inc., DHP, GP, Inc. and Premier Education Group GP, Inc. ("GP stock") to certain of the Family defendants with fraudulent intent. The Family defendants do not believe that the evidence will show fraudulent intent even by a preponderance of the evidence, let alone by clear and convincing evidence. Therefore, the Family defendants do not believe that they will be required to present any affirmative defenses as to this claim.

However, the Family defendants can readily prove that they received the GP stock in good faith and for reasonably equivalent value. The GP stock at issue was stock of the general partners of three limited partnerships, Premier Education Group LP (formerly CEC Partnership LP), One Summit Place Partners LP and Day Hill Partners LP. Premier operated several vocational schools; Day Hill and One Summit owned real estate at which some of Premier's operations were located. Bast and certain of the Brennan Trusts had been limited partners in Premier since its formation in 1993, and in One Summit and Day Hill since their formation in 1994 and 1996, respectively. The general partner of each of these partnerships was a corporation whose stock was owned by Yao. Under the partnership agreements, the general partners of One Summit and Day Hill each had a 1/3 interest in partnership distributions. In Premier, the general partner had an interest in partnership distributions ranging from 5% to 40%; increase of the percentage above 5% depended upon the limited partners receiving certain returns on their capital contributions.

The Family defendants made substantial capital contributions and loans to these partnerships, particularly to Premier. By 2002, their investment totaled over $7.5 million (more than $4 million in equity and the remainder in outstanding loans). Other than interest payments, the Family defendants, by 2002, had received virtually no return on their investments in these partnerships. Although they were hopeful that their nine years of investment in Premier would eventually provide a reasonable return, they had no assurance that it would do so.

From 1995 to 1998, the Family defendants purchased subordinated debentures totaling $3 million from SFC. SFC's obligations under each debenture were personally guaranteed by Yao. From 1998 to 2002, the Family defendants made a number of short term bridge loans to SFC. These, too, were personally guaranteed by Yao and, in some instances, his wife. In the spring of 2002, all of the debentures were still outstanding, as were $3.3 million in bridge loans that were made by certain of the Family defendants on March 5, 2002, and $676,000 of a $3 million loan that Bast made to SFC in 1999. In principal alone, SFC owed the Family defendants almost $7 million.

SFC defaulted on these loans, first by failing to provide the collateral required under the loan agreements for the March 2002 loans and then, in May 2002, by failing to make interest payments. After the first default, Yao pledged the GP stock as collateral to partially secure his obligations under the guaranties. Although the Family defendants did not believe that the GP stock was worth anywhere near the amount that SFC owed them under the loan agreements, they accepted Yao's pledge and took no further action at the time. Already facing the possibility of losing the money they had lent to SFC, the Family defendants saw the pledge of the GP stock as a way at least to protect their substantial investments in Premier, One Summit and Day Hill. They also believed that any other creditors of Yao would prefer his other assets to the GP stock,

since this stock was not liquid, marketable or readily transferable to anyone outside the partnership. After the second default, the Family defendants exercised their right under the loan agreements to accelerate the maturity date of the debt, proceed against the guarantor and execute against the GP stock that they held as collateral for Yao's guaranties. In short, the Family defendants did nothing more than enforce their rights as creditors, properly and in good faith, under the loan agreements and guaranties.

Since they had received virtually no return on their investments in the partnerships, the Family defendants reasonably believed, at the time they received the GP stock, that it was worth far less than the $7 million that Yao owed them. In fact, based on expert analysis, this belief was correct: the Family defendants' experts have determined that the fair market value of the GP stock on the transfer date was only $2.3 million. Moreover, the transfer was made under Assignment and Acceptance Agreements with Yao, under which the Family defendants transferred to Yao the SFC loan agreements and debt instruments that were in default. Under the Assignment and Acceptance Agreements, if the GP stock were sold and the amount received was less than the principal, accrued interest and fees due under the loan agreements, the Family defendants would be entitled to the shortfall from Yao; if the amount received was more than the amount due under the loan agreements, Yao would be entitled to the excess. These facts demonstrate conclusively that the Family defendants gave reasonably equivalent value for the GP stock that Yao transferred to them and acted with good faith intent to insure that they would receive nothing more than they were owed by Yao under his guaranties.

The Family defendants also intend to prove that, if Yao had not transferred his stock in Premier Education Group GP to them in 2002, they would have been able to terminate his rights under the partnership agreement in 2003, when they discovered that he had misappropriated

funds from Premier. In addition, the Family defendants will show that they have rights to setoff and recoupment against any amounts that the Trustee contends he is entitled to recover. Further, the Family defendants will show that the Trustee's claims are barred, at least in part, by the statute of limitations, because their execution on the GP stock constituted the enforcement of a security interest granted by the 1995, 1997 and 1998 debentures, which interest is outside the statutory limitations period.

