## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                              :
STUDENT FINANCE CORPORATION,                        :
                              Debtor.               :
                                                    :        CIVIL ACTION No. 04-1551 (JJF)
_____             :
CHARLES A. STANZIALE, JR.,                          :
CHAPTER 7 TRUSTEE OF STUDENT                        :
FINANCE CORPORATION,                                :
                                                    :
                              Plaintiff,            :
            v.                                      :
                                                    :
PEPPER HAMILTON LLP, et al.,                        :
                                                    :
                              Defendants.           :
_____             :

## THE FAMILY DEFENDANTS' MOTION IN LIMINE NO. 3 TO
## PRECLUDE THE TESTIMONY OF MARTIN LIEBERMAN

For the reasons set forth in the accompanying memorandum, defendants Robert L.

Bast, Pamela Bashore Gagné, the Brennan Trusts and W. Roderick Gagné as Trustee of the

Brennan Trusts (the "Family defendants") respectfully move this Court to enter an Order in the

form attached hereto granting the Family defendants' Motion In Limine No. 3 to Preclude the

Testimony of Martin Lieberman.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Dated: October 4, 2007                      _____
                                            KAREN LEE TURNER (No. 4332)
                                            BRYA M. KEILSON (No. 4643)
                                            300 Delaware Avenue, Suite 1210
                                            Wilmington, DE 19801
                                            Telephone: (302) 425-0430
                                            Fax:    (302) 425-0431
                                            E-mail:kturner@eckertseamans.com

Neil G. Epstein
Carol L. Press
Charles F. Forer
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone: (215) 851-8400
Fax:    (215) 851-8383

Attorneys for Defendants Robert L. Bast, Pamela
Bashore Gagné, the Brennan Trusts and W.
Roderick Gagné, as Trustee of the Brennan Trusts

M0612632

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:                                              :
STUDENT FINANCE CORPORATION,                         :
              Debtor.                        :
_____             :     CIVIL ACTION No. 04-1551 (JJF)
CHARLES A. STANZIALE, JR.,                            :
CHAPTER 7 TRUSTEE OF STUDENT                          :
FINANCE CORPORATION,                                 :
                                                    :
              Trustee,                       :
     v.                                      :
                                                    :
PEPPER HAMILTON LLP, et al.,                          :
                                                    :
              Defendants.                    :
_____             :

## MEMORANDUM OF LAW IN SUPPORT OF THE
## FAMILY DEFENDANTS' MOTION IN LIMINE NO. 3 TO
## PRECLUDE THE TESTIMONY OF MARTIN LIEBERMAN

Dated: October 4, 2007

KAREN LEE TURNER (No. 4332)
BRYA M. KEILSON (No. 4643)
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801
Telephone: (302) 425-0430
Fax:      (302) 425-0431
E-mail:   kturner@eckertseamans.com

Neil G. Epstein
Carol L. Press
Charles F. Forer
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone: (215) 851-8400
Fax:   (215) 851-8383

Attorneys for Defendants Robert L. Bast,
Pamela Bashore Gagné, the Brennan Trusts
and W. Roderick Gagné, as Trustee of the
Brennan Trusts

## I.    INTRODUCTION.

In Count VII of the First Amended Complaint, the Trustee seeks to avoid transfers of stock in three entities (each of which were the corporate general partner in limited partnerships in which certain Family defendants were limited partners) by Andrew Yao ("Yao"), CEO of SFC, to certain Family defendants. One of the relevant issues in the Trustee's fraudulent transfer claim is the fair market value on the date of transfer of the stock in Premier Education Group GP, Inc. ("PEG GP") that Yao transferred. The Trustee has proffered Martin Lieberman, ASA ("Lieberman"), to give an opinion valuing a 100% equity interest in Premier Education Group, LLP ("Premier") as of March 31, 2002.[1]

Lieberman's testimony will not be helpful to, and indeed will serve only to confuse, the determination of this material fact for two separate and independent reasons. First, as reflected in his deposition testimony, Lieberman did not use a reliable methodology in reaching his conclusions because he admittedly (a) did not use his own "real world" methodology; (b) failed to follow generally accepted business-valuation principles and methodologies; and (c) failed to take into account an important revenue recognition policy which resulted in a $21.6 million change in retained earnings and profoundly affected the key financial ratios used in the valuation methodology. Moreover, Lieberman valued the wrong asset – a 100% interest in Premier – and not Yao's stock in PEG GP, the sole asset that Yao transferred.

