```
                                                               1
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF DELAWARE
 3   C.A. No. 02-1294-JJF
     ----------------------------------------x
 4   MBIA INSURANCE CORPORATION AND
     WELLS FARGO BANK, N.A. (f/k/a
 5   WELLS FARGO BANK MINNESOTA N.A.)
     AS TRUSTEE OF SFC GRANTOR TRUST
 6   SERIES 2000-1, SFC GRANTOR TRUST,
     SERIES 2000-2, SFC GRANTOR TRUST,
 7   SERIES 2000-3, SFC GRANTOR TRUST,
     SERIES 2000-4, SFC GRANTOR TRUST,
 8   SERIES 2001-1, SFC GRANTOR TRUST,
     SERIES 2001-2, SFC OWNER TRUST,
 9   SERIES 2000-I, AND SFC GRANTOR
     TRUST, SERIES 2001-3,
10              Plaintiffs/
                Counterclaim Defendants,
11
             - vs -
12
     ROYAL INDEMNITY COMPANY,
13              Defendant/
                Counterclaim Plaintiff.
14   ----------------------------------------x
     ROYAL INDEMNITY COMPANY,
15              Third-Party Plaintiff,
16           - vs -
17   ANDREW N. YAO, STUDENT LOAN SERVICING
     LLC, STUDENT LOAN ACCEPTANCE II LLC,
18   STUDENT LOAN ACCEPTANCE III LLC, STUDENT
     LOAN ACCEPTANCE V LLC, STUDENT LOAN
19   ACCEPTANCE VIII LLC, STUDENT LOAN
     ACCEPTANCE IX LLC, SFC FINANCIAL LLC I,
20   SFC FINANCIAL LLC II, SFC FINANCIAL LLC
     VI, SFC FINANCIAL LLC VII,
21              Third Party Defendants.
     ----------------------------------------x
22                    August 24, 2007
                      9:39 a.m.
23
24   TRACK I WITNESS: MARTIN LIEBERMAN
25
```

Page 2

```
ROYAL INDEMNITY COMPANY,
            Counter-Claimant,
    - vs -
MBIA BANK and WELLS FARGO BANK MINNESOTA
N.A.,
            Counter-Defendants.
------------------------------x
C.A. No. 04-1551-JJF
------------------------------x
CHARLES A. STANZIALE, JR., CHAPTER 7
TRUSTEE OF STUDENT LOAN FINANCE
CORPORATION,
            Plaintiff,
    - vs -
PEPPER HAMILTON LLP, et al.,
            Defendants.
------------------------------x
C.A. No. 05-72-JJF
------------------------------x
CHARLES A. STANZIALE, JR., CHAPTER 7
TRUSTEE OF STUDENT LOAN FINANCE
CORPORATION,
            Plaintiff,
    - vs -
McGLADREY & PULLEN LLP AND MICHAEL AQUINO,
            Defendants.
------------------------------x
C.A. No. 05-165-JJF
------------------------------x
ROYAL INDEMNITY COMPANY,
            Plaintiff,
    - vs -
PEPPER HAMILTON LLP, et al.,
            Defendants.
------------------------------x
```

Page 3

August 24, 2007
9:39 a.m.

Deposition of MARTIN LIEBERMAN, held at the offices of McElroy Deutsch Mulvaney & Carpenter LLP, Three Gateway Center, Newark, New Jersey, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New Jersey.

Page 4

APPEARANCES:

SONNENSCHEIN NATH & ROSENTHAL, ESQ.
1221 Avenue of the Americas
New York, New York 10020
    Attorneys for Royal Indemnity
    Company
BY:  DANIEL PANCOTTI, ESQ.

McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079
    Attorneys for the Bankruptcy
    Trustee for SFC
BY:  STEPHEN PAYERLE, ESQ.

SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street
Philadelphia, Pennsylvania 19103-7286
    Attorneys for Pepper Hamilton LLP
BY:  LINDA ALLE-MURPHY, ESQ.

ECKERT SEAMANS
Two Liberty Place
50 South 16th Street
22nd Floor
Philadelphia, Pennsylvania 19102
    Attorneys for W. Roderick Gagne,
    Pamela Gagne, Robert Bast and the
    Family Trusts
BY:  NEIL G. EPSTEIN, ESQ

Page 5

MARTIN LIEBERMAN,
called as a witness, having been first
duly sworn, was examined and testified
as follows:

EXAMINATION BY MR. EPSTEIN:                09:39:05AM
   Q.   Good morning, Mr. Lieberman.      09:39:27AM
My name is Neil Epstein. I'm from Eckert   09:39:30AM
Seamans, a Philadelphia law firm. I        09:39:33AM
represent in this action Robert Bast,      09:39:41AM
Pamela Gagne, certain family trusts, and   09:39:44AM
Rod Gagne as trustee of those trusts.      09:39:50AM
        I'm going to be asking you        09:39:57AM
questions about your report. I want to     09:39:59AM
tell you that what I've done is put your   09:40:00AM
report and the underlying documents that   09:40:05AM
were sent to me by counsel as being those  09:40:09AM
documents listed in your report that you   09:40:13AM
relied on in a book. Unfortunately, FedEx  09:40:15AM
has not delivered the two boxes, but they  09:40:19AM
should be here relatively soon.            09:40:24AM
        But in the meanwhile, what I      09:40:25AM
would like you to do, if you would, is     09:40:27AM
answer my questions off of just the report 09:40:32AM
without the exhibits. Okay?                09:40:34AM

## Page 6

```
 1          LIEBERMAN
 2   A.   That's fine.                         09:40:36AM
 3   Q.   I want to ask you, I read your       09:40:44AM
 4  report and I read your background, I want  09:40:46AM
 5  to ask you whether you have had experience 09:40:48AM
 6  in advising a buyer of a business as to    09:40:51AM
 7  the value of the company that the buyer    09:40:54AM
 8  was intending or proposing to purchase.    09:40:58AM
 9   A.   I have had experience                09:41:01AM
10  consulting with buyers on purchasing       09:41:04AM
11  businesses as to their value.              09:41:06AM
12   Q.   Has that occurred frequently,        09:41:08AM
13  infrequently, during your career?          09:41:10AM
14   A.   I think it has occurred              09:41:13AM
15  frequently.                                09:41:15AM
16   Q.   Recently?                            09:41:15AM
17   A.   Yes.                                 09:41:17AM
18   Q.   Within the last six months?          09:41:18AM
19   A.   Yes, within the last six             09:41:20AM
20  months.                                    09:41:22AM
21   Q.   And was it a case of your going      09:41:22AM
22  to the company or looking at the company   09:41:24AM
23  either through books, records, or          09:41:29AM
24  whatever, and advising your client as to   09:41:31AM
25  whether some proposed purchase price was   09:41:35AM
```

## Page 7

```
 1          LIEBERMAN
 2  reasonable or not reasonable?              09:41:37AM
 3   A.   Normally when I do a consulting      09:41:41AM
 4  assignment, I will do a site visit to the  09:41:44AM
 5  company that's under investigation. I      09:41:47AM
 6  will review the books and records to the   09:41:50AM
 7  extent they are provided to me about the   09:41:52AM
 8  company, as well as get a sense towards    09:41:56AM
 9  what the future of the company is, what    09:41:59AM
10  direction is the company going, what are   09:42:01AM
11  the strengths, weaknesses, opportunities   09:42:05AM
12  and threats facing the company, as well as 09:42:07AM
13  some sort of projection as to future cash  09:42:11AM
14  flows related to the company, as stated by 09:42:15AM
15  management.                                09:42:19AM
16   Q.   Have you ever had a situation        09:42:19AM
17  where the person that you were             09:42:21AM
18  representing or your client in purchasing  09:42:25AM
19  a business did not want to see the past    09:42:27AM
20  financial statements of the business?      09:42:29AM
21   A.   I don't think I've seen an           09:42:36AM
22  instance where someone would buy a company 09:42:38AM
23  where they would not want to see the past  09:42:40AM
24  financial statements, no.                  09:42:42AM
25   Q.   It would be critical, at least       09:42:45AM
```

## Page 8

```
 1          LIEBERMAN
 2  a starting point for any analysis of what  09:42:46AM
 3  the proper purchase price would be,        09:42:49AM
 4  correct?                                   09:42:52AM
 5       MR. PAYERLE: Objection to             09:42:52AM
 6  form.                                      09:42:53AM
 7   A.   The past financial statements        09:42:55AM
 8  form a basis for commencement of the       09:42:57AM
 9  investigation of any company.              09:42:59AM
10   Q.   You were retained to give an         09:43:11AM
11  opinion with respect to the fair market    09:43:16AM
12  value of Premier Education Group, Inc. as  09:43:20AM
13  of March 31, 2002 and some date that I     09:43:26AM
14  can't recall in 2006; is that correct?     09:43:33AM
15   A.   I was engaged to prepare a           09:43:35AM
16  valuation as of March 31st, 2002 and       09:43:38AM
17  December 31st, 2006.                       09:43:40AM
18   Q.   And you did that?                    09:43:45AM
19   A.   I did that.                          09:43:47AM
20   Q.   And your analysis is in your         09:43:47AM
21  report, correct?                           09:43:51AM
22   A.   My analysis is in my report and      09:43:52AM
23  in the work papers that I maintain in my   09:43:55AM
24  files associated with preparation of this  09:43:59AM
25  report.                                    09:44:03AM
```

