# EXHIBIT 5

**Exhibit 5**

## FAMILY DEFENDANTS' STATEMENT OF INTENDED PROOFS

It will be the Trustee's burden to prove, by clear and convincing evidence, that Andrew Yao conveyed his stock in One Summit Place, GP, Inc., DHP, GP, Inc. and Premier Education Group GP, Inc. ("GP stock") to certain of the Family defendants with fraudulent intent. The Family defendants do not believe that the evidence will show fraudulent intent even by a preponderance of the evidence, let alone by clear and convincing evidence. Therefore, the Family defendants do not believe that they will be required to present any affirmative defenses as to this claim.

However, the Family defendants can readily prove that they received the GP stock in good faith and for reasonably equivalent value. The GP stock at issue was stock of the general partners of three limited partnerships, Premier Education Group LP (formerly CEC Partnership LP), One Summit Place Partners LP and Day Hill Partners LP. Premier operated several vocational schools; Day Hill and One Summit owned real estate at which some of Premier's operations were located. Bast and certain of the Brennan Trusts had been limited partners in Premier since its formation in 1993, and in One Summit and Day Hill since their formation in 1994 and 1996, respectively. The general partner of each of these partnerships was a corporation whose stock was owned by Yao. Under the partnership agreements, the general partners of One Summit and Day Hill each had a 1/3 interest in partnership distributions. In Premier, the general partner had an interest in partnership distributions ranging from 5% to 40%; increase of the percentage above 5% depended upon the limited partners receiving certain returns on their capital contributions.

M0610382.DOC

The Family defendants made substantial capital contributions and loans to these partnerships, particularly to Premier. By 2002, their investment totaled over $7.5 million (more than $4 million in equity and the remainder in outstanding loans). Other than interest payments, the Family defendants, by 2002, had received virtually no return on their investments in these partnerships. Although they were hopeful that their nine years of investment in Premier would eventually provide a reasonable return, they had no assurance that it would do so.

From 1995 to 1998, the Family defendants purchased subordinated debentures totaling $3 million from SFC. SFC's obligations under each debenture were personally guaranteed by Yao. From 1998 to 2002, the Family defendants made a number of short term bridge loans to SFC. These, too, were personally guaranteed by Yao and, in some instances, his wife. In the spring of 2002, all of the debentures were still outstanding, as were $3.3 million in bridge loans that were made by certain of the Family defendants on March 5, 2002, and $676,000 of a $3 million loan that Bast made to SFC in 1999. In principal alone, SFC owed the Family defendants almost $7 million.

SFC defaulted on these loans, first by failing to provide the collateral required under the loan agreements for the March 2002 loans and then, in May 2002, by failing to make interest payments. After the first default, Yao pledged the GP stock as collateral to partially secure his obligations under the guaranties. Although the Family defendants did not believe that the GP stock was worth anywhere near the amount that SFC owed them under the loan agreements, they accepted Yao's pledge and took no further action at the time. Already facing the possibility of losing the money they had lent to SFC, the Family defendants saw the pledge of the GP stock as a way at least to protect their substantial investments in Premier, One Summit and Day Hill. They also believed that any other creditors of Yao would prefer his other assets to the GP stock,

since this stock was not liquid, marketable or readily transferable to anyone outside the partnership. After the second default, the Family defendants exercised their right under the loan agreements to accelerate the maturity date of the debt, proceed against the guarantor and execute against the GP stock that they held as collateral for Yao's guaranties. In short, the Family defendants did nothing more than enforce their rights as creditors, properly and in good faith, under the loan agreements and guaranties.

Since they had received virtually no return on their investments in the partnerships, the Family defendants reasonably believed, at the time they received the GP stock, that it was worth far less than the $7 million that Yao owed them. In fact, based on expert analysis, this belief was correct: the Family defendants' experts have determined that the fair market value of the GP stock on the transfer date was only $2.3 million. Moreover, the transfer was made under Assignment and Acceptance Agreements with Yao, under which the Family defendants transferred to Yao the SFC loan agreements and debt instruments that were in default. Under the Assignment and Acceptance Agreements, if the GP stock were sold and the amount received was less than the principal, accrued interest and fees due under the loan agreements, the Family defendants would be entitled to the shortfall from Yao; if the amount received was more than the amount due under the loan agreements, Yao would be entitled to the excess. These facts demonstrate conclusively that the Family defendants gave reasonably equivalent value for the GP stock that Yao transferred to them and acted with good faith intent to insure that they would receive nothing more than they were owed by Yao under his guaranties.

The Family defendants also intend to prove that, if Yao had not transferred his stock in Premier Education Group GP to them in 2002, they would have been able to terminate his rights under the partnership agreement in 2003, when they discovered that he had misappropriated

funds from Premier. In addition, the Family defendants will show that they have rights to setoff and recoupment against any amounts that the Trustee contends he is entitled to recover. Further, the Family defendants will show that the Trustee's claims are barred, at least in part, by the statute of limitations, because their execution on the GP stock constituted the enforcement of a security interest granted by the 1995, 1997 and 1998 debentures, which interest is outside the statutory limitations period.

With regard to the Trustee's asserted preference claims for payments made by SFC to the Family defendants between 90 days and one year before the Filing Date, it is the Trustee's burden to prove that each Family defendant to whom a transfer was made was an insider of SFC at the time of the challenged transfer. Hundreds of hours of deposition testimony have not produced a shred of evidence to support this contention, and the Family defendants do not believe the Trustee can meet his burden of proof on this issue. Even if he could meet his burden, the Family defendants will be able to show that of the $4,229,093 paid by SFC to the Family defendants in the year before the Filing Date, the Trustee is precluded by the new value defense from avoiding all but $952,239, because the loans totaling $3.3 million made by the Family defendants to SFC on March 5, 2002 constitute new value under section 547(c)(4) of the Bankruptcy Code. Although payments to a debtor that are secured by an otherwise unavoidable security interest do not constitute new value, the security interests for the $3.3 million that the Family defendants were entitled to receive under the loan agreements were never provided by SFC, and thus were never perfected. Therefore, this exception to the new value defense does not apply.

Further, the Family defendants intend to show that all allegedly preferential payments made to them by SFC – both in the 90 days and in the one year preceding the Filing Date – were

made in the ordinary course of business of SFC and the Family defendants and are therefore not avoidable by the Trustee under section 547(c)(2) of the Bankruptcy Code. All payments made by SFC were for debts incurred in the ordinary course of business between SFC and the Family defendants, and all payments were made in the ordinary course of business between them. The bridge loans that were made and repaid in the one year before the Filing Date were completely consistent with the course of dealings between the parties extending back to 1998. The loan terms such as interest rates and commitment fees were the same as prior bridge loans. Further, consistent with the loan agreements and with the parties' prior dealings, the bridge loans were repaid when SFC obtained other, more permanent financing, and the commitment fees and accrued interest on the loans were paid at that time. The Family defendants will also show that all interest payments made by SFC to the Family defendants on the debentures were entirely consistent with the interest payments that had been made as far back as 1995 to 1997, when the debentures were purchased. In short, nothing that occurred in the 90 days or one year before the Filing Date with regard to the Family defendants' making of loans to SFC, or SFC's payment of interest and fees on the loans and repayment of principal, was out of the ordinary in any way.

Finally, as regards the last prong of the ordinary course defense, the Family defendants will show that all payments by SFC to the Family defendants were made according to ordinary business terms. The credit terms between the parties were within industry norms, and in accord with the parties' six year relationship. Therefore, the ordinary course of business defense is applicable to all payments that the Trustee contends were preferential, and the payments cannot be avoided by the Trustee.