IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHARLES A. STANZIALE, JR., Ch. 7 Trustee of Student Finance Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PEPPER HAMILTON LLP, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 04-1551-JJF<br>)<br>)<br>)<br>)<br>)<br>) |

---

## MEMORANDUM OF LAW SUBMITTED BY TRUSTEE IN OPPOSITION TO FAMILY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

and

McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711

*Attorneys for Plaintiff*
*Charles A. Stanziale Jr., Trustee*

## TABLE OF CONTENTS

I.    **STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**...................1

II.   **SUMMARY OF ARGUMENT** ..............................................................................1

III.  **FACTS** .........................................................................................................................3

      A.  **SFC's Operations**....................................................................................................3

      B.  **Gagné's Relationship with SFC and Yao**............................................................4

      C.  **Gagné's and the Other Family Defendants' Transactions with SFC**..................5

      D.  **The Collapse of SFC** ............................................................................................7

      E.  **Transfer of Yao's GP Stock**...............................................................................8

      F.  **Gagné's Notice of the Fraud** ............................................................................10

IV.  **LEGAL ARGUMENT**.............................................................................................12

     A.  **The Family Defendants Have Not Met Their Burden for
         Summary Judgment** ............................................................................................12

     B.  **The Preference Claim Presents Genuine** .............................................................14

     1.  **The Family Defendants Are Insiders under §547(b)(4)(B)** ..................15

     C.  **The Ordinary Course of Business Defense Presents Genuine
         Issues of Fact Precluding Summary Judgment** ...................................................18

     1.  **Transactions in Relation to a Ponzi Scheme**.....................................................19

     2.  **The Conduct Asserted by the Family Defendants to Support Their
         Ordinary Course of Conduct Exception Arose *After* Insolvency**......................22

     3.  **The Transfers Were Not Made According to Ordinary Business Terms**..........23

     C.  **The New Value Defense Presents Genuine Issues of Fact Precluding
         Summary Judgment** ............................................................................................24

     B.  **The Fraudulent Transfer Claim Presents Genuine Issues of Fact
         Precluding Summary Judgment** .........................................................................27

      IV.  **CONCLUSION**.................................................................................................33

**Federal Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)            12

Celotex Corp. v. Catrett, 477 U.S. 317, 232 (1986)            12

El v. S.E.P.T.A., 479 F.3d 232, 238  (3d Cir. 2007)            13

Emerson v. Maples (In re Mark Benskin & Co.), 161 B.R. 644, 649 (Bankr.W.D.Tenn.1993)    29

Floyd v. Dunson (In re Ramirez Rodriguez), 209 B.R. 424, 433 (Bankr.S.D.Tex.1997)    29

Hirsch v. Allen Products Co., Inc., 789 F.2d 230, 234 n.2 (3d Cir. 1986)    12

Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256    16, 17

Horowitz v. Fed. KemperLife Assur. Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)    12

In re Acme-Dunham, Inc., 50 B.R. 734, 739 (D. Me. 1985)    15

In re American International Airways, Inc., 68 B.R. 326, 337 (Bankr.E.D.Pa.1986)    25

In re American Rehab & Physical Therapy, Inc., 2006 WL 1997431 (Bankr. E.D.Pa. 2006)    29

In re Baker & Getty Financial Services, Inc., 88 B.R. 792, 799 (N.D. Ohio Bankr. 1988)    20, 21

In re Bayou Group, LLC, 363 B.R. 674    29

In re Blatstein, 192 F.3d 88 (3d Cir. 1999)    28

In re Braniff, Inc., 154 B.R. 773, 780 (M.D.Fla. 1993)    19

In re Bullion Reserve of North America, 836 F.2d 1214, 1219 (9th Cir. 1988)    20

In re Burry, 309 B.R. 130 (Bankr. E.D.Pa. 2004)    29

In re Dolata, 306 B.R. 97 (Bankr. W.D.Pa. 2004)    29

In re Greene, 202 B.R. 68, 73 (Bankr.D.Md.1996)    28, 31

In re Gull Air, Inc., 82 B.R. 1 (D. Mass. Bankr. 1988)    19

In re Hechinger Inv. Co. of Del., 320 B.R. 541, 547 (D. Del. Bankr. 2004)    15, 19

In re Henderson, 96 B.R. 820, 824-25 (E.D. Tenn.  Bankr. 1989)    15

In re Jersey First Securities, Inc., 180 F.3d 504, 513 (3d Cir. 1999)                    24

In re Molded Acoustical Products, Inc., 18 F.3d 217, 219, 225 (3d Cir. 1994)    19, 20, 22

In re Montgomery, 123 B.R 801, 814 (M.D. Tenn. Bankr. 1991)                       20

In re Oakwood Homes Corp., 340 B.R. 510, 523 (D. Del. Bankr. 2006)               15

In re Poage, 92 B.R. 659, 665 (N.D. Tex. Bankr. 1988)                            15

In re Taubman, 160 B.R. 964, 983 (Bankr. S.D. Ohio 1993)                         29

In re Western World Funding, Inc., 54 B.R. 470, 481 (D. Nev. Bankr. 1985)        20

In re World Vision Entertainment, Inc., 275 B.R. 641, 656 (M.D. Fla. 2002)    21, 29, 30

J.P. Fyfe, Inc. v Bradco Supply Corp., 96 B.R. 474 (D.N.J. 1988), affirmed, 891 F2d 66
    (CA3 NJ 1989)                                                                 19

Jobin v. Ripley (In re M & L Business Machine Co., Inc.), 198 B.R. 800, 806-07
    (D.Colo.1996)                                                                 29

Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 524 (3d Cir. 2004)         13

Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 110
    (E.D. Pa. 2002)                                                            passim

Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc., 819 F.2d 214, 218 (9th Cir.
    1987)                                                                        20

Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 860-61 (D.Utah 1987) 29

Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.), 277 B.R. 520, 565       16

New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc)., 880 F.2d 679,
    680-81 (3d Cir. 1989)                                                        25

Protocomm Corp. v. Novell, Inc., 171 F.Supp.2d 459, 468                          29

Quilling v. Stark, 2006 WL 1683442 at *6 (N.D. Tex. 2006)                        29

Seaver v. Allstates Sales & Leasing Corp. (In re Sibilrud), 308 B.R. 388
    (Bkrtcy. D. Minn. 2004)                                                      19

Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.), 335 B.R. 539, 547 (D. Del.
    2005), quoting Walsh v. Dutil (In re Demko), 264 B.R. 404, 408 (W.D. Pa. Bankr. 2001)    16

Three Flint Hill Ltd. Partnership v. Prudential Ins. Co., 213 B.R. 292, 299 (D. Md. 1997)    16

U.S. v. Purcell, 798 F.Supp. 268 (W.D. Pa. 1991)    28

**Federal Statutes**

11 U.S.C. § 547    19

11 U.S.C. §§101(31)    16

11 U.S.C. §101(31)    15

11 U.S.C. §101(31)(B)    15

11 U.S.C. §102(3)    15

11 U.S.C. §541    27

11 U.S.C. §547(b)    1, 14

11 U.S.C. §547(c)(2)(C)    23

11 U.S.C. §547(c)(4)    25

11 U.S.C. §547(c)(4)(A)    25

11 U.S.C. §547(c)(4)(B)    27

11 U.S.C. §548(a)    29

**State Statutes**

12 Pa. C.S. §5104(10)    32

12 Pa. C.S. §5104(a)(1)    3, 28

12 Pa. C.S. §5104(b)    28

12 Pa. C.S. §5104(b)(1)    31

12 Pa. C.S. §5104(b)(2)    32

## I.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Plaintiff, Charles A. Stanziale, Jr., as Chapter 7 Trustee (the "Trustee") of Student

Finance Corporation ("SFC") submits this brief in opposition to the motion for summary

judgment filed by Robert L. Bast, Pamela Bashore Gagné, the family trusts created by Elizabeth

B. Brennan and James T. Brennan, and W. Roderick Gagné ("Gagné") as trustee of those trusts

(the "Family Defendants"). Trial of this action commences on October 10, 2007.

