# EXHIBIT 12

# MEMORANDUM



TO: Perry Turnbull
Gary Hawthorne
Diane Messick

FROM: W. Roderick Gagne

DATE: February 14, 2001

RE: Securitization Seminar in Scottsdale, Arizona

---

1. <u>General Comments and Economic Issues.</u>

    a. <u>SFC's Name Recognition.</u> SFC was well known by everyone to whom I spoke. In addition, SFC was mentioned at several of the seminars indirectly as one of the newer asset classes being seen by the investment banking and investor community. I spoke with West LB, Marianna Stershic from Wells Fargo, DG Bank, Deutsche Bank, Sharon Asch from Moody's and Rob Blake from MBIA, all of whom have said that they have received several inquiries lately concerning SFC, the Royal Policy and other matters. Each of these parties' discussions is discussed below in an enumerated paragraph.

    b. <u>Economic Issues.</u> The seminar made it clear that the focus of the entire industry is on the economy, the potential for a recession and the effect of a slow down or recession on the asset-backed securitization ("ABS") market. Many felt that the ABS market would remain stable. The ABS market is a safe haven for people seeking yield because the corporate bond market is more susceptible to fluctuation caused by downgrades (there have been less than 8 downgrades since 1993 of an ABS). Also, ABS security issuers have far less bankruptcies and fewer defaults than corporate bonds. The vast majority of the ABS defaults

-1-

have not been principal or interest defaults, but rather are originator and servicer balance sheet defaults. The investment community is now focusing on servicer stability and originator balance sheet to prevent similar defaults from occurring in the future. Investors and Insurers uniformly stated they were looking closely at these points. SFC has done what it can to alleviate these concerns on its and SLS's balance sheets, however, the stability of SFC and SLS will continue to be a major focal point and source of unease for the capital markets, despite the double wrap. Accordingly, SFC should continue to focus on insuring the viability of SLS and SFC and maintaining their balance sheet covenants.

Many thought that the stability of the ABS market would not necessarily translate into an increased demand for ABS securities because of the wide yield spread between corporate bonds and ABS securities. Many of the investors actually thought it was a buying opportunity in the corporate bond market to get the higher yield since they think the economy will land more softly than predicted. Accordingly, many thought that investors would not shift significant funds from the corporate bond market to the ABS market, thereby keeping demand for ABS securities level. Consequently, almost every speaker felt the ABS market should remain stable for the year despite having different reasons for reaching that conclusion.

The main thrust of the speakers comments was that the recession will cause and has already caused a tightening of credit. Many banks are tightening lending criteria and are slowing the amount of new loans being made. Only the highest quality borrowers will continue to receive favorable borrowing terms and conditions. With the increased credit restrictions, Borrowers and finance companies will find access to the capital markets much more restricted and difficult. Consequently, Borrowers and finance companies may experience liquidity restrictions. This puts a greater need on SFC to increase warehouse financing as swiftly as

PHLEGAL: #1036963 v1 (M84J01!.DOC)

PH 029823

possible to prevent liquidity issues. In addition, the investors will be focusing on coupon and yield to maturity to protect themselves. The focus on the coupon rate may cause an increase in the payments made by SFC. It was interesting to note that the vast majority of the panelists still price ABS securities off of treasury bills, with only MetLife pricing off the swap rate. The reason for the continued use of treasury bills as the bench mark is because the investors benchmarks are still against treasury bills even though swap rates provide a truer benchmark for yield.

In addition, many of the industry analysts feel that the originators need to tighten their credit risk criteria and shrink growth. A company that is rapidly growing is viewed as having a higher potential for default, bankruptcy or failure for several reasons. The principal reason cited was that, historically, many rapidly growing companies relaxed underwriting standards to increase growth. Consequently, the loans were of a lesser quality causing increased default ratios. However, because competition was fierce, the yields on the notes were reduced, causing less spread reserve and loan or security defaults. The second most cited reason in rapidly growing companies the infrastructure did not keep pace with the growth causing servicer defaults, declines in collection performance and increases in reporting errors. Accordingly, any rapidly growing company will engender a much higher degree of scrutiny. A common theme for the reports on ABS failures and Servicer failures was rapid growth of the originator and the originator's inability to keep up with the growth. The rapid growth in many instances was achieved at the expense of maintaining a high quality underwriting criteria. In light of the tightening credit market, the questionable economy and because rapid growth is a red flag for all investors, the Panelists suggested that originators tighten their credit standards to slow growth and shore up their infrastructure in order to evidence their viability to the capital markets.

