# Exhibit 30



G:\Pepper_070606\GAGNE_1A3

EM0127316_PHLEGAL_1636261_0_SFC description.doc

Stanziale, Trustee for Student Finance Corporation

The claimant in this threatened (but as yet not filed) claim is Mr. Charles Stanziale, the liquidating trustee for our former client, Student Finance Corporation (SFC). SFC was in the business of making loans to students, primarily those of trade schools, and particularly those at truck driving schools. SFC's "formula for success" was that it obtained warehouse financing at a low interest rate from a bank, such as Wilmington Trust Co. or PNC, which SFC used to acquire the student loans from several. SFC originated loans from several truck driving schools and sold them to the warehouse facilities that were bankruptcy remote entities. The student loans sold to the warehouse facilities were guaranteed by an insurance policy issued by Royal Indemnity Company. The proceeds from the sale of the student loans were in turn used to fund the tuition loans for the students with the truck driving schools. Once several million dollars of loans had been acquired, SFC would obtain a policy of credit insurance covering those loans, from an A rated insurer, and on the strength of that credit insurance SFC would "securitize" the loans by transferring them to a special purpose financing vehicle, a trust, which would sell trust certificates to qualified institutional investors (such as Citi, Pru, Morgan Stanley Prudential Insurance Company, JC Penney Life Insurance Company, ING, and the like). Naturally, there was a spread between the interest rates payable on the student loans, which might be as high as 18-20%, and the rates payable on the trust certificates, which might be in the area of 8-10%. Also, there was by design an overcollateralization of the trusts: a student loan balance of $15 million might stand behind a securitization trust of $10 million in trust certificates. And, there were through various "reserve" accounts funded by the difference between the face amount of the loans purchased from a school, and the amounts actually paid to the school on account of those loans; depending on the credit score of the student, as determined by SFC, the school might be required to suffer anywhere from a 20% to a 50% holdback on the face amount of the loans acquired by SFC. Through this financing mechanism, supported by credit insurance obtained from Royal Sun Alliance and MBIA, SFC acquired student loans in the face amount of many hundreds of millions, and sold trust certificates in the approximate amount of $500 million. Pepper represented SFC in connection with its relations with its warehouse lenders, its credit insurers, and ultimately its special purpose financing entities and their trust certificates.

Unfortunately, SFC appears in hindsight to have been something akin to a Ponzi scheme. SFC apparently routinely and regularly made use of "reserve" accounts designed to help its borrowers over a temporary rough spot while they obtained employment after completing their course of study, to disguise each and every delinquency of 90 days or more, in order to prevent those loans from falling into default which would trigger a claim under the credit insurance and a concomitant obligation to pay 100% of the then outstanding loan balance to the trustee for the certificate holders, and through it to the certificate holders. By hiding the true default rates in this fashion, SFC was able to continue to obtain warehouse financing, credit insurance, and the sale of trust certificates. The only way SFC was able to continue this practice, however, was by accepting more and more student loans, requiring more and more financing, until the scheme collapsed

Because SFC was wholly owned by one individual, Mr. Andrew Yao, there were no public financials available. Mr. Yao's "modus operandi" was to keep information available

PEPPER202462

only to those with a "need to know." SFC made its financial statements and its data on each securitization pool's performance available to its lenders, its credit insurers, and the purchasers of trust certificates, but not to Pepper Hamilton's attorneys.

By the spring of 2002, SFC's credit insurers and warehouse lender were asking SFC why it was that SFC's reports on individual loan status showed ~~hundreds~~thousands of loans in the category of 60 to 90 days delinquency, but none over 90 days, which would have put them into default. In meetings attended by representatives of those credit specialists as well as Pepper attorneys, SFC representatives (reporting to, but not including, Mr. Yao) responded that this was a function of the fact that SFC's borrowers were primarily long haul truckers, who would typically be on the road for a month or two at a time, and would catch up with their bills after completing their tour. This explanation satisfied the credit specialists, and the Pepper attorneys thus saw no reason to challenge it. In fact, that explanation was not true. The real explanation was that SFC was misusing reserve account monies to disguise default rates. When that was revealed, Pepper insisted that this information be shared with all concerned, including investment bankers, warehouse lenders, credit insurers, and investors. We were assured by Mr. Yao that this would be done. We also insisted that as a condition of our continuing to wo~~t~~rk with Mr. Yao as he tried to restructure his company, the individual officers who had been responsible for the fabricated descriptions be isolated from any communications with potential investors, and Mr. Yao assured us that this would be done as well. Unfortunately, within a matter of weeks, we learned that those same individuals were continuing to make presentations to potential investors, and so we withdrew from any further representation of SFC. An involuntary petition in bankruptcy was filed within two months, and that was converted to a liquidation proceeding within another few months.

The liquidating trustee has threatened a claim against Pepper based on its supposed duty to have discovered SFC's misuse of reserve account monies, and to have prevented SFC from continuing that misuse, as a result of which SFC acquired more and more debt which it was unable to repay. That claim is threatened to be in the vicinity of the total debt of SFC's special purpose subsidiaries, which approximates $500 million.

We believe that we have several meritorious defenses available to the firm, both on the facts and the law. We know of no legal requirement that an attorney be able to uncover a fraud which escaped discovery by sophisticated credit specialists, especially when those specialists had far more information about the situation available to them than was available to the attorneys. Pepper and its attorney primarily responsible for SFC, far from being complicit in SFC's fraud, were in fact victims of that fraud. When thrown into bankruptcy, SFC owed Pepper more than $500,000 for services performed, and SFC owed family trusts which benefited, in part, the Pepper attorney, Mr. Roderick Gagné, approximately $7 million (please be aware that these trusts were managed not by Mr. Gagné <u>(although he was a trustee)</u>, but by his uncle, a sophisticated commercial lawyer and longstanding business associate of Mr. Yao, who, like Mr. Gagné, had no idea that Mr. Yao was manipulating the reserve accounts of SFC). <u>Moreover, we have waivers of the conflict in our files.</u> Indeed, it was Pepper's insistence on full disclosure, upon learning of SFC's misuse of reserve accounts, which forestalled any further fraud and prevented any worsening of SFC's debt burden. Pepper and Mr. Gagné both suffered losses as a consequence, and so both were victims, not co-conspirators.

Although we believe Pepper and Mr. Gagné will ultimately be vindicated, we expect that the process of obtaining that result will incur large defense expenses, both for counsel and for expert witnesses. Our deductible applicable to that claim is $500,000, but I expect defense costs will reach into the range of $5 million, assuming the claim is prosecuted by aggressive and well-funded attorneys.

Please do not hesitate to call me if the foregoing description raises any questions, or if you would like any additional details.

PEPPER202464

Document comparison done by DeltaView on Wednesday, September 22, 2004 4:38:56 PM

| Input | |
|---|---|
| Document 1 | pcdocs://phlegal/1636261/1 |
| Document 2 | pcdocs://phlegal/1636261/2 |
| Rendering set | PH Standard |

| Legend | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics | Count |
|---|---|
| Insertions | 10 |
| Deletions | 6 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 16 |

PEPPER202465