# Exhibit 41

# MEMORANDUM

**PERSONAL AND CONFIDENTIAL**                    **DRAFT**

**TO:**     Chub Wilcox

**FROM:**   W. Roderick Gagné

**DATE:**   May 15, 2002

**RE:**     Representation of Student Finance Corporation

---

This memorandum is intended to set forth in writing my recollection of events pertaining to the representation of Student Finance Corporation ("SFC"). It is not intended to encompass our entire representation, but is limited to only a few of the events pertaining to our withdrawal.

Pepper Hamilton LLP ("Pepper") made a decision to withdraw from representation of Student Finance Corporation because executives at Student Finance Corporation made material misrepresentations of fact to Pepper and outside investors. For example, I personally witnessed Gary Hawthorne and Perry Turnbull make statements to investors, underwriters and the Royal Indemnity Company which later proved to be false. In two meetings, one in the Spring of 2001 with Royal Indemnity and another in a meeting with Smith Barney, Gary Hawthorne and Perry Turnbull were directly asked why almost 60% of the portfolio of student loans were 60 days delinquent but never went into default (90 days delinquent). In each instance, Perry and Gary responded that the reason was the manner in which truck drivers made payments. They would go on long road trips and would pay in advance. Under the simple interest reporting method employed by SFC, an advance payment is treated as a prepayment of principal. Thus, if a truck driver was to be on the road for two months

PHLEGAL: #1259425 v1 (QZS101!.DOC)

PEPPER 047281

**CONFIDENTIAL**



and the loan would not go into default since the second payment would be treated as a prepayment on principal. Therefore the loan would go into delinquency after the second payment date until payments were collected. If collection activity was successful, the truck drivers would pay and the loan would not go into default. SFC proposed remedying the situation by changing the method in which they applied loan payments by allowing the students to have an option to apply payments on a forward-looking basis. In fact, what SFC was doing was applying reserves from the schools to make the delinquent student payments so that the loans never went into default. Gary Hawthorne and Perry Turnbull implemented this policy and therefore knew of this misrepresentation.

In the Fall of 2000, Perry Turnbull had asked Pepper Hamilton to draft school agreements which were shorter and simpler than the ones we had previously drafted for them and that implemented the reserve account. At that time, I specifically stated to Perry Turnbull that I did not think it was prudent to change the school agreements. I also felt that shortening the Agreements was not a good idea because it would eliminate many of the typical boilerplate language which is necessary. I also felt that the institution of the forbearance accounts to make the monthly payments would be misleading to investors and rating agencies since the payments potentially skewed all of the statistical data since it would apply payments from the schools on behalf of the students, which would make the loans to perform better than they in fact did. I strongly objected to any changes in the agreements at which point Perry Turnbull, presumably with the consent of Andrew Yao, shifted the project to Fox Rothschild. Fox Rothschild drew up the agreements and SFC implemented the new school agreements at some point in time without our knowledge or consent. We were never informed that they repapered the Agreements until well after the fact. We were given the agreements to review in connection with certain issues

that arose on perfecting security interests in the loans in August of 2001. We noticed that there were several deficiencies which we attempted to address. We restated that we took no responsibility for the agreements and sent an email stating that the agreements were poorly drafted, caused confusion possibly in accountable ??????, and that Pepper would not be responsible for any issues arising out of the school agreements. In essence, we told them that the forbearance account and the school agreements were wholly inadequate and poor documents that ultimately would end up in litigation.

Perry Turnbull had direct communication with the Wilmington office, in particular, Rick Eckman and Darsie Malcolm. Perry sometime in 2001 requested that the student loan agreements and retail installment education plan agreements be revised to reflect the forbearance accounts. I personally was not aware of this change until after the Wilmington office made the changes. We again stated that we thought that this was a bad program. These agreements were given to prospective investors. When we inquired as to the use of the forbearance accounts from SFC, they informed us that forbearance payments were only made on behalf of students in very limited instances as set forth in the SFC policy manuals which were distributed to investors. In fact, this was not true which we discovered on March 12, 2002. Forbearance payments were made on behalf of any delinquent student and were automatically pulled from the forbearance accounts. This widespread use of the forbearance payments completely eliminated defaults under the loans until such time as SFC's funding ceased. In addition, we discovered in March of 2002 that SFC also included forbearance payments in its static pools data which it distributed to the rating agencies, Royal, MBIA and others. The static pool data was manipulated to lessen the number of defaults. We did not discover how SFC was applying the forbearance accounts until about March 12, 2002 when this information was

CONFIDENTIAL

revealed to us by Andrew Yao. Andrew Yao informed us at that time that he was going to make disclosure to Royal Indemnity Company, the insurer of the loans, MBIA, the insurer of the notes and certificates, to the investors, Moody's Rating Agency, Fitch Rating Agency, all of the investors, PNC Bank and Wilmington Trust Company. In fact, Mr. Yao only advised Royal Indemnity Company and PNC Bank. He stopped his disclosures at that point in time. He was advised by PNC not to continue the disclosure process until such time as he had a plan from Royal as to whether or not they were going to make payments. We admonished him that he should and must continue to make disclosure to all parties involved of the misuse of the forbearance accounts and their existence.

In addition, we advised SFC that they should never originate loans unless they had liquidity to pay for the loans. We subsequently learned that SFC did originate loans without any liquidity for those loans in August of 2001, and we advised them in writing that this was a criminal act and that they should never do it again. Despite our warnings to the contrary, they did it again in February of 2002 which we again discovered in March of 2002 from Andrew Yao.

WRG/bdw

CONFIDENTIAL