With regard to the Trustee's asserted preference claims for payments made by SFC to the Family defendants between 90 days and one year before the Filing Date, it is the Trustee's burden to prove that each Family defendant to whom a transfer was made was an insider of SFC at the time of the challenged transfer. Hundreds of hours of deposition testimony have not produced a shred of evidence to support this contention, and the Family defendants do not believe the Trustee can meet his burden of proof on this issue. Even if he could meet his burden, the Family defendants will be able to show that of the $4,229,093 paid by SFC to the Family defendants in the year before the Filing Date, the Trustee is precluded by the new value defense from avoiding all but $952,239, because the loans totaling $3.3 million made by the Family defendants to SFC on March 5, 2002 constitute new value under section 547(c)(4) of the Bankruptcy Code. Although payments to a debtor that are secured by an otherwise unavoidable security interest do not constitute new value, the security interests for the $3.3 million that the Family defendants were entitled to receive under the loan agreements were never provided by SFC, and thus were never perfected. Therefore, this exception to the new value defense does not apply.

Further, the Family defendants intend to show that all allegedly preferential payments made to them by SFC – both in the 90 days and in the one year preceding the Filing Date – were

made in the ordinary course of business of SFC and the Family defendants and are therefore not avoidable by the Trustee under section 547(c)(2) of the Bankruptcy Code. All payments made by SFC were for debts incurred in the ordinary course of business between SFC and the Family defendants, and all payments were made in the ordinary course of business between them. The bridge loans that were made and repaid in the one year before the Filing Date were completely consistent with the course of dealings between the parties extending back to 1998. The loan terms such as interest rates and commitment fees were the same as prior bridge loans. Further, consistent with the loan agreements and with the parties' prior dealings, the bridge loans were repaid when SFC obtained other, more permanent financing, and the commitment fees and accrued interest on the loans were paid at that time. The Family defendants will also show that all interest payments made by SFC to the Family defendants on the debentures were entirely consistent with the interest payments that had been made as far back as 1995 to 1997, when the debentures were purchased. In short, nothing that occurred in the 90 days or one year before the Filing Date with regard to the Family defendants' making of loans to SFC, or SFC's payment of interest and fees on the loans and repayment of principal, was out of the ordinary in any way.

Finally, as regards the last prong of the ordinary course defense, the Family defendants will show that all payments by SFC to the Family defendants were made according to ordinary business terms. The credit terms between the parties were within industry norms, and in accord with the parties' six year relationship. Therefore, the ordinary course of business defense is applicable to all payments that the Trustee contends were preferential, and the payments cannot be avoided by the Trustee.

EXHIBIT 10

**Exhibit 10**

This Court has already issued a ruling rejecting Wells' motion to dismiss Royal's breach of contract counterclaim. (02-1294 D.I. 252.) Only the issues of law listed below need to be resolved before or after trial. To the extent that any issues of fact set forth in Exhibit 2 of the Joint Pretrial Order may be considered issues of law, or any motions in limine that Royal files may be considered issues of law, Royal incorporates those portions of Exhibits 2 and 23 by reference.

Royal has provided exemplary legal citations in support of each issue of law. Royal expressly reserves the right to cite additional legal support, if appropriate.

**<u>Issue of Law For Summary Judgment</u>**

Royal has moved for summary judgment against Wells Fargo on the following issue of law:

> Whether Minnesota's canons of construction governing the interpretation of contracts foreclose a contracting party from altering the plain meaning of an unambiguous contract where doing so means ignoring a defined term in the contract, would render certain contractual terms meaningless, and the evidence supporting such alteration consists of that party's unexpressed intent.

> *Environmental Prods. Corp. v. King Cos.,* 47 F.3d 1164, 1995 WL 81740 (4th Cir. Feb. 21, 1995)
> *Indianhead Truck Line, Inc. v. Hvidsten Transp., Inc*, 128 N.W.2d 334 (Minn. 1964)
> *Current Tech. Concepts, Inc. v. Irie Enters., Inc.,* 530 N.W.2d 539 (Minn. 1995)
> *Diffley Square Partners LLP v. Roberts*, No. C3-97-1328, 1998 WL 2425 (Minn.App. Jan. 6, 1998)
> *Transclean Corp. v. Motorvac Techs., Inc.*, No. Civ. 01-287 JRT/FLN, 2002 WL 31185886(D.Minn. Sept. 30, 2002)

**Post-Trial Issues Of Law**

Whether Royal is entitled to prejudgment interest on any damages
awarded against Wells Fargo.

19 Del. C. § 1103

*Tekstrom Inc.  v. Savla*, 2005 WL 3589401 (Del.Ct.Com.Pl. Nov.
2, 2005)

# EXHIBIT 11

<u>**EXHIBIT  11**</u>

<u>**Trustee's Statement of Issues of Law that Remain to be Litigated**</u>

Plaintiff the Trustee expects to present the below listed issues of law at trial.  To the extent that any issues of fact set forth in Statement of Issues of Fact of the Joint Pretrial Order may be considered issues of law, the Trustee incorporates those portions by reference.