## II.    BACKGROUND FACTS.[2]

### A.    Premier.

Premier (formerly named CEC Partnership LP) was formed as a limited partnership in 1993. Premier's business is the operation of vocational schools. As set forth in

---

[1] Mr. Lieberman's report is attached hereto as Exhibit A.

[2] The facts herein are recited in greater length in the Memorandum of Law in Support of the Family Defendants' Motion for Summary Judgment

the Premier Limited Partnership Agreement dated February 1, 1993,[3] the limited partners of

Premier were Robert Bast ("Bast") and the Elizabeth Brennan Trust; the corporate general

partner was PEG GP (formerly named CEC GP, Inc.). Yao owned the stock of PEG GP. At the

time the partnership was formed, the partners' respective interest percentage was PEG GP, Inc.

5%; Bast 47.5%; and the Elizabeth Brennan Trust 47.5%.

The Premier Limited Partnership Agreement contained a formula for distribution

of cash from operations and sale of assets and dispositions, including the sale of all assets and

liquidation, which treated the general partner and the limited partners differently. Exh. B,

pp. 31-35. Under the formula, the general partner's percentage interest in distributions ranged

from 5% to 40%; an increase of the distribution percentage above 5% depended upon the limited

partners receiving certain returns on their capital contributions. The Premier Limited Partnership

Agreement also contained restrictions on transfer of partnership interests and provided that the

general partner could not transfer its interest in the limited partnership, except with the prior

consent of the limited partners holding a majority of the partnership interests. Exh. B, pp. 49-50.

**B.     The Family Defendants' Loans to Student Finance Corporation.**

From 1995 through 2001, the Family defendants made a number of loans to

Student Finance Corporation ("SFC"). As of April 2002, all of the loans had been repaid, except

for $3 million in debentures, $3.3 million in bridge loans made in March 5, 2002, and $676,000

owed to Bast on a prior loan. The total amount of these outstanding loans was $6.976 million.

Each of the loans to SFC was personally guaranteed by Yao and in some cases by his wife, Lore

Yao. The loan documents and Yao's guaranties are included in a stipulation of authenticity to be

entered into by the Trustee and the Family defendants.

---

[3] Relevant portions of the Premier (formerly CEC) Limited Partnership Agreement are attached hereto as Exhibit B.

**C.    SFC's Default and Yao's Pledge of Premier Education Group GP, Inc. Stock.**

Toward the end of April 2002, there was an event of default under the loan agreements, since SFC failed to provide the collateral under the loan documents. This event of default made Yao liable for the obligations of SFC to the Family defendants under the express terms of Yao's guaranties. On May 5, 2002, Yao pledged his stock in PEG GP, One Summit Place GP, Inc. and DHP GP, Inc. to certain of the Family defendants pursuant to a Pledge Agreement. Yao pledged this stock as collateral to partially secure his obligations under his personal guaranties.

In May 2002, SFC again defaulted under the loan agreements by failing to make interest payments. As of June 14, 2002, the defaults remained uncured. Accordingly, certain of the Family defendants who were lenders on the outstanding debt sent notice that the were exercising their right under the loan agreements to accelerate the maturity date of the debt and to proceed against the guarantor. On that date, those Family defendants executed against the guaranties and Yao, in order to partially satisfy his obligations under his guaranties, agreed to transfer his stock in Premier Education Group GP, Inc., One Summit Place GP, Inc. and DHP GP, Inc. to those Family defendants. In connection with the Family defendants' execution against the stock in these three entities, the Family defendants and Yao entered into a series of Assignment and Acceptance Agreements dated as of June 14, 2002, under which Yao transferred the stock in these three entities to the Family defendants and the Family defendants assigned to Yao the SFC loan agreements and debt instruments then in default.