## Page 9

```
 1          LIEBERMAN
 2   Q.   Have you looked at your work         09:44:03AM
 3  file in preparation for this deposition?   09:44:06AM
 4   A.   I looked at my work file, yes.       09:44:09AM
 5   Q.   Do you have a copy of your work      09:44:14AM
 6  file with you?                             09:44:15AM
 7   A.   My work file is in computer          09:44:19AM
 8  form. It is files within a computer        09:44:21AM
 9  setting. I didn't take the files with me.  09:44:25AM
10   Q.   Let me ask you, what's in the        09:44:29AM
11  computer other than the report -- are      09:44:33AM
12  there drafts of the report in your         09:44:37AM
13  computer?                                  09:44:40AM
14   A.   I don't believe so.                  09:44:41AM
15   Q.   So in preparing the report, you      09:44:44AM
16  would do a draft and then you would work   09:44:46AM
17  over the draft on the same document; is    09:44:48AM
18  that your procedure?                       09:44:51AM
19   A.   Normally we do actually save         09:44:55AM
20  the drafts. I just can't recall in this    09:44:58AM
21  case if I have the drafts in that same     09:45:01AM
22  computer file or someplace else. But       09:45:03AM
23  chances are there are drafts laying around 09:45:05AM
24  and I could produce those drafts.          09:45:11AM
25       MR. EPSTEIN: I would request          09:45:14AM
```

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

Page 10

LIEBERMAN

1 the production of those drafts, if you 09:45:15AM
2 would. 09:45:18AM
3 Q. What else would be in the work 09:45:24AM
4 file, if they are in the work file, I'm 09:45:26AM
5 not suggesting they are on the computer, 09:45:28AM
6 but I'm including the drafts within a work 09:45:30AM
7 file, but the work file on the computer, 09:45:31AM
8 what else would be in there other than 09:45:33AM
9 drafts, perhaps the final report, the 09:45:36AM
10 documents that were sent to me which are 09:45:42AM
11 the ones listed in your report; would 09:45:44AM
12 there be anything else? 09:45:47AM
13 A. Well, the work file would have 09:45:52AM
14 documents and worksheets that led up to 09:45:58AM
15 the final worksheet in our report. 09:46:02AM
16 In other words, our report, for 09:46:05AM
17 example, the Schedule 7 in my report on 09:46:07AM
18 Appendix D has certain calculations 09:46:15AM
19 underlying the results that are shown on 09:46:17AM
20 Schedule 7. Those documents would be in 09:46:19AM
21 the work file. 09:46:22AM
22 Q. Anything else you can think of? 09:46:27AM
23 A. All of the documents that were 09:46:29AM
24 provided to me by this office here. 09:46:30AM

Page 11

LIEBERMAN

1 Q. Those are the documents listed 09:46:37AM
2 in your report, correct? 09:46:38AM
3 A. That's correct. Well, there 09:46:40AM
4 are other documents that were provided to 09:46:41AM
5 me that I didn't necessarily use for my 09:46:42AM
6 report. 09:46:46AM
7 Q. What are those documents? 09:46:46AM
8 A. I don't know. 09:46:48AM
9 Q. You don't know? 09:46:48AM
10 A. No. 09:46:49AM
11 Q. Did counsel provide you with 09:46:50AM
12 the financial statements of Premier prior 09:47:00AM
13 to 2001? 09:47:02AM
14 A. I don't know. 09:47:53AM
15 Q. When you say you don't know, on 09:47:54AM
16 the list of documents that you say you 09:47:56AM
17 reviewed, going to Appendix C, I think, 09:48:01AM
18 "Sources of Information," you have audited 09:48:08AM
19 financial statements of Premier for the 09:48:12AM
20 years 2001 to 2005; is that correct? 09:48:15AM
21 A. Yes, that is correct. 09:48:23AM
22 Q. Can I assume that if you had 09:48:27AM
23 been given the previous financial 09:48:30AM
24 statements prior to 2001, you would have 09:48:33AM

Page 12

LIEBERMAN

1 listed them here? 09:48:34AM
2 A. Only if I used them in my 09:48:38AM
3 report. 09:48:42AM
4 Q. What about if you used them to 09:48:42AM
5 review to get some idea as to how the 09:48:45AM
6 company had done prior to 2001, would you 09:48:47AM
7 have put them down in this list? 09:48:52AM
8 A. Had I used the reports prior to 09:48:55AM
9 2001, I would have put it on the list. 09:48:58AM
10 Q. By "used," if you would have 09:49:00AM
11 reviewed them to form some idea as to how 09:49:02AM
12 the company had performed prior to 2001; 09:49:07AM
13 is that what you mean? 09:49:10AM
14 A. If I had used the financial 09:49:12AM
15 statements, I would have listed them in my 09:49:14AM
16 report. 09:49:17AM
17 Q. Did you think it was unusual, 09:49:17AM
18 Mr. Lieberman, that you were asked to do 09:49:20AM
19 an appraisal of a company as of March 2002 09:49:22AM
20 and you were not given financial 09:49:28AM
21 statements other than the 2001 financial 09:49:31AM
22 statement? 09:49:35AM
23 MR. PAYERLE: Objection, form. 09:49:35AM
24 Q. I mean prior to the 2002 09:49:36AM

Page 13

LIEBERMAN

1 period. 09:49:39AM
2 A. I don't know what you mean by 09:49:42AM
3 "unusual." 09:49:44AM
4 Q. Did you find it unusual? I 09:49:44AM
5 mean, that word I think has a definition 09:49:48AM
6 that we all could agree to. Out of the 09:49:52AM
7 ordinary. 09:49:55AM
8 MR. PAYERLE: Same objection. 09:49:56AM
9 Go ahead. 09:49:57AM
10 A. I was presented with the 09:49:57AM
11 information I was presented with and 09:50:01AM
12 that's what I used in my report. 09:50:03AM
13 Q. Who presented it to you? 09:50:04AM
14 A. This office, Lois Goodman. 09:50:06AM
15 Q. Have you had any contact with 09:50:11AM
16 any lawyers in this office other than Lois 09:50:13AM
17 Goodman? 09:50:18AM
18 A. Yes, Michael Waters and Steve 09:50:18AM
19 Payerle. 09:50:31AM
20 Q. So you did have some 09:50:41AM
21 communications with Lois Goodman and also 09:50:43AM
22 Mr. Waters, correct, and Mr. Payerle? 09:50:45AM
23 A. I received information from 09:50:49AM
24 Lois Goodman and Mr. Waters. I did not 09:50:52AM

**Page 46**

```
1           LIEBERMAN
2  contracts work?                        10:33:57AM
3       MR. PAYERLE: Same objection.      10:33:59AM
4   A.    I don't follow you.             10:33:59AM
5   Q.    Let me make it very clear. A    10:34:04AM
6  student comes in and signs a contract for  10:34:07AM
7  $5,000. You report 80 percent of that as   10:34:12AM
8  being revenues. Is that correct?       10:34:17AM
9   A.    I don't know, but all right.    10:34:20AM
10  Q.    You didn't read the '96 through 10:34:25AM
11 2000 financials, did you?              10:34:28AM
12  A.    Yes, I did.                     10:34:30AM
13  Q.    Oh, you did read them?          10:34:31AM
14  A.    Yes, I did.                     10:34:32AM
15  Q.    So they were given to you by    10:34:34AM
16 counsel --                             10:34:36AM
17  A.    I'm sorry, I didn't get that    10:34:37AM
18 far back. 2001 was the beginning. I    10:34:40AM
19 misheard you.                          10:34:45AM
20  Q.    I'm talking '96 through 2000.   10:34:45AM
21  A.    I'm sorry, I misheard you.      10:34:48AM
22  Q.    Now, in the 2001 financial, are 10:34:50AM
23 you telling me it didn't say the breakdown 10:34:54AM
24 of what was reported as revenue from the   10:34:56AM
25 contract that I just gave you as a     10:35:00AM
```

**Page 47**

```
1           LIEBERMAN
2  hypothetical?                          10:35:01AM
3       MR. PAYERLE: Objection, form.     10:35:04AM
4   A.    I would have to refer back to   10:35:05AM
5  it. But I recall there is a paragraph  10:35:07AM
6  which describes the revenue recognition 10:35:10AM
7  policy.                                10:35:13AM
8   Q.    And wasn't it 80/20?            10:35:13AM
9   A.    I would have to look at it.     10:35:15AM
10  Q.    Why don't you take a look at    10:35:16AM
11 the year 2000, which is in your book under 10:35:19AM
12 tab 1A. It is note 4. Would you read to    10:35:40AM
13 yourself note 4.                       10:36:12AM
14     (Witness perusing document.)       10:36:32AM
15  Q.    For that year, it is stated     10:36:51AM
16 that 80 percent is recognized as revenue   10:36:56AM
17 at the time of the contract; is it not?    10:37:02AM
18  A.    It appears to be so.            10:37:04AM
19  Q.    Now go to the next financial    10:37:07AM
20 statement, which is 2001, which I believe  10:37:09AM
21 you testified you did review?          10:37:14AM
22  A.    Yes, I did. Though "review" is  10:37:17AM
23 a poor choice of words. Because in     10:37:22AM
24 accountant parlance, that means I gave a   10:37:25AM
25 review opinion, which I did not.       10:37:27AM
```

**Page 48**

```
1           LIEBERMAN
2   Q.    Well, review or read note 4,    10:37:28AM
3  whatever you refer --                  10:37:31AM
4   A.    "Read" is the word.             10:37:32AM
5   Q.    We are not in accounting        10:37:33AM
6  school. Read note 4, if you would.     10:37:36AM
7      (Witness perusing document.)       10:37:41AM
8   Q.    Note 4 of the 2001 seems to be  10:38:12AM
9  the same recognition, 80/20?           10:38:14AM
10  A.    It appears that way.            10:38:18AM
11  Q.    Do you have any question that   10:38:19AM
12 was the policy that is stated in the   10:38:20AM
13 financial statements as being the policy   10:38:23AM
14 of the company with respect to revenue 10:38:25AM
15 recognition?                           10:38:28AM
16  A.    The policy appears to be that   10:38:28AM
17 when a student enrolls, 80 percent of the  10:38:31AM
18 tuition is taken into revenue.         10:38:36AM
19  Q.    So you knew that when you read  10:38:39AM
20 this, correct? "This" being the 2001   10:38:42AM
21 financial statement which is marked as 10:38:46AM
22 Exhibit 354.                           10:38:48AM
23  A.    I knew that after I read it.    10:38:50AM
24  Q.    You can keep going with your    10:39:10AM
25 comments on Mr. Waddington, his report. 10:39:13AM
```