## II.    SUMMARY OF ARGUMENT

1.    The Trustee's preference claim under 11 U.S.C. §547(b) presents genuine issues

of material fact precluding summary judgment on each element or defense addressed by the

Family Defendants' motion – insider status, the ordinary course of business defense, and the new

value defense. The fact issues are established by substantial evidence such as that addressing the

close relationship of Gagné with SFC and Andrew Yao ("Yao"), and the nature of SFC's

operations.

2.    There is substantial evidence that Gagné was an insider of SFC under

§547(b)(4)(B) based on his close relationship with SFC and SFC's principal, Yao. Gagné not

only was effectively the General Counsel of SFC, with his paralegal serving as its Assistant

Secretary, but he provided business advice to it, personally represented Yao, and was involved in

financing arrangements for SFC. The Family Defendants' motion is based on a false predicate –

that insider status requires day-to-day control. That is contrary to the open-ended definition of

insider under the statute and the case law interpreting that term. Further, because Gagné acted on

behalf of the other Family Defendants with respect to the transactions at issue, and they benefited

directly from his close relationship with SFC and Yao, the other Family Defendants also are

insiders for purposes of §547(b)(4)(B).

3.    The ordinary course of business defense under §547(c)(2) presents general issues of material fact precluding summary judgment in at least three respects. First, because the defense does not apply to transactions related to a fraudulent scheme, the Family Defendants' must prove that SFC's operations were not in the nature of a Ponzi scheme. There is substantial evidence that SFC was operated as a Ponzi scheme, and that the Family Defendants' investments in SFC facilitated the continued operation of that scheme. Second, there is a genuine issue of material fact regarding when SFC became insolvent, which the Trustee's expert opines had occurred by 1998. The extent of pre-insolvency dealing between the parties impacts the determination of whether the terms of the challenged transfers were consistent with the ordinary course. Because the transactions that the Family Defendants identify as establishing their "ordinary course" of dealing with SFC occurred almost entirely from 1998 to 2002, SFC's insolvency during that period presents a genuine issue of fact on the ordinary course of business defense. Third, there is substantial evidence, as reflected in the opinion of the Trustee's expert, that the terms of the transactions between the Family Defendants and SFC were not consistent with the industry norm and, therefore, were not within the ordinary course under the meaning of the statute.

4.    The new value defense under §547(c)(4) similarly presents a genuine issue of material fact because it cannot apply to alleged new value that facilitated the continuation of a Ponzi scheme. In addition, the new value defense is not applicable because the asserted new value provided by the Family Defendants was fully secured and, therefore, excluded from the defense under the plain terms of the statute.

5.    The fraudulent transfer claim presents genuine issues of material fact on the issue of the actual intent of Yao, as the debtor, to hinder, delay or defraud creditors under 12 Pa. C.S.

§5104(a)(1). The substantial evidence of Yao's operation of a Ponzi scheme through SFC supports the inference of such actual intent. In addition, communications between Yao and Gagné also provide evidence of the intent to protect Yao's assets from creditors. Other circumstantial evidence also supports the inference of such intent, including the close relationship between Gagné and Yao that reflects insider rather than arms-length dealing, the continued retention by Yao of a potential interest in the transferred asset, and the timing of the transfer relative to the substantial liability to which Yao was becoming exposed as the SFC scheme collapsed.

## III.    FACTS

### A.    SFC's Operations

SFC, a company started in 1992 by Yao, was in the business of acquiring and originating student loans. Most of those loans came from trucking school students. SFC bundled those loans into pools and sold them as asset backed securities. Until its collapse in 2002, SFC received hundreds of millions of dollars from investors purchasing these securities.

To induce investors to buy these securitized loans, SFC concealed the true default rates, which were very high, by using its own money to make payments on the loans to keep them from defaulting. The payments appeared as if they had been made by the students. People at SFC referred to these payments as "forbearance payments" and considered the making of forbearance payments to be part of their business model. See Exhibit 1; see also Exhibit 2 (minutes of Finance Committee meeting dated November 13, 2001) Exhibit 3 (describing "Third Balance" forbearance); Exhibit 4 (describing forbearance process as "the process that determines how much money Student Finance Corporation will pay on loans on behalf of the students. . . .

Forbearance means that Student Finance Corporation makes a payment on behalf of the student to prevent that student's loan from going to claims.")

SFC kept two sets of books, one reflecting balances based on payments made by students, and the other showing balances reduced by the forbearance payments. While the two sets of books allowed SFC to keep up the appearance of financial health, the Trustee's expert has opined that it was in fact insolvent as early as 1998. Exhibit 5 (Report of Harry Steinmetz at 9-10).

**B.    Gagné's Relationship with SFC and Yao**

Gagné represented SFC while a partner at Pepper Hamilton, and earlier at his previous firm. He functioned as SFC's outside general counsel. See Exhibit 6 (SFC auditors referring to Gagné as "the main counsel for Student Finance Corporation and its related entities"). During the course of his representation, he and his colleagues prepared the documents necessary for the student loan securitizations. His paralegal, Maria DeCarlo, was the Assistant Secretary to the company and was authorized to execute documents on its behalf. Exhibits 7, 8, 9. He also worked on contracts with the schools from which SFC bought student loans. His relationship with SFC and with Yao, made him aware of business and investment opportunities related to its operator.

In addition, Gagné and his team set up separate entities related to SFC. Some were part of the securitization process, which called for the creation of special purpose entities. Others, such as Student Loan Servicing LLC ("SLS") and Student Marketing Services LLC ("SMS") were created to separate out part of SFC's business operations. Gagné represented each of the newly formed entities.

At the same time that he was representing SFC, Gagné also represented Yao personally. He advised the Yao family members with regard to their estate planning, handled their real estate transactions, and prepared their wills. Exhibit 10 (Gagné 2/26/07 deposition at 361).

Aside from his role as legal counsel, Gagné gave *business advice* to SFC. See, e.g. Exhibit 11 (Gagné email to Yao commenting on structure of deals, interest rates, etc). When he attended a conference relating to securitizations in Scottsdale, Arizona, he reported back that he had discussed SFC's business while at the conference and had explored business opportunities and financing sources for SFC. Exhibit 12. His recommendations following the conference were heeded. Exhibit 13 at WSFC0754183.

The money Pepper billed for services rendered to SFC and its related entities made up the greatest percentage of Gagné's billing originations as a partner at Pepper. Exhibit 14 (Gagné 2/23/07 deposition at 31). Yao recognized the benefit he was conferring on Gagné. In an email he wrote to Gagné on January 5, 2001, Yao stated that:

> We have no problem with the magnitude of fees. They seem to be directly proportional to the size of our business.
>
> At least you get to benefit from the fees SFC, et al pays. That way, we still keep it all "in the family" (i.e., our extended business family).

Exhibit 15.

## C.    Gagné's and the Other Family Defendants' Transactions with SFC

The Family Defendant had longstanding involvement with Yao, both with regard to SFC and other ventures. Yao owned the stock of Premier Education Group, GP, Inc. (formerly CEC GP, Inc.), DHP GP, Inc. and One Summit Place, GP, Inc. (referred to collectively as "GP"), three entities which served as the general partners for three limited partnerships. The Family Defendants jointly with Yao owned Premier Education Group LP (formerly, CEC Partnership

LP), Day Hill Partners LP, and One Summit Place LP (referred to collectively as "LP"). Premier
LP owned several trade schools.