-3-

As discussed later, Michael Bozzo of Prudential Securities specifically expressed a concern over SFC's rapid growth and its infrastructure. You should know that the conference is all about networking. Consequently, if Michael Bozzo is concerned by SFC's rapid growth and he shared his views with me (knowing I was SFC's counsel), he certainly shared his concerns with any other SFC investor he met or that inquired, including the Royal and MBIA.

2. <u>Comments by Individuals at the Securitization Seminar are Summarized below</u>:

(a) <u>Marianna Stershic, Wells Fargo</u>. Marianna identified Deskcap and West LB as being good fits for SFC. She spoke very highly of Deskcap, stating that they are hard working, deal closers. She felt that Deskcap could add to the ability of SFC to access the markets. She also thought that West LB was a good fit for SFC as a warehouse lender. She also stated that Deskcap needed financials to be able to move forward.

(b) <u>West LB</u>. West LB stated that SFC needs to be more flexible in release of their financial statements and must be more willing to provide term securitization work to the warehouse provider. I also heard this from Fleet, Deutsche Bank and other potential warehouse providers. I informed West LB that every warehouse facility wanted the same terms. However, since SFC is interested in increasing the size of its securitizations to $100,000,000 or so to cut down on the costs, SFC is reluctant to grant exclusive rights since they want to package the loans from several warehouse facilities. I stated to West LB (not knowing the amount of the warehouse facility they were proposing) that to increase the share of the term deals West LB receives, West LB would need to substantially increases the size of the warehouse facility to approximately $250,000,000. Later on I learned that DG Bank was willing to allow the term deals to be split proportionately among the warehouse lenders. SFC may want to consider offering West LB the

-4-

ability to share in the term securtizations on some pro rata basis. West LB may be amenable to sharing the term securitizations on a pro rata basis as is DG Bank.

(c) <u>DG Bank</u>. I had a long conversation with Dan Marino regarding SFC's warehouse facility. Although DG Bank is very comfortable with Andrew Yao and SFC, Dan feels it will be a difficult sell to DG Bank's management. First and foremost, DG Bank is in the business of doing deals with which they are comfortable. DG Bank does not understand the Royal's financial position and feels that the Royal is at significant risk because of the experience account. They are very concerned about advancing 100 cents on the dollar without escrowing some portion of the same. They have heard about SFC's financials. As a result, DG Bank discounts the worth of the experience account because SFC has a high probability of defaulting on the experience account notes since SFC's balance sheet does not support the debt. DG Bank is analyzing the transaction as a rating agency would and assumes all of the loans go bad on day one. Using this stress factor, DG Bank believes that the Royal's 8.5% premium does not protect it with out the experience account being fully funded. Under this scenario they give no credit to the excess spread reserve since no funds will have built up in the excess spread account. If Scott Schauer is successful in getting a shadow rating on the deal, they would be more comfortable with the transaction. Dan Marino feels that some cash should be left in the deal by SFC to fund the experience account. Consequently, they are reticent to do a warehouse facility. Although they feel it is an extremely safe investment because of the double wrap, Dan Marino did not think they could match PNC Bank's terms in advancing 100 cents on the principal balance of the Student Loans.

(d) <u>Sharon Asch, Moody's</u>. Sharon has received many calls on the SFC structure and transactions. She is very comfortable with the current transactions as they are

structured. Sharon is working with Scott Schauer to give SFC's deal structure an independent shadow rating. Without the Royal wrap, the stress factor is at a 60% default rate. Without an upfront cash provision, it is doubtful whether the deal will take such a stress model. However, they are looking at analyzing whether paying the Royal premium into a cash reserve (instead of the Royal) would assist their ability to get the structure rated. Sharon and Scott are working on concluding this matter and will determine a structure that models sufficiently to give a BBB- rating.