The Trustee has provided legal citations in support of each issue of law.  The Trustee expressly reserves the right to cite additional legal support, if appropriate.

**Issues of Law to be Presented**:

1.  Whether Gagne and the Family Defendants were insiders of SFC.

> 11 USCS § 101
>
> <u>In re Student Finance Corp.</u>, 335 B. R. 539 (D. Del. 2005)
>
> <u>In re Broumas</u>, 1998 U.S. App. LEXIS 3070 (4th Cir. 1998)
>
> <u>In re Demko</u>, 264 B.R. 404 (Bankr. W.D. Pa. 2001)
>
> <u>Official Comm. of Unsecured Creditors v. Shapiro</u>, 2001 U.S. Dist. LEXIS 18734
>
>> (E.D. Pa. 2001)

2.  Whether certain payments to the Family Defendants are voidable as  preferences.

> 11 USCS § 101
>
> 11 USCS § 547

3.  Whether certain payments to the Family Defendants were fraudulent conveyances under Bankruptcy Law.

> 11 USCS § 544
>
> 11 USCS § 548
>
> 11 USCS § 550

4.  Whether certain payments to the Family Defendants were fraudulent conveyances under

the applicable Pennsylvania statute.

12 Pa. C.S. § 5101-5119

5.  Whether the Trustee is entitled to prejudgment interest on any damages awarded against

the Family Defendants.

Tekstrom, Inc. v. Savla, 2005 WL 3589401 (Del.Ct.Com.P. Nov. 2, 2005)

EXHIBIT 12

**[Exhibit 12]**

**Wells Fargo's Statement of Issues of Law that Remain to be Litigated**

To the extent that any of the issues of fact set forth by Wells Fargo in this pre-trial order may be considered issues of law, Wells Fargo incorporates those issues by reference.

1.       Whether Section 8.19 or Section the PSAs or Section 6.17 of the Servicing Agreement required Wells Fargo to compare monthly Servicer Reports to weekly electronic data.

2.       Whether Royal is a third party beneficiary of Section 8.21 of the PSAs or Section 6.19 of the Servicing Agreement.

3.       Whether any of the Agreements required Wells Fargo to analyze weekly data from SFC to determine the meaning of numerical transaction codes or to discern and report to Royal anything about the sources or patterns of payments on student loans.

4.       Whether, even assuming that it could be discerned from some weekly data that certain loan payments had not been made by students, a "discrepancy" within the meaning of the Agreements could ever arise on that basis, where, in accordance with the requirements of the Agreements, the monthly Servicer Reports contained only aggregate payment data for the month on all loans, and contained no information at all about the source of loan payments.

5.       Whether Section 8.21 of the PSAs or Section 6.19 of the Servicing Agreement required Wells Fargo to use any weekly data to verify any information in the monthly Servicer Reports or to verify payment data against any loan balances in any trial balance reports.

6.       Whether Wells Fargo could be held liable, if it had breached an administrative duty in one securitization, for losses Royal incurred on new insurance policies it chose to issue in connection with subsequent warehouse loan facilities or securitizations.

7.      Whether Wells Fargo could be held liable, if it had breached its monitoring duties under Section 8.21, where Section 8.20 provides that "The Trustee…shall monitor the performance of the Servicer on behalf of the Certificateholders as set forth in <u>Section 8.21</u> hereof; provided, however, that the Trustee shall not have any liability in connection with the malfeasance or nonfeasance by the Servicer or for monitoring the Servicer."

8.      Whether the PSAs exempt Wells Fargo from the liabilities that Royal seeks to have imposed on it in this case.

9.      Whether, even assuming Wells Fargo otherwise had any liability to Royal, any such purported liability should be reduced by Royal's recoveries to date, and by Royal's future recoveries, from others.

# EXHIBIT 13

**Exhibit 13**

**FAMILY DEFENDANTS' STATEMENT OF
ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

The following issues of law remain to be litigated at trial. Most are mixed questions of fact and law and are also included in the Family Defendants' Statement of Issues of Fact To be Litigated.

1.    Whether Roderick Gagné and the Family defendants were insiders of SFC under section 101(31)(B) of the Bankruptcy Code at the time of each challenged payment made by SFC during the period between 90 days and one year prior to the Filing Date.

Bankruptcy Code § 101(31)(B), 11 U.S.C. §101(31)(B).

*Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820 (Bankr. D. Del. 2006).

*Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234 (Bankr. D. Del. 2005).

2.    Whether the payments made by SFC to the Family defendants during the applicable period (either 90 days prior to the Filing Date or one year prior to the Filing Date if the Family defendants were insiders at the time of such payments) are subject to being avoided as preferences.