III.   **ARGUMENT.**

   A.   **The Principles Governing Expert Testimony.**

Under Rule 702 of the Federal Rules of Evidence, <u>Daubert v. Merrell Dow</u>

<u>Pharmaceutical, Inc.</u>, 509 U.S. 579, 580 (1993), and well established Third Circuit law, the trial

court as a "gatekeeper" bars expert testimony that is unreliable or not relevant. The trial court's

role, in ensuring the reliability and relevancy of expert testimony, is as follows:

> It is to make certain that an expert, whether basing testimony upon
> professional studies or personal experience, employs in the courtroom the
> same level of intellectual rigor that characterizes the practice of an expert
> in the relevant field.

<u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

Rule 702 places three prerequisites on the admissibility of expert testimony:

qualifications, reliability and fit. <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir.

2003); <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 741 (3d Cir. 2000). The party offering the expert

testimony has the burden of establishing that the proffered expert testimony satisfies each of

these three requirements. <u>Padillas v. Stork-Gamco, Inc.</u>, 186 F.3d 412, 418 (3d Cir. 1999).

In determining whether an expert employs a reliable methodology, "the expert's

opinion must be based on the 'methods and procedures of science' rather than on 'subjective

belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." <u>In</u>

<u>re Paoli R.R. Yard PCB Litigation</u>, 35 F.3d 717, 742 (3d Cir. 1994) ("<u>Paoli II</u>"). These

requirements apply to both scientific expertise and technical knowledge. <u>Kumho Tire Co., Ltd.</u>

<u>v. Carmichael</u>, 526 U.S. 137, 149 (1999). Courts routinely have excluded expert testimony

where the expert did not employ a reliable methodology. <u>See, e.g.</u>, <u>Oddi v. Ford Motor Co.</u>, 234

F.3d 136, 156 (3d Cir. 2000) (the expert did not employ any methodology at all); <u>Fedor v.</u>

<u>Freightliner, Inc.</u>, 193 F. Supp.2d 820, 830 (E.D. Pa. 2002) (conclusions not based on a

4

discernable methodology). This same level of intellectual rigor applies to experts who propose to present testimony on economic, accounting and valuation issues. See, e.g., Elcock v. Kmart Corp., 233 F.3d 734, 754-55 (3d Cir. 2000); In re: Nellson Nutraceutical, Inc., 356 B.R. 364 (D. Del. 2006) ("Where an expert ... fails to consider relevant facts in reaching a conclusion the expert's opinion can offer no assistance to the trier of fact and is excluded as irrelevant."). If the Court concludes the studies or data upon which the expert relied are insufficient to support the expert's conclusions, the Court has a duty to close the gate on the admission of evidence as unreliable. General Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997). See e.g., In re: Med Diversified, Inc., 346 B.R. 621 (E.D.N.Y. 2006) (valuation expert excluded for lack of reliability where underlying data was so flawed that the expert lacked 'good grounds' for his conclusions).

An expert opinion does not pass muster merely because it is "reliable." The opinion also must "fit" the material facts in dispute; the evidence must support the expert's opinions and that the opinions must directly relate to a material issue in the case. Paoli II, 35 F.3d at 742-743.

### B.   Lieberman's Methodology of Estimating the Fair Market Value of Premier Education Group, LP was Unreliable.

The Trustee engaged Lieberman to estimate the fair market value of a 100% equity interest in Premier, as of March 31, 2002. In calculating these values, Lieberman used the standard of a willing buyer and a willing seller:

> Q.   What was the standard you used, a willing buyer and willing purchaser?
>
> A.   I used fair market value, yes.

Exh. C, Lieberman Dep. at 238.[4]

---

[4] Portions of the Lieberman deposition cited in this memorandum are attached hereto as Exhibit C.