**Page 49**

```
1           LIEBERMAN
2       MR. PAYERLE: You referred to     10:39:51AM
3  Exhibit 354?                          10:39:52AM
4       MR. EPSTEIN: Yes, that was the   10:39:54AM
5  2000. The 2001 financial statement I  10:39:56AM
6  asked Mr. Lieberman to look at, that is 10:39:58AM
7  Exhibit 326, Track II.                10:40:06AM
8      (Witness perusing document.)      10:42:26AM
9   A.    So I object to the last        10:42:27AM
10 sentence on the last paragraph "These 10:42:29AM
11 analyses performed by Mr. Lieberman were 10:42:32AM
12 an integral component of his selection of 10:42:34AM
13 a discount rate."                     10:42:38AM
14     My objection is -- I object to    10:42:40AM
15 that statement.                       10:42:44AM
16  Q.    You what?                      10:42:45AM
17  A.    I object to that sentence.     10:42:45AM
18  Q.    Your objection is you object;  10:42:47AM
19 is that what you just said?           10:42:50AM
20  A.    I think I did.                 10:42:51AM
21     My objection is I don't agree     10:42:54AM
22 with that statement.                  10:42:56AM
23  Q.    But you did use the income in  10:42:58AM
24 determining an appropriate discount rate, 10:43:02AM
25 didn't you?                           10:43:04AM
```

13 (Pages 46 to 49)

## Page 62

```
1        LIEBERMAN
2    A.   Well, it depends on -- no, I      10:56:52AM
3  would put a demand note right after cash.  10:56:55AM
4    Q.   Okay, let's move on.              10:56:58AM
5         (Witness perusing document.)      10:57:40AM
6    A.   On page 15, in the middle of      10:57:40AM
7  the page, "There is no apparent          10:57:44AM
8  consideration by Mr. Lieberman of the    10:57:46AM
9  impact these recently acquired schools had 10:57:49AM
10 in determining what a reasonable         10:57:52AM
11 projection of cash flow may have been in 10:57:54AM
12 March 2002."                             10:57:56AM
13        I disagree with that statement.   10:57:58AM
14   Q.   Why?                              10:58:01AM
15   A.   Because there was consideration   10:58:03AM
16 of the impact of what the cash flow may  10:58:04AM
17 have been in March of 2002.              10:58:13AM
18   Q.   That's not what it says, is it?   10:58:17AM
19 It is determining what a reasonable      10:58:20AM
20 projection of cash flow may have been.   10:58:22AM
21 Isn't that the exact wording that        10:58:25AM
22 Mr. Waddington used?                     10:58:31AM
23   A.   Mr. Waddington says what a        10:58:33AM
24 reasonable projection of cash flow may   10:58:35AM
25 have been in March 2002. I'm saying I did 10:58:37AM
```

## Page 63

```
1        LIEBERMAN
2  address that.                            10:58:43AM
3    Q.   By looking at the actuals for     10:58:46AM
4  that year, correct?                      10:58:48AM
5    A.   Well, I looked at the actuals     10:58:52AM
6  not only for that year, but for subsequent 10:58:54AM
7  years as well, right through 2005, on the 10:58:57AM
8  theory that subsequent events, if they are 10:59:04AM
9  unanticipated, for example, the school   10:59:12AM
10 burns down, yeah, you can't use that, look 10:59:14AM
11 back and say "Okay, I knew that was going 10:59:17AM
12 to happen in March 2002."                10:59:19AM
13        But in a case where business is   10:59:21AM
14 going on as usual and as anticipated and 10:59:25AM
15 as management planned, then you can look 10:59:28AM
16 back at subsequent events as a means of  10:59:33AM
17 determining value at a prior date.       10:59:36AM
18   Q.   We are going to go into that in   10:59:38AM
19 so much detail, you will probably be sick 10:59:41AM
20 of me and sick of my questions.          10:59:43AM
21   A.   I don't think so. That's not      10:59:45AM
22 possible.                                10:59:47AM
23   Q.   I think it is close. We will      10:59:47AM
24 explore that in detail later, but I      11:00:00AM
25 understand you disagree with his         11:00:03AM
```

## Page 64

```
1        LIEBERMAN
2  statement. Go on.                        11:00:05AM
3         (Witness perusing document.)      11:00:26AM
4    A.   The last paragraph as well, for   11:00:26AM
5  the very same reasons. "Mr. Lieberman's  11:00:29AM
6  discount rate used in calculating the    11:00:32AM
7  present value of the anticipated cash flow 11:00:35AM
8  does not appear to consider the impact on 11:00:37AM
9  operations or related risks which may have 11:00:40AM
10 been considered with the acquisition of  11:00:43AM
11 six new schools."                        11:00:45AM
12        I did take that into account in   11:00:46AM
13 the compilation, the buildup, of my      11:00:49AM
14 discount rate.                           11:00:53AM
15   Q.   By using the actual figures       11:00:54AM
16 that occurred over the next five years,  11:00:55AM
17 correct?                                 11:00:58AM
18   A.   By using the actual figures       11:00:58AM
19 with the view that those amounts were    11:01:02AM
20 predicted in March 2002.                 11:01:07AM
21   Q.   With the assumption that they     11:01:09AM
22 were predicted in March of 2002, because 11:01:11AM
23 no one made that assumption, did they?   11:01:13AM
24        MR. PAYERLE: Objection to         11:01:16AM
25 form.                                    11:01:18AM
```

## Page 65

```
1        LIEBERMAN
2    A.   "Assumption" isn't the right      11:01:18AM
3  word. With the prediction as reflected in 11:01:22AM
4  certain documents presented to me.       11:01:25AM
5    Q.   Did you go back and, by the       11:01:29AM
6  way, look at the history of the six      11:01:31AM
7  schools that were purchased in terms of  11:01:34AM
8  their ability to produce either cash flow 11:01:37AM
9  or income?                               11:01:39AM
10   A.   That was not presented to me.     11:01:41AM
11 I did not go back and look.              11:01:43AM
12   Q.   Did you ask for that              11:01:44AM
13 information?                             11:01:46AM
14   A.   I was given a set of              11:01:47AM
15 information and told there was no more   11:01:49AM
16 information.                             11:01:53AM
17   Q.   You've got to answer my           11:01:54AM
18 questions, not someone else's questions. 11:01:55AM
19        Did you ask for that              11:01:57AM
20 information? You don't know whether it   11:02:01AM
21 exists or not, all right, so don't give an 11:02:03AM
22 answer on something you don't know.      11:02:05AM
23        I'm asking you, did you ask for   11:02:07AM
24 that information? "What's the financial  11:02:10AM
25 history of these six schools they        11:02:12AM
```

## Page 78

```
 1          LIEBERMAN
 2  do that in terms of negotiating a fair and    11:14:58AM
 3  reasonable price; is that your testimony?     11:15:01AM
 4          MR. PAYERLE: Objection to            11:15:03AM
 5  form. This has been asked and answered.       11:15:03AM
 6          MR. EPSTEIN: I wish it had           11:15:08AM
 7  been.                                         11:15:09AM
 8          MR. PAYERLE: We each have our        11:15:10AM
 9  position on that. Go ahead.                   11:15:11AM
10      Q.  You have nothing to add to your      11:15:13AM
11  answer?                                      11:15:15AM
12      A.  I have nothing to add to my          11:15:15AM
13  answer.                                      11:15:16AM
14      Q.  Okay, continue on.                   11:15:17AM
15          (Witness perusing document.)         11:15:28AM
16      A.  On page 16, under "Conclusion,"      11:15:28AM
17  the first paragraph I disagree with.         11:15:31AM
18          "In our opinion, to a                11:15:41AM
19  reasonable degree of accounting certainty,   11:15:45AM
20  the discounted cash flow calculations        11:15:48AM
21  prepared by Mr. Lieberman and used in his    11:15:50AM
22  methodology of valuing PEG are inaccurate    11:15:54AM
23  and unreliable." I completely disagree       11:15:56AM
24  with that.                                   11:16:00AM
25          "His methodology is based upon       11:16:01AM
```

## Page 79

```
 1          LIEBERMAN
 2  the selective use of information, fails to   11:16:02AM
 3  consider other relevant information, and     11:16:05AM
 4  contains inaccurate adjustments to arrive    11:16:07AM
 5  at cash flow of PEG." I disagree with        11:16:09AM
 6  that statement as well.                      11:16:12AM
 7      Q.  So you think that the financial     11:16:14AM
 8  information for Premier for 1966 through    11:16:18AM
 9  the year 2000 are totally irrelevant to a   11:16:22AM
10  valuation of Premier in March of '02; is    11:16:32AM
11  that what you are saying?                   11:16:36AM
12          MR. PAYERLE: I assume you           11:16:37AM
13  didn't mean 1966.                           11:16:38AM
14          MR. EPSTEIN: Probably not.          11:16:39AM
15  1996.                                       11:16:41AM
16          MR. PAYERLE: Objection to           11:16:42AM
17  form.                                       11:16:47AM
18          MR. EPSTEIN: Even with that         11:16:47AM
19  correction, you object to the form, not my  11:16:48AM
20  1966?                                       11:16:51AM
21          MR. PAYERLE: I was taking the       11:16:53AM
22  liberty to correct you on the 1966.         11:16:54AM
23          MR. EPSTEIN: But that's not         11:16:57AM
24  your objection?                             11:16:58AM
25          MR. PAYERLE: As I recall the        11:16:58AM
```

## Page 80

```
 1          LIEBERMAN
 2  question, yes.                              11:16:59AM
 3          MR. EPSTEIN: Okay, thank you.       11:17:01AM
 4      A.  I've forgot the question.           11:17:01AM
 5          (The record was read.)              11:17:25AM
 6      A.  I don't think Premier existed       11:17:25AM
 7  in 1966.                                    11:17:27AM
 8      Q.  We changed that to 1996.            11:17:29AM
 9      A.  But I believe that that             11:17:34AM
10  information could have some relevance in    11:17:37AM
11  forming an opinion of the value of Premier  11:17:39AM
12  on March of 2002.                           11:17:44AM
13      Q.  So that when Mr. Waddington         11:17:46AM
14  says "fails to consider other relevant      11:17:49AM
15  information," by your own testimony he is   11:17:52AM
16  correct, isn't he? Because you didn't       11:17:56AM
17  consider the financial information from     11:17:59AM
18  1996 through 2000 for Premier.              11:18:02AM
19      A.  I had not had that available.       11:18:09AM
20  But had I had that available, it would      11:18:11AM
21  have an influence on my conclusions, but    11:18:13AM
22  not as significant an influence as the      11:18:18AM
23  information that I did have, which told me  11:18:20AM
24  what the prospects of the company were      11:18:24AM
25  going forward and its growth trend and the  11:18:27AM
```