From 1995 through 2002, the Family Defendants, including Gagné as the trustee of
various family trusts and also a beneficiary, repeatedly provided funding to SFC loans and the
purchase of subordinated debentures. The rates they realized from SFC, including commitment
fees, were high – well in excess of what was market for such loans at the time. Exhibit 16
(Hecht Report at 3, 6) ("we calculated the effective annual interest rate combining the interest
and commitment fees on a $3.5 million loan from Pamela Gagne revealing a 77% effective
interest rate.") In suggesting a short term loan in the Fall of 1999, Yao told Gagné "there is a
benefit to SFC and, therefore, there is another opportunistic investment opportunity for you to
consider. . . . On a positive note, this represents an opportunity for you to add $70,000 to $80,000
to your income this year." Exhibit 17.

When Yao wanted to show potential investors that SFC was creditworthy, he asked the
Family Defendants to buy stock in the company, rather than lending the money. Exhibit 18
(Yao: "SFC sold common stock to demonstrate that it has the capacity to raise equity financing
on short notice and to signal SFC's commitment to its long term business plan.") (Bast
acknowledged the reason for the investment. Exhibit 19 (Bast deposition at 163). The Family
agreed and in early 2000, they became shareholders of SFC in return for their payment of $6
million. Exhibit 18; Exhibit 20. Yao and his wife gave personal guaranties, although Bast noted
that the guaranties would not be included in the letter setting forth the agreement "for a variety of
reasons." Exhibit 21. Yao then used the fact that he had equity investors to bolster SFC's
appearance of financial well-being. He did not disclose that those equity investors were in fact
his lawyer and his lawyer's family. When SFC's accountants requested shareholder information

for the annual report, Gagné facilitated Yao's plan by recommending that the report be done in-house, rather than by the accountants, in order to keep the shareholder identity confidential. Exhibit 22.

The agreement provided for a redemption of the Family's stock within a year, and the redemption was completed in January 2001, with the Family Defendants receiving $6.7 million for their shares. According to the Trustee's expert, Harry Steinmetz, SFC was already insolvent at the time of the redemption, and the stock was in fact worthless. Exhibit 5 (Steinmetz Report).

While they were shareholders, the Family Defendants, including Gagné, his wife Pamela Gagné, and Gagné's uncle Robert Bast, expressly ratified the actions of Yao and the other officers and directors of SFC. Exhibit 23. Yao's actions included making forbearance payments.

### D.    The Collapse of SFC

In early March 2002, when SFC was unable to complete another securitization, it urgently needed funds to make the forbearance payments for February in order to keep the fraud going. Without those payments, thousands of loans would go into default, revealing the fraudulent nature of SFC's operations. Yao turned to the Family for the quick infusion of cash that was needed. The Family responded quickly and Gagné wrote to Yao:

> Bob [Bast] to my dismay is flying back today from Florida and I will not know how much he can deliver until late this afternoon after the wire transfer deadline. I am drafting after this e-mail my wire transfer instructions to the various lenders to move $1,500,000 to SFC. I do not know if it will hit today but definitely tomorrow morning.

Exhibit 24. The Family came up with the money, Yao was able to make the February forbearance payments, and the scheme continued for another month. Eventually, in June 2002,

when it could no longer fund the forbearance, SFC was forced into involuntary bankruptcy by

three truck driving schools.

### E.     Transfer of Yao's GP Stock

In April 2002, as the fraudulent scheme was collapsing under the weight of increasing

defaults and scrutiny and SFC's bankruptcy was becoming increasingly imminent, Yao reassured

the Family Defendants, through Gagné, that he would protect their interests:

> I know that these are troubling time for you as well.  I have been
> very impressed, and reassured, by your steady hand, and continued
> guidance.

> Please be assured, in return, that I will protect your family's
> investment in SFC, notwithstanding any adverse outcome that may
> result, should Royal make an uneconomic decision with respect to
> our recovery and repurchase proposal.

*     *     *

> Please know that I always will reciprocate your good will.  I will
> not abandon those who do not abandon us.

Exhibit 25.

And he did protect them.  Initially, Yao gave the Family a personal guaranty to protect

their March 2002 loans, with the assets of SFC shown as collateral.  On May 14, 2002, when it

was clear that SFC could not avoid bankruptcy, Yao substituted a pledge of his stock (the "GP

Stock") in the general partners of three limited partnerships, Premier Education Group LP

("Premier LP"), One Summit Place LP, and Day Hill LP.  See, e.g., Exhibit 26 (Pledge

Agreement).   While this served the stated purpose of satisfying Yao's obligations under the

guaranties, it also protected the valuable Premier Stock from Yao's creditors, most notably SFC.

After SFC was put into an involuntary bankruptcy, the Family executed on the pledge on

June 14, 2002 and took the GP Stock, which it still holds to this day.  See, e.g., Exhibit 27

(Assignment and Acceptance of Loan and Security Agreement dated June 14, 2002).    Under the agreement for the assignment of the stock, Yao continues to have an interest in the stock as well: in the event of a disposition of the stock, if the value is greater than the amount Yao originally guaranteed, plus any capital investments made by the Family in the interim, Yao would receive the difference.

The Premier Stock is valuable.  In December 2001, Yao suggested a value of $150 million for Premier LP.  Exhibit 28.  The Trustee's expert has valued Premier LP at $30.3 million as of March 2002.  Lieberman Report at 25-26.  Premier growth suggests that when it finally sold and Yao received his carried interest which the Trustee seeks to recover, the value of that interest will much exceed the original debt.

The Family Defendants' efforts to assist Yao in protecting his assets did not end with the transfer of the GP Stock from Yao to the Family in June 2002.  In October, 2002, Gagné noted that the Family was willing to enter into a consensual judgment to assist Yao in avoiding claims being asserted by Wilmington Trust.  Exhibit 29.

Wilmington Trust was not the only creditor asserting a claim against Yao's assets.  On or about September 14, 2004, the Trustee filed a complaint against Andrew Yao and his wife, Lore Yao, as well as certain related entities.  The Trustee has settled the action against Lore Yao but the complaint against Yao remains pending and discovery has not been able to proceed, in light of the pending criminal actions against Yao.  Yao has also been the focus of numerous other suits, including those by Royal Indemnity Company, Lumbermens Casualty, and U.S. Bancorp Equipment Finance Inc., among others.  One of the criminal trials has already been conducted, resulting in a conviction, and the other is still pending.

F.    **Gagné's Notice of the Fraud**

In a draft memo prepared more than a year after Pepper had withdrawn from representing SFC, Gagné himself referred to the operation of SFC as a "Ponzi scheme" (or akin to one) and further stated:

> SFC apparently routinely and regularly made use of "reserve"
> accounts designed to help its borrowers over a temporary rough
> spot while they obtained employment after completing their course
> of study, to disguise each and every delinquency of 90 days or
> more, in order to prevent those loans from falling into default. . . . .

Exhibit 30. In that same memo, Gagné tells his firm that "[b]ecause SFC was wholly owned by one individual, Mr. Andrew Yao, there were no public financials available." He expressly states that the financials statements were not made available to Pepper but he neglects to tell them that as a shareholder and investor, Gagné himself, along with his Family, did have access to those financials and any other financial data but never requested any. Exhibit 30 at PEPPER 202463; Exhibit 31 (Loan and Security Agreement at PH 009015: "Borrower ... has heretofore furnished to Lender its most recent Audited Financial Statement and quarterly internal financial statement and will furnish to Lender all annual audited financial statements thereafter..." and "Borrower . . . (c) shall promptly provide such financial or other information as Lender may from time to time request to keep itself informed of Borrower's financial condition and affairs.").