        (e) <u>Michael Bozzo, Prudential</u>. Michael did a lecture on 144A placements. Michael early in the lecture stated that most investors prefer not to have a wrap transaction since they would rather receive the increased yield on the transaction rather than pay it to a credit enhancer. The investors stressed that they still need to do sufficient due diligence on any private or 144A transaction to determine if the asset class and structure will support the investment security. Thus, the investors felt that they should receive the increased yield otherwise payable to the credit enhancer to compensate them for the extra effort necessary to get comfortable with the transaction. When I asked Michael Bozzo whether SFC should consider the same, he stated that he would not have bought the SFC term securitizations unless the MBIA wrap was in place. Michael candidly stated that he was concerned with Student Finance Corporation because of its rapid growth. He felt that SFC's reporting and servicing capacities may not be keeping pace with its growth. He was also concerned about SFC's underwriting standards potentially deteriorating. He was able to get comfortable with the last two securitizations solely because of the MBIA wrap. Finally, he was not that familiar with the Royal and thought that MBIA resolved all of the foregoing issues.

It was interesting to learn the investor perspective on the 144a placement market. They felt that all it did was shorten the time they had to react to a deal and did little more than add a marketing piece to the offering. The panel felt that in many cases they would pass on a 144A offering because they did not have sufficient time to get comfortable with the deal. I asked Michael if he felt that the 144A placement was detrimental to SFC. He first stated that they clearly viewed SFC's term transactions as private placements. The use of 144A was not a bad idea from a long term marketing perspective, but most investors will view SFC's securitizations as private placements. He does not think 144A is necessary, especially if no additional support is provided for increased liquidity, such as Bloomburg reporting of quotes, etc. 144A is designed to give liquidity to the investors by creating a secondary market for the ABS paper. However, as Michael candidly states, it is doubtful whether a large secondary market will grow for SFC's certificates since they are so small and are a lesser known issuer. Thus, placing the certificates in the 144A market has the sole benefit of speeding the process along and giving a slight marketing benefit to the term paper. Additionally, long term, the 144A placements will have benefits especially if the securities begin to trade on a secondary market, giving the certificates greater liquidity.

(f) <u>Pam Brill</u>. Pam was very impressed with SFC's management team and operations. However, it is doubtful whether she will do another deal since the typical bond that she purchases is between a five and ten years in maturity. SFC's term deals are five years or shorter in duration. Therefore, she probably will not participate again especially in light of the increased spread between the five and ten year corporate bonds versus the asset backs. She will notify Rusty on this point.

(g) <u>Bob Broseman</u>. I attended Bob Broseman's lecture on due diligence. During the course of his comments, he advised that all investors should buy software to do their own individual modeling since investment bankers may not have the same interests as the investors. Without naming names, he described the SFC transaction and how he had assumed that PNC had calculated the coupon on a yield basis factoring in the 20 day lag in payment. He stated he was angry with himself for missing it. However, he was extremely upset with the investment banker and stopped just short of stating that PNC mislead him, but suggested it. He did say that the investment bankers work for the issuer and that you should be very careful. One of his co-panelists was Pam Brill, so I am sure she now knows of the situation and will be on her guard.

(h) <u>Royal Sun Alliance</u>. The Royal Sun Alliance was optimistic that they will be able to issue another policy to SFC along the lines discussed with better pricing. In my conversations with the Royal, they are frustrated with corporate's attitude and believe that either through reinsurance or via S & P approval, they will be able to issue a new master policy. All indications are positive. Ted Moore, the Royal's agent, spoke to William Hibberd, who confirmed that he was optimistic that something would be forthcoming as soon as the internal politics worked themselves out. The general counsel agreed because the FSL and Royal Indemnity Company product lines were very profitable.

3. <u>Conclusion</u>. Many other comments macro and specific comments were made, however, none of which were extremely material. In conclusion, SFC's name is becoming well positioned in the market and beginning to get market recognition. However, the investors and investment bankers all suggested that it would be prudent for SFC to slow growth, focus on the improving its systems, servicing, collections and reporting, etc., obtain increased warehouse

-8-

lines before credit ids unavailable, and position itself to move to the next level. You should consult with John Loofbourrow, PNC Bank and others to obtain their views on 2001 and the steps they see SFC should take to position themselves to continue to have access to the capital markets in the coming year. For what it is worth, this summarizes the conference. I would suggest that SFC attend the conference one year because of the networking potential. Please call if you have further questions.

WRG/bdw