Bankruptcy Code § 547(b)(4), 11 U.S.C. § 547(b)(4).

Bankruptcy Code § 547, 11 U.S.C. § 547.

3.    Whether SFC was insolvent at the time of each such payment.

Bankruptcy Code, § 547(b)(3), 11 U.S.C. § 547(b)(3).

Bankruptcy Code, § 101(32)(A), 11 U.S.C. § 101(32)(A).

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (1991)

4.      Whether any or all of such payments were made in payment of a debt incurred by

SFC in the ordinary course of business or financial affairs of SFC and the Family defendants,

were made in the ordinary course of business or financial affairs of SFC and the Family

defendants and were made according to the ordinary business terms.

> Bankruptcy Code § 547(c)(2), 11U.S.C. § 547(c)(2).
>
> *Hechinger Inv. Co. v. Universal Forest Prods., Inc.*, 489 F.3d 568 (3d Cir. 2007).
>
> *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.*), 18 F.3d 217 (3d Cir. 1994).
>
> *HL1 Creditor Trust v. Metal Techs. Woodstock Corp. (In re Hayes Lemmerz Int'l, Inc.*), 339 B.R. 97 (Bankr. D. Del. 2006).
>
> *Safety-Kleen Creditor Trust v. Eimco Process Equip. Co. (In re Safety-Kleen Corp.*), 331 B.R. 591 (Bankr. D. Del. 2005).
>
> *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.*), 320 B.R. 541 (Bankr. D. Del. 2004).

5.      Whether after any such payment to a Family defendant, that Family defendant

gave new value to or for the benefit of SFC (a) not secured by an unavoidable security interest;

and (b) on account of which new value SFC did not make an otherwise unavoidable transfer to or

for the benefit of that Family defendant.

> Bankruptcy Code § 547(c)(4), 11 U.S.C. § 547(c)(4).
>
> *New York City Shoes, Inc .v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.),* 880 F.2d 679 (3d Cir. 1989).
>
> *Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.*), 185 F.3d 329 (5th Cir. 1999).
>
> *In re Kroh Brothers*, 930 F.2d 648 (8th Cir. 1991).
>
> *Maxwell v. Begler (In re March First, Inc.),* Case No. 01 B 24742, Adv. No. 03 A 241, 2007 Bankr. LEXIS 2513, at *13-16 (Bankr. N.D. Ill. July 20, 2007).

*Intercontinental Polymers, Inc. v. Equistar Chems., LP*, 359 B.R. 868 (Bankr. E.D. Tenn. 2005).

*In re Formed Tubes, Inc.*, 46 B.R. 645 (Bankr. E.D. Mich. 1985).

6.    Whether, by clear and convincing evidence, Yao transferred his stock in One

Summit Place, GP, Inc., DHP, GP, Inc. and Premier Education Group, GP, Inc. to certain of the

Family defendants with actual intent to hinder, delay or defraud his creditors.

Pennsylvania Uniform Fraudulent Transfers Act § 5104.

*Lichtenstein v. MBNA Am. Bank* (*In re Computer Personalities Sys. Inc.*), 284 B.R. 415 (Bankr. E.D. Pa. 2002).

*Protocomm Corp. v. Novell Advanced Services, Inc.*, 171 F. Supp.2d 459 (E.D. Pa. 2001.

*Erie Marine Enters., Inc. v. Nationsbank, N.A.* (*In re Erie Marine Enters., Inc.*), 216 B.R. 529 (W.D. Pa. 1998).

*Provident Life & Accident Ins. Co. v. Gen Syndicators of Am.* (*In re Laramie Assoc.*), No. 97-3135, 1997 U.S. Dist. LEXIS 14170 (E.D. Pa. Sept. 8, 1997)

*Morse Operations, Inc. v. Goodway Graphics of Va., Inc.* (*In re Lease-A-Fleet, Inc.*), 155 B.R. 666 (Bankr. E.D. Pa. 1993).

*Beard v. DeVito* (*In re DeVito*), 111 B.R. 529 (Bankr. W.D. Pa. 1990).

*Schaps v. Just Enough Corp.* (*In re Pinto Trucking Serv., Inc.*), 93 B.R. 379 (Bankr. E.D. Pa. 1988).

*Commonwealth Nat'l Bank v. Miller*, 437 A.2d 1012, 1014 (Pa. Super. 1981).

7.    Whether the Family defendants who received the challenged transfer received the

transfer in good faith and for a reasonably equivalent value.

Pennsylvania Uniform Fraudulent Transfers Act § 5108(a).

Pennsylvania Uniform Fraudulent Transfers Act § 5108(a), comment (6).

*In re Burry*, 309 B.R. 130 (Bankr. E.D. Pa. 2004).