Lieberman testified that a ready, willing and able buyer would look at all factors associated with the financial data that he or she is given, and that the buyer then would draw conclusions from the relationships within that financial data. Id. at 153. Lieberman also testified that he represents buyers of businesses, id. at 6, and that in representing these buyers, he always needs to see past financial statements of the business that his client seeks to buy:

> Q.    Have you ever had a situation where the person that you were representing or your client in purchasing a business did not want to see the past financial statements of the business?
>
> A.    I don't think I've seen an instance where someone would buy a company where they would not want to see the past financial statements, no.
>
> Q.    It would be critical, at least a starting point for any analysis of what the proper purchase price would be, correct?
>
> MR. PAYERLE:  Objection to form.
>
> A.    The past financial statements form a basis for commencement of the investigation of any company.

Id. at 7-8.

Turning his back on his real world consulting practice, however, Lieberman testified that while he reviewed Premier's audited financial statements for 2001 through 2005, he did not review Premier's audited financial statements for 1996 through 2000; and that he did not even recall asking to see these financial statements. Id. at 11, 46, 80-83. In failing to review these past financial statements – which "form a basis for commencement of the investigation of any company" – Lieberman's expert report did not apply the same level of intellectual rigor that characterizes his practices for his non-litigation business consulting clients.

Lieberman made other concessions further undermining the reliability of his methodology in valuing Premier. For instance, Lieberman acknowledged that Internal Revenue

6

Service Revenue Ruling 59-60 is the seminal ruling on valuation methodology of a closely held

company. Revenue Ruling 59-60 provides, in pertinent part:

> It is advisable to emphasize that in the valuation of the stock of
> closely held corporations or the stock of corporations where market
> quotations are either lacking or too scarce to be recognized, *all
> available financial data,* as well as all relevant factors affecting fair
> market value, should be considered. The following factors,
> although not all inclusive *are fundamental and require careful
> analysis in each case*:
>
> . . .
>
> (c) *Balance sheets should be obtained, preferably in the form of
> comparative annual statements for two or more years immediately
> preceding the date of appraisal,* . . . .

Exh. D, Revenue Ruling 59-60 at 3, 4 (emphasis added).[5]

Lieberman explained that this Revenue Ruling lists all of the factors in preparing

a valuation of a closely held company and that business appraisers universally agree that this

Revenue Ruling sets forth the generally accepted closely-held-business-valuation methodology:

> Q.    Going to the letter that you signed which went to Mr. Waters, you
> referred to, in the third paragraph, IRS Revenue Ruling 59-60. Can
> you tell me what that ruling is?
>
> A.    That's a ruling that was prepared in 1959, and that has all the factors
> that come into play in preparing a business valuation of closely-held
> stock. It talks about the nature of the business, the earnings
> capacity, the book value, intangible value, you know, value of
> intangible assets, dividend-paying capacity, sales of the company in
> its own stock, and market comparables.
>
> Q.    Can you describe to me, if you would, the importance of this
> revenue ruling for people that practice your profession, which is
> appraisers?

---

[5]  IRS Revenue Ruling 59-60 is attached hereto as Exhibit D.

A.    It is considered the seminal work on valuation methodology and is referred to in all later documents that purport to lay out the practices and procedures in preparing a business valuation. It is sort of like the Magna Carta of business valuation.

Q.    That is generally accepted by all appraisers; is that correct?

A.    That is generally accepted, yes.

Q.    By all appraisers who you would give some credibility?

A.    All accredited appraisers, yes.

Id. at 108-09. Lieberman conceded that this "Magna Carta" Revenue Ruling lists "book value," meaning a review of past financial statements, including profit, loss and revenues in prior years, as a factor in reaching the fair market value of a business. Id. at 142-43.

As reflected in his deposition testimony, Lieberman failed to request or use Premier's past audited financial statements. He thereby ignored Revenue Ruling 59-60, which he acknowledged as the "Magna Carta of business valuation," by failing to obtain and consider all available financial data. The bottom line is that Lieberman admittedly failed to do what all business appraisers are required to do and what he personally does in representing his business clients outside of the litigation context. Consequently, his opinion regarding the valuation of Premier is based on methodology which is unsound and hence unreliable.

### C.    Lieberman's Conclusion of Value of Premier is Based Solely on a Flawed and Unreliable Discounted Cash Flow Calculation.