## Page 81

```
 1          LIEBERMAN
 2  markets it was serving and the national     11:18:30AM
 3  economy and the industry economy, and all   11:18:33AM
 4  the much more important factors that we     11:18:36AM
 5  can use to look forward and say the value   11:18:39AM
 6  of this school is what it is going to       11:18:42AM
 7  produce, not what it did produce.           11:18:44AM
 8          So the more relevant data was       11:18:49AM
 9  looked at. The less relevant data, we did   11:18:52AM
10  not have access to.                         11:18:56AM
11      Q.  When you say you didn't have        11:18:59AM
12  access to it, you weren't given it,         11:19:01AM
13  correct?                                    11:19:03AM
14      A.  I was not given that data, nor      11:19:03AM
15  did I have access to it.                    11:19:06AM
16      Q.  Did you ask for that data? You      11:19:10AM
17  don't recall?                               11:19:12AM
18      A.  I don't recall.                     11:19:13AM
19      Q.  Go on.                              11:19:16AM
20          (Witness perusing document.)        11:19:29AM
21      A.  The next paragraph,                 11:19:29AM
22  "Mr. Lieberman fails to recognize the       11:19:31AM
23  effect that the change in revenue           11:19:32AM
24  recognition policy had on the revenue and   11:19:34AM
25  net income of PEG prior to December 31st,   11:19:36AM
```

**Page 82**

```
 1         LIEBERMAN
 2   2004, and as a result inaccurately uses     11:19:40AM
 3   unreasonable revenue and net income         11:19:47AM
 4   amounts in performing his analysis of the   11:19:49AM
 5   financial condition and in calculating the  11:19:52AM
 6   discounted cash flow."                      11:19:55AM
 7         I object to that statement as         11:19:56AM
 8   being wrong, in that my cash flow analysis  11:20:00AM
 9   did not depend upon the revenue             11:20:06AM
10   recognition policy. My cash flow analysis   11:20:10AM
11   depended on when cash was received and in   11:20:12AM
12   what amount.                                11:20:17AM
13   Q.   As you've explained before,            11:20:18AM
14   correct?                                    11:20:22AM
15   A.   As I explained before, the cash       11:20:22AM
16   flow is the driver of my analysis, not the  11:20:24AM
17   revenue recognition policy.                 11:20:28AM
18   Q.   Go on.                                 11:20:30AM
19       (Witness perusing document.)            11:20:37AM
20   A.   "Mr. Lieberman's entire                11:20:37AM
21   financial analysis fails to consider        11:20:39AM
22   appropriate financial results of PEG prior  11:20:42AM
23   to 2005, including over $20 million of      11:20:44AM
24   adjustments."                               11:20:51AM
25         I object to that as well.  It        11:20:52AM
```

**Page 83**

```
 1         LIEBERMAN
 2   did consider those results.                 11:20:53AM
 3   Q.   Okay, go on.                           11:20:59AM
 4       (Witness perusing document.)            11:21:02AM
 5   A.   "Additionally, the adjustment         11:21:02AM
 6   to add back to net income unauthorized      11:21:04AM
 7   payments to Mr. Yao of $913,217 for nine    11:21:06AM
 8   months in 2002 and $575,085 in 2003 lacks   11:21:08AM
 9   any supportable basis and overstates his    11:21:12AM
10   calculation of cash flow."                  11:21:15AM
11         I do not agree with that              11:21:17AM
12   statement.                                  11:21:19AM
13         "Based upon our analysis, the         11:21:21AM
14   documents identified in Mr. Lieberman's     11:21:24AM
15   calculations of projected cash flow and     11:21:26AM
16   resulting discounted cash flows for PEG     11:21:29AM
17   are inaccurate, unreliable, unreasonable,"  11:21:32AM
18   and I do not agree and object to that       11:21:35AM
19   statement.                                  11:21:38AM
20         "As a result, his schedule of         11:21:39AM
21   discounted cash flows is a series of        11:21:41AM
22   mathematical calculations that cannot lead  11:21:44AM
23   to a supportable or reasonable conclusion   11:21:45AM
24   of value."  I disagree with that.           11:21:47AM
25   Q.   So you believe that you have           11:21:51AM
```

**Page 84**

```
 1         LIEBERMAN
 2   presented a report which has a reasonable   11:21:54AM
 3   conclusion of value, correct?               11:21:58AM
 4   A.   Correct.                               11:21:59AM
 5   Q.   Of Premier Education Group LLP?        11:22:02AM
 6   A.   No.  It is just LP.                    11:22:08AM
 7   Q.   LP, okay.                              11:22:11AM
 8         I think we are through with           11:22:14AM
 9   Mr. Waddington. Now we can go on to         11:22:15AM
10   Mr. Penny.  I assume that you -- I better   11:22:20AM
11   not assume.                                 11:22:24AM
12         Have you formed opinions with         11:22:25AM
13   respect to Mr. Penny's report?              11:22:26AM
14   A.   I have.                                11:22:29AM
15   Q.   Do you disagree with some of           11:22:29AM
16   the statements or all of the statements     11:22:33AM
17   made by Mr. Penny in his report?            11:22:34AM
18   A.   I disagree with the methodology       11:22:39AM
19   Mr. Penny used in his report, and I         11:22:42AM
20   disagree with his comments on my report,    11:22:46AM
21   and I disagree with his insertion of        11:22:49AM
22   the -- using my report and my Schedule 7,   11:22:55AM
23   he carried my analysis from 2001 through    11:23:01AM
24   2005 using actual financial statements as   11:23:04AM
25   projected and inserted 2006 actual, which   11:23:08AM
```

**Page 85**

```
 1         LIEBERMAN
 2   came out after I had done my report.        11:23:12AM
 3         He came to a conclusion that          11:23:15AM
 4   had I used the actual 2006 financial        11:23:17AM
 5   statements, my value would have been, I     11:23:21AM
 6   believe it was some $11 million as opposed  11:23:24AM
 7   to the $30 million which I had given an     11:23:27AM
 8   opinion on.                                 11:23:33AM
 9         Now, in his insertion of the          11:23:33AM
10   actual 2006 financial cash flows, he        11:23:37AM
11   surprisingly put in every number as stated  11:23:50AM
12   on the financial statements except for the  11:23:51AM
13   changes in working capital.  For that       11:23:54AM
14   number, he adopted my number, my            11:23:58AM
15   guesstimate used in my report, versus       11:24:02AM
16   every other number was right off the 2006   11:24:07AM
17   statements, but he chose to selectively     11:24:10AM
18   take that one number for changes in         11:24:12AM
19   working capital and use the number that     11:24:14AM
20   had appeared in my report as an estimate    11:24:17AM
21   over the actual changes in working          11:24:19AM
22   capital.                                    11:24:23AM
23         So were one to substitute my          11:24:23AM
24   number with the actual changes and be       11:24:25AM
25   consistent with the rest of his column,     11:24:29AM
```

**106**

LIEBERMAN

```
 2       MR. PAYERLE: Did we mark this        12:05:45PM
 3  binder, by the way?                       12:05:47PM
 4       MR. EPSTEIN: No. Let's mark          12:05:49PM
 5  the binder.                               12:05:50PM
 6       (Exhibit 2061-I marked for           12:06:04PM
 7  identification.)                          12:06:12PM
 8  Q.   Just as a refresher to you,          12:06:13PM
 9  what I attempted to do in this binder is  12:06:15PM
10  put together your report, all documents   12:06:17PM
11  that I received from counsel which are    12:06:22PM
12  listed in your report as documents that   12:06:28PM
13  you either reviewed or relied on, plus I  12:06:30PM
14  put in the financials of Premier for 1997 12:06:33PM
15  through the year 2000. The '97 financial  12:06:41PM
16  statement has the '96 figures also. And   12:06:47PM
17  also the 2006 financial statements.       12:06:51PM
18       That should be what's in front       12:06:57PM
19  of you.                                   12:06:59PM
20       MR. PAYERLE: Are you done with       12:07:02PM
21  the identification of the exhibit?        12:07:02PM
22       MR. EPSTEIN: Yes.                    12:07:04PM
23       MR. PAYERLE: If I can state          12:07:05PM
24  quickly, we object to the marking of the  12:07:06PM
25  exhibit to the extent that it does include 12:07:08PM
```

**107**

LIEBERMAN

```
 2  materials that Mr. Lieberman did not      12:07:11PM
 3  produce or rely on, and to the extent that 12:07:13PM
 4  by marking it together as one exhibit it  12:07:16PM
 5  might be suggested or misunderstood       12:07:19PM
 6  otherwise.                                12:07:22PM
 7       We also do understand, Counsel,      12:07:22PM
 8  your description of what is in it. It is  12:07:24PM
 9  obviously a lengthy exhibit. We have not  12:07:27PM
10  gone through to verify that everything is 12:07:29PM
11  as exactly stated. To the extent that     12:07:34PM
12  something comes up during the examination 12:07:37PM
13  of the exhibit, we can note it then.      12:07:39PM
14       MR. EPSTEIN: There is one page      12:07:42PM
15  I left out. That was an index which is    12:07:43PM
16  preceding the insert 1A which gives a     12:07:48PM
17  short description of each of the tabs. I  12:07:53PM
18  think that's the only thing I left out.   12:07:57PM
19       MR. PAYERLE: With reference to       12:08:01PM
20  that exhibit, I do note that it states    12:08:03PM
21  that tab 1A has the audited financial     12:08:06PM
22  statements of Premier Education Group LP  12:08:08PM
23  for the years 2001 to 2005. As you        12:08:11PM
24  indicated, it in fact goes back to 1996, I 12:08:15PM
25  believe.                                  12:08:18PM
```