In fact, Gagné had notice of the fraud well before he and Pepper withdrew from representing SFC. Gagné's firm served as litigation counsel with regard to at least two cases that provided notice that SFC was being operated as a Ponzi scheme. In one, a school with which SFC did business, Nielsen Electronics Institute, sued SFC, charging that the company was really a huge Ponzi scheme. Gagné's partner, Duncan Grant, handled the litigation, along with

associate Andrea Unterberger, but Gagné was the focal point for contact with SFC, at least in the

early stages. Exhibit 32. During the course of the litigation, Grant and Unterberger came into

possession of documents that reflected that SFC was in fact making payments on behalf of

students. In making forbearance payments, SFC used transaction codes ("TC") to designate the

nature of the payment, using TC 60 and TC 12 for forbearance payments, depending on whether

the payments were made on loans that were already securitized (TC 60) or still in the warehouse

(TC 12). Exhibit 33. An outline for preparing witnesses for deposition included the TC codes.

Exhibit 34; Exhibit 35. The agenda for the meeting of SFC personnel with the attorneys to

review the Nielsen litigation issues and prepare for depositions included a specific caution not to

"confuse bank side definitions with school side definitions – the NEI litigation is primarily

concerned with school side transactions (as you know, our different contracts sometimes require

us to account for the same transaction in two different manners)." Exhibit 36. Yao confirmed

that there were two sets of books and that the wrong set had been sent to Nielsen:

> As a rule, we should keep school reporting separated from investor
> reporting. This should apply to all situations going forward and
> should be built into our IT.
>
> This is the first that I know that investor information was provided
> to NEI in the litigation. Once again, we are our own worst enemy.

Exhibit 37 . Unterberger sent the TC code list to Arthur Anderson, SFC's accounting expert in

the Nielsen case. Exhibit 33.   These documents were in the possession of Duncan Grant who

communicated with Gagné regarding the litigation. Although they went to the heart of the

Nielsen allegations of fraudulent conduct, both Gagné and Grant testified that they did not

understand or investigate the significance of the documents, beyond asking Yao whether they

were true. Exhibit 38 (Grant deposition at 471-475).

Gagné's firm also assisted SFC in the preparation of their contracts with schools and with students. Gagné's partner, Rick Eckman, worked on revisions to the school contracts, which Gagné also revised. Those revised contracts were a vehicle for the forbearance payments. Although both Gagné and Eckman worked on those revisions, when their paralegal, Darcy Malcolm Lee sent a report to the New York State Department of Banking with regard to SFC's operations, she submitted the outdated contract that did not reference the changes Exhibit 39. Later, when Gagné advised his firm of the SFC issues, he denied having prepared the school contracts, Exhibit 40, and denied even knowing that the contracts had been revised. Exhibit 41 at PEPPER 047282-3.

## IV.   LEGAL ARGUMENT

### A.   The Family Defendants Have Not Met Their Burden for Summary Judgment

Under Rule 56, summary judgment may be entered only if there is no genuine issue of material fact. The party moving for summary judgment under Rule 56 bears the initial burden of demonstrating the absence of an issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 232 (1986). The party opposing the motion is entitled to all reasonable inferences from the evidence that could be drawn in its favor by a fact-finder. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (all reasonable inferences to be drawn in favor of non-moving party). Unless the evidence and the reasonable inferences from that evidence could not support a verdict by the finder of fact in favor of the non-moving party, summary judgment is precluded. *See Hirsch v. Allen Products Co., Inc.*, 789 F.2d 230, 234 n.2 (3d Cir. 1986). In making this determination, the Court cannot weigh the credibility of the evidence. *See Anderson*, 477 U.S. at 249. If credibility must be determined, summary judgment is not appropriate. *Horowitz v. Fed. KemperLife Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

The Family Defendants' motion addresses issues on which summary judgment is applied even more sparingly, in two respects. First, the Family Defendants bear the ultimate burden of proof on two of the four points addressed by their motion – the affirmative defenses of ordinary course of business and new value asserted against the Trustee's preference claim. Because the Family Defendants bear the ultimate burden of proof, they must make an even greater showing to establish that there is no genuine issue of material fact. The Family Defendants cannot simply address the sufficiency of the Trustee's evidence on these issues, but must demonstrate that their own affirmative evidence would have to be accepted by the trier of fact. *El v. S.E.P.T.A.*, 479 F.3d 232, 238 (3d Cir. 2007) ("it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law") If the trier of fact would be free not to accept the Family Defendants' evidence on issues – such as the self-serving characterizations of the dealings between them and Yao or SFC – summary judgment cannot be granted. *Id.*

Second, the Family Defendants' motion depends on issues regarding the intent of Yao, Gagné, and others. Issues of intent are "particularly inappropriate for resolution by summary judgment." *Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 524 (3d Cir. 2004). To prevail on summary judgment involving issues of intent, the moving party must demonstrate that there is no basis on which the alleged intent could be inferred and that no determinations of credibility are required to adjudicate those issues.

For the reasons that follow, the Family Defendants fall far short of their burden in seeking summary judgment. They have not demonstrated the absence of genuine issues of material fact. The motion, therefore, must be denied.

**B.    The Preference Claim Presents Genuine**
**      Issues of Fact Precluding Summary Judgment**

The Trustee asserts a claim against the Family Defendants under Bankruptcy Code §547

to avoid preferential transfers totaling $4,229,073 made in the year preceding the filing of

bankruptcy.  Section 547(b) states the elements of a preference claim:

> b) … [T]he trustee may avoid any transfer of an interest of the
> debtor in property--
>
>   (1)   to or for the benefit of a creditor;
>
>   (2)   for or on account of an antecedent debt owed by the debtor
>         before such transfer was made;
>
>   (3)   made while the debtor was insolvent;
>
>   (4)   made--
>
>         (A) on or within 90 days before the date of the filing of the
>         petition; or
>
>         (B) between ninety days and one year before the date of the
>         filing of the petition, if such creditor at the time of such
>         transfer was an insider; and
>
>   (5)   that enables such creditor to receive more than such
>         creditor would receive if--
>
>         (A) the case were a case under chapter 7 of this title;
>
>         (B) the transfer had not been made; and
>
>         (C) such creditor received payment of such debt to the
>         extent provided by the provisions of this title.

11 U.S.C. §547(b).

The Family Defendants' motion challenges only one element of the Trustee's preference

claim – whether the Family Defendants were insiders under §547(b)(4)(B) subject to a one-year

preference avoidance period.  In addition, the Family Defendants' motion raises two exceptions

to avoidance under §547(g), which apply to transfers made in the ordinary course of business and to transfers followed by the giving of new value by the creditor. These exceptions are affirmative defenses to avoidance, on which the Family Defendants bear the ultimate burden of proof. *In re Hechinger Inv. Co. of Del.*, 320 B.R. 541, 547 (D. Del. Bankr. 2004).

### 1.    The Family Defendants Are Insiders under §547(b)(4)(B)

The Bankruptcy Code defines "insider" only by listing examples of persons that the term "*includes*." 11 U.S.C. §101(31).[1] The statute's use of the term "includes" establishes that the list is not exhaustive. 11 U.S.C. §102(3) ("'includes' and 'including' are not limiting"); *In re Henderson*, 96 B.R. 820, 824-25 (E.D. Tenn. Bankr. 1989); *In re Poage*, 92 B.R. 659, 665 (N.D. Tex. Bankr. 1988). The legislative history reflects that the term is "'open-ended' because it is not susceptible of precise specification." *In re Acme-Dunham, Inc.*, 50 B.R. 734, 739 (D. Me. 1985). Therefore, courts have interpreted "insider" under §547(b)(4)(B) "flexibly to include a broad range of parties who have a close relationship with the debtor." *In re Oakwood Homes Corp.*, 340 B.R. 510, 523 (D. Del. Bankr. 2006).