Lieberman uses a Discounted Cash Flow ("DCF") method to value Premier. Exh. A, Lieberman Report, at 14. A DCF analysis derives the value of a company by calculating the company's future cash flows, multiplied by a discount factor to determine the present value of those future cash flows. Id. at 14-15. In performing the DCF analysis in this case, Lieberman did not project the anticipated future cash flows of

Premier. Id. at 15. Instead, he used the actual financial statements from 2001 to 2005 as his "projections." Exh. C, Lieberman Dep. at 64. The actual net income of Premier was then adjusted by Lieberman to arrive at the cash flow which was discounted to a present value. Exh. A, Lieberman Report at 14-16. The aggregate present value of his "projected" annual cash flow represents his conclusion of value for Premier as of March 31, 2002. Exh. A, Lieberman Report at 15. The adjustments Lieberman made to the net income of Premier were based on his analysis of the Company's financial statements and included his analysis of key financial ratios. Id. at 11.

Prior to the change in revenue recognition policy and change in retained earnings in 2005, Premier's revenue recognition policy was to record 80% of total tuition as income at the time a student enrolled in school and the remaining 20% was classified as unearned tuition. Exh. C, Lieberman Dep. at 48. However, in 2005, Premier made a significant change in the manner in which it recorded income and was required to restate Premier's retained earnings which had been accumulated from prior years. The adjustment would necessarily have changed the revenue, net income and liabilities of Premier which Lieberman had relied upon in performing his analysis of prior years. The original retained earnings of Premier Education Group LP as of December 31, 2004, were $21,670,968; and after the restatement the balance of retained earnings as of December 31, 2004, was $60,494. Lieberman was aware of this decrease in retained earnings of over $21.6 million and discusses the change as follows:

> We note that the audited balance sheet as of December 31, 2004 as initially presented differs from the balance sheet presented as a comparison in the financial statements for the year ended December 31, 2005. **An unexplained and unaccounted for difference in retained earnings and unearned tuition income payable exists** between the two statements purporting to

9

> represent the financial position at the same date. We used the
> balance sheet presented with the 2005 financial statements in our
> analysis.

Exh. A, Lieberman Report at p. 11 (emphasis added). The change in retained earnings ($21.6

million decrease) which Lieberman noted is significant because it indicates that Premier had

previously recorded $21.6 million in net income which had not yet been earned. Lieberman

failed to determine why this change was made or its effect on prior years.

      Although Lieberman claimed the change in retained earnings was "unexplained

and unaccounted for," the Company's audited financial statements at December 31, 2005 clearly

state at second Note 14 the basis for the restatement as "a change in the methodology of the

reporting of unearned and earned tuition in order to be sure that [earned tuition revenue] is in

compliance with generally accepted accounting principles [GAAP]." In any event, the simple

fact is that Lieberman proceeded with his valuation despite his lack of understanding of the

dramatic change that occurred:

> Q.    I don't see the statement in here, "an unexplained and
> unaccounted and irrelevant difference." You just say "an
> unexplained and unaccounted for difference."
>
>     Are you telling me that you didn't understand when you read this
> second note 14, the bottom note, the one that says "Restatement,"
> you didn't understand what the accountant who prepared this was
> communicating to you? Are you saying that to me?
>
> A.    I'm saying that his explanation did not lead me down the path to
> be able to implement that change in the annual financial
> statements that were presented to me.
>
> Q.    So you weren't able to do it.
>
>     Did you see that Mr. Waddington did it?
>
> A.    I saw that Mr. Waddington did it, based on, he says, on the work
> papers that were provided to him of the prior accountant.

Q.    Did you ask to see the work papers of -- when you looked at this and felt confused and didn't know the basis, did you make any inquiry for any additional information?

A.    I made an inquiry for additional information.

Q.    You did?

A.    Yes, I did.

Q.    Who did you make it of?

A.    Lois Goodman.

Q.    Did she tell you that in fact these Halterman documents had all been produced and that the work papers were available?

A.    I'm not aware of that.

Q.    Well, what did she tell you?

A.    My recollection is that we were not -- we didn't have access to those documents. Or if we did have access, they weren't findable. I asked for the accountant's work papers and was told I was not getting the accountant's work papers. That was the first thing we asked for.