**108**

LIEBERMAN

```
 2       MR. EPSTEIN: That is an error,       12:08:19PM
 3  and I appreciate you correcting me. Thank 12:08:20PM
 4  you.                                      12:08:25PM
 5  BY MR. EPSTEIN:                           12:08:27PM
 6  Q.   Going to the letter that you         12:08:29PM
 7  signed which went to Mr. Waters, you      12:08:31PM
 8  referred to, in the third paragraph, IRS  12:08:35PM
 9  Revenue Ruling 59-60. Can you tell me     12:08:39PM
10  what that ruling is?                      12:08:44PM
11  A.   That's a ruling that was             12:08:48PM
12  prepared in 1959, and that has all the    12:08:52PM
13  factors that come into play in preparing a 12:08:58PM
14  business valuation of closely-held stock. 12:09:05PM
15  It talks about the nature of the business, 12:09:11PM
16  the earnings capacity, the book value,    12:09:14PM
17  intangible value, you know, value of      12:09:21PM
18  intangible assets, dividend paying        12:09:24PM
19  capacity, sales of the company in its own 12:09:27PM
20  stock, and market comparables.            12:09:33PM
21  Q.   Can you describe to me, if you       12:09:37PM
22  would, the importance of this revenue     12:09:38PM
23  ruling for people that practice your      12:09:44PM
24  profession, which is appraisers?          12:09:46PM
25  A.   It is considered the seminal         12:09:50PM
```

**109**

LIEBERMAN

```
 2  work on valuation methodology and is      12:09:51PM
 3  referred to in all later documents that   12:09:59PM
 4  purport to lay out the practices and      12:10:02PM
 5  procedures in preparing a business        12:10:07PM
 6  valuation. It is sort of like the Magna   12:10:10PM
 7  Carta of business valuation.              12:10:13PM
 8  Q.   That is generally accepted by        12:10:20PM
 9  all appraisers; is that correct?          12:10:21PM
10  A.   That is generally accepted,          12:10:22PM
11  yes.                                      12:10:24PM
12  Q.   By all appraisers who you would      12:10:24PM
13  give some credibility?                    12:10:26PM
14  A.   All accredited appraisers, yes.      12:10:28PM
15  Q.   I want to go to your                 12:10:37PM
16  definition, if you would, on page 2, with 12:10:40PM
17  the number 2 on it, the definition of     12:10:46PM
18  nonmarketable minority interest.          12:10:50PM
19       In the present case, you do not      12:11:00PM
20  use that level of value, correct, in your 12:11:03PM
21  valuation?                                12:11:10PM
22  A.   This report does not reflect a       12:11:10PM
23  value for nonmarketable minority interest. 12:11:12PM
24  Q.   What do you mean when you say        12:11:21PM
25  "lacking both control and market          12:11:28PM
```

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

## Page 142

```
1            LIEBERMAN
2   break?                          12:55:36PM
3         MR. PAYERLE: Whenever it is   12:55:38PM
4   convenient for you.             12:55:40PM
5   Q.    Revenue Ruling 59-60 also  12:55:52PM
6   strongly suggests, those are my words, but  12:55:57PM
7   interpreting the document, that you get   12:56:00PM
8   financial statements for a company and you  12:56:03PM
9   go back some two to five years; does it  12:56:05PM
10  not?                            12:56:10PM
11        MR. PAYERLE: Objection to   12:56:10PM
12  form.                           12:56:12PM
13  Q.    In making a valuation, in   12:56:12PM
14  determining a fair value for the company,  12:56:17PM
15  doesn't it say that?            12:56:20PM
16  A.    It doesn't refer to fair value,  12:56:21PM
17  it refers to fair market value, which is  12:56:24PM
18  very different than fair value.  12:56:27PM
19        It does have as one of the  12:56:34PM
20  components of preparing a valuation the   12:56:38PM
21  historical financial statements, which  12:56:41PM
22  would be the B in NEBIDISM. The B in  12:56:53PM
23  NEBIDISM stands for book value. Book  12:57:01PM
24  value would contemplate let's look at the  12:57:04PM
25  financial statements.           12:57:06PM
```

## Page 143

```
1            LIEBERMAN
2   Q.    Are you saying that the Revenue  12:57:09PM
3   Ruling 59-60 says to go back to the  12:57:23PM
4   financial statements for previous years  12:57:27PM
5   just to see what the book value of the  12:57:29PM
6   company was during those years? Is that  12:57:31PM
7   your testimony?                 12:57:34PM
8   A.    The book value reflects the  12:57:36PM
9   operations of the company. Yes. Maybe I  12:57:39PM
10  don't understand.               12:57:45PM
11  Q.    So the only thing you would go  12:57:46PM
12  back and look at is the book value?  12:57:48PM
13  A.    Well, you would look at the  12:57:51PM
14  operations of the company in prior years  12:57:53PM
15  clearly.                        12:57:55PM
16  Q.    Profit, loss, revenues?    12:57:56PM
17  A.    Yes. But I think the essence  12:57:57PM
18  of it is that that's not the sole thing  12:57:59PM
19  that we are going to rely on to value a  12:58:07PM
20  company. That is one factor. But it  12:58:10PM
21  recognizes that more important is looking  12:58:15PM
22  forward.                        12:58:17PM
23        I have to add that we've come a  12:58:18PM
24  long way since Revenue Ruling 59-60.  12:58:21PM
25  Revenue Ruling 59-60 started the process.  12:58:24PM
```

## Page 144

```
1            LIEBERMAN
2   But since then there has been much  12:58:27PM
3   advancements in procedures and sources of  12:58:31PM
4   information to be used for valuing a  12:58:37PM
5   business.                       12:58:39PM
6         I think the current thinking is  12:58:40PM
7   the most important aspect of valuing a  12:58:42PM
8   business is its prospective future cash  12:58:46PM
9   flow.                           12:58:51PM
10  Q.    Not its history?          12:58:51PM
11  A.    Less important is its history.  12:58:53PM
12  Q.    Wouldn't that depend upon the  12:58:55PM
13  company and depend upon the industry?  12:58:58PM
14  A.    Absolutely. A company that is  12:59:00PM
15  not growing, yes, the history is it, the  12:59:01PM
16  history is pretty much going to tell us  12:59:06PM
17  what the future is going to be because  12:59:08PM
18  there is no anticipated changes.  12:59:10PM
19        For a company that is growing,  12:59:11PM
20  the history is of significantly less  12:59:13PM
21  importance.                     12:59:17PM
22  Q.    Most house builders over the  12:59:19PM
23  last seven or eight years were growing  12:59:22PM
24  pretty well, wouldn't you agree, during  12:59:26PM
25  that period?                    12:59:29PM
```

## Page 145

```
1            LIEBERMAN
2   A.    From my understanding, they had  12:59:29PM
3   been growing very nicely.       12:59:31PM
4   Q.    They are not growing so well  12:59:34PM
5   this year and the year before this; isn't  12:59:35PM
6   that true?                      12:59:38PM
7   A.    I would suggest that they are  12:59:39PM
8   shrinking as opposed to growing in terms  12:59:40PM
9   of sales.                       12:59:43PM
10  Q.    Are you suggesting that someone  12:59:47PM
11  two and a half, three years ago would be  12:59:48PM
12  able to project ahead as to what the  12:59:51PM
13  housing market was going to be in 2007?  12:59:54PM
14  A.    There are projections that were  01:00:01PM
15  prepared back then that predicted a  01:00:03PM
16  housing collapse around this time. If  01:00:06PM
17  someone were to study the industry  01:00:10PM
18  literature, they would perhaps come to  01:00:12PM
19  that conclusion, perhaps not.   01:00:15PM
20  Q.    Have you looked at that     01:00:17PM
21  literature?                     01:00:18PM
22  A.    In fact, I actually have,  01:00:19PM
23  because I'm working on a valuation for a  01:00:21PM
24  builder of homes.               01:00:25PM
25  Q.    Tell me what report you are  01:00:25PM
```

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

**150**

```
1              LIEBERMAN
2  Premier, the fact that their profits and    01:49:36PM
3  pretax income as a percentage of sales was  01:49:41PM
4  substantially higher than these benchmark   01:49:47PM
5  companies that you are referring to?        01:49:50PM
6     A.    I'm not sure what you mean by      01:49:54PM
7  "red flag."                                 01:49:55PM
8     Q.    Would a prospective purchaser      01:49:58PM
9  want to investigate as to why that was so?  01:50:02PM
10    A.    A prospective purchaser would      01:50:04PM
11 certainly want to investigate why that was  01:50:06PM
12 so.                                         01:50:08PM
13    Q.    Would a prospective purchaser      01:50:09PM
14 also want to know the basis for the 80/20   01:50:12PM
15 percent reporting of revenue?               01:50:17PM
16    A.    Do you mean the revenue            01:50:22PM
17 recognition policy that we discussed        01:50:24PM
18 earlier?                                    01:50:26PM
19    Q.    Yes.                               01:50:26PM
20    A.    They would want to -- I'm not      01:50:29PM
21 sure of the question. "The basis"? I        01:50:31PM
22 don't know what you mean.                   01:50:34PM
23    Q.    You are not sure of the            01:50:35PM
24 question?                                   01:50:37PM
25    A.    No.                                01:50:37PM
```