As this Court ruled earlier in this case, "[a]ny person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny may qualify as an

---

[1] Specifically, the statutes provides with respect to insiders of corporate debtors:

> 31) The term "insider" includes—
>
>     . . . .
>     (B) if the debtor is a corporation--
>     (i) director of the debtor;
>     (ii) officer of the debtor;
>     (iii) person in control of the debtor;
>     (iv) partnership in which the debtor is a general partner;
>     (v) general partner of the debtor; or
>     (vi) relative of a general partner, director, officer, or person in control of the debtor[.]

11 U.S.C. §101(31)(B).

'insider.'" _Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)_, 335 B.R. 539, 547 (D. Del. 2005), _quoting Walsh v. Dutil (In re Demko)_, 264 B.R. 404, 408 (W.D. Pa. Bankr. 2001). "Actual control is not a predicate to finding someone to be an extra-statutory [i.e., not listed in §101(31)] insider." _Three Flint Hill Ltd. Partnership v. Prudential Ins. Co._, 213 B.R. 292, 299 (D. Md. 1997). Insider status also may be based on influence, access to information, or a non-arms length relationship. _Id._; _Krehl_, 86 F.3d at 743; _Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)_, 277 B.R. 520, 565 (S.D.N.Y. Bankr. 2002); _Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.)_, 286 B.R. 256 (S.D.N.Y. Bankr. 2002). As this Court noted, the inquiry "is fact-intensive and can be made only on a case-by-case basis." _In re Student Finance Corp._, 335 B.R. at 547.

The Family Defendants' motion inexplicably ignores this Court's prior ruling and the flexible definition of "insider" recognized by the courts under the Code. Instead, restricting their discussion to a narrow view of the examples of insiders listed in §101(31), the Family Defendants argue that insider status must be based on control of the debtor's day-to-day affairs. The Family Defendants' argument is contrary to the express language of the statute, 11 U.S.C. §§101(31) and 102(3), and to the substantial case law recognizing that the term "insider" must be interpreted flexibly.

The record contains substantial evidence that Gagné's close relationship with SFC was that of an insider. The evidence establishes that Gagné effectively served as General Counsel to SFC and not merely as an outside counsel in the usual sense. Indeed, during this same period, his paralegal formally served as SFC's Assistant Secretary, further establishing the close link between Gagné and SFC. Gagné also served as counsel to Yao, SFC's chief executive officer, creating an even closer relationship. Gagné's role also went well beyond that of legal officer.

He advised SFC on business as well as legal matters, and played a key role in providing financing to SFC, both in his role as investor individually and as a trustee of the Family Trusts, and in his role in the intertwined business relationships of the Family Defendants, Yao and SFC. Gagne was involved in other investments with Yao as to Premier. Gagné made use of the company plane for a weekend.

The evidence establishing that Gagné is an insider also establishes that the other Family Defendants are insiders. That is because, by analogy to the extension of insider status under §101(31)(vi) to relatives of insiders listed in that statute, insider status logically extends to relatives of other insiders as well. *See In re A. Tarricone, Inc.*, 286 B.R. at 263 (principle of *ejusdem generis* supports finding insider status by analogy to examples listed in §101(36)). This analogy applies to the Family Trusts as well, because they are controlled by Gagné as trustee and are established for the benefit of Gagné's relatives, and so are subject to the same concerns that extend to individuals who are relatives of an insider.

Other evidence also establishes the insider status of the other Family Defendants. This includes evidence of the Family Defendants' own involvement with SFC and Yao, including their participation in converting a loan from them to an equity investment so that SFC could falsely demonstrate to creditors its ability to raise equity – despite the fact that the Family Defendants' stock would then be redeemed by SFC shortly thereafter. In addition, the evidence establishes that Gagné repeatedly acted on behalf of the other Family Defendants in dealing with SFC (indeed, Gagné was a trustee of the Family Trusts), and that all of the Family Defendants benefited thereby from Gagné's relationship with Yao and SFC.

Any doubt is removed by the April 23, 2002 email from Yao to Gagné, which expressly reflects both the special relationship of Gagné with Yao and, thereby, SFC, and the extension of

that relationship to the other Family Defendants. Yao explicitly assures Gagné that he will

protect his family's investment in SFC based on their relationship:

> Rod,
>
> I know that these are troubling times for you as well. I have been very impressed, and reassured, by your steady hand, and continued guidance.
>
> Please be assured, *in return, that I will protect your family's investment in SFC. . . .*
>
> Please know that I always will reciprocate your good will. I will not abandon those who do not abandon us. . . .
>
> Andrew

(Exh. 1172-I). Such a relationship-based preference is a hallmark of insider status.

   Although the Trustee submits that this is compelling evidence of insider status, that is not

the Trustee's burden on this motion. The evidence of these facts, and the inferences that can be

drawn from them, would permit a jury to find that Gagné and the other Family Defendants were

insiders. At best, the Family Defendants' arguments raise factual issues subject to differing

inferences from the evidence regarding the nature of Gagné's multi-hatted relationship with Yao

and SFC. Summary judgment, therefore, is precluded on this point.

**C.    The Ordinary Course of Business Defense Presents**

<u>**Genuine Issues of Fact Precluding Summary Judgment**</u>

   The first affirmative defense asserted by the Family Defendants is the "ordinary course of

business" defense under §547(c)(2). The statute, as it was in effect in 2002, provides:

> (c) The trustee may not avoid under this section a transfer-
>
>    . . . .
>    (2) to the extent that such a transfer was-

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee;
>
> (B) made in the ordinary course of business and financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms.

11 U.S.C. § 547 (c)(2). The purpose of the ordinary course of business exception is "to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 219, 225 (3d Cir. 1994).

The Family Defendants have the burden of establishing all facts necessary for this exception to apply. *In re Hechinger Inv. Co. of Del.*, 320 B.R. at 547. Further, as with other exceptions under §547(c), "[t]he ordinary course of business exception to the trustee's avoiding powers should be narrowly interpreted" within the confines of its purpose. *In re Braniff, Inc.*, 154 B.R. 773, 780 (M.D.Fla. 1993). *Accord J.P. Fyfe, Inc. v Bradco Supply Corp.*, 96 B.R. 474 (D.N.J. 1988), *affirmed*, 891 F2d 66 (CA3 NJ 1989); *In re Gull Air, Inc.*, 82 B.R. 1 (D. Mass. Bankr. 1988). Narrow construction is necessary because, contrary to the general principle of the Bankruptcy Code, the exception places one unsecured creditor on better footing than all other such creditors. *Seaver v. Allstates Sales & Leasing Corp. (In re Sibilrud)*, 308 B.R. 388 (Bkrtcy. D. Minn. 2004).

The Family Defendants have failed to demonstrate the absence of any genuine issue of material fact on this defense, for at least three reasons.

### 1. Transactions in Relation to a Ponzi Scheme Are Not an Ordinary Course of Business

Consistent with the purpose of §547(c)(2), an ordinary course of business within the meaning of the statute does not include the operation of a Ponzi scheme or other fraudulent

scheme, or related transactions in furtherance of such a scheme. The ordinary course of business exception applies only to transfers by legitimate business enterprises. *In re Bullion Reserve of North America*, 836 F.2d 1214, 1219 (9th Cir. 1988). "Ponzi-type schemes are not legitimate business enterprises and therefore transactions connected with such schemes are not entitled to §547(c)(2) protection." *In the Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 819 F.2d 214, 218 (9th Cir. 1987); *In re Bullion Reserve of North America*, 836 F.2d at 1219; *In re Western World Funding, Inc.*, 54 B.R. 470, 481 (D. Nev. Bankr. 1985) ("Ponzi-type arrangement is not 'ordinary' and not the kind of enterprise whose protection was intended by the drafters of (c)(2)"); *In re Baker & Getty Financial Services, Inc.*, 88 B.R. 792, 799 (N.D. Ohio Bankr. 1988); *In re Montgomery*, 123 B.R 801, 814 (M.D. Tenn. Bankr. 1991).