Q.    You would have liked to have seen those?

A.    Yes, I would have.

Exh. C, Lieberman Dep. at 160-62.  In fact, the Halterman documents and work papers that Mr. Waddington reviewed had been produced to counsel for the Trustee and were available:

Q.    I don't mean to represent that Halterman was deposed -- I don't know the day that he was deposed and I don't know how it fits in with the May 7th date.  But when did you start working on this? You said February was the first contact.

A.    I think it was February.  It could have been March.  I'm not sure.

Q.    But, at any rate, at some point you said to Ms. Goodman "I would really like to see the work papers"?

11

A.    I did make that request.

Q.    And she responded to you they are not available, correct?

A.    She did not produce them.  I don't remember her exact response.

Q.    I will represent to you that at some point they were produced, in other words, they were made available to all counsel, all counsel had them.  I will make that representation.[6]

At no time did you ever get a call from Ms. Goodman or anyone else at McElroy, "Hey, we have those work papers that you wanted to look at"?

A.    I did not get a call that the work papers were available.

Id. at 163-64.

Because Lieberman did not establish why the retained earnings were adjusted, he made a singular adjustment to cash flow to 2004 operating results to reflect the change while performing his analysis and discounted cash flow calculation.  However, the change in revenue recognition policy affected all earlier years' revenue recognition and operating results — specifically 2001, 2002 and 2003, which had been previously analyzed by Lieberman.  In fact, the old and new revenue recognition policies of Premier were clearly disclosed in its financial statements.  Lieberman's analysis of the financial position of the Company during 2001 through 2004 utterly failed to account for the change in the Company's revenue recognition policy for those years as reflected in the decrease in retained earnings at December 31, 2004.  As a result, his entire analysis of financial results of Premier through 2004 is based upon faulty and overstated revenue and net income, which is a fatally flawed methodology.  As discussed by the Court in In re: Nellson Nutraceutical, Inc., 356 B.R. 364 (D. Del. 2006) (business valuation

---

[6] The documents had been obtained by Royal in the SFC bankruptcy litigation.  Royal had notified all counsel of their availability.  See Letter dated February 23, 2006 from Lisa MacVittie to James Rodgers, et al., which is attached hereto as Exhibit E.  Counsel for Trustee questioned Mr. Halterman about documents from this production at his October 2006 deposition.

expert excluded for lack of reliability and fit) (citations omitted), if the factual basis of an expert's opinion is fundamentally unsupported because the expert relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact and is not admissible on relevance grounds. General Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997); see also, In re: Med Diversified, Inc., 346 B.R. 621 (E.D.N.Y. 2006) (valuation expert excluded for lack of reliability). Accordingly, Lieberman's testimony must be excluded.[7]

### D.    Lieberman's Methodology in Estimating the Fair Market Value of Premier Education Group LP does not "Fit" the Facts of this Case.

As set forth above, one of the relevant issues in the Trustee's fraudulent transfer claim is the fair market value, on the date of transfer, of the stock in Premier Education Group GP, Inc. that Yao transferred to certain Family defendants. Lieberman's opinion does not speak to this issue at all. Lieberman instead valued a wholly different asset – the value of a 100% equity interest in Premier Education Group LP. Lieberman Report, Exhibit A, at p. 1. However, it is undisputed that Yao did not convey a 100% equity interest in Premier Education Group LP to the Family defendants.

At his deposition, Lieberman admitted that he was asked to value a 100% equity interest in Premier Education Group LP, even though both the Trustee's counsel and he knew full well that Yao actually had transferred his stock in Premier Education Group GP, Inc., the corporate general partner of Premier Education Group LP, to the Family defendants. Lieberman's only explanation for valuing the entire limited partnership and not the general

---

[7] Lieberman describes an attempted alternative valuation methodology, Market Approach - Private Transaction method but failed to complete that analysis as no private comparable transactions were identified. Exh. A, Lieberman Report at 14. Nevertheless, Lieberman proceeded with a Market Approach by using public companies as comparable transactions, a fatally flawed methodology, since he compared apples to oranges and a methodology which he considered but rejected. This alternative valuation methodology, one specifically rejected even by Lieberman, is likewise flawed and irrelevant, making Lieberman's opinion on value under that methodology inadmissible.

partner interest conveyed by Yao were that certain unidentified documents gave conflicting versions as to what interest the general partner had in the limited partnership:

Q.  Did you ever ask Mr. Waters or any of the attorneys at McElroy, or the Trustee for that matter, "Why am I not being asked to value the property that was actually transferred, the general partnership interest?"