**151**

```
1              LIEBERMAN
2     Q.    You can't understand my            01:50:37PM
3  question?                                   01:50:38PM
4     A.    No.                                01:50:39PM
5     Q.    I will go on to the next           01:50:39PM
6  question.                                   01:50:41PM
7     A.    Okay.                              01:50:41PM
8     Q.    Do you think there is any          01:50:41PM
9  relationship between -- do you think that   01:50:45PM
10 a prospective purchaser would see a         01:50:48PM
11 relationship between this last sentence     01:50:51PM
12 that I read to you and the fact that the    01:50:54PM
13 company was reporting as revenues 80        01:50:57PM
14 percent of the contracts that were signed   01:51:03PM
15 during a particular year?                   01:51:05PM
16    A.    I can't put myself in the shoes    01:51:06PM
17 of a particular purchaser. That's what      01:51:10PM
18 you are asking me to do.                    01:51:13PM
19    Q.    No, not particular. A ready,       01:51:14PM
20 willing, able buyer with reasonable         01:51:18PM
21 knowledge of what he was negotiating to     01:51:20PM
22 buy under the definition of fair market     01:51:23PM
23 value.                                      01:51:25PM
24          Would that person sort of draw     01:51:25PM
25 a relationship between your sentence here   01:51:27PM
```

**152**

```
1              LIEBERMAN
2  and the fact that they were recognizing     01:51:29PM
3  revenues on an 80/20 percent split?         01:51:33PM
4     A.    A buyer, hypothetical buyer,       01:51:38PM
5  would look at all data that a company is    01:51:43PM
6  presenting and would look at all            01:51:47PM
7  relationships between balance sheet and     01:51:49PM
8  income statement items and derive his own   01:51:53PM
9  conclusions as to what will the cash flows  01:51:57PM
10 from the company be.                        01:51:58PM
11    Q.    So is your answer yes to my        01:52:01PM
12 question?                                   01:52:04PM
13    A.    My answer is what the answer       01:52:04PM
14 is.                                         01:52:06PM
15    Q.    Is your answer yes, or do you      01:52:07PM
16 refuse to answer that question? Is your     01:52:10PM
17 answer yes?                                 01:52:12PM
18          MR. PAYERLE: Objection to          01:52:13PM
19 form.                                       01:52:14PM
20    A.    I don't even remember what the     01:52:14PM
21 question is anymore.                        01:52:15PM
22    Q.    That's because your answer went    01:52:16PM
23 on in a rambling manner totally             01:52:18PM
24 unresponsive to what I asked you.           01:52:21PM
25          MR. PAYERLE: I had an              01:52:23PM
```

**153**

```
1              LIEBERMAN
2  objection to form previously to the         01:52:24PM
3  question and another objection to the       01:52:27PM
4  commentary by Counsel.                      01:52:29PM
5     Q.    I will ask it again.               01:52:34PM
6          Do you think a willing              01:52:36PM
7  purchaser or a ready, willing and able      01:52:40PM
8  prospective purchaser of Premier would      01:52:45PM
9  take a look at the facts which underlie     01:52:46PM
10 the last sentence that I read to you in     01:52:53PM
11 your report and tie those facts in with     01:52:56PM
12 the 80/20 percent recognition?              01:52:59PM
13    A.    A ready, willing and able          01:53:05PM
14 purchaser would look at all factors         01:53:07PM
15 associated with the financial data that he  01:53:09PM
16 is presented with and draw conclusions      01:53:11PM
17 from the relationships within that          01:53:13PM
18 financial data.                             01:53:16PM
19    Q.    So would the answer to my          01:53:17PM
20 question be yes?                            01:53:19PM
21    A.    I gave you my answer.              01:53:20PM
22    Q.    I'm asking you another             01:53:22PM
23 question. Would the answer to my question   01:53:24PM
24 be yes?                                     01:53:26PM
25          MR. PAYERLE: Objection, form.      01:53:28PM
```

39 (Pages 150 to 153)

**Page 158**

```
1            LIEBERMAN
2  restatement that was made; is that         02:01:20PM
3  correct?                                    02:01:22PM
4    A.   Well, apparently there is two       02:01:24PM
5  note 14's, and I read the first note 14    02:01:26PM
6  that appears on the page. You must be      02:01:29PM
7  referring to the second note 14.           02:01:32PM
8    Q.   Correct, I am.                      02:01:34PM
9    A.   I did not read the second note      02:01:35PM
10 14 as of yet.                              02:01:38PM
11   Q.   Why don't you read it.              02:01:39PM
12   A.   I will.                             02:01:40PM
13        (Witness perusing document.)        02:01:44PM
14        MR. PAYERLE:  To be clear, we       02:01:44PM
15 are now referring to the note 14 captioned 02:01:45PM
16 "Restatement"?                             02:01:47PM
17        MR. EPSTEIN:  Yes.                  02:01:53PM
18   Q.   Have you read that now?             02:02:22PM
19   A.   Yes, I have.                        02:02:23PM
20   Q.   I go back, again, to your           02:02:24PM
21 statement in your text of your report at   02:02:26PM
22 page 11, "an unexplained and unaccounted   02:02:29PM
23 for difference in retained earnings."      02:02:33PM
24        Do you think that this note 14      02:02:36PM
25 does not explain the difference?           02:02:39PM
```

**Page 159**

```
1            LIEBERMAN
2    A.   I think this note 14 does not       02:02:42PM
3  properly explain the difference.           02:02:45PM
4    Q.   Is the word "properly" in your      02:02:47PM
5  report?                                    02:02:52PM
6    A.   No.                                 02:02:53PM
7    Q.   It says an "unexplained and         02:02:53PM
8  unaccounted for"?                          02:02:56PM
9    A.   The inference is not properly       02:02:57PM
10 explained or accounted for.                02:03:01PM
11   Q.   So you draw inferences from         02:03:02PM
12 your own writing, is that what you are     02:03:03PM
13 telling me?  Let's move on.                02:03:05PM
14        This does explain why the           02:03:08PM
15 restatement was made, correct?             02:03:12PM
16   A.   According to APB 20, this does      02:03:16PM
17 not explain the accounting change that is  02:03:20PM
18 improperly accounted for in these          02:03:27PM
19 financial statements.                      02:03:28PM
20   Q.   So this is not an explanation?      02:03:29PM
21   A.   It is not a correct                 02:03:33PM
22 explanation, no. It does not cover the     02:03:34PM
23 criteria that APB 20, to be in generally   02:03:37PM
24 accepted accounting principles, which      02:03:44PM
25 oddly they say they are doing it to        02:03:46PM
```

**Page 160**

```
1            LIEBERMAN
2  conform to, it does not conform to APB 20, 02:03:47PM
3  which is a part, at this time, of          02:03:51PM
4  generally accepted accounting principles.  02:03:54PM
5  It has since changed.                      02:03:56PM
6    Q.   So when you read this, you were     02:03:57PM
7  confused, you didn't know what this meant? 02:03:59PM
8  You as an accountant, CPA, didn't know     02:04:01PM
9  what this meant?                           02:04:04PM
10        MR. PAYERLE:  Objection to          02:04:05PM
11 form.                                      02:04:07PM
12   A.   I read this and couldn't track      02:04:07PM
13 the change to identify in particular what  02:04:09PM
14 years it affected and how I would          02:04:15PM
15 implement this change into my analysis.    02:04:19PM
16        Moreover, since I was doing a       02:04:21PM
17 cash flow analysis, this change became I   02:04:24PM
18 wouldn't say irrelevant, but less          02:04:28PM
19 important, because my cash flows were not  02:04:31PM
20 dependent upon this change. My cash flows  02:04:33PM
21 were dependent upon what cash came in.     02:04:37PM
22   Q.   I don't see the statement in        02:04:39PM
23 here, "an unexplained and unaccounted and  02:04:40PM
24 irrelevant difference." You just say "an   02:04:43PM
25 unexplained and unaccounted for            02:04:46PM
```

**Page 161**

```
1            LIEBERMAN
2  difference."                               02:04:48PM
3        Are you telling me that you         02:04:49PM
4  didn't understand when you read this       02:04:51PM
5  second note 14, the bottom note, the one   02:04:54PM
6  that says "Restatement," you didn't        02:04:56PM
7  understand what the accountant who         02:04:58PM
8  prepared this was communicating to you?    02:05:00PM
9  Are you saying that to me?                 02:05:02PM
10   A.   I'm saying that his explanation     02:05:04PM
11 did not lead me down the path to be able   02:05:08PM
12 to implement that change in the annual     02:05:10PM
13 financial statements that were presented   02:05:14PM
14 to me.                                     02:05:15PM
15   Q.   So you weren't able to do it.       02:05:17PM
16        Did you see that Mr. Waddington     02:05:19PM
17 did it?                                    02:05:21PM
18   A.   I saw that Mr. Waddington did       02:05:22PM
19 it, based on, he says, on the work papers  02:05:25PM
20 that were provided to him of the prior     02:05:27PM
21 accountant.                                02:05:30PM
22   Q.   Did you ask to see the work         02:05:30PM
23 papers of -- when you looked at this and   02:05:32PM
24 felt confused and didn't know the basis,   02:05:34PM
25 did you make any inquiry for any           02:05:38PM
```

41 (Pages 158 to 161)

**Page 162**

```
1         LIEBERMAN
2  additional information?                02:05:39PM
3    A.   I made an inquiry for           02:05:40PM
4  additional information.                02:05:42PM
5    Q.   You did?                        02:05:42PM
6    A.   Yes, I did.                     02:05:43PM
7    Q.   Who did you make it of?         02:05:43PM
8    A.   Lois Goodman.                   02:05:45PM
9    Q.   Did she tell you that in fact   02:05:46PM
10 these Halterman documents had all been 02:05:48PM
11 produced and that the work papers were 02:05:52PM
12 available?                             02:05:54PM
13   A.   I'm not aware of that.          02:05:54PM
14   Q.   Well, what did she tell you?    02:05:56PM
15   A.   My recollection is that we were 02:05:58PM
16 not -- we didn't have access to those  02:06:00PM
17 documents. Or if we did have access, they 02:06:04PM
18 weren't findable. I asked for the      02:06:07PM
19 accountant's work papers and was told I 02:06:09PM
20 was not getting the accountant's work  02:06:11PM
21 papers. That was the first thing we asked 02:06:14PM
22 for.                                   02:06:17PM
23   Q.   You would have liked to have    02:06:18PM
24 seen those?                            02:06:20PM
25   A.   Yes, I would have.              02:06:21PM
```