The rationale for excluding Ponzi schemes from the ordinary course of business defense is not limited to the avoidance of payments to early investors under the Ponzi scheme, but extends to all transactions that further or perpetuate the scheme. Again, this conclusion is compelled by the purpose of the defense -- facilitating normal transactions for legitimate business purposes that potentially enable a debtor to avoid bankruptcy and, thereby, potentially benefit all current and future creditors. *See In re Molded Acoustical Products, Inc., supra.* Stated simply, the purpose is to help a debtor, and its creditors, reach the light at the end of the tunnel without bankruptcy. That purpose would be confounded by the application of the exception to conduct that furthers or perpetuates a Ponzi scheme. There is no light at the end of the tunnel in that situation. Under a Ponzi scheme, there is no such potential benefit to all creditors because collapse cannot be avoided. *"[B]y definition* . . . investors at the end of the line will lose their money." *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103, 110 (E.D. Pa. 2002) (emphasis added; addressing Ponzi schemes in the context of

fraudulent conveyances). Collapse can only be delayed by the perpetuation of the scheme, during which time, the Ponzi scheme model dictates that the debtors' insolvency will increase, placing it into deeper debt to existing creditors and new debt with new creditors, and thereby harming all creditors except those, such as the Family Defendants here, who receive preferential payments. Any transaction that furthers the scheme is part of the fraud harming the debtor's creditors. *See In re C.F. Foods, L.P., supra* (the debtor's contributions to the defendant charity furthered the debtor's Ponzi scheme by contributing to its appearance as a legitimate business); *In re World Vision Entertainment, Inc.,* 275 B.R. 641, 656 (M.D. Fla. 2002) ("any acts taken in furtherance of the Ponzi scheme, such as paying brokers' commissions, are also fraudulent"); *In re Baker & Getty Financial Services, Inc.,* 88 B.R. at 800.

To prevail on summary judgment, therefore, the Family Defendants need to show that SFC was not operated as a Ponzi scheme at the time of the transactions that they allege occurred in an ordinary course of business. However, there is significant evidence that SFC was operated as a Ponzi scheme. The evidence shows that SFC was operated on a model that depended on keeping default rates low by using SFC's own money to make what it called "forbearance" payments, without disclosure to creditors that these payments were not being made by the students. As explained by the Trustees' expert, this model depended on ever-increasing new investments (through the securitization of new student loans and otherwise) to provide the payments shielding the defaults on prior student loans and, therefore, was a Ponzi-scheme. Further, the evidence demonstrates that the Family Defendants' bridge loans and other financing facilitated the short-term continuation of this scheme – thereby enabling SFC to fall into an ever-increasing insolvency leading into bankruptcy, while the Family Defendants enjoyed substantial returns on their mostly short-term investments in SFC's operations because of SFC's ability to

obtain other financing based on the sham appearance of its business as sustainable. For example, the bridge loans provided by the Family Defendants in September and October 2001 enabled SFC to obtain warehouse financing, from which the Family Defendants' bridge loans were then repaid with interest and commitment fees in November 2001. The Family Defendants' transactions with SFC thereby enabled SFC to forestall bankruptcy by falling into deeper insolvency, while, just like an early investor in a Ponzi scheme, the Family Defendants were repaid with a substantial return from the proceeds of a later investor or other creditor. That is not the intended reach of the ordinary course of business exception.

The Family Defendants' denial that SFC was operated as a Ponzi scheme and their self-serving characterizations of the nature of their transactions with SFC, therefore, only underscore the existence of genuine issues of material fact with respect to their ordinary course of business defense. As a result, they cannot obtain summary judgment on this defense.

### 2.    The Conduct Asserted by the Family Defendants to Support Their Ordinary Course of Conduct Exception Arose *After* Insolvency

Consistent with its purpose, §547(c)(2) applies most clearly to transfers made consistent with an ordinary course of business that was itself established *before* the debtor became insolvent. As the Third Circuit explained,

> [W]hen the relationship in question has been cemented *long before the onset of insolvency* – up through and including the preference period – we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given a straitened debtor a fighting chance of sidestepping bankruptcy and continuing business.

*In re Molded Acoustical Products, Inc.*, 18 F.3d at 225. It was in this context only – where "at the starting point of the relationship insolvency was a distant prospect" – that the Third Circuit suggested that the ordinary course of business exception might apply to transactions with terms that had some variance from the industry norm. *Id.* Even if the ordinary course of business

defense is not precluded by the fact that the alleged course of business began after the debtor's insolvency, this fact subjects the alleged course of business to greater scrutiny.

Here, the Family Defendants assert that the ordinary course of business between them and SFC was established by transactions occurring "[f]rom 1998 to 2002." (Family Defendants' Memorandum of Law at p. 33). For the period prior to 1998, they identify only the purchase of several debentures, reflecting only a small fraction of the transactions at issue. Most importantly, since most of the preferential payments sought to be avoided by the Trustee were based on the two bridge loans made in the fall of 2001, the course of dealing between the Family Defendants and SFC regarding bridge loans began, according to the Family Defendants themselves, in 1998. (*Id.* at pp. 8-9, 33).

The Family Defendants' motion, therefore, presents a genuine issue of material fact regarding when SFC became insolvent. Although the Family Defendants bear the burden of proof on this issue as it arises in the context of an affirmative defense, their motion proffers no evidence on this issue. Even if the Family Defendants had proffered such evidence, however, that would only underscore the existence of a genuine issue of material fact. As explained by the Trustees' expert, there is substantial evidence demonstrating that SFC was insolvent by 1998. Because the Family Defendants have not established that a contrary conclusion by the trier of fact would be compelled, summary judgment on this issue is not appropriate.

### 3. The Transfers Were Not Made According to Ordinary Business Terms

The Family Defendants also must prove that the challenged transfers to them were "made according to ordinary business terms." 11 U.S.C. §547(c)(2)(C). As explained by the Trustee's expert, however, the terms of the payments were, in fact, highly preferential to the Family Defendants. For example, based on the evidence regarding the terms of the bridge loans, the

Trustee's expert opines that the commitment fees paid to the Family Defendants on these loans aggregated more that $1 million above market and that the interest and fees combined provided an effective annual interest rate *as high as 77%.*

The Family Defendants' motion seeks to bootstrap their argument by asserting that the fees paid on the challenged transfers were consistent with the terms of their earlier bridge loan transactions with SFC. The consistency of the parties' pre- and post-insolvency transactions, however, is not determinative under §547(c)(2)(C), which requires objective consistency with ordinary terms in the industry. *In re Jersey First Securities, Inc.*, 180 F.3d 504, 513 (3d Cir. 1999). Further, as discussed above, the transactions that the Family Defendants seek to use as a benchmark of consistency are transactions made *after* SFC was insolvent. Such transactions cannot provide the standard for ordinary business terms under §547(c)(2)(C).

Ultimately, the Family Defendants' motion disputes that evidence and the opinion of the Trustee's expert. However, that is the nature of a genuine issue of material fact. For this reason also, the Family Defendants have not met the burden to obtain summary judgment based on the ordinary course of business defense.