A.  Actually, I did.  I was told that "We don't know what the percentage interest of the general partner was.  We have conflicting documents that have different percentages."  And, in fact, those were presented to me.

Q.  Tell me what was presented to you which had conflicting information, because I don't think they are listed either.

A.  I didn't use it in my report.

Q.  So you were aware at the time of your report that what was transferred was a general partnership interest, and you were told the reason why you weren't valuing the general partnership interest is because there was conflicting information as to what interest the general partner had in the limited partnership; is that correct?

A.  I was asked to do a 100 percent interest in the limited partnership, and that's what I did.

Q.  But you were told the reason why you shouldn't do an appraisal of the general partnership interest is because there was – isn't that what you testified to?

A.  Yes, it was unknown as to what the general partnership interest was.

Q.  And you were given documents to show what was this conflict?

MR. PAYERLE: Objection.

A.  Yes.

Q.  And what were those documents?

A.  I don't recall.

14

Id. at 321-323.

Providing the value of a 100% equity interest in Premier Education Group LP will not assist the jury in understanding the evidence or determining any material facts in issue for the simple reason that Yao did not transfer a 100% equity interest in Premier Education Group LP to the Family defendants.  Consequently, Lieberman's opinions do not "fit" the facts of this case.

Lieberman's opinions on the value of a 100% equity interest in an asset that was not conveyed would serve only to mislead and confuse the jury because that value is not relevant to the material facts of this case.

E.    **Lieberman's Estimate of the Fair Market Value of Premier Education Group LP as of December 31, 2006 Does Not "Fit" Facts of this Case.**

Lieberman also reached an opinion on the valuation of Premier Education Group LP as of December 31, 2006.  Lieberman Report, Exhibit A, at page 3.  As set forth above, the relevant inquiry to the Trustee's fraudulent transfer cause of action is that of the fair market value on the date of transfer.  Here, Yao transferred stock to certain Family defendants in June 2002.  Lieberman's opinion regarding valuation of a 100% equity interest in Premier Education Group LP as of the end of 2006 is not relevant, will not assist a trier of fact and would only serve to mislead and confuse the jury.  For that reason, Lieberman's opinion on this issue is unreliable and not relevant and should be excluded.

## IV.    CONCLUSION.

For the reasons set forth above, Lieberman's opinions are unreliable and not relevant and the Family defendants respectfully request that this Court preclude Lieberman from testifying at trial.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Dated: October 4, 2007

KAREN LEE TURNER (No. 4332)
BRYA M. KEILSON (No. 4643)
300 Delaware Avenue, Suite 1210
Wilmington, DE  19801
Telephone:  (302) 425-0430
Fax:          (302) 425-0431
E-mail:      kturner@eckertseamans.com

Neil G. Epstein
Carol L. Press
Charles F. Forer
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone:  (215) 851-8400
Fax:      (215) 851-8383

Attorneys for Defendants Robert L. Bast,
Pamela Bashore Gagné, the Brennan Trusts
and W. Roderick Gagné, as Trustee of the
Brennan Trusts

M0612133.DOC

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I am not less than 18 years of age and that

on October 4, 2007, I caused a true and correct copy of the Family defendants' Notice of Motion,

Proposed Order, Motion in Limine No. 3 to Preclude Testimony of Martin Lieberman and

Memorandum of Law in Support of the Motion upon the following via e-mail and United States

first class regular mail postage prepaid:

William H. Sudell, Jr., Esquire
Donna L. Culver, Esquire
Joanna F. Newdock, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Email:wsudell@mnat.com
*Counsel for Pepper Hamilton LLP and
W. Roderick Gagné*