**Page 163**

```
1         LIEBERMAN
2    Q.   I don't mean to represent that  02:06:28PM
3  Halterman was deposed -- I don't know the 02:06:30PM
4  day that he was deposed and I don't know 02:06:32PM
5  how it fits in with the May 7th date. But 02:06:35PM
6  when did you start working on this? You 02:06:40PM
7  said February was the first contact.   02:06:43PM
8    A.   I think it was February. It     02:06:46PM
9  could have been March. I'm not sure.   02:06:55PM
10   Q.   But, at any rate, at some point 02:06:56PM
11 you said to Ms. Goodman "I would really 02:06:59PM
12 like to see the work papers"?          02:07:02PM
13   A.   I did make that request.        02:07:03PM
14   Q.   And she responded to you they   02:07:05PM
15 are not available, correct?            02:07:07PM
16   A.   She did not produce them. I     02:07:10PM
17 don't remember her exact response.     02:07:12PM
18   Q.   I will represent to you that at 02:07:20PM
19 some point they were produced, in other 02:07:22PM
20 words, they were made available to all 02:07:25PM
21 counsel, all counsel had them. I will  02:07:28PM
22 make that representation.              02:07:30PM
23        At no time did you ever get a   02:07:32PM
24 call from Ms. Goodman or anyone else at 02:07:34PM
25 McElroy, "Hey, we have those work papers 02:07:37PM
```

**Page 164**

```
1         LIEBERMAN
2  that you wanted to look at"?           02:07:39PM
3    A.   I did not get a call that the   02:07:42PM
4  work papers were available.            02:07:44PM
5    Q.   Even though you didn't          02:07:59PM
6  understand this adjustment, for purposes 02:08:00PM
7  of your calculations for subsequent years, 02:08:03PM
8  you did incorporate the change that was 02:08:06PM
9  made; isn't that correct?              02:08:10PM
10   A.   I incorporated the change that  02:08:16PM
11 was made in my cash flow analysis.     02:08:18PM
12   Q.   What caused you to accept that  02:08:23PM
13 change if you felt that you had not been 02:08:27PM
14 provided sufficient information to     02:08:30PM
15 determine why the change was made?     02:08:33PM
16   A.   It had nothing to do with       02:08:35PM
17 accepting the change. I had to account 02:08:37PM
18 for the change because the financial   02:08:38PM
19 statements changed.                    02:08:41PM
20        So when I went from one period  02:08:42PM
21 to another, there was a different      02:08:43PM
22 financial statement, so I had to account 02:08:46PM
23 for this change, and I accounted for it by 02:08:47PM
24 eliminating it to get to my cash flow  02:08:51PM
25 number.                                02:08:53PM
```

**Page 165**

```
1         LIEBERMAN
2    Q.   I understand that.              02:08:53PM
3         Had you been given the work     02:08:55PM
4  papers that you had requested and which 02:08:57PM
5  apparently Mr. Waddington was given, would 02:09:00PM
6  you have gone back the same way that   02:09:03PM
7  Mr. Waddington did and recalculate the 02:09:08PM
8  revenues and the profits for each of the 02:09:12PM
9  preceding years? By "preceding," I mean 02:09:14PM
10 preceding this restatement.            02:09:17PM
11        MR. PAYERLE: Objection to       02:09:19PM
12 form.                                  02:09:20PM
13   A.   It would not have changed my    02:09:20PM
14 cash flow analysis.                    02:09:22PM
15   Q.   So you would not have done what 02:09:24PM
16 I just said? You would not have gone back 02:09:25PM
17 and recalculated income -- excuse me,  02:09:29PM
18 revenues and profits for the preceding 02:09:34PM
19 years?                                 02:09:37PM
20        MR. PAYERLE: Same objection.    02:09:37PM
21   A.   I would not have changed my     02:09:39PM
22 cash flow analysis. It would have changed 02:09:41PM
23 my narrative to some degree obviously  02:09:44PM
24 because I would have different amounts in 02:09:47PM
25 my comparison to the RMA data.         02:09:50PM
```

42 (Pages 162 to 165)

238

```
1          LIEBERMAN
2  experience is. Why don't you tell me what   03:40:12PM
3  that is.                                    03:40:14PM
4      A.    As a business valuator, I         03:40:15PM
5  valuated a language school in Manhattan.    03:40:17PM
6  Well, it is Manhattan, Queens, Vancouver,   03:40:21PM
7  Miami, and New Jersey. I did a valuation    03:40:27PM
8  of the school.                              03:40:31PM
9      Q.    For what purpose was that         03:40:33PM
10 valuation?                                  03:40:36PM
11     A.    Strategic planning.               03:40:36PM
12     Q.    Tell me what that means.          03:40:39PM
13     A.    Planning the future of the        03:40:42PM
14 company, to make decisions based on what    03:40:47PM
15 the value is today, or identify value       03:40:50PM
16 drivers in the company and make an effort   03:40:53PM
17 to improve value through utilizing          03:40:57PM
18 techniques to increase the value drivers    03:41:02PM
19 so that the company is worth more tomorrow  03:41:05PM
20 than it is today.                           03:41:07PM
21     Q.    Am I correct, then, that to the   03:41:09PM
22 extent the company had components, you put  03:41:11PM
23 a fair market value on each of the          03:41:14PM
24 components; is that what you did?           03:41:16PM
25     A.    I put a fair market value on      03:41:18PM
```

239

```
1          LIEBERMAN
2  the company as a whole.                     03:41:20PM
3      Q.    But in doing that, I understood   03:41:22PM
4  you to say that you put values on the       03:41:26PM
5  components to see what was profitable and   03:41:28PM
6  not; or am I misreading what you said?      03:41:31PM
7      A.    I believe you are misreading      03:41:34PM
8  that, because I didn't say anything of the  03:41:36PM
9  kind.                                       03:41:38PM
10     Q.    You just went in and gave an      03:41:38PM
11 overall value of the company for strategic  03:41:41PM
12 planning?                                   03:41:44PM
13     A.    I gave a value of the company     03:41:44PM
14 for strategic planning, yes.                03:41:47PM
15     Q.    What was the standard you used,   03:41:49PM
16 a willing buyer and willing purchaser?      03:41:52PM
17     A.    I used fair market value, yes.    03:41:53PM
18     Q.    Was there any buyer involved or   03:42:05PM
19 was this just internal? In other words,     03:42:08PM
20 was it for the purpose of determining       03:42:10PM
21 whether an offer for the company was fair   03:42:13PM
22 and reasonable or anything like that?       03:42:16PM
23     A.    One of the strategic plans,       03:42:18PM
24 which is the purpose of the valuation, was  03:42:21PM
25 to bring in outside investors. That was     03:42:23PM
```

240

```
1          LIEBERMAN
2  part of the strategic planning process.     03:42:26PM
3  So to bring in outside investors, a value   03:42:29PM
4  for the company overall needed to be        03:42:34PM
5  established to attract investors.           03:42:38PM
6      Q.    Were you successful in            03:42:43PM
7  attracting investors?                       03:42:45PM
8      A.    The plan was actually             03:42:46PM
9  abandoned.                                  03:42:49PM
10     Q.    Did you do a report?              03:42:49PM
11     A.    Yes, I did.                       03:42:51PM
12     Q.    Was it abandoned because you      03:42:54PM
13 put a higher value on it than what the      03:42:57PM
14 owners of the company thought the company   03:42:59PM
15 was worth?                                  03:43:00PM
16     A.    No, it was abandoned because      03:43:02PM
17 the owner was too egotistical to allow      03:43:04PM
18 anybody to come in and work even on a       03:43:08PM
19 minority basis in his company.              03:43:11PM
20     Q.    So you did that valuation and     03:43:30PM
21 that was in a language school setting, all  03:43:34PM
22 within the metropolitan New York area?      03:43:38PM
23     A.    National.                         03:43:41PM
24     Q.    Oh, national. And when was        03:43:44PM
25 that done?                                  03:43:47PM
```

241

```
1          LIEBERMAN
2      A.    2000.                             03:43:48PM
3      Q.    Do you have a copy of that        03:43:49PM
4  report in your files?                       03:43:51PM
5      A.    Yes, I do. I have a               03:43:51PM
6  non-letterhead copy. It is just a Word      03:43:57PM
7  file. Because I was with a different firm   03:44:00PM
8  at the time.                                03:44:03PM
9      Q.    In that situation, did you make   03:44:05PM
10 projections of revenues?                    03:44:08PM
11     A.    Yes, we did.                      03:44:10PM
12     Q.    You didn't use actual, you made   03:44:10PM
13 projections?                                03:44:13PM
14     A.    We did projections based on       03:44:13PM
15 management's best estimate of the future    03:44:18PM
16 of the company.                             03:44:21PM
17     Q.    What kind of projections did      03:44:27PM
18 they give you? Did they give you a pretty   03:44:29PM
19 comprehensive set of directions,            03:44:32PM
20 documents, in which they really set forth   03:44:36PM
21 the analytical process by which they made   03:44:38PM
22 these projections? Or was it just an        03:44:41PM
23 oral, "We expect to bring in $24 million    03:44:46PM
24 next year"? Do you recall?                  03:44:49PM
25        MR. PAYERLE: Objection to            03:44:52PM
```

61 (Pages 238 to 241)

**Page 318**

```
1        LIEBERMAN
2    Q.    But you are not going to go        05:30:24PM
3  into court and say the value of Premier on  05:30:26PM
4  March 31, 2002 was $77,550,000, or are      05:30:30PM
5  you?                                        05:30:36PM
6    A.    Were Gary Camp to go in and say     05:30:39PM
7  what's the value of your company, he        05:30:41PM
8  theoretically would say it is worth $77     05:30:44PM
9  million on March of '02 and $172 million    05:30:46PM
10 on December of '06.                         05:30:50PM
11       I'm presenting this as a              05:30:55PM
12 possible range of the value. But I'm        05:30:56PM
13 conservative. Taking a conservative         05:30:58PM
14 stance on this company, I valued it at the  05:31:00PM
15 $30 million and the $59 million.            05:31:04PM
16   Q.    Again, you are not going to get     05:31:09PM
17 on the stand, you, not Gary Camp, not me,   05:31:12PM
18 not your attorney, you, you are the         05:31:16PM
19 expert, are you going to get on the stand   05:31:21PM
20 and say Premier, on March 31, 2002, was     05:31:23PM
21 worth $77,550,000; are you going to say     05:31:27PM
22 that?                                       05:31:32PM
23   A.    My conclusion of value is $30       05:31:32PM
24 million.                                    05:31:33PM
25   Q.    So you will not say 77,             05:31:33PM
```