**C.      The New Value Defense Presents Genuine**

**Issues of Fact Precluding Summary Judgment**

The second affirmative defense asserted by the Family Defendants is the "new value" defense under §547(c)(4). The statute provides:

> The trustee may not avoid a transfer under § 547
>
> . . . .
>
> > (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
> >
> > > (A) not secured by an otherwise unavoidable security interest; and

> (B) on account of which new value the debtor did
> not make an otherwise unavoidable transfer to or for
> the benefit of such creditor.

11 U.S.C. §547(c)(4). The purpose of this exception is to encourage the extension of credit to

debtors in financial difficulty because that potentially assists such a debtor to avoid bankruptcy,

thereby benefiting all creditors. *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York*

*City Shoes, Inc).*, 880 F.2d 679, 680-81 (3d Cir. 1989). *See In re American International*

*Airways, Inc.*, 68 B.R. 326, 337 (Bankr.E.D.Pa.1986) (§547(c)(4) "protects creditors who deal

with financially unstable businesses and reasonably rely on their payments as a consideration for

providing these future services").

The Family Defendants assert this defense based on the $3.3 million that they hurriedly

transferred to SFC at Yao's request in March 2002. The Family Defendants' new value defense

is subject to genuine issues of material fact for two reasons.

First, just as with the ordinary course of business defense, the new value defense cannot

be based on a transaction that was in furtherance of a fraudulent Ponzi scheme. To apply the

defense in such a situation would subvert its purpose, by rewarding conduct that, because of the

nature of a Ponzi scheme, could not assist the debtor to avoid bankruptcy and, instead, by

delaying the exposure of the scheme could only further harm creditors. The evidence shows that

the hurried transfer of funds by the Family Defendants in March 2002 was made in order to fund

forbearance payments designed to forestall the discovery by creditors of the true rate of defaults

and, thereby, the discovery of the Ponzi scheme being operated through SFC. Therefore, the

relation of this transfer to the fraudulent scheme is at issue and precludes summary judgment.

Second, the new value exception does not apply to the extension of value that is "secured

by an otherwise unavoidable security interest." 11 U.S.C. §547(c)(4)(A). The Family

Defendants' motion addresses this requirement only with respect to the point that, in connection with Yao's personal guarantee of the repayment of the $3.3 million, Yao granted to them a security interest in all of SFC's assets. However, in connection with the same guarantee, Yao later granted to the Family Defendants a security interest in the GP Stock. This security was never avoided and, in fact, the Family Defendants are now in possession of that stock.[2] Further, the value of that stock is a fact question. For example, while the Family Defendants assert in their motion that the Premier stock was worth only $1.76 million, based on their expert's valuation of the Premier business to be worth $13.3 million in 2002, the Trustee's expert valued that business to be worth almost three times as much, $30.3 million, at that time. Under the Trustee's expert's valuation, the value of the Premier stock is increased above $1.76 million by at least 20% of the difference in the experts' respective valuations of the Premier business. (Exh. 866-II, 1993 Partnership Agreement ¶6.01(c)). Thus, the alleged new value provided by the Family Defendants in March 2002 was fully secured.

The Family Defendants' argument that the security was in property of Yao rather than SFC is immaterial. The Family Defendants and the cases they cite address this argument only in the context of subsection (B) of §547(c)(4), which precludes the new value defense where the debtor made an unavoidable transfer to the creditor on account of the new value. (Family Defendant's Memorandum of Law at p. 39). However, while subsection (B) is limited to transfers by "the debtor," the plain language of the subsection (A) preclusion contains no such limitation. Subsection (A) precludes the new value defense when the new value is secured

---

[2] The Family Defendants' motion does not assert that the security interest in the GP Stock was not perfected. Under the terms of the Pledge Agreements, "[t]he pledge of the Securities in accordance with the terms hereof creates a valid and perfected first priority security interest in the Securities securing payment of the Obligations." (Pledge Agreement ¶3). Further, in opposition to the Trustee's fraudulent conveyance claim under PUFTA, the Family Defendants assert that the transfer of that stock is not avoidable.

without any limitation of this preclusion to situations in which the security interest is given by the debtor or is in property of the debtor. 11 U.S.C. §547(c)(4)(B).

By its plain terms, therefore, subsection (A) precludes the new value defense regardless of the source of the security. The plain and unambiguous language of the statute is determinative. Further, even if it were appropriate to go beyond the statutory language, reading subsection (A) to preclude the new value defense without regard to the source of the security is fully consistent with the purpose of the defense. The purpose of the defense is to encourage the extension of new credit to troubled businesses by offsetting the risk of doing so. *In re New York City Shoes, Inc., supra.* The source of the security interest is not relevant to that purpose. Instead, when the extension of new credit is secured by *any* source, the risk of extending that credit is offset by the security interest and the statutory protection afforded by the new value defense is not necessary.

Consistent with the scope of its purpose, therefore, the plain language of §547(c)(4)(A) precludes the new value defense in this case because the alleged new value was fully secured. For this reason also, the Family Defendants' motion for summary judgment must be denied.

### B.    The Fraudulent Transfer Claim Presents Genuine Issues of Fact Precluding Summary Judgment

The Trustee's fraudulent transfer claim addresses the June 2002 transfer of the GP Stock by Yao to the Family Defendants. This claim is brought under 11 U.S.C. §541 based on the Trustee's cause of action to avoid that transfer under §5104(a)(1) of the Pennsylvania Uniform Fraudulent Transfers Act ("PUFTA"). Under that statute,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay or defraud any
> creditor of the debtor. . . .

12 Pa. C.S. §5104(a)(1). The fraudulent transfer of an asset may be avoided, the property subject to attachment or other provisional remedies, or other equitable relief entered. 12 Pa. C.S. §5107.

Actual intent to hinder, delay or defraud creditors can be proven by direct evidence or inferred from circumstances surrounding the transaction. *U.S. v. Purcell*, 798 F.Supp. 268 (W.D. Pa. 1991). The analysis is inherently factual. While PUFTA provides examples of factors to which "consideration *may* be given, *among other factors*," as circumstantial proof of actual intent, 12 Pa. C.S. §5104(b) (emphasis added), these so-called "badges of fraud" are not exclusive. "The plain language of §5104(b) clearly provides that other factors, beyond those listed, can be considered in determining whether a transfer was made with actual intent to defraud." *In re C.F. Foods*, 280 B.R. at 109. "Therefore, even in the absence of any of the enumerated badges, a court can find actual fraud." *Id.*

Much of the Family Defendants' argument is directed to their contention that the transfer of the GP Stock was in satisfaction of obligations by Yao pursuant to his guarantee of SFC's obligations. However, the asserted intent to satisfy such obligations, even if true, does not resolve the fraudulent transfer issue. Even if there was a legitimate reason for the transfer, a transfer is fraudulent if it was at least partly motivated by an actual intent to hinder, delay or defraud creditors. *In re Blatstein*, 192 F.3d 88 (3d Cir. 1999), *citing In re Greene*, 202 B.R. 68, 73 (Bankr.D.Md.1996) (holding that debtor's attempt to avoid one creditor's collection efforts in an effort to allow him to pay other creditors "does not change the fact that Debtor transferred ... assets with the actual intent to hinder" a creditor).