John H. Eickemeyer, Esquire
Marie A. Tieri, Esquire
Vedder, Price, Kaufman & Kammholz, P.C.
1633 Broadway, 47th Floor
New York, NY 10019
Email: jeickemeyer@vedderprice.com
          mtieri@vedderprice.com
*Counsel for Freed Maxick & Battaglia,
CPAs, PC*

Elizabeth K. Ainslie, Esquire
Nicholas J. LePore, III, Esquire
Bruce P. Merenstein, Esquire
Stephen J. Shapiro, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Email: eainslie@schnader.com
          sshapiro@schnader.com
          nlepore@schnader.com
          bmerenstein@schnader.com
*Counsel for Pepper Hamilton LLP and
W. Roderick Gagné*

David E. Wilks, Esquire
Reed Smith, LLP
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Email: dwilks@reedsmith.com
*Counsel for Freed Maxick & Battaglia,
CPAs, PC*

Tiffany Geyer Lydon, Esquire
Philip Trainer, Jr., Esquire
Carolyn Shelly Hake, Esquire
Ashby & Geddes
222 Delaware Avenue
P. O. Box 1150
Wilmington, DE 19899
Email: tlydon@ashby-geddes.com
        ptrainer@ashby-geddes.com
*Counsel for Royal Indemnity Company*

John I. Grossbart, Esquire
Alan S. Gilbert, Esquire
Sonnenschein Nath & Rosenthal LLP
8000 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606
Email: jgrossbart@sonnenschein.com
        agilbert@sonnenschein.com
*Counsel for Royal Indemnity Company*

John W. Shaw, Esquire
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391
Email: jshaw@ycst.com
*Counsel for McGladrey & Pullen LLP*

Michael Lastowski, Esquire
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Email: mlastowski@duanemorris.com
*Counsel for Freed Maxick & Battaglia,
CPAs, PC; McGladrey & Pullen LLP
and Michael Aquino*

Veronica E. Rendon, Esquire
Richard P. Swanson, Esquire
Jason M. Butler, Esquire
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
Email: veronica_rendon@aporter.com
        richard.swanson@aporter.com
        jason_butler@aporter.com
*Counsel for McGladrey & Pullen LLP
and Michael Aquino*

Charlene M. Davis, Esquire
Ashley B. Stitzer, Esquire
Mary E. Augustine, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P. O. Box 25130
Wilmington, DE 19899
Email: cdavis@bayardfirm.com
        astitzer@bayardfirm.com
        maugustine@bayardfirm.com
*Counsel for Charles A. Stanziale, Jr.,
Chapter 7 Trustee of Student Finance
Corporation*

Steven M. Farina, Esquire
Thomas H.L. Selby, Esquire
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
Email: sfarina@wc.com
            tselby@wc.com
*Counsel for McGladrey & Pullen LLP*

Charles A. Gilman, Esquire
David G. Montone, Esquire
David G. Januszewski, Esquire
M. Justin Lubeley, Esquire
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
Email: cgilman@cahill.com
            dmontone@cahill.com
            djanuszewski@cahill.com
            jlubeley@cahill.com
*Counsel for Pepper Hamilton LLP*

Michael S. Waters, Esquire
Lois H. Goodman, Esquire
Jeffrey T. Testa, Esquire
Donald Crecca, Esquire
John P. Dwyer, Esquire
McElroy, Deutsch, Mulvaney & Carpenter,
LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102
Email: lgoodman@mdmc-law.com
            mwaters@mdmc-law.com
            dcrecca@mdmc-law.com
            jtesta@mdmc-law.com
            jdwyer@mdmc-law.com
*Counsel for Charles A. Stanziale, Jr.,
Chapter 7 Trustee of Student Finance
Corporation*

Andre G. Castaybert, Esquire
Ronald Rauchberg, Esquire
Steven Obus, Esquire
Proskauer Rose LLP
1585 Broadway
New York, NY 10035
Email: acastaybert@proskauer.com
            rrauchberg@proskauer.com
            sobus@proskauer.com
*Counsel for MBIA*

BRYAN M. KEILSON

M0612133.DOC