**Page 319**

```
1        LIEBERMAN
2  correct?                                    05:31:35PM
3    A.    77 is a different number than       05:31:36PM
4  30.                                         05:31:39PM
5    Q.    So you will not say it?             05:31:39PM
6    A.    I will not say that as my           05:31:41PM
7  conclusion of value.                        05:31:43PM
8    Q.    You will also not say that your     05:31:44PM
9  conclusion of value on December 31, 2006    05:31:46PM
10 is $172,290,000, will you?                  05:31:49PM
11   A.    My conclusion of value on           05:31:54PM
12 December 31, 2006 is $59,795,000.           05:31:56PM
13   Q.    Let me ask you, were you told       05:32:04PM
14 why you were being asked to value Premier   05:32:07PM
15 as an entity?                               05:32:12PM
16   A.    In a litigation associated with     05:32:21PM
17 a bankruptcy.                               05:32:23PM
18   Q.    Is that all you were told?          05:32:25PM
19   A.    Yes.                                05:32:27PM
20   Q.    Generally when you are asked to     05:32:28PM
21 do an appraisal, do you ask a question      05:32:30PM
22 such as "For what purpose?"                 05:32:32PM
23   A.    Yes.                                05:32:35PM
24   Q.    If you are told it is for a         05:32:37PM
25 litigation, that's sufficient?              05:32:39PM
```

**Page 320**

```
1        LIEBERMAN
2    A.    Well, yes, it is a litigation       05:32:45PM
3  in association with a potential fraudulent  05:32:51PM
4  conveyance, I believe. But that's not my    05:32:54PM
5  expert opinion. That's just what I          05:32:56PM
6  believe. I was told it was for a            05:32:58PM
7  litigation.                                 05:32:59PM
8    Q.    Did you ask Mr. Waters, who you     05:33:00PM
9  believed was the trustee, as to why he      05:33:02PM
10 wanted this information?                    05:33:04PM
11       MR. PAYERLE: Objection, form.         05:33:05PM
12   A.    Yes, and he said it is a            05:33:10PM
13 litigation associated with a bankruptcy.    05:33:13PM
14   Q.    Did you ask him specifically        05:33:14PM
15 why he wanted it?                           05:33:16PM
16   A.    Yes. He said for a litigation       05:33:19PM
17 associated with a bankruptcy.               05:33:21PM
18   Q.    No other details?                   05:33:22PM
19   A.    Again, because of a possible        05:33:25PM
20 fraudulent conveyance was my impression.    05:33:28PM
21 I can't say that I recall him saying that.  05:33:30PM
22   Q.    Fraudulent conveyance of what?      05:33:32PM
23   A.    I'm speaking without knowledge.     05:33:35PM
24 My impression.                              05:33:41PM
25   Q.    Fraudulent conveyance of            05:33:41PM
```

**Page 321**

```
1        LIEBERMAN
2  Premier Education Group LP, was that your   05:33:43PM
3  understanding?                              05:33:51PM
4    A.    Actually, it is of a general        05:33:51PM
5  partnership, GP of Premier Education        05:33:56PM
6  Group, Inc.                                 05:34:01PM
7    Q.    That you were told was              05:34:02PM
8  fraudulently transferred, the general       05:34:06PM
9  partnership interest?                       05:34:08PM
10   A.    I wasn't told it was                05:34:08PM
11 fraudulently transferred. I figured that    05:34:12PM
12 out all by myself.                          05:34:19PM
13   Q.    From what?                          05:34:21PM
14   A.    I don't recall.                     05:34:23PM
15   Q.    Did you ever ask Mr. Waters or      05:34:26PM
16 any of the attorneys at McElroy, or the     05:34:28PM
17 Trustee for that matter, "Why am I not      05:34:34PM
18 being asked to value the property that was  05:34:36PM
19 actually transferred, the general           05:34:38PM
20 partnership interest?"                      05:34:41PM
21   A.    Actually, I did. I was told         05:34:41PM
22 that "We don't know what the percentage     05:34:43PM
23 interest of the general partner was. We     05:34:46PM
24 have conflicting documents that have        05:34:49PM
25 different percentages." And, in fact,       05:34:51PM
```

**Page 322**

```
 1           LIEBERMAN
 2  those were presented to me.                05:34:54PM
 3     Q.    Tell me what was presented to     05:34:57PM
 4  you which had conflicting information,     05:35:02PM
 5  because I don't think they are listed      05:35:03PM
 6  either.                                    05:35:05PM
 7     A.    I didn't use it in my report.     05:35:05PM
 8     Q.    So you were aware at the time     05:35:07PM
 9  of your report that what was transferred   05:35:08PM
10  was a general partnership interest, and    05:35:12PM
11  you were told the reason why you weren't   05:35:14PM
12  valuing the general partnership interest   05:35:16PM
13  is because there was conflicting           05:35:17PM
14  information as to what interest the        05:35:23PM
15  general partner had in the limited         05:35:24PM
16  partnership; is that correct?              05:35:26PM
17     A.    I was asked to do a 100 percent   05:35:27PM
18  interest in the limited partnership, and   05:35:30PM
19  that's what I did.                         05:35:34PM
20     Q.    But you were told the reason      05:35:37PM
21  why you shouldn't do an appraisal of the   05:35:39PM
22  general partnership interest is because    05:35:42PM
23  there was -- isn't that what you testified 05:35:44PM
24  to?                                        05:35:47PM
25     A.    Yes, it was unknown as to what    05:35:48PM
```

**Page 323**

```
 1           LIEBERMAN
 2  the general partnership interest was.      05:35:49PM
 3     Q.    And you were given documents to   05:35:51PM
 4  show what was this conflict?               05:35:53PM
 5           MR. PAYERLE: Objection.           05:35:55PM
 6     A.    Yes.                              05:35:56PM
 7     Q.    And what were those documents?    05:35:56PM
 8     A.    I don't recall.                   05:35:57PM
 9     Q.    Do you still have those           05:35:58PM
10  documents?                                 05:35:59PM
11     A.    Yes, I do.                        05:35:59PM
12           MR. EPSTEIN: I call for the       05:36:02PM
13  production of those documents also.        05:36:03PM
14           MR. PAYERLE: We will consider     05:36:06PM
15  it.                                        05:36:07PM
16     Q.    Anything else you looked at       05:36:07PM
17  that you haven't -- at the time you        05:36:08PM
18  prepared this report that you haven't      05:36:12PM
19  disclosed to me today?                     05:36:14PM
20     A.    It is very possible. I looked     05:36:16PM
21  at a lot of things.                        05:36:19PM
22     Q.    You see, you don't understand.    05:36:20PM
23  It is not supposed to be very possible.    05:36:22PM
24  You are supposed to tell me every document 05:36:24PM
25  that you reviewed or relied upon in        05:36:26PM
```

**Page 324**

```
 1           LIEBERMAN
 2  preparing a report.                        05:36:28PM
 3     A.    Every document I reviewed and     05:36:30PM
 4  relied upon is in this report or I have    05:36:32PM
 5  disclosed to you today. There may be       05:36:35PM
 6  other documents that I looked at that I    05:36:37PM
 7  did not use or rely upon in this report,   05:36:39PM
 8  such as --                                 05:36:42PM
 9     Q.    You see, you changed "reviewed"   05:36:43PM
10  to "used." Sometimes a document will be    05:36:45PM
11  contrary to your position and you look at  05:36:48PM
12  it. You don't use it. But you are          05:36:51PM
13  obligated to disclose it.                  05:36:54PM
14           Do you understand that as an      05:36:55PM
15  expert, that you are obligated to disclose 05:36:56PM
16  that?                                      05:36:58PM
17           MR. PAYERLE: Objection, form.     05:36:58PM
18     Q.    Or you don't understand that?     05:37:00PM
19           MR. PAYERLE: Objection to         05:37:02PM
20  form.                                      05:37:02PM
21     Q.    You don't know the answer to      05:37:02PM
22  that?                                      05:37:04PM
23     A.    Every document that I used or     05:37:04PM
24  reviewed has been disclosed in this report 05:37:06PM
25  or to you.                                 05:37:09PM
```

**Page 325**

```
 1           LIEBERMAN
 2     Q.    That's all I wanted to hear.      05:37:12PM
 3  So there are no other documents?           05:37:14PM
 4     A.    No.                               05:37:16PM
 5     Q.    You gave testimony in two         05:37:24PM
 6  cases, correct?                            05:37:26PM
 7     A.    Within the last three years.      05:37:27PM
 8     Q.    Tell me what testimony you gave   05:37:30PM
 9  in the two cases. And that will be my      05:37:31PM
10  swan song for today.                       05:37:36PM
11     A.    I have to refresh myself as to    05:37:37PM
12  what those two cases were.                 05:37:40PM
13     Q.    Tell me the testimony that you    05:38:39PM
14  gave.                                      05:38:41PM
15     A.    Well, in Andre Assous versus      05:38:42PM
16  Ellen Zoldessy, I did a calculation and a  05:38:46PM
17  valuation of a contract between Andre      05:38:54PM
18  Assous, Inc. and the Andy Warhol           05:39:00PM
19  Foundation.                                05:39:07PM
20     Q.    Was that a breach of contract     05:39:07PM
21  case?                                      05:39:08PM
22     A.    It was a case where Ellen         05:39:09PM
23  Zoldessy purportedly ruined the deal, so   05:39:12PM
24  to speak, for Andre Assous and the Andy    05:39:17PM
25  Warhol Foundation and tried to establish   05:39:22PM
```