In this case, there is substantial circumstantial and even direct evidence that Yao's transfer of the GP Stock was made with the actual intent to hinder, delay or defraud creditors.[3]

First, the substantial evidence that Yao was operating SFC as a Ponzi scheme is itself sufficient to establish that transfers by him were made with the actual intent to hinder, delay or defraud creditors. "Numerous courts have decided that a debtor's actual intent to hinder, delay or defraud creditors may be inferred from the Debtor's active participation in a Ponzi scheme." *In re C.F. Foods*, 280 B.R. at 109-110, *citing Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. BAP 1996).; *Jobin v. Ripley (In re M & L Business Machine Co., Inc.)*, 198 B.R. 800, 806-07 (D.Colo.1996); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860-61 (D.Utah 1987); *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 433 (Bankr.S.D.Tex.1997); *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 649 (Bankr.W.D.Tenn.1993); *In re Taubman*, 160 B.R. 964, 983 (Bankr. S.D. Ohio 1993). *Accord Quilling v. Stark*, 2006 WL 1683442 at *6 (N.D. Tex. 2006); *In re Bayou Group, LLC*, 363 B.R. 674 (S.D.N.Y. 2007); *In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656 (M.D. Fla. 2002). This inference extends to any transfers made as part of transactions that furthered or facilitated the Ponzi scheme. *See In re C.F. Foods, L.P., supra* (the debtor's contributions to the defendant charity furthered the debtor's Ponzi scheme by contributing to its appearance as a legitimate business); *In re World Vision Entertainment, Inc.*,

---

[3] The Family Defendants argue incorrectly that the Trustee is required to prove actual intent by clear and convincing evidence. The Family Defendants, however, rely on pre-PUFTA case law, citing cases under the Pennsylvania Uniform Fraudulent Conveyances Act which was repealed when PUFTA was enacted. *E.g., Protocomm Corp. v. Novell, Inc.*, 171 F.Supp.2d 459, 468 (E.D.Pa. 2001). PUFTA follows the standard of proof applicable under 11 U.S.C. §548(a). *In re C.F. Foods, supra; see also In re Burry*, 309 B.R. 130 (Bankr. E.D.Pa. 2004); *In re Dolata*, 306 B.R. 97 (Bankr. W.D.Pa. 2004). Under §548(a), the majority of courts apply a preponderance of the evidence standard to proof of actual intent to hinder, delay or defraud creditors. *See In re American Rehab & Physical Therapy, Inc.*, 2006 WL 1997431 (Bankr. E.D.Pa. 2006)

*supra* ("any acts taken in furtherance of the Ponzi scheme, such as paying brokers' commissions, are also fraudulent"). Absent good faith and reasonably equivalent value, "all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud." *In re C.F. Foods, supra.*

There is substantial evidence that Yao was operating SFC as a Ponzi scheme. There also is substantial evidence that the Family Defendants' transactions with Yao and SFC facilitated the continuation of that scheme. For example, bridge loans provided by the Family Defendants enabled SFC to make forbearance payments that were used to conceal the rate of student loan defaults in order to induce investors to continue to provide securitization for the loans – the fuel on which the Ponzi scheme ran. Similarly, the conversion of loans from the Family Defendants to SFC stock was used by SFC to misrepresent to investors that SFC had the ability to raise equity capital (without disclosing that the Family Defendants' stock was to be quickly redeemed). These transactions enabled the continuation of the Ponzi scheme no less than investments directly in the scheme.

There also is substantial evidence that, by May 2002 when Yao pledged the SFC stock, the imminent collapse of the Ponzi scheme was apparent. The anticipation of such a collapse also establishes the anticipation of enormous claims by creditors against Yao based on his fraudulent operation of SFC – including claims by the bankruptcy trustee against Yao which would inevitably be brought once SFC was in bankruptcy.

The Family Defendants' argument that the Ponzi scheme is immaterial because the challenged transfer was by Yao rather than by SFC cannot be squared with these facts. The Ponzi scheme is plainly relevant to *Yao's* intent to defraud creditors: Yao himself was an active, leading operator of the Ponzi scheme, and Yao was subject to claims based on his participation

in the scheme. His transfer of the GP Stock removed that asset from SFC's claims against Yao, and the Ponzi scheme supports the inference that this was done by Yao with actual intent to hinder, delay, and defraud creditors including SFC.

The parties' communications also provide evidence of actual intent. For example, an October 2002 email from Gagné to Yao specifically addresses taking action to remove assets of Yao from the reach of a creditor. The Family Defendants' argument that this clear expression of intent is immaterial because it was made "months" after Yao's transfer of the GP Stock has neither basis nor logic. There is a reasonable inference that if the parties were expressly intending to shield Yao's assets from a creditor in October 2002, a transfer that accomplished precisely that only a few months before was undertaken with the same intent.

Similarly, the April 2002 email from Yao to Gagné stating his intent to protect Gagné's family's SFC investments in "these . . . troubling times" smacks of the intent to protect the Family Defendants at the expense of other creditors. Since Yao had issued guarantees of SFC's obligations, and since the collapse of SFC would expose him to enormous claims by creditors, this email plainly supports the inference that Yao's subsequent transfer of the GP Stock to the Family Defendants was intended to protect their investments by removing that valuable asset from the reach of other creditors of SFC and Yao. The Family Defendants' argument that absent fraudulent intent the fact of preferring a creditor does not constitute a fraudulent transfer is tautological. The intentional preference of a creditor can itself be evidence of the intent to hinder other creditors. *In re Greene, Supra.*

Actual intent also is supported by factors identified or similar to those identified as badges of fraud in §5104(b). One badge of fraud is a transfer of the property to an insider. 12 Pa. C.S. §5104(b)(1). As discussed above, there is substantial evidence of the Family

Defendants' insider status based on Gagné's relationship with Yao and SFC. That close relationship also is indicative of an insider relationship between Gagné and Yao that, similarly, extends to the other Family Defendants as well. In fact, there could be no clearer evidence of such an insider relationship than Yao's April 2002 email to Gagné.

Another badge of fraud is the retention by the debtor of some possession or control of the asset after the transfer. 12 Pa. C.S. §5104(b)(2). A similar indication of fraud can arise from any arrangement in which the debtor continues to have some interest in or potential benefit from the property while at the same time removing it from reach of creditors. *In re Verma,* 2007 Bankr. LEXIS 3159 (E.D.N.Y. 2007). In this case, the evidence shows that Yao continues to carry an interest in the GP Stock, pursuant to the terms of the assignment under which he could be paid based on the value of the stock if it were sold by the Family Defendants. At the same time, the stock is kept out of the reach of creditors. While the Family Defendants argue that this shows that there was no fraud because the proceeds from any such sale would be available to creditors (putting aside the point of the Family Defendants' control over the occurrence of that condition and the question of what would be left of the proceeds after the Family Defendants' claims), even their argument acknowledges that the arrangement between the Family Defendants and Yao at least delays any recovery by creditors against the stock. That itself is sufficient to constitute the hindering, delaying or defrauding of creditors supporting a fraudulent transfer claim.

The evidence also shows that the transfer was made in circumstances within other badges of fraud -- the making of the transfer shortly before or after the debtor incurs substantial debt or is threatened with suit. 12 Pa. C.S. §5104(10) and (5). There is substantial evidence that, by May 2002, Yao was aware of the imminent collapse of SFC, the exposure of the Ponzi scheme, and the resultant exposure of Yao to enormous claims by the investors and other creditors who

lost millions of dollars in the fraud perpetrated by Yao. In this context, the timing of Yao's transfer of the GP Stock provides additional circumstantial proof of the actual intent to defraud those creditors, including SFC.

## IV.    <u>CONCLUSION</u>

Because the claims and defenses present genuine issues of material fact, the Family Defendants' motion for summary judgment should be denied.

Respectfully submitted,

Dated: October 5, 2007                THE BAYARD FIRM

_____
Charlene D. Davis (No. 2336)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
(302) 655-5000

and

MCELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
Michael S. Waters, Esq.
Lois H. Goodman, Esq.
Stephen F. Payerle, Esq.
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711

*Attorneys for Plaintiff*
*Charles A. Stanziale Jr., Trustee*

672504-1